```
 1        IN THE UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF NORTH CAROLINA

 3               WESTERN DIVISION

 4

 5   -------------------------X

 6   UNITED STATES OF AMERICA,   :

 7        Petitioner,            :

 8   v.                          : CASE NO. 5:10-HC-2009-FL

 9   DANIEL KING,                :

10        Respondent.            :

11   -------------------------X

12

13

14

15               BENCH TRIAL (VOLUME I)

16               OCTOBER 17, 2011

17        HONORABLE JAMES E. GATES, PRESIDING

18

19

20

21

22

23        Reported by:  Glynde M. Jones

24                      Court Reporter

25                      Notary Public
```

**ORIGINAL**

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208   (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 1 of 221

```
 1    APPEARANCES:

 2         FOR THE GOVERNMENT:

 3              EDWARD D. GRAY, Esq.

 4              US Attorney's Office

 5              Room 800

 6              310 New Bern Avenue

 7              Raleigh, North Carolina  27601

 8              (edward.gray@usdoj.gov)

 9         AND

10              MICHAEL E. LOCKRIDGE, Esq.

11              Federal Bureau of Prisons, Legal Center

12              PO Box 1600

13              Old Highway 75

14              Butner, North Carolina  27509

15              (mlockridge@bop.gov)

16

17         FOR THE RESPONDENT:

18              JOSEPH L. BELL, JR, Esq.

19              Batts, Batts & Bell, LLP

20              103 Candlewood Road

21              Rocky Mount, North Carolina  27804

22              (jbelljr@battslaw.com)

23

24

25
```

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 2 of 221

1                          CONTENTS

2    THE WITNESS: GARY ZINIK, Ph.D          EXAMINATION

3            BY MR. LOCKRIDGE              14, 188, 199

4            BY MR. BELL                      134, 194

5    THE WITNESS: DANIEL KING               EXAMINATION

6            BY MR. GRAY                          202

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889

1            THE COURT: Good morning, folks.

2            AUDIENCE: Good morning, Your Honor.

3            THE COURT: We're here this morning for the

4    commitment hearing in the case United States of America

5    versus Daniel H. King. Before we get started with the

6    hearing itself -- solicit any housekeeping comments from

7    counsel, I had a few of my own. I can tell you that my

8    goal will be to after today start court at nine, take an

9    anticipated hour lunch break at noon and work until

10   somewhere between 4:30 and five with a morning break, of

11   course, and an afternoon break of 10 to 15 minutes or

12   so. I notice that the exhibit notebooks have been

13   submitted, and I do appreciate that.

14            I wanted to inquire of counsel if they wished

15   witnesses to be excluded pursuant to Evidence Rule 615

16   during this hearing. Mr. Bell, do you have any thoughts

17   on that?

18            MR. BELL: Your Honor, we do not have any

19   desire for the witnesses to be excluded. It will be fine

20   if they stay in the courtroom.

21            THE COURT: Mr. Lockridge?

22            MR. LOCKRIDGE: No, Your Honor. Our expert

23   witnesses are available to be here.

24            THE COURT: Okay. That's fine. Are there any

25   housekeeping issues that counsel would like to take up?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 4 of 221

1          MR. BELL: Your Honor, we had over the last

2     couple of days, end of last week and over the weekend

3     made a determination that there was some additional

4     exhibits that needed to be put on the pretrial order --

5     the one that you signed.

6          THE COURT: That's fine.

7          MR. BELL: Most of them are mine, but there

8     were a couple of actual pages that had been left out of

9     one pretrial order that the Government needed to add in.

10    I prepared a final pretrial order for The Court. If you

11    wouldn't mind, I'll hand it you, and the Government is

12    in concurrence with me doing that.

13         THE COURT: That's fine. Is it possible for

14    you to point out the difference?

15         MR. BELL: On the Government's side, I believe

16    it's exhibit -- help me out mere.

17         MR. LOCKRIDGE: Yes, Your Honor, I can do

18    that.  Exhibit 23, there was a clerical issue and we

19    added Bates stamp page 1956. There was one page --

20    Exhibit 23 that was blank, so we added a page that had

21    the actual information on that document.

22         THE COURT: That's Exhibit 23 you're referring

23    to?

24         MR. LOCKRIDGE: Yes, Your Honor. That is in

25    the trial notebook as well. And then I believe at

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 5 of 221

1    Exhibit 34, Your Honor we added two documents to Exhibit

2    34.

3              THE COURT: I see. Yes. I see that. Are those

4    the only changes for the Government?

5              MR. LOCKRIDGE: I believe so, Your Honor,

6    depending on which -- possibly Exhibit Five would

7    contain a date correction. It's the same exhibit.

8              THE COURT: Okay.

9              MR. LOCKRIDGE: Just a clerical change on the

10   date possibly. That's our only changes, Your Honor.

11             MR. BELL: And, Your Honor, in our case, we

12   added Exhibit 16 which is an article by Thomas K.

13   Zander, and there's a hearsay objection to that

14   article. Exhibit 17, another article by Jack Vognsen and

15   Amy Phenix.  There is a hearsay objection to that.

16   Article, 18 by Theodore Donaldson and Brian Abbott.

17   The Government also has a hearsay objection to that.

18   Article 19 is a book, Sex Offenders - Identification,

19   Risk Assessment, Treatment, and Legal Issues, edited by

20   Fabian Saleh and others. There's also a hearsay

21   objection on that exhibit.

22             Exhibit 20 is a letter from Marlene King to

23   Nicole Weaver dated March 1st of 2010. There is no

24   objection to that. Exhibit 21, a Coalinga State Hospital

25   Civil detainee patient rights document, there's no

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 6 of 221

1  objection to that. And, finally, Exhibit 22, the APA

2  Ethical Principals of Psychologists and Code of Conduct,

3  and there is no objection to that exhibit. That would be

4  the extent of the changes for the Respondent, Your

5  Honor.

6          THE COURT: Okay. I've executed this amended

7  proposed joint pretrial order and I will direct that it

8  be filed, although for the time being, I'm going to hang

9  on to it so that I can refer to it. Mr. Gray?

10          MR. GRAY: Your Honor, if The Court is willing

11  to entertain our thoughts on the hearsay objection that

12  we made to the additional exhibits, it's our

13  understanding under 803(18) that these documents,

14  although relied upon by the experts in the course of

15  making their evaluations, are not admissible as

16  substantive exhibits.  We understand that The Court in

17  its gatekeeping function can properly weigh this

18  evidence, and we more or less made sure that we want to

19  make -- preserve our hearsay objection for the record.

20  However, we do understand that in terms of overall

21  weight and consideration, that's something that The

22  Court will take -- well, can take judicial notice on.

23          THE COURT: Very good, sir. Mr. Bell?

24          MR. BELL: Your Honor, our response would be

25  we would ask The Court to just reserve the ruling on

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 7 of 221

1    those objections until the documents are actually used

2    so that The Court can make the proper determination on

3    the use and weight of the documents at that time.

4              THE COURT: Very good. I am reserving my

5    ruling, but I appreciate the comments by counsel. Any

6    further housekeeping matters?

7              MR. LOCKRIDGE: Just one, Your Honor. Pursuant

8    to that pretrial order, Your Honor, both parties have

9    stipulated to the admissibility of Government's Exhibit

10   One through 57, so we would offer those into evidence.

11             THE COURT: Any objection, Mr. Bell, to any of

12   those exhibits?

13             MR. BELL: No, Your Honor.

14             THE COURT: Those exhibits will be admitted.

15             MR. BELL: And, Your Honor, with regard to our

16   exhibits, we would ask that the ones that there are no

17   objections to it be admitted into the record, and I can

18   specify those. That would be Exhibits One through 15 and

19   then Exhibits 20 through 22.

20             THE COURT: Mr. Lockridge, any objection to

21   those exhibits?

22             MR. LOCKRIDGE: Well, only with respect to

23   Exhibits Six and Seven, Your Honor. Those are

24   depositions, so we'd object to those as hearsay.

25             MR. BELL: I'm sorry, Your Honor. I missed

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 8 of 221

1  those objections. Again, we would just ask The Court to

2  reserve ruling on those, but the other exhibits, we

3  would ask that they be admitted at this time.

4           THE COURT: One through Five, then Eight

5  through 15 and 20 through 22. Did I get those numbers

6  right? That is, Respondent is moving for admissions of

7  Exhibits One through Five, Eight through 15 and 20

8  through 22?

9           MR. BELL: That is correct, Your Honor.

10          THE COURT: No objection, Mr. Lockridge?

11          MR. LOCKRIDGE: No, Your Honor.

12          THE COURT: Okay. Very good. I'll admit those

13 exhibits then and reserve ruling on the objection to the

14 others. Gentlemen, any further housekeeping type

15 matters?

16          MR. LOCKRIDGE: No, Your Honor. We'd just like

17 to give a brief opening.

18          THE COURT: Let me -- before we get -- and

19 I'll certainly allow both sides the opportunity to

20 provide a brief opening. I just want -- I know Mr. King

21 has, I'm sure, gone over this in some detail with his

22 counsel, but, Mr. King, I just want to give you a brief

23 advice of the rights that you have in connection with

24 this hearing.

25          You have the right to be represented by

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 9 of 221

1  counsel, and if you're financially unable to obtain

2  adequate representation, then counsel will be appointed

3  for you pursuant to Section 3006A, Title 18. In fact,

4  Mr. Bell has been appointed as your counsel, as you

5  know.

6           You have the right to testify at this

7  proceeding if you care to do so. In addition, you may

8  present evidence. You may subpoena witnesses on your

9  behalf. That is, you have the right to have The Court

10 issue orders directing witnesses to come to trial -- to

11 come to this hearing, I should say, so that they may

12 testify on your behalf, and you have the right to

13 confront and cross-examine witnesses who appear at the

14 hearing.

15          Very good. Why don't we begin then with

16 opening statements? Mr. Lockridge?

17          MR. LOCKRIDGE: Thank you, Your Honor. May it

18 please The Court, Counsel, Mr. King has been in the

19 custody of the Bureau of Prisons pending a

20 determination, as you know, as to whether he meets the

21 criteria as a sexually dangerous person under 4248.

22 During this evidentiary hearing, the Government will put

23 forth testimony to show by clear and convincing evidence

24 that Mr. King is, indeed, a sexually dangerous person.

25          Now, the Government will put on evidence by

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 10 of 221

1   Doctor Gary Zinik who is a psychologist who evaluated

2   Mr. King for purposes of 4248. Also, you'll hear

3   testimony from Doctor Dawn Graney, another psychologist

4   who works for the Bureau of Prisons who evaluated Mr.

5   King for -- under the statute. You'll also have the

6   opportunity to hear from Mr. King himself, his testimony

7   and other evidence that the Government will put on, and

8   at the conclusion of all that evidence, the Government

9   proffers that will show that Mr. King is a sexually

10  dangerous person, number one, that he's engaged or

11  attempted to engage in sexually violent conduct or child

12  molestation, that he suffers from serious mental

13  illness, abnormality or disorder and that he will have

14  serious difficulty refraining from sexually violent

15  conduct or child molestation if released.

16          Thank you, your Honor.

17          THE COURT: Mr. Bell?

18          MR. BELL: Thank you, Your Honor.  Mr. King is

19  a 53 year old divorced individual. The evidence will

20  show that he has a significant criminal history, that he

21  spent the last 23 years in the custody of the Bureau of

22  Prisons. The evidence will show that his sentence was to

23  expire on January 20, 2010, and the evidence will show

24  that he was certified as a potentially -- precertified

25  as a sexually dangerous person one day before his

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 11 of 221

1  release, expected release from the Bureau of Prisons.

2          The evidence will show that other than a

3  charge of indecent exposure in 1974 as a 15 year old,

4  he's not been charged or convicted of a statutorily

5  defined sex offense. The evidence will slow that he has

6  not been a choirboy, he has been in serious trouble in

7  the past, and he's also been involved in some

8  infractions and issues while he's been in the Bureau of

9  Prisons. The evidence would show that.

10          Now, you'll hear -- as Mr. Lockridge

11  indicated, you will hear from two experts for the

12  Government, Doctor Zinik and Doctor Graney and then you

13  will hear from one expert for the Respondent, a Doctor

14  Fabian Saleh. The evidence would show that Doctor Zinik

15  diagnosed Mr. King with a paraphilia not otherwise

16  specified, forced sex with nonconsenting females, also

17  known as paraphilic coercive disorder, exhibitionism,

18  polysubstance abuse and antisocial personality disorder

19  and that he is a sexually dangerous person under the

20  act.

21          The second Government expert, Doctor Graney,

22  will present evidence or an opinion that Mr. King

23  suffers from paraphilia not otherwise specified,

24  nonconsent, exhibitionism, alcohol abuse, opiate abuse

25  and antisocial personality disorder, and she will opine

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 12 of 221

1  that he is a sexually dangerous person under the act.

2          However, Doctor Saleh, the evidence will show,

3  is a Board certified psychiatrist, and he will give an

4  opinion that Mr. King only suffers from an antisocial

5  personality disorder and that he presents with a history

6  of heroin, marijuana, cocaine, methamphetamine and

7  alcohol abuse.

8          It's our position that at the close of all

9  the evidence in this hearing based upon the testimony

10  and the submissions of the parties that The Court will

11  conclude that the Government has failed to establish by

12  clear and convincing evidence that Mr. King is a

13  sexually dangerous person under the act. Thank you, Your

14  Honor.

15          THE COURT: Thank you, sir. Mr. Lockridge,

16  I'll be happy to hear any evidence the Government cares

17  to present.

18          MR. LOCKRIDGE: Thank you, Your Honor. The

19  government calls Doctor Gary Zinik.

20          GARY ZINIK, having been duly sworn, was

21  examined and testified as follows:

22          (Whereupon off the record.)

23          MR. BELL: Your Honor, if I might, before we

24  get started, I think Mr. Ross had something he wanted

25  The Court to hear, and I apologize for not bringing it

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 13 of 221

1  up sooner. I just remembered -- just something brief

2  that I think he wanted to address The Court in another

3  case. I'm sorry.

4      (Whereupon off the record.)

5          THE COURT: Mr. Lockridge?

6          COURT CLERK: Sir, please state your name for

7  the record.

8          THE WITNESS: My name is Gary Zinik.

9          THE COURT: Doctor Zinik, let me just comment

10  briefly. If there happens to be an objection to a

11  question that's asked of you during your testimony, I'd

12  request that you wait until The Court issues a ruling on

13  that objection and instructs you to proceed before

14  answering. And, of course, that's -- I'm sure you're

15  aware of this, but after Mr. Lockridge asks you

16  questions, I'm sure Mr. Bell is going to have some

17  questions for you as well.

18          THE WITNESS: Yes, Your Honor.

19          THE COURT: Very good. Mr. Lockridge?

20          MR. LOCKRIDGE: Thank you, Your Honor.

21      EXAMINATION

22      BY MR. LOCKRIDGE:

23  Q    How are you employed, Doctor Zinik?

24  A    I'm a licensed psychologist in private practice.

25  Q    All right. And could you please refer to

Huseby, Inc.        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 14 of 221

1    Government's Exhibit Six?  It's in the white binder in

2    front of you.

3    A      Okay.

4    Q      What is that?

5    A      This is a copy of my resume.

6    Q      Is that a current copy?

7    A      Yes, it is.

8    Q      And does it fairly and accurately depict your

9    education, employment, training and credentials as they

10   relate to your employment as a psychologist?

11   A      Yes, it does.

12   Q      Doctor Zinik, could you please just go through

13   your educational background beginning with your

14   undergraduate degree, please?

15   A      Okay. I have an undergraduate degree in

16   psychology from Stanford University that I got in 1976.

17   I have master's degree in counseling and consulting

18   psychology from Harvard University, received in 1979,

19   and my Ph.D in counseling, psychology and education was

20   from the University of California-Santa Barbara that I

21   received in 1983.

22   Q      All right. And what professional licenses, if

23   any, do you currently hold?

24   A      I'm a licensed psychologist in California and I

25   also have a provisional license in Washington State to

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 15 of 221

1   practice psychology. Those are my licenses.

2   Q      All right. And how long have you been a licensed

3   psychologist?

4   A      Since 1987 in California and 2004 in Washington

5   State.

6   Q      Do you specialize in any particular area of

7   psychology?

8   A      I do. I've been specializing in forensic

9   psychology since I was licensed in the late 1980s, and

10  in particular, my specialty is risk assessment of sexual

11  offenders. I do -- I've been doing evaluations and some

12  treatment of violent offenders since I was licensed, and

13  that's really primarily what I do.

14  Q      Could you just briefly explain what risk

15  assessment of sex offenders means?

16  A      Okay. Well, risk assessment of sex offenders is

17  a type of psychological evaluation in which I do a

18  thorough case history. You know, these are offenders who

19  were referred to me by -- in -- several sources.

20         I'm on the panel of SVP evaluators in California

21  State, and I've been doing that since the law took

22  effect in 1996, and so I'm sent the cases from the

23  Department of Mental Health. And these are offenders who

24  are currently in prison who are approaching release and

25  completion of their sentence, and they have met certain

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 16 of 221

1  criteria and have convictions for sexually violent

2  crimes in their history, and I am asked to do risk

3  assessment evaluations which involves determining

4  whether they meet certain legal criteria as a sexually

5  violent predator and evaluating the probability that

6  they may reoffend in the future and commit future

7  sexually violent crimes.

8          I also get referrals from the Public Defender's

9  office in Ventura County, California, my home county.

10 I've been working for them for -- you know, since I was

11 licensed in the late 1980s, and private attorneys, some

12 from the district attorney's office, and I've been

13 working for the US Attorney's office for about a year

14 now. I started last October, 2010.

15 Q      All right. Earlier I believe you mentioned

16 California Department of Mental Health. Can you explain

17 that relationship? The work you do for them, how does

18 that work?

19 A      I'm a contract -- independent contract evaluator

20 on the panel of psychologists that is contracted with

21 the State Department of Mental Health. I've been doing

22 that since 1996 and we -- you know, I had to apply and

23 submit credentials to be accepted as a member of the

24 panel, and as a member of the panel, I am referred these

25 SVP evaluations.

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 17 of 221

1          We are expected to be a neutral, unbiased

2    evaluator. In other words, we're not working for either

3    the defense or the prosecution, but we're employed by

4    the Department of Mental Health, and we get referred a

5    case or sent a file, a digital file which contains all

6    the criminal records and clinical records and so on on a

7    case, and I review all those materials and then I

8    schedule an interview to visit the inmate who's in one

9    of the State prisons somewhere around California and I

10   travel to the prison, I review the prison files and the

11   mental health files and then interview the inmate and

12   then go home and write up a report to determine whether

13   they meet the legal criteria as a sexually violent

14   predator.

15   Q       And you mentioned the acronym SVP. You're

16   talking about sexually violent predator?

17   A       Yes.

18   Q       Is that the State term for --

19   A       Yes, it is, in California, yes.

20   Q       Okay. So that was California Department of

21   Mental Health. You also worked for the -- you do

22   contract work for the Washington State Joint Forensic --

23   A       Yes, I have since 2004 and I have a couple

24   ongoing cases that are still in process for the -- it's

25   through the Department of Health and Social services,

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 18 of 221

1  but I don't do much work up there since I started here

2  at the US Attorney's Office. I've, frankly, been so

3  busy, I haven't taken new cases up there.

4  Q       How much of your practice pertains to issues

5  related to sex offenders percentage wise?

6  A       Well, I would say -- question was how much of my

7  practice involves working with sex offenders? I would

8  say 95 percent. I would say probably three fourths of

9  that involves forensic evaluations, and then I do some

10 treatment of private clients in my private practice who

11 are typically sex offenders who are on probation for

12 lower risk sex offenses and are required to go to

13 treatment as a condition of their probation.

14 Q       And approximately how many -- if you can

15 estimate, how many sex offenders have you evaluated for

16 civil commitment purposes in any jurisdiction?

17 A       I don't have an exact number, but I'm going to

18 guess around 500.

19 Q       For what jurisdiction? Did you explain what

20 those --

21 A       California, Washington State, US Attorney's

22 office and private clients and Public Defender's office

23 in Ventura County.

24 Q       I know you mentioned some of 'em were

25 independent evaluations. Approximately what percentage

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 19 of 221

1   of those were for the individual, the government and

2   then independently?

3   A        Approximately how many were for the government

4   and how many were --

5   Q        For the respondent.

6   A        For the respondent? Okay. Well, the majority --

7   well, again, the evaluations that come from the State

8   Department of Mental Health were not from either side,

9   so to speak, but -- if you ask me what was my percentage

10  of cases in which I found the offender to meet the

11  criteria under California law, I would say approximately

12  I think 35 to 40 percent. Again, I don't have an exact

13  number, and so but most of the testifying I've done has

14  been for the prosecution, but I have certainly -- I have

15  evaluated, again, I'm going to guess around 50 percent

16  evaluations for the respondent in SVP type cases, and

17  I've testified once for the defense.

18  Q        All right. You mentioned that you opine

19  approximately 35 to 40 percent of your time in

20  California that they've met the criteria for civil

21  commitment?

22  A        I think that's correct.

23  Q        Does that mean you opine approximately 55 to 60

24  percent of the time --

25  A        Yes.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 20 of 221

1    Q        -- that they didn't meet the criteria?

2    A        Yes.

3    Q        And you previously testified in Federal court

4    with regard to the 4248 law?

5    A        No, I haven't. This is my first time.

6    Q        And is there a reason that you are aware of that

7    most of your testimony has been for the government?

8    A        Well, when -- I think it's because for the cases

9    in which I find the offender does not meet the criteria,

10   at least in California as a SVP, most of those cases do

11   not go forward to court, so I'm not called to testify

12   because there's no court proceeding.

13   Q        Very good. Doctor Zinik, turning to a different

14   part of your resume there, what, if any, teaching or

15   presentation experience related to the topic of sex

16   offending do you have?

17   A        Teaching and professional experience? Well, I

18   presented at some professional conferences, including

19   the ATSA conference, the Association for the Treatment

20   of Sexual Abusers. I presented last October at that

21   conference. I've also taught training and orientation to

22   law enforcement agencies related to sex offenders and

23   what we need to know about sex offenders. I have -- in

24   the past -- I used to live in Santa Barbara County and I

25   did a fair amount of training with -- there's a local

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 21 of 221

1   organization that provides treatment and supervision of

2   sex offenders.

3         I've worked with adolescents who have been

4   convicted, juvenile sex offenders who were in

5   residential treatment. I was a consulting psychologist

6   and provided treatment for those offenders, and I also

7   had some part-time jobs in years back teaching human

8   sexuality at the college level and various other

9   of teaching and training in human sexuality.

10  Q     You mentioned that you're affiliated in some

11  capacity with ATSA as you phrased it. Are you a member

12  of that organization?

13  A     I'm a member. I'm a clinical member of ATSA,

14  the Association for the Treatment of Sexual Abusers --

15  National and international Society of professional

16  researchers, clinicians, treatment providers, law

17  enforcement association who specialize in the area of

18  supervising and treating, studying sex offenders.

19  Q     Are you a member of any other professional

20  organization pertaining to the topic of sex offending?

21  A     I'm a member of California Coalition on Sex

22  Offenders, State organization.

23  Q     Are you a member of the American

24  Psychological --

25  A     Yes, I am.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 22 of 221

1   Q      Turn to the last page of your CV or resume. Is

2   it fair to say you attended numerous seminars and

3   training events?

4   A      Yes. Since I joined the panel in California in

5   1996, I have participated regularly in training related

6   to sex offender evaluations and risk assessments. This

7   ATSA organization I mentioned, they have annual

8   conferences every year. I go to those, not every year,

9   but just about, and, you know, those are three or four

10   days conferences that present all the latest research

11   and information on sex offenders. And I've also been

12   fortunate to be at a -- as a member of the California

13   Department of Mental Health SVP panel, they provide us

14   with regular training a couple times a year and bring in

15   experts from around the country and around the world who

16   train us in the latest risk assessment techniques.

17   Q      Are you familiar with the Federal civil

18   commitment law?

19   A      Yes, I am.

20   Q      How did you become familiar with that?

21   A      I became familiar after I received a call from

22   Rudy Renfer. He got my name from another member on the

23   panel, Doctor Amy Phenix, and I was asked if I was

24   interested in doing this work and I accepted gratefully,

25   and so I studied the statute and began doing the

Huseby, Inc.     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 23 of 221

1    sexually dangerous person evaluations under 4247 in last

2    October, 2010.

3    Q       And approximately how persons have you conducted

4    evaluations on other than Mr. King in this case?

5    A       Yes, I have.

6    Q       Approximately how many have you conducted?

7    A       I think about 15.

8    Q       Doctor Zinik, have you authored any publications

9    on the topic of sex offending in general?

10   A       I do have a publication that's in press. It's a

11   book chapter that I wrote on the -- the topic is

12   paraphilic coercive disorder and the psychology of rape,

13   and it's going to be published in a book. I'm just not

14   sure when. Possibly by the end of this year or next

15   year.

16   Q       How does that publication relate to risk

17   assessment or evaluation of --

18   A       Well, I think it has some direct bearing. In

19   fact, it's related in many ways to this case because

20   paraphilic coercive disorder is a common diagnosis that

21   is used in sexually violent predator and sexually

22   dangerous person cases to identify these high risk

23   offenders who commit serial sex offenses against

24   multiple victims, sexual assaults typically involving

25   adolescent or adult victims that involves coercion and

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 24 of 221

1  violence.

2          And the term that is -- I don't know how -- I'm

3  sure at some point we'll discuss further the history of

4  the term paraphilic coercive disorder. It's not

5  currently a diagnosis listed in the Diagnostic and

6  Statistical Manual, but it is -- it's really synonymous

7  with the paraphilia NOS, nonconsent diagnosis that is

8  applicable in Mr. King's case, and this is, again, a

9  common diagnosis. You hear the term paraphilia NOS,

10 nonconsent, rape paraphilia, paraphilia forced sex with

11 nonconsenting victims, paraphilic coercive disorder.

12 These terms are synonymous and, again, they describe the

13 serial sex offender who is aroused by nonconsent of the

14 victim and the erotic response to the power and

15 dominance and control over the nonconsenting victim.

16          So this book chapter I wrote is a history of the

17 whole thing and all about, you know, how -- actually

18 been -- to the DSM manual a couple times and all the

19 politics around it is very interesting -- political hot

20 potato, so to speak. It has been for several decades. So

21 that's the subject of my book chapter.

22 Q        Thank you.

23 A        Could I add, if you don't mind, please, I have

24 conducted a research study on the nature of paraphilia

25 coercive disorder. It was a survey of experts around the

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 25 of 221

1    country who do sex offender evaluations and risk

2    assessments as well as treatment providers and so on. We

3    did an -- collection of respondents who -- and so I'm

4    working on compiling a checklist.  It's kind of a

5    diagnostic checklist to identify this particular

6    paraphilic disorder and kind of standardize the

7    diagnostic criteria. That's a work in progress, however,

8    but it is also reviewed in the book chapter that I

9    wrote.

10   Q      All right. Thank you, Doctor.

11          MR. LOCKRIDGE: Your Honor, at this time, we

12   would offer Doctor Zinik as an expert in forensic

13   psychology based upon his education, experience,

14   knowledge and skill and training in the field of

15   forensic psychology.              THE COURT: Any

16   objection, Mr. Bell?                    MR. BELL: No

17   objection, Your Honor.

18          THE COURT: Doctor Zinik is so recognized.

19          MR. LOCKRIDGE: Thank you, Your Honor.

20          BY MR. LOCKRIDGE:

21   Q      Doctor Zinik, were you asked by the United

22   States Attorney's office to evaluate the Respondent in

23   this case, Daniel King?

24   A      Yes, I was.

25   Q      What were you asked to do?

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 26 of 221

1    A        I was asked to determine if he qualified as a

2    sexually dangerous person under Title 18 of US Code

3    4247.

4    Q        And was that also as well as 4248?

5    A        Yes.

6    Q        And are you being paid for your evaluation?

7    A        Yes.

8    Q        And does your fee depend on you reaching a

9    particular conclusion?

10   A        No, it does not.

11   Q        Generally what materials did you rely on in your

12   evaluation of Mr. King?

13   A        Well, I was sent a disk of records that

14   contained approximately 2,000 pages of discovery.

15   I reviewed all that material and then I wrote my

16   initial report, and after that, I was told I could

17   interview Mr. King, so I went to the Federal Corrections

18   Institute at Butner and interviewed him and then wrote

19   that additional material and wrote an update report

20   after that.

21   Q        Can you just broadly explain the type of

22   materials that you reviewed as part of your evaluation?

23   A        Sure. The materials were voluminous. They

24   included original -- some original criminal records,

25   police reports, victim reports and so on, charging

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 27 of 221

1  documents, court records, transcripts from his original

2  offense as well as the court proceeding. There were a

3  lot of clinical records from the treatment that he

4  participated in over the years. There were records from

5  his treatment within the Board of Prisons -- with the

6  Board of Prisons psychologists. There were disciplinary

7  records documenting all of his disciplinary violations.

8  There were a number of significant letters that were

9  written by Mr. King both to the Board of Prisons -- and

10 to his ex-wife, Marlene King. There were some e-mails

11 that were exchanged between the two of them. There were

12 some certificates of completion, you know, programs he

13 participated in in the prison. It was really a

14 collection of all of the documentation about his life

15 really since about 1974.

16 Q      And is all the documents and evidence you have

17 reviewed in evaluating Mr. King the type upon which

18 other mental health professionals in your field commonly

19 rely on in evaluating persons to determine criteria for

20 meeting civil commitment?

21 A      Yes.

22 Q      And you mentioned that you interviewed Mr. King.

23 A      Yes, I did.

24 Q      And can you explain where that was, when that

25 happened?

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 28 of 221

1    A        That was up at the prison at Butner in the

2    visiting room. We had a private room and -- sat across

3    the table and I brought my laptop computer with me and

4    took notes, and we interviewed for -- I think it was

5    about three and a half hours. The interview was August

6    1, 2011, three and three fourths hours.

