```
 1
 1          IN THE UNITED STATES DISTRICT COURT
 2           EASTERN DISTRICT OF NORTH CAROLINA

 3                  WESTERN DIVISION

 4

 5    --------------------------X

 6    UNITED STATES OF AMERICA,  :

 7          Petitioner,          :

 8    v.                         : CASE NO. 5:10-HC-2009-FL

 9    DANIEL KING,               :

10          Respondent.          :

11    --------------------------X

12

13

14

15                  BENCH TRIAL (VOLUME II)

16                  OCTOBER 18, 2011

17         HONORABLE JAMES E. GATES, PRESIDING

18

19

20

21

22

23       Reported by:  Glynde M. Jones

24                     Court Reporter

25                     Notary Public
```

**ORIGINAL**

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 1 of 163

```
 1   APPEARANCES:

 2        FOR THE GOVERNMENT:

 3             EDWARD D. GRAY, Esq.

 4             US Attorney's Office

 5             Room 800

 6             310 New Bern Avenue

 7             Raleigh, North Carolina  27601

 8             (edward.gray@usdoj.gov)

 9        AND

10             MICHAEL E. LOCKRIDGE, Esq.

11             Federal Bureau of Prisons, Legal Center

12             PO Box 1600

13             Old Highway 75

14             Butner, North Carolina  27509

15             (mlockridge@bop.gov)

16

17        FOR THE RESPONDENT:

18             JOSEPH L. BELL, JR, Esq.

19             Batts, Batts & Bell, LLP

20             103 Candlewood Road

21             Rocky Mount, North Carolina  27804

22             (jbelljr@battslaw.com)

23

24

25
```

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 2 of 163

1                          CONTENTS

2    THE WITNESS: DANIEL KING                EXAMINATION

3          BY MR. GRAY                              4, 103

4          BY MR. BELL                                 57

5    THE WITNESS: DAWN GRANEY, PSY.D

6          BY MR. LOCKRIDGE                      111, 156

7          BY MR. BELL                           133, 159

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Huseby, Inc.                                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 3 of 163

1          THE COURT: Good morning, folks.

2          AUDIENCE: Good morning, Your Honor.

3          THE COURT: Are there any housekeeping type

4   matters we need to take up this morning?  Mr. Gray?

5          MR. GRAY: No, Your Honor.

6          MR. BELL: Not on behalf of the Respondent,

7   Your Honor.

8          THE COURT: Very good. When we last left, I

9   believe we were in the midst of testimony from Mr. King.

10         MR. GRAY: Yes, Your Honor, and the Government

11  would like to continue that examination at this time.

12         THE COURT: Very good. Mr. King, if you'd

13  resume the stand, please. Mr. King, let me remind you,

14  sir, that you do remain under oath.

15         THE WITNESS: Thank you.

16         THE COURT: Very good. Mr. Gray?

17         MR. GRAY: Thank you, Your Honor.

18      EXAMINATION

19      BY MR. GRAY:

20  Q      Good morning, Mr. King.

21  A      Good morning.

22  Q      Mr. King, yesterday we started off your

23  testimony -- you said that you were not a sexual

24  offender, isn't that right?

25  A      That's correct.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 4 of 163

1    Q        And you don't consider yourself a sexual

2    offender because you don't think you've committed any

3    offenses of a sexual nature, isn't that right?

4    A        What I said was -- yesterday and what I said

5    before is that I have no crimes of a sexual nature --

6    any Federal statute or Commonwealth of Virginia statute

7    other than indecent exposure when I was a juvenile.

8    Q        So is it your testimony today that you have not

9    committed any offenses of a sexual nature?

10   A        That's correct.

11   Q        So you haven't committed any offenses of a

12   sexual nature?

13   A        That's correct.

14   Q        And it's your testimony that the information

15   that you told Doctor Graney in part of the

16   precertification interview -- it's your testimony today

17   that all that was a lie?

18   A        I fabricated it, yes.

19   Q        Why did you fabricate it?

20   A        Because I wanted to be civilly committed because

21   I thought I was going to be in a civil commitment type

22   environment and I thought it would benefit me because I

23   had no place else to go and I figured since I know how

24   to live in prison, I'd just stay there.

25   Q        Now, what do you mean by a civil commitment type

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 5 of 163

1    environment?

2    A      My current status is I'm a civil detainee inside

3    of a prison. I'm under prison guidelines. I'm directed

4    by prison staff and I have no -- there's nothing

5    different about my serving a 24 year under a term of --

6    for punishment than I am right now. I'm under the same

7    guidelines. There's nothing different, absolutely

8    nothing.

9    Q      Why did you think you'd be under something

10   different?

11   A      Because I investigated it and I saw what could

12   happen, what could be and what should be.

13   Q      And you said you investigated it. You looked at

14   the Coalinga State Hospital?

15   A      That's one.

16   Q      What else did you look at?

17   A      I also looked at New Jersey.

18   Q      What did you find out about those places?

19   A      I found out that they are not governed by the

20   Department of Corrections. They're governed by the

21   Department of Health and Human Services, the same as

22   with California and Washington and New Jersey -- and

23   that the patients should we say are in a therapeutic

24   environment, not guided by correctional staff who do not

25   know how to do therapeutic environments.

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 6 of 163

1  Q        So it's your testimony that you wanted to stay

2  in an environment where you could essentially just

3  continue to receive treatment?

4  A        I didn't say I wanted to receive treatment.

5  I wanted to be taken care of.

6  Q        And you did a lot of research on this, isn't

7  that right?

8  A        I did some study, yes.

9  Q        And you felt like you had investigated things

10 pretty good, isn't that right?

11 A        I did a fair job.

12 Q        I mean, you looked at a number of other programs

13 other than just the Federal program. You looked at

14 California and New Jersey, some other ones, didn't you?

15 A        Yes.

16 Q        Now, in your interview with Doctor Graney, you

17 told her that you had admitted to masturbating between

18 the ages of six and 13 without feeling guilty to sexual

19 fantasies where you had exposed yourself, isn't that

20 right?

21 A        Between what ages again? Say that again.

22 Q        Between the ages of six and 13.

23 A        I don't recall that.

24 Q        Would taking a look at her report -- would that

25 refresh your memory?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 7 of 163

1   A       Well, I mean, between six and 13 is a little bit

2   young. I mean, I might have started masturbating when I

3   was ten or 11. I don't remember six. It certainly wasn't

4   fantasies about that.

5   Q       So any statement that's in there that said that

6   you were having those sort of fantasies, that's a lie?

7   A       That's fabricated, yes.

8   Q       And when you told her that when you did have

9   intercourse with a girl, you fantasized about exposing

10  yourself and not about having -- about exposing yourself

11  to women and tying up women and raping them, isn't that

12  right?

13  A       I may have, yes.

14  Q       And that you told her that at the age of 14, you

15  exposed yourself for the first time to some girls, isn't

16  that right?

17  A       Yes, I did.

18  Q       But you are saying that that's a lie now?

19  A       I did commit that crime.

20  Q       And you told her that you did this under the

21  influence of alcohol and you didn't have an erection,

22  isn't that right?

23  A       I was under the influence of alcohol and Darvon,

24  pain medication.

25  Q       But you're telling her -- the other facts about

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 8 of 163

1  that, those are all a lie?

2  A       I committed that offense as stated. As listed in

3  the police report, I did what it said.

4  Q       Now, I'm not talking about the police report.

5  I'm talking about what you told Doctor Graney.

6  A       Okay. What I told Doctor Graney.

7  Q       Now, with regard to what you told Doctor Graney,

8  you told him (sic.) that you began exposing yourself,

9  you saw how humiliated it made the women feel, isn't

10 that right?

11 A       That's what I told her.

12 Q       And you told her that it gave you a sense of

13 control, isn't that right?

14 A       That's what I said.

15 Q       But you're now saying that those statements are

16 a lie?

17 A       I fabricated that.

18 Q       And you also told her that -- you described it

19 as a stimulating feeling when you humiliated females and

20 you felt euphoric from the sense of control, isn't that

21 right?

22 A       That's what I said.

23 Q       But you're now saying that those statements are

24 a lie?

25 A       I fabricated that.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 9 of 163

1    Q        And you told Doctor Graney that you -- reported

2    that you exposed yourself to others on an almost daily

3    basis until you were arrested for the incident offense,

4    isn't that right?

5    A        That's what I said.

6    Q        But now you're saying that that is a lie?

7    A        That's a lie.

8    Q        And you told Doctor Graney that at the age of 14

9    you abducted a victim using a knife when you were 14 and

10   you took her into the woods and you exposed yourself to

11   her?

12   A        That's what I said.

13   Q        Are you now saying that that was a lie?

14   A        That's a lie.

15   Q        And you told Doctor Graney that you never

16   engaged in any sexual contact with your victims but you

17   would expose yourself to them and occasionally have them

18   masturbate you, isn't that right?

19   A        That's what I said.

20   Q        But now you're saying that that's a lie as well?

21   A        That's a lie.

22   Q        And you also told Doctor Graney that as a rule,

23   sex means nothing to you, isn't that right?

24   A        That's what I said, yes.

25   Q        And now you're saying that that's a lie as well?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 10 of 163

1   A        I'm saying that -- well, I've been locked up

2   almost 30 years. I'm really not too interested in sex,

3   to be quite honest with you.

4   Q        And when you were speaking about that, you were

5   talking about sex with your victims, so you weren't

6   interested in having sex with your victims?

7   A        As a juvenile, it wasn't on my mind, no.

8   Q        And now you're saying that sex isn't on your

9   mind now.  And when you were engaging in those acts,

10  what you were telling Doctor Graney, that was a lie?

11  A        Yes.

12  Q        And you also told Doctor Graney that you went

13  through some elaborate plans in picking your victims,

14  isn't that right?

15  A        That's what I said.

16  Q        You told her that you picked victims that would

17  be most easy to assault, isn't that right?

18  A        Sure.

19  Q        You told her that you picked victims that would

20  be women, isn't that right?

21  A        Sure.

22  Q        You said you picked women because they were

23  easier, isn't that right?

24  A        Correct.

25  Q        And you also told her that, you know, you would

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 11 of 163

1    pick women that were vulnerable such as women that were

2    walking alone at night, isn't that right?

3    A       That's correct.

4    Q       And then you also told her that you would not

5    pick Black or foreign women because you felt that they

6    would put up more of a fight, isn't that right?

7    A       That's correct.

8    Q       And you also told her it was your opinion that

9    Caucasian women tended to focus more on just survival,

10   so they would be a little more compliant to you, isn't

11   that right?

12   A       That's correct.

13   Q       You also told Doctor Graney that you

14   specifically targeted women who were less likely to

15   resist because they'd have something to live for, isn't

16   that right?

17   A       That's correct.

18   Q       But now you're saying all those statements you

19   told Doctor Graney, those were all lies?

20   A       I fabricated it.

21   Q       And you also told Doctor Graney that you used a

22   knife as your weapon of choice drug these abductions

23   because you felt that women feared knives more than

24   firearms, isn't that right?

25   A       That's correct.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 12 of 163

1  Q       But now you're saying that that's a lie?

2  A       It's fabricated.

3  Q       And you also told her that you would

4  occasionally wear masks to disguise your face during

5  some offenses because you felt that your features were

6  too distinct, isn't that right?

7  A       That's correct.

8  Q       And then you also told her that you would

9  disguise your voice and use notecards so that women

10 couldn't recognize your voice, isn't that right?

11 A       That's what I said.

12 Q       Because you felt your speech pattern was too

13 distinctive, isn't that right?

14 A       That's correct.

15 Q       And you told her that you would prepare these

16 cards ahead of time with phrases instructing the women

17 on what to do, isn't that right?

18 A       Yes.

19 Q       And you told her that you would give these women

20 these cards instructing them what to do so that they

21 would engage in the conduct that you wanted them to

22 engage in, isn't that right?

23 A       Yeah, I believe I said that. I believe I said I

24 showed 'em the cards, or I didn't give 'em to 'em. I

25 showed 'em. That's what I told her.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 13 of 163

1    Q      But now you're saying that all that stuff you

2    told Doctor Graney is a lie?

3    A      Yes.

4    Q      And you also told Doctor Graney that you would

5    normally take your victims and try to place 'em into

6    your car, is that right?

7    A      That's what I said, yes.

8    Q      But now you are saying that that's a lie?

9    A      That's correct.

10   Q      And you also told her that you would try to use

11   things such as bindings, luggage straps, blindfolds with

12   your victims, isn't that right?

13   A      That's what I said.

14   Q      Ropes, isn't that right?

15   A      No, I don't think I said rope. I said bindings.

16   Q      But you would do those not only to physically

17   control your victims but also to impart fear into them,

18   isn't that right?

19   A      That's what I was indicating.

20   Q      You did this to control your victims mentally as

21   well as physically, isn't that right?

22   A      That's what I was trying to say.

23   Q      But now you're saying all that's a lie?

24   A      That's correct.

25   Q      And you also told her that you didn't actually

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 14 of 163

1  try to cut or pierce the victims' skin because you

2  didn't want to have blood in your car, isn't that right?

3  A      That's correct.

4  Q      But now you're telling us that that's a lie as

5  well?

6  A      Correct.

7  Q      And then you told her that you occasionally

8  would leave some of these items in your car because you

9  might need them on occasion, isn't that right?

10  A      I believe I said that, yes.

11  Q      But now you're saying that that's all a lie?

12  A      Yes.

13  Q      And you also told her that you admitted that you

14  would use handcuffs and ropes to obtain control of a

15  victim, isn't that right?

16  A      I don't recall that statement.

17  Q      But if you had said that to her now, you're now

18  saying that that's a lie?

19  A      Yes.

20  Q      And you told her that you would take steps in

21  order to make sure that you could control your victims,

22  isn't that right?

23  A      Yes.

24  Q      And if you wanted to, you would fondle your

25  victims because you could do it, isn't that right?

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 15 of 163

1   A       Well, yeah. Yes, I did, yes, yes, uh-huh.

2   Q       And you told her that you engaged in this type

3   of behavior approximately three times a month since you

4   were the age of 15, isn't that right?

5   A       Yes, I did.

6   Q       But you're saying that that's a lie?

7   A       Yes.

8   Q       And you also told her that you replayed these

9   prior sexual offenses in your head, isn't that right?

10  A       That's correct.

11  Q       And now you're saying that that's a lie as well?

12  A       Correct.

13  Q       And you told her that once the offense occurred,

14  you knew another one would follow because the "euphoric

15  high was so good, it was better than any drug," isn't

16  that right?

17  A       That's correct.

18  Q       But now you're saying that that statement to her

19  was a lie?

20  A       That's correct.

21  Q       Now, you are not denying that you didn't say

22  those to her?

23  A       I'm not denying it at all.

24  Q       You're just saying that when you told her it at

25  the time, it was a lie?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 16 of 163

1    A       I had an ulterior plan.

2    Q       And you also told her that you had fantasies

3    about you exposing yourself to women almost daily, isn't

4    that right?

5    A       That's correct.

6    Q       But now you're saying what you told Doctor

7    Graney was a lie?

8    A       That's correct.

9    Q       But you also told her that whenever you got

10   caught for a crime, it's because you got too wired, you

11   weren't prepared, is that right?

12   A       That's correct.

13   Q       You got caught because things just got, you

14   know, out of hand, isn't that right?

15   A       Sure.

16   Q       You got caught because you lost control, isn't

17   that right?

18   A       I got caught because I made a mistake.

19   Q       Now, you had the opportunity to tell Doctor

20   Graney that all this stuff was a lie right after you had

21   that interview, didn't you?

22   A       I probably did.

23   Q       And when you had this interview with Doctor

24   Graney, did that interview take place at Butner?

25   A       Yes, it did.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 17 of 163

1    Q        And you were staying in one of the compounds at

2    Butner? Was it the Clemson House?

3    A        I was isolated in the special housing unit

4    because of my custody level -- was not allowed on the

5    yard.

6    Q        But that interview took place while you were

7    here at Butner?

8    A        Yes.

9    Q        When did you get transferred to Butner

10   permanently? Around September of 2009?

11   A        Around September, 2009.

12   Q        And in September, 2009, that's when you were

13   moved into the Maryland unit?

14   A        That's when I was moved into the special housing

15   unit.

16   Q        And after the special housing unit, you were

17   moved into the Maryland unit?

18   A        Well, the day my sentence expired on January 20,

19   2010, they allowed me the privilege of living in the

20   Maryland unit.

21   Q        So you have been living in Maryland Unit since

22   January of 2010, isn't that right?

23   A        That's correct.

24   Q        Now, Mr. King, when you were a child and you

25   were the age of 14, you admitted to exposing yourself to

Huseby, Inc.                                     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 18 of 163

1    two girls, isn't that right?

2    A        Yes, I did.

3    Q        And you didn't touch 'em, did you?

4    A        No, I did not.

5    Q        You just showed 'em your penis and said you want

6    to touch this, don't you?

7    A        I may have said that. I don't even recall saying

8    that, but I may have.

9    Q        But you certainly didn't touch 'em?

10   A        No, I did not. They were on the other side of

11   the creek.

12   Q        You didn't rape 'em?

13   A        No.

14   Q        Didn't sexually penetrate them?

15   A        No, I did not.

16   Q        You just showed 'em your penis?

17   A        That's correct.

18   Q        And in 1975, you were assaulted by a group of

19   teenage boys, isn't that right?

20   A        I believe that was '76.

21   Q        Okay. In '76, these boys, they came up to you

22   and they hit you?

23   A        Yeah. They touched me up pretty good.

24   Q        So good that they put you into a coma, isn't

25   that right?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 19 of 163

1   A       Yes.

2   Q       In fact, you spent about six weeks in a coma?

3   A       Spent about six weeks in the hospital, about

4   seven days in a coma.

5   Q       And then when you were the age of 19 -- I'm

6   sorry. When you were the age of 17, you were arrested

7   for seizing, transporting and detaining with the intent

8   to defile her person, that being a young woman outside

9   of a football game, isn't that right?

10  A       Yeah, that's correct, 1975.

11  Q       I'm going to bring up on the timeline from

12  yesterday -- which is Government Exhibit Number 56. Let

13  me know if you see that on your screen.

14  A       Okay.

15  Q       I'm speaking of the event that's in red, in the

16  red box that's October, 1975, age 17.

17  A       I got you.

18  Q       Okay. And in that offense, you used a knife,

19  didn't you?

20  A       Yes, I did.

21  Q       You took that female and dragged her to a car,

22  didn't you?

23  A       I escorted her to her vehicle, yes, I did.

24  Q       But it's your testimony that that wasn't a

25  sexual offense?

Huseby, Inc.                                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 20 of 163

1   A       I took advantage of a situation. I had no

2   intention of raping the woman.

3   Q       But you did touch her breasts?

4   A       Yes, I did.

5   Q       And you did expose your penis to her?

6   A       I denied that then. I deny it now.

7   Q       If you would, take a look on that binder at

8   Government Exhibit Number Eight.

9   A       Okay.

10  Q       And if you would, please go to page 2023, Bates

11  number at the bottom.

12  A       All right.

13  Q       That's the police report, isn't it?  And in this

14  police report, the police are saying that you told them

15  that you remembered molesting the girl's breasts, isn't

16  that right?

17  A       That's correct.

18  Q       But you said you don't recall exposing yourself,

19  isn't that right?

20  A       That's correct.

21  Q       But we have on page 2022 the victim stated that

22  you exposed your penis to -- 'em, isn't that right?

23  A       Yes, that's what she said.

24  Q       So on page 2023 it doesn't say that you deny

25  exposing your penis. You just said you don't remember,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 21 of 163

1   isn't that right?

2   A     That's correct.

3   Q     And isn't it true that also -- your buddy who

4   was in this offense with you, he also remembered it that

5   way, that you were touching her and trying to expose

6   your penis to her, isn't that right?

7   A     I guess if they would have arrested me first, I

8   would have remembered it different also. That's how I

9   got caught. He got hit first.

10   Q     So it's your testimony because he got hit first,

11   his story just happens to coincide with the story of the

12   victim?

13   A     That seems to be par for the course in the

14   justice system.

15   Q     In fact though, a lot of times in this justice

16   system, you seem to be the person who's always the

17   victim of people telling lies about you, isn't that

18   right?

19   A     Hell of a system, isn't it?

20   Q     Indeed, it is.

21      THE COURT: Mr. Gray, I think you were the

22   first one to use the word hit first or the phrase hit

23   first, and I'm not --

24      MR. GRAY: I'm sorry?

25      THE COURT: I believe you were the first in

Huseby, Inc.     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 22 of 163

1  your discussion with Mr. King to use the phrase hit

2  first, that the other gentleman was hit first.