7    Q        Actually, Doctor Zinik, can you refer to Exhibit

8    57 in the white binder in front of you? Would referring

9    to that document on page one refresh your recollection

10   as to the date you interviewed Mr. King?

11   A        Yes.

12   Q        What was that date?

13   A        August 1, 2011.

14   Q        I ask you to look at the first paragraph there.

15   A        Okay. I do see a little mistake, where Mr.

16   King's actually 53 years old, which I listed up above,

17   but in the first sentence, I said he was 52 years old.

18   Q        Okay. I'm asking you about further down in the

19   first paragraph as to the interview date.

20   A        About the interview date?

21   Q        Right.

22   A        Oh, I'm sorry. I was looking at the report date.

23   The interview date was July 26, 2011. I'm sorry.

24   Q        And so you prepared a report of your evaluation

25   of Mr. King?

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 29 of 221

1    A        Yes, I did.

2    Q        And could you please turn to Government Exhibit

3    Five? Is that a forensic evaluation you conducted of Mr.

4    King under the --

5    A        Yes.

6    Q        What's the date of that report?

7    A        October 1, 2010.

8    Q        Within that report, did you render an opinion as

9    to whether Mr. King is a sexually dangerous person under

10   the statute?

11   A        Yes, I did.

12   Q        What is that opinion?

13   A        It was my opinion that Mr. King did engage or

14   attempted to engage in sexually violent conduct or child

15   molestation and that he was sexually dangerous to others

16   because he suffers from a serious mental illness,

17   abnormality or disorder, and as a result of that mental

18   illness, he would have serious difficulty refraining

19   from sexually violent conduct or child molestation if

20   released.

21   Q        Was your opinion based upon a reasonable degree

22   of professional certainty?

23   A        Yes, it was.

24   Q        And you conducted a subsequent evaluation of him

25   as well, correct?

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 30 of 221

1   A       Yes, I did.

2   Q       Could you please turn to Government Exhibit 57

3   that you were looking at earlier? And is that the second

4   forensic evaluation you conducted on Mr. King?

5   A       Yes, it is.

6   Q       And the date of that report is August 1, 2011?

7   A       Yes, it is.

8   Q       Why did you complete a second evaluation of Mr.

9   King?

10  A       Because I was given the opportunity to interview

11  Mr. King and I also was provided some new information,

12  you know, new discovery records.

13  Q       Okay. And within that second report, did you

14  also render an opinion as to his sexual dangerousness

15  under 4248?

16  A       Yes, I did.

17  Q       Is that opinion the same as in your first

18  opinion?

19  A       Yes, it is.

20  Q       Was that opinion also based on a reasonable

21  degree of professional certainty?

22  A       Yes, it was.

23  Q       Earlier you stated -- is the phrase sexually

24  dangerous person, to your understanding, defined under

25  Federal law?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 31 of 221

1    A        Under -- yes, under the code.

2    Q        Okay.

3    A        Yes.

4    Q        And did you use that definition in opining in

5    your reports?

6    A        Yes, I did.

7              MR. LOCKRIDGE: Your Honor, may I approach the

8    easel?                   THE COURT: You may, sir.

9              BY MR. LOCKRIDGE:

10   Q        Doctor Zinik, could you please look at the

11   demonstrative exhibit on the easel?  Do you recognize

12   that?

13   A        Yes, I do.

14   Q        What do you recognize that as?

15   A        That's the Adam Walsh Act, the sexually

16   dangerous person act, and it's the criteria for

17   meeting -- you know, for qualifying as a sexually

18   dangerous person.

19   Q        And I believe you testified earlier that -- as

20   to the first bullet, could you just read that?

21   A        The respondent has engaged in or attempted to

22   engage in sexually violent conduct or child molestation.

23   Q        And your opinion was that he was --

24   A        Yes, he has.

25   Q        And could you read the second bullet, please?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 32 of 221

 1   A        The respondent suffers from a serious mental

 2   illness, abnormality or disorder.

 3   Q        And you testified that he has?

 4   A        Yes, I did.

 5   Q        And the third bullet, please?

 6   A        As a result of which, the respondent would have

 7   serious difficulty in refraining from sexually violent

 8   conduct or child molestation if released. And it is my

 9   opinion that Mr. King meets that criteria.

10   Q        What do you understand looking at the first

11   bullet up there -- and it's also on your screen in front

12   of you, I believe. What do you understand that -- the

13   term sexually violent conduct to mean?

14   A        What I understand that to mean is that the

15   individual has committed acts either charged or

16   uncharged that involve sexually violent conduct, which,

17   you know, is -- according to the Federal regulations, I

18   understand is defined as a threatening force against an

19   individual to commit a sexual act or placing the victim

20   in fear that they will be -- that they or someone else

21   will be harmed as a result of a sexual act.

22   Q        Did you consult those regulations in

23   determining -- in considering whether he had committed

24   sexually violent conduct?

25   A        Yes, I did.

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 33 of 221

1    Q       Doctor Zinik, could you please refer to Exhibit

2    56, which should be a document called Daniel King case

3    history?  Is that in your binder?

4    A       Yes.

5    Q       Do you recognize what that is?

6    A       Yes, I do.

7    Q       What do you recognize that to be?

8    A       That's a timeline that I made to outline Mr.

9    King's history.

10   Q       And is the -- looks to be three pages long, is

11   that correct?

12   A       Yes.

13   Q       And is the information in Exhibit 56 in that

14   case history some of the facts upon which you base your

15   testimony today?

16   A       Yes.

17   Q       Is that information and type reasonably relied

18   upon by experts in your field?

19   A       Yes.

20   Q       And does it appear accurate?

21   A       Yes.

22           MR. LOCKRIDGE: Your Honor, may I approach the

23   easel?                    THE COURT: You may, sir.

24           BY MR. LOCKRIDGE:

25   Q       Finally, Doctor Zinik, would referring you to a

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
                                            (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 34 of 221

1    blown up version of that exhibit assist you in your

2    testimony today?

3    A        Yes, yes.

4    Q        Without getting into the details of that

5    chart -- and I believe it's just the first page of the

6    chart there or the case history. Could you just explain

7    the color coding and flow of how the chart works?

8    A        Okay. Well, the key's at the top, so the red

9    squares identify -- it's a timeline, and it's a vertical

10   timeline and it moves from top to bottom in terms of the

11   past to -- up to the present, and the color coding is

12   such that the red squares identify arrests for sexual --

13   for attempted or actual sexual offenses.

14          The green identifies statements that were made

15   by Mr. King to treatment providers or clinicians or

16   prison staff. The blue identifies statements that were

17   actually made by Mr. King in his own letters. I think

18   there's also a letter from his ex-wife, Marlene King, in

19   blue. And then the yellow is just other notable dates.

20   Q        Could you just start there at the top yellow

21   box and explain -- actually, as part of your evaluation,

22   did you review Mr. King's upbringing and early history?

23   A        Yes, I did.

24   Q        Could you, starting from the top of that box,

25   explain his early childhood history?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 35 of 221

1  A         Okay. Well, Mr. King, unfortunately, had a

2  really troubled childhood, and he was adopted. It was

3  either around a year and a half or age two. He did

4  suffer from multiple disabilities as a child. He had a

5  hearing impairment, a serious hearing impairment. He had

6  a speech problem, a stuttering problem. When he became a

7  preteen around 10 or 11 years old, he began to develop

8  club feet and developed a physical disability as a

9  result of that which was an impairment in terms of his

10 ability to do athletics and things like that. He had

11 multiple surgeries on his feet during his preteen and

12 adolescent years, so he was in the hospital a lot,

13 disabled and in pain and recovering from multiple

14 surgeries.

15         He also was born with two what are called

16 supramammary nipples, so he had some extra nipples on

17 his chest. I think that caused embarrassment when he was

18 unclothed.

19             THE WITNESS: And the reason I think these are

20 important, Your Honor, is because he really did struggle

21 as a kid and he felt different. He was teased and

22 ridiculed and ostracized by his peers, and the result of

23 that was he became very angry as a kid and he started to

24 act out, get in trouble as early as 12 years old, and

25 this is well-documented in his early records. And so

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 36 of 221

1  this troubled childhood, I think, psychologically

2  contributed to his antisocial personality style and his

3  criminality and his tendencies which in some respects

4  later manifested themselves as a compulsion to sexually

5  assault women.

6  A       He developed a -- he had -- let's see. He

7  developed a hostility toward women that was described by

8  his mother in some of the early records. He really had a

9  difficult relationship with his mother. She felt

10 threatened by him. Sometimes she would lock him out of

11 the house in order to protect herself. She talked about

12 how he seemed to get angry at her at things that would

13 not have bothered him had his father done them. And you

14 see throughout his treatment record and his prison

15 record, you know, subsequent references to hostility and

16 anger towards women.

17 Q       Did you review any information pertaining to his

18 sexual habits as a child?

19 A       Yes, I did.

20 Q       What was the information you gleaned from that

21 review?

22 A       What the early records show is that Mr. King

23 began to sexually expose himself when he was around 12

24 years old. He did get arrested twice we know when he was

25 approximately 14, and he -- I'm sorry, 15. This was in

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 37 of 221

1    1974. He was 15. But the exposure began apparently

2    around age 12. He was sent to therapists and doctors for

3    treatment. He had a problem with making obscene phone

4    calls.

5             His parents were very involved and caring and

6    concerned parents. They did send him -- you know, they

7    tried to get him help. You know, they used their

8    resources to try to help him when he was a kid, but,

9    like I say, he got arrested for the first -- well, twice

10   we know, once I think in April of '74 and then again

11   about -- and then he was -- this was for sexual

12   exposure. And then he was sent for a mental health

13   evaluation.

14            Then approximately a month later, he got

15   arrested the second time for sexually exposing himself

16   to two little girls and asking them to touch his penis,

17   although they refused to do so and they went and

18   reported it.

19   Q       Before we get to that, you mentioned he was in

20   trouble for obscene phone calls. What, if any,

21   information did you learn about the obscene phone calls?

22   A       I don't remember a lot of detail about that, I'm

23   afraid. I just -- as I recall, that was a reference in

24   his early records that was just one of many of the

25   behaviors that he was involved in that was causing

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 38 of 221

1    trouble.

2    Q        All right. Going down there to the first red

3    box, you mentioned the indecent exposure. Could you

4    please explain the details, what you know about that?

5    A        Okay. Well, as I was saying, he -- approximately

6    at age 12, he began to sexually expose himself. You

7    know, I think what we know what that is. He would open

8    his pants and show his penis to strangers, nonconsenting

9    individuals.

10            I know that when he was arrested the second time

11   at age 15, the victims that he exposed himself to were

12   two little girls, age seven and eight. I don't know who

13   the other individuals were that he exposed -- them to,

14   whether they were male or female or who they were, but

15   then when he was arrested the second time, this actually

16   occurred at his school. The police went to his school to

17   pick him up and the school secretary reported that there

18   were other reports of Mr. King exposing himself in other

19   instances. So this was already a chronic problem by the

20   time he was 14, 15 years old.

21   Q        Just going back to -- with regard to the two

22   girls you mentioned, do you know what the setting was,

23   where that occurred?

24   A        It occurred outside town apparently in a creek

25   bed, and the little girls were fishing and Mr. King

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 39 of 221

1  approached them and exposed himself and asked them if

2  they would touch penis. The girls reported that he was

3  rubbing his penis and he did have an erection. They

4  didn't touch him, and they went and told their mother,

5  and then he was later identified in a lineup as the

6  person who had asked them to do that.

7  Q      All right. Did you render an opinion as to

8  whether that conduct in 1974 regarding those two girls

9  constitute sexually violent conduct?

10 A      Yes. I believe it did. I think it certainly did,

11 because he was trying to get these girls to touch his

12 penis, and that would be an act of child molestation.

13         THE COURT: Doctor Zinik, I want to make sure

14 I understand correctly. There were two separate episodes

15 of this in 1974, is that correct?

16         THE WITNESS: Yes, Your Honor. If I can just

17 refer to my report -- and by the way, we don't have

18 the -- at least I have not seen the juvenile criminal

19 rap sheet, so to speak, of Mr. King's juvenile history,

20 so some of this information comes from later records

21 that was in the presentence investigation report from

22 1998 and clinical records that occurred in the mid

23 1970s, but it appears that he was arrested twice. The

24 first time was April 18, 1974, but I don't have any

25 details of that incident.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 40 of 221

1    After that, he was sent to Northern Virginia

2  Mental Health Clinic in Fairfax for an evaluation, and

3  then a second arrest occurred on May 21, 1974, and that

4  is the one that we actually have the Fairfax County

5  police report describing the details of how he

6  encountered these two little girls, seven and eight

7  years old who were fishing in a creek bed and exposed

8  himself and asked them to touch him. And he was

9  convicted of two counts of sexual exposure. Now, whether

10  the two counts applied to the two girls in that same

11  incident or the two separate arrests, I don't know,

12  actually, what the two counts applied to.

13    THE COURT: So in this exhibit, Government's

14  Exhibit 56, when it says arrested for indecent exposure

15  to two girls age seven and eight, that's a reference to

16  the May 21, 1974 incident, is that correct?

17    THE WITNESS: Yes, yes.

18    BY MR. LOCKRIDGE:

19  Q    Doctor Zinik, could you refer to Government

20  Exhibit Seven? It's also on your screen there. It should

21  be on your screen in front of you.

22  A    Okay.

23  Q    What do you recognize that to be?

24  A    That is the police report documenting this

25  arrest on May 21, 1974.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 41 of 221

1  Q        And is that the event you were talking about

2  regarding the two girls age seven and eight?

3  A        Yes, it is.

4  Q        And as you mentioned, the date of that is May

5  21, 1974?

6  A        Yes.

7  Q        Could you please turn to Exhibit Number 23?  And

8  I believe that's Bates number at the bottom -- should be

9  page three, but it's the page following page three,

10 Exhibit -- Bates number 1956.

11 A        Exhibit --

12 Q        It sudden be Exhibit 23.

13 A        Twenty-three, okay.

14 Q        And I believe that's on your screen.

15 A        Yes, the presentence investigation report. Okay.

16

17 Q        And if you could look under the juvenile section

18 there, --

19 A        Okay.

20 Q        -- are those the two -- the indecent exposure

21 two counts that you were referring to earlier?

22 A        Yes.

23 Q        And as a result of those two counts, what, if

24 any, adjudication did Mr. King receive?

25 A        He was -- let's see. He was convicted. He was

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 42 of 221

1    placed on unofficial probation for two years and he was

2    enrolled in a sex offender treatment program.

3    Q       And is the date discrepancy on that page April

4    18, '74 -- that's different from the date you mentioned

5    on Exhibit Seven, correct?

6    A       Yes, you're right. It is different.

7    Q       Okay. So is that part of the confusion why there

8    might be two different instances?

9    A       Yes, yes.

10   Q       Continuing on with the case history up on the

11   board, the first box with the 1975 date in it, what is

12   that referring to?

13   A       That's an incident in which Mr. King -- he was

14   16 years old and he reported to a later -- in a later

15   evaluation -- was actually my understanding that he

16   reported this to Doctor Graney, Dawn Graney in her

17   evaluation in 2009 -- that was where I found that

18   information -- that he was assaulted by a group of

19   teenage boys after he was caught exposing himself.

20              THE WITNESS: And if I can add, Your Honor, he

21   was -- they hit him on the head. It resulted in a

22   serious head injury. He was in the hospital and in a

23   coma for, I think, a few weeks and he had to have a

24   shunt surgically installed in his head to drain the

25   swelling and so on, and it was quite a serious injury.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208      www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 43 of 221

1  Q      All right. Continuing on with the next red

2  block there --

3  A      Okay. So this -- this is his second arrest. This

4  was in -- April 15, 1974 and -- oh, I'm sorry. I'm on

5  the wrong blocks here. Okay. October 9, 1975, this is

6  his second arrest, and this involved abducting a 19 year

7  old female at knifepoint, exposing his penis and forcing

8  her to touch it. He also fondled her breasts and he was

9  convicted of seizing, transporting and detaining with

10  the intent to defile a person.

11  Q      What are the circumstances surrounding that

12  offense, to your knowledge?

13  A      Okay. And, again, for this offense, we do have

14  the original police report, and according to the

15  victim's account, she was walking after a football game,

16  a high school football game and Mr. King grabbed her

17  around the neck and held a knife to her and dragged her

18  into a car that drove up that was driven by another male

19  that was a friend of Mr. King.

20      Mr. King pulled the victim into the back seat of

21  the car and told the driver to start moving, and then

22  Mr. King, he kept his -- he held the victim by the

23  throat and I fondled her breasts. He tried to tear off

24  her blouse but wasn't able to, so he put his hand under

25  her shirt and then he opened his pants and he pulled out

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 44 of 221

1  his penis and grabbed the victim's hand and made her

2  touch it, and she did pull her hand away immediately.

3          And the victim described how the driver of the

4  vehicle kept telling Mr. King to let the victim alone

5  and argued with Mr. King that he should release the

6  victim, and, you know, eventually Mr. King agreed and

7  they stopped the car and they put the victim out of the

8  car. And the victim reports that she felt that the male

9  driver was really -- she appreciated the fact that he

10 appeared to prevent her from further harm by Mr. King by

11 persuading Mr. King to release her and let her out of

12 the car. She states that she did not believe the male

13 driver committed a crime against her and, in fact,

14 protected her from further harm.

15 Q      You indicated that he was convicted for that

16 offense, and does the part of the statutory name

17 of that offense -- the intent to defile her person, does

18 that have any significance to you?

19 A      I think it does. It certainly sounds like a

20 sexual offense based on the wording of the conviction.

21          MR. BELL: Objection, Your Honor. He's asking

22 him for a legal conclusion.

23          THE COURT: Please rise, Mr. Bell, when

24 addressing The Court.

25          MR. BELL: I'm sorry. Objection, Your Honor.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 45 of 221

1 He's asking for a conclusion regarding statutory

2 language. I don't believe he's been qualified as an

3 expert in that regard.

4        THE COURT: I'll allow him to testify as to

5 the significance that he's giving it, but I share the

6 view of Mr. Bell, that this witnesses is not qualified

7 as a legal expert, but to the extent that he's given

8 that term -- interpretation, I think The Court needs to

9 know that. The objection is overruled. Mr. Lockridge?

10       BY MR. LOCKRIDGE:

11 Q      Doctor Zinik, upon that conviction, do you

12 recall what punishment, if any, Mr. King received?

13 A      Let's see. He was sentenced to indeterminate

14 probation to age 18 and he was also sent to a --

15 required to go to sex offender treatment. He was

16 originally sent to Westbrook Hospital in Richmond,

17 Virginia, but he was discharged in December, 1975 and

18 described as unmanageable and he was removed due to

19 alleged sexual activity with a female patient.

20       He was returned to jail for a period of time and

21 then he was sent to the Phipps Clinic at Johns Hopkins

22 Hospital, a residential treatment program, and he was

23 there for six months.

24 Q      All right. Doctor Zinik, I'd like to refer you

25 back to Exhibit 23, and that would be page three of

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 46 of 221

1    Bates stamp 1956. We're going to try to pull it up for

2    you real quick. Again, going -- looking down to the

3    juvenile history, do you see the conviction there for

4    seize, transport and detain with intent to defile?

5    A       Yes, I do.

6    Q       What does that say there next to that about the

7    adjudication he received?

8    A       Indeterminate probation not to exceed subject's

9    21st birthday. Oh, I think I said it was his 18th

10   birthday, so I was mistaken there. It was his 21st

11   birthday.

12   Q       Okay. As a result of that, you said he was

13   treated at Westbrook Hospital is what you'd indicated?

14   A       Yes.

15   Q       And following that, he was treated at Phipps

16   Psychiatric Clinic?

17   A       Yes.

18   Q       What information and details do you have about

19   that treatment, if any?

20   A       There's actually some original treatment records

21   from the Phipps Clinic from 1976, so some helpful

22   records that are quite detailed about the fact that --

23   let's see if I can just refer to my report, please --

24   where Mr. King reported that since age 13, his sexual

25   fantasies have mainly concerned exposing himself. This

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 47 of 221

1  is a quote. He fantasizes about exposing himself or

2  about tying women up and raping them. He described

3  himself as manipulative and able to get away with

4  anything.

5         So this is significant to me because here we

6  have, you know, an admission by Mr. King at age 17 that

7  he's got these compelling sexual thoughts to expose

8  himself and sexual fantasies about tying women up and

9  raping them and that he was preoccupied with those

10  sexual thoughts and urges as young as age 17.

11  Q      Who did he make those disclosures to?

12  A      He makes those to his treatment provider at the

13  Phipps Clinic. I'm not sure exactly who the person was

14  that he exposed them to. I know he was -- one of his

15  providers -- I mean, excuse me, I'm not sure who the

16  provider was that he said those statements to. I know

17  one of his therapists was a psychiatrist named Doctor

18  Park Dietz, a famous forensic psychiatrist.

19  Q      And continuing on --

20         MR. LOCKRIDGE: Your Honor, may I approach the

21  easel?              THE COURT: You may, sir.

22         BY MR. LOCKRIDGE:

23  Q      Looking at the top of that red box there,

24  there's a date of 1978. Could you please explain what

25  happened or the significance of that box?

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 48 of 221

1    A        This is when Mr. King was arrested for his third

2    offense which I think was probably a sexually motivated

3    offense, although we don't have many details about it.

4    There were records on microfilm apparently, but the

5    machine was not available at the time. The microfilm

6    machine was broken at the time the discovery was

7    collected, so we weren't able to find out what the

8    details of the offense were. All we have are some

9    reports by Mr. King describing that he -- apparently

10   there were two victims involved, and these were two

11   separate incidents that occurred on the same day in

12   which he attempted to abduct a first victim, she got

13   away, and, therefore, he abducted a second victim a

14   short time later. And again in later records, Mr. King

15   refers back to this offense and describes it as a

16   sexually motivated offense.

17             THE WITNESS: And what's significant about the

18   timeline, Your Honor, is just how quickly in my opinion

19   Mr. King reoffends. There was less than -- about 21

20   months between the conviction for his prior offense in

21   1975 which was the second sex offense and then this

22   third one that occurred in April of '78.

23             BY MR. LOCKRIDGE:

24   Q        Doctor Zinik, earlier you testified that he was

25   on probation until age 21.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 49 of 221

1     A     Correct.

2     Q     And would this offense have occurred based on

3     your review of the records while he was still on

4     probation?

5     A     Correct, yes.

6     Q     What, if any, punishment did he receive for this

7     offense -- well, he was convicted. He did receive a

8     conviction, correct?

9     A     He was convicted of one of the charges. Let's

10     see. He was convicted of -- consult my original report

11     to determine which charge he was convicted on. Let's

12     see. He was convicted of count one, which was, I think,

13     attempted abducting -- attempted abduction was my

14     understanding was the count that he was -- wait. I'm

15     sorry. I'm a bit confused. I don't know which count he

16     was convicted on.

17     Q     Can I refer you to Exhibit Ten, please?

18     A     Okay.

19     Q     And what's the date of that top sentence there?

20     A     Date November, 19 -- November 8, 1978.

21     Q     All right.

22     A     And it looks like he was convicted of abduction.

23     Q     Okay. And do you see any sentence he might have

24     received on that page there?

25         THE COURT: Which exhibit are we looking at?

Huseby, Inc.     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 50 of 221

1        MR. LOCKRIDGE: Exhibit Ten, Your Honor. That

2   would be a criminal judgment from 1978, Your Honor.

3        BY MR. LOCKRIDGE:

4   Q       And if you can look at page two of Exhibit Ten,

5   Doctor Zinik--,

6   A       Yes.

7   Q       -- what was the remainder of his sentence that

8   he incurred?

9   A       Let's see. Five years were suspended.

10  Q       And did he receive any probation?

11  A       He was placed on probation and his probation was

12  revoked April 4, 1979 and he returned to prison for five

13  years.

14  Q       All right. So to your knowledge, he was in

15  prison after the conviction of 1978 for a five year

16  sentence?

17  A       Yes.

18  Q       All right. And turning -- do you have any

19  details as to why his probation was revoked in 1979?

20  A       No, I don't. I don't know why.

21  Q       Referring you to the next box there, 1983, could

22  you please explain what that means, what that is?

23  A       This was for his fourth arrest, and this

24  occurred November 23, 1983. You know, I'm just realizing

25  that it looks like the period of time that he was in the

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 51 of 221

1    community is missing from the chart. You know, there was
2    a period of time after the conviction in 1978 that he
3    went to prison and then he got out. I'm not exactly sure
4    when he was paroled. I thought it was sometime in 1982
5    or '83. Mr. King has reported that he was paroled
6    December 29, 1980, so, you know, it's possible it was in
7    late 1980 or 1981 or so.
8            But then he's arrested again November 23, 1983,
9    and this case involved another assault and the -- he
10   approached a woman who was walking to her car. He asked
11   the woman if she would -- let's see -- if she would walk
12   him to his car so he wouldn't be arrested because he was
13   drunk, and the victim refused and she continued to walk
14   to her car, and he then approached her and said --
15   pushed her in her car and said don't scream or I'll kill
16   you, but she fought him off. She kicked him in the groin
17   and she screamed and then he fled in his car, and the
18   police were summoned and he was arrested 20 minutes
19   later.
20   Q     All right. Was there any evidence collected at
21   the scene of that offense?
22   A     There was. And this offense is particularly
23   significant because Mr. King was in possession of items
24   that he later described as a rape kit. At the time he
25   was arrested, he was wearing a green jacket, and in the

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 52 of 221

1  pocket of the jacket was a pair of handcuffs, and later

2  when his car was searched, an air pistol was found on

3  the front seat and there were various lengths of ropes

4  and straps that could be used for bindings, and, in

5  fact, one of the ropes was looped through the seat belt

6  anchor, and there was also an axe handle with long nails

7  taped to the end of it that were sticking out, and so

8  these looked like implements that he could use in an

9  assault in a sexual offense. And, in fact, later on, he

10 testified again in the precertification report to Doctor

11 Dawn Graney in 2009 that, in fact, these were rape kit

12 items that he frequently used during sexual assaults.

13 Q       Doctor Zinik, are you aware of whether or not

14 Mr. King actually possessed the handcuffs during this

15 offense?

16 A       Well, you know, it's very clear from the -- we

17 have the original police records, and at the time he was

18 arrested, the police report notes that he was wearing

19 this green jacket and in the pocket of the jacket were

20 the handcuffs, and that's actually cross-referenced in a

21 couple places in the police report.

22 Q       I'll refer you to Exhibit 13, Doctor Zinik. It

23 should be on your screen there.

24 A       Yes.

25 Q       Is there any information on that exhibit that

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 53 of 221

1  leads you to find that he possessed those handcuffs

2  during that crime?

3  A      Yes.

4  Q      What is that?

5  A      There's a list of the property recovered and the

6  items of evidence, and number two in that list is one

7  pair of handcuffs found in the right front jacket

8  pocket, and where it says -- then there's a column that

9  says from whom or, you know, where the evidence was

10  located, and the other items of evidence were identified

11  in the defendant's automobile, but the handcuffs were

12  identified to be on the defendant himself.

13  Q      Okay. Turning to the next page of that exhibit,

14  is there any information on that page that led to your

15  opinion that he possessed those handcuffs?

16  A      Let's see. There are --

17  Q      Let me strike that. Was there any information on

18  that page that he was wearing a green jacket at the time

19  he was apprehended?

20  A      I know there is because I've seen it, but I

21  highlighted in my own notes -- let's see. Thank you for

22  helping me here. Let's see. Gave -- he was wearing --

23  the description of the defendant wearing a red hat and a

24  green jacket was given by the victim.

25  Q      Okay. And further down there, any other evidence

Huseby, Inc.    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 54 of 221

1   about that jacket and the handcuffs?

2   A       It says lying on the front passenger seat was

3   one Crosman air pistol.

4   Q       Prior to that, I'm sorry. The sentence before

5   that, what's that say?

6   A       Oh. The victim was riding with the police and

7   they spotted Mr. King. She yelled it's him, and before

8   the defendant had gotten out of his vehicle, the

9   defendant was wearing a red knit hat and a green jacket,

10  and then later on, they found the other items in the

11  car.

12  Q       What's it say with regard to recovered from that

13  jacket?

14  A       Oh. Recovered from the front jacket pocket was

15  one pair of handcuffs.

16  Q       And were you able to --

17          THE COURT: Mr. Lockridge, let me interject

18  here. Throughout this little bit of testimony as Counsel

19  has made inquiries in this exhibit as to where

20  particular information is, I believe Co-counsel for the

21  examining counsel -- I'm assuming that's you, Mr. Gray,

22  but -- underlining the key words here. I have no

23  objection to that being done as long as it's disclosed

24  on the record, but I would request if that procedure is

25  being used that it be stated on the record.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 55 of 221

1          MR. LOCKRIDGE: My apologies. We'll do that.

2          THE COURT: Were you aware of that, Mr. Bell?

3          MR. BELL: I was looking at my own computer,

4    Your Honor. I didn't realize it was being done, but I

5    think it's fine as long as I have an opportunity to do

6    the same thing on cross-examination, which I'm sure The

7    Court will allow.

8          THE COURT: Well, is the blue lining that's

9    showing up on the screen that I have, is that not

10   appearing on the screen --

11         MR. BELL: It's appearing on the large screen,

12   Your Honor, but I just have the document on my computer

13   and I was looking at it -- the same document. I didn't

14   happen to notice it, but I'll look at the big screen so

15   I can notice what's going on.

16         THE COURT: Well, I just want to be sure that

17   you're aware of it. I think otherwise -- without some

18   disclosure, I'm concerned that it may give perhaps a

19   potential misimpression as to the witness's testimony.