3          MR. GRAY: I'm sorry, Your Honor. He said that

4  he -- he testified that if you got hit first, that's how

5  the story would go. I took that to mean -- and I can ask

6  Mr. King to clarify what he meant by hit first.

7          BY MR. GRAY:

8  Q      Mr. King, you said that your partner got hit

9  first. Could you elaborate a little bit as to what you

10  meant by that?

11  A      My meaning is is that he was arrested first and

12  he never got charged with anything, even though he was

13  involved in the crime. He was arrested and then I was

14  arrested two days later.

15          THE COURT: Oh, I see. Okay. Thank you.

16          THE WITNESS: And then all of a sudden, he's

17  not in the picture anymore. It's just all me.

18          THE COURT: Thank you, sir. Mr. Gray?

19          MR. GRAY: Thank you, Your Honor.

20          BY MR. GRAY:

21  Q      And, Mr. King, the victim also said that you

22  forced her to touch your penis, isn't that right?

23  A      That's what she said.

24  Q      But you're saying that that's a lie as well?

25  A      I'm saying two things. It didn't happen, and,

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 23 of 163

1  two, she couldn't see. She had a hat pulled over her

2  eyes.

3  Q        She had a hat pulled over her eyes because you

4  pulled the hat over her eyes?

5  A        When I escorted her to the vehicle, I did it

6  right away.

7  Q        And, Mr. King, you pled guilty to that offense,

8  isn't that right?

9  A        I certainly did.

10  Q        Now, Mr. King, shortly after that offense, you

11  spent some time in a couple of hospitals, isn't that

12  right?

13  A        That's correct.

14  Q        In fact, you spent some time in Westbrook

15  Hospital, isn't that right?

16  A        Yes, I did.

17  Q        And you got kicked out of Westbrook Hospital

18  because you claimed you were "falsely accused" of trying

19  to kiss one of the women patients there, isn't that

20  right?

21  A        I didn't say I was falsely accused. I said I got

22  caught kissing another girl.

23  Q        Let me turn your attention to Exhibit Number

24  Nine, and if you would turn to page 1502, the doctor

25  says that you told him that you were falsely accused by

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 24 of 163

1  a female patient of having kissed her. Do you see that

2  on the page on that paragraph?

3  A       Yes, I see it.

4  Q       So you are saying that that's a lie?

5  A       No. I'm saying I was trying to keep from being

6  kicked out. I told him what he wanted to hear.

7  Q       And what he wanted to hear was it was -- falsely

8  accused?

9  A       He wanted to hear that it didn't happen.

10  Q       But that's not the only time that that was

11  mentioned. If you turn to page 1508 in that same

12  exhibit, isn't it true that another doctor in the

13  discharge note -- I'm sorry, that's 1505. The doctor in

14  that discharge note notes that you were expelled from

15  the hospital for engaging in sexual behavior with a

16  female patient. That's also a lie, isn't it?

17  A       Who is this? Who wrote this?

18  Q       Well, one of your physicians. Are you saying

19  that this is a lie?

20  A       I'm saying I admitted it and I have admitted it

21  since that myself and a girl named Sally were caught

22  kissing and I was expelled. I mean, if you want to call

23  kissing a sexual misconduct, I'm fine with it.

24  Q       So it's your story that you were caught kissing?

25  A       Yes, we were.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 25 of 163

1  Q        And that this woman was engaging in this

2  willingly with you?

3  A        Sure, she was.

4  Q        Mr. King, with regard to other behavior that you

5  said was consensual, that doctor also said that you were

6  unmanageable while you were at Westbrook, isn't that

7  right?

8  A        He may have.

9  Q        Now, Mr. King, isn't it true that after you left

10 Westbrook, you were being treated at Phipps Hospital for

11 a while at Johns Hopkins? Isn't that right?

12 A        Yes. I left Westbrook, went back to jail, and

13 then I was placed in Phipps Clinic at Johns Hopkins

14 Hospital.

15 Q        And at Johns Hopkins, you told the doctors that

16 you were having difficulty controlling your impulses

17 exposing yourself to women, isn't that right?

18 A        Yes, I did.

19 Q        And you told the doctors back in 1976 that you

20 were having fantasies about exposing yourself and tying

21 women up and raping them?

22 A        That's what I said.

23 Q        And you spent a lot of time at Phipps Hospital.

24 In fact, you got pretty good treatment there, wouldn't

25 you say?

Huseby, Inc.                           www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 26 of 163

1    A        Yes.

2    Q        Yet after you were done getting treated at

3    Phipps Hospital, in '78, you were arrested for abduction

4    of two women, isn't that right?

5    A        That's correct.

6    Q        And it's your story that this abduction wasn't

7    for any sexual reason, isn't that right?

8    A        That's correct.

9    Q        It's your story that this was for money, isn't

10   that right?

11   A        That's correct.

12   Q        In fact, you testified that you went to the

13   first woman and tried to get her into a car, isn't that

14   right?

15   A        No, that's not what I said. I said I went up

16   behind the woman and attempted to grab her and push her

17   up against the vehicle, which is what I did.

18   Q        But she got away?

19   A        Yes.

20   Q        So after she got away, then you went and tried

21   to find another woman?

22   A        Yes.

23   Q        And when you found her, you tried to push her

24   into a car as well, isn't that right?

25   A        I followed her out of the establishment after I

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 27 of 163

1  discovered that she had good finances and I followed her

2  to her vehicle. When she got into her vehicle, I jumped

3  in with her and demanded the money.

4  Q       You said that you did it after you discovered

5  she had good finances?

6  A       Yes.

7  Q       You had a chance to see her credit report?

8  A       Go to a bar. All you've got to do is watch.

9  Q       So you were watching her for a while, isn't that

10 right?

11 A       I was watching several people.

12 Q       But you were watching her in particular, isn't

13 that right?

14 A       Yes.

15 Q       In fact, you just testified that she had good

16 finances, so you must have seen her pull money out of

17 her purse a couple times, isn't that right?

18 A       Yes, I did.

19 Q       So you must have been watching her purse, isn't

20 that right?

21 A       I was watching her pay, yes.

22 Q       And you followed her out of the bar, isn't that

23 right?

24 A       That's correct.

25 Q       And you saw her as she was walking out of the

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 28 of 163

1   bar, isn't that right?

2   A       Yes.

3   Q       But rather than stealing her purse, you went and

4   you grabbed her body, isn't that right?

5   A       I didn't grab her body. When she was in her

6   vehicle, I jumped in there beside her and pushed her

7   down and demanded the money.

8   Q       So as you saw her get out of the -- walk out of

9   the bar, before she got to her car, you didn't take her

10  purse, you waited until she got in her car, jumped in on

11  top of her and then threatened her?

12  A       Yes.

13  Q       And this was the second woman of that night?

14  A       That's correct.

15  Q       Yet this woman, she got away, didn't she?

16  A       Yes.

17  Q       How did she get away?

18  A       She started kicking and screaming, so I left.

19  Q       You left voluntarily?

20  A       Yes.

21  Q       Because you figured that you weren't going to be

22  getting what you wanted from her, isn't that right?

23  A       Too big of a scene. I left.

24  Q       And after you left, you went back to your car,

25  isn't that right?

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 29 of 163

1   A        Yes, I did.

2   Q        And when you got back to your car, that's when

3   the police caught you, isn't that right?

4   A        No, it's not.

5   Q        When did the police catch you?

6   A        They caught me approximately a month later from

7   a composite sketch.

8   Q        And that composite sketch, that's when the

9   police showed your photo to the victim, isn't that

10  right?

11  A        I don't know. I don't really know what they did

12  at that point. I know I had just been arrested for a

13  trespassing charge. When they took me to the jail, there

14  was a composite sketch and the deputies identified me

15  and they notified the police department.

16  Q        Just to make sure we're all talking about the

17  same thing, I've put back up on the screen Exhibit

18  Number 56. I'm speaking about the top red block that

19  says April 7, 1978, age 19.

20  A        Okay.

21  Q        That's the event where you followed the first

22  woman where you got to her and you were -- you pushed

23  her up against the car, left her, went to the bar,

24  followed this woman to the bar, pushed her into her car,

25  she started kicking and screaming and you walked away

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 30 of 163

1   voluntarily?

2   A       Yes.

3   Q       Now, Mr. King, would you please turn to Exhibit

4   Number Ten in that binder?

5   A       Yes.

6   Q       On that page, it talks about how you were on

7   probation at this time, isn't that right?

8   A       I was on -- I don't know if I was still on

9   probation for the 1975 thing or not. I may have been.

10  I think I was if it went until I was 21, so yes.

11  Q       Yet it's your testimony that that assault took

12  place and that wasn't sexually motivated, you were just

13  trying to take money from both those women?

14  A       That's correct.

15  Q       Now, after that, you had some time in prison,

16  isn't that right?

17  A       I did -- I completed a five year sentence. I was

18  sentenced to ten years with five years suspended and I

19  served five.

20  Q       While you were in jail, did you get married?

21  A       Not at that time, no.

22  Q       Were you married when you went into jail?

23  A       No, I was not.

24  Q       So when you got out of jail in 1983 --

25  A       I got out of jail December 29, 1980. That was --

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 31 of 163

1    my five year sentence was up from 1978 until January --

2    I mean, December 29, 1980 is when I was released from

3    the Virginia Department of Corrections.

4    Q        So you were released from jail in 1980?

5    A        Correct.

6    Q        And in 1983, you get arrested again?

7    A        Two and a half, almost three years later, that's

8    correct.

9    Q        And this time it's also for assaulting a woman,

10   isn't that right?

11   A        Yes.

12   Q        And also for carrying a deadly weapon, isn't

13   that right?

14   A        That's correct.

15   Q        And in this event, you told the woman don't

16   scream or I'll kill you, isn't that right?

17   A        I said something to that effect.

18   Q        And it's your testimony that this was not being

19   done for the purposes of any sexual motivation, it was

20   done because you were trying to take her money, isn't

21   that right?

22   A        That's correct.

23   Q        And it was in this event that the police found

24   in your possession handcuffs, isn't that right?

25   A        That's what they reported.

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 32 of 163

1   Q        And you also had -- air pistol, isn't that
2   right?
3   A        That's correct.
4   Q        And you also had an axe handle, isn't that
5   right?
6   A        That's correct.
7   Q        And you had ropes, isn't that right?
8   A        Yes, I did.
9   Q        You also had tape, isn't that right?
10  A        I don't know anything about any tape.
11  Q        But it's your testimony that those items weren't
12  in your car because you were going to engage in any sort
13  of activity with that woman?  Why did you have those
14  items in your car?
15  A        Well, first of all, none of those items were
16  with me when I committed the simple assault. Nobody ever
17  reported seeing anything with me at that time. Twenty
18  minutes later, I was apprehended driving my vehicle and
19  they found these items in my vehicle. The ropes went
20  along with -- 120 foot rope and a climbing saddle that I
21  used for my job because I was a tree climber. I also had
22  tree spikes in there that I used.
23  Q        What are tree spikes?
24  A        -- that you strap on to your leg and climb a
25  tree with. You stick 'em to the tree.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 33 of 163

1    Q        Are they sharp instruments?

2    A        Yes, they are.

3    Q        Could you kind of describe them? Are they

4    long --

5    A        They fit around your leg, you strap 'em on and

6    you climb trees or you climb a telephone pole. Pole

7    climbers use 'em to climb telephone poles.

8    Q        So these are long, sharp rods?

9    A        No. They're just strap-on rods. They fit on to

10   your feet and you use 'em to climb trees with or

11   telephone poles, and it's part of my job.

12   Q        Okay.

13   A        The handcuffs were in my coat which was laying

14   on the seat along with the box that had a Crosman air

15   pistol in it.  I also had a knife, which is ultimately

16   what I was charged with, the knife.

17   Q        So you're saying that the knife was the deadly

18   weapon that you were charged with?

19   A        That's what I pled guilty to, that's correct.

20   Q        Now, you're saying you pled guilty to the knife

21   being the deadly weapon but not the air pistol?

22   A        That's correct.

23   Q        Now, the events of that night, you went to the

24   woman, and did you grab her?

25   A        No, I did not.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 34 of 163

1   Q     So it's your testimony you didn't grab her?

2   A     No.

3   Q     You just walked over to her and said I'll try to

4  kill you?

5   A     I walked up to her and her -- that sounds cool.

6  That's not going to work. I walked up to her and her

7  boyfriend standing on a corner. They just come out of a

8  drinking establishment, and I asked her and him if they

9  would escort me to my vehicle because I had been

10  drinking, and they both denied it, so I watched them

11  walk to a vehicle.  When she sat down in a vehicle, I

12  walked up to them and I leaned over to her and said

13  something to the effect of don't scream or I'll kill

14  you, give me your money, and he said what are you doing.

15  I told him to get away.

16   Q    So it's your testimony that you went up to her,

17  both of them, and said hey, could you walk me to my car?

18   A     Yes.

19   Q    And then it's your testimony that you followed

20  her to the car?

21   A     Followed them both. I watched them both walk to

22  the vehicle.

23   Q    And you didn't ask her to take you anywhere? You

24  just walked with her to her vehicle?

25   A     That's correct.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 35 of 163

1    Q        Then got into the vehicle with her?

2    A        I walked behind them both while they went to the

3    vehicle.

4    Q        And then when she got to the vehicle, did you

5    wait until she got in the car door and close the door

6    before you started talking?

7    A        Waited for her to open the car door and sit down

8    and put the key in the ignition. When she was in the

9    vehicle, I leaned over to her and said don't scream,

10   give me your money. I told him to back away because he

11   asked me what I was doing.

12   Q        And when you did this, you were wearing a green

13   coat?

14   A        I had no coat on. I had a green shirt on because

15   it's a part of my work outfit.

16   Q        But your testimony is that when you did this,

17   you didn't have any weapons on you?

18   A        No, I did not.

19   Q        And after this --

20   A        I never displayed a weapon because one was never

21   reported at the scene of the crime.

22   Q        And then after this happened and she said no,

23   you walked away?

24   A        Yeah, between her and him, I got out of there.

25   Q        And when you walked away, you decided that you

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 36 of 163

1    were going to go to your car?

2    A       I did.

3    Q       And when you got to your car, that's when the

4    police showed up, isn't that right?

5    A       No, it's not.

6    Q       When did the police show up?

7    A       I got in my vehicle, I drank a beer, started my

8    vehicle up, took off, went driving down the road,

9    Wisconsin Avenue, and about that time, a police car

10   pulled up behind me and he told me to pull over. I

11   pulled over on Brandywine Avenue and they -- by that

12   time, there was two other vehicles there, two other

13   police vehicles, and they told me to get out of the

14   vehicle, and I did.

15   Q       So you got out of the vehicle, and when they

16   started to search your vehicle, they found rope, didn't

17   they?

18   A       They found my climbing gear, yes.

19   Q       They found rope, right?

20   A       Okay.

21   Q       That's a yes?

22   A       Yeah.

23   Q       And they found handcuffs, right?

24   A       They found 'em in the coat pocket, yes.

25   Q       And they also found the air pistol, isn't that

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 37 of 163

1   right?

2   A        That's correct.

3   Q        Now, they found the handcuffs in the coat

4   pocket, right?

5   A        That's what they reported.

6   Q        And they found an axe handle in your car, isn't

7   that right?

8   A        Yes, they did.

9   Q        But it's your testimony that that axe handle was

10  part of your work equipment, isn't that right?

11  A        Yes, it was.

12  Q        And the rope that was found, that was because of

13  your work equipment as well, isn't that right?

14  A        That's correct.

15  Q        And they also found electrical tape in your car,

16  isn't that right?

17  A        That was in my toolbox.

18  Q        And they also found -- in addition to the rope,

19  the electrical tape, the axe handle and the air pistol,

20  they found the knife?

21  A        That's correct.

22  Q        And the rope, wasn't that attached to one of the

23  seat belts and, you know -- the seat belt anchors?

24  A        I don't recall that. It's been said that it was,

25  but I really don't recall that.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 38 of 163

 1   Q      So are you saying that that didn't happen?

 2   A      I'm saying I don't recall that being there like

 3   that. If it was, I don't know how it got like that.

 4   Q      But you recall being pulled over on Brandywine?

 5   A      Yes, I do.

 6   Q      But you don't recall the rope?

 7   A      Yes. I would have recalled that then if I'd have

 8   put it there.

 9   Q      Would you take a look at Exhibit Number 13, page

10   1970? That's the police report.

11   A      Okay.

12   Q      In that paragraph, it says that -- lying in the

13   front passenger seat, one Crosman air pistol. It says

14   that, doesn't it?

15   A      Yes, it does.

16   Q      And it says removed from the front jacket

17   pocket, one pair of handcuffs, isn't that right?

18   A      Yes, it does.

19   Q      It also says that you were wearing a coat at

20   that time, isn't that right?

21   A      No, I did not have a coat on. I had a green

22   shirt on. The coat was lying on the seat next to the

23   box.

24   Q      So that line that says Defendant wearing red

25   knit hat and green jacket, that's a lie?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 39 of 163

1    A        Yeah. They're just mistaken. The green shirt was

2    big. It's long sleeve. They took the jacket right off

3    the seat.

4    Q        And the air pistol that was lying in the front

5    passenger seat, that's part of your work equipment as

6    well?

7    A        No.

8    Q        Well, you probably had some legitimate reason

9    for having it there.

10   A         Well, it was in the box. It was still in the

11   box and -- which I -- I seen they conveniently didn't

12   put that in the report, but it belonged to my stepson.

13   Q        And the handcuffs, that's part of your work

14   equipment as well, isn't it?

15   A        No, it's not.

16   Q        Well, I'm sure you have some legitimate reason

17   for having handcuffs there, right?

18   A        They belonged to my stepson as well.

19   Q        Your stepson had handcuffs?

20   A        Toy handcuffs. They were not real handcuffs.

21   Q        And it's just a coincidence that the police

22   didn't identify them as toy handcuffs, right?

23   A        -- I didn't get charged with 'em either, did I?

24   Q        Then we have in there under the driver's seat,

25   one axe handle. That's what the report says, right?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 40 of 163

1   A       Okay.

2   Q       And you keep your axe handle under the driver's

3   seat because that's where you keep most of your work

4   equipment, isn't that right?

5   A       I keep it there because it's more convenient to

6   keep it out of the way so it doesn't roll around.

7   Q       And then it says that -- numerous length of rope

8   lying on the floorboards, including one hooked through

9   seat belt anchor, isn't that right?

10  A       That's what it says.

11  Q       Now, if you turn to the page right in front of

12  that, that page which is 1969, --

13  A       Okay.

14  Q       -- at the bottom of that page, it looks as

15  though there's an inventory of the stuff that was

16  found -- has air pistol, isn't that right?

17  A       Correct.

18  Q       Pair of handcuffs, isn't that right?

19  A       Correct.

20  Q       Doesn't say toy handcuffs, does it?

21  A       No, it doesn't.

22  Q       One axe handle, right?

23  A       That's correct.

24  Q       Numerous pieces of rope, isn't that right?

25  A       That's correct.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 41 of 163

1   Q        Right below that, it shows handcuffs, air

2   pistol, tape, lengths of rope, Defendant on parole.

3   Do you that paragraph below in that block 17?

4   A        Yes, I do.

5   Q        It doesn't say anything in there about work

6   gloves, does it?

7   A        Work gloves?

8   Q        Work gloves.

9   A        No. I didn't see anything there.

10  Q        It doesn't say anything about the tree spikes in

11  there, does it?

12  A        No, it doesn't.

13  Q        And it's your testimony that the reason why you

14  engaged in that conduct was because you were trying to

15  steal her money, isn't that right?

16  A        That's correct.

17  Q        Now, on page 1969 where it says one pair of

18  handcuffs, --

19  A        Yes.

20  Q        -- it says right front jacket pocket right next

21  to that. Do you see that?

22  A        That's correct.

23  Q        It says that it was taken from the defendant

24  right next to that. You see that, right?

25  A        Yes, I do.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 42 of 163

1    Q       The axe handle where it says -- under driver's

2    seat, it says it's taken from Defendant's auto, doesn't

3    it?

4    A       That's correct.

5    Q       And it's your testimony that the weapon that you

6    pled guilty to was the knife?

7    A       That's correct. I still don't see that on here.

8    Q       If you would take a look at Government Exhibit

9    Number 12, --

10   A       Okay.

11   Q       -- it says you were charged with the dangerous

12   weapon being the air pistol, doesn't it? Daniel King did

13   carry either openly or conceal on or about his person a

14   deadly or dangerous weapon, to wit, a Crosman air

15   pistol.

16   A       That's what it says.

17   Q       But it's your testimony that you pled guilty to

18   the knife as being the deadly weapon?

19   A       That's what I recall pleading guilty to.

20   Q       And it's guilty to the knife that's not listed

21   on the report, right?

22   A       That's correct.

23   Q       Yet you pled guilty to the assault, isn't that

24   right?

25   A       Simple assault, yes, I did.

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 43 of 163

1    Q        And you pled guilty to the -- a dangerous

2    weapon, isn't that right?