20   Very good. Mr. Lockridge?

21         MR. LOCKRIDGE: Thank you, Your Honor. We'll

22   make that change and make sure that happens -- The

23   Court's decision.

24         THE COURT: That will be fine. Thank you.

25         BY MR. LOCKRIDGE:

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 56 of 221

1    Q        Doctor Zinik, staying with that 1983 offense,

2    was he convicted of that offense?

3    A        Yes, he was.

4    Q        And was there any information you received

5    regarding Mr. King's statement about the circumstances

6    of that offense?

7    A        When I interviewed Mr. King, he told a very

8    different story about that offense. He claims that his

9    motivation was to rob the victim, that it wasn't a

10   sexually motivated offense. In fact, Mr. King has

11   recanted, you know, prior -- many, you know, prior

12   admissions he made that his offenses were sexually

13   motivated and now he's claiming that none of these

14   offenses were sexually motivated, including this one.

15       He claims that he was attempting to rob the victim,

16   although there's no reference about asking the victim

17   for money. You know, the victim doesn't report anything

18   said by Mr. King that would indicate he wanted money or

19   he was trying to rob the victim. And Mr. King claimed

20   that the handcuffs were toy handcuffs, that they weren't

21   his handcuffs. He does say that they were in the jacket

22   pocket, but he claims the jacket was not his and he was

23   not wearing the jacket and the jacket was found on the

24   seat of the car after he was arrested, but we know that

25   that wasn't the case. The facts are clear that he was

1    wearing the green jacket when he was arrested and that

2    it did contain a pair of handcuffs, and there's nothing

3    in the police report that would suggest they weren't

4    real handcuffs. There's no mention that they were toy

5    handcuffs.

6    Q      Doctor Zinik, do you have any information as to

7    whether Mr. King was on any type of supervision while he

8    committed this offense?

9    A      He would have been under probation, community

10   supervision when he committed this offense.

11   Q      I'd like to refer you there to the screen again

12   to Exhibit 13 and down to the bottom part there. Does

13   that inform your opinion?

14   A      Yes. It says the defendant was on parole in

15   Fairfax City, Virginia for abduction until 1983.

16   Q      And based upon your review of this offense,

17   Doctor Zinik, did you render an opinion as to whether

18   that conduct was sexually violent conduct or child

19   molestation?

20   A      I did, yes.

21   Q      What was that opinion?

22   A      Well, because I think Mr. King reported a prior

23   occasion that this was a rape kit and particularly when

24   he was arrested in 1988 for his final fifth sex offense,

25   he referred back to these earlier offenses and said that

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 58 of 221

1  I know what my intent was, my intent was for a sexual

2  assault, and he actually gave a very detailed

3  description of his paraphilia and the kind of sexual

4  assaults that he commits to doctor Dawn Graney in 2009.

5          And I think this is also significant because this

6  is the second time he sexually reoffended while on

7  probation or parole, so I think that issue speaks to the

8  serious lack of control over committing sexually violent

9  behavior or what we call volitional impairment. I mean,

10  here he was being supervised. He was under probation or

11  parole. He was being watched and yet there was something

12  driving him to do this behavior again. It was very

13  compelling and he reoffends quite quickly, and these are

14  all important when it comes to the diagnosis and the

15  risk assessment issue.

16  Q      Doctor Zinik, with regard to that conviction, do

17  you recall what his original charges were?

18  A      Let's see. He was charged with -- dangerous

19  weapon and assault with intent to kidnap while armed.

20  Q      Thank you, Doctor Zinik. Do you recall how

21  much -- what punishment, if any, he received as a result

22  of that conviction?

23  A      Yes. He was convicted in February, 1985.  He

24  pled to simple assault. He received a year in jail and

25  was -- let's see. He was also convicted of assault with

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 59 of 221

1  attempt to kidnap while armed, and he -- his final

2  sentence was two to eight years.

3  Q      Doctor Zinik, let me refer you back to Exhibit

4  14. Could you look there in your binder at Exhibit 14?

5  A      Okay. Do you want me to find it in the binder?

6  Q      Yes, if you don't mind.

7  A      Okay.

8  Q      What does that indicate that he was convicted of

9  on that judgment?

10  A      He was convicted of carrying a dangerous weapon

11  and assault.

12  Q      All right. Earlier you stated he was convicted

13  of a kidnapping offense, but looking at this judgment,

14  you -- correct that?

15  A      Yes.

16  Q      All right. Following that, there's a yellow box

17  under that. Can you please explain what that is?

18  A      That's the period of time that Mr. King was in

19  the community, so he was actually paroled September 3,

20  1987 and he reoffended February 19, 1988, so that's

21  approximately five and a half months later he committed

22  his fifth crime which I interpret to be a sexually

23  motivated crime. He was out in the community only five

24  and a half months. He was still on parole, and he was

25  arrested February 19, 1988.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 60 of 221

1    Q        What were the circumstances, if you know, of

2    that offense?

3    A        This was another assault at knifepoint in which

4    he attacked a female stranger and he held her. He led

5    her across the street at knifepoint towards -- car.

6    He --  apparently he was then interrupted by a witness

7    and the victim was able to flee and escape.

8    Q        Were there an -- official records to your

9    knowledge in which Mr. King made a statement regarding

10   that offense?

11   A        Yes. Well, this is the one that we have the

12   presentence report for, the 1988 report, and it was in

13   that report that he stated that I know what my intent

14   was, it was to commit a sexual assault, and he actually

15   went into some detail about the fact that this was a

16   sexually motivated crime.

17   Q        And let me refer you to Exhibit 23 if I can get

18   that up.

19   A        Is it all right if I look that up in my own

20   binder?

21   Q        Sure.

22   A        Okay.

23   Q        If you can refer to your screen, what document

24   do you recognize that to be? I pulled up Exhibit 23

25   there, page three.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 61 of 221

1    A        This the 1988 presentence report.

2    Q        And the top of that page, what do you see up

3    there?

4    A        It says defendant's version.

5    Q        And will that refresh your recollection as to

6    what statement he provided to officials?

7    A        Yes. This was a quote from Mr. King where he

8    describes -- he says I walked up behind the victim, put

9    a knife to her head, attempted to take her to my

10   vehicle. I was attempting to push her into the vehicle,

11   but she broke away from me. That's all that happened.

12   Man, I wish I could tell you I know what my intentions

13   were for a sexual assault. I wasn't able to control what

14   I was doing. I wasn't intoxicated and I don't use drugs.

15   Every crime I committed, I don't recall why I was there

16   at that particular point. I don't blame them. I don't

17   think about them before I do it. The impulses are so

18   strong, I attempted to get help for them. It's been

19   happening since 1975.

20   Q        What, if any, significance did that statement

21   have to you?

22   A        I think this is an important statement because

23   it is more of a paper trail, you might say, of the

24   admissions made by Mr. King -- started back in 1976 when

25   he was at the Phipps Clinic. We've already referred to

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 62 of 221

1    that where he talked about having fantasies of tying up

2    victims and raping them. Here we have an admission that

3    he's saying that this crime he committed in 1988 was a

4    sexually motivated crime and his intent was a sexual

5    assault. And he's also talking about how the impulses

6    were so strong, I couldn't control them.

7           This, again, is the exact language that you

8    would be looking for if you wanted to demonstrate a

9    serious difficulty refraining from committing sexually

10   violent behavior. This speaks directly to the volitional

11   impairment in which -- which I think reflects the

12   underlying paraphilia, the sexual disorder that Mr. King

13   has, that he is sexually aroused to force sex with

14   nonconsenting victims and this is a very compelling

15   thing that drives him to commit these crimes and he

16   feels out of control and he's doing it -- even though he

17   just got out of prison five and a half months ago for

18   the same kind of thing, he's doing it again. He can't

19   control himself.

20   Q     Doctor Zinik, as a result of that conviction,

21   are you aware of what punishment, if any, he received?

22   A     Yes. He -- sorry. I'm referring to my notes

23   here. Let's see. He was convicted by -- plea of armed

24   kidnapping and he was sentenced to 12 to 36 years in

25   prison.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 63 of 221

1  Q        Doctor Zinik, did you render an opinion as to

2  whether this offense constituted sexually violent

3  conduct?

4  A        Yes. I believe it did.

5  Q        And referring down to the next block on case

6  history, Doctor Zinik, dated June 7, 1988, --

7  A        Yes.

8  Q        -- what's the significance of that?

9  A        This is the blue box. This is a statement that

10 Mr. King made in a letter that he wrote to the judge at

11 this time of the adjudication of this offense, and so

12 this is a handwritten letter that we have in the

13 discovery dated June 7, 1988 in which he said "I'm tired

14 of dealing with the mental problem that takes over my

15 whole being. Worst of all, my whole life has been

16 destroyed and controlled by my mental problems."

17 Q        Just for clarity, under the date there, June 7,

18 1988, that next -- 22, is that Exhibit 22?

19 A        Yes.

20 Q        Continuing on that timeline --

21 A        The next entry is a green box dated November 5,

22 1991, and this was a statement that was found in the

23 Board of Prisons therapy notes, the psychology treatment

24 notes in which it says "says his frustration with his

25 ex-wife would accumulate and finally be released as

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 64 of 221

1  impulsive abductions with rape intent. Admits that such

2  episodes were expressions of his need to regain and

3  exert control."

4  Q      When it refers to the ex-wife, do you have any

5  information as to what they are talking about there?

6  A      Yes. I'm assuming this refers to his second

7  wife, Marlene. Mr. King has been married twice, and, you

8  know, the first time -- they were both rather short

9  marriages. I think the first one occurred in 1982 and

10 then the second one occurred -- let's see. He was

11 married February 14, 1987. This was -- I think this was

12 in prison. I think he was actually married while he was

13 in prison, but he had met Marlene prior to being

14 incarcerated.

15         And what was significant in the records, his

16 parents actually talked about -- and both -- Marlene

17 King, they were both -- they both had statements in the

18 1988 presentence report about how Mr. King seemed to be

19 doing really well. He was newly married. He was

20 expecting his first child, so he had a consenting sexual

21 partner available to him. He was newly married -- in

22 fact, twice when he reoffended he was newly married and

23 had a consenting sexual partner, and yet he continued to

24 commit these sexually violent crimes.

25         In the 1988 case, he had a job. He was working.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
                                          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 65 of 221

1  He was steadily employed. He seemed to be doing well.

2  His parents remarked about -- how the fact that he

3  seemed to have his life together and everything seemed

4  to be going really well, and then here he did it again,

5  so I think that's significant.

6  Q       At the bottom of that chart there, the 1993

7  date, what significance, if any, does that have?

8  A       Okay. That's an important event because Mr. King

9  was in prison and he received a rule infraction or a

10 disciplinary violation on April 9, 1993, and this

11 occurred when he was in a counseling session with a

12 female therapist and the session was actually being

13 taped or being tape recorded. Now, I don't know if that

14 was video or audiotape, but the records talk about the

15 session was being recorded.

16          And he was talking about his compulsion to

17 expose himself and have women touch his penis and he was

18 talking about that -- he got emotional. He started

19 crying, and then he asked that the tape be shut off, and

20 the therapist shut off the tape, and then after that he

21 asked the therapist if she would touch his penis, and so

22 he got violated for that. And I think that's significant

23 clinically, because it's an example of how the very act

24 of describing the sexual compulsion and talking about it

25 to in particular a female therapist sexually excited him

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 66 of 221

1  apparently and he was stimulated to the point where, you

2  know, he was talking about his problem and then he

3  actually asked the therapist if she would touch his

4  penis. I find that really significant.

5  Q       During your interview with Mr. King, did you

6  discuss this incident?

7  A       I did, yes.

8  Q       What did he tell you about it?

9  A       Mr. King denied that he asked the therapist to

10 touch his penis. He claimed that he and the female

11 therapist were in a relationship and that they had been

12 intimate together and kissing and hugging and that

13 apparently another inmate had observed this and that he

14 was concerned that his girlfriend, the therapist, would

15 get in trouble, so they agreed to manufacture this story

16 so that he would take the blame and she would get off

17 the hook. This was the story that Mr. King told me in

18 this interview, but he denies that he asked the

19 therapist to touch his penis.

20 Q       Just for clarity, did you indicate that the

21 record showed whether or not he received discipline for

22 that?

23 A       He did, yes.

24          MR. LOCKRIDGE: Your Honor, I've got one more

25 board, if I could approach the easel.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 67 of 221

1          THE COURT: That would be fine.

2          BY MR. LOCKRIDGE:

3     Q       And for clarify, with regard to Mr. King's

4     incarceration in 1988, how long was he incarcerated on

5     that offense?

6     A       Let's see. I think he was sentenced up to 32

7     years, but he's been incarcerated since that time. He's

8     never been out in the community.

9     Q       And referring to this last page of the case

10    history, I'd like to refer you to the top block that's

11    dated 1997. What, if any, significance does that block

12    have?

13    A       This was from a report, a psychological

14    evaluation by Doctor Mauriz, M-A-U-R-I-Z, and this was a

15    statement that was quoted in that report that Mr. King

16    made where he was talking about the origin of his sexual

17    exposure compulsion and his impulses to sexually assault

18    women. He was talking about how as an adolescent he was

19    angry at girls and he described his anger toward females

20    and he said, you know, I like you, you don't like me,

21    take this and gestured toward his penis in a sense that

22    he would expose himself, and he said I was in control

23    and I liked it.

24          And during that evaluation, he admitted that

25    he's not always been able to control his indecent

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 68 of 221

1    exposure and my need to control completely and humiliate

2    other individuals through dominance.

3    Q        Would this statement, to your knowledge, have

4    been made prior to the implementation of the Adam Walsh

5    Act?

6    A        Yes, it was. You know, I mean, all the

7    statements he made up to this point were prior to the

8    Adam Walsh Act, and this is significant because Mr. King

9    has now recanted the fact that he's made statements in

10   the past suggesting that he has impulses to expose

11   himself, commit sexually violent crimes, and he has an

12   explanation for why he made those statements in 2009.

13   I don't know if you want me to discuss that now, but the

14   important thing is that there is a paper trail dating

15   back to 1976 where he was making statements in the '70s,

16   in the '80s, in the '90s, in the 2000s, long before the

17   Adam Walsh Act, long before he was facing release from

18   prison without support and fear that he might reoffend,

19   and so this, I think, is good documentation that he is

20   describing a sexual disorder that is, you know,

21   well-documented in the records.

22   Q        With regard to the next block there dated 2000,

23   what significance, if any, does that block have?

24   A        This is another statement made to a BOP

25   treatment provider, September 22, 2000, a psychology

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
                                          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 69 of 221

1  consult note that says he has a history of

2  exhibitionism, aggressiveness, et cetera, "indicates

3  that when these thoughts enter his mind, he becomes

4  anxious, indicates problems since teen years and states

5  I have no remorse."

6  Q     And continue on down there to the three blocks

7  dated 2009. Could you please explain those boxes?

8  A     Okay. The first one is June 30, 2009. I think

9  this one actually should have been in blue now I'm

10  realizing because this is a quote from a letter that Mr.

11  King wrote himself, a handwritten letter, and he wrote

12  this letter to the Sex Offender Certification Review

13  Branch, and he was writing this letter because he was

14  expressing a desire to cooperate with the civil

15  commitment proceedings. He stated "having been

16  incarcerated for the amount of years that I have been, I

17  can only compare this to a hibernating bear who awakens

18  with the desire to eat, and eat he will. I have not

19  developed the ability to control myself."

20      And this is referring to his admission that he's

21  going to -- if he gets out, he's going to reoffend and

22  commit a new sexually violent crime, and he -- at the

23  time that he was making these statements -- and this is

24  flushed out later on in the precertification reports, he

25  was -- he claims that he was afraid to be released to

Huseby, Inc.     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 70 of 221

1   the community because he still had this sexual

2   compulsion. He was afraid to be out on his own. He

3   didn't have any resources. He didn't have any help. He

4   didn't have any funds, and he was concerned that he

5   would go back to drug abuse and that without any

6   support, it would just be a matter of time that he would

7   commit new sexual crimes, and he was afraid. He wanted

8   help, and he was -- this was a cry for help, saying I

9   will cooperate with the civil commitment proceeding

10  because I don't want to go out and do it again, because

11  I know I will.

12  Q      Now, these admissions would have been made after

13  the implementation of the Adam Walsh Act, correct?

14  A      Yes.

15  Q      Did you discuss these admissions with Mr. King?

16  A      Yes, I did.

17  Q      What did he tell you about those?

18  A      Mr. King has retracted these admissions. Mr.

19  King -- and as we go forward, you will see he gave a

20  very detailed explanation of his sexual compulsion to

21  Doctor Graney and he has retracted that. He's claiming

22  that he has never committed a sexually motivated crime

23  and he made this very dramatic about-face after he

24  received a letter from his ex-wife, Marlene King, whom

25  he hadn't heard from for about 20 years. As he put it,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 71 of 221

1  she popped back into my life and she wrote him a letter

2  a letter that said, you know, I still love you and you

3  can come live with me when you get out.

4       You know, their son is an adult now. He has a

5  daughter, so Mr. King is a grandparent, and Mr. King

6  claims that now -- this is what he told me during his

7  interview, that now that he has someone who can help him

8  and support him and provide him a place to live and that

9  sort of thing when he's released, he's not afraid to get

10  out anymore. But these were all stories that he made up

11  and none of 'em are true, and he only made them up

12  because he was afraid to get out on his own, but now

13  that he's got some support in the community, he is

14  categorically recanting everything he said before.

15  Q     All right. Thank you, Doctor. Now, is there any

16  other evidence that you considered that you wanted to

17  talk about as to whether he's engaged in sexually

18  violent conduct?

19  A     Yes. I think the statements that he made to

20  Doctor Graney in her precertification report are very

21  important, and that report -- so he was interviewed by

22  Doctor Graney November 13, 2009, and she wrote a very

23  detailed report about the things he said. And he

24  essentially described this -- I mean, he described what

25  I would say is a textbook example of a paraphilia NOS,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 72 of 221

1  nonconsent. He talked about how he had been having these

2  impulses to expose himself and sexually assault women

3  since he was a teenager. He admitted to committing

4  unreported sexually violent crimes.

5       He claimed the first time he abducted a female

6  was when he was 14 years old.  He had a pocketknife and

7  he claims that he abducted another girl at knifepoint

8  and sexually exposed himself and made her masturbate

9  him. He described how his -- he described a very

10 ritualized MO or modus operandi, which is very

11 characteristic of a paraphilia. The more the behavior is

12 ritualized and scripted and repeated in a very specific

13 order and a specific fashion, the more likely it's going

14 to be a paraphilic type sexual disorder.

15      So what he described was that he would -- he

16 would pack up his rape kit and put it in his car, and

17 this is when he described the handcuffs and the ropes

18 and the -- you know, he would blindfold his victims.

19 He would have these items in his car. He described how

20 he had written index cards with instructions for the

21 victim because he -- because of his hearing impairment,

22 he felt that his voice was distinctive and that the

23 victims would recognize his voice, so he tried to talk

24 as little as possible. They were blindfolded, and at

25 least while he abducted them and move -- he would kidnap

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 73 of 221

1  them, move them to a secluded area and then take off the

2  blindfold.

3        He talked about how he would target specific

4  victim types, that he preferred Caucasian women because

5  they were more passive and less likely to fight and

6  resist than African American women or minority women. He

7  kind of talked about the psychology of the victim and

8  how Caucasian women are more worried about just

9  surviving and they're less likely to struggle and so on.

10 He talked about how he would abduct these victims and he

11 would then take them to a private area and he would

12 expose himself and he would force them to masturbate

13 him.

14        There was not any penetration involved. He

15 wasn't interested in, you know, vaginal penetration or

16 oral copulation or anything like that. In fact, he had

17 very minimal contact, physical contact with the victims,

18 and so it was a very sort of narrowly focused, scripted

19 type of behavior where he would expose himself and he

20 would force them to masturbate him.

21        And he talked about the euphoric high that this

22 produced and how it was better than any drug and how he

23 knew he was going to do it again and how he -- the

24 length of the assaults was getting longer. He was

25 keeping the victims for longer and longer and he felt

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 74 of 221

1  that his violence was escalating, and he talked about

2  how he was afraid that if he got out, he would do it

3  again and he would probably kill his victims because he

4  didn't want to risk detection and getting caught again.

5          And so he really gave a very elaborate,

6  detailed, complicated explanation for his sexual

7  disorder. He talked about how he had assaulted many

8  unreported victims when he was out in the community. It

9  was very unusual to see such an honest -- you know, what

10  I interpret to be an honest self-disclosure and -- and a

11  plea for help.

12  Q     All right, Doctor Zinik. Thank you. As part of

13  your -- let's move on. Earlier you testified that you

14  diagnosed Mr. King with a serious mental illness,

15  abnormality or disorder.

16  A     Yes.

17  Q     How does a psychologist go about doing that?

18  A     Well, you gather information from all of these

19  sources. You look at the history of the individual. You

20  interview the individual, if they're willing to

21  interview, and then you consult the Diagnostic and

22  Statistical Manual which is the catalog of mental

23  disorders published by the American Psychiatric

24  Association and you arrive at a mental disorder that you

25  think is appropriate.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 75 of 221

1    Q        Is the Diagnostic and Statistical Manual

2    well-accepted in your field?

3    A        Yes.

4    Q        What, if any, diagnosis did you render in this

5    case?

6    A        Okay. I diagnosed Mr. King -- I'm going to refer

7    to my report here -- with paraphilia NOS, nonconsent.

8    Q        I'm sorry. Could you please explain what NOS is?

9    A        Okay. Paraphilia NOS is -- the paraphilias are

10   a group of sexual disorders that appear in the

11   Diagnostic Manual, and there are a few that are

12   specified such as pedophilia and voyeurism and

13   exhibitionism and so on. There's about eight of those

14   that are specifically identified, and then there is

15   what's called a residual category which is paraphilia

16   NOS. NOS stands for not otherwise specified, and this is

17   the term that you would use to diagnose any paraphilia

18   that is not included in the eight that are specifically

19   identified in the manual, and there are many

20   paraphilias.

21           In fact, there's a famous book called Love Maps

22   written by a sexologist named John Money (phonetic)

23   published in the mid 1980s where it's sort of an

24   encyclopedia of paraphilias, and he has over 60

25   paraphilias in his book. And so there is no specific

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 76 of 221

1  diagnosis for a rape paraphilia or a paraphilia

2  nonconsent or paraphilic coercive disorder, so this

3  would be the appropriate way to diagnose it. You would

4  diagnose paraphilia NOS, and then you'd put the

5  descriptor, which would be paraphilia NOS, nonconsent or

6  paraphilia NOS, forced sex with nonconsenting victims.

7  Some psychologists use paraphilia NOS, rape, but these

8  are all synonymous terms that really mean the same

9  things, and that would be the correct way to diagnose

10  the sexual disorder according to the DSM.

11  Q      For clarity, is the diagnosis paraphilia not

12  otherwise specified a diagnosis in the Diagnostic and

13  Statistical Manual?

14  A      Yes.

15  Q      And you diagnosed him with some other diagnoses.

16  What are those?

17  A      Yes. I diagnosed him with exhibitionism, which

18  is the, you know, intense repeated urges, fantasies and

19  behaviors that involve exposing his penis to a --

20  exposing his genitals to a stranger, and I diagnosed him

21  with polysubstance dependence. This is a polydrug

22  addiction disorder that includes -- he has a long

23  history of substance abuse, substance dependence that

24  includes alcohol, marijuana, heroin, methamphetamines,

25  cocaine. And then I also diagnosed him with antisocial

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 77 of 221

1    personality disorder.

2             MR. LOCKRIDGE: Your Honor, may I approach the

3    easel?

4             THE COURT: You may, sir. Mr. Lockridge, let

5    me just make an inquiry. We're about five 'til 12. I do

6    intend to break around 12. If we're about to launch on

7    an area that will take --

8             MR. LOCKRIDGE: This is a good time to take a

9    break, Your Honor.

10            THE COURT: Okay. Why don't we do that? We'll

11   take our lunch break. We'll reconvene at -- let's just

12   round it up. We'll reconvene at 1:00.

13   (Whereupon off the record.)

14            THE COURT: Good afternoon, folks.

15            AUDIENCE: Good afternoon, Your Honor.

16            THE COURT: Before we get started with the

17   continuation of the testimony, let me just expand a

18   little bit on my comments regarding use of the screens

19   that we have in the courtroom. To the extent that

20   underlining is used or circling, the directive that I

21   gave previously was that if it's being used, the parties

22   using it, Counsel using it needs to disclose its use and

23   needs to describe what's being underlined, the location

24   and so forth so that's clearly stated on the record.

25            I'm also directing that documents should not be

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 78 of 221

1   shown on the screen unless the examining counsel is

2   referring to it at the time. I believe that the parties

3   each have the capability of pulling up documents on

4   their screens for their own use at counsel table without

5   it being shown on the screen that would be visible at

6   the bench or at the witness stand, and I think it's only

7   appropriate that the screens that -- the display at the

8   bench and at the witness stand display only documents

9   that are the subject of questioning by examining counsel

10  at that time. Very good.

11          Doctor Zinik, let me remind you, sir, that

12  you do remain under oath.

13          THE WITNESS: Yes, Your Honor.

14          THE COURT: Mr. Lockridge?

15          MR. LOCKRIDGE: Yes, Your Honor. One

16  administrative matter --

17          THE COURT: Yes, sir.

18          MR. LOCKRIDGE: During questioning -- if

19  you'll recall, we, Your Honor, recently signed the

20  amended pretrial order.

21          THE COURT: Yes.

22          MR. LOCKRIDGE: Apparently two of the

23  documents that were added to that pretrial order didn't

24  make it in the exhibit notebooks, and I do have those.

25  They both fall under Exhibit 34, and I have those here

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208              (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 79 of 221

1    --

2              THE COURT: That would be excellent --

3    would you approach with them, please? Thank you.

4              MR. LOCKRIDGE: I would note, Your Honor, that

5    there is one page of Exhibit 34 in the binder already.

6    These would be the last two remaining pages.

7              THE COURT: Very good. So these go at the rear

8    of Tab 34?

9              MR. LOCKRIDGE: That's correct, Your Honor.

10             THE COURT: Thank you. Very good, sir. You may

11   proceed.

12             MR. LOCKRIDGE: Thank you, Your Honor. I think

13   as we dismissed for lunch, Your Honor, I was about to

14   approach the easel.

15             THE COURT: That will be fine.

16        BY MR. LOCKRIDGE:

17   Q     Doctor Zinik, I believe we left off before

18   lunch -- you were discussing the topic of paraphilias. I

19   would direct your attention to the easel. Do you

20   recognize what that is?

21   A     Yes.

22   Q     What does that show?

23   A     That's a chart I made that gives a definition of

24   paraphilias.

25   Q     And would referring to that chart help you in

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 80 of 221

1  your testimony today?

2  A      Yes.

3  Q      Could you please explain what that chart shows?

4  A      Okay. This is -- paraphilias are a category of

5  sexual disorders. This is the definition from the

6  Diagnostic Manual, and they're defined as recurrent

7  intense sexually arousing fantasies, urges or behaviors

8  generally involving either, one, non-human objects, two,

9  suffering or humiliation of one's self or one's partner

10 or, three, children or other nonconsenting persons, and

11 a sexual preoccupation must occur over a period of at

12 least six months and cause significant distress or

13 impairment in social, occupational or other important

14 areas of functioning.

15 Q      With respect -- how does the definition there of

16 paraphilias relate to your diagnosis of paraphilia

17 not otherwise specified?

18 A      Okay. Well, again, to begin with, as I

19 mentioned, I diagnosed Mr. King with paraphilia not

20 otherwise specified, forced sex with nonconsenting

21 victims, so the definition of paraphilia NOS would have

22 to meet this criteria. In other words, Mr. King would

23 have to have recurrent, intense sexually arousing

24 fantasies, urges or behaviors involving in this case

25 forced sex with nonconsenting victims, and these urges

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 81 of 221

1  and fantasies and behavior must occur over a period of

2  at least six months and cause significant distress or

3  impairment in functioning.  And, of course, being

4  incarcerated would be considered an impairment in

5  functioning. So the definition of paraphilia NOS, forced

6  sex with nonconsenting victims would fall under this

7  category.

8  Q      Now, your diagnosis of -- you called it a script

9  or a forced sex, what does forced sex mean with regard

10  to your diagnosis?

11              THE COURT: Can I stop you one moment? I've

12  got on my screen now up here a document that is

13  different from the chart that is the --

14      (Whereupon off the record.)

15              MR. LOCKRIDGE: It is not on our screen.

16              THE COURT: What do you have on your screen?

17              THE WITNESS: I have like a spreadsheet of

18  stuff.

19              MR. LOCKRIDGE: It may be coming from our

20  computer, Your Honor, if you give us a moment.

21              THE COURT: Certainly. It's now off of my

22  screen and I can see Doctor Zinik's screen, and it's off

23  of his screen as well.

24              MR. LOCKRIDGE: We apologize about that, Your

25  Honor.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 82 of 221

1        THE COURT: That's quite all right. Let me

2    also note for the record that the chart that's the

3    subject of examination of Doctor Zinik at this point is

4    behind tab 56 following the timeline.

5        MR. LOCKRIDGE: Yes. Thank you, Your Honor.

6        THE COURT: Very good. Mr. Lockridge, sir, I

7    apologize for interrupting you after you asked a

8    question. I hope you recall it.

9        MR. LOCKRIDGE: Thank you, Your Honor. I

10   apologize for the inconvenience.

11       BY MR. LOCKRIDGE:

12   Q      You were discussing paraphilia not otherwise

13   specified, and I asked you a question regarding what

14   forced sex means.

15   A      Okay.

16   Q      Could you answer that question?

17   A      Yes. I think in -- what that really could mean

18   is any kind of coercive sex, and in Mr. King's case,

19   what it involves is, you know, forcing victims to --

20   sexually exposing himself to victims, forcing them to

21   watch him and his activity of forcing the victims to

22   masturbate him. That would qualify as coercive sex or

23   forced sex with nonconsenting victims.