3    A        Yes, I did.

4    Q        Now, Mr. King, after those two incidents, you

5    spent some time in jail again, isn't that right?

6    A        I had my probation from Virginia violated and

7    the judge executed a five year suspended sentence and I

8    was placed in Virginia Department of Corrections.

9    Q        So you spent some time in jail?

10   A        Spent another two years and some change there

11   until I was paroled -- to my DC offense.

12   Q        And then you were paroled and out on parole --

13   you were on parole for approximately six months?

14   A        Yeah, October, whatever it was, until February.

15   Q        And you violated your parole in February after

16   being out of jail for a simple assault by committing

17   another assault, isn't that right?

18   A        That's correct.

19   Q        And in that assault in 1988, you told the

20   presentence investigator that your intentions were for

21   sexual assault, that you weren't able to control what

22   you were doing?

23   A        That's what I said.

24   Q        And you also told that pretrial services officer

25   that your impulses were strong and that you'd been

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 44 of 163

1    engaging in this sort of stuff since 1975, isn't that

2    right?

3    A       That's what I said.

4    Q       But you're now saying what you told the pretrial

5    services officer -- that's a lie, isn't it?

6    A       It was a fabrication to a point where I was

7    trying to manipulate something.

8    Q       And what were you trying to manipulate this

9    time?

10   A       Some assistance -- lesser time. I was facing a

11   life sentence.

12   Q       So you were facing life sentence from a crime

13   that you had committed?

14   A       That's correct.

15   Q       And did you plead guilty to a assault for sexual

16   purposes?

17   A       No, I did not.

18   Q       You didn't plead guilty to sexual assault, did

19   you?

20   A       No, I did not.

21   Q       You didn't plead guilty to attempted sexual

22   assault, did you?

23   A       No, I did not.

24   Q       You pled guilty to assault with intent to rob,

25   isn't that right?

Huseby, Inc.                                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 45 of 163

1    A        I pled guilty to armed kidnapping.

2    Q        So it's your testimony that you were telling the

3    pretrial services officer that you were engaging in a

4    sexual offense because you wanted to get less time?

5    A        I was trying to manipulate, yes.

6    Q        Now, you told that to the pretrial services

7    officer, isn't that right?

8    A        Yes.

9    Q        And you were represented by an attorney, right?

10   A        Yes, I was.

11   Q        And this attorney, did she advise you that, you

12   know, in order to get less time, you would do better if

13   you admitted to some sort of sexual offense?

14   A        Not to the extent where they were saying I would

15   get less time for me -- to a sexual offense, but I would

16   probably come out better if they thought I had some

17   psychological issues that needed some attention.

18   Q        So you're saying that your attorney advised you

19   that if you had psychological problems, you'd be better

20   off sentence wise? Is that your testimony?

21   A        Yes.

22   Q        So it's your testimony that your attorney is

23   telling you that if you say you've got sexual problems,

24   you're going to get less time?

25   A        Yeah. Problems period, yes.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 46 of 163

1    Q       Well, had problems -- then you decided that

2    instead of just saying you had problems, you decided you

3    were going to say you had sexual problems?

4    A       Well, it would fit the pattern of my life, yes.

5    Q       And you did it because you thought it would fit

6    the pattern of your life, isn't that right?

7    A       Yes, I did.

8    Q       And prior to sentencing, you guys provided

9    evidence to the judge, isn't that right?

10   A       Yeah, I think we did.

11   Q       In fact, you even wrote a letter to the judge,

12   didn't you?

13   A       Yes, I did.

14   Q       And in that letter to the judge, you said, you

15   know, the stuff that you say to a judge when you're

16   about to be sentenced, isn't that right?

17   A       Yeah.

18   Q       You say you're sorry?

19   A       Said it all.

20   Q       You said you wanted to take responsibility for

21   your actions?

22   A       I certainly did.

23   Q       You say that, you know, you've learned the

24   errors of your ways and you're going to do better in the

25   future, isn't that right?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 47 of 163

1   A       That's right.

2   Q       And you knew that this judge was going to help

3   you out with the sentencing aspect, right?

4   A       I didn't know a damn thing.

5   Q       Well, you knew this judge was handling the

6   sentencing, right?

7   A       I knew I was facing a life sentence. I would

8   have tap danced if that's what he wanted.

9   Q       And if he would have wanted, you said you would

10  have tap danced?

11  A       Yes.

12  Q       Yet in your letter to this judge, you didn't

13  mention anything about your sexual problem, did you?

14  A       No, I didn't. I don't recall. It's been so long

15  since I've seen the letter, but, no, I don't recall

16  that.

17  Q       Well, if you turn to Exhibit Number 22, it's

18  right there.

19  A       Yeah. I remember that letter.

20  Q       And in that letter, you talk about how you --

21  you know, you're frustrated with yourself for the stuff

22  you're doing, right?

23  A       That's correct.

24  Q       You talk about how you were tired of dealing

25  with these problems. In fact, you say mental problem.

Huseby, Inc.                                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 48 of 163

1  You don't say sexual assault problem. You say mental

2  problem, isn't that right?

3  A       That's what I said.

4  Q       In fact, nowhere in this letter to the judge who

5  is responsible for your sentencing that spans three

6  pages does it say anything about sexual problems, does

7  it?

8  A       No, it doesn't.

9  Q       Could you turn to page 23?  I'm sorry, to

10  Exhibit Number 23.

11  A       Okay.

12  Q       And turn to the fourth page in that -- on that

13  exhibit which is Bates number 1956, and it's out of

14  order because the actual page which would have been 855

15  is a blank page, so it's been inserted with knowledge of

16  Counsel of what the actual page is. Top of that

17  paragraph says Defendant's version, doesn't it?

18  A       Yes.

19  Q       And in that defendant's version, it says I was

20  attempting to push her into the vehicle, but she broke

21  away from me, isn't that right?

22  A       Yes.

23  Q       And that's what took place, isn't it?

24  A       That's what I told -- took place.

25  Q       And then you said that's all that happened,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 49 of 163

1   isn't that right?

2   A       Yes.

3   Q       And then it says why, man, I wish I could tell

4   you. I know my intentions were for sex assault. I wasn't

5   able to control what I was doing. I wasn't intoxicated

6   and I don't use drugs. It says that, right?

7   A       That's what it says.

8   Q       And you told that to the pretrial investigator?

9   A       Yes, I did.

10  Q       But you're saying you fabricated this to the

11  pretrial investigator for ulterior motives?

12  A       I boosted it up a little bit, yeah.

13  Q       Then a little bit later on in that paragraph, it

14  says the impulses were so strong, I attempted to get

15  help for them. It says that?

16  A       In that paragraph?

17  Q       Uh-huh, at the bottom line of that paragraph.

18  A       Oh, yeah, yeah. Okay. I see it.

19  Q       And it's been happening since 1975?

20  A       That's what it says.

21  Q       And this is all part of the pretrial report

22  which you had an opportunity to review prior to trial,

23  isn't that right?

24  A       Yes, it is.

25  Q       Yet you didn't file any objections to it?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 50 of 163

1    A        Not that I recall. I think we filed one where I

2    indicated that Russell Caheen and Ms. Van Susteren

3    said that the fact that I had gave a dirty urine

4    indicated that I was using drugs.

5    Q        But other than that, all the information in here

6    you felt was accurate, isn't that right?

7    A        That's what I gave 'em.

8    Q        Now, Mr. King, while you were in the Bureau of

9    Prisons, you received a lot of counseling, isn't that

10   right?

11   A        Yes. I received my fair share.

12   Q        And some of it has been useful to you, isn't

13   that right?

14   A        Say that again, please.

15   Q        Some of it's been useful to you, right?

16   A        Sure.

17   Q        And some of it you would say is not so helpful?

18   A        Pretty much.

19   Q        And in some of the treatment, they tell you that

20   you need to discuss what it is that you've done in order

21   to better explain or better treat your overall problem,

22   isn't that right?

23   A        Yeah, yeah. Okay. I'll go with that.

24   Q        I mean, it's part of the treatment for you to

25   discuss some of the things that you've done so that you

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 51 of 163

1   can recognize where you've gone wrong, isn't that right?

2   A      Yeah. Well, I'm not a fool. I'm not going to

3   tell 'em something I did and it's not true. I mean, I

4   made up a lot of stuff, yes, but I wasn't going to sit

5   there and tell 'em I got this going on, I've got that

6   going on, because you've got to be very careful what you

7   say in prison to a prison psychologist, very careful.

8   Q      Because what can be said to you can be used

9   against you?

10  A      Because of what's happening right now. If I'd

11  have known all this that was going to happen and bite me

12  in the ass like this, I'd have never done it.

13  Q      And by never done it, you mean --

14  A      I would have never talked to a damn one of 'em.

15  Q      Now, you wrote a letter to the certification

16  review board asking for certification, didn't you?

17  A      Yes, I did.

18  Q      In fact, you wrote a letter back in -- when

19  you were at Terre Haute asking to be admitted into the

20  program back in June of 2009, isn't that right?

21  A      Where is that so I can see it, please?

22  Q      That's back in Exhibit Number 24 if you want to

23  take a look at it.

24  A      Thank you.

25  Q      I'm sorry, 44.

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 52 of 163

1    A       Yes. I recall that letter.

2    Q       And that letter, you're talking about how you

3  have problems?

4    A       Yes.

5    Q       How you want to get treatment for those

6  problems?

7    A       That's what I said.

8    Q       And that you don't have any desire to harm

9  anybody, right?

10    A       Correct.

11    Q       And that ultimately if you get a little help,

12  you'll be able to become a productive member of society

13  is basically what you're trying to get across, isn't

14  that right?

15    A       That's the plan.

16    Q       Then you wrote another letter this time, and

17  this is at 45, to Ms. Marbury. (phonetic) Who's Ms.

18  Marbury?

19    A       She was the warden at US Penitentiary at Terre

20  Haute.

21    Q       And in that letter to the warden, you were

22  letting her know listen, you're willing to cooperate and

23  not contest your decision when it came to certification,

24  isn't that right?

25    A       That's correct.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 53 of 163

1   Q       But in April of 2010 -- and this is Exhibit

2   Number 51 -- you wrote a letter saying that you don't

3   want to participate in certification or sexual offender

4   treatment anymore, isn't that right?

5   A       Correct.

6   Q       In fact, you say the reasoning behind that is

7   because now you've got a place to stay, isn't that

8   right?

9   A       That's -- basically my feeling was that I had

10  some support in society to assist me. That's basically

11  what I was saying.

12  Q       Now, you're telling her in this letter that

13  you've got some support in society to assist you, so you

14  don't need to go to sexual offender treatment anymore,

15  isn't that right?

16  A       Basically what I was saying was I didn't need to

17  stay at FCI Butner anymore in this so-called program.

18  Q       Because staying at this so-called program at

19  that point in time didn't look as good as staying

20  with --

21  A       Being that my sentence was up, I really didn't

22  like the idea of still doing time.

23  Q       And you told Ms. King -- who's your wife, right?

24  A       My former wife, yes, my ex-wife.

25  Q       -- your ex-wife that you're not interested in

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 54 of 163

1  having a relationship with her anymore, isn't that

2  right?

3  A        We've got a very good relationship. I don't want

4  to have a -- an affair -- I mean, a live in relationship

5  while I'm her boyfriend or husband because that's not

6  going to work.

7  Q        So you don't want to live with her?

8  A        No.

9  Q        You don't want to have the supportive

10 relationship of her being a husband or a -- I mean, of

11 being a wife --

12 A        No. I mean, I love her to death. I think the

13 world of her, but I can't live with her.

14 Q        And you can't live with her for a number of

15 reasons?

16 A        There's a variety of reasons.

17 Q        One of those reasons is when you live with

18 somebody, your past history shows that you get married,

19 you go to jail because you commit a crime, isn't that

20 right?

21 A        Pretty much.

22 Q        In fact, you said as much at your deposition,

23 remember?

24 A        Oh, I did. I think it's a wise decision then.

25 Q        So you would not want to live with Ms. King if

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 55 of 163

1   you were released, isn't that right?

2   A        No, huh-huh, don't want to.

3   Q        Mr. King, the reason why you're now recanting

4   your previous statement that you wanted commitment and

5   that you thought you had a problem is because now you

6   realize that you would have been at FCI Butner

7   undergoing treatment and you don't like that, isn't that

8   right?

9   A        I'll put it to you like this. I completed

10  serving a criminal sentence where I was -- punished for

11  24 years. My sentence was up, and I was still under the

12  same guidelines. I am not going to try to receive

13  treatment in that environment. It will not work.

14  Q        And part of it is because you don't need

15  treatment for sex offense because you're not a sex

16  offender?

17  A        That's one reason.

18  Q        And you don't like the environment?

19  A        I certainly do not. If I want to be in prison,

20  I'll commit another crime.

21  Q        And, Mr. King, you are not a sex offender, isn't

22  that right?

23  A        That's my feeling, yes.

24  Q        Although you exposed yourself to a seven and

25  eight year old when you were 14, right?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 56 of 163

1   A        Correct.

2   Q        And you pushed a woman into a car after a

3   football game, fondled her breasts and asked her to

4   touch your penis?

5   A        At 15.

6   Q        And then you had rope, axe handle, air pistol,

7   handcuffs in your car after trying to abduct yet another

8   woman?

9   A        That's correct.

10  Q        And you attempted to engage or -- you asked a

11  prison psychiatrist to touch your penis while in jail

12  serving time for that 1983 offense, right?

13  A        1993, that's correct.

14  Q        Yet you're not a sex offender?

15  A        I don't think so.

16  Q        And any sex offender treatment you feel wouldn't

17  be useful for you?

18  A        No.

19          MR. GRAY: Thank you. No further questions,

20  Your Honor.

21          THE COURT: Thank you. Mr. Bell?

22          MR. BELL: Thank you, Your Honor.

23          EXAMINATION

24          BY MR. BELL:

25  Q        Mr. King, I want to go back and talk a little

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 57 of 163

 1   bit about your family background and your history.

 2   I believe it's been well-established that you were

 3   adopted at a very young age.  Do you have any idea how

 4   old you were when you were adopted?

 5   A       I was 13 months.

 6   Q       And you have an older or a younger brother who's

 7   also adopted?

 8   A       I've got an older brother.

 9   Q       Do you have any relationship with your older

10   brother?

11   A       No.

12   Q       What's his name?

13   A       Stephen Robert King.

14   Q       When's the last time you heard or talked to or

15   saw him?

16   A       2002 maybe.

17   Q       And since all of this certification process has

18   started, have you had any contact with him at all?

19   A       No, I haven't.

20   Q       And both your parents -- your mother's name is

21   Ruth -- was Ruth. Your father was Bob. Are they still

22   living?

23   A       No. They have passed on.

24   Q       Okay. And, of course, you testified in reference

25   to your ex-wife, Marty (sic.) King. She's still living,

Huseby, Inc.                                            www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 58 of 163

1   but you guys are divorced, correct?

2   A       That's correct.

3   Q       You do have a son. What's his name?

4   A       Matthew Nolan Edward King.

5   Q       She was pregnant with Matthew when you were

6   incarcerated in 1988, isn't that correct?

7   A       That's correct.

8   Q       Have you ever seen Matthew?

9   A       No.

10  Q       Have you talked to him on the phone?

11  A       Yes.

12  Q       And your other wife, your prior wife, your first

13  wife, Dorothy Jordan, you were married to her in the

14  early '80s, were divorced. You haven't heard or talked

15  to her since then, have you?

16  A       Actually, since my arrest in 1983 when we were

17  married, no --

18  Q       Okay. Now, you mentioned that you -- when you

19  were very young or when you were young, you had a

20  hearing problem that affected your ability to speak.

21  A       That's right.

22  Q       If you would, tell The Court a little bit about

23  it, what the nature of the hearing problem was and what

24  was done to try to correct that problem.

25  A       I had to have surgery to fix the anvil bone,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 59 of 163

1   what they call the anvils and the stirrup, whatever, and

2   the nerve had to be reconnected properly so I could

3   hear.

4   Q        Do you have any recollection as to when, what

5   the time frame was, how old you were when that took

6   place?

7   A        I was almost nine years old.

8   Q        Did they do both ears around the same time?

9   A        Yes, they did.

10  Q        Did that correct the problem completely, or do

11  you still even to this day have some hearing deficits?

12  A        I hear different than most people do. I still

13  lip read because it's assistance to me, but I hear.

14  Q        And as we sit here today, you have hearing aids

15  that you use?  You don't have 'em in today, but you do

16  have hearing aids, isn't that correct?

17  A        Yeah.

18  Q        And it has affected your ability to speak?  You

19  do have a little bit of a speech impediment as a result

20  of your hearing loss?

21  A        I've been working at it since I was ten years

22  old, I mean.

23  Q        Okay, but it still affects the way you speak?

24  A        Yeah, some.

25  Q        And even as a result of your hearing issues, up

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 60 of 163

1    until age eight or nine, I think the records reflect

2    that you were in a school for the hearing impaired.

3    A        That's correct.

4    Q        And then after your hearing was repaired, you

5    went into the regular school system?

6    A        I started going to regular schools.

7    Q        Now, you didn't graduate from high school, did

8    you?

9    A        No, I did not.

10   Q        Have you gotten your high school diploma or an

11   equivalency since then?

12   A        Yeah. I received my GED, I believe it was 1978

13   or '79, at Staunton Correctional Center while I was in

14   Virginia Correctional Department.

15   Q        And have you gotten any further education since

16   then?

17   A        Yes. While I was at Staunton, I took college

18   courses for the Blue Ridge Community College, and then

19   since I've been in the Bureau of Prisons, I used a Pell

20   grant to obtain enough credits for business

21   administration, two year degree.

22   Q        So you have an associate's degree in business?

23   A        That's correct.

24   Q        And that was done since you've been in the

25   Bureau of Prisons?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                  www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 61 of 163

1   A        Correct.

2   Q        Have you been able to use any of those skills

3   that you obtained in your business degree since you've

4   been incarcerated?

5   A        Yes. My work history shows that I worked in

6   UNICOR for approximately maybe nine or ten years where I

7   did cost accounting, payroll and accounts payable.

8   Q        Now, you're not currently working for UNICOR

9   while you're in Butner, are you?

10  A        No, I'm not.

11  Q        What are you doing up there now?

12  A        The only job I'm committed to have is working in

13  the bakery in the midnight shift.

14  Q        And you're doing that currently?

15  A        That's correct.

16  Q        Your work history before your incarceration, you

17  talked to -- you testified related to your work as a

18  tree surgeon or a tree climber.

19  A        That's correct.

20  Q        Tell The Court a little bit about what that is,

21  if you would, please.

22  A        I learned how to climb trees, to -- prune 'em

23  and take down trees if necessary.

24  Q        When was -- how old were you when you first got

25  into that business?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 62 of 163

 1   A        I started -- when -- in the mid '70s, I started

 2   liking it and working at it, but I was working on the

 3   ground because I was still recovering from surgery on my

 4   feet, so I was learning the maneuvers and the works at

 5   that time.

 6   Q        And you mentioned your feet. Tell The Court, if

 7   you would, kind of what the nature of the problem with

 8   your feet is and what's been done to try to correct

 9   those issues.

10   A        I have a bone deformity that's -- medically it's

11   called cavus foot where the outside bones and the

12   interior ankle bones deteriorate, so they had to go in

13   and repair the bones, take 'em out and repair 'em and

14   put 'em back.

15   Q        And you've had this since you were born?

16   A        It started -- you're born with it. It's passed

17   on, but it didn't start effecting me until I was like 11

18   years old.

19   Q        And at age 11, you started a series of surgeries

20   to try to correct this issue, isn't that right?

21   A        That's correct.

22   Q        How many surgeries have you had over the years

23   on your feet?

24   A        I've had eight.

25   Q        Now, were those surgeries prior, you know, when

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 63 of 163

1    you were younger, or have you had any surgeries on your

2    feet in more recent years?

3    A        My last one was here in the Bureau of Prisons.

4    I had arthroscopic surgery to repair a -- tendons, try

5    to loosen up my tendons on my toes.

6    Q        So this cavus foot condition is still affecting

7    you and your ability -- your feet?

8    A        I have documented -- arthritis deforming me, my

9    toes, and I have seen a lot of problems.

10   Q        Okay. Let's go back to your work as a tree

11   surgeon. The last company that you worked for, you were

12   working for 'em in 1988, was Davey Tree Company, is that

13   true?

14   A        That's correct.

15   Q        Now, tell The Court, if you would, when you

16   first went to work for Davey Tree Company and sort of

17   what your working relationship was with them up in the

18   DC/Northern Virginia area.

19   A        When I was released from prison in 1980, a man

20   by the name of John Dingus (phonetic) gave me a job,

21   Davey Tree Expert Company, and he gave me a job to do up

22   and down Constitution Avenue in Washington, DC, working

23   on the government contracts, pruning and working on the

24   trees and preparing the trees around the Vietnam

25   Memorial.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 64 of 163

1  Q      So when you got in trouble and were

2  incarcerated, you obviously quit working that job, is

3  that right?