24   Q      All right. Doctor Zinik, let's go through the

25   chart up there on the easel. Could you please explain

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 83 of 221

1   what, if any, recurrent intense sexually arousing

2   fantasies, urges or behaviors that you diagnosed Mr.

3   King as experiencing?

4   A       Okay. Well, we've already talked about how Mr.

5   King has admitted to having these recurring sexual

6   fantasies about tying women up and raping them. That was

7   a term he used back in 1976. He was more descriptive

8   about that in his discussion with Doctor Dawn Graney in

9   2009 where he described the whole paraphilia I explained

10  earlier about forcing women to watch him masturbate --

11  exposing himself to women and forcing them to masturbate

12  him -- doesn't involve any penetration, but it is, you

13  know, just as coercive and involving threat of bodily

14  harm.

15          He would obviously kidnap these victims,

16  sometimes at knifepoint. He would restrain them with

17  handcuffs and ropes and blindfolds and things like that,

18  and, you know, this kind of event would be extremely

19  traumatic to the victim despite the lack of penetration

20  or forced intercourse.

21          THE WITNESS: By the way, Your Honor, I think

22  it's important to understand that doesn't -- just

23  because there's no penetration doesn't reduce what we

24  call the rape trauma syndrome or the traumatic effect

25  that the victim would experience, especially being held

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208              (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 84 of 221

1   captive like this sometimes for hours and hours and

2   being tied up and so on -- would have perhaps life

3   changing type of traumatic effects on the victims.

4   A        So, you know, I think it's an unusual form of

5   paraphilia NOS, nonconsent or forced sex with

6   nonconsenting victims, but it certainly meets the

7   criteria of that type of paraphilia.

8   Q        Doctor Zinik, with regard to those numbers, one,

9   two and three up on the chart, which, if any, of those

10  apply in this case?

11  A        It would be number three, the nonconsenting

12  persons.

13  Q        And that would be the victims?

14  A        The victims, yes.

15  Q        What's it mean with regard to the period of at

16  least six months?

17  A        You know, interestingly, the six month criteria

18  was really arbitrary. I heard Doctor Allen Frances say

19  that. He's one of the editors of the DSM, the Diagnostic

20  Manual, and he talked about how the -- this definition

21  of paraphilias first appeared in the Third Edition of

22  the DSM back in 1980 and that was when the six month

23  criteria first appeared, and it was really just kind of

24  an arbitrary decision. They pulled that time frame out

25  of a hat. There's really no specific clinical importance

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 85 of 221

1  to it, but the idea is that there has to be some

2  duration to the fantasies and urges and they can't just

3  be, you know, a brief single type incident or a short

4  phase of behavior. There has to be some duration over

5  time, and in the case of the DSM, they just chose six

6  months as that time frame.

7          But, of course, this would apply for Mr. King

8  because he's -- first started sexually offending -- I

9  mean, his first violent -- well, I mean, if you consider

10 the first offense where he exposed himself to the two

11 little girls as an act of child molesting as a sexually

12 violent offense, you know, that began at age 15, and

13 then his most recent -- that began in 1974, and then his

14 most recent sex offense was at age 29 in 1988. So we

15 clearly have a long time frame of the same type of

16 sexually violent behavior that would meet the -- way

17 over the six month criteria for the paraphilia

18 diagnosis.

19 Q       And staying up there on the easel, directing

20 your attention to the easel again, Doctor Zinik, what's

21 it mean to say the urges or fantasies cause significant

22 distress or impairment in social, occupational or other

23 important areas of functions?

24 A       You know, what that means -- that's the

25 impairment that we're talking about, and, you know, the

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 86 of 221

1  impairment can be subjective. It can cause the

2  individual distress, and I think that has been expressed

3  by Mr. King in the past. He was very concerned that --

4  he's talked about how he was afraid he would get out and

5  reoffend and -- caused him a lot of grief.

6          And then the other form of impairment is that

7  there's some individuals that suffer from paraphilias,

8  but it doesn't bother them. They don't think the

9  behavior is wrong. They're not personally distressed by

10 it, but, nevertheless, it interferes with their social

11 functioning. Some of them are incapable -- when a

12 paraphilia is really in a very powerful exclusive form

13 we call it, it interferes with normal emotional love

14 relationships and healthy dating and intimacy and what

15 we call pair bonding, and so some individuals are not

16 able to form healthy, intimate life relationships with

17 an age appropriate adult. Some, you know, may get in

18 trouble in the workplace or in other contexts. So those

19 are the other forms of impairment that can occur.

20 Q      Doctor Zinik, in your view, does this diagnosis

21 of paraphilia not otherwise specified, nonconsent

22 constitute a serious mental illness, abnormality,

23 disorder under the Federal law?

24 A       Yes, it does, absolutely, because of the -- you

25 know, the really terrible violent crimes that are the

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 87 of 221

1  result of it and the trauma to the victims that we've

2  already discussed.

3  Q       In your opinion, does this diagnosis have any

4  relationship to his volitional or emotional capacity?

5  A       Well, yes, it does. I mean, that's not -- the

6  volitional impairment is not an element of the clinical

7  diagnostic criteria. You don't find that in the DSM, but

8  I think that is evident in Mr. King's case because of

9  some of the things we already discussed, how quickly he

10 reoffends after being released from custody, how he's

11 described in several places over the years, over the

12 decades that he feels like he's out of control. He can't

13 control these impulses. He's made some very descriptive

14 statements about being out of control, which is exactly

15 what we mean by the volitional impairment.

16 Q       All right, Doctor Zinik, you testified that Mr.

17 King's last conviction for a sexually violent offense

18 was in 1988. How can you say to a reasonable degree of

19 professional certainty that he continues to suffer from

20 this diagnosis?

21 A       Well, I think there's a few reasons. One is that

22 a -- paraphilias in general, all of them, are very

23 deeply entrenched lifelong sexual preferences. These are

24 preferred forms of sexual arousal that don't go away

25 over time, even if the individual doesn't have the

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 88 of 221

1   opportunity to act on them. These are lifelong,

2   entrenched sexual preferences. They can be kept alive,

3   so to speak, with masturbation fantasies so that even

4   though the individual is in custody or somehow prevented

5   from contact with his victim pool, it's possible that he

6   could be reinforcing and reenacting the deviant sexual

7   behaviors during his sexual fantasies.

8          And the other reason that I think this applies

9   to Mr. King is the -- I'm repeating myself here, but,

10  you know, he's continued to make these disclosures about

11  having this sexual disorder ever since he was 15, and

12  most recently just two years ago in 2009 during his

13  precertification evaluation with Doctor Graney, he

14  talked about how he felt quite certain that he was going

15  to get out and do it again, but he was like a -- he used

16  the analogy of being a hibernating bear and if he's

17  released, he's going to wake up and he's going to be

18  famished with hunger and he's going to go out and commit

19  these violent crimes again and even used the phrase

20  about eating his victims, referring to killing his

21  victims, so I thought that was a very apt description of

22  not only the paraphilia but that it is currently active

23  and sort of alive in his psychological makeup.

24  Q     All Right, Doctor Zinik. Turning to the --

25  earlier you mentioned the terminology paraphilic

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 89 of 221

1    coercive disorder.

2    A       Yes.

3    Q       In what way, if any, does that relate to your

4    diagnosis of paraphilia not otherwise specified,

5    nonconsent?

6    A       Well, it's really just a synonymous term for the

7    same thing. Like I said, there's -- all these terms

8    really could apply to the same sexual disorder

9    paraphilia NOS, nonconsent, rape paraphilia, paraphilia

10   coercive disorder.

11           Now, the term paraphilic coercive disorder has a

12   long and controversial history. It was a paraphilic

13   disorder that was first proposed in the DSM -- actually,

14   it was first called sexual assault disorder. That was

15   the original title, and that was proposed for inclusion

16   in the DSM-III, but it was not accepted.

17           The DSM-III was published in 1980. And then the

18   term paraphilic coercive disorder first appeared as a

19   recommendation for the DSM-III-R, the revised edition of

20   the DSM-III, and there was a very well-publicized debate

21   about the issue back in the mid 1980s. This was in the

22   news a lot of the time and there was a lot of

23   controversy over whether this was a legitimate

24   diagnosis.

25           There were a lot of politics over it, whether it

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 90 of 221

1    should be included in the DSM or not. There was a lot of

2    concern -- at that time the rape prosecution laws were

3    being reformed and revised, and there was concern that

4    rapists would claim that they had paraphilic coercive

5    disorder and that they had a mental illness, that they

6    weren't really criminals, but they were -- they had

7    mental problems and that they should be sent to

8    treatment to mental hospitals and not be sent to prison

9    and that there was a concern that this would be misused

10   as a way of avoiding responsibility for criminal

11   behavior and being released early from treatment from

12   mental hospitals and this sort of thing. There was

13   really a very loud public outcry. Feminist organizations

14   were opposed to it and so on.

15           So, anyway, the long and the short of it was

16   that it was ruled out of the DSM-III-R by a vote of ten

17   to four. There were 14 members on the DSM committee at

18   that time, and they outvoted paraphilic coercive

19   disorder, so it was not accepted as official -- as an

20   official diagnosis. Then it was reproposed about two

21   years ago.

22           Currently we're on the sixth edition of the

23   manual, the DSM -- manual. This is the sixth edition,

24   which is actually -- it's the DSM Fourth Edition Text

25   Revised, DSM-IV-T-R, and the Fifth Edition, the DSM-V is

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 91 of 221

 1  currently being compiled, and that is scheduled for
 2  publication in 2013.
 3          So a couple years ago, the DSM committee --
 4  there was a paraphilias workgroup that recommended that
 5  paraphilic coercive disorder be reconsidered as an
 6  official diagnosis, and as you can imagine, that was
 7  kind of stimulated, I think, to a large degree by the
 8  enactment of SVP laws and the Adam Walsh Act and these
 9  civil commitment laws that started occurring among
10  states in -- like the mid 1990s was when the civil
11  commitment laws reappeared, and so there developed
12  renewed interest in paraphilic coercive disorder and
13  paraphilia non -- OS, nonconsent, because this was the
14  diagnosis that was most commonly used to be a qualifying
15  mental disorder for serial rapists and sex offenders.
16          You know, there's two groups that fall into the
17  SVP camp, so to speak, two primary diagnostic groups.
18  There are the child molesters who are diagnosed with
19  pedophilia, the sexual preference for children, and then
20  there are the serial rapists or the repeat rapists, and
21  since we don't have an official diagnostic term for this
22  type of rape paraphilia, paraphilic coercive disorder
23  was reproposed for the DSM, but just a few months ago,
24  it turned out that it was decided not to include it as
25  an official paraphilic diagnosis, but it has been moved

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 92 of 221

1  to what's called the appendix of the DSM-V which is a

2  category for mental disorders where they're worthy of

3  future study and need more research.

4        And so at the present time, paraphilia NOS,

5  nonconsent or forced sex with nonconsenting victims

6  would be the appropriate diagnosis for someone like Mr.

7  King.

8  Q        Thank you. And is that paraphilia not otherwise

9  specified, nonconsent that you just mentioned -- in your

10 experience, has that been accepted in courts you've

11 testified as a valid diagnosis?

12 A        I think it has. I actually think it's widely

13 accepted among the clinical community who is familiar

14 with this population. The community that evaluates and

15 treats sex offenders, particularly SVP, sexually violent

16 predators, I mean -- you know, and I've done some of my

17 own research in that area, and there has been wide

18 agreement among the professionals that I've surveyed on

19 the existence of this type of rape paraphilia, and there

20 are -- there's old studies from the 1990s that show that

21 there was widespread agreement among particularly the

22 clinical community that treats sex offenders.

23 Q        Okay. Now, just with regard to the diagnosis

24 itself of paraphilia not otherwise specified,

25 nonconsent, have you testified to that diagnosis in

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 93 of 221

1    court?

2    A       Yes, I have.

3    Q       Was that diagnosis accepted?

4    A       Yes, it was.

5            MR. LOCKRIDGE: Your Honor, may I approach the

6    easel?

7            THE COURT: You may, sir.

8            BY MR. LOCKRIDGE:

9    Q       All right, Doctor Zinik, trying to finish up

10   with this particular diagnosis, can you please refer to

11   the easel? And do you know what that particular chart

12   shows?

13   A       Yes.

14   Q       And what is that?

15   A       This is the definition of paraphilia NOS, forced

16   sex with nonconsenting females. These are the specific

17   symptoms, and underneath that are the specific symptoms

18   and behaviors, the signs and symptoms that are

19   manifested by Mr. King.

20   Q       Could you just real briefly go through those

21   signs and symptoms?

22   A       Okay. Well, the ones that apply to Mr. King,

23   these are -- there's kind of two main categories. The

24   first is what we call persistence of sexual offending,

25   and this is demonstrated by multiple victims of actual

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 94 of 221

1  or attempted coercive sexual acts, so these are the

2  repeat offenders that assault multiple victims over

3  time, the serial sex offenders.

4         Number two is multiple sentencing dates. In Mr.

5  King's case, he has four for sexually motivated

6  aggression. And, now, what we mean by this is this is

7  called the cycle of offending where the offender commits

8  an offense, he gets caught, gets arrested, gets

9  prosecuted, convicted, sanctioned somehow, usually by

10 going to jail or prison, gets out into the community and

11 then repeats that cycle. And the more times an offender

12 repeats that cycle, the greater the persistence of

13 sexual offending that he demonstrates.

14        In Mr. King's case, he has four of those cycles

15 where he offended, you know, got caught, incarcerated,

16 released and reoffended, so, you know, now he's on his

17 fifth offense. He's had four cycles of reoffending you

18 might say, and that's really powerful evidence, I think,

19 that this is a very compelling disorder that drives him

20 to commit sexually violent crimes.

21        Number three is history of sex offending as a

22 minor and as an adult. This is a well-established risk

23 factor in the sex offender literature. Most juveniles

24 who commit sexual crimes never reoffend. There's a very

25 small minority that never reoffend later on in

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 95 of 221

1    adulthood, and there's a very small minority that do,

2    that start their sex offending careers as juveniles and

3    continue to reoffend a adults. And so when you've got

4    that history of reoffending as a juvenile and then

5    reoffending as an adult, what it typically means is that

6    the meaning of the sex offense in adolescence signaled

7    the onset of sexual deviance that became a life pattern

8    that carries out throughout the offender's life. That's

9    true in Mr. King's case. He has two -- actually, I

10   think, three arrests as a juvenile for sex offending. We

11   have the two in 1974 and the one in '75.

12          Now, the fourth item on the list is rapid

13   reoffending which is defined as committing a new

14   sexually violent crime within a year after being

15   released to the community or a year after sanctions for

16   a prior sexually violent crime, and we have that in Mr.

17   King's case. We know that he was paroled September 3,

18   1987 from his fourth sex offense that was committed in

19   1983 and five and a half months later he reoffended on

20   February 19, 1988. So he was on parole, only been out

21   five and a half months and he committed a very similar

22   attempted abduction of a female victim.

23          Moving on to behavioral signs -- may I move on?

24   Q      Yes, please.

25   A      Okay. There are certain behavioral signs. These

Huseby, Inc.                                   www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208              (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 96 of 221

1  are the signs that are -- if you review the literature

2  on paraphilia NOS and rape paraphilia and so on as well

3  as -- these were factors that were verified by my

4  research. These are signs, behavioral signs of this type

5  of forced paraphilia.

6          The first one is committing acts of coercive sex

7  despite the presence of an available sexual partner. I

8  mean, you would have to ask, if the offender had an

9  opportunity to have consenting sex with his partner but

10  they went on to commit rape and forced sexual crimes,

11  something must be driving them to do that. They weren't

12  content to -- you know, they weren't satisfied or

13  content you might say by their current relationship with

14  their available sexual partner. And we know that in Mr.

15  King's case, he was newly married in 1983 when he

16  sexually offended and in 1988, so that item would apply

17  to him.

18          The second item is carries a rape kit in their

19  car or carries a rape kit in some form, typically in

20  their car. This is evidence of advanced planning and

21  premeditation. We've already talked about how this

22  applies to Mr. King.

23          And the third item is stereotyped rituals or

24  repetitive patterns of behavior that demonstrates a

25  modus operandi, and this is kind of a well-established

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 97 of 221

1  description of a paraphilia, that the more the behavior

2  is ritualized and repeated and scripted in this certain

3  fashion, the more -- you know, certain props are

4  required and certain events have to occur in a certain

5  order to produce a sexual arousal, the more likely it is

6  to be a paraphilia, and I think the way that Mr. King

7  described his sexual offending to Doctor Graney in 2009

8  would fit this category.

9         He talked about how he seeks out a certain type

10 of victim and he abducts them at knifepoint, blindfolds

11 them, ties them up, and then the only thing he has them

12 do is watch him while he exposes himself and forces them

13 to masturbate him. It's very kind of narrowly defined

14 and scripted.

15 Q     Moving on to your next diagnosis, I believe you

16 stated you diagnosed Mr. King with exhibitionism, is

17 that correct?

18 A     Yes.

19 Q     And are the diagnostic criteria for

20 exhibitionism set forth in the Diagnostic and

21 Statistical Manual?

22        THE COURT: Mr. Lockridge, before we get past

23 this chart, I just want to note for the record that the

24 chart about which Doctor Zinik has been testifying is

25 the third chart after the timeline under Exhibit 56.

Huseby, Inc.                                   www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 98 of 221

1          MR. LOCKRIDGE: Thank you, Your Honor.

2          THE COURT: Yes, sir.

3          MR. LOCKRIDGE: And I would ask to approach

4    the easel one more time, Your Honor.

5          THE COURT: You may.

6          MR. LOCKRIDGE: And that document I'm about to

7    show, Your Honor, is also -- that Exhibit 56.

8          THE COURT: That is, in fact, the next chart

9    under Tab 56 -- in Exhibit 56. Mr. Lockridge?

10         MR. LOCKRIDGE: Thank you, Your Honor.

11         BY MR. LOCKRIDGE:

12   Q      Doctor Zinik, what does the easel show at this

13   time?

14   A      This is the definition of exhibitionism that you

15   find in the DSM.

16   Q      If you could, could you please explain what

17   exhibitionism is and how, if at all, Mr. King meets the

18   criteria for that diagnosis?

19   A      Okay. This is another paraphilia that involves

20   intense recreant sexual fantasies, urges or behaviors

21   involving exposure of one's genitals to a stranger. The

22   individual may masturbate while exposing himself or

23   later while fantasizing -- exposing himself. Typically

24   exhibitionists do not attempt further sexual activity

25   with the victim or the stranger. Interestingly, they

Huseby, Inc.                                  www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 99 of 221

1  usually keep their distance and then leave when they're

2  done, but that isn't always the case, and it isn't the

3  case with Mr. King, as we've already discussed.

4         Often there's a desire to shock or surprise the

5  observer, and sometimes these men will report that they

6  have sexually -- while exposing themselves, they have

7  fantasies that the observer or the victim will also be

8  sexually aroused and want to have sex with them. That's

9  part of the intrapsychic motivation and the fantasy that

10  propels them to do it.

11  Q      Does this particular diagnosis also have a

12  period, a minimal period for which the person must have

13  exhibited --

14  A      Yes. That's not on there, but there's a six

15  month duration requirement for this paraphilia just like

16  all of the paraphilias, and it is also causing --

17  distress or impairment of functioning is another

18  criteria.

19  Q      To the extent you haven't already explained with

20  regard to Mr. King's case, how does he fit these

21  criteria?

22  A      He fits this criteria because there's evidence

23  that he began sexually exposing himself when he was 12

24  years old. He was arrested for it for a couple times

25  when he was 14 -- or 15, excuse me. You know, it's

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208            (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 100 of 221

1  reported by his parents he went to treatment with mental

2  health professionals as an adolescent for this problem.

3  He reported these fantasies of exposing himself when he

4  was in treatment at the Phipps clinic in 1976, and he

5  had the incident in 1993 that we already described where

6  he was in Federal prison and was in treatment with a

7  female therapist and was talking about his exhibitionism

8  and his compulsion to have women touch his penis, and

9  then he, in fact, asked his female treatment provider to

10 do that.

11       And again just recently in his important

12 interview with Doctor Graney in 2009, he talked about

13 how he still has daily fantasies of exposing himself. He

14 talked about how he had been using heroin in prison to

15 dampen his sexual impulses so that he wouldn't expose

16 himself to the female officers in prison and, you know,

17 that that was currently a problem for him.

18 Q       All right. Thank you, Doctor Zinik. Is

19 exhibitionism, in your opinion, a serious mental

20 illness, abnormality or disorder?

21 A       Yes. I think it is. I mean, I think it

22 certainly -- it commonly results in breaking the law and

23 criminal sanctions. It's typically considered a

24 nonviolent paraphilia, but I think in Mr. King's case,

25 he's unusual in the fact that it's sort of merged

Huseby, Inc.                                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 101 of 221

1  together. It's almost as if his paraphilia for forced

2  sex and his exhibitionism have merged together into one

3  type of paraphilia that causes him to expose himself and

4  have the victims masturbate him.

5  Q      And that -- you testified again that Mr. King's

6  last conviction was in 1988. How can you say to a

7  reasonable degree of professional certainty that he

8  continues to suffer from exhibitionism?

9  A      Well, again, I'm repeating myself, but we've

10  got -- he's made admissions to this fact more recently

11  than 1988, particularly with Doctor Graney in her

12  precertification report.

13  Q      All right. Doctor Zinik, I'd like to turn to

14  your next diagnosis. I believe you diagnosed -- through

15  your testimony, you indicated you diagnosed Mr. King

16  with antisocial personality disorder.

17  A      Yes.

18  Q      And are the criteria for that diagnosis set

19  forth in the Diagnostic and Statistic Manual?

20  A      Yes.

21  Q      Is that a diagnosis well-accepted among

22  professionals in your field?

23  A      Yes.

24          MR. LOCKRIDGE: Your Honor, may I approach the

25  easel?              THE COURT: You may.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 102 of 221

1          MR. LOCKRIDGE: Thank you.

2          BY MR. LOCKRIDGE:

3     Q    Doctor Zinik, I'd like to refer you to the chart

4     on the easel once again. Could you please -- to the

5     extent you know, what is that?

6     A      Okay. This is the DSM criteria for antisocial

7     personality disorder.

8          MR. LOCKRIDGE: Briefly, just for the record,

9     Your Honor, I'd like to note that exhibit as well as --

10    under tab 56.

11         THE COURT: Yes, it is. In fact, it is the

12    next chart, and I believe the last chart at least under

13    my tab 56 -- Exhibit 56 for the Government.

14         MR. LOCKRIDGE: Thank you.

15         BY MR. LOCKRIDGE:

16    Q    Please continue.

17    A      Okay. So this is diagnostic criteria from the

18    DSM -- manual, and you know, personality disorders

19    involve these longstanding maladaptive patterns of

20    behavior that interfere with a person's social,

21    occupational and emotional functioning. Antisocial

22    personality disorder in particular is characterized by a

23    pervasive pattern of disregard for and violation of the

24    rights of others that begins in childhood or early

25    adolescence and continues into adulthood.

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 103 of 221

1          There's actually seven individual factors under

2    the definition of antisocial personality disorders, but

3    these were the five that I felt applied to Mr. King. The

4    first is failure to conform to social norms by

5    repeatedly performing acts that are grounds for arrest.

6    The second is deceitfulness, repeated lying, use of

7    aliases or conning others. The third is irritability and

8    aggressiveness, repeated physical fights or assaults.

9    The fourth is reckless disregard for the safety of self

10   or others, and the fifth is lack of remorse.

11   Q      How do those numbered items on the board there

12   appear, if at all, in Mr. King's case?

13   A      Well, I think they all appear in Mr. King's

14   history. As we've already said, he's got five arrests

15   for what I believe are sexually motivated offenses. He's

16   only got one other arrest in his history, which was for

17   possession of marijuana, so we would call Mr. King a

18   sexual offender specialist, which is interesting. This

19   has really comprised the sum total of his criminal

20   career. He demonstrates deceitfulness, repeated lying

21   and conning of others.

22          He has claimed in the past that he had a

23   disorder called multiple personality disorder. For a few

24   years, he actually had -- he had -- he was spending a

25   lot of time in treatment with the BOP psychologist

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 104 of 221

1  talking about how he had all these different

2  personalities and, you know, put a lot of effort into

3  conning others and has later admitted that that was all

4  a sham and a made up disorder.

5          He's also claimed to be suicidal on several

6  occasions in the past in order to gain privileges or,

7  you know, be changed to different housing assignment or

8  something like that and then admitted that he never

9  really was suicidal but he was just using this as a gain

10  to get what he wanted.

11          It's significant that he has made these

12  admissions ever since the mid 1970s of having impulses

13  to commit sexual crimes, expose himself, assault victims

14  and so on, made this elaborate presentation to Doctor

15  Dawn Graney in 2009 all about it, so he showed

16  consistent -- what I suspect to be honest

17  self-disclosure about his sexual disorder up until last

18  year, 2010, when he got this letter from his ex-wife,

19  Marlene, who invited him to stay with her when he's

20  released from prison, and after that time, he claimed

21  that -- you know, he recanted his earlier admissions and

22  repudiated what he said to Doctor Graney and Doctor

23  Ivonne Bazerman, another one of the precertification

24  evaluations that was written about him in 2009. He's

25  repudiated all that and now claims that he made all that

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 105 of 221

1  up and that those were lies, too.          And, so you

2  know, what I suspect is the recanting is not the truth

3  and that the admissions of the disorder are true because

4  we have evidence of those that goes way back to 1976,

5  long before he faced civil commitment, long before the

6  Adam Walsh Act, long before he was getting close to

7  being released to the community before he began to be

8  concerned that he might get out, reoffend because he

9  didn't have any support. We've got these consistent

10  admissions all the way through.

11          And now he's claiming that -- well, I don't know

12  if he's claiming that the early admissions -- forgive

13  me. I think in his letter he's claiming -- the letter he

14  wrote repudiating what he said was specifically replying

15  to the admissions he made to Doctor Bazerman and Doctor

16  Graney, but, you know, he's now claiming that he's never

17  had these impulses and these were not sexually motivated

18  crimes. I look at that as part of his con game, frankly,

19  the recanting, I think, which is an item here under the

20  antisocial personality disorder, the number two item,

21  the deceitfulness item.

22          Okay. Number three is irritability and

23  aggressiveness, repeated physical fights or assaults.

24  He's described as being angry in the records. He

25  admitted to me during the interview that he was angry as

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 106 of 221

1  an adolescent and young man because of the disabilities
2  that he had as a kid and the kind of teasing and
3  ridicule that he suffered and the ostracism, there's
4  also references to his anger at women in his BOP
5  records, too. And he has a couple prison infractions and
6  rule violations for being threatening and, you know,
7  threatening staff.
8         Okay. Number four is reckless disregard for
9  safety of self or others. I think this applies to his --
10 you know, his criminal behavior, the violent crimes he's
11 committed in the community. He also has continued to
12 abuse narcotics during his prison term up until as
13 recently, I think, as 2009. That was his last infraction
14 for use of narcotics. You know, this also speaks to his
15 substance dependence and his addiction, but it's another
16 example of disregard for safety and self.
17        And then number five, lack of remorse, there's
18 one statement in the records. I think it was up on the
19 timeline where he talked about he said I have no
20 remorse, and I think he showed some remorse in the
21 admissions that he made to Doctor Graney and Doctor
22 Bazerman, but now he's claiming that those were all, you
23 know, a ruse and that he really -- those weren't true
24 and he's retracting those statements, and I think that
25 shows a lack of remorse.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 107 of 221

1    Q        Thank you, Doctor Zinik. Turning to -- next

2    issue, one of the things you were asked to determine is

3    whether Mr. King will have serious difficulty refraining

4    from sexually violent conduct or child molestation if

5    released, is that correct?

6    A        Yes.

7    Q        And you testified -- what was your answer to

8    that?

9    A        I believe that he will, yes.

10   Q        How do you go about -- in your field of work as

11   a psychologist, how do you go about determining whether

12   someone will have serious difficulty in refraining from

13   sexually violent conduct or child molestation?

14   A        Well, you look at their history. You look at

15   their pattern of offending. You look at the timing of

16   offenses.  You look at the number of cycles of offending

17   that we've already described. You look at how quickly

18   they reoffend after they're released to the community.

19   You look at the statements that they've made about their

20   offending behavior. All of these things -- I think

21   there's plenty of evidence that demonstrates that Mr.

22   King will have serious difficulty refraining from

23   committing sexually violent behavior based on all of

24   those things.

25            You also look at the fact of whether or not

Huseby, Inc.          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 108 of 221

1  they've completed any sex offender treatment, and Mr.

2  King has not in -- in this case, he's had a fair amount

3  of general counseling and therapy, but he's never -- at

4  least since his last offense in 1988, he has not

5  participated in a structured sex offender specific

6  treatment program.

7        And I think you also look at their current

8  attitudes and presentation about their crimes, and, of

9  course, two years ago, he was being forthcoming and

10  taking responsibility for his crime and his sexual

11  deviance, but now he's saying I never committed any

12  sexually violent crimes, I was only attempting to rob my

13  victims and I don't have any problems -- I don't have

14  any sexual problems, I don't have any sexual deviance.

15  I refuse to register as a sex offender. This is what he

16  says. He's refusing to register as a sex offender if

17  he's released to the community because he believes that

18  he has not been convicted of any sexual crimes that

19  would require that, and, you know, he's seeming,

20  you know, pretty noncompliant with any of the kind of

21  conditions that might be placed on him to reduce his

22  risk to reoffend.

23  Q     Now, in guiding your opinion with regard to his

24  likelihood or serious difficulty in refraining from

25  sexually violent conduct or child molestation, did you

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 109 of 221

1   use any instruments to guide you in that determination?