4  A      Yes.

5  Q      After you were released from prison after that,

6  were you rehired by Davey Tree Company?

7  A      When I was released from prison again in 1987, I

8  went back to work for Davey Tree Expert Company. He

9  hired me back right away.

10  Q      And you worked there up until and including the

11  time until you were incarcerated this very last time --

12  A      That's correct.

13  Q      -- in 1988, isn't that right?

14  A      That's correct.

15  Q      Now, as you sit here today -- talked about your

16  hearing issues and your issues with your feet. Do you

17  have any other physical problems that effect you

18  currently?

19  A      I have Hepatitis C.

20  Q      Okay. Is that being treated, or is it just a

21  condition that you --

22  A      No. It's not at the stage where it warrants

23  treatment, but it's -- anybody's aware what Hepatitis C

24  will do.  It's just there -- it's there.

25  Q      Let's talk about the -- Mr. Gray asked you some

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 65 of 163

1   questions about your mental health treatment history.

2   Let's talk about that a little bit. I believe you

3   testified that you were treated back in the early '70s

4   by different various mental health facilities.

5   A        Yes, yes.

6   Q        Initially was the treatment court ordered, or

7   was it just something that your parents or you decided

8   you needed --

9   A        Initially it was my parents decided because I

10  was becoming disruptive.

11  Q        And I think you testified that the problems

12  related to your hearing and problems with your feet and

13  you couldn't -- you know, you were being picked on and

14  so -- that sort of thing at school and it was causing

15  you anger issues. Is that an accurate statement?

16  A        Well, I was different and I wasn't able to

17  engage in normal activities with -- the other kids were

18  doing, and they made fun of me occasionally, and when

19  they did, the difference between me and a lot of kids

20  was I'd do something.

21  Q        Okay. And through the years, the initial

22  treatment involved that. Then you had this indecent

23  exposure charge and then ultimately ended up at this --

24  you had the indecent exposure charge in 1974. Do you

25  recall whether you underwent any treatment immediately

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 66 of 163

1    after the indecent exposure charge?

2    A        Yes. The court asked that I engage in

3    psychological therapy.

4    Q        And you did that?

5    A        Yes.

6    Q        I mean, you were involved in that treatment?

7    Then you had an abduction charge in 1975, and it's after

8    that when you were -- I assume it was court ordered --

9    you went to the Westbrook Hospital. Do you recall that?

10   A        Yes.

11   Q        And your testimony was that you -- I believe you

12   said you got caught or were involved with kissing

13   another patient. Is that a true statement?

14   A        Yes, it is.

15   Q        And I believe you were kicked out or sent out of

16   the hospital for that, and I think they said you were

17   unmanageable. Explain to The Court what you think they

18   meant by unmanageable, if you know.

19   A        Basically because when they initially caught me,

20   I refused to respond to it, deal with it.

21   Q        But to be clear, this incident at the Westbrook

22   hospital didn't involve sex beyond the kissing accident.

23   Is that a true statement?

24   A        With the girl -- in, fact, the girl and I

25   continued to write back and forth together for several

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 67 of 163

1    years afterwards.

2    Q        Then you ultimately went to the Phipps Clinic at

3    Johns Hopkins in Baltimore?

4    A        Yes.

5    Q        Tell me what you recall about that treatment.

6    Was that court ordered?  In other words, you went to the

7    Westbrook Hospital. That was court ordered, isn't that

8    correct?

9    A        That's correct.

10   Q        Then did you immediately -- to the Phipps

11   Clinic, or did you go back to jail for a period of time

12   before you went to the Phipps Clinic?

13   A        Well, we had the -- the court -- I was in jail.

14   The judge had executed a one year sentence, but then

15   when the Phipps Clinic opportunity presented itself, we

16   asked the judge to suspend the sentence to allow me to

17   participate in the program.

18   Q        Your attorney at that time asked the judge to

19   suspend the sentence and put you in treatment?

20   A        That's right. His name was Richard McMurtry.

21   (phonetic)

22   Q        Okay. So you went to the Phipps Clinic. Did you

23   feel like the treatment at the Phipps Clinic was Helpful

24   to you?

25   A        I thought it was a good way to get out of jail.

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 68 of 163

1   It was helpful some.

2   Q        And I think you said that in relation to that

3   that you told them -- I believe the record -- just a

4   second. The record reflected that you denied or said

5   that you were wrongfully accused at the Westbrook

6   Hospital in relation to this incident, the kissing

7   incident.

8   A        That's what I said. My answer was that it was an

9   issue that was blown way out of proportion, and people

10  always want to say I was removed for a sex problem. I

11  don't consider kissing a sex problem. I consider it a

12  juvenile activity. It may have been against the rules,

13  but, you know, --

14  Q        Let's talk about -- well, let's see. Now, after

15  your treatment there, the records reflect that there was

16  some additional treatment at Fairfax County Hospital in

17  1977. Do you recall whether that was a result of you

18  voluntarily going in, or was that court ordered

19  treatment?

20  A        I was still under court ordered treatment. I

21  went to see a doctor. I think his name was LeDuff,

22  (phonetic) and he and I saw each other a couple times,

23  but he felt because I was being ordered to go there, it

24  wasn't being beneficial to me.

25  Q        Now, you had numerous interactions with the

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 69 of 163

 1   mental health system since you've been in BOP, isn't

 2   that right?

 3   A      Yes.

 4   Q      And you've been diagnosed with any number of

 5   mental illnesses since you have been incarcerated, isn't

 6   that right?

 7   A      Yes.

 8   Q      Tell The Court, if you would, generally and then

 9   specifically when we get to that point specifically

10   certain diagnoses -- what was in general your motivation

11   for seeking mental health treatment while you've been in

12   custody in BOP?

13   A      I initially started with the idea that it could

14   be beneficial to me to help me become more -- just a

15   better person, more understanding of myself.

16   Q      I think you testified yesterday that it helped

17   you manage your time or manage your ability to be in

18   prison and do your time. Is that a fair statement?

19   A      Correct.

20   Q      Now, were there some instances where certain

21   things happened to you while you were in BOP that caused

22   you to feign mental illness or make up things to

23   accomplish a goal?

24   A      Sure. Since I entered the BOP in 1980 -- '88,

25   I've been engaging in drug use, you know, activities

Huseby, Inc.     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 70 of 163

1  that are just against the BOP, and every now and then,

2  I'd run myself up on a snag. I had to do something to

3  manipulate myself out of that position.

4  Q       Well, give me a specific example of when you ran

5  into a snag and needed to manipulate yourself out of a

6  position.

7  A       When I was at USP Atlanta, I ran into a big snag

8  because I was using drugs so much and I was having

9  trouble attempting to pay because I was using it so much

10  that I had to feign an illness. I feigned multiple

11  personalities because they were trying to throw me out.

12  Q       Okay. So you reported to the psychiatrist or

13  psychologist that was working there in the prison and

14  you acted like there were other -- well, tell The Court,

15  if you would, exactly what you did.

16  A       I went down there and told them I was having

17  blackouts, I'd been having 'em since I was young and

18  that I made up some names that I was using to feign

19  multiple personality disorder and did a pretty good job

20  of it. They transferred me.

21  Q       Where did they send you to?

22  A       Butner.

23  Q       Now, this was the first time, I guess, you were

24  at Butner --

25  A       1994 or '95.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 71 of 163

1  Q        And you spent some time at Butner. Did you

2  receive any sort of treatment for this --

3  A        We looked at it, but then they quickly figured

4  out I was BSing.

5  Q        And the Government attorney asked you about your

6  request for sex offender -- getting in the sex offender

7  treatment program you've been in the BOP. Do you recall

8  exactly when that was that you requested that?

9  A        1995 when I was at Butner. Yeah, it was at that

10 time.

11 Q        And was there a reason why you wanted to get

12 in -- other than receive sex offender treatment, was

13 there any reason other than that why you asked to be put

14 in the program?

15 A        Because they had already told me they knew I was

16 feigning mental illness, and they told me that since I

17 didn't want to engage in the proper way or psychological

18 care, that they were going to send me back to USP

19 Atlanta, so I asked her if I could get into a sex

20 offender program.

21 Q        And basically USP Atlanta was where you had

22 faked this illness to get out of it, right?

23 A        Yeah.

24 Q        So you didn't want to go back there?

25 A        Well, I had numerous problems there, not to

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 72 of 163

1  mention the amount of extreme violence that was

2  occurring at that prison -- had killed an officer at

3  that time. It was just out of control.

4  Q      Turns out Butner, was it a -- in your opinion as

5  an inmate, was Butner a better place to be?

6  A      Well, if you're serving a criminal sentence,

7  things don't get no sweeter.

8  Q      Have there been any other incidents where you

9  have feigned mental illness or, as an example, told

10 someone you feel like you're going to commit suicide or

11 something of that nature to avoid or manipulate the

12 system in some way?

13 A      I did that at Butner. I did it at USP Beaumont

14 when I ran into a snag at Beaumont and I believe I -- I

15 did it so many times, I just can't recall it anymore.

16 Q      Well, just as an example, tell The Court why you

17 would have told them you were suicidal at USP Beaumont.

18 What was the issue there?

19 A      I was trying to gain a transfer out.

20 Q      And why was that?

21 A      Because I was having problems with the Texas

22 Syndicate Mexican group because I was running up a

23 pretty heavy drug bill.

24 Q      So it sort of appears to me that there's a

25 pattern when you run into an issue within a --

Huseby, Inc.                                     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 73 of 163

1            MR. GRAY: Objection. Counsel's testifying.

2            THE COURT: Overruled. It's cross-examination.

3            BY MR. BELL:

4    Q      You run into a -- what you call a snag or an

5    issue in a particular facility -- appears to be a

6    pattern that you feign these mental illnesses to try to

7    get a transfer or removed, is that correct?

8    A      It was that, and I came up with other good

9    plans, too.

10   Q      Talk to The Court about that.

11   A      I created a escape plot while at USP Beaumont.

12   I've created incidents where I'd tell the institution

13   that the Aryan Brotherhood was trying to manipulate

14   money from me.

15   Q      Were these lies or were these truthful

16   statements?

17   A      They were lies.

18   Q      Let's talk about this escape plot. It was at USP

19   Beaumont, and, again it was a place you were trying to

20   get out of or you had run into an incident?

21   A      I was trying to get out of there.

22   Q      Okay. And I believe there was some indication in

23   the record that you had a rope or something made out of

24   bedspreads and other things that could be used to

25   escape, but then there was also a note that was written

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 74 of 163

1    that ultimately I think they determined was written by

2    you. Is that a true statement?

3    A       That's correct.

4    Q       And so you essentially turned yourself in before

5    you could escape?

6    A       Yeah. I spent a month manipulating that because

7    I braided a rope. I made a gaffling hook. I used six $20

8    bills. I hid six $20 bills, actual cash money, and I

9    wrote National Geographic for topographical maps of the

10   Beaumont and -- area so I could have them for evidence.

11   Q       So you did all of these things, and then when it

12   was all said and done, you wrote a note and give it to

13   one of the people -- facility people that basically told

14   them what you were planning on doing, is that correct?

15   A       Right.

16   Q       And this was to ultimately get you transferred

17   out of this facility or you felt like it would get you

18   transferred out of this facility?

19   A       And it did.

20   Q       Where did you end up going from there?

21   A       USP Terre Haute.

22   Q       How many different facilities have you been in

23   since you've been in the bureau of Prisons?  Do you

24   remember?

25   A        FCI Phoenix, FCI Petersburg, FCI El Reno, USP

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 75 of 163

1    Atlanta, USP Lewisburg, USP Leavenworth, USP Beaumont

2    and then USP Terre Haute.

3    Q      Okay.

4    A      I forgot Butner. I was at Butner for a minute

5    too in between Atlanta and Lewisburg.

6    Q      You were at Butner for a minute. What do you

7    mean by that? A short period of time?

8    A      Yeah. Almost -- seven or eight months.

9    Q      Okay. Now, in each situation where you moved,

10   was it always that you sort of manipulated and got a

11   transfer approved or caused a transfer, or were there

12   times when you were just moved as a matter of course?

13   A      No. I was moved because I was either being

14   disruptive or trying to get out of there.

15   Q      And you would do this because you had a problem

16   or something in that particular facility?

17   A      Run into issues that I couldn't manage any

18   further.

19          THE COURT: Folks, why don't we take our

20   break? Let's reconvene in about ten minutes at 10:40.

21      (Whereupon off the record.)

22          THE COURT: Mr. Bell?

23          MR. BELL: Thank you, Your Honor.

24          BY MR. BELL:

25   Q      Mr. King, before we took our morning break, we

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 76 of 163

1    were talking about the various facilities that you have

2    been in and transfers that you have had with the

3    different transfers that have occurred since you've been

4    incarcerated in 1988, and I believe your testimony was

5    that in most every instance, it was a situation where

6    you tried to manipulate and get moved because you had an

7    issue at that particular facility.

8    A        That's right. There was only one or two that

9    wasn't.

10   Q        Now, you've been diagnosed with numerous

11   different mental illnesses since you have been

12   incarcerated. I'm going to ask you -- I'm going to go

13   through the ones that I have got listed here and see if

14   you remember when you were diagnosed and what the

15   circumstances were surrounding it.

16   A        Okay.

17   Q        It appears that at one point in time you were

18   diagnosed with a psychotic disorder not otherwise

19   specified. Do you have any idea when that occurred or

20   what the circumstances were around that?

21   A        That could have been Lewisburg. I believe it

22   might have been Lewisburg. I honesty don't remember.

23   Q        Do you have any idea who it was that diagnosed

24   you with that mental illness?

25   A        No, not at this time I don't.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 77 of 163

1   Q        And you mentioned multiple personality disorder.

2   We have already talked about that, that was involved

3   with a doctor at USP Atlanta, is that right?

4   A        Doctor Timberlake.

5   Q        There's a diagnosis of schizophrenia. Do you

6   have any recollection of when that took place or what

7   the circumstances were surrounding that?

8   A        I think that was El Reno.

9   Q        If you would, tell The Court about your

10  interaction with the mental health professional there.

11  A        There was a lot of things going on at El Reno,

12  violence, drugs, what not, so I started manipulating the

13  psychology department saying that I had to get

14  treatment.  I even went as far as to have them put me on

15  Haldol.

16  Q        What did you take that for? What was it supposed

17  to --

18  A        Well, I was saying I had schizophrenia and I was

19  hearing voices.

20  Q        So they prescribed you Haldol?

21  A        They gave me one milligram of Haldol.

22  Q        Okay. And you were diagnosed with hallucinosis

23  not otherwise specified. Do you have any recollection of

24  when that may have been where you may have told somebody

25  you were hearing or seeing things?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 78 of 163

1    A        That might have been Beaumont.

2    Q        Do you have any reason for why you would have

3    told them that you were seeing or hearing things?

4    A        I was trying to see if they could do anything to

5    get -- to help me -- get me out of there.

6    Q        Did you end up ultimately getting out of

7    Beaumont? Let's back up a little bit. If you can

8    remember -- and you may not be able to, but if you can,

9    are the facilities that you have been in and -- sort of

10   generally when you were there when you first in 1988

11   were incarcerated, where did you first go? What facility

12   did you first go to?

13   A        I first went to FCI Phoenix, Arizona.

14   Q        Do you remember how long you were in?

15   A        Almost a year.

16   Q        And after FCI Phoenix, where did you go?

17   A        Petersburg, Virginia.

18   Q        Do you remember how long you were there?

19   A        Several years. I was there for a couple years,

20   and then they sent me back to the DC Department of

21   Corrections in 1991.

22   Q        Why was that?

23   A        Because the contract had expired. I was under a

24   contract and the BOP -- and contract had expired, so

25   they had to send me back, but I eventually manipulated

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 79 of 163

1    that back into the Bureau of Prisons.

2    Q      How did you do that?

3    A      I feigned multiple personalities in DC

4    Department of Corrections.

5    Q      They sent you back to --

6    A      Back to Petersburg.

7    Q      After Petersburg, where did you go?

8    A      El Reno.

9    Q      How long were you there?

10   A      Almost a year.

11   Q      After that, where did you go?

12   A      Atlanta.

13   Q      How long?

14   A      I was there from '93 to end of --

15   Q      I believe you testified you went to Butner

16   for -- you called it a minute or --

17   A      Seven or eight months.

18   Q      And then you were sent back to Atlanta after

19   they found out you were malingering and feigning

20   illness, right?

21   A      That's correct.

22   Q      How long were you in Atlanta the second time

23   around?

24   A      I was in Atlanta long enough to get caught

25   with -- weapon and then get transferred to USP

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 80 of 163

 1   Lewisburg.

 2   Q       How long were you at USP Lewisburg?

 3   A       Less than six months.

 4   Q       Then where did you go?

 5   A       USP Leavenworth, couple years. I was at

 6   Leavenworth from '96 or '98 or 9.

 7   Q       Then you left and went where?

 8   A       USP Beaumont.

 9   Q       -- then where did you go?

10   A       Terre Haute.

11   Q       Is that the last facility you were in prior to

12   coming to Butner in 2009?

13   A       That's correct.

14   Q       So if I calculated that right, you were at Terre

15   Haute the longest --

16   A       The longest.

17   Q       -- at any facility you were in, is that correct?

18   Let's go back and talk a little bit about your 1988

19   offense and the presentence interview process and the

20   information that you testified was false that you gave

21   to the probation officer that went into the presentence

22   report.

23   A       Okay.

24   Q       While you were in custody waiting to be

25   sentenced in that case, you were in the DC jail, is that

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 81 of 163

1   right?

2   A        That's correct.

3   Q        Did something happen to you at the DC jail that

4   affected your -- whether or not you wanted to stay in

5   the DC system?

6   A        Yes. I was assaulted by three inmates and

7   sexually assaulted.

8   Q        And this occurred while you were waiting to be

9   sentenced, so did it affect your desire to be placed in

10  the Federal BOP versus the DC system?

11  A        It helped to -- first of all, let's go back.  I

12  was arrested -- this happened in 1984 when I was

13  arrested on simple assault and carrying -- deadly weapon

14  charge. That's when I was assaulted.

15  Q        Okay.

16  A        And at that point on, I did everything I could

17  to stay away from the DC Department of Corrections.

18  Q        Was it your understanding that if you needed

19  mental health treatment of some kind, whether it be

20  sexual treatment or otherwise, was it more likely or

21  less likely for the judge to recommend that you be

22  placed in the Federal system?

23  A        Yes, it would.

24  Q        More likely or less likely?

25  A        If you needed it, it was more likely.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 82 of 163

1    Q        And ultimately when you were sentenced in 1988

2    for the last offense, you were placed -- designated to

3    the Federal system, is that right?

4    A        Yeah. My judge -- made a recommendation that I

5    be given a Federal designation, which took maybe six or

6    seven months for it to occur, but the BOP finally

7    accepted me and brought me into the Bureau of Prisons.

8    Q        Now, since you have been incarcerated, you've

9    had all these various places -- other than the incident

10   in 1993 involving a statement to the staffer about

11   touching your penis, have you had any sort of

12   disciplinary infraction, charge, anything like that of a

13   sexual nature?

14   A        No, I have not.

15   Q        You've had other infractions, is that right?

16   A        Yes.

17   Q        It appears from the record it's mostly related

18   to drugs and use of drugs and drugs being in your

19   system, is that correct?

20   A        Drugs and use of intoxicants, alcohol.

21   Q        You're a bisexual, aren't you?

22   A        Yes, I am.

23   Q        And you have actually had homosexual

24   relationships with other inmates since you have been in

25   the Bureau of Prisons, is that right?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 83 of 163

1    A        Yes.

2    Q        Specifically I think there's something in the

3    record about a gentleman in -- is it Terre Haute?

4    A        USP Leavenworth.

5    Q        -- where there was some sort of issue about

6    keeping you separated from him. Do you remember that

7    that was a --

8    A        It came to the attention of the staff due to the

9    use of drugs.

10   Q        Okay. Have you had other sexual partners since

11   you've been in the BOP?

12   A        Indiscreetly, yes.

13   Q        Have you ever had any sort of charge,

14   disciplinary action, infraction, anything related to any

15   sort of improper sexual conduct with a male inmate or

16   staffer?

17   A        No, I have not.

18   Q        Okay. Let's talk a little bit about the 42 --

19   Section 4248 precertification process and your testimony

20   regarding that. You testified -- well, let me ask you

21   this. When did you first find out that you were a

22   potential person to be precertified as a 4248 inmate?