2   A       Yes, I did.

3   Q       What type of instruments did you use?

4   A       I used three actuarial risk scales.

5   Q       What is an actuarial risk scale?

6   A       Okay. An actuarial risk scale is an instrument

7   that is designed to improve the probability of risk

8   assessment and accuracy in predicting, you know, whether

9   offenders may reoffend or not.

10  Q       All right. And how do those usually generally

11  work?

12  A       Well, how do they work? It's sort of

13  complicated, but the way they work, they're what you --

14  let's see. Let's see if I can kind of boil this down. If

15  I were doing what we call unguided risk assessment

16  without using any kind of tools or risk scales to guide

17  my judgment, I would be -- you know, in that case, the

18  evaluator has to predict whether the offender is going

19  to reoffend or recidivate or not, and what studies have

20  shown in the past is that when evaluators base those

21  decisions only on clinical judgment without any

22  additional tools, their likelihood of being correct is

23  no greater than chance. They may as well be flipping a

24  coin, because the probability that they're going to be

25  correct is no greater than 50 percent. It's 50/50. It's

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 110 of 221

1    no greater than chance.

2          With the development of actuarial risk scales,

3    we are able to improve that probability so that our --

4    the risk scales give us what we call moderate predictive

5    accuracy. They're certainly not foolproof. You know,

6    they're not 100 percent correct and accurate, but they

7    do improve risk prediction to a small but significant

8    degree, at least enough to where they're useful, and I

9    like to think of them as sorting tools, that the

10   actuarial risk scales are like sorting tools. They help

11   you sort your offenders into categories of being low

12   risk, moderate risk and high risk, and, you know, so

13   they do improve the risk prediction.

14         They can't tell you whether -- you know, we

15   never know -- nobody has a crystal ball. We can't

16   predict what will happen in the future and, you know, we

17   don't know who will or will not reoffend. No evaluator

18   can say that with any definitive degree, but what we can

19   do is improve our risk assessment. They're sort of

20   like -- the analogy is weather reports. You look at the

21   weather report which helps you decide whether or not to

22   carry an umbrella. If there's going to be an 80 percent

23   chance of rain, you know, and you bring your umbrella,

24   you're likely to stay dry and not get rained on. If

25   there's a 20 percent chance of rain, then, you know, you

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 111 of 221

1   can take a risk and not go -- and go out without your

2   umbrella. So they just help improve risk prediction,

3   but -- and they're a starting point for the risk

4   assessment. They're not the end point, but they help you

5   identify low risk, medium risk and high risk offenders.

6   Q        And how long, generally speaking, have actuarial

7   instruments been used in the field of civil commitment

8   studies -- cases?

9   A        Since probably the late 1990s, mid 1990s.

10  I think the first one that came out was the RRASOR in

11  the mid -- maybe '97. Static-99 was the second one that

12  was published in 1999. And I should add that these

13  are -- this is what we call group data. You know, we're

14  comparing an individual case to a group of offenders

15  that appear to be similar, so we are making statements

16  that -- you know, again, we can't say specifically based

17  on the risk assessment whether this offender will or

18  won't reoffend, but we can say that based on his score

19  which is similar to other offenders in the original

20  study for which the risk scale was developed that that

21  group reoffends at a high rate at such and such a

22  percentage over a certain period of time, that he is

23  similar to that group, but that's as far as we can --

24  Q        Are these instruments widely used by

25  professionals in your field?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 112 of 221

1    A        Yes, they are. And I think it's fair to say that

2    actuarial risk assessment has become the standard of

3    professional practice in evaluating sex offenders,

4    especially in these kinds of civil commitment cases.

5    Q        Now, earlier you mentioned groups of offenders.

6    Are these actuarial instruments? What's the grouping

7    you're talking about? Can you please explain that a

8    little bit?

9    A        Okay. Well, whenever these instruments are

10   developed, they're developed based on the results of a

11   specific sample of sex offenders that they've been

12   designed that -- been created against, so these are --

13   you know, these are specific groups of offenders that

14   were released from a certain prison or state hospital

15   somewhere, you know, a certain locale, in other words,

16   and were followed for a period of time and they were

17   tracked to determine those that reoffend.

18           So we take sex offenders, those who have

19   committed at least one sex offense, release them from a

20   particular jurisdiction, follow them over a specific

21   follow-up period and identify those that reoffend and

22   commit a new second sexual crime during that time frame

23   and those that don't and then we look at the

24   differences, what's different between those that

25   reoffend and those that don't and we develop a profile

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 113 of 221

1    of sorts, a profile of risk factors and then we can

2    score our own case on those risk factors.

3            But we have to keep in mind that all of these

4    instruments were developed on a specific population of

5    offenders that may or may not generalize to other

6    offenders in different countries, you know, different

7    periods of time historically, and this is called the

8    base rate problem, so we always have to keep in mind

9    that whatever sample of sex offender an actuarial

10   instrument was developed on has a particular base rate,

11   and that could influence the rate of reoffense of -- of

12   your case if you compare to that sample, and those base

13   rates are different among different samples.

14   Q      All right. Now, what actuarial instruments did

15   you use in Mr. King's case?

16   A      I used three instruments. I used the Static-99R,

17   the Static-99 Revised. I used the Static 2002R --

18   revised and I used the MNSOST-R Revised. MNSOST stands

19   for Minnesota Sex Offender Screening Tool Revised,

20   M-N-S-O-S-T - R.

21   Q      Doctor Zinik, I would ask that you turn to

22   Exhibit Five in your white binder there and specifically

23   to page 22 of that exhibit. It's also Bates stamped in

24   the bottom right hand corner of 2006136.

25   A      Okay.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 114 of 221

1    Q       Is this one of the reports you did?

2    A       Yes, it is.

3    Q       Is that the report you conducted on October 1,

4    2010 --

5    A       Yes.

6    Q       -- on Mr. King?

7    A       Yes.

8    Q       What is the graph there in the middle of that

9    page?

10   A       That's a table of scores that Mr. King got on

11   the three actuarial instruments that we just described.

12   Q       All right. We're going to put that document up

13   on the screen, if that will help you and your testimony.

14   A       Okay.

15   Q       Now, why did you use these particular

16   instruments?

17   A       I used these because they're commonly used in

18   sex offender risk assessments around the country by SVP

19   evaluators doing civil commitment. I mean, I wouldn't

20   say they're universally accepted. There is some

21   disagreement over the use of actuarials. I wouldn't say

22   everybody uses them, and there is some criticism of

23   them, but I think the use of them is becoming more

24   widespread, and, like I said, it's becoming the standard

25   of practice for sex offender civil commitment

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 115 of 221

1  evaluations.

2          These three -- I've been trained to score these

3  three. These three are commonly used. These three all

4  have what we call cross-validation studies which support

5  their predictive accuracy and they just seem to be the

6  most relevant to Mr. King's case.

7  Q      Have these three instruments been subjected to

8  peer review and publication?

9  A      Yes.

10 Q      What standards or rules, if any, are there in

11 controlling the use of these instruments?

12 A      Well, they each have scoring manuals that

13 explain how each item is to be scored, and so they --

14 you know, the scoring is very standardized.

15 Q      And you mentioned you were trained in the

16 scoring of these --

17 A      Yes.

18 Q      -- and the use of these? And did you base your

19 scoring on the rules -- manuals?

20 A      Yes, I did.

21 Q      I want to refer you to the first instrument

22 there, the Static-99R. What does the Static-99R predict?

23 A      It predicts risk of future recidivism for

24 offenders who have committed at least one prior sex

25 offense.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 116 of 221

1   Q      So is it predicting sexual recidivism?

2   A      Yes. Specifically sexual recidivism, yes.

3   Q      And what does the graph there with respect to

4   the Static-99R tell us?

5   A      What it tells us is that Mr. King got a score of

6   eight which puts him at the high risk level that

7   translates into the -- that places him at the 99th

8   percentile, meaning that he scores higher than 99

9   percent of other offenders that were used in the

10  developmental samples for which the Static-99R was

11  constructed.

12        He has what's called a risk ratio of nearly five

13  that's 4.96. What that means is that with the

14  developmental sample for the Static-99R, the typical sex

15  offender scored a two. He scored an eight, so he's --

16  you know, his risk ratio is nearly five times higher.

17  Now, this gets a little more complicated. So those are

18  what we call relative measures of recidivism.

19        Then we have what are called the estimated

20  recidivism percentages, and those are over two different

21  time frames for the Static-99. There's one for five

22  years and there's one for ten years, and in order to get

23  those numbers, those risk -- those estimated risk

24  percentages, we have to compare Mr. King to one of four

25  different norm groups that have been established for the

Huseby, Inc.            www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 117 of 221

1    Static-99. And so there are actually four different norm

2    groups or comparison groups for the revised Static-99R

3    and you might say they are on a continuum from the

4    lowest risk to the highest risk offenders. And when I

5    wrote this report in 2010, I determined that Mr. King

6    was most like and most comparable to the high risk norm

7    group.

8            There's what's called -- the four groups are

9    called the routine group. That's the lowest risk group.

10   The treatment referred group would be the next higher

11   risk group. Then there's the highest risk group and then

12   there's what's called the nonroutine group, which is a

13   combination of the treatment group and the high risk

14   group that's sort of in between. And it was my

15   conclusion that because of Mr. King's -- you know, his

16   history, his five convictions for sexually motivated

17   crimes, the fact that he had already been precertified

18   twice by other evaluators, that he had been retained

19   beyond his release date, because of his potential for

20   sexual dangerousness and because of the admissions that

21   he made to Doctor Graney and Doctor Bazerman, I felt

22   that he belonged in the -- he was most like and most

23   comparable to the high risk group, and based on his

24   score of eight comparing to the high risk, high needs

25   group that that group -- that the offenders in that

Huseby, Inc.    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 118 of 221

1  group that scored an eight that were most similar to Mr.

2  King, they had a recidivism rate of 45 percent in five

3  years and 55.3 percent in ten years.

4  Q     Now, those percentages, those don't necessarily

5  speak to Mr. King's recidivism, is that correct?

6  A     That's correct. Those are the group -- the

7  results of the estimated recidivism rates for the -- the

8  group of offenders that scored an eight for which the

9  Static-99 was originally developed.

10  Q     Doctor Zinik, I'd like to -- if you could turn a

11  few pages to page 27 of that same report, what is that?

12  A     That's my scoring summary sheet for the

13  Static-99R on Mr. King.

14  Q     Can you just please explain how the scoring of

15  this one particular actuarial instrument was done?

16  A     Okay. All right. Well, you can see that there

17  are ten items.

18  Q     And, Doctor Zinik, we'll put that on the screen

19  for you.

20  A     I got it.

21  Q     Okay. Just go through these briefly and explain

22  why, if at all, those are important to the scoring

23  process.

24  A     Okay. All right. Well, so this is the

25  Static-99R, and there are ten items, and I scored Mr.

Huseby, Inc.                                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 119 of 221

1  King, and item one is based on his age and because
2  he's -- actually he's now 53, he would receive a minus
3  point because you can see the age span 40 to 60, you get
4  a minus point, and the reason for that is is that as
5  offenders age, you know, beyond their 30s and 40s, they
6  begin to, you know, statistically show a decrease in sex
7  offending. So Mr. King gets a minus one point for that
8  item.
9       Item number two is what we call the single item,
10 and that's defined as never having been married or
11 cohabited with a partner for at least two years. And
12 even though Mr. King's been married twice, if you look
13 at the time frame that he was in the community, he would
14 not have the opportunity to have lived with his --
15 either of his partners, either of his wives for at least
16 two years -- he reoffended quickly, and so he gets one
17 point on that item even though he's been married twice.
18      And the point of that item is that what often
19 happens with sex offenders is they have intimacy
20 deficits. They're not able to maintain extended intimate
21 relationships like a marriage or a cohabitating
22 relationship with a partner. Even when they get in those
23 relationships, they end quickly because of their sexual
24 deviance or the fact that they lack the skills to
25 maintain that kind of relationship, and I think that's

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 120 of 221

1  reflective of Mr. King.

2          Moving on to item number three, conviction for

3  index nonsexual violence and -- let's see. I scored a

4  zero on that item, and the reason for that was because

5  the index offense is the current -- is the most recent

6  sex offense, which would be the 1988 conviction. That

7  would be his index sex offense, and he -- because that

8  offense was described as a sexually motivated offense by

9  Mr. King in the presentence investigation report, I

10  actually interpreted that offense to be a sexual offense

11  rather than a nonsexual violent offense. That's how I

12  scored it.

13          THE COURT: Doctor, is it the index offense

14  because it's the most recent?

15          THE WITNESS: Yes.

16          THE COURT: I see.

17  A      So item four, the conviction for nonsexual

18  violence prior to index, and in that case if we look at

19  Mr. King's history, he was convicted -- his convictions

20  in '78 and '83 were -- let's see. I think they were --

21  convictions in '75, '78 and '83 that were, you know, the

22  qualifier. The sexual violence was not included in the

23  description of the charge. I scored him a point on

24  nonsexual violence prior to index.

25          Number Five is prior sex offenses. And, by the

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 121 of 221

1  way, in the scoring of the Static-99, it is possible to

2  count a prior sex -- a prior offense as both a sex

3  offense and a nonsexual violent offense. A kidnapping,

4  for example, for sexual purposes can be -- it may look

5  like -- so to speak, but the way the scoring rules were

6  written -- but if you are convicted of, say, kidnapping

7  for sexual purposes, you would count that -- as both

8  sexual offense and a nonsexual violent offense.

9          So if you count up all his charges, he has seven

10 charges and seven separate convictions. Now, once you

11 get over six charges and four convictions, you get a

12 score of three. This item five, prior sex offenses,

13 that's the only item -- unfortunately, it's not very

14 clear by the scoring sheet here, but it's the only item

15 at which you can score zero, one, two, or three points.

16 All other items are scored zero or one point, but prior

17 sex offenses you can score up to three points on that

18 one item, and the reason for that is it make sense

19 because, again, it's the -- it's that persisting of

20 reoffending, the more frequently you commit new sex

21 offense, the more -- you know, the higher your score on

22 that item and it shows that you don't -- you just keep

23 doing it and you have more charges and more convictions

24 and so your score goes up.

25          Okay. Item six, if you have four or more

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 122 of 221

1  sentencing dates prior to your index offense, it doesn't

2  matter what -- whether they were sexual or nonsexual

3  crimes violent crimes or nonviolent crimes. You get a

4  point on that item, and that just shows, you know, more

5  criminal apt amount that -- if you have four prior

6  arrests prior to your index -- and Mr. King's fifth sex

7  offense, his index offense in 1988 is his fifth -- was

8  sexually motivated offense, so he's got four prior

9  that -- and then he's also got a conviction for

10  possession of marijuana, so he's got enough prior to

11  qualify on that item and get a point.

12        Okay. Any convictions for non-contact sex

13  offenses, this is item seven. Now, this refers to

14  non-contact sex offenses including sexual exposure,

15  window peeping, possession of child pornography, sexual

16  offenses that do not involve contact with a victim. And

17  because Mr. King was convicted of two counts of sexual

18  exposure as a juvenile in '94, it's important on that

19  item juvenile and adult offenses count on Static-99.

20        And moving on, number eight, nine and ten are

21  the -- number eight -- see, all those victims are

22  strangers. A stranger is defined as a victim who --

23  victim -- has known less than 24 hours, and all the

24  victims were strangers. And I'm sorry I skipped around

25  there.  Number eight is unrelated victims.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 123 of 221

1          Nine is stranger victims, and the idea is that

2     these items separate the incest offenders from nonincest

3     offenders, and the reason that's important is because

4     the research shows that incest offenders who were --

5     offenders who only molest or assault victims within the

6     family that they are related to, they have lower rates

7     of recidivism, and the reason is because incest

8     offending is typically not motivated by --  incest

9     offenders are less likely to qualify for a paraphilia

10    diagnosis.

11          There are other situational factors or

12    opportunities in this case, factors that are more likely

13    to come into play with incest offending. So when you go

14    outside the family and molest or assault non-related

15    victims, you're moving beyond the lower risk group of

16    incest offenders, and if you offend against stranger

17    victims, the recidivism studies show that offenders who

18    target strangers have the highest recidivism rate,

19    higher than acquaintance victims or unrelated and then,

20    of course, higher than incest victims -- again, that may

21    seem like -- that stranger victim is going to be an

22    unrelated victim, so -- but this is the way the scoring

23    rules have been written, and if you understand the sort

24    of hierarchy of recidivism related to victims, it makes

25    sense -- lowest risk acquaintance victims who are not

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 124 of 221

1  strangers, next highest risk -- and stranger victims are

2  highest risk offenders.

3          And the next item is male victims, and he has no

4  male victims, so he gets a zero on that item. So his

5  total score would be eight.

6  Q       And what -- looking at the lower part of that

7  scoring summary there, the second box there, how does

8  the eight translate to that part?

9  A       Anything above a six would be determined to be

10 high risk.

11 Q       What does the term interrater reliability mean

12 to you?

13 A       Interrater reliability, what that means is if

14 you take two evaluators and you have them rate the same

15 case on the Static-99, for example, or any test or risk

16 assessment instrument, unless they come up with the same

17 or nearly the same score -- in other words, when a scale

18 has high interrater reliability, that means that

19 different evaluators usually arrive at the same or

20 nearly the same score for the same case.

21 Q       And is there -- does this particular instrument

22 have -- what's the interrater reliability would you

23 consider?

24 A       You know, I don't know the numerical value of

25 the interrater reliability. I know it's high enough to

Huseby, Inc.          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 125 of 221

1  be considered -- it's not 100 percent, because sometimes

2  you do the scoring different. You know, different

3  evaluators will score the same case differently and they

4  may be a point or two apart, but usually they are only a

5  point or two apart, so I know it has -- good enough

6  interrater reliability.

7  Q      All right.  Doctor Zinik, turning back to page

8  22 of that same report, I don't want you to go through

9  and individually score the other instruments you used,

10 but I would like you to refer back to page 22 briefly

11 and just summarize please, briefly, the score that you

12 came up with on the other two instruments.

13 A      Okay. On the Static-2002R, Mr. King scored a

14 nine. That placed him in the high risk category, and on

15 the MNSOST, he scored 16, which placed him in the

16 highest risk category. That category is called refer for

17 civil commitment evaluation level, and these -- what's

18 significant to me about that is it's not unusual that

19 you get an offender who has --  ends up with different

20 scores that place him at different risk levels on those

21 three different instruments. He may be high on one and

22 low on the other or moderately low on one and high on

23 the other or something like that, and then you have to

24 look and explain why that is and what do those different

25 instruments tab or not tab in this particular offender

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 126 of 221

1  which identified where their areas of risk are.

2        In Mr. King's case, he scores high risk across

3  the board on all those, and I think that's significant

4  and it shows there's consistency in the way that he

5  ranks on those actuarial --

6  Q     Doctor Zinik, thank you. Are there any other

7  factors that you considered besides these actuarial

8  instruments in reaching an opinion as to whether he will

9  have serious difficulties in refraining from --

10  A        -- some other pieces to the risk assessment

11  evaluation. I look at dynamic risk factors. Actuarial

12  scales measure what we call static risk factors. Those

13  are historical things characteristic of the case. Often

14  you can get them out of the records or off a rap sheet.

15  You don't always have to interview. Usually there's

16  enough information to score them without interviewing

17  the client. They are historical matters of fact related

18  to history. They're unchangeable and therefore they're

19  considered static risk factors.

20        We have dynamic risk factors, sometimes referred

21  to as psychological risk factors. These are aspects of

22  an individual's personality and psychological makeup,

23  and they're called dynamic because they can change and

24  they are often used to design treatment intervention so

25  that we know that part of the -- of sex offender's range

Huseby, Inc.                                   www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
                                               (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 127 of 221

1  is to alter dynamic risk factors and improve the

2  person's function on those. So I looked at dynamic risk

3  factors.

4         There's a couple studies for evaluating dynamic

5  risk factors. There's an instrument called Stable 2007,

6  and even though I wasn't able to score --

7  instrument because Mr. King is incarcerated and the

8  instrument was developed on sex offenders in the

9  community, I was at least able to evaluate him on some

10 of those items -- as dynamic risk factors, and I also

11 used a new scale called the SRA-FV. It's called

12 Structured Risk Assessment-Forensic Version, and that

13 has been designed to evaluate dynamic risk factors of

14 sex offenders, and I used that in my second report.

15        And then I also evaluated Mr. King on the

16 psychopathy checklist or what's called also PCL-R to

17 determine his level of psychopathy.

18 Q      What were the results of that, if any?

19 A      The psychopathy checklist is designed to measure

20 the psychopathic percentage. There's 20 items. It's a

21 very well-used, well-validated instrument. It's not a

22 risk assessment instrument. I mean, it doesn't predict

23 risk or -- it's not specifically designed for sex

24 offenders, but there's some good studies that shows that

25 sex offenders who do score high in psychopathy have

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 128 of 221

1  higher rates of recidivism. These are offenders who have

2  psychopathic type personalities -- and they manipulate

3  others for their own personal gain and, you know, they

4  lack remorse and they're kind of thrill seekers and so

5  on. That's the profile of the psychopath.

6        Mr. King got a score of 33 out of 40 on the

7  psychopathy checklist, which is a high rate of

8  psychopathy. And I don't remember exactly what the

9  percentage was. I have to look that up in my records

10 real quick here, but it placed him in the 94th

11 percentile score, and that's considered very high.

12 Q        -- dynamic risk factors. What, if any, risk

13 factors did you consider with regard to Mr. King?

14 A        Those are listed on at least my first report on

15 page 24. These are from the Stable 2007. These are

16 factors that have been shown to be, you know -- related

17 to sex offender recidivism, and some of these were hard

18 to evaluate because I hadn't interviewed Mr. King yet,

19 but antisocial influences, you know, we know that

20 offenders who have other serious association -- and

21 friends who kind of circulate among other criminals and

22 have those kind of associations tend to have higher rate

23 of criminal activities.

24        And, you know, at the very least, we know that

25 Mr. King has been abusing narcotics in prison, he --

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 129 of 221

1  getting heroin and different narcotics in prison, so

2  he's involved with that -- those kind of social

3  influences.

4        Intimacy deficits is another dynamic risk factor

5  that could -- and, you know, experienced with

6  relationships, but I think that I would characterize Mr.

7  King -- at this point, he's never been able to maintain

8  a long-term healthy intimate relationship with a

9  partner. He's been out in the community a few times.

10 He's had opportunities to do that. He's been married a

11 couple times, but he always reoffends and those

12 relationships get destroyed, so I think there is a

13 dynamic risk factor that applies to him.

14       There's another one called sexual poor sexual

15 self-regulation, and I think this would apply to Mr.

16 King because of the frequency that he's reoffended. He

17 has not been able to control his sexual deviance. He's

18 talked about -- I've said many times already about how

19 he feared he was going to get out, do it again. He

20 discussed that with Doctor Graney and Doctor Bazerman --

21 would be an example of poor sexual self-regulation.

22       He's demonstrated poor cooperation with

23 supervision when he's been out in the community on

24 probation and parole. He drinks and uses drugs, and I

25 assume that those -- that he was prohibited from doing

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 130 of 221

1  those things while he was on probation or parole

2  typically. I haven't seen his -- and conditions of

3  probation or parole, but usually that is one of the

4  conditions. The -- condition is not to drink alcohol or

5  use illegal drugs or engage in criminal activity, but he

6  did those things and he placed himself in high risk

7  situations by following women and assaulting women

8  again. And so those are some of the dynamic risk

9  factors.

10  Q        What does the term protective risk factor mean?

11  A        There are some protective risk factors which

12  lower the risk of recidivism. These include being very

13  elderly, because we know that advanced age, you know,

14  statistically speaking, sex drive decreases, their

15  levels of testosterone decreases as they age into their

16  60s and 70s and so on, and sex offenders reoffend less

17  often as they get into their 60s or 70s. That's a

18  protective factor.

19          Having lived in the community for a significant

20  period of time without engaging in criminal behavior --

21  so it's, you know, a transformation, and that the

22  offender has reformed and changed his ways, changed his

23  lifestyle. Mr. King has never been able to live in the

24  community for any length of time. Since he was about 17,

25  he's only had about a total of -- it's a little hard to

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 131 of 221

1    know exactly -- figure it out, but it's something likely

2    to five years in the community total. If you added all

3    the time together, he's only spent that much time in the

4    community since he was about 17.

5              And then the last protective factor would be

6    having some kind of physical disability or some kind of

7    life-threatening disease that would shorten his life

8    timespan than would reduce the amount of time that he

9    could reoffend or physical disability that would reduce

10   his physical ability to reoffend, but none of those

11   things apply to Mr. King. None of these protective

12   factors apply to Mr. King.

13   Q       Thank you, Doctor Zinik. Just a few more

14   questions. With regard to your overall opinions, what

15   would you have to say with regard to whether he would

16   experience serious difficulties continuing refraining

17   from sexually violent conduct or child molestation if

18   released?

19   A       I believe that he would. I'm very concerned

20   about Mr. King. I'm very concerned about -- particularly

21   about the statements that he made that he was a

22   hibernating bear and he was going to get out, wake up

23   and get out in the community and reoffend and, you know,

24   be forced to feed that bottomless appetite that he

25   described and but he may -- that he may actually kill

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
                                                   (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 132 of 221

1  his victim. I know he's recanted those statements, but

2  I'm very concerned about those statements.

3          I think once those statements are made, you

4  just -- you have to take those seriously and, in fact,

5  in the world of risk assessment, there are some things

6  that are considered clinical override and that increase

7  risk of recidivism, and one of them is the stated

8  offender -- intent for sexual assault when they get out.

9  He has said that many times over decades, but most

10 likely clearly just two years ago in 2009, and I

11 understand he's recanted that, but I'm not convinced

12 that it was all a story that he made up. So I'm just

13 very concerned that he gets out and commits other

14 sexually violent crimes that would end up -- could end

15 up being fatal. And I think they meet all the criteria

16 as a sexually dangerous person.

17          MR. LOCKRIDGE: Thank you. I have no further

18 questions.

19          THE JUDGE: Why don't we take our afternoon

20 break since it is 2:30?  Will ten minutes be sufficient?

21 We'll reconvene at 2:40.

22     (Whereupon off the record.)

23          THE JUDGE: Mr. Bell?

24          MR. BELL: Thank you, Your Honor.

25          EXAMINATION

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 133 of 221

1          BY MR. BELL:

2     Q     Good afternoon, Doctor Zinik.

3     A     Good afternoon.

4     Q     I'm not as well-versed in the use of the

5     computer display and so forth, so I may ask you to refer

6     to the notebook, if that's okay. It might make it a

7     little easier for everyone. You indicated in your

8     earlier testimony -- we were looking at your curriculum

9     vitae. It's Exhibit Six, if you want -- Government's

10    Exhibit Six, if you want to get it and look at it.

11    Talking about your educational background, you graduated

12    from Stanford University with a BA in psychology,

13    Harvard University with a master's in counseling and

14    consulting psychology, UC-Santa Barbara with Ph.D in

15    counseling and education. Do you have any sort of formal

16    fellowship type training in forensic psychology?

17    A     No.

18    Q     So you have never completed a fellowship with an

19    accredited program in forensic psychology or anything

20    like that?

21    A     No, I have not.

22    Q     You're not Board certified in forensic

23    psychology?

24    A     I'm not.

25    Q     And you indicated that this is the first

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 134 of 221

1   evaluation you have conducted for the government or it

2   was the first one -- it's not the only one, now, but

3   when you were asked to do this, it was your first

4   evaluation, is that correct?

5   A      Yes.

6   Q      Okay. Prior to conducting the evaluations in Mr.

7   King's case, had you had any specific training related

8   to doing a forensic evaluation, not generally which

9   we've talked about or you have talked about, but just as

10  it relates to the Adam Walsh Act?

11  A      Not other than documents that were sent to me,

12  you know, about the statutes. I hadn't attended any

13  training specifically about the Adam Walsh Act, no.

14  Q      And as we sit here today, have you done any

15  training since you did Mr. King's original evaluation?

16  A      Specifically about the Adam Walsh Act?  No.

17  Q      And you talked about your understanding of the

18  statutes and that sort of thing, so I'm not going to go

19  back into that. Would you agree that if Mr. King does

20  not suffer from a serious mental illness, abnormality or

21  disorder, he can't be a sexually dangerous person under

22  the act?  Would you agree with that statement?

23  A      Yes.

24  Q      Okay. Now, you're doing this as a consultant.

25  You indicated you had done work for the State of

Huseby, Inc.                                  www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 135 of 221

1    California. You have a private practice. I assume you're

2    being compensated to be here today, is that correct?

3    A      Yes.

4    Q      What is your hourly rate for your testimony here

5    today?

6    A      Two hundred fifty dollars.

7    Q      Okay. And in the last year -- you have said you

8    do forensic evaluations on a regular basis. In the last

9    year, can you give us an estimate of how much income you

10   have made from doing forensic evaluations?

11   A      In the past 12 months, you mean?

12   Q      Yes, sir.

13   A      You know, I don't have an exact amount, but, you

14   know, I'm going to estimate it might be around $200,000.

15   Q      Okay. So it's a fairly lucrative profession?

16   A      I would agree with that, yes.

17   Q      You indicated this is your first time testifying

18   in Federal court.

19   A      Correct.

20   Q      And you've testified any number of times in

21   courts of California and courts up in Washington, I

22   assume.

23   A      Yes.

24   Q      Now, you indicated in your testimony that when

25   you're given a case as an example by the State of

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 136 of 221

1  California, at least in one way that you do it, you're

2  considered an independent evaluator. You explained that

3  you just make a determination independently whether a

4  person should be detained under their act or not, is

5  that correct?

6  A      Yes.

7  Q      Now, when you were asked to look at Mr. King's

8  case back in 2010, he had already been precertified by

9  two forensic evaluators at that point in time, is that

10 correct?

11 A      Yes.

12 Q      And you had access to their reports when you

13 completed your report in evaluating Mr. King, is that

14 right?