23   A        USP Terre Haute -- and at the beginning of

24   2009, I went to my unit team, asking them to start

25   preparing for my release because my date was coming up

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 84 of 163

1  within a year or so, and under the law, I was eligible

2  for a six month halfway house, so I wanted to get

3  started.  And then I found out that they told me we can

4  do the paperwork, but you have got to be reviewed for

5  Adam Walsh. I had no idea what it was, so that's why I

6  started researching.

7  Q      Tell The Court, if you would, a little bit about

8  what you did, how you got the information, where you got

9  your information about -- what sort of information you

10 received.

11 A      Most institutions have an excellent law library,

12 and then I started writing letters to different places,

13 different states, California, New Jersey, and I started

14 finding out about the civil commitment programs and I

15 did research on the 4248 law, 4247. I found out what the

16 Adam Walsh law was all about.

17 Q      And in the course of doing that, did you find

18 out, you know, what types of programs existed in, for

19 instance, California, New Jersey, other places like

20 that?

21 A      Absolutely.

22 Q      And what was your understanding of what those

23 programs involved?

24 A      What was involved?

25 Q      I think you testified -- but just clarify a

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 85 of 163

1  little bit exactly what you understood 'em to be.

2  A      The process of the program itself was that New

3  Jersey, California, even Kansas where each -- came out

4  of in Washington State, the inmates, once they're

5  released are placed in the care of Health and Human

6  Services -- not within the Department of Corrections.

7  Q      Why does that make such a big difference to you?

8  A      Because you've done your time. I've been

9  punished.

10  Q      How would that affect your impression of how you

11  would do the time or how you would be treated?

12  A      Department of Corrections does not know how to

13  run a treatment program. The treatment program they have

14  had -- programs they have had are failures. They don't

15  work. It doesn't work, and now they are still trying to

16  operate a civil commitment program within the BOP

17  guidelines when you're not serving a sentence.

18  Q      When you say within the BOP guidelines, let's

19  just say on a daily basis, are you treated any

20  differently today than you were prior to January 20,

21  2010, I mean, as far as your privileges, what you can

22  and can't do?

23  A      Absolutely. I've got less movement now than I

24  had when I was at the penitentiary -- as a maximum

25  custody inmate, I had more freedom of movement. I can't

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 86 of 163

1    be around the general population inmates, yet like last

2    night they put me in general population in the county

3    jail. I'm not an inmate. I'm a civilian.

4    Q        But back in 2009 when you started researching

5    and looking at those other programs, California, New

6    Jersey, so forth, was it your feeling or your

7    understanding that it would not be as it is today?

8    A        Yes. I read that some places get minimum wage.

9    They -- they get their privileges -- they're in a

10   therapeutic environment. They are not under Department

11   of Corrections. They don't have BOP -- they don't have

12   correctional staff around. They have therapeutic staff.

13   Their clothing -- I mean, I could go on for hours and

14   tell you the differences, but it's unbelievable.

15   Q        And your feeling at that time or your

16   understanding at that time or your anticipation was that

17   that's the sort of program that the Federal 4248 program

18   would be?

19   A        Yes. They weren't giving up any information,

20   because I asked. I said -- I wanted to know what the

21   program was in the BOP. Nobody would tell me. All they

22   said was they had a CTP program at Butner that has their

23   own unit. It's civil committed -- treatment program CC,

24   something like that, and so --

25   Q        I think you testified that you really didn't

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 87 of 163

1   have any family to speak of. I mean, you hadn't had any

2   contact with your ex-wife in how long?

3   A        Twenty some years.

4   Q        You hadn't had any contact with your brother --

5   A        No.

6   Q        And I think it was since early 2000, correct?

7   A        Numerous years.

8   Q        Your parents were deceased. You had been locked

9   up for -- at that point 22 years, correct?

10  A        On that instant offense, yeah.

11  Q        I mean, the last extended period of time was 22

12  years, correct?

13  A        Yes.

14  Q        What you told -- you talked to your -- you say

15  your unit team. What were you told as far as, you know,

16  where you would likely be placed once you were released

17  if you were released in January of 2010?  What were you

18  told as far as where you would be placed?

19  A         The situation was because I'm a DC -- offender

20  that I was going to have to go to a halfway house in

21  Washington, DC. I was eligible for six months, and I

22  might get some of that, I wouldn't get all six months.

23  And then I would have to go to a homeless shelter to

24  live if I didn't have a home.

25  Q        And did this concern you?

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 88 of 163

1   A     Sure did.

2   Q     Tell The Court, if you would, why you were

3  concerned about that.

4   A     Well, par for the course. All homeless

5  shelters -- in the brightest district. I mean, there's a

6  couple up in DC right in the middle of the drug

7  district, and with my history, it wouldn't have worked

8  out too good.

9   Q     So your testimony is if you're out and drugs are

10  available to you, you may have a problem with that?

11   A     That -- most certainly.

12   Q     Okay. And so you made the decision or at least

13  your testimony was you made the decision at that point

14  in time that perhaps as opposed to going to the DC

15  halfway house and then ultimately a homeless shelter of

16  some kind that you would try to get into this 4248

17  program?

18   A     I mean, there was other factors involved, too.

19  One, that the economy as it was at that time -- it still

20  is a mess. I'm a 57 year old man coming out of prison

21  with -- serious felony conviction -- have a hard time

22  getting a job. I'm getting older. I could have got a job

23  somewhere, but I was really concerned I had no support.

24  What do you call -- want to call -- or group behind me,

25  nothing.  So I've been in prison so long, actually,

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 89 of 163

1  minus three years since I was 17, I know how to operate

2  in an institutional environment. I can work. I work

3  every day. On the street, I probably wouldn't have a

4  job.

5  Q       And that's important to you?

6  A       Sure, it is. I've worked all my life. I don't

7  have trouble working, and I want to work, but I also

8  want to be free some days. But I say to myself I don't

9  want to go out there and live on the street. I don't

10  want to do that. I've got too much pride for that.

11  These people can take care of me. If that's how it's

12  going to be, I'm good with that, because they feed me,

13  they clothe me, and I can work.

14  Q       And so during the evaluation process leading up

15  to your precertification as a 4248 inmate, you first met

16  with a Doctor Bazerman -- Bazerman. Do you recall that?

17  A       Doctor Bazerman.

18  Q       And Doctor Bazerman conducted an interview of

19  you. Was it in person, or how did that interview take

20  place?

21  A       I was in the special housing unit at USP Terre

22  Haute for one of my frequent visits for a dirty urine,

23  and I could do it over the telemonitor.

24  Q       And when Doctor Bazerman interviewed you, she

25  asked you about the offense that you had in your

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 90 of 163

1   history --

2   A       Right.

3   Q       -- and went all the way back, and I believe you

4   told her that even though the 1978 offense was not a

5   "statutorily sexual offense", that it was sexually

6   motivated. Did you tell her that?

7   A       Yes, sir, I did.

8   Q       Was that a true statement?

9   A       No.

10  Q       And the 1983 offense, even though it was not a

11  statutorily sex offense, you told her that it was a

12  sexually motivated offense, didn't you?

13  A       Yes, I did.

14  Q       And was that a true statement?

15  A       No, it's not.

16  Q       And this latest, the last offense, the offense

17  that you are currently incarcerated on, the 1988

18  offense, you told her that was also sexually motivated,

19  as you told the probation people back when you were

20  originally sentenced, is that right?

21  A       That's correct.

22  Q       Was that a true statement?

23  A       No.

24  Q       In fact, the record would reflect that in that

25  particular case, the victim even indicated that you had

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 91 of 163

1  asked for money or do you have money or do you have a
2  lot of money, isn't that true?
3  A        That's correct.
4  Q        Okay. You also told Doctor Bazerman that you had
5  committed sex offenses for which you had not been
6  caught. Did you tell her that?
7  A        Yes, I did.
8  Q        Was that a true statement?
9  A        No, it's not.
10 Q        Then I believe you said something about
11 returning to Terra Haute on death row or you'd be
12 returning to Terra Haute, but it would be on death row.
13 Why did you say that to her?
14 A        Basically because my -- my reasoning here is
15 that being a four or five time convicted felon, it
16 doesn't matter what I do. I'm going to prison for life.
17 It doesn't matter if I hurt somebody or kill somebody.
18 I'm going to do life, so death row or however makes no
19 difference.
20 Q        Now, did you really mean that you were going to
21 go out and kill somebody?
22 A        I'm not saying I'm going out to kill somebody,
23 no. Reality dictates if you are in prison and you have
24 got four or five convictions -- felonies, you know that
25 if you get caught, you're going to prison for life.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 92 of 163

1    Q        You don't have any legal training or anything.

2    You're just saying that that's your understanding?

3    A        You don't have to. Prisons and penitentiaries

4    are full of 'em right now.

5    Q        Okay. And then later in this interview with

6    Doctor Bazerman -- by the record occurred July 31st of

7    2009. You were later interviewed by Doctor Graney who is

8    here in the courtroom today. Do you see her?

9    A        Yeah.

10   Q        Was there more than one interview with Doctor

11   Graney?

12   A        I think we had maybe three or four sessions. I

13   don't recall exactly how many.

14   Q        But it was over the course of several days?

15   A        A couple weeks, two weeks or so maybe.

16   Q        And, again, you testified earlier about many of

17   the things that you said to her, correct?

18   A        Yes.

19   Q        And specifically with regard to the 1978 offense

20   being sexually motivated, you told her that it was,

21   correct?

22   A        Yes, I did.

23   Q        Was that a true statement?

24   A        No, it's not.

25   Q        The 1983 offense, was that a true statement that

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 93 of 163

1   that was sexually motivated?

2   A        No, it's not.

3   Q        And the 1988 -- the one you're in jail for now,

4   was that a sex -- you told her that, correct?

5   A        Yes, I did.

6   Q        Was that a true statement?

7   A        No, it's not.

8   Q        You also told her that the -- that you had

9   committed sex offenses for which you had not been

10  caught, is that correct?

11  A        Yes, I did.

12  Q        In fact, you told her that you had abducted

13  people three times a month since you were 15 years of

14  age, is that correct?

15  A        Yes. I said that.

16  Q        Now, of course, you were incarcerated for much

17  of the time --

18  A        If that was possible, I'd --

19  Q        So your -- but your testimony is that you had

20  committed sex offenses while you were in the community

21  the periods of time when you were not incarcerated,

22  correct?

23  A        Yes.

24  Q        So there was about a two year period of time and

25  then maybe another two year period of time when you were

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 94 of 163

1  out of jail since you have been 15 that you told her you

2  had committed three sex offenses a month? You said that

3  to her?

4  A      Yes, I did.

5  Q      Was that a true statement?

6  A      No, it's not.

7  Q      Now, at some point in time between when you

8  first found out that you were a potential targeted

9  person to be looked at as far as being certified under

10 the Adam Walsh Act and a later period of time when you

11 decided it was not something you wanted to do, something

12 happened. You received a letter, had some contact with

13 Ms. King. Tell The Court, if you would, about that.

14 A      Well, my ex-wife, Marlene, sent me a

15 correspondence because she was wondering why I hadn't

16 been released. She had checked the BOP thing. You can go

17 on the web and check the BOP -- where people are at, and

18 she realized I had not been released. She knew my

19 release date -- been keeping up with that. So I wrote

20 her and told her what the situation was. She started

21 writing me back. She told me if I needed support in the

22 community, she would be there for me, help support me.

23 Q      And, in fact, she offered to let you come live

24 with her?

25 A      She said I could get a job, rent a room from her

Huseby, Inc.                                  www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 95 of 163

1  and stay there, so we tried to do a relocation from

2  District of Columbia to Virginia which would allow me to

3  fall under the Federal guidelines -- DC code, and the

4  Federal people rejected it.

5  Q        Now, as you sit here today, you testified that

6  you do not want to live with Ms. King, is that true?

7  A        No. That's not what I want to do for real. I was

8  willing to give it a shot because I need some place to

9  go to hang my hat for a minute, and renting a room from

10  her would take some of the power away from her

11  for control. That would just be a business situation.

12  Q        But you've now determined that that probably is

13  not something that would be useful to you, is that

14  right?

15  A        Yeah. We still communicate, and she's a

16  wonderful person, but she's still very manipulative and

17  bossy and I just can't take it.

18  Q        Now, at what point in time did you make the

19  decision, if you recall, that the 4248 program which you

20  testified you were trying to get certified into was not

21  somewhere where you wanted to be?

22  A        It didn't take long. When I was released from

23  the special housing unit when my sentence ended and they

24  allowed me to go to the Maryland unit, I realized within

25  30 days it was a joke.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 96 of 163

1   Q      Okay.

2   A      It was a joke.

3   Q      In other words, it was not as you had

4  anticipated it being, similar to, say, California, New

5  Jersey, --

6   A      I realized --

7   Q      -- the research you had done?

8   A      Correct. The thing that hit me the most was that

9  I was still in prison. I could still receive incident

10  reports. I could still go to the SHU, special housing,

11  lose privileges when they don't have that authority to

12  do that, --

13   Q      Okay.

14   A      -- because I'm not serving a sentence. I don't

15  know where they get the authority to do these things

16  that they're doing. They still made me -- they can't --

17  I'm still only getting paid what prisoners get paid.

18   Q      How much is that?

19   A      I make $35, maybe $40 a month.

20   Q      And you work how many hours a day?

21   A      I work seven and a half hours a day.

22   Q      And you make 35 or 40 dollars a month?

23   A      Yes. I work in a bakery. That's prison pay.

24   Q      And at that point in time -- well, there's been

25  several instances where you have recanted the statements

Huseby, Inc.    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 97 of 163

1  that you've made not only to -- well, to Doctor Graney.

2  You wrote a letter, I guess two letters, indicating that

3  those statements that you made were untrue, is that

4  correct?

5  A      I think it was around April of 2010 that I

6  said -- recanted my statements.

7  Q      And were you represented by counsel at that

8  point in time?

9  A      No, I was not.

10  Q      When was it that you first were appointed

11  counsel?

12  A      I was certified on January 19th, and I never

13  received counsel until June of 2010.

14  Q      Okay.

15  A      I was appointed to the Federal Public Defender's

16  office.

17  Q      So the first letters or these letters that you

18  wrote recanting your statements saying they weren't true

19  and so forth came sometime before you were appointed

20  counsel?

21  A      That's correct.

22  Q      Now, if you are released -- after this

23  proceeding -- ultimately you're released, do you have

24  any knowledge how long -- about how long you will be

25  on I guess it would be parole or supervised release?

Huseby, Inc.                                  www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 98 of 163

1  A        It's been a while since I looked at my

2  paperwork, but I believe -- 2024 or 23 that I'm still on

3  supervision.

4  Q        How restrictive is your supervision as you

5  recall it?

6  A        Parole Commission has given me the strictest

7  guidelines I can possibly receive. They have even stated

8  they don't want me to have a driver's license, and I'm

9  fine with that.

10 Q        Well, tell The Court as you recall what sort of

11 the guidelines are that you would be --

12 A        -- stipulated that I would receive drug -- what

13 do you call it?  Drug counsel -- not counseling, but

14 when you get UA --

15 Q        What's a UA?

16 A        Urinalysis and outside -- going to drug

17 counseling and alcohol counseling. I have to receive

18 psychological treatment at my expense, and I also have

19 to register as a violent offender under the Violent

20 Offender law that came out in '95 or so. I have to

21 register as a violent offender. They didn't say anything

22 to me that I recall about registering as a sex offender,

23 because I couldn't. I don't have a sex offense, but they

24 did say they wanted me to take sex offender treatment.

25 They did say that in their paper.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 99 of 163

1          MR. BELL: Your Honor, if I can have just a

2     minute --

3          THE COURT: All right, sir.

4          BY MR. BELL:

5     Q     Mr. King, one of the statements that you made to

6     Doctor Graney involved your methodology for these

7     abductions that you say that you did that you, I guess,

8     weren't caught for, and one was that you would wear -- a

9     couple of things was that you would wear a mask and use

10    notecards. Is that what you told her?

11    A     Yes, I did.

12    Q     And you also indicated those statements were not

13    true, correct?

14    A     Yes.

15    Q     Now, you have been arrested several times for

16    abduction, various abductions up until 1988. In any of

17    those abductions where you were actually arrested, was a

18    mask of any kind found that you're aware of?

19    A     No.

20    Q     Were there any notecards or anything like that

21    found that you're aware of?

22    A     No, there was not.

23    Q     And the case where various items were found in

24    your vehicle, the ropes and the handcuffs and knives and

25    so forth, the axe handle that was under your seat, was

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 100 of 163

1  there a work purpose for that axe handle? What did you

2  use that for?

3  A      That axe handle is actually what they call a

4  tree lopper. It has a part that sits on top of it that

5  you hold and you hit small limbs with it and knock 'em

6  off as you climb up a tree.

7  Q      So your testimony would be that that axe handle

8  was a part of a tree lopper that you used in your work?

9  A      I take the top of it off and put it underneath

10 the seat and take it back and forth to work because it's

11 my personal tool.

12 Q      Was it typical for guys that did the work that

13 you did, work for tree companies, to have some of their

14 own personal tools and then the company would have their

15 own tools as well?

16 A      Oh, sure. I had my own chainsaws and ropes to

17 climb and spikes, everything.

18 Q      Okay. If you'd look at -- I'm going to have to

19 hand it to you.

20         MR. BELL: Your Honor, may I approach the

21 witness with an exhibit?

22         THE COURT: You may.

23         MR. BELL: Thank you.

24         BY MR. BELL:

25 Q      Mr. King, I'm going to hand you what's been

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 101 of 163

1  marked for identification as Respondent's Exhibit 21,

2  and could you tell me what the title of that document is

3  there?

4  A      The Coalinga State Hospital Civil Detainee

5  Patient Rights.

6  Q      Now, is this document something that you

7  obtained during your research related to civil detention

8  and civil detainees?

9  A      Yes, it is.

10 Q      And the document talks about various rights that

11 civil detainees have?

12 A      That's correct.

13 Q      In fact, it refers to 'em I believe in the

14 second line -- civil detainee patient rights, is that

15 true?

16 A      That's exactly what it says.

17 Q      And if you read through, it discusses the

18 various rights and so forth. Was this a document that

19 you read and understood or felt like would be similar to

20 the rights and so forth that you would have as a Federal

21 civil detainee?

22 A      Yes. One of the most influencing issues about it

23 is is that as you read through this, there's so many

24 Federal laws governing this that they have been ruled

25 and -- and by US law, the Supreme Court and the CFR, and

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 102 of 163

1    I think to myself that if that's the case, the Federal

2    Government's got it going on because I might have it

3    made.

4    Q      Okay.

5           MR. BELL: I don't have anything further, Your

6    Honor.

7           THE COURT: Thank you, sir. Mr. Gray?

8           MR. GRAY: Yes, Your Honor, briefly.

9           EXAMINATION

10          BY MR. GRAY:

11   Q      Mr. King, Exhibit 21, this is a document that

12   you were looking at when you were doing your research?

13   A      I'm sorry. Would you start over again? I missed

14   some of that.

15   Q      Mr. King, Exhibit 21, that's the document you

16   were looking at when you were doing your research?

17   A      Yes.

18   Q      And, Mr. King, you testified with the

19   questioning from Counsel that you made comments to

20   Doctor Bazerman which were lies.

21   A      Correct.

22   Q      And you made these statements to him with the

23   intent of trying to get into the SOTP program because of

24   the research that you had performed using things like

25   Exhibit 21, right?

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 103 of 163

1    A        It was the civil commitment training program,

2    not the SOTP, yes.

3    Q        And these are similar to the lies that you told

4    Doctor Graney with regard to acts of conduct that you

5    had engaged in?

6    A        Yeah. I actually saw Doctor Bazerman prior,

7    before I saw Doctor Graney.

8    Q        And is it your testimony then that, you know,

9    when you were talking with doctors about your sexual

10   urges that you were lying to them to try to get some

11   ulterior motive accomplished?

12   A        That's correct.

13   Q        For instance, when you talked to the presentence

14   officer, your ulterior motive was to try to get a

15   lighter sentence, right?

16   A        That and the fact that throughout the years of

17   my -- since the incidents happened in '74 and '75 where

18   I received lighter sentences for the crimes that I

19   committed, to me it was obvious that if you have a sex

20   offense or if you've got some issues, you're going to

21   get a lighter sentence, and it seemed to be working.

22   Q        And when you were in these other facilities, for

23   instance, like when you were in FCI Atlanta, you lied

24   about your mental health history in order to get from

25   Atlanta to another facility. In this case, it was

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 104 of 163

1    Butner, isn't that correct?

2    A       That's correct.

3    Q       And it's your testimony that when you were --

4    was it USP Beaumont in Texas you conducted this plan of

5    faking an escape so that you could get transferred out

6    of Texas to another facility?

7    A       Yes, I did.

8    Q       So when we have these issues of misconduct or

9    lying, you're doing it for another purpose, isn't that

10   right?