15 A      Yes.

16 Q      Okay. What was your charge as far as looking at

17 his case?  Were you asked to evaluate it, come up with a

18 determination that he was a sexually dangerous person,

19 or did they say look at it and tell us what you think?

20 A      The latter.

21 Q      And tell us what you think --

22 A      I've never been instructed to reach a particular

23 finding or conclusion, and, in fact, several of the Adam

24 Walsh cases that I've evaluated this past year I've

25 determined they did not meet the criteria as a sexually

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 137 of 221

1    dangerous person.

2    Q       In those cases, were you acting as a

3    precertifying evaluator, or had they already been

4    precertified and you were looking at 'em as a forensic

5    evaluator as you did with Mr. King?

6    A       My understanding was I was playing the same

7    role. They had already been precertified and I was the

8    forensic evaluator. I think all the cases that had been

9    sent to me, they have all been precertified is my

10   understanding.

11   Q       Okay. Now, it appears from your testimony that

12   you have done most of your work under the California --

13   I guess it's sexually violent person or however y'all

14   designate it out there. Tell The Court, if you would,

15   what the difference is between California's statute and

16   Federal statute.

17   A       Okay. The California statute has three -- three

18   elements. The first is that the offender has to have

19   been convicted of a qualifying sexually violent crime,

20   and there's a list of penal codes and sexual crimes that

21   are able to qualify in that regard. There's only about a

22   dozen or so.

23           The second element is very similar to the Adam

24   Walsh Act. They must have a mental illness or disorder

25   that causes them serious volitional impairment, and that

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 138 of 221

1   increases their risk of committing sexually violent

2   crimes.

3            And the third element is that they -- they

4   are -- must be considered likely to commit a sexually

5   violent crime in the future and -- is defined such that

6   it does not necessarily mean they have to be more likely

7   than not or 50 -- you know, greater than 50 percent that

8   that is not the criteria.

9   Q      Let's look at the exhibit. I believe it's 56,

10  the timeline which you testified you created in

11  anticipation of your testimony here today. Do you have

12  that in front of you?

13  A      Okay.

14  Q      I'd like to go through some of the testimony you

15  gave in reference to these incidents that you have

16  pointed out in the timeline, starting out with the early

17  history. I guess it's the second entry there, 1971-'74,

18  age 12 to 15 indicates -- your statement in there --

19  he's seen by various doctors in Fairfax County for

20  sexual exposure and obscene phone calls.

21           Other than the police record that we looked at

22  earlier related to the incident of exposure in 1974,

23  your source of other information about doctors and

24  sexual exposure and obscene phone calls, that comes from

25  the presentence report that was prepared in this case,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 139 of 221

1  isn't that right, in 1988?

2  A       I think that -- I'd have to check, but I think

3  there was also information about that in the record from

4  the treatment at Phipps Clinic in 1976. I think those

5  were the two sources where that came from.

6  Q       And in the presentence report which is -- if you

7  need to look at it, it's Exhibit 23 -- there's a

8  statement in there on page 858, Bates stamp page 858 at

9  the top --

10  A       Okay.

11  Q       You have that?

12  A       Yes.

13  Q       -- where it's talking about Mr. King's history,

14  and I guess his mother was reporting this information to

15  the probation officer and it was reported that he was a

16  chronic liar, at times unable to tell the truth. This

17  goes all the way back to his childhood is what that

18  basically is saying, isn't that correct?

19  A       Yes.

20  Q       Okay. Now, the next incident that you discussed,

21  if you look at the timeline, it's April, May, 1974 time

22  frame, and there was a bit of confusion about the number

23  of counts and convictions. We only had -- police record

24  related to the one incident with the two young girls, is

25  that correct?

Huseby, Inc.
www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 140 of 221

1   A       Yes.

2   Q       Now, he was found guilty or pled guilty to that

3   incident and was put on probation. Other than that

4   record -- conviction, there are no other documented

5   cases by way of police record, convictions in court or

6   anything like that of exposure, is that correct?

7   A       There's no police record. Well, the police

8   records from that early incident -- there are references

9   to the fact that he may have exposed himself in other

10  instances.

11  Q       Well, but I'm talking about post 1974.

12  A       Okay.

13  Q       Other than the incident that Mr. King himself

14  has told various evaluators or mental health

15  professionals about, other than his own words, his own

16  statements, what I would call self-reports to make it

17  easy, his own self-reporting, there are no other records

18  of exposures on his part, isn't that correct?

19  A       The only other thing I can think of is in the

20  record in the Phipps Clinic treatment in 1976, there are

21  references to two arrests.

22  Q       Okay. But we don't know whether that's the '74

23  arrest and maybe a prior arrest or some other arrest. We

24  don't know, because it doesn't say, isn't that right?

25  A       Well, it talks about two arrests that were

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 141 of 221

1    approximately a month apart and that he had a mental

2    health evaluation in between the two.

3    Q        Right.

4    A        And do you want me to find that?

5    Q        Well, I'm going to look at that record in a

6    minute. We can look at that, but other than those two

7    instances which would have been the 1974 time frame,

8    there are no other records of any exposure by Mr. King,

9    isn't that true?

10   A        Yes, that's correct.

11   Q        All right. And in the 2009 interview when he

12   talked to Doctor Graney, he self-reported other

13   incidents of exposure and that kind of thing, but he has

14   since recanted all of those statements, isn't that

15   correct?

16   A        Yes.

17   Q        Now let's look at this incident related to the

18   next incident down -- and timeline in reference to the

19   1975 -- it appears that Mr. King reported that in 1975,

20   he was assaulted by a group of teenage boys after he was

21   caught exposing himself. Again, there's no record or

22   report or anything of that nature other than Mr. King

23   self-reported that incident in the 2009 interview, is

24   that correct?

25   A        Correct.

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 142 of 221

1  Q       Look at the next entry, October, 1975, age 17,

2  the abduction of a 19 year old female at knifepoint,

3  exposing his penis and so forth. There are some

4  discussions by the victim of what happened in that case,

5  is that right, in the police report which we looked at

6  earlier today?

7  A       Yes.

8  Q       In that case, she indicates she was fondled, he

9  asked her to touch his penis, but there was no injury of

10 any kind, isn't that correct?  She wasn't harmed,

11 physically harmed, I should say, is that correct?

12 A       I think that's correct, yes.

13 Q       Okay. If you would, look at Exhibit Nine, which

14 is treatment notes from the Phipps Clinic. Government

15 Exhibit Nine, if you would, look at Bates stamp page

16 1506. Actually, 1505 starts with the attending

17 physician's discharge note.

18 A       Yes.

19 Q       Well, first off, tell The Court if you would,

20 what is a discharge note? When would a physician or a

21 psychiatrist or a psychologist enter a discharge note

22 into someone's record? When would that take place?

23 A       When they are being released from the hospital.

24 Q       So it's kind of the last interaction at least

25 from this particular stay in the clinic that he had, is

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 143 of 221

1    that correct?

2    A       Yes.

3    Q       Okay. I direct your attention to the next page

4    which is 1506. Last paragraph on that page states that

5    during the last three months of his hospitalization,

6    talking about Mr. King, he apparently experienced no

7    significant sexual urges to expose himself. Now, the

8    last three months of his hospitalization, apparently he

9    expressed no significant sexual urges to expose himself,

10   and the record does not reflect the criminal record

11   or -- other than his self-reporting, there are no other

12   times when he has been caught exposing himself, isn't

13   that true, since he was released from the Phipps Clinic

14   back in 1976?

15   A       No. He exposed himself in 1983.

16   Q       When did he do that --

17   A       When he abducted -- this was -- he abducted the

18   victim. The car drove up with his friend driving the

19   car. He pushed the victim in the back seat of the car.

20   Q       I think that's the 1978 -- the one you're

21   thinking of.

22   A       No. That's 1983. Sorry. I'm getting confused

23   here. Excuse me. I think that was '75. Okay. Yes, that

24   was the 1975 case where he exposed himself. And your

25   question was?

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 144 of 221

1  Q       Since he was released from the Phipps Clinic, --

2  A       Okay. I apologize.

3  Q       -- that would be the only -- since then he had

4  not had any criminal charges of any sort of exposure, is

5  that correct?

6  A       Yes, you're correct. I was confused. Sorry.

7  Q       I know these dates are confusing. They are

8  confusing to everybody. I'm trying to keep it relatively

9  straight, but it's not easy.

10         All right. If you go back to the timeline,

11 please, okay, the next incident was April 7, 1978, which

12 you testified about he was charged and convicted of one

13 count of attempted abduction, and you indicated that you

14 felt this was a sexually motivated offense. Now, there

15 was really no records about this offense, no police

16 report, nothing to really give us that information other

17 than Mr. King's self-reporting that it was sexually

18 motivated, isn't that correct?

19 A       Yes.

20 Q       Okay. And it's not necessarily so that all

21 abductions are sexually motivated. That's a true

22 statement, isn't it?

23 A       Yes, it is.

24 Q       Okay. Look at the next entry, the November 23,

25 1983 -- where Mr. King was arrested for simple assault

Huseby, Inc.      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 145 of 221

1    and carrying a dangerous weapon. Now, in that incident,

2    there were two other witnesses based on the police

3    report to the incident, and one of those witnesses was

4    her boyfriend, isn't that correct?

5    A        You know, I'm not sure that -- there were two

6    other witnesses mentioned in the record, you're correct.

7    Whether they actually witnessed the attempted abduction,

8    I'm not sure whether they were present and witnessed

9    that, but the victim did run up to her boyfriend after

10   she was able to fight off Mr. King and he was present.

11   She was able to find him and the other witness is my

12   understanding.

13   Q        I believe if we look at Exhibit 13, Bates

14   stamped page 1970 --

15   A        Yes.

16   Q        -- about midway through that paragraph, it just

17   talks about witness one ran to W2, her boyfriend, and W3

18   told them what had happened. So there were other --

19   apparently other people around based on the record. Is

20   that a true statement?

21   A        Correct. I think they were around, but it's not

22   clear to me that they observed the crime being

23   committed. I know Mr. King told me in his interview that

24   he claimed the boyfriend was there the whole time, but

25   that's not clear based on the police report. I interpret

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 146 of 221

1  this to mean that the boyfriend was around somewhere,

2  but the victim was separated from the boyfriend at the

3  time that Mr. King attacked her and then she was able to

4  fight him off, he fled, and then she ran and found her

5  boyfriend and the other witness.

6  Q      All right. Now, you were aware that at the time

7  that this incident occurred Mr. King was working as a

8  tree surgeon for -- I think it was Davy Tree Company.

9  You're aware of that, correct?

10  A      Yes, I was.

11  Q      And he had ropes and a stick with some nails in

12  it in his vehicle, and I believe he told you that those

13  were used for his work, isn't that correct?

14  A      That's what he told me in his interview, yes.

15  Q      Okay. And he also told you that the air pistol

16  and the handcuffs belonged to his stepson and that the

17  handcuffs were toys and they belonged to his stepson, is

18  that correct?

19  A      Yes, that's what he told me.

20  Q      And he was married at that time and had a

21  stepson, isn't that correct?

22  A      I know he was married at the time. I'm not aware

23  of stepchildren, but that could have been true. I didn't

24  know about that.

25  Q      Now, this discussion of a "rape kit" that you

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 147 of 221

1    testified about as it relates to this incident, that was

2    based on self-reported conduct or self-reporting to

3    Doctor Graney in the 2009 interview, correct?  There's

4    no evidence of him saying it was a rape kit in any of

5    the police reports or anything like that that were done

6    contemporaneously with the offense, is that right?

7    A       Correct.

8    Q       Okay. Let's look at the February 19, 1988

9    incident on the timeline. Now, I believe you testified

10   with regard to the prior incident, the 1983 incident,

11   that there was no mention of money, and that was one of

12   the reasons why you concluded that it was a sexually --

13   well, one of the reasons you concluded it was a sexually

14   motivated offense, is that correct?

15   A       Yes.

16   Q       All right. In this particular instance, in the

17   February 19, 1988 case, in the police report there were

18   two mentions of money. He asked her do you have any

19   money and he asked her do you have a lot of money, and

20   you still determined that this was a sexually motivated

21   offense.  Now, is the fact that he asked for money --

22   did you just discount the fact that he asked for money

23   in the 1988 offense, or are you basing the fact that it

24   was sexually motivated on his subsequent statements, you

25   know, self-reporting to the probation officer and that

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 148 of 221

1   sort of thing who did the presentence report? What are

2   you basing that on?

3   A       Let me answer that. With respect to the 1988

4   offense, in fact, that is the only offense of the five

5   offenses in which there's any mention in the original

6   records of money or intent to rob. Mr. King has claimed

7   that that was the motivation for all his attempted

8   abductions. That's the only one out of the five where we

9   see any mention of money or attempt to rob. But you're

10  right, there were two references to do you have any

11  money, do you have a lot of money in that offense, and

12  so there certainly may have been some intent to rob as

13  well, but because of the statement that he made in the

14  presentence report about well, my real intent was to

15  commit a sexual assault, that's the basis of my opinion

16  that that was a sexually motivated assault, but perhaps

17  there was some motivation to rob in addition.

18  Q       Okay. And just to point -- to point out the June

19  7, 1988 letter that he wrote to the judge, I'm assuming

20  that that letter was written prior to his sentencing.

21  This is, again, self-reporting by Mr. King about his

22  conduct and his motivation, isn't it?

23  A       Yes, it is, and that's correct, prior to

24  sentencing.

25  Q       And the November 5, 1991 -- the Bureau of

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 149 of 221

1  Prisons therapy note where he discusses his frustration

2  with his wife and -- and so forth, again, that is

3  strictly just self-reporting by Mr. King in his

4  motivations and what he's all about when he's talking to

5  that therapist, isn't that correct?

6  A       That's correct. That statement though, I mean, I

7  do have more to say about that. I don't know if this is

8  the time, but you're correct, yes.

9  Q       And in the April 9, 1993 incident when he was

10 actually charged with an infraction of making a sexual

11 proposal to someone in -- a female staffer where it's

12 alleged that he asked her to touch his penis, there was

13 no actual touching, correct?

14 A       Correct.

15 Q       At least the records do not reflect there was

16 any actual touching?

17 A       There was no exposure or touching.

18 Q       No exposure?  No violence?  It was strictly a

19 comment?  Is that a true statement?

20 A       Yes.

21 Q       And based upon your review of the records, would

22 you agree that this is the only arguably sexual

23 infraction that he's incurred since he's been in the

24 Bureau of Prisons' custody?

25 A       Yes.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 150 of 221

1    Q        And he's been there since 1988?

2    A        Yes.

3    Q        The September 22, 1997 record is again his

4    discussing his motivations and his feelings about

5    something to an evaluator or mental health therapist, is

6    that correct?

7    A        Yes.

8    Q        So a self-reporting type situation, is that

9    correct?

10   A        Yes.

11   Q        Same thing with the September 22, 2000 incident

12   where he talks about a history and aggressiveness, of

13   exhibitionism, again, he's talking about himself, his

14   self-reporting of these thoughts and actions and so

15   forth, is that correct?

16   A        Yes.

17   Q        All of these things that are said in the letter

18   are things that he is saying to the person he wrote the

19   letter to?  There's no other record that he's, you know,

20   a hibernating bear who awakens to a desire to eat?

21   There's no evidence of that, that's he's done anything

22   like that while he's been incarcerated, is that correct?

23   A        Yes.

24   Q        It's just a statement that he made?

25   A        Yes.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 151 of 221

1    Q        Okay. The July 31, 2009 interview he had with

2    Doctor Bazerman where he's talking about not receiving

3    adequate tools to control himself, unable to stop and he

4    talks about his prior offenses, all of these things are

5    things that he's saying to her in reference to his

6    motivation for those offenses, and they're

7    self-reporting by Mr. King, is that correct?

8    A        Yes.

9    Q        And the same would be true of the statements he

10   makes to Doctor Graney in the November 13, 2009 -- I

11   guess that's her report, but she interviewed him prior

12   to doing the report. All of these are statements that

13   he's made to her in relation to his motivation for the

14   offenses that he's committed in the past and things that

15   he's done in the past, isn't that correct?

16   A        Yes.

17   Q        And then finally, the last entry there, April

18   25, 2010, where he writes a letter and categorically

19   refutes everything that he told Doctor Graney in the

20   interview, that's him again telling someone about his

21   motivations, his -- what he's all about, is that

22   correct?

23   A        Yes.

24   Q        Okay. Doctor Zinik, if you would, I want to turn

25   our attention now to the diagnoses you that made with

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 152 of 221

1   regard to Mr. King. The first diagnoses was paraphilia

2   NOS, nonconsent. Now, you have reviewed what are

3   voluminous records of Mr. King related to his life and

4   his time in custody going all the way back to 1974, and

5   in those records, there are various evaluations by

6   mental health professionals throughout his life. You

7   looked at Doctor Graney's report, precertification

8   report, Doctor Bazerman's precertification report.

9        Throughout all of those evaluations and diagnoses

10  made by other mental health professionals, you three,

11  Doctor Graney, Doctor Bazerman and yourself are the only

12  ones that have diagnosed Mr. King with paraphilia NOS,

13  nonconsent, isn't that correct?

14  A    Yes.

15  Q    And he's had any number of other diagnoses made

16  over the years, isn't that correct?

17  A    Yes.

18  Q    Now, this paraphilia NOS, I'm going to call it a

19  label since it's not in the DSM.

20        MR. LOCKRIDGE: Objection, Your Honor,

21  assuming facts.

22        THE COURT: I'm not sure exactly what you

23  mean, Mr. Bell, when you refer to it as a label.

24        MR. BELL: Well, Your Honor, Doctor Zinik's

25  testimony earlier today was that paraphilia NOS,

Huseby, Inc.                                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 153 of 221

1  nonconsent is not found in the DSM-IV-T-R, so I don't

2  choose to refer to it as a diagnosis. It is not a

3  diagnosis and -- can address this. It's not a diagnosis

4  under the DSM if it's not contained in the manual, so I

5  would not refer to it as a diagnosis. I'd refer to it as

6  label or condition or something like that.

7           THE COURT: I think as long as we all know

8  what you're talking about, I don't think it, frankly,

9  matters. I understand the point. The objection is

10  overruled.

11           BY MR. BELL:

12  Q     The labeling of Mr. King with the condition of

13  paraphilia NOS, nonconsent, the nonconsent aspect of the

14  offense has to be for it to be a correct labeling -- has

15  to be the arousing part of the activity, isn't that

16  correct?

17  A     Yes. It has to be the fact that the

18  nonconsenting aspect of the sex is what is the turn-on

19  or the arousing, what's arousing.

20  Q     Now, there's a lot of discussion in the records

21  and in Mr. King's statements of the feeling of control.

22  Is it your opinion that that feeling of control or

23  wanting that feeling of control equates to the arousal

24  based on the nonconsent?

25  A     To some degree, yes. I think, you know, when he

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 154 of 221

1  experiences this total domination and control over a

2  female, it's sexually arousing to him in this context

3  when he's committing a crime and he's got the victim

4  tied up and, you know, blindfolded and he's involved in

5  his ritualistic paraphilic behavior that he describes,

6  you know, the fact it's -- it's the control and the

7  domination and the power that is sexually arousing to

8  him.

9  Q    Okay. And you agree that you must evaluate Mr.

10 King and determine whether he's currently suffering from

11 this serious mental illness, abnormality or disorder,

12 not something that may have occurred in 1983 or '88 or

13 sometime in between? It's got to be a diagnosis that's

14 current, isn't that correct?

15 A    Yes.

16 Q    Now, you testified that in every instance

17 related to Mr. King's prior criminal history starting in

18 1974 with the exhibitionism up through and including

19 1988 with the current offense where he was incarcerated

20 that in your opinion each one of those offenses was a

21 sexual offense.

22        THE COURT: Is that a question, Mr. Bell?

23        BY MR. BELL:

24 Q    Do you agree with that statement?

25 A    Yes, I do.

1    Q        The 1988 offense, you indicated that you base

2    that primarily on the self-reporting of Mr. King, his

3    motivations based on the presentence report, correct?

4    A        Yes.

5    Q        The 1983 -- you based it upon the -- his

6    statements and then I guess the things that were present

7    in his vehicle and his person at the time that the

8    offense occurred, is that correct?

9    A        Yes.

10   Q        And then in the 1978 -- based strictly upon his

11   statements related to sexual motivation for the crime?

12   A        Yes.

13   Q        And then in '75, it was based upon the fondling

14   of the victim and asking her to touch his penis, is that

15   correct?

16   A        And exposing his penis, yes.

17   Q        And then in the 1975 incident, it was based upon

18   the self-reporting in the 2009 interview, is that

19   correct?

20   A        Yes. The 1975 offense, there was also

21   information in the Phipps treatment records that Mr.

22   King reported having sexual fantasies and tying up

23   victims and raping them, so I also consider those

24   statements that were made after -- you know, shortly

25   after the '75 offense.

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 156 of 221

1    Q        But, again, these are statements made by Mr.
2    King related to what his motivations --
3    A        Yes, they are.
4    Q        Now, you looked at Doctor Bazerman's report, and
5    I believe it's Government Exhibit -- it's 46. Yes,
6    Government Exhibit 46. Precertification report of Doctor
7    Ivonne Bazerman, do you have that in front of you?
8    A        I do.
9    Q        And you had access to that report prior to your
10   initial evaluation that you did of Mr. King, isn't that
11   correct?
12   A        Yes.
13   Q        The facts in that report, if you could -- as
14   related in that report, did any of the facts that are
15   related in that report particularly with regard to her
16   interview with Mr. King have a bearing on your diagnosis
17   of paraphilia NOS, nonconsent or your labeling of that?
18   A        Yes.
19   Q        Could you tell The Court what they are, please?
20   A        Okay. Well, on the Bates stamped page 2383 which
21   is page three of the report, he says according to Mr.
22   King -- this is the second to the bottom paragraph.
23   According to Mr. King, sex offender treatment was not
24   and has not been effective due to his lack of
25   "ownership" of his issues. He acknowledged his behavior

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 157 of 221

1    is not appropriate but feels he has not received

2    adequate tools to control himself and is "unable to

3    stop".  That was the statement that he made that

4    contributed to the diagnosis of paraphilia NOS,

5    nonconsent.

6            On the following page under substance abuse, he

7    reports how he used stimulants to enhance his alertness

8    as well as his sex drive, and I think here he's

9    referring to methamphetamines. He also reported -- this

10   is kind of a cross-reference you might say that --

11   Doctor Graney's report where he talked about using meth

12   to sexually enhance his behavior during his offending.

13           Under nonsexual criminal offense history, Doctor

14   Bazerman talked about Mr. King has two nonsexual

15   convictions in 1974 and 1978. However, based on this

16   writer's interview with Mr. King, this has changed. Mr.

17   King reported the motive behind both cases were of a

18   sexual nature. His intent was to sexually assault both

19   victims. Therefore, the case will be discussed in --

20   detail under the sexual offense criminal history.

21           Page five -- I mean, there's just more

22   statements.

23   Q     Well, let me short circuit this a little bit. Is

24   it fair to say that other than the criminal history that

25   we've already reviewed and the records that we've looked

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 158 of 221

1  at, the remaining basis or underlying -- for your

2  labeling of Mr. King with paraphilia NOS, nonconsent

3  relate primarily to his statement, self-reporting of his

4  motivations, his activities and that sort of thing?

5  A      Yes.

6  Q      Okay. Now, you did an interview with Mr. King I

7  guess after you did your original report but before you

8  did your second report, isn't that right?

9  A      Yes.

10  Q      Okay. And in your interview with Mr. King, were

11  there any statements to the effect that the offenses

12  that he was involved with were sexually motivated?  Did

13  he ever admit to you that they were sexually motivated?

14  A      He admitted that his original sexual exposure

15  offense in 1974 as a juvenile -- that he did expose

16  himself. You know, I don't remember if he used the --

17  you know, he described that using words such as that was

18  sexually motivated, but, I mean, he did admit that he

19  committed those acts of exposure, but that was the only

20  offense in which he either admitted or applied that

21  there were sexual motivations.

22  Q      Do you think it's important to your diagnosis or

23  labeling of Mr. King with PNOS, nonconsent that he's

24  only been cited for one infraction of sexual misconduct

25  since he's been incarcerated since 1988 and that did not

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208              (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 159 of 221

1  involve any sort of touching or exposure, it was simply

2  a comment -- how is he able to control these urges while

3  he's incarcerated?

4  A      Well, he talked about -- in Doctor Graney's

5  report, he talked about using heroin as a way of

6  self-medicating, but he had strong impulses to expose

7  himself to the female officers in prison, and the way

8  that he mediated those and controlled them was by using

9  heroin. He talked about how he used meth while he was

10 offending to enhance his sexual experience and he used

11 heroin to dampen his urges, his deviant sexual urges in

12 prison so he wouldn't sexually offend.

13        He talked about how there were -- there were

14 occasions in which he sort of suddenly exposed himself

15 but without really drawing attention to it so that he

16 didn't get written up for it, you know, like when the

17 female officers were doing a count or kind of walking by

18 and he would kind -- you know, he would move in such a

19 way as to possibly expose himself but not draw the kind

20 of attention that he might otherwise. So based on that

21 information, this was a way that he controlled himself

22 in custody.

23 Q      But there's no record in the disciplinary

24 infractions that he's had where he's ever been cited or

25 written up for exposure or written up for anything of

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 160 of 221

1    that nature, is that correct?

2    A        That is true. Of course, we have many examples

3    of getting written up for use of narcotics and alcohol

4    and so on, but nothing other than the '93 incident

5    regarding sexual misconduct.

6    Q        Now, you read the record, and it indicates that

7    Mr. King is bisexual and had a homosexual relationship

8    while he was incarcerated, isn't that correct?

9    A        Yes.

10   Q        And he's never been written up or there's never

11   been an infraction or a charge against him for having

12   any sort of sexual misconduct with a male while he's

13   been incarcerated, isn't that correct?

14   A        Yes.

15   Q        Now, in your August 1, 2011 report, the one you

16   did after you interviewed him, you describe him as a

17   pathological liar. I believe that's your words exactly.

18   A        Yes.

19   Q        And you cite records dating back to 1976 at

20   least indicating that he was an extremely skilled liar

21   and manipulator and malingerer and used the system to

22   his advantage, isn't that correct?

23   A        Yes.

24   Q        How do you reconcile the fact that you find him

25   to be a chronic liar and malingerer and so forth with

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208            (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 161 of 221

1   the fact that you're using his own statements, his

2   self-reports to find that these crimes were sexually

3   motivated and so on and so forth? How do you reconcile

4   the two?

5   A          Okay. Just to explain quickly, the term

6   pathological liar, I didn't invent that term. That's a

7   clinical term.  If you look at the psychopathy

8   checklist, the PCLR, that's item four on the psychopathy

9   checklist. You actually -- it's -- you know,

10  pathological lying is item four, and you give 'em a

11  score for that, and I scored Mr. King high on that item.

12          I understand what you're saying. You're asking

13  me if he's really a chronic liar, why do I believe the

14  statements he's made about committing sexually motivated

15  crimes, and the reason is that I believe -- I believe

16  those are true, and the reason I believe that is because

17  of the consistency that he showed in making those

18  statements. As we've already said, as far back as 1976

19  he was making those statements. He's made those

20  statements for 30 years, and he's made those statements

21  consistently, and those statements also I think are

22  consistent with his acts of criminal offending.

23          He specifically chose young women that were

24  peers of his in order to abduct and assault. If he

25  really was interested in robbing and gaining money, why

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 162 of 221

1    didn't he rob or assault men?  Why didn't he rob or

2    attempt to rob elderly victims, older women, other

3    vulnerable type victims? He always picked young women,

4    and -- I lost my train of thought.

5          He made those statements when there was no

6    motivation for him -- in other words, the reason that

7    he -- he made those statements in 2009 to Doctor Graney

8    and Doctor Bazerman -- because he claimed at that time

9    he was afraid of getting out without resources and

10   support. He didn't face those same circumstances in the

11   prior years that he made similar statements. He was not

12   close to being released from prison. There was no risk

13   that he was going to be thrust out in the community

14   without support. You know, none of those circumstances

15   were present.

16         And he made several requests in the past for sex

17   offender treatment. He tried to get into the SOTP, Sex

18   Offender Treatment Program. I think it was around '94,

19   but he was not eligible because he was too far away from

20   his release date. Why would he do that if he didn't

21   really believe that he had a sexual problem that he

22   needed help for?

23         So, you know, I admit that I'm being somewhat

24   selective about my opinion about what I believe is true

25   and what isn't true, but I think that this -- there's

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 163 of 221

1    more data, so to speak, to support the opinion that

2    these statements that he has these sexual compulsions

3    and these offenses were sexually motivated -- I think

4    there's more data to support that than the other

5    position that they are not true.

6    Q      But he has made statements, as an example, to a

7    mental health professional to cause them to diagnose him

8    with psychotic disorder or schizophrenia, hallucinosis.

9    I mean, he's had -- appears to me something in the

10   neighborhood of 15 -- or 15 different diagnoses while

11   he's been incarcerated, you know, giving -- self-report

12   hearing voices, self-reporting hearing -- having

13   alternate personalities, that sort of thing, and

14   subsequently it has been determined to be not true as he

15   self-reported those things.

16          So your testimony is that you believe the

17   statements he's made about the sexual offending, don't

18   necessarily -- well, you didn't diagnose him with any of

19   these other issues, so I assume you don't believe

20   that -- the evidence in the record for any of these

21   other offenses that he has been diagnosed with while

22   he's been incarcerated.

23          MR. LOCKRIDGE: Objection to form. Is there a

24   question in there somewhere?

25          THE COURT: I think he was just reaching the

Huseby, Inc.                                     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 164 of 221

1  end of it.  Did you understand the question?