11   A       That's correct.

12   Q       Now, there were times when you were honest with

13   some of your psychologists and treatment providers,

14   right?

15   A       I'm sure there was times, yes.

16   Q       And when -- those would be times when there

17   wouldn't be any real motive to gain, right?

18   A       There were times when I felt -- like when my

19   parents passed on, when you start feeling depressed in

20   prison, which isn't hard to do, there's issues you want

21   to go speak about, and that's what you do.

22   Q       And you didn't fabricate anything to get out of

23   Terre Haute, did you?

24   A       No. I -- my time was up. I was getting ready to

25   leave and then I got sent to Beaumont -- I mean, excuse

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 105 of 163

1   me, Butner.

2   Q      And you were generally pretty happy at Terre

3   Haute, right?

4   A      That was a pretty good joint for a penitentiary.

5   Q      And there were drugs there, weren't there?

6   A      Absolutely. I caught several dirty urines there.

7   Q      And you were using a lot of drugs there?

8   A      Yes, I was.

9   Q      But it's your testimony that you didn't want to

10  move to a halfway house in DC because you were concerned

11  you were going to be around drugs?

12  A      No. I didn't mind the halfway house, but it was

13  upon the completion of the halfway house that I -- if I

14  did not have a residence in the District of Columbia

15  that I would have to go to a shelter.

16  Q      And you were concerned that the shelter was

17  going to be in a place that had drugs?

18  A      That and the fact that with the economy as it

19  was, I didn't know how I was going to afford anything.

20  DC is not cheap.

21  Q      So overall your time at Terre Haute was pretty

22  good? You were on your way out?

23  A      Yep.

24  Q      You were getting some mental health treatment

25  during that time, right?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 106 of 163

1    A        No, not while I was at Terre Haute.

2    Q        Oh. Would you turn in that binder to Exhibit

3    Number 34 for me, please? And what I'm going to do is

4    I'm going to put that on the screen so that you have a

5    chance to see it.

6    A        What number was that again?

7    Q        Exhibit Number 34. And if you would turn to page

8    1970, I have it up on the screen for you in case you're

9    having trouble.

10   A        It's not here.

11   Q        It may be one of the ones that's missing --

12   Okay. I have up on the screen for you. Exhibit Number

13   34 has on -- that Mr. King was seen in SHU or --

14   psychiatry clinic consult. You were in the SHU at the

15   time of this interview, correct?

16   A        Is this in Terre Haute?

17   Q        It's in 2000.

18   A        I was still at Beaumont. I was in Terre Haute in

19   2001.

20   Q        So you were at Beaumont at this point in time?

21   A        That's correct.

22   Q        And while you were at Beaumont, you were telling

23   the staff that you had had some anger, anxiety issues?

24   A        That's right.

25   Q        And that you had had some problems since your

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 107 of 163

1    teen years, correct?

2    A        Yes.

3    Q        That you were charged with abduction and

4    attempted murder?

5    A        Yeah, I see that it.

6    Q        And that you feel that you have eight years to

7    serve left on your commitment, right?

8    A        Yeah, that's what it says.

9    Q        And you've been inpatient at Johns Hopkins for

10   about 15 months, right?

11   A        Yes.

12   Q        And that you stated to the treatment provider

13   that you have no remorse?

14   A        That's what it said.

15   Q        And that you also told the treatment provider

16   that -- you have a history of exhibitionism,

17   aggressiveness, et cetera?

18   A        That's on here. I see it. Okay. Yes, yeah.

19   Q        But you're probably saying this to get out of

20   something, right?

21   A        Looks like I was trying to get some -- yes, I

22   was on my way back out of Beaumont. I was probably in

23   the SHU when I did this.

24   Q        But you were trying to do it in order to get

25   something out of it?

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 108 of 163

1    A        Yes.

2    Q        And, Mr. King, all those statements that are

3    lies, there's an ulterior motive behind them, yet you

4    still feel as though there's no risk of sexual offense

5    from you in the future?

6    A        There's no risk of sexual offense, no.

7    Q        And that the only reason why you told those

8    stories about being a hibernating bear, the nature --

9    your victims, the modus operandi, your senses of elation

10   and euphoria you get from controlling and dominating

11   women, you said all of those things because you had done

12   your research and you had found out that a civil

13   commitment setting was supposed to be a very nice

14   setting and you wanted to stay there?

15   A        That's correct.

16   Q        And as a result of that research, you said I

17   want to go to a civil commitment program, right?

18   A        That's right.

19   Q        So you were willing to say what you needed to

20   say in order to get there?

21   A        That's correct.

22   Q        And then when you got to Butner, you found out

23   that it was not going to be like you had read in the

24   civil commitment research, right?

25   A        Well, that and the fact that I discovered that

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 109 of 163

1  is it not anywhere close, but also I discovered that as

2  per the law of Adam Walsh, the states weren't taking any

3  -- so in other words, in order to -- civilly committed

4  to take me, they are not going to take me, so I'm stuck

5  in prison here.  The states are not taking anybody, so

6  that was a mark against it, too, because I did enough

7  research to the law to realize that's what's supposed to

8  happen. They are not even supposed to be -- to have a

9  CTP program, but they do, and it's garbage.

10            MR. GRAY: No further questions, Your Honor.

11            THE COURT: Mr. Bell?

12            MR. BELL: Nothing further, Your Honor.

13            THE COURT: Very good. You may step down, Mr.

14  King. Is there any further evidence from the Government,

15  Mr. Gray?

16            MR. GRAY: Yes, Your Honor. At this time, we

17  would like to call Doctor Graney. We anticipate that her

18  testimony will take about 45, 40 minutes on our end.

19  We just want to let The Court know that. I know we're at

20  about 11:30 and there's probably some timing issues in

21  terms of logistics that you want to think about, but we

22  anticipate if we do get started, we will be able to

23  complete our presentation of her prior to any lunch

24  break.

25            THE COURT: That will be fine.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 110 of 163

1        MR. GRAY: Thank you, Your Honor.

2        DAWN GRANEY, PSY.D, having been duly sworn,

3   was examined and testified as follows:

4        COURT CLERK: Please state and spell your name

5   for the record.

6        THE WITNESS: My name is Dawn Graney,

7   G-R-A-N-E-Y.

8        THE COURT: Mr. Lockridge?

9        MR. LOCKRIDGE: Thank you, Your Honor.

10       EXAMINATION

11       BY MR. LOCKRIDGE:

12   Q    Good morning, Doctor Graney.

13   A    Good morning.

14   Q    Where are you employed?

15   A    I'm employed with the Federal Bureau of Prisons

16   and I'm currently -- my current duty station is Federal

17   Correctional Institute in Butner, North Carolina.

18   Q    And you're employed as a psychologist there?

19   A    Correct, as a sex offender forensic

20   psychologist.

21   Q    How long have you been a licensed psychologist?

22   A    Since 2003.

23   Q    How long have you been working with sex

24   offenders in the capacity of evaluating them?

25   A    Since two -- about 2008 and then -- had done

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 111 of 163

1   some work with them as a general population psychologist

2   prior to that time.

3   Q       And your duties there at Butner involve

4   evaluating sex offenders?

5   A       Yes.

6   Q       For civil commitment purposes?

7   A       Correct.

8   Q       How many evaluations have you done today?

9   A       About 14.

10  Q       And are you familiar with the Adam Walsh Act,

11  Law 4248?

12  A       Yes.

13  Q       Are you familiar with the regulations governing

14  that law?

15  A       Yes.

16          MR. LOCKRIDGE: Your Honor, for the sake of

17  expediency, we would tender her as an expert in forensic

18  psychology.

19          THE COURT: Any objections, Mr. Bell?

20          MR. BELL: Your Honor, I've reviewed her

21  credentials and so forth. We have no objection.

22          THE COURT: Doctor Graney, I have one

23  question, and that is can you tell me the difference

24  between the degree that you have which is PSY.D as

25  opposed to Ph.D as opposed to MD -- psychiatrist would

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 112 of 163

1    have?

2          THE WITNESS: Of course. A psychiatrist does

3    have a doctorate or degree in medicine and they are able

4    to prescribe medication, and they typically focus their

5    treatment around medication and do less in the way of

6    therapy typically. An individual with a doctorate of

7    philosophy in psychology, a lot of times there's more of

8    a research background there, whereas a doctorate of

9    psychology does usually more clinically focused --

10          THE COURT: And that's your degree, a

11    doctorate of psychology?

12          THE WITNESS: Correct. And psychologists

13    typically do more in the way of psychological testing

14    than would a psychiatrist.

15          THE COURT: I see. Very good. Mr. Lockridge,

16    you tendered Doctor Graney as an expert in the specific

17    field of forensic psychology. Very good. The Court

18    recognizes Doctor Graney as an expert in the field of

19    forensic psychology.

20          MR. LOCKRIDGE: Thank you, Your Honor.

21          BY MR. LOCKRIDGE:

22    Q     Doctor Graney, are you familiar with the

23    respondent, Daniel King, in this case?

24    A     I am. So in 2009, I conducted a precertification

25    forensic evaluation on Mr. King, and then most recently

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 113 of 163

1  this year, I completed an updated forensic evaluation on

2  Mr. King.

3  Q      Could you briefly turn to tab two in your

4  binder, Government Exhibit Two? And do you recognize

5  that document?

6  A      I do.

7  Q      What is that?

8  A      That is my forensic evaluation of Mr.

9  King from August of this year.

10 Q      And also tab three, is that a supplement to your

11 August, 2011 evaluation?

12 A      Yes.

13 Q      And, finally, going back to tab one, is that

14 your precertification report?

15 A      Correct.

16 Q      When did you do that report?

17 A      The report was written in November, 2009.

18 Q      Can you just explain briefly what the difference

19 is between those two reports as far as timing?

20 A      Yes. Under the Adam Walsh Act, the Bureau of

21 Prisons reviews any individual who is preparing for

22 release who has a history of sexual misconduct, and

23 Sexual Offender Certification Review Branch, which is

24 based out of Washington, DC, does an initial review of

25 the cases. They look through the individual's records.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 114 of 163

1  They usually do an initial scoring on Static-99R and

2  they determine if there's enough evidence that the

3  person could possibly meet the criteria to be certified.

4        If then that's the case, they send the

5  individual to Butner for more intensive evaluation, and

6  that's called precertification evaluation, and they use

7  that evaluation to -- as part of their decision making

8  as a panel as to whether or not they are going to opt to

9  certify the individual as a sexually dangerous person.

10        The most recent evaluation I conducted on Mr.

11  King, forensic evaluation of 2011, of course, it was

12  conducted after he was already certified, and it's

13  really almost identical to the precertification

14  evaluation report based on the same facts, same

15  information. The only difference is basically who was

16  requesting the evaluation.

17  Q      And who requested the 20011 evaluation?

18  A      The Government, to my knowledge.

19  Q      -- render any -- diagnosis in those reports?

20  A      I did.

21  Q      What diagnoses were those?

22  A      I diagnosed Mr. King with paraphilia not

23  otherwise specified, nonconsent, with exhibitionism,

24  with opiate and alcohol abuse and antisocial personality

25  disorder.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 115 of 163

1    Q        Do those diagnoses remain your diagnoses today?

2    A        Yes.

3    Q        And just very briefly, what type of information

4    did you review in preparing your report?

5    A        I had some police and psychiatric records

6    dating back from the -- around the mid 1970s -- from the

7    time that Mr. King has been in custody of the Bureau of

8    Prisons. I had presentence investigation report, and

9    then Mr. King also agreed to be interviewed by me in

10   2009.

11   Q        And did you render an opinion as to whether Mr.

12   King met the criteria for civil commitment under Section

13   4248 in those reports?

14   A        I did.

15   Q        What was that opinion?

16   A        My opinion, to a reasonable degree of

17   professional certainty, was that he did meet the

18   criteria as a sexually dangerous person based on his

19   history of either sexually violent conduct or attempted

20   sexually violent conduct or child molestation, his

21   having been diagnosed with a serious mental illness or

22   disorder and -- would have difficulty from refraining

23   from sexually violent conduct or child molestation.

24   Q        Do those opinions remain your opinions today?

25   A        Yes.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 116 of 163

1   Q       -- did you interview Mr. King --

2   A       In 2009, I think we had about three interviews

3   that total about two and a half hours.

4   Q       And during those interviews, did you talk

5   generally -- at least generally about his sex offenses

6   or his offense behavior?

7   A       Yes. During his evaluation with Doctor Bazerman,

8   he had said to her that all of his previous crimes were

9   sexually motivated and repeated that still during our

10  interviews, so we didn't go into great detail about each

11  offense. I did talk to him in detail about at least one

12  offense, I know, but he said in general that all of his

13  prior offenses were sexually motivated.

14  Q       Were you present in court today for his

15  testimony?

16  A       Yes.

17  Q       And did you hear it?

18  A       Yes.

19  Q       During the 2009 interview with Mr. King, what,

20  if anything, did he tell you about the victims of his

21  criminal offenses?

22  A       They were all females.

23  Q       And is what he told you during these interviews

24  consistent with the evidence you reviewed?

25  A       Yes.

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 117 of 163

1    Q       What, if anything, did he tell you about whether

2    he used a weapon during his offense conduct?

3    A       He said that he used a knife, that he thought

4    women feared knives more than firearms and that he used

5    the knife as a form of intimidation and control. In at

6    least two of his documented offenses, he was found to

7    have had a knife.

8    Q       Now, in your interviews, was the discussion

9    about the knife brought up in reference to his -- sexual

10   offenses, or it was just offenses in general?

11   A       No. He was specifically talking about using the

12   knife in the context of committing these sexual

13   offenses.

14   Q       Did he tell you -- upon meeting these victims if

15   at all that he would take or attempt to take them?

16   A       He didn't talk necessarily about a specific

17   location, but that he would try to get them into his

18   vehicle and then move them to another location.

19   Q       And are those statements consistent with the

20   evidence and information you reviewed in this case?

21   A       Yes. Specifically in his 1974 or 5 offense, I

22   believe when he was 17, he abducted a victim at

23   knifepoint, placed her in the vehicle. There was another

24   driver in the vehicle, and the vehicle either was no --

25   or went to another location during the time that he was

Huseby, Inc.                                  www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 118 of 163

1  with the victim and fondled her breasts and exposed his

2  penis and placed her hands on his penis.

3          And then there's really no -- about these

4  offenses at age 19, I believe in 1978, but the other two

5  subsequent offenses in 1983 and 1988, there were

6  vehicles involved in which he attempted to get the

7  individual in the vehicle.

8  Q      What, if anything, did he tell you during your

9  interviews with him about using bindings or other items

10 to control victims?

11 A      He said that he would use bindings such as

12 luggage straps to gain control of his victim and he

13 stated that he would choose bindings that would not cut

14 into the skin to reduce there being blood in his car and

15 also to minimize the pain --

16 Q      And how, if at all, were those statements

17 supported by any of the evidence you considered in this

18 case?

19 A      I thought it was significant that during his

20 1983 arrest that rope was found in his vehicle and that

21 it was hooked through a seat belt anchor and that he was

22 also found to have a pair of handcuffs, and I did

23 specifically ask Mr. King about those items, and he had

24 said that the handcuffs and rope was going to be used to

25 obtain control of his victim.

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 119 of 163

1    Q        What, if anything, during the interviews that

2    you did -- discuss with Mr. King tell you about his

3    intentions once he had victims in the vehicle or

4    location where he --

5    A        Mr. King described his sexual urges, his

6    fantasies as relating to exposing himself to these

7    females, that he would want to take them to a location

8    where he could expose himself and/or have them

9    masturbate him as well. He talked about using the mask,

10   wearing a mask because he thought he had distinctive

11   features. That way a victim wouldn't be able to easily

12   identify him -- and using index cards which have been

13   mentioned because of his speech impediment, that they

14   wouldn't be able to easily identify him from his voice

15   and that he would use these notecards and show them to

16   the victim and would say something to the effect of do

17   what I tell you to do or I'll rape you, and then he

18   would use these index cards to instruct victims as to

19   what he wanted them to do.

20   Q        Were his statements to you about that topic

21   supported in any way by the evidence that you reviewed?

22   A        There was no evidence in the documented sexual

23   offenses that he was ever found with a mask or index

24   cards.

25   Q        What about his sexual -- the sexual urges he

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 120 of 163

1  reported to you?

2  A       Can you clarify that?

3  Q       You testified that he talked to you about the

4  sexual -- his sexual acts he would commit during his

5  offensive behavior. What, if any, evidence had you

6  reviewed that supports, if at all, those statements?

7  A       Well, certainly with his offense at age 17, you

8  know, he had talked about having a history or having

9  urges and fantasies of exposing himself to females,

10 having females masturbate him.

11         He had also at age 18 -- I believe in the Phipps

12 Clinic, he had had fantasies about tying women up and

13 raping them, and so -- offense at age 17, he took the

14 victim by knifepoint, which was consistent with his

15 report of using a knife to obtain control of the

16 victims. He fondled her breasts, exposed his penis and

17 placed his victim's hands on his penis, which would be

18 consistent with his reports his of his urges and

19 fantasies.

20         And with his statements at age 18 where he

21 talked about having fantasies about tying up his

22 victims, of course, he was found with rope in his

23 vehicle during his 1983 arrest.

24 Q       Do you have an opinion as to whether Mr.

25 King has engaged or attempted to engage in sexually

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 121 of 163

1    violent conduct or child molestation?

2    A        I do.

3    Q        What's that opinion?

4    A        That he has attempted to engage in

5    attempted child molestation with his offense at age 15

6    and that he has engaged in attempted sexually violent

7    conduct with the other four documented offenses between

8    the age of 17 --

9    Q        Is there anything unusual about the evidence

10   you have reviewed and discussions with him about his

11   particular sexual urges?

12   A        Mr. King is very unique in that his urges to

13   expose himself are intertwined with -- arousal to the

14   aspect of offensive behavior. Often exhibitionists will

15   expose themselves to strangers and it doesn't really

16   proceed beyond that, but he has these urges and

17   fantasies about forcefully exposing himself to someone,

18   to restrain them or essentially holding them captive

19   while he engages in this behavior and then having them

20   masturbate him. So that was unusual. That is unique.

21   It's not something I personally have seen before.

22            And I thought when Mr. King was discussing these

23   urges and fantasies with me, the manner in which he

24   would engage in his offensive behavior, that all seemed

25   very consistent with the information that I had obtained

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 122 of 163

1   from the records as to what he had previously reported

2   about his urges and fantasies of tying up women and

3   exposing himself and then with his offense conduct as

4   well.

5   Q       I just want you to talk briefly about your

6   diagnosis of paraphilia not otherwise specified. First

7   of all, that -- that diagnosis in the Diagnostic and

8   Statistical manual, can you explain nonconsent act or

9   term you --

10  A       Nonconsent specifically indicates that the

11  individuals are sexually aroused to the coercive nature

12  of sexual acts. I know from Doctor Zinik's testimony

13  yesterday, he talked about the ongoing debate in the

14  community about the use of paraphilia NOS, and most

15  often that diagnosis is used when you're talking about a

16  rapist typically, wherein the case of Mr. King, we're

17  not saying that he engaged in rape behavior or that he's

18  a rapist per se. He's never engaged that we know -- of

19  sexual intercourse with a victim or forced oral

20  copulation or anything of that nature, but the diagnosis

21  is typically used when you're talking about rapists.

22          Part of the concern with the diagnosis of

23  paraphilia NOS is is that it would be -- in these types

24  of procedures in part because the diagnosis talks about

25  urges, fantasies or both -- and there was concerns that

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 123 of 163

1   because somebody had had a history of rape or documented

2   rape that they could be labeled as having paraphilia

3   simply because they have engaged in that behavior.

4        Not all rapists who rape even repeatedly are

5   considered to have a paraphilia -- has to be evidence

6   that these -- had these ongoing and intense urges and

7   fantasies about the coercive nature of the act. There

8   are rapists who rape simply because they're just very

9   criminally minded. They might in the course of a robbery

10  come across a female victim and just opt to rape her

11  just as part of his criminal thinking, but he doesn't

12  necessarily have urges or fantasies that are driving

13  that behavior.

14        So that's part of the concern about the NOS

15  diagnosis and the potential misuse, but there was an

16  article from 2008, Doctor Frances who was the

17  chairperson for the DSM-IV-T-R, was one of the

18  contributing authors and they're talking about

19  paraphilia NOS and how it can be potentially used in SVP

20  or SDP hearings, and they do go on to say -- the authors

21  say that despite these concerns --

22        MR. BELL: Your Honor, if I may object to the

23  article, we haven't established a foundation that she

24  used it in any way in rendering her diagnosis. She just

25  seems to be talking about a hearsay article, but there's

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 124 of 163

1   no foundation for its use in this proceeding.