2  A        I'd like you to please repeat the question.

3  Q        I'll try. Basically you're saying that you

4  believe the statements he's made about offending, sexual

5  motivations, exposing himself, so on and so forth that

6  are in the record. You do not believe the statements

7  he's made in the past in the record that gave rise to

8  these diagnoses that you do not believe he's suffering

9  from currently. Is that a true statement?

10  A        Yes.

11  Q        So, in effect, you are picking and choosing the

12  things that you believe that he has said, isn't that

13  true?

14  A        Yes.

15  Q        Okay. That was the question. And your diagnosis

16  of exhibitionism that you made, that is included in the

17  DSM-IV-T-R. We established that. And other than the

18  records that we talked about previously and his actual

19  conviction for exposing himself back in '74, there's no

20  other evidence of that other that the statements that

21  he's made through the years related to his

22  exhibitionism, isn't that true?

23  A        And the '93 request to the treatment provider to

24  touch his penis, yes, but that's the evidence.

25  Q        That's the only other incident that can be

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 165 of 221

1  independently looked at other than his statements, isn't

2  that correct?

3  A     Yes.

4  Q     Now, you made a diagnosis of polysubstance

5  dependence. If you would, explain to The Court what the

6  term dependence means as far as polysubstance

7  dependence.

8  A     Okay. Let me just find that page in my report.

9  The DSM does distinguish between substance abuse and

10  substance dependence, and substance dependence is a more

11  severe form of drug and alcohol abuse, and it's defined

12  as a cluster of symptoms characterized by continuous use

13  of a substance such as alcohol or drugs despite the

14  significant problems it causes.

15          Polysubstance abuse requires repeated use of a

16  substance or at least repeated use of at least three

17  substances for a minimum of one year that involves

18  compulsive drug taking. Behavior may result in physical

19  tolerance and withdrawal of the substance.

20          I think the fact Mr. King continued to use I

21  know heroin, I think marijuana and alcohol repeatedly

22  during his incarceration, he seems very addicted to it.

23  He continually got write-ups and in trouble for it, but

24  it didn't stop his behavior. You know, I think this

25  demonstrates substance dependence more than just

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 166 of 221

1  substance abuse.

2  Q      Did you -- in any way to see if he's developed a

3  tolerance or if he has suffered from any withdrawal or

4  did you see any evidence in the record that he had

5  developed a tolerance or suffered from any withdrawal

6  from any of the substances that you diagnosed him as

7  being dependent upon?

8  A      No.

9  Q      Is there anything in the record that you're

10 aware of since he has been at FCI Butner I guess since

11 2009 indicating that he has been written up or has

12 received an infraction for any sort of drug offense?

13 A      No. His last infraction was -- let's see -- May

14 26, 2009 for testing positive for opiates. Yeah, that

15 was the last one.

16 Q      Now, you've talked about -- your testimony

17 earlier about the diagnosis of -- I'm going to call it

18 PNOS or paraphilia not otherwise specified, nonconsent,

19 and you said it's basically synonymous with another

20 diagnosis, paraphilic coercive disorder, PCD?

21 A      Yes.

22 Q      You agreed that it is not recognized or is not

23 found in the DSM-IV-T-R.  Isn't it true that it's

24 basically recognized by a small group of forensic

25 psychologists that follow the teachings of Dennis Doren,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 167 of 221

1    a psychologist in Wisconsin regarding paraphilia NOS,

2    nonconsent?

3    A      No.

4    Q      How widely accepted is that diagnosis?

5    A      Okay. Well, I'm going to have to refer to my own

6    research project in one respect.

7    Q      Well, has it been peer reviewed or published or

8    anything of that nature?

9    A      No, it has not been published in a peer reviewed

10   journal. I did present -- give a presentation on it at

11   the ATSA conference last fall, and that is -- peer

12   review. You know, it was submitted for consideration to

13   the presentation committee and they accepted it, and I

14   was able to present on it at that conference, but, I

15   mean, I think there's other information besides my study

16   that shows that this is -- you know, it is a widely

17   accepted diagnosis.

18   Q      Well, you indicated in your testimony that in --

19   1980 I guess was the original time that it was proposed

20   to be put into the DSM-III at that point and it was

21   rejected --

22   A      Yes.

23   Q      -- and was not put in the appendix as I

24   understand, is that correct?

25   A      Yes.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 168 of 221

1    Q        And then, once again, there was a group that

2    proposed it to be put into the DSM-III --

3    A        R.

4    Q        R, revised?

5    A        Yes.

6    Q        And it was rejected, as you said, by a vote of

7    ten to four in 1986, isn't that correct?

8    A        Yes.

9    Q        My understanding is is that it was not even

10   accepted as a proposed diagnosis in the DSM-IV, isn't

11   that correct?

12   A        Yeah. It was not proposed for the DSM-IV.

13   Q        And it was not proposed for the DSM-IV-T-R, is

14   that correct?

15   A        Yes.

16   Q        And you testified that it has been proposed for

17   the DSM-V?

18   A        Yes.

19   Q        And you believe it will be in the appendix, but

20   you -- where does that come from? Where do you have that

21   information from?

22   A        I think I got that off a DSM-V -- but, frankly,

23   I don't remember exactly. I just heard it kind of

24   through the grapevine.

25   Q        But it was rejected by the DSM-V committee or

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 169 of 221

1  board once again, but it may be in the appendix is what

2  your testimony is?

3  A      Yes.

4  Q      And it comes out when? 2013 is the year?

5  A      I think so, yes.

6  Q      So as we sit here today in this courtroom, it is

7  not -- there's no diagnosis for PNOS, nonconsent, that

8  specific diagnosis in the DSM-IV-T-R?

9  A      That's correct, yes.

10 Q      Now, you're -- are you familiar with the -- I'm

11 sure you're familiar with the ethical codes that govern

12 psychologists. You're familiar with those, is that

13 correct?

14 A      Oh, I've read them, but it's been a long time, I

15 have to confess. But I know about them.

16 Q      Ethical code 9.01 states -- and I'll be happy to

17 provide you with a copy of it, okay?

18        MR. LOCKRIDGE: This will be Exhibit 22, Your

19 Honor, if I may approach the witness.

20        THE COURT: You may.

21        BY MR. LOCKRIDGE:

22 Q      I've handed you what's been marked for

23 identification as Respondent's Exhibit 22. If you would

24 turn to -- find the page -- it's page 14 of 18.

25 A      Okay.

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 170 of 221

1    Q         -- it's about the third paragraph down --

2    A         Okay.

3    Q         The ethical code 9.01 which states psychologists

4    base their opinions contained in their recommendation

5    reports and diagnostic or evaluative statements,

6    including forensic testimony, on information and

7    techniques sufficient to substantiate their findings --

8    And then it refers to a second code, ethical code which

9    is 2.04, and that is on page five of 18, which states

10   the bases for psychiatric and professional judgment,

11   psychologist work is based upon established scientific

12   and professional knowledge of the discipline.

13        Now, how do you reconcile those two code

14   provisions with making a diagnosis of a "mental illness"

15   that is not found anywhere in the DSM-IV-T-R which --

16   agree with me is I guess the diagnostic Bible for

17   psychologists?  How do you reconcile that, that you're

18   making a diagnosis based upon established scientific and

19   professional knowledge of the discipline?

20   A         Okay.  Well, I would start by saying that the

21   DSM-IV-T-R does not contain the whole universe of

22   scientific knowledge and research and information.

23   There's a lot of scientific knowledge, there's a lot of

24   clinical information that is not contained in the DSM --

25   manual. I think that there has been a longstanding

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 74  Filed 11/03/11  Page 171 of 221

1  clinical and research interest in this paraphilia NOS

2  forced sex or paraphilic coercive disorder, if you want

3  to call it that.

4        There are some really eminent researchers around

5  the country right now who are studying it, including

6  Doctor David Thorton. There is some good PPG evidence to

7  support it, and by PPG evidence, I mean -- data that has

8  been collected using the penile plethysmograph. These

9  include studies of incarcerated rapists who, you know,

10 agree to submit to a plethysmograph evaluation. A

11 plethysmograph is a device that measures the erection

12 activity of a man's penis, and it's used in research on

13 sexual arousal, and there is some evidence that repeat

14 rapists respond differently to, you know, sexual

15 stimulus materials that involve forced sex and rape

16 activity.

17       You know, this has been a particularly spirited

18 debate the last year or two in the professional

19 community, and I think there's certainly a lot of

20 support for the existence of this type of paraphilic

21 disorder. Even though it has not been included in the

22 DSM, there's scientific evidence. There's research data.

23 There's some important experts around the field that are

24 advocating for it, so I think it is a reasonable,

25 clinical and professional, you know, opinion to make.

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 172 of 221

1    Q        So in your mind, you are not violating any of

2    these code provisions related to making that diagnosis?

3    A        No, I don't believe I am.

4    Q        And you indicated in your earlier testimony when

5    you were talking about when it was rejected and how it

6    was rejected that it was a lot of political activity and

7    so forth, but there was also some very significant

8    concerns about diagnosing this disease, wasn't there?

9    A        Yes, yes. It's hard to diagnose because there

10   are very few rapists that will admit to these urges and

11   feelings like Mr. King has. He's quite unusual in the

12   sense that he's been willing to talk about them. You

13   know, most sex offenders who are facing legal sanctions

14   are not honest and forthcoming about their private

15   sexual feelings and fantasies, so it's really hard to

16   gather -- you know, to kind of collect the data and do

17   the research and gather the information. You know, it's

18   controversial, and for good reason.

19   Q        And, again, just to reiterate, as we sit here

20   today, it's not included in the DSM, so your diagnosis

21   is based upon other information out in the psychological

22   field or the universe of psychologists?  It's not based

23   on the specific DSM-IV-T-R diagnosing tool that is used

24   in your profession?

25   A        That is correct, yes.

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 173 of 221

1    Q        Let me ask you one other thing. You mentioned in

2    your answer just a moment ago that there are clinical

3    uses for certain diagnoses, and I think you mentioned

4    that, you know, if it exists -- a clinical way of

5    looking at it, that sort of thing. Do you not believe

6    there's a difference between using a diagnosis in a

7    clinical sitting versus using a diagnosis in a courtroom

8    to commit someone civilly?

9    A        I do believe there's a difference, yes.

10   Q        And it's significantly more involved when you're

11   talking about civilly committing someone, isn't it?

12   A        I would say the standard is higher, yes.

13   Q        But you still believe that your diagnosis is

14   correct even in the setting that we're in here today?

15   A        Yes, I do.

16   Q        Now, you testified that you had given this

17   diagnosis in court previously in other situations, but

18   you also testified this is the first time you have been

19   in Federal court. So it would be the first time that

20   you've given this diagnosis in Federal court, isn't that

21   correct, under the Adam Walsh Act?

22   A        Correct.

23   Q        Okay. Let's talk about the risk assessment

24   tools. You state in your report that the standard of

25   professional practice -- and this is from your report.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 174 of 221

1    I'm not sure exactly what page. You state in your report

2    that the standard of professional practice of sex

3    offender risk assessment is moving toward the use of

4    multiple actuarial risk scales and determine how they

5    lead to similar or divergent results. Is that related to

6    your testimony about whether someone scores the same on

7    all of the tests or whether they score differently on

8    one versus another one?  Is that what you're talking

9    about there?

10   A      Yes.

11   Q      Okay. What you say is a standard in professional

12   practice, do you have any articles or any peer reviewed

13   articles or anything that you can point to that

14   indicates that that is the standard of practice in the

15   psychological field?

16   A      I can point to the -- in terms of recommending

17   the use of actuarial instruments, that's in the ATSA

18   guidelines and you find that on the ATSA website, and I

19   do have a copy of those guidelines with me in terms of

20   recommending the use of actuarial scales for civil

21   commitment evaluations.

22          In terms of recommending the use of multiple

23   actuarial scales, I know I've heard Doctor Carl Hanson

24   recommend that. He's one of the designers of the

25   Static-99 and one of the founding fathers of risk

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 175 of 221

1    assessment you might say in the United States.

2    Q        He's the one that basically told everybody to

3    quit using the Static-99 because it was no longer valid

4    a couple of years ago, isn't that right?

5    A        Well, he told everybody to stop using the

6    Static-99 and replace it with using the Static-99R. Is

7    that what you're referring to?

8    Q        Yes.

9    A        Yes, the kind of new and improved version,

10   Static-99R, yes.

11   Q        And all of these risk assessment tools, they

12   give you an estimate of both the relative risk and

13   absolute risk? Explain that again. I think you talked

14   about it earlier, but --

15   A        Sure. The relative risk means kind of ranking

16   the offender compared to how other offenders rank on

17   measures of being low risk, high risk, moderate risk and

18   so on, and percentile ranking is also a measure of

19   relative risk, and so is the risk ratio that I have in

20   my table on page 22, my -- well, I'm looking at my

21   original report from October, 2010.

22           So those are measures of relative risk, and

23   what's important about those measures is they're not

24   influenced by base rates so that they're -- you can

25   compare offenders across different samples and kind of

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 176 of 221

1   make statements about their level of risk that are not

2   influenced by the -- the sample of -- population they

3   come from or the base rate of that sample.

4           On the other hand, the absolute measures of risk

5   are they do -- they are dependent on base rates, and

6   that's what the estimated recidivism percentages are in

7   my table here, and they change. You know, they're not

8   the same across different samples. We've got the four --

9   for the Static-99 we've talked about so that you can

10  have the same score but different estimated recidivism

11  percentages because you are, you know, similar or

12  different to a comparison group or the norm group that

13  most closely matches your case -- would have a specific

14  base rate that would be different from other samples.

15  Q       But isn't it true that these actuarials -- and

16  you eluded to it in your testimony, that they're very

17  limited in what they can do with regard to an

18  individual's risk of reoffending. You know, they are

19  more useful in looking at groups of people and the

20  percentage that they would reoffend or not reoffend in a

21  particular period of time, isn't that true?

22  A       Essentially, yes. I mean, I wouldn't say they're

23  very limited. I think they have what we call moderate

24  predictive accuracy. They do have limitations, but

25  they're useful enough to be used and they do provide a

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 177 of 221

1  starting point for the risk assessment, and they are

2  most useful in, you know, identifying your offender as

3  low, medium or high risk. And then you look at the rest

4  of the -- and all the idiosyncratic factors related to

5  the case and the dynamic factors and the protective

6  factors and so on before you reach your final

7  conclusion. So they're useful, but they do have

8  limitations.

9  Q      But as a matter of caution, The Court should not

10 look at a Static-99R score and then -- as it's reflected

11 in a percentage and say well, Mr. King is in this group

12 and he scored this number, he's got a 45 percent chance

13 of reoffending or a 53.2 chance of reoffending?  The

14 Court should not do that, should it?

15 A      I agree with that. I think that's a good

16 cautionary statement.

17 Q      And, well, along those lines, just to get

18 specifically your scoring on the Static-99R, you can't

19 tell, you know, the scoring -- this comparison group and

20 on the Static-99 you ended up with 45 percent of

21 offenders in that group would reoffend within five

22 years, 55 percent that will not, and then in a ten year

23 period, it was 53 point -- 55.3 would reoffend and 44.7

24 would not reoffend, but you don't know whether Mr. King

25 is going to end up in the 45 percent that would reoffend

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 178 of 221

1    or the 55 percent that would not. You have no way of

2    telling, isn't that true?

3    A        Yes, it is.

4    Q        Okay. The same thing would apply for the Static

5    2002R, you know, the percentages are a little bit

6    different, but it's the same principle. You can't as we

7    sit here today testify that he's got a 41 percent chance

8    of reoffending because you don't know whether he's going

9    to be in that group or in the larger group that doesn't

10   reoffend, isn't that true?

11   A        Yes.

12   Q        Now, you indicated earlier that you think you've

13   done about -- I think you said 500 risk -- well,

14   forensic evaluations, which I assume those included some

15   sort of risk assessment or reoffending assessment, is

16   that correct?

17   A        Well, I think the question that I answered is --

18   was I was asked how many sex offender risk assessments

19   have I performed, and my estimate was approximately 500.

20   Q        Do you have any idea how many of those risk

21   assessments that you completed, how many of 'em you were

22   right or wrong on?

23   A        No, I don't.

24   Q        Okay. Now, in talking about the determination in

25   the 99R and the Static 2002R specifically, to a certain

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 179 of 221

1    extent, they are discussed as being actuarial, in other

2    words, objective scales, but there is a subjective part

3    of it, isn't that true, and it's related to which

4    comparison group and particular offender ends up in --

5    that is a purely subjective decision made by the

6    evaluator, isn't that correct?

7    A       Well, yes and no. I mean, yes, that is the case.

8    That was the case in my first report, but in my second

9    report I actually used another scale called SRAFV which

10   I scored which involves some subjective judgment in

11   scoring that scale, but once I arrived at my final score

12   on that scale, based on that number, it identified which

13   of the comparison groups I should use on the Static-99,

14   and it turned out to confirm my prior choice of the high

15   risk group.

16   Q       But, again, there is a subjective element? In

17   other words, you have to look at the offender and make

18   determinations about whether the prior offense was a sex

19   offense or not? You know, I mean there are subjective

20   aspects to whether you put him in a particular group or

21   not, isn't that true?

22   A       Yes, it is.

23   Q       And you talked about the structured risk

24   assessment forensic version. Is that what you -- talking

25   about, the --

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 180 of 221

1    A        Yes.

2    Q        -- score that you gave him in your second?

3    A        Yeah.

4    Q        Now, you didn't evaluate Mr. King using that

5    tool in your first. Was that because you had not had an

6    opportunity to interview him, or what was the reasoning

7    behind that that you didn't use it the first time

8    around?

9    A        It wasn't available yet. I hadn't been trained

10   in it yet.

11   Q        So it's very new?

12   A        Yes, it is.

13   Q        Has it been peer reviewed?  Is there any

14   empirical data related to its reliability or anything

15   like that?

16   A        There is empirical data supporting its

17   reliability and validity. I'm not aware that it's been

18   published in a peer reviewed journal. I do know that

19   it's gaining acceptance, and in particular in California

20   it has been selected for, you know, all -- all sex

21   offenders that are paroled from the California prison

22   system have to -- there's kind of a short risk

23   assessment that is done on that group, which includes

24   the Static-99 and it also includes this SRAFV, so it has

25   actually been endorsed by the California Department of

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 181 of 221

1   Corrections as a dynamic risk assessment tool used on

2   all paroled sex offenders in California, but I'm not

3   aware that it has been published yet in a peer reviewed

4   journal.

5   Q     So in your opinion, it's appropriate to sit in a

6   courtroom and use a tool that is -- as you understand

7   it -- don't know whether it's been peer reviewed or --

8   or peer reviewed in a peer reviewed article, you know,

9   in a publication in making a determination about whether

10   Mr. King should be civilly committed or not?

11   A     Well, I do believe that it is gaining

12   acceptance. I actually was trained in it by -- you know,

13   there was an official California Department of Mental

14   Health training where all the SVP evaluators were -- you

15   know, we were all gathered together, and Doctor David

16   Thornton who created the instrument came and trained us

17   how to do it, so we got credit, you know, through the

18   Department of Mental Health, so it's sort of endorsed,

19   you might say, by the State Department of Mental Health.

20      I hear what you're saying about jumping the gun

21   and using it before it's been published in a peer

22   reviewed journal, but I think the way it's being

23   accepted and disseminated justifies the use of it at

24   this point.

25   Q     Are you saying it's been accepted and -- but the

Huseby, Inc.     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 182 of 221

1  reality is it's being used in California. Is it being

2  used anywhere else that you're aware of?

3  A       I understand that other evaluators doing Adam

4  Walsh case evaluations are using it now -- not the only

5  one, and I know there's going to be several

6  presentations about it at the ATSA conference coming up

7  later -- early November, so I think it is starting to be

8  used. I think it's being used by evaluators in

9  Washington State, so it's think it's starting to

10 disseminate.

11 Q       There's one statement that you made in your

12 report, and I believe it's just an error, but it was a

13 statement that Mr. King's sexual offending began at age

14 12 and spanned 27, ended in 1988. I guess what I want to

15 clarify is that's 17 years.

16 A       Oh.  Did I do the math wrong?

17 Q       Well, what I'm asking you, you're not testifying

18 or your report is not stating that he has continued with

19 sex offending for ten additional years while he's been

20 incarcerated?  You're not trying to say that, are you?

21 A       No, I'm not.

22 Q       So it's 17 years?

23 A       Yes.

24 Q       All right. And if the offenses that took place

25 in 1978 and 1983 and 1988 were not sexually motivated,

Huseby, Inc.                                            www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 183 of 221

1  in other words, if Mr. King's self-reports of a sexual

2  motivation are lies, are wrong, then actually his sex

3  offending would have covered a much smaller period of

4  time, isn't that correct?

5  A     Yes.

6  Q     You indicated earlier that the risk assessment

7  tools that you used have a moderate -- I think it was a

8  moderate success rate or impact. What do you mean by

9  moderate? I mean, how do you quantify the term moderate,

10 or is it quantifiable?

11 A     Yes, it is. The term is moderate predictive

12 accuracy, and that terms comes from -- all these risk

13 assessment instruments have -- you know, the statistical

14 analysis produces a number called the AUC index, which

15 stands for Area Under the Curve index, and it's really a

16 measure of hit rates, hits versus misses in terms of

17 correctly identifying the recidivist from the

18 non-recidivist, and so the -- the AUC index for all

19 three of these instruments is around .68 to .71,

20 something like that, and that's an improvement over

21 chance, which is .5.

22 Q     So it goes from .5 which is flipping a coin to

23 .68 or a little bit --

24 A     Well, it would go from .5 which is -- purely

25 random chance to one. You know, if you have a risk

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 184 of 221

1 assessment instrument that has an AUC index of one,

2 that's a perfect --

3    Q        It's right every time?

4    A        They're right every time, yeah, and but if

5 you've got one that's, you know, in the point -- you

6 know, the high .6 -- .68, .65 to .72 or 3, that's in the

7 moderate predictive accuracy range. That's where that

8 term comes from.

9              THE COURT: Doctor, let me ask you. Does that

10 mean that -- well, that would mean with -- obviously it

11 doesn't mean, I'm assuming, with respect to an

12 individual that there's, say, a 68 to 71 percent chance

13 -- I assume it doesn't mean that.

14             THE WITNESS: It doesn't apply to an

15 individual. What it applies to -- remember I talked

16 about risk assessment instruments are like sorting

17 tools.  They help you sort the true recidivist from the

18 true non-recidivist, and so what that number means is

19 that the probability of randomly selecting a true --

20 that the probability that a true recidivist would have a

21 higher Static-99 score, for example, than a randomly

22 selected non-recidivist is, say, .71, something like

23 that.

24             THE COURT: Thank you. Okay. Mr. Bell?

25             MR. BELL: I'm sorry, Your Honor.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 185 of 221

1          THE COURT: That's all right.

2          BY BELL:

3    Q     So, again, not to belabor the point, but it

4    really is speaking to the group, not particularly an

5    individual?  It's just a limited use tool that you use

6    in your overall assessment of what you believe is a risk

7    of reoffending, the risk assessment tools?

8    A     Well, I think if you get -- you're right, we're

9    talking about group data, but I think if you get an

10   offender like Mr. King who gets high -- who scores in

11   the high risk level on all three of these scales, you

12   know, I think that tells you something about who he is

13   most similar to in terms of the group's -- you know, the

14   breakdown of offenders in the original study. That's

15   what it tells you.

16   Q     Okay. And, of course, in scoring these risk

17   assessment tools, if you make a mistake as far as

18   whether an offense was a sexual offense or not a sexual

19   offense or if, you know, you determine that someone was

20   not married for more than a two year period of time and

21   they were and you didn't give 'em a point for that or

22   whatever, all of those things factor in?  That's the

23   human error, I guess, or the subjective part of scoring

24   someone on these risk assessment tools?

25   A     I would agree with that, yes.

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 186 of 221

1    Q        And -- different categories, but it would apply

2    equally to the MNSOST or the Static-2002R or the

3    Static-99R? It's the same principle? Your evaluative

4    abilities are brought into play when you score someone?

5    A        I would agree with that, yes.

6    Q        Now the dynamic risk assessment that you did,

7    risk factors that you discuss in your report with regard

8    to Mr. King, I think you testified that you didn't score

9    him on a -- 2007 the first -- you didn't score him, but

10   you just used the criteria, I guess, to discuss his

11   case. Is that a fair statement?

12   A        Yes.

13   Q        Okay. And, of course, those factors are those

14   categories, social influences, intimacy, deficits and

15   self-regulation. All of those things to a large extent,

16   again, are based on self-reported behavior,

17   self-reported motivation, self-reported conduct that you

18   gleaned from interviews, notes from the record and that

19   sort of thing of Mr. King himself. Is that a true

20   statement?

21   A        Well, not 100 --

22   Q        Not 100 percent, but there was a factor that

23   involved self-reporting of Mr. Kind and his motivations

24   and so forth?

25   A        They did involve self-report, yes, but they

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 187 of 221

1  weren't limited to that.

2  Q      No, no.

3  A      Yes.

4  Q      I mean, I'm sure you took into account the

5  criminal history and so forth as well.

6  A      Yes, that's correct.

7          MR. BELL: I don't have anything further, Your

8  Honor.

9          THE COURT: Thank you, sir. Mr. Lockridge?

10          MR. LOCKRIDGE: Can I just have a moment?  We'd

11  like to redirect the witness -- rebuttal.

12          THE COURT: You may. How much time do you need?

13          MR. LOCKRIDGE: Just about 30 seconds, Your

14  Honor.                        THE COURT: Okay.

15          EXAMINATION

16          BY MR. LOCKRIDGE:

17  Q      Doctor Zinik, you were asked questions a moment

18  ago about your diagnosis of exhibitionism and the

19  paraphilia diagnosis you rendered. Can either or both of

20  those diagnoses be rendered based on a person's current

21  urges or fantasies without exhibiting any conduct?

22  A      Yes, yeah.

23  Q      And so if a person -- hypothetically if a person

24  had exhibited exhibitionistic or paraphilic behavior in

25  the past, would it be possible to diagnose them based

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 188 of 221

1    only on current urges or fantasies in lieu of past

2    behavior?

3    A        If you only had evidence of past behavior and no

4    current admissions, could you still make that diagnoses?

5    Is that the question?

6    Q        Well, if you had evidence of current urges and

7    fantasies but no actual contact or exposure, could they

8    be diagnosed with exhibitionism?

9    A        So the question is could exhibitionism be

10   diagnosed with no evidence of past behavior and actual

11   acts of sexual exposure but merely self-report that say

12   I have these feelings and I want to expose myself? Is

13   that the question?

14   Q        Not quite.

15   A        Sorry.

16   Q        The question was with acts of past exposures and

17   only evidence of current urges and fantasies, could you

18   render an opinion of exhibitionism?

19   A        Yes, you could.

20   Q        All right. You were also asked questions again

21   about Mr. King's convictions, and I just briefly wanted

22   to ask you a few questions about those again. With

23   regard to his 1975 offense -- on the chart was listed as

24   seizing, transporting and detaining with intent to

25   defile a person. Do you recall where approximately the

Huseby, Inc.                           www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 189 of 221

1  evidence showed you that Mr. King met the victim?

2  A      He met the victim -- let's see. She was walking

3  home from a high school football game.

4  Q      And where do you recall, if anywhere, did he ask

5  her to go to?

6  A      I think he just grabbed her and took her by the

7  neck and pulled a knife on her. I don't remember more

8  than that. I'd have to look at the police report.

9  Q      Can I refer you to Exhibit 13, please?

10  A      Okay. Sorry.

11  Q      And the second page of that exhibit --

12  A      Okay -- just get that in my binder, please.

13  Second page, okay.

14  Q      -- which is Bates stamped 1970, at the top under

15  statement of facts, what does that say there?

16  A      Okay. She says -- the victim reports while

17  walking to her auto, the defendant approached and asked

18  if she would walk him to the defendant's auto so the

19  police would not arrest defendant for being drunk.

20  Q      So is it your understanding that the victim

21  asked him to -- he asked the victim to accompany him to

22  his auto?

23  A      Yes.

24  Q      And with regard to the 1978 offense -- excuse

25  me. With regard to the 1983 offense, do you recall the

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
                                           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 190 of 221

1    circumstances of whether there was an automobile

2    involved in that incident?

3    A       Yes. That was -- 1983 offense. That one -- he

4    also asked the victim if she would walk him to his car

5    and she said no, and then he told her not to scream or

6    he'd kill her and he tried to push her across the seat

7    of her own car, and she kicked him in the groin and

8    scared him off.

9    Q       I think I referred you earlier to the 1983

10   offense which is Exhibit 13 that you just read.

11   A       Yes.

12   Q       Can you turn back to the second page of that?

13   Is that the 1983 offense there?

14   A       Yes.

15   Q       And is that the one where he -- in your words,

16   he asked her if she would walk with him to defendant's

17   auto?

18   A       Yes.

19   Q       All right. And in the 1988 offense, do you

20   recall whether there was an automobile involved in that

21   incident?

22   A       Yes.

23   Q       What do you recall about that?

24   A       Let's see. Mr. King asked the victim do you have

25   any money, do you have a lot of money. He then ordered

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 191 of 221

1    the victim into his auto while still holding her and

2    still displaying his knife. So, yes, he tried to get her

3    into his own car.

4    Q       Was that after he asked her for money?

5    A       I think so, yes.

6    Q       All right. Shifting -- you testified earlier

7    that Mr. King -- there's no record of Mr. King

8    exhibiting acts of exhibitionism while in his current

9    confinement since 1988, is that correct?

10   A       Yes.

11   Q       In your experience, does incarceration or the

12   fact that a person is incarcerated -- does that have any

13   weight with regard to whether they will sexually

14   reoffend?

15   A       Yes. Usually -- usually being incarcerated

16   inhibits deviant sexual behavior and offenders are less

17   likely to act out sexually because it's easier to get

18   caught and punished, so typically they don't exhibit

19   or exhibit sexual deviant behavior less often in

20   custody.