2              MR. LOCKRIDGE: Well, Your Honor, I can ask

3   her whether she considered that as part of her

4   consideration.

5              THE COURT: That'll be fine. Why don't we lay

6   a foundation for that? Before you do that though, I

7   know, Doctor Graney, you used two acronyms. I believe

8   they were SDP and SVP. I just want to make sure that the

9   record's clear.

10             THE WITNESS: SVP, sexually violent person, or

11  SDP, sexually dangerous person.

12             THE COURT: Thank you. Mr. Lockridge?

13         BY MR. LOCKRIDGE:

14  Q      Doctor Graney, in your knowledge of the

15  paraphilia NOS diagnosis, have you considered any

16  information or read any articles that informs your

17  opinion as to what that diagnosis -- the purpose of that

18  diagnosis and the history behind it?

19  A      Yes.

20  Q      And what information, if any, did you consider?

21  A      The article I'm speaking of is a 2008 article.

22  Doctor Frances was one of the authors. It was out of the

23  Journal of the American Academy of Psychiatry and the

24  Law. Basically what the article says is that the

25  paraphilia NOS diagnosis can and should be used with

Huseby, Inc.                                     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 125 of 163

1    individuals that do have evidence of arousal to

2    coercive nature of sexual acts, but the authors say that

3    if you're going to use the diagnosis, there should be

4    clear evidence of the urges and fantasies that support

5    the arousal to the coercive nature of the acts.

6            And in the case of Mr. King, we have over 30

7    years of documentation where he has repeatedly stated I

8    have these fantasies to expose myself to women, I have

9    these uncontrollable urges to engage in this act and --

10   and, again, his criminal conduct seemed to support his

11   statements about having these urges and specifically

12   when he spoke with me, his modus operandi, if you will,

13   of how he would engage in these acts.

14   Q       You also diagnosed him with three other

15   diagnoses you already mentioned. Without going through

16   all those diagnoses, which, if any, of the mental

17   illnesses you diagnosed Mr. King with would you consider

18   to be serious in nature? Let me rephrase that. Are any

19   of the diagnoses you made with respect to Mr. King

20   serious mental illnesses?

21   A       Yes.

22   Q       And could you just please explain?

23   A       In the case of Mr. King, certainly the

24   paraphilia NOS, nonconsent and the exhibitionism I would

25   say are serious mental illnesses, disorders or

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 126 of 163

1    abnormalities. He has suffered repeated legal

2    consequences as a result of his actions. He has on more

3    than one occasion talked about the problems that these

4    sexual urges have caused in his life and has even

5    reported some distress about being unable to control

6    these urges.

7         I also believe certainly the antisocial

8    personality disorder in his case is considered a serious

9    illness or disorder. He has, you know, repeatedly

10   violated the law. He has even himself described himself

11   as very deceitful and manipulating. He uses others to

12   his advantage. He has expressed having no remorse for

13   his actions, and these behaviors have again caused him

14   repeated problems throughout his life.

15        I diagnosed him with opiate abuse and alcohol

16   abuse. I did not diagnose him with dependence just based

17   on -- really, the primary bases for those diagnoses were

18   his repeated incident reports in prison for either

19   heroin -- testing positive for heroin or possession of

20   alcohol or intoxicants, and so I don't -- he clearly has

21   a problem. He could reach the level of dependence. I

22   didn't diagnose that, but that also is a serious problem

23   for him in that he's repeatedly used, even in a prison

24   environment.

25   Q    Just one other question with regard to your

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 127 of 163

1  diagnoses. What evidence did you rely on in forming your

2  opinion as to whether he currently possesses -- diagnose

3  or if these diagnoses are just prior, in the past?

4  A     Well, certainly the statements that he made in

5  2009 were significant, and I know Mr. King has recanted

6  those statements, but I do find it significant that the

7  information he provided to me is very consistent with

8  statements he's made since age 15 or 17 about his sexual

9  urges and behaviors and consistent with his criminal

10 history. So I don't know if I answered your question.

11 Q     Thank you. I believe you did.

12 A     Okay.

13 Q     And, Doctor Graney, do you have an opinion as to

14 whether as a result of his serious mental illness,

15 abnormality or disorders he would have serious

16 difficulty in retraining from sexually violent conduct

17 or child molestation?

18 A     Yes.

19 Q     And did you use any actuarial instruments to

20 support your opinion?

21 A     Static-99R.

22 Q     Did you score that Static-99R?

23 A     I did.

24 Q     What score did you arrive at?

25 A     An eight.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 128 of 163

1    Q        What does that mean, a score of eight?

2    A        A score of eight is in the high risk category,

3    and so that is additional evidence that he would likely

4    have serious difficulty refraining from sexually --

5    violent conduct. The actuarial alone does not inform my

6    opinion about that. I also looked at the fact that Mr.

7    King has had repeated documented offenses for these --

8    for what I identified as sexually motivated offense

9    behavior. He has engaged in these behaviors even when

10   he's been on supervision. He's engaged in this type of

11   sexual misconduct when he's had consenting sexual

12   partners such as his wives.

13        He has stated that -- he told me in 2009 that

14   when he was caught for an offense, it was because he

15   acted impulsively and didn't really plan or think things

16   through very well, which would say that sometimes these

17   urges were so overwhelming that he acted without maybe

18   giving it as much thought or planning as he normally

19   would like. So all of these factors to me suggests that

20   he does have serious difficulty refraining from the

21   behavior.

22        And in -- during the interviews, the level of

23   detail that he provided when talking about his offense

24   behaviors, when talking about the types of victims he

25   selected, when talking about the bindings and weapons

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 129 of 163

1  that he used, that information wasn't prompted from me.

2  I wasn't questioning him as to what type of victims do

3  you prefer, what type of weapons do you use. Mr. King

4  just provided this -- you know, this array of

5  information about his offense behaviors, and it made me

6  question it since his last offense in '88 until 2009 --

7  that he still vividly remembers this is why I chose

8  these victims, this is the weapons I used, these are the

9  bindings, this is why I chose the binding I chose. He's

10 still having these persistent fantasies and thoughts and

11 recollections of prior offenses.

12        And he told me in 2009 that he was still having

13 fantasies of exposing himself to females in the prison

14 environment, that he sometimes engaged in that behavior,

15 but he would do it in ways in which he was unlikely to

16 get caught, for example, having himself maybe exposed

17 and having it appear accidental when a female staff

18 member was doing rounds. And he talked about using

19 heroin also in prison to reduce his sexual urges or

20 impulses.

21 Q      Doctor Graney, from your understanding, was he

22 able to complete the crimes for which he was convicted?

23 A      Based on a review of the records, I would say

24 no.

25 Q      Does your opinion on that issue in any way

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 130 of 163

1    affect your diagnoses?

2    A        No. The fact -- whether or not he successfully

3    completed whatever he intended -- set out to do, the

4    fact that he even attempted to engage in a behavior

5    would suggest, of course, that the urges are still there

6    to act on these fantasies or thoughts that he's having.

7    And I did think it was significant.

8            I believe a question was asked yesterday, was it

9    unusual that someone would only have these like

10   attempted offenses. I thought it was significant that he

11   told me in 2009 that whenever I was caught, it was

12   because I acted impulsively and I didn't plan it out,

13   and from what the record shows for the -- let's see --

14   four attempted abductions, five, actually, I think,

15   attempted abductions -- at age 19 that he didn't

16   complete those, he wasn't able to follow through, that

17   the victims either managed to escape or the offense was

18   -- he was somehow interrupted.

19   Q        Doctor Graney, have you read the evaluation

20   prepared by Doctor Fabian Saleh in this case?

21   A        I have.

22   Q        And are you aware of his overall opinion?

23   A        Yes.

24   Q        What was that opinion?

25   A        I believe he did not believe that Mr. King

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 131 of 163

1    suffered from paraphilia. I believe he did diagnose him

2    with antisocial personality disorder, but based on his

3    review of all the information and the lack of a

4    paraphilic diagnosis, he did not believe Mr. King met

5    the criteria of a sexually dangerous person.

6    Q        Are there any details that you would

7    specifically disagree with other than the actual

8    diagnosis, the overall opinion?

9    A        Details of?

10   Q        Of, for example, whether he's committed sexually

11   violent conduct.

12   A        I'd have to look back at his report more for

13   details, but I did not agree that he had not engaged in

14   sexually violent conduct or attempted sexually violent

15   conduct, and I also did not agree with Doctor Saleh's

16   opinion that there was no evidence of a paraphilia.

17              MR. LOCKRIDGE: Your Honor, I have no further

18   questions.

19              THE COURT: We're at our -- at noon. Why don't

20   we take our lunch break and we'll reconvene at 1:00?

21     (Whereupon off the record.)

22              THE COURT: Good afternoon, folks.

23              AUDIENCE: Good afternoon, Your Honor.

24              THE COURT: Mr. Bell, I trust you have some

25   questions for the witness.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 132 of 163

1        MR. BELL: We do, Your Honor. Thank you.

2        EXAMINATION

3        BY MR. BELL:

4    Q    Doctor Graney, let's take a look at your

5    curriculum vitae. I believe that's Government's Exhibit

6    Four.

7    A    Yes.

8    Q    You've got that in front of you?

9    A    Yes, sir.

10   Q    Now, it indicates that you got your BA in

11   psychology, your master's degree in applied forensic

12   psychology or master's under an applied forensic

13   psychology program.

14   A    Correct.

15   Q    And then your doctorate in applied forensic

16   psychology. Post getting your Ph -- sorry, not your

17   Ph.D -- your psychology doctorate, did you do any sort

18   of fellowship training or anything like that in

19   conducting forensic evaluations or forensic psychology?

20   A    I did. I completed a year long fellowship at the

21   Federal Medical Center in Rochester, Minnesota in

22   forensic psychology in 2001 to 2002.

23   Q    Now, were you an employee of the Bureau of

24   Prisons at that time, or were you just working as an

25   intern or attending or something like that in the

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 133 of 163

1  program that you were discussing?

2  A        I was considered an employee.

3  Q        Have you been working for the Bureau of Prisons

4  since you got your degree, doctorate in psychology or

5  even before that?

6  A        Well, yes. I completed my internship at the

7  Bureau of Prisons as well at the same facility that I

8  just mentioned. So I've been working with the Bureau of

9  Prisons since 2000.

10  Q       Okay. Have you done any forensic evaluation work

11  for any other entities other than the Bureau of Prisons?

12  A        No.

13  Q        And I think in your deposition you testified

14  that you had done -- at that point, which was a month or

15  so ago, you had done 14 forensic evaluations. Have you

16  done any more since then?

17  A        Well, I've done 14 of these evaluations under

18  the Adam Walsh Act, and since our deposition, I think

19  I've done two more.

20  Q        Were they precerts or were they actual forensic

21  evaluations?

22  A        Precerts.

23  Q        Okay. So how many precertification evaluations

24  have you done and how many actual full-blown forensic

25  evaluations have you done?

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 134 of 163

1  A        Well, I do want to say that with the

2  precertification evaluations, they are full evaluations.

3  They're just requested by the Bureau of Prisons. I'm

4  trying to think number wise. I think there may be

5  only -- so to date, let's say I've done 16. I think

6  there are only three or four of those that I did not

7  actually do a precertification report on before I was

8  asked to do -- 48 forensic report.

9  Q        So ultimately if they get to the point of

10 needing a forensic evaluation in the ones that you've

11 done a precertification on, is it your expectation that

12 you will then do a forensic evaluation in those cases as

13 well if it's requested?

14 A        Yes. The practice in the Bureau of Prisons has

15 been whoever conducts the precertification evaluation

16 then will do whatever updates are requested later on.

17 Q        Okay. Now, is this the first time today -- is

18 today the first time that you've testified in one of

19 these cases in Federal court?

20 A        In one of these cases, yes.

21 Q        Now, of the now 16 forensic evaluations that

22 you've completed, in how many of those have you found

23 the inmate to qualify under the Adam Walsh Act as a

24 sexually dangerous person?

25 A        Of those 16, 14 have been positive, so I opined

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 135 of 163

1   that they were sexually dangerous.

2   Q       Now, prior to conducting -- I'm just going to

3   speak specifically of Mr. King's precertification

4   evaluation and then his forensic evaluation. Did you

5   receive any specific -- or any training specifically

6   designed to teach you or train you in doing the

7   evaluations under the Adam Walsh Act?

8   A       Prior to starting the precertification

9   evaluation?

10  Q       Yeah, of Mr. King.

11  A       Specifically related to the Adam Walsh, I know

12  the Bureau of Prisons had done a training -- had done

13  some training with us, but I think that might have been

14  specifically for the 48. It may have been after I did

15  the precertification evaluation of Mr. King.

16  Q       So between the time you did the precertification

17  and the final, which was, I think, completed in August

18  1st of this year, --

19  A       Yes.

20  Q       -- you did do some training on doing evaluations

21  specifically for the Adam Walsh Act cases?

22  A       Yes, specifically for --

23  Q       Where did that training take place?

24  A       There was actually a training here.

25  Q       Here being this building?

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 136 of 163

1    A       Yes, by Doctor Amy Phenix. And then I believe

2    it's Doctor Trent Evans, who's a member of the Sex

3    Offender Certification Review Branch, did a training

4    with the BOP evaluator I want to say around February of

5    this year.

6    Q       And in the evaluations that you've done, how

7    many of those cases did you render an opinion that the

8    offender suffered from paraphilia not otherwise

9    specified, nonconsent?

10   A       I want to say only two. To my recollection, I'd

11   say two, maybe three. Most of the individuals I've

12   evaluated to date have been -- have primarily committed

13   offenses against children.

14   Q       Pedophilia?

15   A       More often had a diagnosis of pedophilia,

16   correct.

17   Q       And that's a diagnosis that's recognized and is

18   found in the DSM-IV-T-R, correct?

19   A       It is.

20   Q       Now, you've testified in reference to your

21   understanding of the act and how -- what's required to

22   find someone certifiable or to civilly commit someone

23   under the act. Would you agree that if Mr. King does not

24   suffer from a serious mental illness, abnormality or

25   disorder that he cannot be civilly committed under the

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 137 of 163

1    act?  Would you agree with that statement?

2    A      Yes.

3    Q      Now, I'm going to talk -- and I'll try to be

4    brief about some of the timeline events that have

5    occurred or that show up on this Exhibit 56, Government

6    Exhibit 56. I don't know if you want to turn to it. It

7    might be helpful.

8    A      So it's tab 56?

9    Q      It should be tab 56 in the Government book. I

10   would put it on the screen, but I'm not comfortable with

11   the technology at this point.

12   A      Okay.

13   Q      I just want to specifically just touch on some

14   of the offenses. If you will look at the second red

15   block, October, 1975 abduction case when Mr. King was

16   age 17, that is the last case where there's any

17   evidence -- other than Mr. King self-reporting, there's

18   any evidence of actual physical touching of a victim in

19   a sexual manner, isn't that correct?

20   A      Yes.

21   Q      Okay. And if you'll go down just to the next

22   block, it says 1975. The report of the assault by the

23   teenage boys I believe is referenced. That information

24   was given to you in the 2009 -- can you find it? Do you

25   see it?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 138 of 163

1    A       Yes. The green block?

2    Q       Yes, ma'am.

3    A       Uh-huh.

4    Q       That was reported to you in the 2009 interview,

5    one of the interviews that you had with Mr. King,

6    correct?

7    A       Yes, I believe so.

8    Q       There was no record or police report or anything

9    of that nature related to that incident, was there?

10   A       No.

11   Q       And if you look a little further down, the April

12   7 -- I think is the first entry on the next page. Red

13   block, April 7, 1978 involved an arrest and conviction

14   for attempted abduction. In that particular case, you

15   determined that that was a sexually violent or sexual

16   offense, correct?

17   A       Correct.

18   Q       And that determination was based solely on Mr.

19   King's self-reporting of it as being a sexually

20   motivated crime, isn't that correct?

21   A       Yes, on his report that it was sexually

22   motivated and that it also fits the pattern of the other

23   offenses that I felt were sexually motivated.

24   Q       Well, but in that particular case, there's no

25   police record or anything that was done currently with

Huseby, Inc.                                     www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 139 of 163

1   that offense indicating that it was a sexual offense of

2   any kind, correct?

3   A       Correct.

4   Q       And the 19 -- go down two blocks lower. The 1983

5   offense where he was convicted of simple assault and

6   carrying a dangerous weapon, that offense was

7   self-reported by Mr. King as being a sexually motivated

8   offense, correct? In your interview with him, did he

9   report that as being a sexually motivated offense, the

10  1983 offense?

11  A       Yes. He said that all of his prior offenses had

12  been sexually motivated, and then specifically in

13  relation to this offense, he said that the handcuffs and

14  ropes were to be used to gain control of his victim.

15  Q       And you used the term in your report -- it's

16  Exhibit One, Bates stamp 1923, page 1923.  You use the

17  term rape kit when you describe what Mr. King -- how he

18  described these -- these were implements of a rape kit.

19  Do you recall that from your report, or can you find it

20  in your report?

21  A       I'm sorry. What was the page again?

22  Q       It's 1929, I believe, if I've got it correct on

23  my notes. It's page seven of the report, top paragraph,

24  first paragraph.  It's your first report, not the second

25  one.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208   (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 140 of 163

1   A       Oh, the precert report?

2   Q       Yes.

3   A       I'm sorry. Actually, rape kit was the term that

4   Mr. King himself had used.

5   Q       So he used the word rape kit?  That was not a

6   term that you sort of cloned on to what -- how he

7   described it?  You say he used the word rape kit?

8   A       Yes. He said he didn't leave the bindings and

9   things in his car because it could be considered a rape

10  kit.

11          THE COURT: Mr. Bell, I want to make sure our

12  page numbers are sequenced here. The page I believe

13  you're referring to, it's not Bates numbered, but the

14  original page number, page seven in Government's Exhibit

15  One, the Bates number that I have is 002396.

16          MR. BELL: It may be one of those documents

17  that's in there twice, Your Honor. I'll take your word

18  for it. I have it on here on my screen as 1929, so it

19  may be in there twice. I'm sure it's -- what was the

20  page number, Your Honor?  I'll look and see --

21          THE COURT: I just want to make sure for

22  purposes of the record --

23          MR. BELL: It is page seven of her

24  precertification report.

25          THE COURT: There is a reference to -- the

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 141 of 163

1  term rape kit does appear on this page six lines down.

2          MR. BELL: That's correct, and that is the

3  term that I'm speaking of.

4          THE COURT: Okay. Thank you.

5          BY MR. BELL:

6  Q      Now, the 1988 case, the one that he's currently

7  incarcerated -- was currently incarcerated up until

8  January of 2010, he pled guilty to armed kidnapping. In

9  that case, you determined that that was a sexually

10  violent offense, correct?

11  A      Yes.

12  Q      Now, that was based primarily on Mr. King's

13  self-reporting either through his statements to the

14  probation officer in his presentence report from that

15  time or from statements that he made to you in your 2009

16  interview, is that correct?

17  A      Yes.

18  Q      Okay. And, in fact, in that police report

19  related to that incident, there's actually a couple of

20  mentions of do you have money, do you have a lot of

21  money that the victim says that Mr. King mentioned, is

22  that correct?

23  A      Correct.

24  Q      Now, have you reviewed Doctor Zinik's report?

25  A      Yes.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 142 of 163

1  Q       Okay. In his report, he describes Mr. King as a

2  pathological liar. Would you agree with that? Really,

3  it's a diagnosis. Would you agree with that diagnosis of

4  Mr. King?

5  A       Well, I mean, according to the DSM-IV-T-R, it's

6  not a diagnosis. It is a term used in the psychology

7  community. I would say that based on records and his

8  only admissions that he has repeatedly lied or

9  misrepresented information --

10  Q       Throughout his life, from the time he was 15

11  until the present time, is that correct?

12  A       That's what the documents have suggested, and,

13  yes, he's also said that same -- provided that same

14  account.

15  Q       Now, you've obviously -- in preparing your

16  report and your evaluation, you reviewed all of Mr.

17  King's records. Will you agree with me that they are

18  replete with many, many diagnoses of mental illness from

19  the time he was 14 or 15 years until the present time?

20  Would you agree with that statement?

21  A       Correct, and I would say many of the different

22  diagnoses he received was while he was in BOP custody.

23  Q       And would you also agree that of all the

24  diagnoses that he's received over the years that you,

25  yourself, Doctor Zinik and Doctor Bazerman were the

Huseby, Inc.                           www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 143 of 163

1    three that diagnosed him with paraphilia NOS,

2    nonconsent?

3    A      Yes.

4    Q      And you -- I believe you testified on direct

5    that you understand that you -- your diagnosis under the

6    act in making a determination regarding his

7    applicability of the act to Mr. King, you have to make a

8    current diagnosis, not a diagnosis of something that

9    happened in 1988 or what he suffered from in 1988 or '83

10   or '78, whatever the time frame is, it's got to be that

11   he suffers from it currently, is that correct?