21   Q       All right. Doctor Zinik, was Mr. King's

22   self-report the only information you used when

23   determining whether the offenses were sexually related?

24   A       No.

25   Q       Without reiterating what you've already

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 192 of 221

1  testified to, what other factors, briefly, did you

2  consider?

3  A        Just the fact that he targeted young women in

4  every case, there were no other types of vulnerable

5  victims, the frequency of reoffending, the evidence of

6  the rape kit that we've already talked about, the fact

7  that it was kind of a combined merged paraphilia with

8  his sexual exposure and there was prior evidence of

9  that, those things.

10 Q        And did the -- to the extent you haven't already

11 testified, did the similarity of his behavior or acts

12 play a role in that?

13 A        Yes, it did. In fact, just -- you know, you

14 brought to my attention the fact that these all involved

15 abducting a victim and trying to get her into a car,

16 either his car or her car, so there really was a very

17 common theme or an MO that was similar between the

18 offenses.

19 Q        Earlier you were asked a question whether -- and

20 you testified regarding whether the burden of proof in a

21 clinical setting is different than the burden of proof

22 in a court setting. Could you elaborate on that a little

23 bit?

24 A        Well, I think the standard would be higher in a

25 court setting than a clinical setting. I certainly think

Huseby, Inc.                                   www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 193 of 221

1  the consequences are greater. I mean, we're talking here

2  about civil commitment, which would be, you know,

3  denying a man his civil rights and not letting him out

4  into the community, again, even though he served his

5  sentence, and, you know, these are very difficult

6  judgments to make. Either way, there are significant

7  consequences. You've got the civil rights of the

8  defendant versus the protection of the community, so I

9  think the standards are higher than in just merely a

10  clinical setting.

11  Q       With regard to your diagnosis of paraphilia not

12  otherwise specified, in conducting your evaluation, did

13  you take that diagnosis lightly?

14  A       Not at all, no, no.

15  Q       And finally, that -- just for clarity, that

16  particular diagnosis, paraphilia not otherwise

17  specified, is it your opinion that that is a diagnosis

18  in the Diagnostic and Statistical Manual?

19  A       Paraphilia NOS is a diagnosis in the DSM, yes.

20          MR. LOCKRIDGE: I have nothing further, Your

21  Honor.                    THE COURT: Thank you. Mr. Bell?

22          MR. BELL: Just a couple, Your Honor.

23          EXAMINATION

24          BY MR. BELL:

25  Q       Without a diagnosis in this case, without a

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 194 of 221          (704) 333-9889

1  diagnosis of paraphilia NOS, nonconsent, would it be

2  your opinion that Mr. King would be a sexually dangerous

3  person under the act?

4  A     No.

5  Q     And I think you testified just a minute ago that

6  it's your experience that individuals that are

7  incarcerated are less likely to act on these intense

8  sexually arousing fantasies than they are if they are

9  out in the world, out in the public where they are

10 subject to being arrested and sent to prison.

11 A     What I said was that usually being incarcerated

12 has an inhibiting affect on sexual misconduct. Offenders

13 are less likely to act in a sexually deviant manner

14 because it's easier to get caught and get sanctioned

15 and, you know, get in further trouble, have their

16 sentences extended and so on. It's harder to get away

17 with it than it might be in the community.

18 Q     But in Mr. King's particular case, he had any

19 number of infractions and problems while he was

20 incarcerated, did he not?

21 A     He did, yes.

22 Q     For many, many things, none of which were

23 sexually related except for the one incident with this

24 female staff person, is that right?

25 A     Correct.

Huseby, Inc.                                  www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 195 of 221

1          MR. BELL: Nothing further, Your Honor.

2          THE COURT: Mr. Lockridge, any follow-up?

3          MR. LOCKRIDGE: Nothing further.

4          THE COURT: Doctor Zinik, I had a couple of

5     questions. Let me follow up on the statement you just

6     made that if you had not diagnosed Mr. King as having

7     paraphilia NOS, nonconsent, you would not have found him

8     to be a sexually dangerous person. I'm interested in the

9     basis for that. Is that because he does not -- he would

10    not then have other serious mental illnesses, or would

11    it act more on the volitional element of the definition

12    or some other basis?

13         THE WITNESS: It would certainly influence the

14    volitional impairment aspect of the definition. I mean,

15    if I believe that Mr. King did not have the paraphilia

16    NOS, nonconsent diagnosis and he wasn't likely to commit

17    sexually violent crimes, I mean, I certainly wouldn't

18    rule out the possibility that he may commit other

19    violent crimes, nonsexual violent crimes, assault,

20    robbery and so on. I'm certainly not saying that he

21    would not be dangerous in other respects, but I don't

22    think he would meet the threshold of committing a

23    sexually violent crime as required by the statue.

24         THE COURT: Is exhibitionism a serious mental

25    illness?

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 196 of 221

1          THE WITNESS: I would say it is, but by itself

2     I don't think it would be enough to qualify under the

3     statute.

4          You know, on the other hand, I think that Mr.

5     King's -- his paraphilia NOS and his exhibitionism are

6     sort of merged, as I said before, kind of synthesized

7     into one disorder, and, in fact, I think, you know, the

8     paraphilia NOS, the exhibitionism, the polysubstance

9     dependence and the antisocial personality disorder

10    altogether I think have an additive effect. In

11    combination, they're -- you know, the sum is greater

12    than the -- or the whole is greater than the sum of the

13    part, so to speak. I think that is a very dangerous

14    combination of sexual -- a very dangerous combination of

15    mental disorders that together predisposes him to commit

16    sexually violent crimes more than any one of those

17    things would alone.

18         THE COURT: The polysubstance dependence would

19    have that affect even though he has stated that he took

20    heroin actually to repress his urges?

21         THE WITNESS: That is correct, in prison, yes.

22         THE COURT: Yes.

23         THE WITNESS: Yes. And he used meth out in the

24    community to stimulate him and enhance his sexual

25    experiences when he was offending.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 197 of 221

1           THE COURT: In the field of forensic

2    psychology, is the term serious mental illness or

3    serious mental illness, abnormality or disorder, is that

4    a recognized term?

5           THE WITNESS: Well, I think it is, yes, but it

6    depends on the context to some extent, yes.

7           THE COURT: What does it mean to you in the

8    context of the opinions that you've developed in this

9    case?

10          THE WITNESS: Well, it means to me that Mr.

11   King meets that criteria and that he is seriously

12   impaired and that he cannot control his behavior and

13   that it puts him at high risk to be violent in the

14   future and he has not been treated for that disorder. I

15   don't believe he has -- sometimes the term serious

16   mental illness refers to a psychotic disorder like

17   schizophrenia or bipolar disorder involving a thought

18   disorder, psychotic feature, so in some contexts that's

19   what serious mental illness refers to, but I would say

20   in this context certainly this combination of mental

21   disorders rises to the level of serious mental disorder.

22          THE COURT: And seriousness in what sense?

23          THE WITNESS: Seriousness in terms of the

24   consequences, you know, the very serious consequences

25   that this has for him as well as the victims that he's

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 198 of 221

1    likely to assault. I mean, imagine the terror those

2    women experienced that were the victims of his offenses.

3    I think that's very serious.

4              THE COURT: I know one of these charts used

5    the term sign, and in your testimony you

6    distinguished --  I understood you to distinguish signs

7    and symptoms. What's the difference between those two,

8    if there is one?

9              THE WITNESS: Typically signs refer to

10   behavior, observable behavior, and symptoms refer to,

11   you know, the subjective report of the individual's

12   feelings and subjective states.

13             THE COURT: In your experience, is it unusual

14   to have a case in which there are relative -- of outward

15   manifestations of the sexual element of offense conduct?

16             THE WITNESS: You mean like for -- the fact

17   that these appear to be attempted offenses rather than

18   fully executed offenses? Yeah, okay. I would say yes, I

19   think it is unusual, yes.

20             THE COURT: Mr. Lockridge, any follow-up to my

21   questions, sir?

22             MR. LOCKRIDGE: Just one question, Your Honor.

23             THE COURT: Yes, sir.

24        EXAMINATION

25        BY MR. LOCKRIDGE:

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 199 of 221

1    Q        With respect to Mr. King's sexual behaviors as

2    you described them, how does he manifest those in his

3    case?

4    A        How does he manifest --

5    Q        Or how does he act out on his -- when he's

6    committing his offenses, how has he acted out on those?

7    A        Well, I think these -- you know, these were --

8    you know, we've got an incident of sexual exposure, his

9    first offense. We've got the second offense in which he

10   did expose his penis and ask the victim to touch it or

11   force the victim to touch it,

12   and then the other three were all attempted sexual

13   crimes.

14          And I think Mr. King himself testified in the

15   presentence investigation report in 1988 -- well, we

16   know that he said that these were -- the intent was

17   sexual assault, and he also said -- I don't remember

18   exactly where, but I know he said it -- that he got

19   sloppy and he got too -- you know, he didn't prepare

20   carefully and that these offenses, the more recent

21   offenses in which he got caught, he got sort of

22   overexcited and did not follow his typical precautionary

23   measures and so on and he got caught.

24          So, you know, I think that he -- you know, these

25   were attempted sexual assaults that were interrupted and

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 200 of 221

1    his intent was to sexually assault the victims. I'm not

2    sure if that answers the question, but I remember that

3    statement.

4    Q      In your opinion, does Mr. King "get off" by

5    engaging in sex or in the power of engaging in sex,

6    sexual acts?

7    A      Are you asking me is he turned on by having

8    power and control over a female in a sexual way? Is that

9    the question?

10   Q      That's correct.

11   A      Yes, I think he is. I think that's the hallmark

12   of his paraphilia.

13            MR. LOCKRIDGE: Nothing further, Your Honor.

14            THE COURT: Thank you, sir. Mr. Bell?

15            MR. BELL: No, Your Honor.

16            THE COURT: Very good. Thank you, Doctor

17   Zinik.

18            MR. LOCKRIDGE: Thank you, Your Honor.

19            THE COURT: I know it's late in the day, but

20   we got started late. I'm inclined to forge ahead and see

21   if we can get a little bit done with the next witness.

22   Is that satisfactory to the Government?

23            MR. GRAY: Yes, Your Honor.

24            THE COURT: Mr. Gray?

25            MR. GRAY: At this time, I'd like to call our

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 201 of 221

1  next witness, Mr. Daniel King.

2            DANIEL KING, having been duly sworn, was

3  examined and testified as follows:

4            COURT CLERK: Sir, please state your name for

5  the record.

6            THE WITNESS: I'm Daniel H. King.

7       EXAMINATION

8       BY MR. GRAY:

9  Q       Good afternoon, Mr. King.

10  A       Good afternoon.

11  Q       Mr. King, let me ask you a question that will

12  help get to the heart of one of the issues at stake

13  here. Do you consider yourself a sexual offender?

14  A       No, I don't.

15  Q       Why is that?

16  A       Because according to statutes of law, I've not

17  been convicted of any sex offense, nor have I attempted

18  to engage in any sex offense, nor have I ever been

19  charged in any sex offense other than as a juvenile, an

20  indecent exposure charge -- was a misdemeanor.

21  Q       Yet, Mr. King, you made a request while you were

22  at Butner or while you were in the Federal prison system

23  to attend the sexual offender treatment program at

24  Butner. Why did you do that if you aren't a sex

25  offender?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 202 of 221

1   A       I had an option. I was getting ready to get sent

2   back to United States Penitentiary in Atlanta or I could

3   engage in a program with FCI Butner. I didn't care what

4   program I engaged in. I wasn't trying to go back to USP

5   Atlanta, so I made that request and I was denied by

6   Doctor Richard Hilkie (phonetic) who was in charge of --

7   program because his statement was I didn't have a

8   current sex offense -- an instant sex offense and

9   therefore was not qualified to be in the program, nor

10  was I close enough to a release date.

11  Q       Was that your only time with making a request to

12  enter into the sex offender treatment program?

13  A       That's the only time.

14  Q       Have you had any sexual offender treatment at

15  all while you were in the Federal prison system?

16  A       Not per se, no.

17  Q       You say not per se. What do you mean by that?

18  A       Not labeled as sex offense treatment, no.

19  Q       What kind of treatment have you received, sir?

20  A       I received psychological counseling.

21  Q       What kind of psychological counseling?

22  A       Mostly anger management, family counseling, just

23  general counseling.

24  Q       And in the course of this general counseling,

25  did it touch upon your offenses?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 203 of 221

1   A       Sure.

2   Q       Did you discuss the offenses that you had been

3   convicted of?

4   A       Sure, I did.

5   Q       How about discussing your family history?

6   A       Absolutely.

7   Q       Why did you engage in that treatment?

8   A       Well, trying to get a better understanding of

9   myself and my actions and the way I carry myself in

10  life.

11  Q       While you were trying to gain a better

12  understanding of your actions and how you carry yourself

13  in life, were there any counselors or treatment

14  providers that you found were particularly helpful?

15  A       Well, as a rule, at most institutions when you

16  get to engage in -- if you're lucky enough to engage in

17  counseling, you get put with an intern who is under the

18  auspice of a doctor or psychologist, so I found a few

19  that were helpful, but as a rule, it just helped me do

20  my time.

21  Q       What do you mean by it just helped you do your

22  time?

23  A       It just helped my time to go by, to help, to

24  assist to try to do what I could.

25  Q       So are you saying that you were not really

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 204 of 221

1  trying to participate in the counseling and the -- and

2  the help?

3  A      No, I'm not saying that at all. I'm saying I've

4  been incarcerated for a large amount of years. Yes, it

5  helped me do my time because it helped me remain calm

6  and cool while I was in prison pretty much.

7  Q      So when you say to help you do your time, it was

8  a therapeutic value for you?

9  A      Sure, it was.

10  Q      Now, Mr. King, we've shown you what was

11  previously a big board and a binder that was an exhibit

12  that was marked as Government Exhibit Number 56. I'm

13  going to bring it up on our screen. It'll be on the

14  screen in front of you.

15  A      Sure.

16  Q      Do you see that in front of you?

17  A      Yes, I do.

18  Q      Is that the exhibit that we've been referring to

19  as a timeline?

20  A      Yes, I believe it is.

21  Q      Can you see it okay?  I want to make sure that

22  you can read it.

23  A      Yeah. I'm fine -- put my glasses on if I need

24  to.

25  Q      Okay.

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 205 of 221

1   A       Yeah. I'm cool.

2   Q       Great. And I sometimes have trouble reading

3   small text, too, so if we get to a point where you have

4   a little trouble reading, please let me know, okay?

5   A       Sure.

6   Q       What I'd like to do is I'd like to just start

7   walking through some of your history, if that's all

8   right with you. That second block that starts with 1971

9   to 1974 -- and what I'm going to do is just to make sure

10  you were talking about the same block, I'm going to put

11  a blue arrow next to that block. Do you see that blue

12  arrow?

13  A       Yes, I do.

14  Q       It says that between the ages of 12 to 15, you

15  were seen by various doctors in Fairfax County for

16  sexual exposure and obscene phone calls.

17  A       That's correct.

18  Q       Did that happen?

19  A       For the indecent exposure charge that I had in

20  1974, yes, it did.

21  Q       What was the indecent exposure charge that you

22  had in 1974?

23  A       The one that's been spoken of several times

24  today that occurred in the park there near where I lived

25  at and grew up.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 206 of 221

1    Q        So would that be the indecent exposure charge

2    that is -- and I'll put another mark there -- that's

3    marked in the block of red right below it that has the

4    little blue mark next to it?

5    A        Yes, it is.

6    Q        So that 1971 to 1974 block that's above that red

7    block where it says seen by various doctors in Fairfax

8    County for sexual exposure and obscene phone calls,

9    there were no sexual exposures during that time period?

10   A        In 1974, there was, the one that you got marked

11   with the blue mark now.

12   Q        But other than that one in 1974 that's marked

13   with the blue mark, between 1971 and 1974, there were no

14   sexual exposures?

15   A        No, there was not.

16   Q        Now, there were obscene phone calls.

17   A        No, there was not.

18   Q        So there were no obscene phone calls and no

19   sexual exposures from 1971 to 1974 as indicated in that

20   block?

21   A        No, sir. Obscene phone calls would have been

22   almost impossible for me at that age. I could hardly

23   speak.

24   Q        And when you say it would be impossible for you

25   at that age, why do you say that? You said you could

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 207 of 221

1    hardly speak --

2    A        Because I was just learning how to talk. I had

3    just had my ears fixed and I was learning to speak.

4    Q        It says that you were seen by a number of

5    doctors in Fairfax County, so did those visits occur?

6    A        Yes.

7    Q        What were those visits for?

8    A        Mainly because I was dealing with numerous

9    amounts of surgeries on my legs. I was having problems

10   accepting that and being basically alienated by other

11   people because, one, I was learning how to deal with

12   people because I was just learning to hear and speak

13   and, two, I was learning to rewalk and deal with a lot

14   of pain and frustration with the bone operations I was

15   having in my legs. So I was angry and I was getting a

16   lot of treatment for physiological problems and

17   psychological problems at the same time.

18   Q        Now, you say you were getting treatment for

19   psychologic problems. Did any of those psychological

20   problems have anything to do with any sort of sexual

21   activities that you were engaged in?

22   A        Not up until that time. 1974 is when that

23   started.

24   Q        Now, Mr. King, what I'd like to do now is I'd

25   like to take you to that event in 1974 that you said was

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 208 of 221

1  indecent exposure, the one that had the blue mark next

2  to it that's on Government Exhibit Number 56, that first

3  page. It reads April, May, 1974, age 15, arrested for

4  indecent exposure to two girls ages seven and eight.

5  Can you tell us a little bit about that?

6  A       You want to know exactly what -- I mean, you

7  want to know about the incident? Is that what you're

8  asking?

9  Q       Yes, sir. What happened?

10  A       Basically I was walking in the park. I came

11  across two young girls who were fishing on the other

12  side of the creek, and being high and intoxicated and

13  just being mean, I exposed myself to them.

14  Q       Why did you do that?

15  A       Being mean.

16  Q       What about exposing to -- yourself was mean?

17  A       Well, I was just being mean. I was being mean.

18  I was being a bully.

19  Q       Was that your first incident of exposing

20  yourself?

21  A       Yes, it was.

22  Q       Prior to that time, there had been no other

23  incidents of exposure?

24  A       No.

25  Q       Now, as a result of that exposure that took

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 209 of 221

1   place in May, 1974, what happened?

2   A       I eventually got arrested and I got charged with

3   indecent exposure and I pled guilty to it and I got a

4   one year unofficial supervision and I had to receive

5   psychological counseling, continuous psychologic

6   counseling.

7   Q       Now, Mr. King, with regard to that incident that

8   took place with those girls at the age of seven and

9   eight, did you know how old they were?

10  A       No, I did not.

11  Q       Did you think they were 15 years old?

12  A       No. I didn't really care.

13  Q       Did you speak to the girls and ask them to touch

14  your penis?

15  A       I may have. I don't honestly recall if I did or

16  not.

17  Q       As a result of being arrested, did you engage in

18  any counseling?

19  A       Yes, I did.

20  Q       What kind of counseling was that?

21  A       Just general psychological counseling.

22  Q       Given that the nature of the offense was you

23  exposing your genitals, was any of the counseling sex

24  related?

25  A       Not per se. I mean, I never heard of sex

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 210 of 221

1  offender treatment, so I can't -- when I was going to

2  treat at that age, it was psychological counseling. You

3  dealt with anything and everything.

4  Q        And just to be clear, did any of the

5  psychological counseling that you were engaged in -- did

6  that deal with sex and sexual offenses?

7  A        No, it did not target that. No, it did not.

8  Q        Now, Mr. King, with regard to that exposure to

9  the girls that were seven and eight and counts that you

10 were convicted of, were you provided any probation after

11 that offense?

12 A        From the courts, yes, I was.

13 Q        During that probation, were you informed that

14 you should not engage in that sort of activity again?

15 A        Sure, absolutely.

16 Q        Now, Mr. King, with regard to that incident that

17 took place in 1974, they discussed that incident with

18 you when you were being interviewed for your sentence as

19 a result of the 1988 conviction, your instant offense,

20 isn't that right?

21 A        I'm sure we did, yeah.

22 Q        And there was an interview by a person from

23 pretrial services?

24 A        For the presentence investigation, yes.

25 Q        And that person had a chance to talk to you?

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 211 of 221

1    That was around 1988?

2    A       Correct.

3    Q       When that person spoke to you, did they tell you

4    that it was important for you to tell the truth?

5    A       They didn't specifically say that, but, I mean,

6    they just asked me to talk to him and tell him my

7    version, what was happening in my life.

8    Q       And after you had a chance to talk to them, did

9    they tell you they were going to prepare a report?

10   A       Sure.

11   Q       Did you get a copy of that report?

12   A       Yes, I did.

13   Q       At that 1988 conviction, were you represented by

14   an attorney?

15   A       Yes, I was.

16   Q       Who was your attorney?

17   A       I had two attorneys, Greta Van Susteren and Mr.

18   Russell Caheen.

19   Q       Was that Greta Van Susteren of Fox News fame?

20   A       Currently.

21   Q       Did she get a chance to advise you about that

22   offense in 1988?

23   A       We didn't discuss it.

24   Q       You didn't discuss it?

25   A       No, because it wasn't pertinent to my instant

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 212 of 221

1  offense. At that point in time, it was almost 20 years

2  old.

3  Q       You had an opportunity to read the presentence

4  report, correct?

5  A       Yes, I did.

6  Q       Did Ms. Greta Van Susteren or your other

7  attorney tell you that you had the opportunity to object

8  to anything within there that's not true?

9  A       Yeah.

10  Q       Now, what I'd like to do is I'd like to turn

11  your attention to what we've marked as Government

12  Exhibit Number 23. I'm going to turn to the page that's

13  Bates number 868. I know it's in that binder in front of

14  you, but I'll bring it up on the screen for you, okay?

15  Do you see that on your screen?

16  A       Yes. It is.

17  Q       Okay. I'm going to enlarge that just a little

18  bit so that you can read it a little clearer. Is that

19  text big enough for you?

20  A       Sure, it is.

21  Q       Great. It says -- we're looking at a section at

22  the page that's Bates stamped 868 in Exhibit Number 23,

23  and there's a portion in there that says social history

24  and right below that it says family history. Do you see

25  that?

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 213 of 221

1   A       Yes.

2   Q       Now, you had an opportunity to read this PSR

3   prior to it being admitted to The Court, right?

4   A       Yes.

5   Q       Mr. King?

6   A       Yes.

7   Q       And you had an opportunity to provide

8   objections, is that right?

9   A       Yes.

10  Q       And if we take a look at the paragraph that is

11  right below that, it talks about how you were -- your

12  parents -- your father had retired from a job with the

13  Federal government and your mother was an aide at

14  Chantilly High School in Virginia, is that right?

15  A       Yeah.

16  Q       And underneath that it says that -- the next

17  paragraph indicates that you were -- very unstable

18  development as a result of your actions. Do you see that

19  paragraph?

20  A       Yes.

21  Q       And it says you were -- was a disruptive factor

22  in your home since approximately 12 years old?

23  A       That's correct.

24  Q       And your parents sought to get help for you by

25  professionals, but you were told that you were going to

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 214 of 221

1  outgrow the problem. Does that say that right there?

2  A       Yes, it does.

3  Q       And that the paragraph right below that starts

4  off by saying that both defendant and his parents had

5  reported that defendant never got along well with women.

6  Does that say that right there?

7  A       Yes, it does.

8  Q       And that he became easily angered at his mother

9  over something that would not have bothered him had his

10 father been in the same position. Does that say that

11 right there?

12 A       Yes, it does.

13 Q       Now, you had an opportunity to review this and

14 object to any materials that were not true, isn't that

15 right?

16 A       Yes.

17 Q       And you didn't lodge any objections as a result

18 of any of those statements that are within that

19 document, did you?

20 A       I don't recall any objections at this particular

21 part here, no.

22 Q       In fact, on the next page is where your counsel

23 pointed out that your mother noted that you were "a

24 chronic liar" and at times unable to tell the truth?

25 A       Correct.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 215 of 221

1  Q       And that the paragraph right above where it says

2  education and training, that at that time your parents

3  felt that you have demonstrated that you were powerless

4  to control your behavior. Does that say that?

5  A       Yes, it does.

6  Q       Now, Mr. King, within this document, there's

7  discussion about your prior criminal record, stating

8  that you had convictions in '83 and in '88, is that

9  correct?

10  A       Yes.

11  Q       And, Mr. King, this document -- and we are at

12  Bates number 870 -- and I'll show you that on the

13  screen.

14          MR. GRAY: And, Mr. Bell, if you care to

15  follow along, we're on page 870.

16          BY MR. GRAY:

17  Q       There's a paragraph that says with respect to

18  defendant's emotional -- he has a long history of

19  participation in various forms of psychologic and

20  psychiatric counseling. Is that correct?

21  A       That's what it says.

22  Q       And it says that according to information in the

23  probation records, starting at the age of 12, defendant

24  was first seen by Doctor William Morgan, is that

25  correct?

Huseby, Inc.                            www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 216 of 221

1   A       Yes.

2   Q       And it says right in that same paragraph that

3   you were seen by various doctors in Fairfax County

4   Mental Health Clinic in relation to his exposures and

5   obscene phone calls. Does that say that in there?

6   A       That's what it says.

7   Q       You did not object to that language being in

8   there when you originally saw the PSR, did you?

9   A       No. I don't recall a particular objection to

10  that, no.

11  Q       Yet you still maintain that you did not engage

12  in any exposures or obscene phone calls?

13  A       That's what I'm saying. This information came

14  from my parents. It did not come from me. They are

15  entitled to say how they feel. I honestly didn't read it

16  that much at that particular time. Greta did and so did

17  Russell, and if they didn't object, I'm fine with it.

18  Q       Mr. King, I'm going to go back to Exhibit Number

19  56. I have it back on your screen. I want to turn your

20  attention now to the block that says 1975. It's the

21  green block --

22          THE COURT: Mr. Gray, let me interrupt, sir.

23  If we're going to get on to another matter, perhaps this

24  would be a good time to take our evening recess. I

25  assume you have more than just a couple minutes worth of

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 217 of 221

1  questions.

2            MR. GRAY: Yes, Your Honor. If it goes with

3  The Court's time to take a break and take a recess at

4  this time, I think this is a good time to stop.

5            THE COURT: Okay. Very good. We'll take our

6  evening recess in just a moment, but I was having

7  trouble matching up the page numbers you were citing

8  with the copy of Government's Exhibit 23 that I have.

9  Some of these page numbers are obscured as well.

10           MR. GRAY: Yes, Your Honor. I know that some

11 of those page numbers are obscured, and what I'm doing

12 is using page numbers as they were generated by our

13 discovery methods. The disks that we provided over to

14 Defense Counsel -- and just for the sake of

15 demonstration, I will bring up on the screen the last

16 document.

17           Your Honor, what I have is if you look up in

18 the upper left hand corner, it has a page number which

19 corresponds to the Bates number. Well, it should

20 correspond to the Bates number. It may be off, so what

21 I'll do, Your Honor, is I will --

22           THE COURT: Could you go to the top of that

23 page Mr. Gray?

24           MR. GRAY: Yes, Your Honor.

25           THE COURT: I'm interested in seeing if

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 218 of 221

1  there's a page number at the top, because this is on my

2  copy. That's Bates -- now, the Bates number on the page

3  that you're showing on my copy is 859.

4          MR. GRAY: Your Honor, I think -- Your Honor,

5  I'm sorry. There are multiple copies. Unfortunately,

6  with our discovery process, there were multiple copies

7  of the documents that were included, so 859 is the same

8  document as 870.

9          THE COURT: Well, I've been able to follow

10  this, but my overriding concern is that the record be

11  clear so somebody reviewing the transcript -- obviously

12  doesn't have the privilege of being here -- could find

13  the documents among the exhibits that are being

14  referenced.

15          MR. GRAY: Yes, Your Honor. I'll make sure

16  that I cross-check those Bates numbers again just to

17  make sure that we're all dealing with the same

18  documents.  It's part of the reason why we wanted to

19  make sure we were showing the same document on the

20  screen, just to make sure we were all dealing with same

21  set of facts.

22          THE COURT: That's fine. Well, it appears to

23  me that the document that you're referring to as 870

24  is -- in The Court's copy of the exhibit is Bates

25  stamped 859, and I would note that there's continuous

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 219 of 221

1  page numbering at the tops of these pages, so that

2  certainly facilitates locating the appropriate page.

3             MR. GRAY: Yes, Your Honor, and I apologize.

4  Our electronic version of the exhibits has multiple

5  copies. The books and the binders that we're using all

6  have the same page number of 859, so this is my mistake.

7             THE COURT: That's quite all right. I just

8  want to make sure we've addressed it and move on. Very

9  good. Is there anything further before we take our

10 recess?

11            MR. BELL: No, Your Honor.

12            MR. GRAY: No, Your Honor.

13            THE COURT: Well, very good. We'll be in

14 recess until nine a.m. tomorrow morning.

15

16

17       WHEREUPON, the hearing was suspended at 4:59 p.m.

18

19

20

21

22

23

24

25

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
www.huseby.com
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 220 of 221

1                              CERTIFICATE

2

3          I, Glynde M. Jones, Notary Public in and for the

4    State of North Carolina, do hereby certify that the

5    foregoing transcript of proceedings taken in the United

6    States District Court is a true and accurate

7    transcription of the shorthand notes of the proceedings

8    taken by me in machine shorthand and transcribed by

9    computer under my supervision.

10

11         Dated this 2nd day of November, 2011.

12

13

14                          *Glynde M. Jones*

15         _____

16         GLYNDE M. JONES, NOTARY PUBLIC

17         Notary Public Number: 20022120063

18

19

20

21

22

23

24

25

Huseby, Inc.                                           www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 74   Filed 11/03/11   Page 221 of 221