12   A      Correct.

13   Q      You diagnosed Mr. King with the mental illness

14   of exhibitionism. The only two documented incidents

15   where Mr. King exposed himself was in the 1974 case

16   where he pled guilty to indecent exposure, correct?

17   That's one.

18   A      Correct. There was some indication that there

19   were two arrests in '74 for indecent exposure, but yes.

20   Q      And then there was a second arrest. I believe it

21   was the '83 case or the '78 case where the victim said

22   that he exposed himself. Would you agree that those are

23   the only two, perhaps three, if there was another

24   incident in 1974 -- the only three or two incidents

25   where there was actual evidence of Mr. King exposing

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 144 of 163

1  himself other than his self-reports of doing it at other

2  times?

3  A     Yes.

4  Q     And you would also agree that since he's been in

5  Bureau of Prisons' custody since 1988, he has not been

6  written up or charged or sent to the SHU or anything

7  like that for indecent exposure or exposing himself to

8  male or female staff members, correct?

9  A     Correct.

10  Q     Now, you work at Butner, correct?

11  A     Yes.

12  Q     That's where your office is, and you deal with

13  that inmate population, right?

14  A     Yes.

15  Q     How much contact do you have with the inmates --

16  well, the 4248 inmates that are in the Maryland unit,

17  how much time do you spend dealing with those inmates?

18  A     Really, unless they agree to interview, I really

19  wouldn't spend any time with them. I may see them in

20  passing. My office is in a housing unit right next to

21  Maryland Unit, so I might see them in passing. I've seen

22  Mr. King in passing many times, but I don't really have

23  any other direct interaction with them.

24  Q     How difficult has it been for you -- you say

25  you've done 16 evaluations or been asked to do 16

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 145 of 163

1  evaluations. How difficult has it been for you to get

2  the detainees to be interviewed? Are they more -- are

3  most of 'em willing to do it, or do most of 'em not want

4  to do it?

5  A       Most do not agree to be interviewed. In fact, of

6  the 16, Mr. King is one of only three who have agreed to

7  be interviewed.

8  Q       Okay. And as far as you know -- and I understand

9  your knowledge may be limited, but as far as you know,

10 has Mr. King had any problems while he's been on the

11 Maryland unit -- you know, sexual issues, exposing

12 himself or anything like that that he hasn't been

13 written up for or charged with?

14 A       To my knowledge, I have not heard anything about

15 any behavior he's engaged in that he's not received an

16 incident report for.

17 Q       Just so the record's clear, the statements that

18 Mr. King made to you and the series of interviews that

19 he did with you in 2009, at this point in time, he has

20 retracted everything that he said and has indicated it

21 was untrue, correct?

22 A       Correct.

23 Q       You heard Doctor Zinik testify yesterday that

24 absent a diagnosis of paraphilia NOS, nonconsent, it was

25 his opinion that Mr. King could not be certified or

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 146 of 163

1  civilly committed under the Adam Walsh Act. Would you

2  agree with that statement or opinion by Doctor Zinik?

3  A       I would agree, because then the only other

4  diagnosis besides antisocial would be exhibitionism, and

5  I would not say that an individual would meet a criteria

6  with just that diagnosis.

7  Q       Now, you testified earlier in reference to your

8  use of the paraphilia not otherwise specified,

9  nonconsent diagnosis and the fact that there was an

10 article that you at least in part relied upon in doing

11 that. What was the name of the doctor again who wrote

12 the article, and what was the name of the article, if

13 you don't mind?

14 A       The article I believe is Diagnosing Mental

15 Disorders When It Really Counts: DSM-IV-T-R and SVP/SDP

16 Cases.

17 Q       And you said the doctor who wrote this article

18 was who?

19 A       Doctor Frances was one of the authors, and then

20 I'm not exactly sure if I'm pronouncing this correctly.

21 I think it's Sarah Vossen (phonetic) and Weinberger I

22 think are the other two.

23 Q       So there were three different doctors?

24 A       Yes.

25 Q       Now, you indicated that maybe the lead author

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 147 of 163

1  was the chairman of the DSM board that determines which

2  things are included in and excluded from the DSM?

3  A        Yes. Doctor Frances, who is the chairman of the

4  DSM-IV taskforce -- and he has been one of the

5  individuals who has expressed a lot of concern about the

6  misuse or potential misuse of the paraphilia NOS,

7  nonconsent diagnosis.

8  Q        Okay. And is this the -- he's the chairman of

9  the taskforce for the current DSM, meaning the one

10  that --  as I understand it, they're looking to be

11  published in 2013, or is this going back to the

12  DSM-IV-T-R or even the DSM-IV?  Are you talking about

13  the current board or a board that he served on --

14  A        I'm referring to the DSM-IV.

15  Q        Okay. And he's the chairman of this committee,

16  and that committee essentially votes and makes the

17  determination as to whether something will or will not

18  be included in the DSM-IV, DSM-IV-T-R, what have you,

19  correct?

20  A        That's my understanding.

21  Q        So if it's his position that this should be

22  included in the DSM-IV and it was not included in the

23  DSM-IV, then obviously he was in the minority of those

24  that voted on that issue, correct?

25  A        Well, I don't know if he was in the minority. I

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 148 of 163

1  will say this. The article was written only three years

2  ago and he has expressed concern again with the way the

3  paraphilia criteria reads in the DSM-IV-T-R in that it

4  says that there could be paraphilic urges, fantasies or

5  behavior, and my understanding is that was basically a

6  typo more or less, because what they don't want to

7  happen is that clinicians rely only on the behaviors to

8  make a diagnosis of paraphilia NOS, nonconsent. And when

9  I say nonconsent, paraphilia NOS is a diagnosis in the

10 DSM.

11 Q       I understand.

12 A       So the nonconsent -- I mean, you know an

13 individual who is sexually aroused, making obscene phone

14 calls, he would be a paraphilia NOS, scatologia.

15 That's specifying he has this unusual sexual deviancy

16 that doesn't quite fit any disorders, so we're going to

17 put him in the NOS category and we're going to specify

18 that this is his sexual arousal. Or somebody who's

19 sexually aroused to engaging in sexual acts with animals

20 would be paraphilia  NOS, zoophilia.

21         So when I say nonconsent, I'm just saying that

22 he doesn't neatly fit into any one of the existing

23 diagnoses, so he falls into paraphilia NOS category, and

24 then I'm specifying with that nonconsent that his

25 particular arousal -- to coercive acts with a

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 149 of 163

1    nonconsenting person.

2    Q         But there are specific paraphilias that are

3    listed in the DSM-IV-T-R, correct?

4    A         There are some, yes.

5    Q         Such as exhibitionism, sexual sadism, et cetera,

6    et cetera, they are specific diagnoses in the

7    DSM-IV-T-R, correct?

8    A         Yes.

9    Q         And there's also this NOS category that has

10   certain what you call descriptors listed in the

11   DSM-IV-T-R that's actually listed in there, correct?

12   Scatophilia (phonetic) I guess is one of 'em, correct?

13   A         Correct, scatologia.

14   Q         Scatologia, I'm sorry. But this nonconsent

15   descriptor was specifically excluded from the DSM-III,

16   the DSM-IV, and the DSM-IV-T-R. In fact, it was not even

17   included in the appendix, isn't that right?

18   A         That is correct, but the basis for that was,

19   again, there were a lot of individuals in the field who

20   said we don't think there's enough evidence to show --

21   that can be supported by the research to say that

22   there's a significant number of people who are sexually

23   aroused to the coercive nature of sexual acts.

24            Now, people have said though there are these

25   people that do exist. Certainly there are people who are

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 150 of 163

1   aroused to the coercive nature of these behaviors. The

2   problem is often proving that, because most, let's say,

3   rapists, because that's typically who has the diagnosis,

4   are not going to admit to having fantasies and urges to

5   engage in rape behavior, and it's difficult to prove

6   otherwise that these fantasies and urges exist, because

7   even with PPG testing, the penile plethysmograph where

8   they test sexual arousal patterns, somebody might be

9   aroused to a sexually coercive image or they might show

10  that they're aroused when that image is exposed, but you

11  can't really differentiate if it's the coercive nature

12  of the stimuli that's arousing or if it's simply not

13  inhibiting their arousal.

14         So they say that you can make this paraphilia

15  NOS diagnosis with individuals who are sexually aroused

16  by coercive acts, but there has to be some other

17  evidence that they have urges and fantasies that drive

18  that sexually deviant behavior.

19         And, again, in Mr. King's case, since 1974 or

20  earlier, he has reported I have these fantasies of

21  exposing myself, I have these urges to engage in this

22  behavior, I feel that I can't control it.

23  Q      But in his case specifically, you're relying on

24  self-reports primarily where he talks about urges and so

25  on and so forth of an individual who, I think you would

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 151 of 163

1  agree, in fact, was diagnosed or described as a

2  pathological liar, correct?

3  A         This is correct, but it does make me wonder --

4  he's been saying this since about age 17 that we know of

5  at least, but I think even earlier, so age 17 or 18 when

6  he was at the Phipps Clinic, and it was his statement

7  that he's used this at times to avoid consequences or

8  get lighter sentences or be put in treatment versus in

9  jail.

10         My question would be why -- once he's convicted

11  in '88 of his most recent sexual offense and he was in

12  BOP custody, what would be -- then be his motivation to

13  continue to report these same urges and fantasies even,

14  you know, preexisting the Adam Walsh Act?  And so I

15  weighed that with yes, he does have a history of being

16  deceitful and manipulating, but there would be no clear

17  advantage to him continuing to make these assertions

18  while he's in custody and when there's clearly no other

19  benefit from doing that.

20  Q         But isn't there something in the record -- and

21  correct me if I'm wrong, but I believe his mother

22  described him as chronically lying to the point he lied

23  about things he didn't even have to lie about early on.

24  A         I think she referred to him as a chronic liar.

25  I don't know about the other half, that he lied about

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 152 of 163

1    things that he didn't have to lie about. I'm not sure

2    about that.

3    Q        Let me see if I can find that in the record. But

4    you would agree that without this evidence coming from

5    Mr. King as you stated earlier, the concern with the

6    diagnosis is that it be based upon behavior?

7    A        Uh-huh.

8    Q        And in your opinion, it can only be diagnosed

9    when you have specific evidence that it's the nonconsent

10   aspect of the action that causes the arousal, correct?

11   A        Yes. And Mr. King has stated basically in so

12   many words that the forceful act of exposing himself to

13   another person is, he said, stimulating, euphoric, it's

14   better than any drug.

15   Q        And he said this in 2009 in the interview

16   I believe you had with him?

17   A        Yes.

18   Q        Now, when they talk about these diagnoses of

19   paraphilia NOS, nonconsent, do you agree as Doctor Zinik

20   stated yesterday that there is a different standard

21   involved when you're talking about the clinical

22   treatment of an individual and whether using a diagnosis

23   to have him civilly committed -- do you agree that

24   there's a different standard there?

25   A        Yes.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 153 of 163

1  Q       And that the standard in a court of law where

2  you're trying to take someone's liberty away is higher

3  than if you designate someone with a diagnosis when

4  you're just clinically treating them and using that as a

5  method to determine the proper treatment? Do you agree

6  that that's a higher standard?

7  A       Yes, certainly.

8  Q       I don't want to belabor the risk assessment

9  tools, but I just want to briefly touch on it. You

10  indicated that you did a Static-99R evaluation of Mr.

11  King, correct?

12  A       Correct.

13  Q       And that he fell into a high risk category.

14  Would you agree with what Doctor Zinik said yesterday in

15  relation to the limited use and limited -- the limited

16  usefulness of the Static-99 and other actuarial risk

17  tools in determining whether someone will or will not

18  reoffend?

19  A       Yes. It's only one tool in the risk assessment

20  as a whole.

21  Q       And you can't tell -- you can't necessarily

22  take the percentages -- I think in your case you found

23  that those in the group that you placed Mr. King in had

24  a 45 percent chance of reoffending within five years and

25  a 53 percent chance of reoffending in ten years. Is it

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 154 of 163

1  fair to say or do you agree with the statement that you

2  don't know which side of the fence that Mr. King would

3  end up in, only that within that group, that's the rate

4  that they've determined over a period of time? Correct?

5  A      Correct. It's not to say that Mr. King would

6  reoffend, you know, at that rate, but that other sex

7  offenders who were similar to Mr. King have been

8  rearrested or reconvicted. So it doesn't count

9  reoffenses in general, because there may be undetected

10 crimes, so they've either been rearrested or reconvicted

11 of another sexual offense.

12 Q      And in his case, particularly your scoring of

13 him, as an example, related to how many prior sexual

14 offenses he had at least in large part came from the

15 self-reporting of a sexual motivation for these crimes,

16 correct?

17 A      Correct.

18         MR. BELL: Your Honor, if you give me a

19 minute, I may be close.

20         THE COURT: That'll be fine.

21         BY MR. BELL:

22 Q      You indicated that one of the statements that

23 Mr. King made to you in your interview was that he used

24 heroin to dampen his sexual urges while he was in

25 custody. If you know, has he had any infractions or

Huseby, Inc.                                            www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 155 of 163

1   anything for testing positive for opiates or heroin

2   while he's been at Butner?

3   A      Speaking since he's most recently been at

4   Butner, I don't know the date of all his incident

5   reports, so --

6   Q      Well, talking about since his last --

7   A      Since he's been there this last time, he has had

8   no incident reports for substance related violations.

9   Q      And he's been there since, what, early 2009?

10  A      September of 2009, I think.

11  Q      Well, late 2009. And as far as you know, he's

12  not had any infractions or anything for any sexual

13  offenses or any inappropriate sexual conduct since that

14  time, has he?

15  A      No.

16          MR. BELL: Nothing further, Your Honor.

17          THE COURT: Very good, sir. Thank you. Mr.

18  Lockridge?

19          MR. LOCKRIDGE: Just a few questions, Your

20  Honor.

21          EXAMINATION

22          BY MR. LOCKRIDGE:

23  Q      Doctor Graney, you indicated that Mr. King made

24  those various admissions to you in 2009, to Doctor

25  Bazerman in 2009, correct?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 156 of 163

1    A        Correct.

2    Q        Would any doctors that you're aware of that

3    might have evaluated Mr. King while he was in BOP

4    custody -- because it was before 2009, would they have

5    had access to those admissions?

6    A        I'm sorry. Could you repeat that?

7    Q        Admissions Mr. King made to you in 2009, were

8    those doctors that evaluated him prior to 2009 -- and

9    they obviously would not have had access to his later

10   admissions.

11   A        No.

12   Q        Are you aware of whether they would have had

13   access to all the documents that you reviewed for

14   purposes of this evaluation?

15   A        I would say based on my experience at the

16   Bureau, it would be unlikely that they would have the

17   mental health records from his prior treatments.

18   Q        All right. On cross there, you briefly -- the

19   Static-99R again, and you testified that in the

20   Static-99R, it reports or it talks about percentage of

21   risk or it predicts risk to reoffend or arrests and

22   convictions, correct?

23   A        Correct.

24   Q        So in your opinion, does the -- do you have an

25   opinion as to whether the Static-99R accurately reports,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 157 of 163

1  overreports or underreports risk with regard to risk to

2  be arrested or convicted?

3  A     Well, the numbers in the Static-99R are looking

4  at rearrest, reconviction rates, so, of course, there

5  are a large number of sexual offenses that go

6  undetected, so it doesn't necessarily tell you -- it

7  doesn't necessarily tell you the likelihood that someone

8  will reoffend. They might reoffend and not be detected,

9  but they would be rearrested or reconvicted of a sexual

10  offense, so in some cases it could arguably not

11  indicate the -- what's the word I'm looking for?  Not

12  show the likelihood of actually reoffending. It might

13  minimize that number a little bit.

14  Q     I should have made the question a little

15  clearer. I appreciate your explanation. And -- one or

16  two more questions. The diagnosis of exhibitionism, can

17  it be diagnosed based on urges or fantasies alone?

18  A     Yeah. You can diagnose a paraphilia based on

19  urges and fantasies without the presence -- the

20  behaviors if the individual is telling you that those

21  urges and fantasies are causing significant distress or

22  impairment in their life.

23  Q     So would those urges or fantasies typically come

24  from the person that is experiencing them?  I mean,

25  would those admissions typically come from that same

Huseby, Inc.        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 158 of 163

1   person?

2   A      Well, yes, typically.

3          MR. LOCKRIDGE: Nothing further, Your Honor.

4          THE COURT: Thank you, sir. Mr. Bell?

5          MR. BELL: Just briefly, Your Honor.

6          EXAMINATION

7          BY MR. BELL:

8   Q      In the Bureau of Prisons system, for each

9   inmate, is there not a psychology data system that

10  basically has a record of every interaction that that

11  inmate has had with the mental health person within the

12  system?

13  A      Correct.

14  Q      And is that not accessible to any person who

15  would be treating Mr. King during his stay in the Bureau

16  of Prisons?

17  A      It should be, yes. It should be accessible to

18  any psychologist.

19  Q      So that would include records going all the way

20  back to the first day he came in and maybe some records

21  even prior to that based on histories, correct?

22  A      If he reported history and it was documented,

23  yes, then it would be in there.

24         MR. BELL: Nothing further, Your Honor.

25         MR. LOCKRIDGE: Nothing further, Your Honor.

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 159 of 163

1        THE COURT: Doctor Graney, I have one question

2   for you. You were asked, I believe, by Mr. Bell a

3   question, and the question included a reference to the

4   recidivism rate for the high risk, high need group under

5   the Static-99R, and I just want to make sure I

6   understood. You were not -- you were in no way by your

7   answer indicating that they were adopting a different

8   recidivism rate than that that is set forth in your

9   report for that group, is that right?

10        THE WITNESS: No, sir. Without looking at the

11   report, I don't remember the specific numbers. I was

12   just saying that those numbers are based on the sample

13   group that those numbers were taken from -- were

14   rearrests or reconvictions for those individuals, and so

15   it doesn't suggest that Mr. King is -- it's not saying

16   that he's definitely going to reoffend at this rate over

17   this period of time. It's just comparing him to that

18   sample of individuals who are similar to him.

19        What I was trying to say with the -- I think

20   it might have been Mr. Lockridge's questions -- was that

21   because it looks at rearrests and reconvictions, we

22   can't know the degree to which somebody actually

23   reoffends necessarily all the time. There might be

24   undetected offenses, so it might be an underreporting of

25   actual reoffense rate when you're just looking at

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 160 of 163

1   arrests or convictions. We can't ever know how many

2   times somebody may actually reoffend if not all the sex

3   offenses are reported.

4           THE COURT: I understand and I appreciate that

5   response. My specific concern, I think inadvertently Mr.

6   Bell referred to ten year recidivism rate for this group

7   is 53 percent, and I believe the report gives it as 55.

8           MR. BELL: That was my mistake, Your Honor.

9   I misidentified it.

10          THE COURT: I assumed it was inadvertent, and

11  I just wanted the record to be clear that Doctor Graney

12  wasn't adopting 53 percent.

13          THE WITNESS: No, sir. It doesn't change my

14  numbers. Without looking at the report, I didn't

15  remember them off the top of my head.

16          THE COURT: That's fine. Very good, ma'am.

17  You're excused.

18          THE WITNESS: Thank you.

19          THE COURT: Any further evidence from the

20  Government?

21          MR. LOCKRIDGE: No, Your Honor. The Government

22  rests.

23          THE COURT: Mr. Bell, is there any evidence

24  for the Respondent for today?

25          MR. BELL: There is not today, Your Honor.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 161 of 163

1    This is -- unfortunately, we ran into this situation

2    which I was worried about.

3              THE COURT: That's fine.

4              MR. BELL: Doctor Saleh will be here this

5    evening, and he will be prepared to go first thing in

6    the morning, but other than that, we don't have

7    anything.

8              THE COURT: That's fine. Well, let's reconvene

9    then at 9:00 tomorrow morning.

10             MR. BELL: Thank you, Your Honor.

11

12

13        WHEREUPON, the hearing was suspended at 1:51 p.m.
14

15

16

17

18

19

20

21

22

23

24

25

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208      www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 75   Filed 11/04/11   Page 162 of 163

1                              CERTIFICATE

2

3          I, Glynde M. Jones, Notary Public in and for the

4     State of North Carolina, do hereby certify that the

5     foregoing transcript of proceedings taken in the United

6     States District Court is a true and accurate

7     transcription of the shorthand notes of the proceedings

8     taken by me in machine shorthand and transcribed by

9     computer under my supervision.

10

11         Dated this 3rd day of November, 2011.

12

13

14

15         _____

16         GLYNDE M. JONES, NOTARY PUBLIC

17         Notary Public Number: 20022120063

18

19

20

21

22

23

24

25

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 75  Filed 11/04/11  Page 163 of 163