```
 1
 1            IN THE UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF NORTH CAROLINA

 3                     WESTERN DIVISION

 4

 5   ------------------------X

 6   UNITED STATES OF AMERICA,  :

 7          Petitioner,         :

 8   v.                         : CASE NO. 5:10-HC-2009-FL

 9   DANIEL KING,               :

10          Respondent.         :

11   ------------------------X

12

13

14

15                     BENCH TRIAL (VOL III)

16                     OCTOBER 19, 2011

17           HONORABLE JAMES E. GATES, PRESIDING

18

19

20

21

22

23       Reported by:  Glynde M. Jones

24                     Court Reporter

25                     Notary Public
```

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208**   **(704) 333-9889**
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 1 of 234

```
 1   APPEARANCES:

 2        FOR THE GOVERNMENT:

 3             EDWARD D. GRAY, Esq.

 4             US Attorney's Office

 5             Room 800

 6             310 New Bern Avenue

 7             Raleigh, North Carolina   27601

 8             (edward.gray@usdoj.gov)

 9        AND

10             MICHAEL E. LOCKRIDGE, Esq.

11             Federal Bureau of Prisons, Legal Center

12             PO Box 1600

13             Old Highway 75

14             Butner, North Carolina   27509

15             (mlockridge@bop.gov)

16

17        FOR THE RESPONDENT:

18             JOSEPH L. BELL, JR, Esq.

19             Batts, Batts & Bell, LLP

20             103 Candlewood Road

21             Rocky Mount, North Carolina   27804

22             (jbelljr@battslaw.com)

23

24

25
```

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 2 of 234

1                        CONTENTS

2    THE WITNESS: FABIAN SALEH, MD          EXAMINATION

3          BY MR. BELL                          5, 141

4          BY MR. GRAY                         65, 189

5    THE WITNESS: GARY ZINIK, Ph.D

6          BY MR. LOCKRIDGE          156, 170, 197

7          BY MR. BELL              164, 174, 200

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889

1          THE COURT: Good morning, folks.

2          AUDIENCE: Good morning, Your Honor.

3          THE COURT: Any housekeeping matters, folks,

4    before we get started?

5          MR. BELL: Not from the Respondent, Your

6    Honor.

7          MR. GRAY: Not from the Government, Your

8    Honor.

9          THE COURT: Very good. In that event, Mr.

10   Bell, I'd be happy to hear any evidence the Respondent

11   cares to --

12         MR. BELL: Your Honor, at this time, we would

13   call Doctor Fabian Saleh.

14         COURT CLERK: Can you come up and be sworn,

15   please?

16         FABIAN SALEH, MD, having been duly sworn, was

17   examined and testified as follows:

18         COURT CLERK: Please state and spell your name

19   for the record once you're seated.

20         THE WITNESS: Sure. My name is Fabian Saleh.

21   F-A-B-I-A-N is my first name. S-A-L-E-H

22   is my last name.

23         THE COURT: Doctor Saleh, let me just remind

24   you -- I'm sure you're used to testifying. If objections

25   are made to a question that is posed to you, I would

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 4 of 234

1    request that you not respond to that question until the

2    objection is resolved, and also -- and I'll remind you

3    in anticipation in any event, but if your testimony

4    which I anticipate will extend over breaks when you do

5    come back and resume the witness stand, you do, of

6    course, remain under oath.

7              THE WITNESS: Yeah, sure.

8              MR. BELL: Thank you, Your Honor.

9         EXAMINATION

10        BY MR. BELL:

11   Q      Doctor Saleh, just for housekeeping purposes,

12   there are several notebooks in front of you. The black

13   notebooks are the Respondent's exhibit and the white

14   notebook are the exhibits of the Government. You may be

15   asked to refer to those. Doctor Saleh, I'm going to ask

16   you to refer to Exhibit Two in the -- in one of the

17   black notebooks, the top black notebook, so you might

18   want to go --

19   A      Yes.

20   Q      Doctor Saleh, I've asked you to refer to a

21   document that's been marked as Respondent's Exhibit Two.

22   Can you tell The Court what that document is?

23   A      This is my resume or curriculum vitae.

24   Q      And the date of that document is what?

25   A      It's January 26, 2011.

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 5 of 234

1  Q       And the document contains what?

2  A       Well, it's essentially a background of my

3  career, describes where I went to school. It describes

4  where I was born. It describes my current position and

5  my various academic affiliations, various presentations

6  I have given Nationally, internationally, and books,

7  articles I have written.

8  Q       I'm going to be asking you some questions in

9  reference to those areas.  If you need to refer to

10 Exhibit Two, please feel free to do so. Have there been

11 any -- that's dated January 26, 2011. Have there been

12 any additions that would be made to that document since

13 that time?

14 A       Yes. I apologize. I didn't realize it. I haven't

15 given you the most recent updated CV. There have been

16 additional publications, additional presentations, and I

17 think that's it. I mean, just presentations and

18 publications.

19 Q       Thank you. Can you tell The Court what you do

20 for a living, Doctor Saleh?

21 A       I'm a forensic psychiatrist and a child

22 adolescent psychiatrist.

23 Q       And if you would, tell The Court where you're

24 employed.

25 A       I'm presently employed at Mass General Hospital

1  in Boston, and my position is with the Lowell Psychiatry

2  Service at that hospital. And I'm also a part of a staff

3  at the -- what we call the West End Clinic at Mass

4  General where I see and treat patients who are afflicted

5  with substance abuse disorders and also various forms of

6  mental illnesses. I also run a small child psychopharm

7  clinic at Mass General and I'm assistant professor of

8  psychiatry at Harvard Medical School.

9          In addition to that, I'm the director and

10  founder of the Sexual Behaviors Clinic that's

11  affiliated -- and it's in Central Massachusetts in

12  Worcester, and we also have a satellite office which I

13  run in Lexington, which is closer to Boston, so we serve

14  Massachusetts essentially, and, again, it's also called

15  Sexual Behaviors Clinic, part of Community House Clinic.

16  That's what I'm doing.

17  Q     How many languages do you speak, Doctor Saleh?

18  A     Four.

19  Q     Do you speak them fluently?

20  A     Well, it depends. If I'm not too tired, I

21  probably speak them rather fluently, yes.

22  Q     Which languages do you speak?

23  A     German is my primary language. English is --

24  speak Italian and Farsi.

25  Q     Where were you born, Doctor Saleh?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 7 of 234

www.huseby.com
(704) 333-9889

1    A        In Germany --

2    Q        You're a psychiatrist, correct?

3    A        That's correct, yes.

4    Q        We've heard testimony earlier in this trial from

5    psychologists. If you would, explain to The Court what

6    the difference is between a psychiatrist and a

7    psychologist.

8    A        Yeah, sure. With regard to psychiatrists, I

9    mean -- psychiatrist is somebody who would have to go

10   through medical school and earn a medical degree, and

11   after -- and, again, as I said, I did my training

12   overseas in -- I did my high school in Germany, but then

13   my medical school I did in Florence, Italy, and there

14   it's six years at a minimum that you have to go through

15   medical school, and as part of our training there, we

16   have to also write a medical thesis. And so at least

17   with regard to my training in medicine, it was six and a

18   half years, plus the medical thesis that I wrote. And

19   after you complete this, you have to -- you become a

20   physician, then take the state license. I took it in

21   Italy and then Germany, and I'm licensed also to

22   practice medicine in Europe.

23          And psychologists, as far as I understand, they

24   go through, I think, four years or six years of training

25   and then earn their Ph.D or PSY.D. I think the

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 8 of 234

1  difference between the PSY.D and Ph.D is that

2  Ph.D -- that they do research and the PSY.D -- and,

3  again, I'm not 100 percent certain about this. As far as

4  I know, they are not required to do research and it's

5  more clinical and more focused on clinical medicine.

6  Now, with regard -- and that's, I think, the difference

7  in terms of training.

8           Now, to become a psychiatrist, I have still to

9  go through residency, and in my case, I had to take the

10 Boards -- the American Boards for which I trained in

11 Oxford and then passed the Boards, came to the United

12 States, did an internship first, and that did include

13 six months of psychiatry, four months of medicine, and

14 two months of neurology, and thereafter I -- and, again,

15 I've talked a little bit about myself. This would best

16 describe maybe the difference between the psychiatrist

17 and the psychologist. And then you go into general

18 psychiatry or adult psychiatry, and in the United

19 States, it's another three years of training to become a

20 general psychiatrist. Now, in my case, I did two years

21 of a fellowship in child and adolescent psychiatry prior

22 to doing my general training.

23 Q      Doctor Saleh, just let me stop you there.

24 Explain to The Court what a fellowship or a

25 postdoctorate fellowship is.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 9 of 234

www.huseby.com
(704) 333-9889

1   A        Sure. So essentially what you do is once you do

2   the general psychiatry training, the residency, then if

3   you choose, you can take further subspecialties, and

4   there are various subspecialties you can take in

5   psychiatry. One of them would be, for example, the child

6   and adolescent psychiatry fellowship which is two years

7   of additional training on top of the four years you do,

8   and then there are other fellowships like forensic

9   psychiatry. Depending on the program, it may be one to

10  two years, and then -- geriatric psychiatry, substance

11  abuse psychiatry, or it's actually addiction psychiatry.

12  Q        In your particular case, just so I can review

13  and make sure we have it correct, you indicated that you

14  went to undergraduate school and medical school in

15  Europe?

16  A        In Europe, yes.

17  Q        Then you came to the United States and did an

18  internal medicine residency here in addition to

19  neurology and psychiatry?

20  A        Before coming to the States, I went to Germany

21  and did research in Heidelberg in schizophrenia and then

22  with this time period in Oxford, I then came over to the

23  States and did my residency in the United States.

24  Q        And you did the internal medicine in neurology

25  and psychiatry resident -- or internship?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 10 of 234

1   A          Internship, yes.

2   Q          Then you did your residency, you said, in child

3   and adolescent psychiatry?

4   A          That's correct, yes.

5   Q          And then you did a residency -- where did you do

6   your residency, that particular residency?

7   A          The adult residency -- I was recruited to Johns

8   Hopkins Hospital. I did it at Johns Hopkins Hospital

9   University. I did my residency there.

10  Q           And you mentioned various fellowships that you

11  can do, subspecialties, I guess, in psychiatry. You

12  mentioned forensic psychiatry. Did you do a fellowship

13  in forensic psychiatry?

14  A          I did a total of three fellowships. I did -- one

15  was child and adolescent psychiatry, and then I did a

16  fellowship in motivated behaviors, and that was a

17  fellowship that I did while I was at Johns Hopkins, and

18  that had to do with substance abuse, sexual disorders

19  and paraphilic disorders.  And as part of that

20  fellowship, I went to the Royal Ottawa Hospital in

21  Canada and worked with the doctors there.

22  After I finished that fellowship, I'm still part of

23  Johns Hopkins, I then got recruited to join the forensic

24  fellowship program in Massachusetts under Paul Applebaum

25  and did my forensic fellowship.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 11 of 234

1   Q       Where was that?

2   A       In Worcester, Massachusetts at U Mass Medical

3   School.

4   Q       Now, were the programs that you participated in,

5   both overseas in Europe and since you've been in the

6   United States, the training you had here, were those

7   programs accredited?

8   A       Yes, absolutely.

9   Q       Explain to The Court what accreditation means

10  with regard to a particular program.

11  A       As far as I know, I mean -- I don't know exactly

12  what goes into it. I mean, there are many programs that

13  train people and provide training in various forms, and

14  for a program to be -- to go through the accreditation

15  and be recognized, they have to meet certain

16  requirements, and as far as I can say at least, for

17  example, with our forensic fellowship program at Mass

18  General with Harvard Medical School, there are

19  requirements they have to fulfill in terms of the

20  training they offer, in terms of the lecturists they

21  have, the teachers they have in terms of how many hours

22  of supervision the fellow would be given, and it's -- as

23  far as, again, I know it's a governing Board Nationally

24  that then gives them the certification that they can

25  train, and whoever then comes out of that program is a

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 12 of 234

1    recognized, for example, forensic fellow or -- out of

2    that program that has passed that certification process.

3    Q        Now, during your residency -- what is a chief

4    resident?

5    A        Well, a chief resident is somebody who is -- it

6    depends on the program, I have to say, but typically

7    it's somebody who is -- is involved in the supervision,

8    training of other residents, the junior residents and

9    their own fellow residents, and, again, depending on the

10   program, some programs have more than one chief

11   resident.  Other programs have one chief resident, but

12   it's somebody who because of the work was given the

13   privilege to be part, if you want to, of the

14   administration. They help with the supervision of

15   residents and overseeing of the training of the

16   residents.

17   Q        And during your residency, were you appointed as

18   a chief resident?

19   A        I was, yes.

20   Q        Now, after your training, after you completed

21   your training, did you participate in any sort of Board

22   certification process or anything like that?

23   A        Yeah, sure.

24   Q        Explain that to The Court, if you would, please.

25   A        Well, what I had to -- or, actually, not had

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 13 of 234

1  to. I mean, people can work as psychiatrists without

2  going through the Board certifications, so what I did

3  though is I took the Board in psychiatry and neurology

4  and became Board certified and -- specialty -- I took my

5  Boards in forensic psychiatry.

6  Q      So you're Board certified in three different

7  areas?

8  A      Actually, the fellowship in child and adolescent

9  psychiatry I did not go through the Board certification

10  process because I did it my -- my general residency and

11  I was happy with just being a fellowship trained child

12  and adolescent psychiatrist, but for the general

13  psychiatry and forensic psychiatry, I'm Board certified.

14  Q      If you would, explain to The Court what your

15  work experience has been since, you know, you completed

16  your training and to the present time.

17  A      Let's see. The first thing I did, as soon as I

18  got done with my training, forensic fellowship in

19  Massachusetts, I started the sexual -- we called it

20  actually initially Sexual Disorders Clinic, changed the

21  term or name of the clinic to Sexual Behaviors Clinic,

22  so that was founded September of 2003 -- would be a few

23  months after I had completed my training, and the

24  purpose was really to serve Massachusetts and provide

25  at least Central Massachusetts at that time with a

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 14 of 234

1   clinic where we would see patients presenting with

2   various forms of sexual disorders. So that's one thing.

3   I became the founding father and director of this clinic

4   which has been in existence ever since.

5          And in addition to that work, I also ran various

6   programs through U Mass. I was director of a couple

7   programs at U Mass and -- for example, child diagnostic

8   program and other programs. I would have to look at my

9   CV to get a better sense of what other things I did, but

10  there was several other things I did in terms of child

11  psychiatry while at U Mass.

12         I was part of the Lowell psychiatry program, and

13  as part of that, I was actively involved in the training

14  and supervision of forensic fellows through our program

15  at that time and also students and residents coming from

16  abroad. I had people coming from Italy to join me and

17  get experience in sexual disorders. And so I did this

18  for several years and then was recruited to join the

19  Lowell psychiatry program where I have been ever since

20  and where I do forensic work and -- both private and

21  State related court cases, I do -- I continue to run, as

22  I said, the Sexual Disorders Clinic or Sexual Behavior

23  Clinic where I see and treat patients presenting with

24  various forms of sexual disorders, including paraphilic

25  disorders, various forms of mental problems and -- so

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 15 of 234

1   the primary problem they present with is some sort of a

2   sexual problem. It can be a paraphilic disorder. It can

3   be problematic sexual behaviors. Some of the patients

4   present with developmental disabilities, others with

5   mental health problems and others just with sexual

6   disorders, so that I -- treat patients there, and then

7   -- so that I continue to do.

8           As mentioned, I am part of the Lowell psychiatry

9   service where I do forensic work and then also now run a

10  Friday afternoon clinic for children where I treat

11  children and adolescents, and then I also see patients

12  presenting with substance abuse problems at the West End

13  Clinic, and this clinic, I'm there twice a week on

14  Tuesdays and Fridays and treat patients with various

15  forms of substance abuse.

16  Q      Do you have any faculty appointments at this

17  time?

18  A      Yes.

19  Q      Could you tell The Court about those?

20  A      As I actually mentioned previously, I --

21  faculty -- I'm assistant professor of psychiatry at

22  Harvard Medical School at this point.

23  Q      What about any publications and presentations

24  you may have done in the past? Tell The Court about

25  those, if you would, please.

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 16 of 234

1   A        I mean, I have done a number of presentations, I

2   mean, both locally in the Boston area and I've done many

3   presentations to residents and students at Harvard

4   Medical School, law students at the Harvard Law School,

5   for example, and have also presented Nationally and

6   internationally to fellow colleagues at various

7   organizations and was invited to present also to

8   physicians, nurses, various providers throughout the

9   Department of Developmental Services, attorneys, defense

10  attorneys, prosecutors, judges. I've presented over the

11  course of the years and probably have presented more

12  than -- as far as I can say now -- 100 times over the

13  years and then have published in the field of sexual

14  disorders, paraphilic disorders, and recently we

15  published a book through Oxford University Press on the

16  topic of sex offenders and have had authored several

17  chapters in this book as well and -- in the process of

18  writing two books right now. One is on technology and

19  sexual behaviors among juveniles and one is on child

20  forensic psychiatry.

21  Q        How about any boards or committees related to --

22  specifically to forensic psychiatry? Do you serve on any

23  of those types of organizations?

24  A        Yeah, sure. I mean, I'm the past president of

25  the American Society of Adolescent Psychiatry and went

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 17 of 234

1   through the ranks of being a member at large and then

2   was secretary for a couple of years and then

3   vice-president and then became the president several

4   years ago and now am past president.

5           In addition to that, I'm a member of a number of

6   organizations across the US, and one of them would be,

7   for example, the American Psychiatric Association. I'm

8   an active member of the American Academy or

9   Psychiatry -- there I served as a chair for several

10  years on the sex offender committee, as of, I think,

11  just a couple years ago and then was the chair of the

12  child psychiatry and the law committee -- also through

13  the American Academy of Psychiatry and the Law and have

14  served on a number of other committees through that same

15  organization over the years and am a member of the

16  American Society of Forensic -- let me see -- Academy of

17  Forensic Science. I'm a member of that program and

18  chaired -- was a program chair of that organization at

19  one time.

20          And I'm a member of the American Academy --

21  actually, it's the American -- I don't even know what

22  that stands for. American Association for the Treatment

23  of Sexual Abusers, I'm an active member of that

24  organization and have been a member of other

25  organizations nationally, but what I just remembered,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 18 of 234

1  also, I'm chairing the sexual interest group through the
2  Massachusetts Psychiatric Society, have been a chair of
3  this interest group for I now believe almost -- if I'm
4  not mistaken, eight or nine years and have been involved
5  in MPS organizations, Massachusetts Psychiatric Society
6  also for several years.
7  Q      Now, you indicated that you do forensic
8  evaluations as part of what you currently do.
9  A      Yes, sir.
10 Q      Do you also do non-forensic type evaluations?
11 A      Yeah, sure.
12 Q      Explain that to The Court, if you would.
13 A      I mean, I do -- I have quite a busy forensic
14 practice and see many cases over the course of months,
15 for example, but then in addition to that, I have a
16 pretty active clinical practice where I see, per the
17 request of State organizations, regionally or out of
18 State patients or individuals presenting with
19 problematic sexual behaviors, including people with --
20 say with necrophilia, pedophilia, sexual sadism, people
21 who have identified conditions or where the providers
22 wonder if the person suffers from a condition or if a
23 diagnosis is accurate. So somebody may be given a
24 diagnosis, say, of pedophilia for some behavior they may
25 have engaged in when they were, say, young adults, and

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 19 of 234

1  that patient may be then referred to my clinic for me to

2  render an opinion as to the accuracy of that diagnosis.

3       And along those same lines, courts have approved

4  funds many times for me to do what we call a

5  Massachusetts independent medical examination which

6  amounts to a second opinion where I essentially am asked

7  to render opinions with regard to diagnoses, treatment

8  plans, risk management plans of people who are involved

9  in various settings in the hospitals or various court

10  settings.

11  Q    Let's turn now to the area of forensic

12  evaluation. You indicated that you are actively involved

13  in doing forensic evaluations. What sort of forensic

14  evaluations do you do?

15  A    I mean, I do -- I have been asked to do many

16  cases pertaining to some sort of sexual violence. I

17  mean, so in that context, I may end up doing evaluations

18  where I'm asked to -- somebody, if they pose a danger to

19  the community per the request, say, of an attorney. I am

20  involved in -- have done a few SOR cases, meaning cases

21  for the Sexual Offender Registry board. I've done cases

22  for what we call in Massachusetts aid in sentencing

23  assessments, have done competency to stand trial

24  assessments, criminal responsibility assessments or the

25  not guilty by reason of insanity assessment, and I have

Huseby, Inc.    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 85  Filed 11/18/11  Page 20 of 234

1  been involved in a few custody related matters --

2  assistance type of assessments I have done and then have

3  done a number of SDP or sexually dangerous person

4  assessments or in the State of Massachusetts and outside

5  of Massachusetts where they call it sometimes sexual

6  violent predator type of assessments.

7  Q      Specifically just related to your forensic

8  evaluations, do you have an idea of how many of those

9  you've done over the years?

10  A      Forensic? Well, if I -- probably, again, I go

11  with somewhat of a guess, but probably 500, 600 forensic

12  assessments, if I'm not mistaken.

13  Q      And you indicated that you have done it for

14  various organizations. How many of those evaluations

15  have you been retained by the prosecution or the

16  petitioner to complete the evaluation?

17  A      I mean, I --

18  Q      And you -- percentages, not as a number. I

19  know --

20  A      Maybe it's easier for me -- the number because

21  I have a lot for my cases in terms of the SDP cases.

22  I -- as of probably last week, I was at, I believe, 380

23  cases for the prosecution and I -- take a guess.

24  Sometimes I may be asked to assess somebody and I get

25  back to the attorney, the defense attorney and say look,

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 21 of 234

1    I can't assist you on this matter. So I've been retained

2    maybe on 17 cases for the defense and then ended up

3    testifying maybe on 20 occasions and may have written

4    reports on 40 occasions. So probably a total SVP/SDP

5    related cases, I guess about 430, 440.

6    Q       And it appears from your testimony that

7    significantly more of those were for the prosecution or

8    the petitioner than for the respondent or the defense.

9    A       In terms of SDP cases, yes. I mean, for the

10   prosecution, I'm asked -- I mean, various offices

11   have asked me to do the assessment, but what I have been

12   asked to do is to be almost like the gatekeeper to

13   review records, for example, for the prosecution and

14   based on the review of the records determine whether or

15   not -- you go into a more in-depth assessment of the

16   respondent.

17   Q       And you indicated you prepare reports, that you

18   have testified in court?

19   A       Yeah.

20   Q       You've been accepted as an expert in forensic

21   evaluation previously in court testimony, correct?

22   A       Yes.

23           MR. BELL: Your Honor, at this time, we would

24   tender to The Court Doctor Saleh as an expert in the

25   field of forensic psychiatry.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 22 of 234

1          MR. GRAY: No objection, Your Honor.

2          THE COURT: Doctor Saleh is so recognized.

3          MR. BELL: Thank you, Your Honor.

4      BY MR. BELL:

5   Q      Now, Doctor Saleh, in this particular case

6   involving Mr. King, you were contacted and asked to

7   conduct an evaluation by Mr. King, isn't that correct?

8   A      Actually, I was asked by you to, yes.

9   Q      And -- on behalf of Mr. King?

10  A      Yes.

11  Q      And in evaluating Mr. King, what exactly were

12  you asked to do or what exactly did you do?

13  A      Well, I was asked to answer a very specific

14  question, the question of the sexual -- to determine

15  whether or not he met the definition of a sexually

16  dangerous person as defined by statute.

17  Q      And in the process of conducting your

18  evaluation, what did you do exactly?

19  A      Well, I first of all tried -- not tried, because

20  I was familiar with the statute, but I relooked at the

21  statute and refamiliarized myself with the statute, but

22  in the process of it, I reviewed thousands of pages of

23  records over the course of the month, and this is --

24  actually recently listened to audiotape of a telephone

25  conversation Mr. King had with his ex-wife and then also

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 23 of 234

1   came out to North Carolina and interviewed Mr. King at

2   Butner.

3   Q        Okay. And do you remember when the interview at

4   Butner took place?

5   A        If I could make reference to my report -- let's

6   see. I came out -- it was in March of 2011. So I came

7   out in March and met for about four and a half hours.

8   Q        That was at the facility in Butner?

9   A        That's correct.

10  Q        Now, at the end of the evaluation, did you

11  complete a report of some kind?

12  A        Yes.

13  Q        And did you provide that report to me?

14  A        Yes, sir.

15  Q        Would it assist you in your testimony today to

16  be able to refer to that report as we go through your

17  testimony?

18  A        Yes. That would be of great help.

19  Q        I'm going to refer you to what's been marked in

20  the notebook -- I believe you have another copy -- as

21  Respondent's Exhibit One. If you would, identify that

22  for The Court.

23  A        Yes. This is the report I wrote with regard to

24  the questions you asked me to --

25  Q        Now, with regard to your understanding of what

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 24 of 234

1  you were asked to do, explain to The Court, if you

2  would, what your understanding of the definitions

3  needed -- and the inquiry necessary to determine whether

4  someone is a sexually dangerous person.

5  A      Yes. Essentially what one has to do is -- at

6  least that's my understanding of the statute is that

7  there are three prongs. One is one has to determine

8  whether the person in question, the respondent, if he

9  has attempted or engaged in sexually violent conduct or

10 child molestation and then also if he's a sexually

11 dangerous person. And there's a definition of a sexually

12 dangerous person, and the way I understand the

13 definition to be, it essentially suggests that the

14 person in question who has engaged in sexually violent

15 conduct or child molestation, that they suffer from a

16 serious mental illness, abnormality or disorder.

17        Then the third prong is one has to establish the

18 nexus between the disorder or the serious illness they

19 present with, if one were to determine that they present

20 with that illness, and if they were to have serious

21 difficulty refraining from sexually violent conduct or

22 child molestation if released.

23        So it's a three prong approach, and that's what

24 I did in this case. I looked at the statute, trying to

25 understand the statute as best as I can, reviewed the

Huseby, Inc.                           www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 25 of 234

1    records and then tried then to apply the data I give it

2    to the language of the statute where appropriate.

3    Q        And after completing your evaluation of Mr. King

4    and understanding the law as you just described it to

5    The Court, did you reach an opinion to a reasonable

6    degree of medical certainty whether Mr. King was a

7    sexually dangerous person under the act?

8    A        Yes, I did.

9    Q        What was that opinion?

10   A        It is my opinion to a reasonable degree of

11   medical certainty that Mr. King is not a sexually

12   dangerous person as defined by the statute.

13   Q        Now, the Government has presented two experts in

14   this case, a Doctor Zinik and a Doctor Graney, both of

15   whom have opined that Mr. King suffered from a condition

16   known as paraphilia not otherwise specified, nonconsent.

17   Did you diagnose Mr. King with any sort of paraphilia?

18   A        No, I did not.

19   Q        Would you explain to The Court what a paraphilia

20   is as you understand it and then your determination that

21   he did not suffer from such a condition?

22   A        Yes. Well, let's see. Where do you start out

23   with? For somebody to suffer from paraphilia and --

24   start out with a more general description and then go to

25   the very specifics -- one has to look at the person's

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 26 of 234

1  case history and their psychosexual development, and

2  as -- I mean, it's described in the DSM-IV-T-R on page

3  522. It talks about a person, that he or she needs to

4  present with recurrent and intense deviant sexual

5  thoughts, fantasies or behaviors, and then it describes,

6  for example, involving a nonconsenting person, a child

7  and so forth, but the key is that the person has to

8  present with these recurrent and intense sexually

9  arousing thoughts, fantasies or behaviors and that it

10  has to cause some sort of impairment for the person to

11  meet the threshold criteria definition of a paraphilic

12  disorder. In the absence of that, one can't diagnose

13  somebody with a paraphilic disorder. So that's -- wanted

14  the overall understanding of what a paraphilic disorder

15  is.

16          Now, for -- and then you have various sub -- I

17  mean, very specific paraphilic disorders as listed in

18  the DSM. You have, for example, paraphilia. There are

19  subtypes of paraphilia. You have sexual masochism. You

20  have exhibitionism, which is important to discuss in

21  this case. You may have the -- fetishism -- so there are

22  various other types of paraphilic disorders that are

23  described, defined and researched, and all of these

24  conditions are based on research, scientific data that

25  allows the -- me to ultimately say yes, there is such a

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 27 of 234

1  condition such as a pedophilia. As we say, there's a

2  condition -- for schizophrenia -- we have enough

3  evidence to support this diagnosis of, say, pedophilia

4  or sexual masochism.  So that's the overall requirement.

5        Now, the issue with Mr. King and the diagnosis

6  he was given I think just by these two doctors, Doctor

7  Zinik --

8  Q      Well, Doctor Bazerman also diagnosed him with

9  that.

10 A      -- is that they used the labeling. That's not a

11 diagnosis that is -- paraphilia NOS, nonconsent. And the

12 key here is that it's nothing more than a label, because

13 there is no such a diagnosis of paraphilia NOS,

14 nonconsent.  It's fictitious and ultimately made up,

15 refuted by the field and not just by a handful of

16 doctors who say well, we disagree with you in terms of

17 the diagnosis, but the American Psychiatric Association,

18 the American Academy of Psychiatry and the Law, even the

19 criminal justice system refuted that diagnosis, not just

20 in one meeting or two meetings but over decades.

21       And that's something that psychologists, a few

22 handful of people try to introduce as a valid diagnosis,

23 yet over now -- I think it would be almost three decades

24 of ongoing debate, discussion and research that --

25 conclusion remain that there is no such diagnosis of

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 28 of 234

1  paraphilia NOS, nonconsent, and it carried different

2  terms in the past.

3        I mean, paraphilic coercive disorder was one way

4  people tried to describe it and introduce it as a valid

5  diagnosis, so the problem with that is is that there is

6  no empirical evidence behind it. There's no way that one

7  could today describe this condition and compare it to

8  some valid condition.

9        And the example I used recently is in medicine

10 if I have a diagnosis like hypertension, for example,

11 it's a valid diagnosis. I have criteria I have to meet

12 to diagnose a person or a patient with hypertension, and

13 then the importance of the diagnosis is it's not just

14 that I say you have hypertension and now go home and

15 live with your hypertension. There's an intervention

16 that follows the hypertension many times, which may be

17 introduction of medications, change of diet, exercise,

18 and to ultimately accomplish a goal to treat and manage

19 this condition you present with and lower your blood

20 pressure. And with the paraphilic disorders, that's the

21 same thing.

22        I mean, in my own clinic, I diagnose patients

23 with paraphilic disorders, and not just because I like

24 doing it or I have a good time and I want to throw out

25 labels at people. There's a purpose behind it, because

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 29 of 234

1  the diagnosis and the differential diagnosis is followed

2  by intervention and treatment, and that's why you have

3  to go through a very careful analysis before you draw a

4  conclusion that somebody suffers from a diagnosis such

5  as a paraphilic disorder. And then that diagnosis is

6  going to inform me, the treater, as to what intervention

7  is needed, and so there is a purpose behind the

8  diagnosis and a purpose behind the diagnosis in

9  psychiatry and in medicine.

10             Now, if I could take this example of the

11  hypertension and use this just really to juxtapose this

12  to this paraphilia NOS, nonconsent issue -- is

13  hypothetically let's say if I were to say today that I'm

14  going to diagnose somebody with hypertension using a

15  certain blood pressure cuff that has not been normed for

16  the individual I have in front of me but it's just a

17  blood pressure cuff and gives me a reading and I get a

18  score and based on that score I'm going to say we have

19  now -- and I arbitrarily then say then if you hit the

20  number 160, you have hypertension and that now means

21  that I'm going to treat you, if I were to do it as a

22  physician and were to use that practice, I would be, I

23  guess, in deep trouble if my patients were to get into

24  harm's way and they were to have some medical problem

25  because of the intervention I introduced that has no

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208           (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 30 of 234

1   basis, no foundation whatsoever.

2          The same is true with the paraphilia NOS,

3   nonconsent diagnosis. There's no foundation behind it

4   whatsoever. There's no research that guides me as to how

5   to derive that conclusion and it's a made up diagnosis

6   by a handful of psychologists, actually by -- Darwin was

7   the first one who introduced this label for the purpose

8   of commitment purposes, and then a couple of other

9   psychologists followed suit and said well, yes, that's a

10  good diagnosis and use different type -- of definitions

11  to diagnose somebody with paraphilia NOS, nonconsent,

12  for example.

13         If you said -- if you -- over six months if you

14  end up raping somebody, say, twice, you may qualify for

15  the diagnosis. So people started making up -- diagnosis

16  for no good reason, and the problem with that is not

17  only did I then have a label or use a label that is

18  inappropriate to be used in a given setting, but then

19  also the other problem is it's -- as far as I can say,

20  it's the ethics behind it. In my judgment, it would be

21  unethical to really diagnose somebody with something

22  that doesn't exist and then use an intervention,

23  whatever that may be, if I don't have a basis -- a

24  condition like the paraphilia NOS, nonconsent -- has

25  been refuted -- for me to take this step and say I

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 31 of 234

1   disregard it, I disregard these signs and I'm just going

2   to use the diagnosis because I feel like it, I don't

3   think it's -- at least it's not the way I would practice

4   medicine or psychiatry, and I don't think it's

5   appropriate to do so in any setting, clinical or

6   forensic.

7   Q        Now, you indicated that you didn't find that Mr.

8   King suffered from any sort of paraphilia, whether it be

9   paraphilia NOS, nonconsent label or a paraphilia of any

10  type. If you would, explain to The Court how you arrived

11  at that determination.

12  A        Yes. It goes back to really understanding how to

13  diagnose, and one -- ideas I have always been interested

14  in actually since I went to medical school was proper

15  diagnosis and proper assessment, because if I properly

16  diagnose and understand the case, I can ultimately help

17  the individual who is in front of me. I'm not talking

18  about forensically, but in the clinical setting -- to

19  help provide them with a better quality of life.

20          So in order to diagnose, you have to look at

21  data, and the data -- ideally you would want them to

22  be -- in psychiatry behavioral data, observations,

23  descriptions of the behaviors that one can, I mean, read

24  and say this is the way the person presented, these are

25  the behaviors he engaged in and, therefore, I can

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 32 of 234

1  extrapolate by looking at the behavioral data and may

2  draw some conclusions with regard to their mental state,

3  their thoughts and fantasies they may have.

4           And with regard to, for example, paraphilia, it

5  talks about the person presenting with these recurrent,

6  intense deviant sexual thoughts, fantasies or behaviors

7  involving sexual activity with a prepubescent child, so

8  if I can establish that the person did indeed engage in

9  sexual behaviors with a prepubescent child, even without

10  knowing what they thought, felt, without knowing about

11  their fantasies, I may be in a position to draw the

12  conclusion that they do, indeed, suffer from pedophilia.

13          So the diagnosis, you look at behaviors, you

14  look at thoughts and fantasies the person presents with,

15  and then in certain cases, at least certain of my cases,

16  even medical data may help me to draw conclusions with

17  regard to diagnoses. And, again, sometimes the person

18  may engage in a sexual offending behavior -- going to

19  use pedophilia as an example, not because they suffer

20  from this condition, pedophilia, because they have a

21  tumor in their brain that ultimately caused them to

22  engage in their behavior.

23          And we had cases where a patient may have had a

24  growth in the brain, started to engage in problematic

25  sexual behavior involving a child, and rather than

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 33 of 234

1  diagnosing that person with pedophilia, we did a study

2  of the brain and saw that they have a growth in their

3  brain and sent them to see a neurosurgeon. So you can

4  draw conclusions with regard to diagnosis also by

5  looking, for example, at a brain pathology.

6          Now, with regard to Mr. King, the reason why I

7  didn't diagnose him with any paraphilic disorder is my

8  assessment is not just based on speculation or made up

9  diagnosis or thoughts I may have, gut feelings, but if I

10 am data driven -- and I am data driven when it comes to

11 diagnosis. I have to look through these records, and we

12 talk about 2,000 plus pages of documents and what I

13 heard from Mr. King and spoke -- where are the data,

14 concrete data? I'm not big with the -- allowing me to

15 draw the conclusion that this man suffers from

16 paraphilic disorder, however you are to define it.

17         Now, what you have is -- in terms of data is --

18 we have one sexual offense he engaged in, and there is

19 no discussion, no ambiguity about that when he was a

20 juvenile. I believe at age 15 when he exposed himself to

21 two children and they -- and my -- and no ambiguity --

22 it's very clear it's described as a sexual offense, but

23 -- that he was found -- of a sexual offense, so that's

24 one.

25         Then you have a subsequent offense which was, I

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 34 of 234

1    think, 15 months later when he got involved or committed
2    a crime where he ended up fondling his victim's breast,
3    and it's somewhat unclear what he did in terms of
4    exposing behaviors. Some records say that he exposed his
5    penis to this victim, and Mr. King's account is actually
6    somewhat all over, but he at one point said he didn't
7    expose his penis, didn't ask this victim to touch his
8    penis, but there is no ambiguity with regard to the --
9    of the fondling of the breast of the victim at that
10   time. So you have those two sets of data where I would
11   say yes, there was some sexual offense, some sexually
12   motivated behavior.
13        Now, subsequent to that -- and we talked now
14   about a total of -- let me just quickly look at this.
15   This would be at 33 years, I mean, or 34 years past, and
16   for me to say that this man suffers from a diagnosis
17   such as a paraphilic disorder, I would have to say well,
18   where are the data for me to draw that conclusion. So I
19   look at 34 years worth of records, and there are plenty
20   of records on Mr. King, I have to say, and there's
21   nothing in the records that would support a diagnosis of
22   a paraphilic disorder at this time.
23        Now, this being said -- and that's why I think
24   the approach, as far as I can say, the way one has to
25   look at it, if I look at data, the question is how do I

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 35 of 234

1  define data and how do I understand data, the term data.

2  As I said, it's observational, reports, official reports

3  from authorities, say, police reports. That would be

4  data points. And then you have, for example, in his

5  case -- that's relevant is urine toxicology screens

6  where you would see -- say use alcohol or drugs at

7  various times, so that's a data point one has.

8          And then you have thoughts and fantasies --

9  again, thoughts and fantasies of the patient in front of

10  me. I'm not saying that Mr. King is my patient, but in

11  general, a patient can be relevant and quite

12  enlightening because it may tell you what the patient

13  feels, thought. It may help you understand the

14  motivation behind a given behavior, and that's where you

15  engage in treatment, because that's when they start

16  talking about whatever is going on and they may help you

17  draw conclusions with regard to a diagnosis.

18          The problem with Mr. King -- and I have to say

19  was a difficult read. I mean, I had a difficult time to

20  digest this set of records here -- is because he has

21  been all over, across the board with regard to what he

22  may have experienced, may have thought at one point in

23  time.

24          And with all due respect to Mr. King, I mean, he

25  has been described as being a pathological liar -- but

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 36 of 234

1 even if you disregard Doctor Zinik's report and

2 description of Mr. King being a pathological liar, he

3 has -- records dating back to the '70s, has been

4 described as being a chronic liar, and I typically don't

5 use the term chronic liar because it's pejorative, but

6 in this case, it's tells you the story, tells you what

7 to make out of what he said or didn't say to people over

8 the course of 30 years. I can't rely on what he says. He

9 may say something to me today I can't rely on, because I

10 know that he has lied about the same topic maybe two

11 weeks prior to my interview, and I can assume that he

12 will lie about this three weeks down the road if he is

13 interviewed by somebody else.

14          And if you look at the records and look at what

15 he said and who he said caused the offending behaviors,

16 I think it's really interesting here, because he has not

17 just blamed drugs and alcohol for his offending

18 behavior. At one point, he said well, it's drugs and

19 alcohol. Then he said it's not drugs and alcohol, that

20 he was free of drugs and alcohol, and he said he

21 committed the offenses because he had blackouts. Then he

22 said -- he didn't just say I had blackouts, but he also

23 then said that an alter committed the offense while he

24 had blackouts, so he's now avoiding responsibility, not

25 just because he's claiming blackouts, but he's also

1  blaming the alter for his offenses.

2          Then at various other times, he was saying that

3  he did commit the offenses and that it was sexually

4  motivated without any evidence in front of me that would

5  support that testimony. I mean, if I had that type of

6  reporting, how can I rely on it and draw any conclusions

7  with regard to a diagnosis -- I can't. It would be -- in

8  my judgment, I would have to be shortsighted. I would

9  have to be bias toward a given opinion to draw a

10  conclusion with regard to -- diagnosis if I were to just

11  rely on one set of data and disregard other data,

12  meaning that if I select certain information out and say

13  well, because I have -- opinion and objective to make

14  the case, a given case, I'm just going to talk about

15  this set of data, disregard others. Some people do it.

16  I don't do it because I don't think that's scientific.

17  I don't think it's appropriate, and I think it's really

18  misleading if I were to do it, and because of that --

19  plus I don't have unambiguous data in support of a

20  diagnosis. I said that nothing here in these records

21  today would support the paraphilia diagnosis.

22          I know that during the deposition, the question

23  I was asked was about what about the self-report that he

24  was this hibernating bear who's going to come out and go

25  and eat and kill and do all those type of things or his

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 38 of 234

1   report that all the behaviors are sexually motivated.

2   Again, that's looking at it from one viewpoint, because

3   I have then to juxtapose that same report to other

4   things he said.

5          And one thing he also said that I can't

6   disregard, because my objective is to be -- objective as

7   possible, is his denial. I mean, several months later,

8   he said look, whatever I said to people was false, I

9   recant everything. How can I now say I'm going to

10  disregard that report he's given to me that what he said

11  was false and just give credence to what he said

12  previously, that he is, indeed, going to go and kill and

13  do those kind of things? You can't. I mean, that's just

14  selecting things out and not being, I mean, I think

15  objective with regard to the facts in front of us --

16  Q      Was it important in your assessment of Mr. King

17  to look at his behaviors after he was incarcerated as

18  far as whether he had had any sexual type offenses or

19  infractions while he was in the Bureau of Prisons?

20  A       Absolutely. I mean, that's what you look at.

21  I mean, if I hypothetically -- I certainly looked at

22  this case from that viewpoint of -- Doctor Zinik's

23  viewpoint. I don't know Doctor Zinik and -- but I said

24  well, let me see if I can arrive at the same conclusion

25  as he did, and now if -- to do that, what I have to do

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 39 of 234

1  is, again, I go back in time and say well, what is it --

2  talk about here and what did he say early on.

3       Mr. King, early on, he said he had a difficult

4  time or inability to control his impulses and he was

5  diagnosed at one point in time with exhibitionism, which

6  is -- on its own, but let me just hypothetically say

7  is -- that if I were to say that this man has, indeed,

8  exhibitionism, which is a sexual disorder characterized

9  by this recurrent and intense sexual thought of wanting

10 to expose yourself to an unsuspecting person, even if I

11 don't want to, I feel compelled to do it, why don't I

12 see any evidence in 30 years of incarceration of

13 exhibitionistic behavior?

14      I mean, it's not something that I can just turn

15 on and off and say well, I'm going to just engage in

16 this behavior when I'm in the community, but I'm not

17 going to engage in these behaviors while I'm

18 incarcerated, because, again, sexual disorders don't

19 work like this. You have it or you don't have it or you

20 suffer from it or you don't suffer from it.

21      If I now look at Mr. King's case, and

22 hypothetically that's what I did -- retrospective, I

23 looked at the case and said let me think about this

24 exhibitionism diagnosis. If he had that condition, the

25 argument for it would be that he did expose himself when

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 40 of 234

1  he was a juvenile. Again, if I even say I gave credence

2  to what he said back then when he was a juvenile, that

3  he did it on several occasions or several years, you

4  could say that's somebody who's developing a sexual

5  disorder called exhibitionism and he -- so

6  hypothetically he had this condition.

7          Now, the argument against exhibitionism in the

8  correctional setting is one could say well, he doesn't

9  have victims. In Mr. King's case though, I couldn't make

10  that argument, because he has said and has described

11  himself as being homosexual or bisexual. I mean, that

12  also has varied over the course of years, but he has

13  reported and has had homosexual relationships,

14  homosexual partners over the course of the years, so you

15  could potentially say there are numerous victims out

16  there in the DOC, not just other inmates, but also

17  staff. I mean, there are female staff, male staff, and

18  if he truly had this condition, exhibitionism, you would

19  see something of it somewhere over 30 years.

20          And, again, knowing what I know about sexual

21  disorders, and I have patients with true exhibitionism,

22  it's not like they say well, I -- control it for 30

23  years. I mean, if you didn't engage in this behavior for

24  30 years, you don't have it, because there is no way

25  that you could control it in that setting knowing what I

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 41 of 234

1   know about Mr. King, if he truly had that condition.

2          So the conclusion is he has had potential

3   victims in the DOC, male, female. He has a sexual drive.

4   It's not that you say that this man has no sexual drive

5   or that he's asexual and chemically castrated. I mean,

6   he has according -- I think Doctor Zinik said in his

7   report a healthy sexual drive.

8          So we have a man with a healthy sexual drive in

9   this setting where he is actually engaged in sexual

10  relationships with other inmates, where he is procuring

11  himself drugs right and left, yet he's not engaging in

12  any type of sexual behaviors. That in my mind -- given

13  what I know about this disorder in Mr. King's case,

14  that's, for me, the conclusion that he can't have this

15  condition, because, again, this is not a condition he

16  can turn on and off at free will. That's for the

17  exhibitionism.

18          In terms of the paraphilic disorder, again,

19  hypothetically, let me just make -- again, look at this

20  case from Doctor Zinik's viewpoint and say well, -- and

21  I have to say that I really don't think there's any

22  evidence in support of this fictitious diagnosis, and

23  it's nothing more than a fictitious diagnosis, this

24  paraphilia NOS, nonconsent condition, but hypothetically

25  let's say Doctor Zinik is right and all the DSM,

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 42 of 234

1  thousands of other doctors and scientists are

2  incorrect -- so Doctor Zinik is the one who prevails and

3  other people don't, I need to have the data in terms of

4  making this diagnosis.

5          Now, if -- again, hypothetically, if there were

6  such a diagnosis of paraphilia NOS, nonconsent, what I

7  have to establish as the clinician the, forensic

8  psychiatrist that he -- this man, Mr. King, is sexually

9  aroused to the nonconsenting aspect of the encounter,

10 not just having rape thoughts or rape fantasies. The key

11 is -- needs to be the nonconsenting aspect of the

12 encounter between the victim and the perpetrator.

13         Again, looking through all these records, where

14 is the data that would support that? I mean, I can't

15 just say well, I believe he has that, because,

16 otherwise, I can start out saying I believe many other

17 people have many various conditions. It's not the way

18 medicine works. It's not the way science works.

19         There's no data, no record entry in the records

20 here that would unambiguously state and support the

21 notion that he has this arousal on a recurrent basis

22 resulting in some sort of arousal -- measured, say, by

23 sexual -- to the sense -- to the nonconsenting aspect of

24 the encounter.

25         Now, I believe Doctor Zinik and the other two

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 43 of 234

1    State examiners said well, we rely on his self-reports

2    and this is what he told us on a given day when he was

3    examined by us, and that's fine. I mean, they're

4    certainly entitled to take that approach, but in my

5    opinion, with all due respect to these good doctors,

6    that's shortsighted. I mean, I can't just look at one

7    set of reporting and say because this chronic liar said

8    this to me on this given day, now I'm going to run with

9    this and make this a diagnosis because he said it.

10         What would I say if he were to tell me today

11   that he's a Martian? Would I say well, you're a Martian,

12   now I have to provide you with a treatment because

13   you're a Martian, or if you report that you hear voices,

14   I'm going to throw antipsychotics at you? That's not the

15   way we would practice medicine or diagnose and prescribe

16   medications.

17         You have to look at the totality of the data in

18   the database, and the database are the thousands of

19   records we have and the descriptions he has received. I

20   mean, he had underwent -- psychological assessment and

21   did the MMPI, which is a way to assess personality

22   disorders, and he was said -- as being a bad faker of

23   psychopathology. He was described by people who had

24   nothing to do with the current court proceedings -- who

25   described him as being a manipulative liar. How can I

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 44 of 234

1   rely on this man's report if that's who he is, who he is

2   presently and how he was described for 30 plus years?  I

3   mean, it would be, again, impossible. So I have -- in my

4   judgment to dismiss the self-reporting that -- I have to

5   look at some other evidence.

6          So you have then the 1993 incident report where

7   he, again, asked the therapist or some staff to touch

8   his penis, but asking somebody to touch his penis is not

9   the same as to say that I have these recurrent intense

10  deviant sexual thoughts of having thoughts of

11  nonconsenting activities. I mean, he asked, and you

12  would say it's even appropriate. He asked. He was --

13  said no, that this person is not going to have sex with

14  him or touch his penis, and that was the end of the

15  story. That's not basis or evidence for a sexual

16  disorder whatsoever.

17          THE COURT: Well, Doctor, if that occurred --

18  if that type of incident, the 1993 incident requesting

19  staff to touch his penis, if that occurred with more

20  frequency, would that then be evidence that he was

21  having these urges or fantasies?

22          THE WITNESS: What this would tell me is that

23  he has a sexual desire, but that wouldn't tell me that

24  it's a paraphilic desire, because I have also to

25  consider that he is institutionalized. I mean, he has

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 45 of 234

1    been in institutions for most of his adult life, as far

2    as I can say, so that would be -- at that juncture, with

3    just that description, I would say that's

4    institutionalized behavior.

5            For me to draw the conclusion and establish

6    the nexus that this behavior is tantamount to a

7    paraphilic phenomena, I have to establish that that is,

8    again, recurrent, intense and it's paraphilic in nature.

9    Asking somebody, even staff, to -- even to have sex with

10   a person is not necessarily a sign of a paraphilic

11   disorder. It could be just a disregard he may have for

12   the role the staff person has and not understanding that

13   he is an inmate and the other person is staff and that

14   he has to respect that boundary.

15           THE COURT: I want to make sure I understand

16   your view on, as you put it, the fictitious nature of

17   paraphilic NOS, nonconsent diagnosis. Am I understanding

18   correctly that you're saying that there's no scientific

19   evidence showing that a person would actually be

20   sexually aroused by the nonconsent aspect of an

21   encounter of that nature?

22           THE WITNESS: Given what we have today at our

23   disposition, there's no empirical evidence for us,

24   meaning scientists and forensic psychiatrists working

25   with this population, to say that we have empirical

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                    www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 46 of 234

1  evidence to establish and introduce this diagnosis. So

2  the answer would be affirmative, there is no evidence to

3  support it.

4          THE COURT: So there's no evidence showing

5  that a person would actually be sexually aroused by the

6  nonconsent aspect of a sexual encounter of the type that

7  we have here?

8          THE WITNESS: There's no evidence that -- no

9  evidence that made it to a diagnosis. I mean, did people

10 at times report that they get sexually excited by the

11 nonconsenting aspect of a sexual encounter? They may

12 have, but that is not sufficient for the signs for

13 the -- to take the next step which is to say that that's

14 enough evidence, enough data for us to say that there is

15 such a condition like a paraphilia NOS, nonconsent

16 diagnosis.

17         THE COURT: Okay. Thank you. Mr. Bell?

18     BY MR. BELL:

19 Q     We were talking about -- I think the judge --

20 might have missed his question a little bit. I think the

21 question was if as opposed to there just being this one

22 incident in 1993 where he made this sexual proposal to a

23 staffer, if it had happened over and over and over

24 again, you know, ten times a year, 12 times a year where

25 you had documented evidence in the record of these --

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 85  Filed 11/18/11  Page 47 of 234

1   over and over doing this sort of thing, would that

2   potentially have had an impact on your decision or your

3   determination whether or not Mr. King had some sort of

4   paraphilia?

5   A       I mean, I certainly -- if he had, say, a

6   situation where, as you pointed out -- and I apologize.

7   I may have misunderstood you, but, say, he would have

8   numerous episodes of similar behaviors of soliciting

9   staff -- despite numerous requests not to do so so that

10  he would request over and over sexual touching type of

11  behaviors, there could be a paraphilic disorder.

12          There is one which has been described which is

13  called toucherism, actually, and it's slightly different

14  than frotteurism because frotteurism involves rubbing

15  and touching. Toucherism just involves the touch -- you

16  might think.

17          I had one patient who presented with toucherism,

18  and he would get excited by somebody touching him, and

19  it could be any body part that would then cause arousal

20  and excitement, and my fellows who would come to my

21  clinic, I would always tell them not to shake people's

22  hands even if they're asked to shake them because they

23  may have a condition called toucherism. And whenever

24  this patient was there, he would ask other fellows to

25  shake their hands, not because he was just a polite guy,

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 48 of 234

1  but he would get something out of it, which was sexual

2  arousal and excitement.

3          So the answer would be affirmative, if I have

4  somebody who is requesting to be touched numerous times,

5  that could be certainly -- that could be some evidence

6  in support of a paraphilic disorder such as toucherism.

7  Q       So your testimony would be that it's important

8  in the sense that it's absent in the records, and it --

9  would it be equally important if it were present in the

10  record?

11  A       I mean, there's nothing in the records other

12  than the 1993 incident as far as I can say where he

13  tried to solicit somebody or ask somebody to be touched,

14  but then even if he had these numerous episodes, one has

15  to go -- then go and take the one next step and

16  understand in what context that this behavior -- occur.

17  What is he trying to get out of it? It could be just for

18  attention because he wants to just annoy the other

19  person and he wants to -- or it can be also because he

20  gets sexual arousal out of it by being touched.

21  Q       Okay. Doctor Zinik in his testimony also

22  testified or diagnosed -- and we talked about the

23  exhibitionism diagnosis, but he also diagnosed Mr. King

24  with polysubstance dependence. That was not a diagnosis

25  that you made. Would you explain to The Court why you

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 49 of 234

1  did not make that diagnosis?

2  A        Well, again, I go by data. I mean, I did agree

3  and understand that Mr. King did engage in substance

4  abuse, and he certainly has a longstanding history of

5  substance abuse. Again, depends -- in terms of the

6  longstanding -- depends what records one -- but I -- at

7  least based on the records, he has engaged in substance

8  abuse. He has done drugs while incarcerated. His urine

9  toxicology screens tested positive at various times,

10  most recently I believe in 2009.

11         So one is he has abused drugs, but abusing drugs

12  doesn't mean that I'm dependent on it. That's, again,

13  where I think -- where I'm -- my approach is to be more

14  careful with a diagnosis before I say somebody is

15  dependent on a substance. I have to establish that, and

16  for me to establish that there is dependency, the DSM

17  requires that the person has to present signs and

18  symptoms of withdrawal or tolerance.

19         Again, looking at these records, where is the

20  evidence of tolerance and withdrawal? I mean, I haven't

21  seen anything in the records that would again

22  unambiguously state that he has experienced tolerance

23  and withdrawal to substances, so I -- again, I not --

24  this diagnosis, just saying well, that fits the bill

25  here and let me use polysubstance dependence.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 50 of 234

1        He has engaged in substance abuse, yes, but

2   there's no evidence to suggest that he became tolerant

3   to -- substance or that he withdrew from a substance.

4   And, again, in the absence of data, I'm not diagnosing

5   him with polysubstance dependence.

6   Q       Is it important to you that -- there was some

7   testimony from both of the experts, government experts

8   earlier in the week related to -- you know, there was

9   the one incident in 1993 with the female staffer, there

10  weren't any other incidents, and there was some

11  testimony related to the penal setting and that being --

12  having an impact on Mr. King's acting out or being

13  afraid about getting in trouble and that sort of thing.

14        Is it important to you in your assessment of Mr.

15  King that he did, in fact, get in trouble over and over

16  again for, as an example, testing positive for drugs and

17  that sort of thing, but, again, there was no

18  disciplinary infractions or anything for -- of a sexual

19  nature?  Was that important to you?

20  A       I mean, absolutely. I mean, the point is if --

21  and that's, again, the way I think one has to look at

22  this case is not just to pick certain pieces of

23  information, but look at the entire picture. And what I

24  always try to do is to really get an understanding of

25  the big picture rather than being lost in the detail and

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 51 of 234

www.huseby.com
(704) 333-9889

1    then drawing erroneous conclusions.

2         If I have somebody who says look, I care about

3    how I do -- I want to behave, I don't want to get in

4    trouble, and if that's their mindset and that's

5    absolutely something -- you would say that's great.

6    That's what hopefully a penal setting -- you would want

7    them to go through is we have -- understanding that

8    proper behaviors are -- expect of you, you have to

9    adhere to the rules and regulations.

10        So if that's the mindset that you -- report and

11   the objective and, therefore, I -- and, if, again, say

12   that that's true, that's the mindset and that's the

13   reason why he didn't engage in sexual behaviors or

14   acting out behaviors and -- sexual wise, how do I

15   explain then all the substance abuse and the drug

16   seeking behaviors and the positive urine toxicology

17   screen? Specifically if I don't have somebody who is

18   dependent on a drug, how can I explain? It just means

19   that he doesn't care, because if he truly would care

20   about the rules and regulations, he would make sure not

21   to do drugs, to sneak in drugs and use even heroin in a

22   penal setting.

23        That's, again, where you can't pick and choose,

24   so that's -- if I look at the totality of the behavior,

25   I see that there has been acting out behavior, even --

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 52 of 234

1    probation -- I mean, if I go to see a psychiatrist and I

2    make up the story of I have an alter who talks to me or

3    that's the alter talking to me and it's not me or I hear

4    a voice, yet the evidence later on showed us that he

5    never heard voices or experienced true hallucinations,

6    that's abusing the system. That's manipulating the

7    system to get some ulterior motive met, but that's not

8    good behavior, somebody who is trying to do his best and

9    be real obedient.

10   Q      Now, you did make a diagnosis in Mr. King's

11   case. Talk to The Court about what diagnosis you did

12   make.

13   A      I mean, the only diagnosis that I thought for

14   which I had evidence was the antisocial personality

15   disorder. I mean, there's plenty of evidence --

16   Q      Well, first explain to The Court what antisocial

17   personality disorder is.

18   A      So antisocial personality disorder is a

19   diagnosis that is listed as one of the personality

20   disorders in the DSM-IV-T-R, and what it requires is

21   enduring a pervasive pattern, and that's really

22   important with personality disorders -- enduring a

23   pervasive pattern of ultimate antisocial behaviors.

24          And in his case, Mr. King's case, the signs of

25   behaviors engaged in that would support that is as a

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 53 of 234

1   juvenile he would, in my judgment, satisfy the conduct

2   disorder diagnosis because that's Criteria C of the

3   diagnosis that you have to meet before you actually even

4   endeavor and give somebody the antisocial personality

5   disorder diagnosis -- you have to establish that they do

6   meet conduct disorder as a diagnosis prior to the age of

7   15, and he does, based on the records. That's one.

8          And then there are characteristics of antisocial

9   personality disorder. One in his case is

10  irresponsibility. Has he been a responsible citizen in

11  the community or out in the penal setting? In my

12  judgment, he has not been a responsible person because

13  he's manipulating everybody left and right and is

14  engaging in all these maladaptive behaviors in the penal

15  setting, so I couldn't say that he has been a

16  responsible person.

17         And along those same lines, he has been conning

18  people. He has been deceitful for years. I mean, all

19  those traits would support -- and because they are

20  persistent, pervasive, they have lasted for 30 plus

21  years now, that's why -- opined that he meets the

22  definition of antisocial -- of antisocial personality

23  disorder as defined by the DSM-IV-T-R.

24  Q      Now, there was some testimony earlier in the

25  week from the Government's experts related to -- well,

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 54 of 234

1   first, there was the diagnosis of the paraphilia NOS,

2   nonconsent, and then there was some risk assessment done

3   of Mr. King related to whether or not he would reoffend.

4   You did not do any sort of risk assessment in your

5   evaluation of Mr. King. Explain to The Court why you

6   didn't do that.

7   A        Well, because there -- it actually doesn't ask

8   for it. I mean, the statute is very -- I mean, the

9   statute is unambiguous. I mean, it says I have three

10  prongs I have to look at. One is the first -- what I

11  look at, did this person engage or attempt to engage in

12  sexually violent conduct or child molestation. That's

13  one.

14       Then I have to determine whether or not he is

15  suffering from a serious mental illness, disorder or

16  abnormality -- with the -- order but that he has this

17  serious mental illness or abnormality or disorder, and

18  in his case, he doesn't have that disorder, and there's

19  no room in the statute that says disregard what you just

20  said, that he doesn't have this disorder, still go ahead

21  and do the risk analysis, because I think it's very

22  clear because it says -- means the person is suffering

23  from this condition and as a result of which -- so

24  there's a nexus that needs to be established -- he's

25  going to have serious difficulty in refraining from. So

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 55 of 234

1  if I can't establish the nexus because I lack that

2  element, for me to go beyond it would be, I think, even

3  inappropriate because the statute is not asking for it,

4  and because of that, I didn't go and do a risk

5  assessment.

6  Q      Now, you do have cases where you do do risk

7  assessments, isn't that correct?

8  A      Absolutely, yes.

9  Q      Explain to The Court, if you would, when you do

10  a risk assessment in a particular evaluation what

11  process you go through.

12          MR. GRAY: Your Honor, at this time, we would

13  object to this answer. He's already testified that he

14  did not do a risk assessment. Therefore, the contents of

15  what he would do in a risk assessment seems to be

16  irrelevant at this point in time.

17          THE COURT: Well, I don't think it's

18  irrelevant, given the fact that the experts proffered by

19  the Government did do risk assessments, so I'm

20  interested in hearing the doctor's opinions in this

21  area. The objection is overruled.  Mr. Bell?

22  A      So the issue is that, first of all, I do risk

23  assessments where appropriate and where indicated, and

24  what I do is I do it as a forensic psychiatrist and as a

25  treating doctor. I'm data driven, and I'm not trying to

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 56 of 234

1  present data if it's to a fellow colleague or to the

2  trier of fact in a way to mislead the other party but to

3  inform them.

4        And even if I'm retained by defense counsel, the

5  objective at least I have in my mind is not to be an

6  advocate for the respondent but the advocate of the

7  opinion and be presenting it as objectively as I can.

8        So what I don't do is I'm not misleading, and

9  that's relevant in this case and in any other case,

10  because if you look at the risk assessment tools that

11  have been used -- and I'm certainly a supporter of the

12  idea that you want to improve the accuracy of our

13  predictions. You want to maximize it as much as we can,

14  because if you're content with second best, we may never

15  be able to accomplish the ultimate goal to ultimately

16  help the trier of fact to understand the person's risk

17  and also to help ultimately the respondent so that they

18  don't get in trouble.

19        With regard to the risk assessment tools that

20  are available, people rely on the actuarial risk

21  assessment tools, and one of them is -- that has been

22  widely published is the Static-99, and then there are

23  progenies from the Static-99 that developed like the

24  Static-99R or Revised, the Stable 2007, MNSOST and now

25  as of recent Thorton's New Structured Risk assessment I

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 57 of 234

1    think Guide or Tool, Forensic Version. I mean, that's --

2    I may be wrong with the acronyms there.  I think they're

3    interesting tools and important in terms of signs that

4    we want to try to capture data and draw conclusions.

5          The problem with them is -- and why I think it's

6    actually dangerous and -- is they call themselves -- as

7    being actuarial instruments, and that as far as I

8    understand the term suggests objectivity scoring,

9    analysis and it's not allowing room for any subjective

10   opinion, thoughts, impressions, and that was the

11   original approach.

12         And the idea with the Static-99 was it was

13   supposed to be a screening tool. It was supposed to be

14   used by anybody without even a -- I don't know if it's

15   college degree, but no postdoctoral fellow type of

16   degrees or master's degree or so forth, but, for

17   example, a probation officer could just use that

18   instrument and based on that say that person's risk is

19   such.

20         So entering the data, entering the numbers,

21   getting the total score and then based on the score

22   saying his risk to offend is low, moderate low,

23   moderate, moderate high or high, and the maximum would

24   be six and whatever would exceed that total store of

25   six, there are ten items on the Static-99 -- he would

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 58 of 234

1   still fall in the high risk category to recidivate

2   sexually over that -- initially it was over three time

3   periods, five years, ten years, 15 years. Very simple,

4   made sense, but then what happened -- and that's how

5   science works.

6          There was an evolution to it, more data, more

7   understanding, more learning and discussion about these

8   risk assessment tools, and what many people found out is

9   is that the norms that they would use to create these

10  samples and these scores were outdated. They were

11  outdated by decades. Therefore, they introduced

12  new norms in 2008 or so.

13         So there was a very brief period of time that

14  that were new norms introduced, and shortly thereafter,

15  people started to say well, look, what about the age

16  factor here? People -- getting older, their risk to

17  recidivate decreases, and that's something that is and

18  has been known, that sex offenders' risks --

19  specifically if they're rapists or extrafamilial child

20  molesters, that their risk to recidivate decreases over

21  time with them getting older.

22         Again, even if I take -- one step beyond the

23  recidivism studies and look at the physiology of sexual

24  drive and sexual functioning, it makes sense, because I

25  do know that male sex hormones, testosterone and

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 59 of 234

1    dihydrotestosterone declines with the aging process and

2    people don't have the same sexual drive as they used --

3    when they were adolescents, so there's even a

4    physiological correlate to this notion that age is going

5    to have an impact on a person's risk to recidivate.

6         So the Static-99R or Revised was introduced to

7    look at the age factor more critically, and so rather

8    than saying that if you are below 25, you're at greater

9    risk of -- compared when if you're above 25, it's broken

10   down in four age categories, as far as I remember, or

11   three age categories, so subtracting numbers if you get

12   older from the total score -- and that's still fine, but

13   then what happened is -- and that's where I think the

14   problem is.

15        The evaluator was then asked to look at cohort

16   data. When we look at the Static-99, MNSOST, Static-99R,

17   it's not that that's specifically designed for the

18   individual in question. It's a core of sex offenders and

19   the data -- scores the percentiles are based on that

20   score.

21        Now, I as the evaluator am now asked to look at

22   the data, look then at my client, the respondent, and I

23   have to make the determination whether or not the

24   respondent falls into -- there are four different

25   categories, subcategories that were then introduced, and

Huseby, Inc.                                  www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 60 of 234

1    I have to make the determination if he is a routine

2    sample type of -- or if he would be more fitting into

3    the core of people who are called -- to be routine sex

4    offenders, high risk offenders, treatment offenders and

5    so forth.

6            So what happens is that I'm as the evaluator

7    asked to make a subjective determination and determine

8    whether or not he falls into one core or the other, and

9    that's a problem. I mean, I can't -- it goes back to

10   what I said earlier about the diagnosis. I can't have it

11   both ways or I have to say that this is the best we

12   have, it's out of moderate predictive accuracy -- in

13   terms of risk recidivism, that's the best we have, and

14   there is subjectivity involved.

15           That would be a honest description of the risk

16   assessment tool, but if I call -- objective assessment

17   tool, it's actuarial, yet there is subjectivity

18   involved, and if I present -- to the trier of fact and

19   say look, this guy or this respondent scored this number

20   and I then use all these scientific terms and numbers,

21   what I do is I, in my opinion, may mislead the trier of

22   fact because I'm presenting to them something that gets

23   you the -- of science, yet there is no -- I mean, there

24   is no science behind it because there is subjectivity

25   involved. So that's why I stay away from them at this

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 61 of 234

1  point in time when I use actuarial risk assessment

2  tools -- and, again, I use them. I just look at the

3  items because the items are important. They have been

4  validated, but I don't correlate the number I get to a

5  risk category, and I'm not saying that his relative risk

6  is this over this time period or over the percentile

7  ranking. I don't go into the -- I don't think that one

8  has been fully flushed out. I think it's misleading and

9  it's a risk of presenting something to the court that

10  could be misinterpreted, and I think that's, again, in

11  my judgment, inappropriate and that's not the way we

12  would do medicine.

13         Again, the example I used earlier with the blood

14  pressure cuff, if I were to say that you have this core

15  of people who have high blood pressures and you have to

16  come up with something to treat this group of people

17  with high blood pressures and I say well, this is the

18  best we have, one blood pressure cuff for everybody, and

19  I use it on somebody who is morbidly obese, on somebody

20  who has, say, my height and muscle mass and a child

21  and -- I would get on all those three people the score,

22  because if I put it around my upper arm, I will get a

23  score and I will get a number, but will I go and act on

24  that number and score and say well, this person has

25  hypertension because of that score and I'm going to put

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 62 of 234

1    him on this -- medication and treat hypertension?

2    Absolutely not, because if I were to do it and I would

3    kill the patient, I would be in trouble, because, again,

4    that's not the way medicine would work, but that's the

5    way sexual risk predictions work at this point in time

6    and that's why I stay away from using the actuarial risk

7    assessment tools.

8           The instrument Thorton has used, same thing. I

9    mean, it's interesting to look at, but it has not been

10   peer reviewed. It has not been looked at carefully

11   enough. We don't know even if it's appropriate to be

12   used in a case like Mr. King's.

13          So as -- I certainly am not objecting to new

14   instruments, new tools, but going then into court and

15   rendering opinions to a reasonable degree of medical

16   certainty or professional certainty based on assessment

17   tools that have not been validated, I think it's

18   dangerous terrain, and in my judgment, given what is at

19   stake, I think it's really almost unethical to go that

20   route at this point in time because you can't mislead

21   people. You can't mislead the trier of fact with what we

22   have and all this --

23   Q      Doctor Saleh, I'm going to wrap up and ask you

24   the last questions I have. Do you have an opinion to a

25   reasonable degree of medical certainty whether Daniel

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 63 of 234

1    King had engaged in or attempted to engage in sexually

2    violent conduct or child molestation?

3    A        Yes, I do.

4    Q        What is that opinion?

5    A        Well, I'll tell you this. The opinion is that he

6    certainly has been and was convicted of sexual offense

7    as a juvenile, and you have this incident offense that

8    followed two years after, I believe in '78, where he

9    fondled, molested this victim's breast. For whatever

10   that is worth, I mean, I would say that that would

11   satisfy in my mind the first prong of the statute, yes.

12   Q        And do you have an opinion to a reasonable

13   degree of medical certainty as to whether Mr. King

14   suffers from a serious mental illness, abnormality or

15   disorder as a result of which he would have serious

16   difficulty in refraining from sexually violent conduct

17   or child molestation if released?

18   A        Yes, I do.

19   Q        And what is that opinion?

20   A        As I stated previously, the opinion is that

21   there's no evidence in front of me today to suggest that

22   he suffers from a statutorily defined serious mental

23   illness, disorder or abnormality, and that's -- there's

24   no evidence in support of it.

25   Q        And do you have an opinion to a reasonable

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 64 of 234

1  degree of medical certainty as to whether Mr. King is a

2  sexually dangerous person under 18 USC 4248?

3  A       Yes.

4  Q       What is that opinion?

5  A       Again, as state -- in the absence of data

6  allowing me to establish a second prong of the statute,

7  the opinion is that he is not a sexually dangerous

8  person as the statute defines a sexually dangerous

9  person at this point in time.

10             MR. BELL: Your Honor, that would be all of

11  our questions.

12             THE COURT: Very good. Thank you. Let's take

13  our morning break. We'll reconvene at 10:45.

14     (Whereupon off the record.)

15             THE COURT: The Government may cross -- oh.

16  Doctor, could you please resume the stand, sir? Counsel

17  for the Government, any cross-examination of Doctor

18  Saleh at this time?

19             MR. GRAY: Yes, Your Honor. Thank you.

20             EXAMINATION

21             BY MR. GRAY:

22  Q       Good morning, Doctor Saleh.

23  A       Hello.

24             MR. GRAY: Your Honor, with the permission of

25  The Court, if it's all right if I stand, I'm vertically

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 65 of 234

1    challenged and I'm having a little trouble seeing over

2    the monitor.

3                 THE COURT: That's fine.

4                 MR. GRAY: Thank you. I appreciate your

5    indulgence.

6                 BY MR. GRAY:

7    Q        Good morning, Doctor Saleh.

8    A        Good morning.

9    Q        Doctor Saleh, I'd like to start off by talking a

10   little bit about your background. You mentioned you had

11   testified as or acted as a gatekeeper for government

12   entities in the past with regard to evaluations of

13   sexually dangerous persons, isn't that right?

14   A        Gatekeeper, yes, that's the term I used.

15   I did screening assessments.

16   Q        And you testified earlier that you had testified

17   roughly 70 percent for the government and 30 percent for

18   the respondent. However, in your deposition, you

19   testified that you had testified 70 percent for the

20   respondent and about 30 percent for the government.

21   A        Actually, if I said it, it would be -- I

22   misspoke. I didn't testify -- the screening assessments

23   I have done didn't require testimony.

24   Q        And I think it was that -- how many evaluations

25   have you done on behalf of the respondent versus the

Husby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 66 of 234

1  government, and you said probably 60 to 70 percent, and

2  then, okay, with regard to the other 30 to 40 percent,

3  would you be working for -- on behalf of the government

4  or the community or the Commonwealth of Massachusetts,

5  and you replied that's right. Does that sound about

6  familiar? That's from page 19 of your deposition.

7  A       Could you just repeat it?  You're going too

8  fast.

9  Q       Sure.

10         THE COURT: And if it would assist -- Your

11  Honor, if I could, I could place that on the monitor to

12  assist the witness.

13  A       Can you just read it?  Whatever you like.

14  Q       Okay. Sure. How many of those 400 were on behalf

15  of the respondent versus the government? Your answer, I

16  have to say -- I have to take a guess here, but I would

17  say 60 -- probably 60 to 70 percent. Okay. And with --

18  the question was okay, and with regard to the other 30

19  to 40 percent, would you be working on behalf of the

20  Government For the Commonwealth of Massachusetts, and

21  your answer is that's right.

22  A       Let me then clarify. What I do is in

23  Massachusetts I'm asked by both the Commonwealth or

24  defense attorneys to look at the SVP cases. Now, for the

25  government, I have done, as far as I recall, about 380

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 67 of 234

1   screening cases, and I probably get one or two cases per

2   week referred to do a screening assessment. And then I

3   have been asked by various defense attorneys over the

4   course of the years to assess their client or review

5   records. This is not just in Massachusetts but outside

6   of Massachusetts. And, there again, I'm going by a

7   guess. I may have been asked 50 to 60 times to look at

8   somebody's case and then may have written a report 30

9   times or 20, 30 times.

10          And then typically when I write a report for the

11  defense, I end up testifying -- there may have been a

12  few occasions where I wrote the report and then the

13  respondent withdrew or -- I mean, I was then asked not

14  to testify -- one occasion I know that the respondent

15  didn't want to go forward.

16  Q      So, Doctor Saleh, would it be fair to say that

17  you work more for the respondent than you have for the

18  government?

19  A      I don't think so. I mean, if you look at the

20  numbers, if you have 380 cases for the Commonwealth and

21  I have, say, 60, 70 or take -- even make it 100 cases

22  for the respondent, I think the way I would look at the

23  numbers here is even if they're not 100 percent accurate

24  is that I would have done more work for the Commonwealth

25  and a quarter of that work I have -- the percentages

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 68 of 234

1    I've done for the defense, respondent.

2    Q       Okay. So I guess the testimony at the

3    deposition, you misspoke?

4    A       It's possible, absolutely, yeah.

5    Q       Now, Doctor Saleh, you are a psychiatrist?

6    A       I'm a psychiatrist, that's correct.

7    Q       And as a psychiatrist, you're a medical doctor?

8    A       Correct. That's correct, yes.

9    Q       And as a medical doctor, you can prescribe

10   medications, correct?

11   A       That's correct.

12   Q       And, in fact, you testified that you're Board

13   certified, correct?

14   A       That's correct.

15   Q       And you also testified earlier that you're a

16   member of the American Psychiatric Association, correct?

17   A       That's correct, yes.

18   Q       And you're a member in good standing with the

19   APA, correct?

20   A       Yes.

21   Q       And you continue to do continuing education,

22   correct?

23   A       Yes, true.

24   Q       In fact, you probably attended a few of the APA

25   conferences, correct?

**Huseby, Inc.**                          www.huseby.com
**1230 West Morehead Street, #408, Charlotte, NC 28208**      **(704) 333-9889**
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 69 of 234

1    A        No, that's not -- I mean, APA sponsored

2    conferences, yes.

3    Q        And you're familiar with what -- the policies

4    and bylaws of the APA, correct?

5    A        I'm not sure if I'm familiar with them. I never

6    read them, as far as I can say.

7    Q        But you're aware that the APA has certain

8    policies and -- that it represents on behalf of its

9    members, correct?

10   A        It probably does, yes.

11   Q        And you are aware that the APA had a taskforce

12   when it came to the evaluation of sexual offenders,

13   weren't you?

14   A        When? At what point in time?

15   Q        The APA had its taskforce which published its

16   findings in 2005.

17   A        Yes. I mean, I don't remember, but that's true.

18   I mean, probably that's true.

19   Q        And you're aware that the APA has made it a

20   policy that it has fought to repeal sexual dangerous

21   person statutes?

22   A        I think there was a -- as far as I recall, right,

23   that spoke to that issue.

24   Q        In fact, the APA has also said that its opinion

25   is that psychiatry must vigorously oppose these statutes

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 70 of 234

1   in order to preserve the moral authority of the

2   profession and to ensure continuing societal confidence

3   in the medical model of civil commitment. Are you aware

4   of that?

5   A       You're reading it, so I assume that's correct,

6   but I'm aware of the language similar to what you just

7   said, yes.

8   Q       And that the APA has also come to the opinion

9   that sexual predator commitment laws represent a serious

10  assault on the integrity of psychiatry, particularly

11  with regard to defining mental illness and clinical

12  conditions for compulsory treatment.

13  A       Well, it depends, because it goes back to what

14  I said earlier is that -- depends how you go about that

15  work. I mean, if you do it unethically and you don't

16  adhere to the requisite standards of medicine, you have

17  a problem, but if you adhere to -- and, again, the issue

18  is you adhere to the medical principles and then you

19  apply the information you gather through the adherence

20  of the medical principles to that statute, as long as

21  you -- ethically, I don't see that to be a problem.

22  Q       And the opinion of the American Psychiatric

23  Association is that it creates an ethical dilemma for

24  psychiatrists to opine as to the sexual dangerousness of

25  a person?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 71 of 234

1    A        Again, it depends how you do it. I testified

2    just two weeks ago, three weeks ago in Washington State

3    on a matter, and there I would agree. I mean what I saw,

4    I thought it was horrendous, inappropriate use and

5    inappropriate testimony, but there are psychiatrists,

6    psychologists who adhere to ethical standards and there

7    are psychiatrists and psychologists who don't.

8    Q        And, Doctor Saleh, you came to a diagnosis in

9    the case of Mr. King, isn't that correct?

10   A        A clinical diagnosis, that's correct.

11   Q        And that diagnosis was that you found him to

12   suffer from antisocial personality disorder, isn't that

13   correct?

14   A        That he presents with a history of antisocial

15   personality disorder.

16   Q        And as he presents with a history of antisocial

17   personality disorder, you made that as a diagnosis that

18   he currently has, isn't that correct?

19   A        That he meets diagnostic criteria as defined in

20   the DSM-IV-T-R for that condition, that's correct.

21   Q        And finding that he meets the diagnostic

22   criteria as found within the DSM-IV-T-R -- you used the

23   DSM-IV-T-R in order to help make your diagnosis, isn't

24   that right?

25   A        Well, it's not helped me make the diagnosis.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 72 of 234

1    There are the ICD, for example, and there are various

2    other -- I mean, the ICD and the DSM-IV-T-R, those are

3    the two references one uses to draw conclusions with

4    regard to one phenomenology and, secondly, with regard

5    to diagnostic -- or syndromes, people may present with

6    or not -- may not present with.

7    Q    So as a psychiatrist, you rely on the

8    DSM-IV-T-R?

9    A    I do rely on the DSM-IV-T-R.

10    Q    And other psychiatrists rely on the DSM-IV-T-R,

11    correct?

12    A    Depends. As I told you just a second ago, two

13    weeks ago, the psychiatrist who testified didn't rely on

14    the DSM-IV-T-R and he used a diagnosis that doesn't

15    exist, and so there are psychiatrists who do adhere to

16    the standards and others who don't.

17    Q    And you think that the use of the DSM-IV-T-R and

18    its criteria that help make -- diagnosis, that's

19    adhering to the standards, correct?

20    A    Not necessarily, because it really goes back to

21    the issue of science and scientific basis for a

22    condition, and the primary principle is the scientific

23    foundation behind the condition that may be described in

24    the DSM-IV-T-R or any of the DSMs, and that's, I think,

25    the primary objective one has to have -- has to have is

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208    www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 73 of 234

1  not just to say well, I go with the diagnosis because

2  it's defined in the DSM-IV-T-R and I just go through the

3  criteria.

4        I, as a independent evaluator, also have to look

5  into the symptoms the person is reporting to me and

6  determine whether or not this report is -- report of

7  this symptom, if that's, indeed, one, accurate with the

8  understanding of how symptoms manifest themselves over

9  time in a given individual and if it's also consistent

10 with the natural course of the disorder.

11       To give you an example, hyperactivity is a

12 symptom you see, for example, in the context of

13 attention deficit hyperactivity disorder, so if I were

14 to say well, I have somebody with hyperactivity and they

15 are fidgety and, therefore, I draw the conclusion and

16 say it's in the DSM-IV-T-R, hyperactivity, and the

17 patient in front of me has ADHD, attention deficit

18 disorder -- hyperactivity disorder, combined type

19 because he's hyperactive, that would be a very

20 simplistic non-scientific approach to diagnosis.

21       What I have to do as a clinician is to determine

22 in what context does this hyperactivity occur. If you

23 look at me, I'm slightly moving on my chair and may be

24 described by you maybe as slightly fidgety. Do I have

25 ADHD? I can assure you I don't have ADHD, but somebody

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 74 of 234

1   with a simplistic view of -- diagnosis could come across

2   and say look, Doctor Saleh is moving in his chair,

3   appears to be slightly hyperactive, therefore, he has

4   ADHD and now also let's put him on Ritalin to treat his

5   ADHD. That would be inappropriate use of the DSM,

6   inappropriate use of understanding the foundation behind

7   the diagnosis and treatments.

8   Q       And I appreciate your answer, but my question

9   was with regard to Mr. King, did you use the DSM-IV-T-R?

10  A       Actually, I do think I did answer your

11  question. I said it -- in my report that the diagnosis I

12  gave him, the antisocial personality disorder is as

13  defined in the DSM-IV-T-R.

14  Q       So that's a yes?

15  A       Well, it was a long worded yes, yes.

16  Q       Thank you. And with regard to Mr. King, did you

17  use any other references in order to help make your

18  diagnosis of Mr. King?

19  A       Well, I'm not sure if you're referring now to

20  the antisocial personality disorder, other references to

21  make that diagnosis.

22  Q       Well, I'm just asking what additional references

23  did you use in order to make the diagnosis you testified

24  quite lengthy that you used in the DSM-IV-T-R?

25  A       I'm not sure --

Huseby, Inc.                                            www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 75 of 234

1   Q     Did you use any other references such as the

2  DSM-IV-T-R to diagnose Mr. King?

3   A     I mean, that's where I'm suddenly confused. If I

4  used the DSM-IV-T-R to diagnose him with antisocial

5  personality disorder, what other references are you

6  referring to if you say did you use other references?

7  Because if I used that as the reference -- maybe if I

8  understand, your question is did I look at other

9  literature pertaining to antisocial personality disorder

10  to draw the conclusion that this presentation is

11  consistent with the description of antisocial

12  personality disorder as described in the DSM-IV-T-R?

13  The answer would be affirmative.

14   Q     No. My question was were there any other

15  references, and it sounds like your answer was no.

16  Would that be a fair characterization?

17   A     I'm not sure if I understand what you mean with

18  other references, because if I use -- because, again, --

19  more you use one reference to diagnose or I could -- I

20  mean, if I understand you correctly, I could have used

21  the ICD to diagnose him with a personality disorder. I

22  didn't do that.

23   Q     So you only used the DSM-IV-T-R?

24   A     Yes. I mean, that's what I said in my report.

25   Q     And, Doctor Saleh, with regard to the diagnosis

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 76 of 234

1    under the DSM-IV-T-R, you testified earlier that it's

2    important as a clinician to not pick and choose, isn't

3    that right?

4    A       It's important to look at the database in front

5    of you, understand the database and then draw

6    conclusions that are consistent with clinical

7    information in front of you. You can't be selecting

8    information in and out with regard to a given diagnosis.

9    Q       And with regard to the database that you used,

10   you have several thousands of pages of medical records

11   spanning a 34 year period, isn't that right?

12   A       That's correct.

13   Q       Now, Doctor Saleh, ultimately one of your

14   conclusions was that due to the fact that Mr. King is,

15   as you described him, a chronic liar, that made a lot of

16   the data that you used unusable?

17   A       -- I'm not sure, because it's not unusable. It's

18   still usable, because you're able to draw -- I mean,

19   you're still able to draw conclusions. It's not like I

20   discard that information. Malingering, for example, is a

21   phenomenon or a construct that is described in the

22   DSM-IV-T-R, and so it's not unusable. It helps me

23   understand the case, this case and concepts around

24   malingering.

25           The other issue is, for example, when he talks

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 77 of 234

1   about alters, I don't just discard it and throw it into

2   the garbage bin and say because it's his report, I

3   discard it. Again, as I said earlier, I looked at it.

4   Even if I at the end concluded that his self-report is

5   not reliable so that he's not a credible person, I --

6   rely on what he says to draw conclusions to a reasonable

7   degree of medical certainty with regard to a diagnosis.

8   I certainly wouldn't want to say it's just not unusable.

9   Q       And then taking a look at the data, you had to

10  make an evaluation as to whether or not the data that

11  came from Mr. King in particular was credible or not, is

12  that right?

13  A       I mean, the thing is you look at the reliability

14  of the information, and the example would be the issue

15  of, again, I see social workers and psychologists and

16  even psychiatrists sometimes say the patient told me he

17  is hearing voices, therefore, he has schizophrenia,

18  let's put him on Haldol. That's what I see many times,

19  and when I do the IMEs, independent medical

20  examinations, that's what I'm asked to look into is

21  what's the basis behind their approach, their diagnosis

22  and treatment.

23          So if I go with a report and the self-report is

24  I hear voices, it would be extremely simplistic for me

25  to take it at face value and say yes, you hear voices,

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 78 of 234

1   therefore, you have schizophrenia. The clinician or

2   physician, they have to take a step back and do an

3   analysis of the symptoms they're hearing about that is

4   reported and determine whether or not that is true --

5   first of all, a true symptom, so an idiopathic

6   presentation of the -- the phenomenon and then in what

7   context does this occur.

8           And so with Mr. King, he has made various claims

9   about alters, voices, different moods, being suicidal,

10  not suicidal, self-injurious, not self-injurious, take

11  whatever -- I mean, actually, I look through the

12  diagnosis and it's a list of everything you have in the

13  DSM he -- carry as a diagnosis, and that tells you

14  always something,

15          I mean, he told people many things over the

16  course of the years, and people at times said well,

17  given what they have, that's the diagnosis, and they

18  diagnose him with it. The advantage I have is -- over

19  what other doctors did at those times is I have had the

20  opportunity to review 3,000 pages of records and put

21  things back into context.

22          And given the fact that he is not carrying any

23  of the above diagnoses, he doesn't carry a diagnosis of

24  dissociative personality disorder, he doesn't carry a

25  diagnosis of schizoid personality disorder, he doesn't

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 79 of 234

1  carry a diagnosis of schizophrenia, he doesn't carry a

2  diagnosis of atypical psychosis, he doesn't carry a

3  diagnosis of anxiety disorder, he doesn't carry a

4  diagnosis of intermittent explosive disorder and so

5  forth -- and the list is much longer than what I'm

6  telling you -- that tells you something about him and

7  his reporting and his presentation, that whatever he may

8  have said at one point in time to somebody may have

9  shown not to be accurate and not valid to justify a

10 clinical diagnosis and a treatment, because he's also on

11 no psychiatric medications.

12 Q     Doctor Saleh, I'll ask this question again in a

13 very simple way.

14           THE COURT: Mr. Gray, let me interrupt you. I

15 want to make sure I understand, Doctor Saleh. When you

16 say that Mr. King doesn't carry a diagnosis, what do you

17 mean by that, sir?

18           THE WITNESS: I mean the point is if you look

19 into the records, he has carried every diagnosis one can

20 think of.

21           THE COURT: Does that mean that at some point

22 somebody has diagnosed him with that?

23           THE WITNESS: That's what that means, and with

24 what they had at their disposition at that time, that is

25 what they felt he presented with, because he at one

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 80 of 234

1  point in time did report hearing voices or somebody said

2  he has psychosis or schizophrenia. What they may -- and,

3  again, I don't think they had that information, because

4  subsequently one learned that this presentation was

5  malingered, fake, and, therefore, that diagnosis was

6  ultimately dismissed.

7          THE COURT: I see. Thank you. Mr. Gray?

8          MR. GRAY: Thank you, Your Honor.

9      BY MR. GRAY:

10 Q     So to ask the question in as simple a manner as

11 possible to get a yes or a no answer -- and if you don't

12 understand the question, just say I don't understand the

13 question.

14 A     Sure.

15 Q     Did you make a determination as to the

16 information provided to you by Mr. King as to whether or

17 not you believed his information or did not believe his

18 information?

19 A     Well, -- tell you this. I already talked about

20 this earlier. It would be foolish for me to say I

21 believe what he told me and I disregard what he told

22 others. How can I believe him even if he talks to me

23 because he, in his eyes, knows I'm retained by his

24 attorney, so he may have the perception that I'm going

25 to be just a hired gun who's going to come up with

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 81 of 234

1  whatever he wants to help him with the case?  That's not

2  the approach I took. I listened to him, heard what he

3  had to say, but I didn't take it at face value and said

4  because he's now telling me a given story or gives me a

5  narrative, I just run with that.

6          I look -- I incorporate that information into my

7  database, and the database is 3,000 plus pages and

8  consider that information, but it certainly didn't have

9  any weight on my ultimately conclusions with regard to

10 the diagnosis I gave him and with regard to the issue of

11 the statutory definition of a sexually dangerous person.

12 Q      So that would be a yes, you had to weigh the

13 credibility of the information provided to you by Mr.

14 King?

15 A      -- tell you this. I'm not weighing the

16 credibility. I mean, when I went into this assessment, I

17 already knew that he has been described as being

18 manipulative, deceitful, a liar, a pathological liar, so

19 I would have to be ingenuous going into that and say

20 well, today he is going to tell me the truth, I'm the

21 first person in the world he's going to tell the truth

22 about his life. That would be -- I mean, some people may

23 do it.

24          I didn't go into the interview with that

25 approach because I knew whatever he's going to tell me,

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 82 of 234

1  I have to take it at face value. I can't take it at face

2  value. I have to put it into context, and the context is

3  that of a chronic liar.

4  Q       So let's take a look at your report and take a

5  look at some comments that he made to you. So if you

6  would turn to Exhibit One and go to the second page of

7  your report, in your report at the top of the page, you

8  had interviewed him for about four hours and 30 minutes,

9  correct?

10  A       About, yes.

11  Q       And in the personal history section, you write

12  that you used direct quotes because you wanted to make

13  sure you had accuracy, isn't that right?

14  A       Actually, the accuracy doesn't mean that --

15  accuracy doesn't mean that it's reliable or credible.

16  It means that I didn't want to misquote what Mr. King

17  told me, so it's an accurate reporting to me at the time

18  of the interview. That's all -- what I mean -- given the

19  verbatim quotes I take out of the records is I didn't

20  want to misconstrue something or misread information and

21  present it in a way that it is not accurate and that it

22  was observed, perceived by whoever wrote it -- certainly

23  don't -- 20 years ago, that's why I used the quotes, and

24  that is what I mean by -- doesn't mean reliability or

25  credibility.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 83 of 234

1    Q        I understand and I appreciate your answer, but

2    I'll ask you questions for clarification, if necessary.

3    If you can do me the favor of just answering the

4    question, this will go a lot quicker.

5    A        I'll do my best.

6    Q        Thank you. Now, on page three of your report,

7    there's an indented portion that begins with the

8    personal account of his life.

9    A        Yes.

10   Q        That indented portion, that's a portion that you

11   took out of another report for accuracy, correct?

12   A        No, it's not. I took it -- I mean, it's indented

13   because -- for accuracy because I tried not to misquote,

14   yes.

15   Q        And in that indention, the second line says in

16   describing his childhood experiences, he relayed example

17   after example of how he felt humiliated and hurt by

18   other children who intentionally made fun of his

19   disability. Do you see that line?

20   A        That is what this reads, yes.

21   Q        Now, with regard to that line, looking at it in

22   context, is that a report from Mr. King?

23   A        If I just read what I have, I would have to look

24   at the context of this document, but the way it's

25   written, it would suggest that it's his description of

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 84 of 234

1   his experiences at that time.

2   Q       And was this one of the things that you have to

3   evaluate when coming to an evaluation or at least a

4   determination of Mr. King's conditions?

5   A       No, absolutely not. I mean, the issue is not

6   because I say well, I don't rely on the things he's

7   telling me or Doctor Zinik or vice versa. With Mr. King,

8   the issue goes back not to just to the last two years.

9   It goes back to his entire life. So whatever he may have

10  said to somebody down -- ten years, 20, 30 years ago,

11  that -- again, I don't think I can give it credence,

12  because he was described as being a chronic liar,

13  manipulator early on in his life.

14          Keep in mind, we don't suddenly become a

15  manipulator or a chronic liar.  It's not like I'm waking

16  up and I suddenly become this liar. There's a past to

17  lying, and given that, whatever he may have said to

18  somebody down the road good or bad, favorable or not

19  favorable, you can't give any weight.

20  Q       So you chose not to give that any weight?

21  A       Well, I chose to consider it. As you see, I

22  wrote it down, and what I tried to do -- maybe that's --

23  explain this. I tried to provide The Court with some

24  examples of what I see these records say, because

25  otherwise, I -- I mean, to be more complete, I would

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208            www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 85 of 234

1   have to write probably a 200 page document, 300 page

2   document describing all the various aspects, behaviors

3   and presentations he had over the course of the years.

4   This is -- if you want to -- as far as I could do a

5   snapshot of what I thought would get my point across as

6   to how I see his case in terms of his reporting.

7   Q      So in that next line where it says education and

8   work history, that next paragraph, do you see that?

9   A      Yes.

10  Q      The line -- it says he reportedly got along with

11  his peers and did not pose a disciplinary problem,

12  noting I didn't have a lot of fights with kids. Was that

13  what he told you?

14  A      That's what he told me, yes.

15  Q      Did you believe him when he told you this?

16  A      How can I?  I mean, if -- then go a couple pages

17  further --

18  Q      Doctor, I just want to ask did you believe him

19  about that statement?

20  A      So my answer would be without any further

21  elaboration, how can I do that?  Do you want to allow me

22  to elaborate?

23  Q      I'll allow you to elaborate, but I just want to

24  make sure I get the answer to the question. So did you

25  believe that? Yes or no?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 86 of 234

1    A       The answer would be negative, that I did not

2    believe him because I would and did consider other

3    things that I read about him, that he got himself in

4    fights at that time period in his life.  So whatever he

5    told me -- that he was a good kid in school, no problems

6    was contradicted by other records that described him as

7    being a fighter.

8    Q       And then two lines down when he told you that he

9    dropped out midway through the 11th grade because he was

10   trouble -- because "I was in trouble with the law", did

11   you believe him there?

12   A       He made a statement that he dropped out in

13   school. I think there was some other information in the

14   records, and most likely by memory that did support it.

15   I don't know if it was verified independently. So the

16   answer would be did I -- and did I have the opportunity

17   to verify independently?  I don't think I had. Do I

18   believe him? In a certain sense, I think certain

19   sections of what he said is credible because I do know

20   he got his GED at a later time and I do understand you

21   can't get a GED if you completed high school regularly,

22   so that may be accurate.

23           The issue of being bullied in grade school --

24   who knows if that's true or not?  That's Bates

25   stamped so that -- I don't know if it was his report,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 87 of 234

1   but the issue of the GED is -- I would say that's

2   credible because I understand he got his GED

3   subsequently. Therefore, he dropped out. That's

4   possible. I mean, it's not possible. It's more likely

5   than not that he did --

6   Q       Okay, Doctor Saleh. Once again, the line I was

7   reading you was the dropping out midway through 11th

8   grade "because I was in trouble with the law".  That

9   line -- and I'll allow you to elaborate, but I just want

10  you to answer the question first.

11  A       Yeah.

12  Q       Did you believe that line?

13  A       I'm not sure at this point if I believed him or

14  not, because I know that he is not believable, so I

15  don't remember if I believed it. I would have to go back

16  and see if -- when he was -- when he dropped out of --

17  midway through the 11th grade if it was consistent in

18  terms of chronology with the time when he got in trouble

19  with the law. I don't remember that offhand.

20  Q       So would it be fair to say that when it came to

21  determining whether or not something he told you was

22  believable or not, you'd check it out with other sources

23  to determine whether or not that was believable or not?

24  A       Depends. Again, it depends on what the report

25  is. I mean, if it's a report of having a fantasy, there

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 88 of 234

1  is no instrument I can use to determine if that fantasy

2  is true or not, but if it's something that I can verify

3  independently through, for example, school records --

4  could certainly try to corroborate some self-reports.

5  Q       And a little further down in that page, it says

6  Mr. King is reportedly a "qualified tree surgeon".

7  A       Yeah.

8  Q       Did you believe him with that statement?

9  A       Well, I, first of all, didn't understand at the

10 beginning what a qualified tree surgeon is, and that is

11 something he said to somebody else at one point in time,

12 and so I think what I have here -- and the quotes makes

13 reference to the Bates stamp page 231. I don't think --

14 and I don't remember though -- I -- that he said this to

15 me. I do know in various other records there was made

16 reference -- the reference was made to the profession he

17 had which is landscaping and also working around trees

18 and trimming trees. That's at least my understanding of

19 what he may have done.

20 Q       And on the next page under medical history, that

21 first line says Mr. King's medical history is

22 significant for caves (sic.) foot. Is that a self-report

23 to you?

24 A       No, because I don't think he would use that

25 language. That's from the medical history section of the

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 89 of 234

1   records I got.

2   Q       Do you believe that portion of the medical

3   history of the records?

4   A       Well, caves foot, I don't need to believe

5   somebody or don't believe. It's not something I can say

6   I have. You have it or you don't have it, and I think if

7   I look at somebody's feet, I can say if they have caves

8   foot or not.

9   Q       Now, in that same paragraph as we go towards the

10  bottom, it says he also suffered a closed head injury at

11  15 years old "getting into a fight with some fellows and

12  they hit me with a piece of wood". Is that a report that

13  he made to you?

14  A       That's a report he made to me.

15  Q       Did you believe him when he told you that?

16  A       Who knows?  I don't know. I don't know if that's

17  true or not true. Again, I'll tell you this. The point

18  with Mr. King is he has told lies for 35 years, and with

19  all due respect to him, I have to say -- but he has not

20  been honest. I mean, he has been deceitful. It's

21  possible that it happened. It's possible that it didn't

22  happen. I didn't see any records that would support that

23  he was in an induced coma, and so I don't know. I could

24  not verify this, as far as I recall.

25  Q       And outside the comment about the coma, because

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 90 of 234

1  that's not on that line, it says he also suffered a

2  closed head injury at 15 years old "getting into a fight

3  with some fellows and they hit me with a piece of wood".

4  If somebody were hit in the head with a piece of wood,

5  would that be something that could be verified by

6  looking at medical records?

7  A       Sure. Let me actually take this back. It depends

8  on the injury to the skull. I mean, if I have a caved in

9  injury to the skull and with subsequent brain damage, I

10  could verify this, but if I got hit with a piece of

11  wood, I may have just a bump, but that would go away

12  after a couple hours.

13  Q       Now, you mentioned earlier about a coma. Did you

14  get that information from the record?

15  A       That's actually I think what he told me, that he

16  was in an induced coma.

17  Q       And did you do anything to verify whether or not

18  he was in an induced coma or in a coma?

19  A       Well, I reviewed whatever I had at my

20  disposition. I didn't go and ask for additional medical

21  records pertaining to 1975 or so, so I didn't do

22  anything beyond what I had at my disposition.

23  Q       Were there any other medical records or records

24  within the thousands of pages that you received that

25  made reference to a coma?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 91 of 234

1   A        I don't remember that.

2   Q        And was the coma referenced in the medical

3   reports and the psychiatric notes that were taken at

4   Phipps Hospital?

5   A        I don't remember. I would have to look at it.

6   It may have -- may not have. I don't remember.

7   Q        Would it help refresh your memory if we were to

8   show that to you?

9   A        Sure, absolutely, if you have it.

10  Q        Doctor, in front of you there's another binder

11  that has Government exhibits within it.

12  A        This is the white --

13  Q        Yes. If you would, turn to Exhibit Number Nine,

14  please, Doctor. Are you there?

15  A        Yes.

16  Q        Okay. If you would please turn to the pages that

17  begins on -- at the bottom, it's Bates stamped 1501.

18  A        Yeah.

19  Q        Okay. And if you would -- sorry. Let me get you

20  to the right page.

21           MR. GRAY: I'm sorry, Your Honor. The computer

22  is taking a little bit of time. I'll move forward and

23  I'll come back to this issue.

24           BY MR. GRAY:

25  Q        Doctor Saleh, if you would take a look at that

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 92 of 234

1   same paragraph where it says that he had surgical

2   removal of some supramammary nipples on the left thorax

3   and right abdomen, --

4   A       Yes.

5   Q       -- do you see that?

6   A       Yes.

7   Q       Did you believe that statement from the record?

8   A       Well, it was documented in the records. I didn't

9   do a physical examination on him to determine whether or

10  not that's true.

11          THE COURT: Doctor Saleh, if you could, to the

12  extent you are able, if he asks you a yes or no

13  question, if you could, answer yes or no. You certainly

14  are entitled to explain your answer. That would be

15  helpful.

16          THE WITNESS: Sure, yeah.

17          BY MR. GRAY:

18  Q       And, Doctor Saleh, if you would go down to where

19  it says substance abuse history, that paragraph, are you

20  there on your report?

21  A       Yes.

22  Q       That second line begins with he reportedly began

23  drinking alcohol at the age of 13 years old.

24  A       Yes. I see it.

25  Q       Was that a report to you?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 93 of 234

1    A        That's what he told me, yes.

2    Q        And did you believe him when he told you that?

3    A        If I believed him -- upon verification, yes.

4    Q        And then the next paragraph, the second sentence

5    begins with Mr. King continued to abuse drugs and

6    alcohol in the prison system, having last used heroin in

7    May of 2009. That last portion, last used heroism --

8    heroin in May of 2009, did he tell you that?

9    A        No. That's Bates stamped reported. I think it

10   may be a urine toxicology screen.

11   Q        Did you ask him whether or not he had last used

12   heroin in May of 2009?

13   A        I don't remember if I did.

14   Q        Did you believe that statement where it says

15   that he last used heroin in 2009?

16   A        Well, it was verified by a urine toxicology

17   screen, so -- somebody hampered with his urine tox

18   screen or his urine or it was his urine, so I would say

19   I believe the urine toxicology screen was not hampered

20   with or there was no evidence to suggest that it

21   was another person's urine.

22   Q        And in that next paragraph where it says

23   relationship and sexual history, do you see that

24   subheading?

25   A        Yes.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 94 of 234

1    Q       The line that begins in that same paragraph Mr.

2    King is a bisexual man, did he report that to you?

3    A       I think that was his report, yes, when I saw it.

4    Q       When he told you that, did you believe him?

5    A       When he told me, I was not sure to believe him

6    or not to believe him.

7    Q       Do you believe him now?

8    A       Well, it depends, and if I could elaborate --

9    because I do know that he has engaged in homosexual

10   activities with other inmates.

11   Q       How do you know that?

12   A       That's per the record.

13   Q       And these records -- you have that cited on

14   there as Bates stamp page 2454?

15   A       No. That is what he described himself to be at

16   one point in time. I think there were documents in the

17   record that talked specifically about him having had

18   sexual activity with other inmates.

19   Q       But, Doctor, wasn't that also a self-report?

20   A       I'm not sure. I would have to look at the

21   records and see if that was based on a self-report, his

22   self-report or that of another inmate. I don't remember.

23   I would have to look at it.

24   Q       Do you have those records in front of you?

25   A       I don't. I have just my report with me today.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 95 of 234

1   Q        So in your mind, it would make a difference if

2   it were reported just by Mr. King, but it would take on

3   a different weight if it were reported by another

4   inmate?

5   A        Not necessarily, because it really depends again

6   what you try to accomplish and the scope of that

7   question, the context in which the question is asked and

8   what that question or the answer he gives or doesn't

9   gives means. So if you take it a step further, the

10  question is would he have an ulterior motive to report

11  that he is bisexual, homosexual, heterosexual or

12  asexual?  I mean, that's the way I would look at this,

13  and as far as I can say at least, he doesn't have a

14  ulterior motive to claim to be bisexual or homosexual

15  and, therefore, if he stated to be bisexual or if it was

16  reported that he had engaged in sexual activity with

17  another inmate, in the absence of a ulterior motive or

18  he's just making it up, which is -- that's certainly

19  possible if it's just based on his self-report or it's

20  something that is true, but there's no reason for me to

21  suggest or for somebody else to suggest that that report

22  is fabricated.

23  Q        So in that last line on that paragraph on page

24  four of your report where it says when I asked Mr. King

25  about his sexual orientation, he acknowledged a history

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 96 of 234

1   of homosexual behavior, you believed him?

2   A       Not -- again, at the time I asked him, keep in

3   mind that I hadn't read the entire records at the time I

4   went and interviewed him. I just solicited information,

5   and then when I went home, I started going through the

6   entire records and subsequently getting other sets of

7   records. So I took down the information, what he told

8   me, and then I went and tried to verify, cross-reference

9   whatever he told me to see if there is something to that

10  report or not.

11  Q       Okay. So when you cross-referenced to determine

12  whether or not there was something to this report or

13  not, did you believe it?

14  A       -- he is saying homosexual behavior. Homosexual

15  behavior doesn't mean homosexual orientation, so I may

16  engage in homosexual behavior without being homosexual.

17  And as far as I recall, the records -- he has engaged in

18  homosexual behavior, so that may be, indeed, an accurate

19  self-report.

20  Q       So you believe it when he said that he has a

21  history of homosexual behavior?

22  A       That he acknowledged a history of homosexual

23  behavior, I think that's consistent with what the

24  records said about him in the DOC system, that he has

25  engaged in homosexual behavior.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208     www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 97 of 234

1    Q        Including his self-report?

2    A        Including the self-report to me on that given

3    day.

4    Q        And the self-reports within the records?

5    A        No, not necessarily, because at -- time he said

6    he was heterosexual. Then he said he's homosexual, and

7    then he says he's bisexual. I'm making reference just to

8    the homosexual behavior.

9    Q        I am, too, Doctor.

10   A        I see. Okay. Sorry.

11   Q        So with regard to the homosexual behavior, you

12   found that that is consistent even though he made

13   statements within the record -- self-reported homosexual

14   behavior?

15   A        Again, I would have to look through the records,

16   but as far as I recall, there was records and record

17   entries describing or talking about him having engaged

18   in homosexual behavior.

19   Q        There is on the next page the paragraph right

20   after the indentation -- I'm sorry. The paragraph with

21   the indentation, that line begins with since age 13, his

22   sexual fantasies have mainly concerned his exposing

23   himself. He's had no homosexual ideas or experiences.

24   He first had intercourse at age 13 when a girl asked him

25   to have sex with her. When he does have intercourse, he

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 98 of 234

1  fantasizes about exposing himself or about tying up

2  women and raping them. That statement, you have that

3  indented in your report.

4  A      Yeah.

5  Q      What's the significance of you having that

6  statement within your report?

7  A      Well, because I didn't want to omit information

8  that one needs to look into in a case like this one,

9  given that there was the notion of paraphilia NOS -- the

10  nonconsent business, but given that, I didn't want to

11  just select certain information out to say well, there's

12  nothing in the record. So because there is this

13  statement about raping, I thought it's important that I

14  have it in there, and that's the reason why I put it in

15  there.

16  Q      So it's a fact that as late as -- as early as

17  1976, we have him self-reporting fantasies about

18  exposing himself and fantasies about tying women up and

19  fantasies about raping them?

20  A      Not the way you said it, because I don't think

21  it's a fact. It's a self-report of a chronic liar who

22  already -- was described to be a liar, so I'll tell you

23  this. The point is it's a record entry that I have in

24  front of me, as I have many record entries about his

25  other self-reports, and that's one of many other record

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 99 of 234

1    entries that go back to his fantasies. But, again, if I

2    talk about the fantasies of the person in front of me

3    and this same person is described by the Phipps Clinic

4    as extremely manipulative and lying, that's the context.

5    So within that context, that is what he said.

6    Q       Looking at the context, do you believe this

7    self-report from 1976? Is it accurate?

8    A       You asked me to do something that is impossible

9    for me to do and -- for me or anybody else to go back in

10   time and say that report is accurate. What I can tell

11   you is -- because it's really impossible. How could I

12   determine if that's accurate or not?

13   Q       I can help you by asking the question

14   differently. Do you consider that to be an accurate

15   statement?

16   A       The answer is that I don't know if it's accurate

17   or isn't accurate. The likelihood -- that it's not

18   accurate is because he at that same time was said to be

19   a liar and manipulator, and so if you take that -- and,

20   again, that is something that I can't, again, dismiss,

21   because that's a theme that has been going on

22   consistently over the course of the last 40 years of his

23   life, lying, being -- manipulator and so forth. That's

24   the context, so within that context, he may have

25   reported something for some ulterior motive at that

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 100 of 234

1    time, which could be abating punishment and being put

2    into a hospital rather than a juvenile delinquency type

3    of -- setting.

4    Q        With regard to a paraphilia diagnosis, would

5    you consider this as part of that diagnosis?

6    A        Absolutely. I mean, how could I do this? I mean,

7    if you use that as the diagnosis, again, what you would

8    then do is -- and I certainly understand your position,

9    but what you would do is if you were to do that is you

10   have -- and would have -- only way you could do it is to

11   say I have to select everything else out and let me just

12   look at a given theme, given statements he made over the

13   course of the last 40 years, and that's not the way at

14   least I practice medicine or diagnose people.

15           I don't select information out. Look at the

16   entire database, the totality of the data, you put it

17   into the context, understand who this person is in terms

18   of his reporting patterns, and then based on that, you

19   may or may not be able to draw conclusions with regard

20   to a diagnosis.

21           With this case and with this statement, I mean,

22   keep in mind the time we talk about. He is now arrested,

23   got himself in trouble. I know the Phipps Clinic. I

24   worked on the same unit where Alessi worked and Dietz

25   worked. I know what the goal and objective is in

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 101 of 234

1   treating people, help people and so forth. So if I'm the

2   manipulator, I have a ulterior motive so I can avoid

3   going to a DYS facility and I end up on the clinic and

4   just report that I feel bad and have these bad thoughts

5   so I can be kept on that facility. I mean, that's the

6   context, so given that, I don't think that I can just

7   run with this and say let's make this the foundation of

8   my diagnosis of whatever paraphilia you want to call it.

9   Q      Now, you said this -- this is from the Phipps

10  Clinic, correct?

11  A      As far as I know, that's right, from Johns

12  Hopkins Hospital at that time.

13  Q      And if you take a look at Exhibit Number Six in

14  the white binder --

15          THE COURT: Let me just note for the record,

16  the indented paragraph we've been talking about is in

17  Respondent's Exhibit Number One on page five. It's the

18  first indented paragraph on that page.

19          MR. GRAY: Thank you, Your Honor.

20          BY MR. GRAY:

21  Q      Are you there?

22  A      Yeah.

23  Q      Thank you, sir. And, sir, if you were to go to

24  page 1500 --

25  A      I -- say Exhibit Six?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208       www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 102 of 234

1   Q        Exhibit Six. I'm sorry. Exhibit Nine.

2   A        Yes.

3   Q        Page 1500.

4   A        Yes.

5   Q        Are you there?

6   A        Yes.

7   Q        Is this page 1500 that you referenced on the

8   indented paragraph on page five of your report for the

9   Respondent?

10  A        I have to look at it. Yes, it's actually right

11  there. Well, let me see. I don't know. I would have

12  to -- let's see. Yes, that's it. That's actually the

13  third paragraph.

14  Q        Now, you're looking at that paragraph and saying

15  that you can't look back at history to determine whether

16  or not it's valid, correct?

17  A        I'm not sure if I follow the question. You

18  say -- I look at this paragraph and I say I can't --

19  Q        Well, let me ask you this.

20  A        Yes, please.

21  Q        This paragraph that's on the indented paragraph

22  of page five of Respondent's Exhibit One, since age 13,

23  his sexual fantasies have mainly concerned his exposing

24  himself, has had no homosexual ideas or experiences. He

25  first had intercourse at age 13 when a girl asked him to

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 103 of 234

1  have sex with her. When he does have intercourse, he

2  fantasizes about exposing himself or tying women up and

3  raping them. I asked you earlier whether or not you

4  would consider that as part of a diagnosis for

5  paraphilia and you said of course not.

6  A       -- if I said it the way you said it, because I

7  said -- I really don't think I said it the way you said

8  it. I said when I asked to look at it into the context

9  you are in, you have to understand who the reporter is,

10 what the characteristics are of the reporter and how the

11 reporter has presented over the course of the ensuing

12 years, so --

13 Q       So in this case, the reporter is Mr. King,

14 correct?

15 A       Yes.

16 Q       And the context of the reporter that we're

17 considering is he's a chronic liar, isn't that right?

18 A       That's the way he was described, yes.

19 Q       And he was described as a chronic liar as you

20 testified earlier by those at the Phipps Clinic,

21 correct?

22 A       I'm not sure if it was. What I said was at the

23 Phipps Clinic, I know that he was described as being a

24 chronic liar, extreme manipulator, something along those

25 lines, but, yeah, I mean, I think it actually -- that it

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 104 of 234

1  was the Phipps Clinic. Let me just double-check.  It was

2  a note -- I'm not sure if it's from this one, but --

3  let's see. I think so. I mean, as far as I recall, it

4  may be a Phipps Clinic related -- I mean -- be from the

5  Phipps Clinic. I don't remember.

6  Q       So at the time of providing this information, to

7  the best of your knowledge, he was known to be a chronic

8  liar?

9  A       He was known to be deceitful and dishonest, yes.

10 Q       And this note was done by Paul Elliott Dietz.

11 Do you know a Doctor Paul Elliott Dietz?

12 A       Let's see -- it's actually Park Dietz, not Paul.

13 Q       Okay. I'm sorry. Park Elliott Dietz?

14 A       Yeah.

15 Q       And Doctor Dietz is a Nationally renown

16 psychiatrist, correct?

17 A       He's a Nationally known psychiatrist.  Renown --

18 up to others to determine.

19 Q       And did Doctor Dietz come up with the diagnosis

20 for Doctor King at that time?

21 A       Actually, the way this works at Johns Hopkins

22 is -- and I have to tell you I didn't look at Doctor

23 Dietz's CV, but as far as I know, if you're a

24 resident -- I mean, you're a resident physician, you

25 have a supervising physician, and if I'm not mistaken,

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 105 of 234

1  Doctor Alessi was the attending physician and Doctor

2  Dietz was the resident physician.  Actually, yes, I'm

3  actually correct. So the attending is Doctor Alessi and

4  Dietz is the resident physician most likely.

5          So your question, did he, Doctor Dietz come up

6  with the diagnosis, I don't think I could determine

7  that.

8  Q      But Doctor Alessi did come up with a diagnosis,

9  one of which being exhibitionism?

10 A      Yeah, sure, yeah.

11 Q      And that diagnosis of exhibitionism was based in

12 part on the information that you have at the top of that

13 indented paragraph on page five of your report?

14 A      Again, you ask me to put myself in the shoes of

15 the doctor at the time. What I would add to that is that

16 if I'm not mistaken, Mr. King at that time prior to the

17 admission to Hopkins had exposed himself to children, so

18 there was actually factual evidence of exposing, if I'm

19 not mistaken, and then he went on and then reported

20 exposing related fantasies.

21 Q      So the exposure fantasies would be disregarded

22 in a diagnosis?

23 A      I mean, again, keep in mind, the thing is, if

24 you have a patient coming to your clinic and he's a 15

25 year old adolescent who was exposing himself and you

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 106 of 234

1   don't have the luxury to know what this person is going

2   to do 30 years down the road, you don't have the luxury

3   to know what his psychosexual development is going to

4   be, but what you have -- the evidence at that time is

5   that this is a troubled child, he exposed himself to

6   children, he's reporting those fantasies. That's the

7   report you have from the 15 year old adolescent who

8   presents with conduct disorder or conduct disorder

9   related behaviors.

10  Q       Not to interrupt you, Doctor, but he was 17 at

11  the time he was at the Phipps Clinic.

12  A       Oh, 17. I mean, he is -- adolescent at that

13  time, yes.

14  Q       So we have a 17 year old fooling a Board

15  certified doctor and a person that later became a world

16  renown, Nationally renown psychiatrist?

17  A       Absolutely. I mean, again -- tell you this. The

18  issue of psychiatry -- the best example is the

19  discussion here about the paraphilia NOS, nonconsent.

20  It's not like I can go and use -- x-ray and determine if

21  I have exhibitionism or not exhibitionism.  It's based

22  on many times the reporting of the individual. And can I

23  be fooled by a patient and a chronic liar who has the

24  skills to lie and mislead me? Absolutely you can, and it

25  can be Doctor Alessi, it can be Doctor Dietz, it can be

Huseby, Inc.                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 107 of 234

1   me, it can be somebody else.  It's absolutely possible

2   that you can be fooled.

3           It would be -- I don't think that your

4   credentials would make you more apt to not -- would make

5   you more apt not to be fooled. What I think is critical

6   is when it comes to the -- not necessarily the

7   reputation, but the skills of the doctor is to put

8   things into context and understand the case and --

9   rather than just going with the information you have in

10  front of you.

11          And, now, again, here we talk about a 17 year

12  old child who presents with exposing behaviors in this

13  report, so I think it's reasonable at that time to make

14  that diagnosis, but for me to go back 40 years later and

15  still say that that's a valid diagnosis in the absence

16  of a -- data and a reporter who is a chronic liar, that

17  would be not appropriate.

18  Q       But it's reasonable in the context?

19  A       I mean, the context being --

20  Q       Just using your words.

21  A       Yeah, sure. I mean -- the context being in '76,

22  1976, December, 1976 and you get this young man to the

23  hospital, to the unit, you have what they used to -- I

24  think -- behaviors unit. To have this patient there, he

25  is -- he got himself in trouble for exposing behaviors.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 108 of 234

1  He's telling you that he has this trouble. At that time

2  in '76, that would be a reasonable diagnosis to give

3  him.

4  Q       So with regard to a diagnosis that you gave to

5  Doctor King -- to Mr. King, you looked at his statements

6  and the other information in the records in context, did

7  an independent evaluation of the information, looked at

8  things that could corroborate or, for lack of a better

9  word, say that that couldn't have happened in order to

10  help form your opinion?

11  A       I apologize. I may have missed the question.

12  So you're saying that I did what? I apologize.

13  Q       Would it be fair to say that what you did is you

14  reviewed the record, took a look at Mr. King in the

15  context of his chronic lying, took a look at the

16  information within the record, his reports, reports of

17  others and all the other information and then used that

18  in order to make a determination as to what's the most

19  appropriate diagnosis for Mr. King. Would that be fair

20  to say?

21  A       I think so, because, again, just to make sure

22  that we are on the same page, what I did is I did review

23  the records that are available to me, and the records

24  include his reports, and I established hopefully

25  previously that he is not a reliable reporter, he has

Huseby, Inc.                                       www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 85  Filed 11/18/11  Page 109 of 234

1    been described as being manipulative, deceitful, chronic

2    liar, pathological liar, all those type of things, was

3    given a diagnosis among many other things over his

4    lifetime of exhibitionism, and then I looked at the

5    totality of the information in front of me and then drew

6    conclusions with regard to scientifically valid clinical

7    diagnosis that would be, if I understood you correctly,

8    accurate, but that's what I did.

9    Q        And you testified earlier that you don't accept

10   some data. You evaluate all the data. You don't just

11   take some data and just toss out other data.

12   A        The issue of tossing them out or not, it's

13   not -- and, again, I may not have been clear on this.

14   The issue is I look at everything I have in front of me.

15   I even look at this paraphilia NOS, nonconsent condition

16   Doctor Zinik diagnosed Mr. King with to see if there's

17   evidence in support of that information, condition or

18   whatever that may be, and so I don't toss things out.

19   I rule out diagnoses and conditions.

20            And the example to give you is I can come in

21   with a fever to a primary care doctor and I'm not just

22   going to be biased because I sell Penicillin and say you

23   have a bacterial infection and take this antibiotic. I

24   look at the symptom of the fever, try to understand what

25   context that occurs, that -- numerous conditions that

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 110 of 234

1  can cause fever, including making it up or just putting

2  your head under the hot water if you have a very --

3  temperature, and then based on that analysis, I may be

4  able to draw conclusions with regard to diagnoses or

5  not, but there is analysis going into that symptom the

6  patient presents with, which is the fever, which

7  includes also is this an accurate report or not.

8  Q      Now, paraphilia NOS is in the DSM-IV-T-R?

9  A      Yes.

10  Q      And the DSM-IV-T-R reads that this category is

11  included for coding paraphilias that do not meet the

12  criteria for any specific categories. Examples include,

13  but are not limited to, telephone scatologia, obscene

14  phone calls, necrophilia, corpses, partialism, exclusive

15  focus on part of the body, zoophilia, animals,

16  coprophilia, feces, klismaphilia, enemas, and urophilia,

17  urine.  You're familiar with the DSM?

18  A      Sure.

19  Q      And it says that examples include but are not

20  limited to that listing of, I guess, identifiers I read

21  to you, correct?

22  A      Yes.

23  Q      For instance, you testified earlier that that

24  was touchism? (phonetic)

25  A      Toucherism.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 111 of 234

1    Q        And is that in the DSM?

2    A        No, it's not.

3    Q        But you said that you can find that. Why is

4    that?

5    A        It's a phenomenon and a description of a

6    paraphilic disorder that has been used. John Money would

7    be one who has described toucherism as a phenomenon, but

8    it's not in the DSM, didn't make it into the DSM because

9    there is no scientific foundation, empirical evidence

10   today to support that specific condition. You have

11   frotteurism for which you have empirical evidence.  The

12   thing is if you look at those conditions you're talking

13   about, it's empirical evidence.

14            The paraphilia NOS diagnosis or the NOS,

15   nonconsent, what it also said is that the NOS -- consent

16   category should not be used as a proxy for something

17   that doesn't exist, so I couldn't just now say because

18   there is this -- and this is what people do,

19   unfortunately, that -- they say there is this NOS,

20   nonconsent and I get that -- exactly that reading from

21   the attorneys or other people that say look, it says

22   e.g., not i.e., including but not limited to,

23   therefore, why can't you put in some other NOS, consider

24   this as NOS defined paraphilic disorder. That's where

25   you go back and look at the empirical evidence behind

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 112 of 234

1   that condition, and if there is no such evidence, it

2   wouldn't make it even in the NOS category.

3          And, again, I said the issue is it should not be

4   used as a proxy for rape or criminal behavior, and that

5   is what has happened. And if you look at actually what I

6   found yesterday evening from the Psychiatric Times, the

7   California DMH takes a stand against the paraphilia NOS,

8   nonconsent issue, and you should read this, because

9   that's very enlightening. It talks about the issue of

10  the misuse of the paraphilia NOS, nonconsent diagnosis,

11  that it's not exist -- that's hot out of the press,

12  October 10, 2011, and that talks about what I'm talking

13  about, that this NOS, nonconsent -- no evidence, no

14  diagnosis and doesn't make it into the paraphilia NOS,

15  nonconsent.

16         Necrophilia -- there is a condition described as

17  necrophilia in the literature. There is evidence.

18  There are people who get excited, aroused by corpses,

19  and it's not a common diagnosis, so it's not listed

20  among the other diagnosis you have in the DSM, the

21  paraphilia exhibitionism. It's because of that it's put

22  in the NOS category, but the -- again, the point is I

23  can't go and say I'm going to make something up to make

24  my case. That's not the way medicine works. That's not

25  the way science works, and that is what has happened

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 113 of 234

1    here.

2    Q        But, Doctor Dietz, (sic.) paraphilia NOS is made

3    up?

4    A        I'm not Doctor Dietz. I'm Doctor Saleh.

5    Q        Doctor Saleh. So paraphilia NOS is made up?

6    A        No. You didn't get my point. I'm saying NOS is

7    not made up. As you very well pointed out, it's in the

8    DSM. It's the last paragraph pertaining to the

9    paraphilias. It's a category used in the DSM, and there

10   is e.g., and you listed the five paraphilias they listed

11   there.

12   Q        Actually, they noted them as categories, not as

13   paraphilias.

14   A        I don't know at this point what you're pointing

15   to.

16   Q        Oh. I was reading. It says these specific

17   categories included scatologia, partialism, zoophilia,

18   klismaphilia, urophilia. It didn't call those

19   paraphilias. It called them categories.

20   A        It's paraphilias within the category of

21   paraphilia NOS. I mean, that's the way I would

22   understand what you're saying. The point is -- I mean,

23   my point to you is I'm not saying that there is no such

24   condition like paraphilia NOS. I'm not saying that.

25   What I'm saying to you is that there's no such condition

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 114 of 234

1  as a paraphilia NOS, nonconsent. That doesn't exist.

2         So if you want me to make it up because you want

3  me to make a case for you, there are people who do it.

4  I'm not one of them. And the APA rejected their

5  approach. The National Association for Social Workers

6  rejected the approach. There are some people who do it

7  for whatever reason. I don't know what their reason is,

8  their motivation is to make things up on the fly to use

9  it to make their case to say somebody suffers from a

10  condition.

11         It's like saying I'm selling Penicillin, you

12  have a fever, you have pneumonia. That's not the way I

13  would practice medicine. Some people do it though, and

14  they get rich by doing that. That's not the way I think

15  one should practice medicine or apply the science to a

16  forensic case.

17         Also, keep in mind, if I have NOS, what does

18  this really mean?  It means not otherwise specified.

19  When I use NOS, that tells me if I read it that I really

20  don't know what this person has. How can I then go and

21  say it's to a reasonable degree of medical certainty or

22  professional certainty that if I already by using that

23  category say that I don't know what that is because it's

24  not specific enough to the presentation in front of me?

25         So you have double trouble here, that, one, I

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208     www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 115 of 234

1    use the condition that is not specific enough. Then you

2    have at -- the nonexisting issue about the paraphilia

3    NOS, nonconsent, and then I go and even try to pretend

4    to say to a reasonable degree of medical certainty. How

5    can I be presenting information to a reasonable degree

6    of medical certainty if I don't know what specifically

7    this person suffers from? And by using the NOS

8    diagnosis, that's exactly what you do.

9           Think about anxiety disorder not otherwise

10   specified. What does this mean? It means that I don't

11   know if this man suffers from generalized anxiety

12   disorder, obsessive-compulsive disorder, separation

13   anxiety disorder, specific phobia, social phobia or

14   PTSD, post-traumatic stress disorder. So there's

15   specific diagnosis -- by using the NOS, that's what this

16   means, and I'm misleading in my judgment -- a trier of

17   fact by saying look, my opinion is to a reasonable

18   degree of medical certainty that this man is suffering

19   from this condition where I don't know even what the

20   condition is. How can you do this?  And that's where the

21   problem is, and add to it then something that doesn't

22   exist, there's no science behind it, you end up creating

23   something that doesn't exist.

24          And, again, people are entitled to be unethical

25   in the execution of the profession. I'm not one of them,

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 116 of 234

1  and I don't think it's appropriate, and, therefore, I

2  don't think I'm coming up or will make -- diagnosis

3  based on inexistent data.

4  Q      And so you're saying that it's that identifier

5  of nonconsent that you're saying there's no -- there's

6  an absence of data?

7  A      That's not the issue --

8  Q      Okay. Well, let me ask it this way. Mr.

9  King was diagnosed with paraphilia NOS. That's a

10  diagnosis under the DSM, correct?

11  A      That's a diagnosis under the --

12  Q      And that was a diagnosis that he was given,

13  correct?

14  A      No. Again, what you're now doing is you're

15  actually making it worse. You're -- it's like saying

16  that I have a condition --

17  Q      Touchism?

18  A      No, no, it's not that. What you're doing is you

19  are saying let me not talk about some part of the

20  diagnosis but the other part that makes my case. You

21  can't now say well, I'm going to just focus on the

22  paraphilia NOS and let's forget the nonconsent that was

23  given to him, because the purpose -- and I don't know

24  Doctor Zinik, but there was a purpose why he used the

25  nonconsent qualifier or description. So I can't now have

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 117 of 234

1  it both ways and say well, let me just focus on the NOS

2  because I can make my case and let's disregard what has

3  been dismissed and refuted by all the organizations

4  Nationally and internationally as a inexisting

5  diagnosis.

6          So what we have to focus on is paraphilia NOS,

7  nonconsent. That's what the diagnosis is that he was

8  given by these three state examiners, and, as I told

9  you, there is no such diagnosis. It's made up, and,

10 again, some people make things up while they go, and our

11 profession would prohibit such behavior and would

12 prohibit such conduct.

13 Q     So it's your testimony that Doctor Zinik's

14 diagnosis was not paraphilia NOS but was paraphilia NOS,

15 nonconsent?

16 A     No. Actually, he used even some other

17 qualifiers. He described a different --

18 Q     Wait, wait, wait. You said qualifiers. What's

19 the difference between a qualifier and diagnosis,

20 please?

21 A     Yeah. If you allow me, I -- explain this. So he

22 started -- and I -- best would be if I can look at this

23 report, because I didn't memorize something that I --

24 that he wrote, but my --

25 Q     It's in the exhibit book.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 118 of 234

1   A        What number?

2   Q        It should be Exhibit Number Five.

3   A        Okay. So what we have here is -- okay. So what

4   he said is --

5   Q        And there was an updated one in 2000 -- the most

6   recent one is on Exhibit Number 57.

7   A        Right. And I think his diagnosis didn't differ,

8   as far as I know, but let me just tell you what he said.

9   He says the diagnosis under Axis One is paraphilia NOS,

10  forced sex with nonconsenting female, also known as

11  paraphilic coercive disorder. So if I take this and if

12  you want me to use a nonclinical term for what this is,

13  that's bogus. There is no such thing as paraphilia NOS,

14  forced sex with nonconsenting females, also known as

15  paraphilic coercive disorder.

16           Paraphilic coercive disorder was first

17  introduced used in the early '80s, refuted by the APA in

18  I believe 1984, APA meaning American Psychological

19  Association -- refuted by the American Academy of

20  Psychiatry and the Law, by the National Institute for

21  the National Social Workers and Criminal Justice System.

22  Paraphilic coercive disorder -- then Darwin came onboard

23  and said now, let's not call it paraphilic coercive

24  disorder, let's call it paraphilia NOS, nonconsent.

25           So what Doctor Zinik did is he's now combining

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 119 of 234

1  two things that -- again, I don't know how he did it.

2  You want to ask him how he came up with this idea to do

3  it the way he did, but he's now mixing two things

4  together, one, the paraphilic coercive disorder and the

5  non -- NOS, and then he adds this forced sex with

6  nonconsenting females. As I told you, there's no

7  empirical evidence in the literature that would support

8  this condition.

9        And take one step further and say I'm the

10 treating doctor and this -- and I'm just a prescriber

11 and this patient comes in with this diagnosis and I'm

12 asked -- prescribe -- medications to this patient

13 because he suffers from paraphilia NOS, forced sex with

14 nonconsenting females, also known as paraphilic coercive

15 disorder. If I were to do it and this person were to

16 experience an anaphylactic reaction to the medication

17 I'm prescribing, I can assure you I would be sued for

18 malpractice, because in order to prescribe, I have to

19 have the foundation in terms of diagnosis. If I'm

20 operating on a flawed diagnosis that doesn't exist and I

21 throw a medication at this patient and he gets an

22 anaphylactic reaction, likely I will be sued for

23 malpractice and most likely I will lose because my

24 diagnosis doesn't exist. So that's what the problem here

25 is.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 120 of 234

1          I mean, if you have somebody who -- choose to do

2    this, Doctor Zinik and the other two state experts, but

3    that's not in accordance with the signs behind

4    paraphilias and the literature pertaining to sexual

5    disorders.

6    Q       So it's your testimony that he did not diagnose

7    paraphilia NOS?

8    A       Let me just see if I understand your question

9    now.

10          THE COURT: I think that question has been

11   asked and answered already.

12          MR. GRAY: Thank you, Your Honor.

13          THE COURT: I think we've plowed this ground

14   that we've been talking about quite well. Why don't we

15   take our lunch break and reconvene at 1:05?

16       (Whereupon off the record.)

17          THE COURT: Doctor Saleh, let me remind you,

18   sir, that you do remain under oath.

19          THE WITNESS: Yes, sir.

20          THE COURT: Very good. Mr. Gray?

21          MR. GRAY: Thank you, Your Honor. Your Honor,

22   we have one housekeeping matter that we'd like to bring

23   to The Court's attention, along with a motion that we

24   would like to make along with that. We were notified

25   during -- just prior to the lunch break by the Marshals

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 121 of 234

1  Service that there may have been an act that would be

2  relevant in terms of the opinions of the experts as well

3  as probably the bearing on The Court with regard to

4  conduct that may have taken place by Mr. King while he

5  was in the custody of the Wake County Sheriff's

6  Department.

7          We're trying to ascertain the details behind

8  that, and from our understanding, the sheriff -- the

9  deputy sheriff that was involved in the incident is

10 not -- they're in Fayetteville some place roaming around

11 the county, so we're trying to get in touch with that

12 person so that we can get a copy of the report in order

13 to ascertain what to do.

14         With that, we would be moving The Court to

15 maintain and keep the court open until we get an

16 opportunity to provide that information for

17 consideration, at least for Respondent's Counsel that --

18 so that they have an opportunity to receive this

19 information as well, and then we can provide it to The

20 Court.

21         THE COURT: What was the date of this alleged

22 incident?

23         MR. GRAY: Last night, Your Honor, or sometime

24 yesterday.

25         THE COURT: I see. Mr. Bell, do you wish to be

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 122 of 234

1   heard on that?

2           MR. BELL: Well, Your Honor, I found out about

3   this alleged event about five minutes ago, don't really

4   know the nature of it. I don't know how it will affect

5   the hearing or whether it will affect the hearing in any

6   way.

7           I know that I've got an expert here who's

8   testifying. The information may or may not be relevant

9   to his testimony. I don't know when we're going to get

10  the testimony or the information. I would hate to keep

11  him here overnight to have to testify about it tomorrow

12  as to whether it's relevant to his opinion or not, so

13  maybe by the end of the day, we'll know more and The

14  Court can make that decision, but I'm kind of -- at this

15  point, I don't know enough about it to really be able to

16  comment.

17          THE COURT: That's fine. Mr. Gray, is the

18  Government trying to get this deputy here today?

19          MR. GRAY: Yes, Your Honor. We're trying to

20  get the deputy. We're also trying to locate them in

21  terms of getting their report, because from what our

22  understanding is, the report has not been generated yet.

23   It's in the process of being generated by the Wake

24  County Sheriff's Department.

25          As an alternative, we understand that Doctor

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 123 of 234

1   Saleh has a busy schedule. What we would recommend is we

2   can provide this information in documentary form to The

3   Court for its consideration. Of course, we'd provide it

4   to Respondent's Counsel initially, and if The Court felt

5   it was necessary to hear the testimony, then we can look

6   for that, but we'd offer alternative forms of testimony

7   and certainly would provide it to Doctor Saleh and the

8   other experts in handwritten forms so that they can use

9   that to inform their decision.

10                  THE COURT: Okay.

11                  MR. BELL: Just --

12                  THE COURT: Yes, sir?

13                  MR. BELL: -- for clarification, Your Honor,

14  if there's a report that involves conduct that my client

15  allegedly engaged in, then I would object vehemently to

16  The Court receiving a report in lieu of live testimony

17  with the possibility that I can cross-examine the

18  individual who generated the report, who saw the alleged

19  conduct and so forth. So I would not agree, nor would I

20  -- I would object vehemently to that.

21                  THE COURT: Okay. Well, my suggestion for the

22  time being is let's proceed with Doctor Saleh. We don't

23  have a report or a witness to be concerned with at the

24  moment. Let's see where we are at the end of the day

25  once we've completed the other testimony.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 124 of 234

1          MR. GRAY: Thank you, Your Honor.

2          THE COURT: Mr. Gray?

3          MR. GRAY: Thank you, sir.

4      BY MR. GRAY:

5    Q      Doctor Saleh, you gave a diagnosis of antisocial

6    personality disorder to Mr. King, isn't that correct?

7    A      That's correct.

8    Q      And antisocial personality disorder has been

9    recognized as a serious mental illness for the purposes

10   of certification of sexually dangerous persons in

11   Massachusetts, isn't that correct?

12   A      You know, I'm not sure.

13   Q      Doctor, are you familiar with the case of

14   Commonwealth versus Reese?

15   A      I don't remember, no.

16   Q      It is a case that discusses the use of the term

17   antisocial personality disorder, and it's a case in

18   which the Supreme Judicial Court of Massachusetts opined

19   that a diagnosis of APD, antisocial personality

20   disorder, is adequate to satisfy the definition

21   requirements. With that additional information, does

22   that assist you in recognizing or understanding the

23   facts of that case?

24   A      Absolutely not. I mean, you're just telling me

25   what the court ruled. I understand that the

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 125 of 234

1    Massachusetts statute talks about the respondent -- I
2    mean, the definition would be that the -- either mental
3    abnormality or personality disorder, and personality
4    disorders is defined as a condition -- statutory defined
5    where they have a general lack of control to their
6    sexual impulses or something along those lines, and
7    that's what I can say in terms of the statutory
8    definition. Again, I'm not familiar with this case. I
9    don't remember the case.

10   Q       And are you familiar that the First Circuit in
11   the United States versus Carter also found that
12   antisocial personality disorder would qualify as a
13   serious mental disorder under 18 USC 4248?

14   A       Again, I'm not an attorney, and I'm aware of
15   some of the statutes. I don't remember the case you
16   mentioned, and I certainly don't have any reason to
17   believe that what you say is incorrect.

18   Q       Doctor Saleh, a percentage of your practice is
19   clinical work, isn't that correct?

20   A       That's correct, yes.

21   Q       In fact, part of your clinical work involves
22   those who have sexual behavioral issues, isn't that
23   correct?

24   A       Yes.

25   Q       Doctor Saleh, if I could pose a hypothetical to

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 126 of 234

1  you, if a patient were to come into your clinic and
2  state to you that they had feelings in which they wanted
3  to go out and kill somebody and they felt like a
4  hibernating bear, you would feel compelled to take
5  action on that, wouldn't you?
6  A      Depends how you define taking action on it.
7  I mean, if somebody comes in with that and so that's the
8  first time I see this individual, he walks into my
9  office and that's the first statement to me with no
10  other records in front of me --
11  Q      Well, we'll use that as the beginning portion of
12  this hypothetical, yes.
13  A      Well, I have to tell you it would be very
14  unusual for somebody to just walk in and then make that
15  statement, but hypothetically let's say if that were the
16  case, would I say to them thanks for sharing this
17  information with me and I will see you in one month for
18  follow-up visit?  Probably not. Would I want to talk to
19  them more in-depth? Absolutely. Would I want to get a
20  better sense of their -- whatever their statement means,
21  where that comes from, understanding the context?
22  Absolutely. Would I like then to corroborate the
23  information via other records or documents? Yes.
24          And would I take action, as you said? I
25  certainly -- what I wouldn't do is I wouldn't just

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 85  Filed 11/18/11  Page 127 of 234

1  discharge or dismiss that statement. The action would be

2  that I would try to get corroborating information, and I

3  may or may not take action, which could be sending the

4  patient to the emergency room for further evaluation if

5  indicated.

6  Q      But you just wouldn't disregard that comment

7  completely?

8  A      Absolutely not. I mean, nobody, I think, in

9  their right mind would just disregard a comment made to

10  you of this nature.

11  Q      And if this were a continuing patient of yours

12  that you had been seeing for a number of years and this

13  patient had a conviction for assault, assault with a

14  deadly weapon, carrying a deadly weapon as well as has

15  been known to expose themselves in the past and they

16  came up to you and said I feel like I'm a hibernating

17  bear who has awakened with a desire to eat and eat he

18  will, you'd take that comment seriously, wouldn't you?

19  A      -- tell you this. You take it seriously, but it

20  doesn't mean necessarily that you act on it. I have

21  patients who come in and do report -- actually, let me

22  see if I can give you an example -- of a person who did

23  report that he had thought of going out and killing

24  little children, and so I certainly wouldn't dismiss it.

25  By no means would I dismiss it, and I would consider

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 128 of 234

1   that, but, again, the thing is you have to put it back

2   in context, understand the motivation behind that

3   information.

4          So if this is somebody who came to my office and

5   everything that I would have at my disposition, reports

6   from people, family members, other psychiatrists, over

7   40 years and everybody would say that this man has never

8   lied, was always honest, shared his emotions and

9   feelings in a truthful manner, has sought out treatment

10  voluntarily to get help and do -- well and doesn't

11  present with anything that would remotely be close to

12  psychopathy or antisocial personality disorder or

13  malingering, I certainly would take that account into

14  consideration and give it the due weight it would

15  deserve.

16         Yet if I take into account what I have in front

17  of me, because that's -- statement from Mr. King, it's a

18  serious concern. It's certainly -- statement that raises

19  anyone's eyebrows, but then if I put it back into the

20  context and see what type of things he has reported over

21  the course of his lifetime, including that he has

22  alters, including that he has offended because of a

23  blackout and it wasn't actually him offending during the

24  blackout, but it was one of his alters, and if I have

25  this man telling me that he hears voices, that he has

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 129 of 234

1  thoughts of killing himself, yet he didn't have any

2  thoughts or plans of killing himself, that's a

3  context -- again, if you just take -- in a vacuum and

4  present to me the concern would be there, but I can't

5  look at things in a vacuum and fit back into the

6  context.

7  Q      Now, you're aware that Mr. King made various

8  claims that he was seeing -- he had voices in his head,

9  that he had -- also had multiple personalities and that

10 led to some diagnoses that were made about Mr. King?

11 A      Yeah.

12 Q      What were those diagnoses?

13 A      Well, let me look at my report. I mean, I have a

14 list of a few, but I can certainly give you a few. One

15 would be schizophrenia, that he carried a diagnosis of

16 psychosis, anxiety disorder, mood disorder, antisocial

17 personality disorder, exhibitionism,

18 Then intermittent explosive disorder, substance abuse,

19 dissociative personality disorder, multiple personality

20 disorder, I believe even borderline personality

21 disorder, if I'm not mistaken, bipolar disorder,

22 malingering. That's what I remember of him.

23 Q      But he was diagnosed with malingering after the

24 folks at Butner determined that he was, in fact, lying

25 and was not truthful about his multiple voices, the

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 130 of 234

1   additional personalities and even some of his suicide

2   attempts, isn't that right?

3   A        The issue of malingering, I mean, he was -- and

4   I have to tell you I would have to go through the entire

5   records to say when they first said or raised the issue

6   of malingering, but I do know that he was said to

7   malinger -- I mean, as you pointed out, at subsequent --

8   at least at one point in time to the -- when he was

9   talking about the multiple personality disorder, all

10  this was --

11  Q        So you would agree that the record at least

12  indicates that some of his behavior in terms of lying

13  about various disorders was actually recognized by some

14  of the psychologists?

15  A        Well, again, you're picking things and choosing

16  things here. I'll tell you this.

17  Q        I'm sorry, Doctor. If you could just answer that

18  question, then feel free to elaborate --

19  A        Sure. The answer would be yes.

20  Q        Thank you.

21  A        And the point you make is you can't just when

22  you have the records in front of me ask -- just take

23  that into consideration as you did previously with the

24  exhibitionism diagnosis he received in 1976 and

25  disregard everything else. The point is that's why you

Huseby, Inc.                                           www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208   (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 131 of 234

1   have clinical data and clinical records on a person is

2   to understand the case.

3           Was he diagnosed at one point in time with

4   atypical psychosis? Yes. Was he said to suffer from

5   dissociative personality disorder? Yes. And if you look

6   at the records, the therapist or psychologist at that

7   time believed that he has this personality or this

8   dissociative personality disorder because what he said

9   is -- let me just tell you -- because I thought that was

10  quite telling.

11          Here we are. So he described -- I'm not sure

12  if that's the section, but what I have highlighted is it

13  says, for example, he described hearing voices, one male

14  and one female and maintained that it was one of these

15  personalities, Ken or Kirsten, that are present when he

16  loses time.

17          And then they went on to say that initially he

18  was unable to tolerate the surfacing of strong emotion

19  without defending either -- avoidance or dissociating.

20  Over time, sadness has become more accessible to him.

21  Anger remains difficult for him to express without

22  dissociating.

23          In general, the personality of Ken is the keeper

24  of anger and aggression.  Ken presents himself regularly

25  in session. Kirsten expresses the need for love and

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 132 of 234

1   affection. She has never presented herself as -- if you

2   read this piece, you really wonder what was going on.

3   The mastery of manipulation, it's really -- it's right

4   in front of you.

5           I mean, how much -- what did Mr. King do to

6   persuade this Phipps psychologist to even believe and

7   write down what he wrote down what we have in front of

8   us? That's -- if you think about this today, it just

9   doesn't make sense. You wonder where -- how could

10  somebody draw those type of conclusions, believing in

11  Ken, Kirsten and all that stuff?  That's manipulation.

12          And, again, the point is of malingering -- it

13  goes hand in hand with manipulating the system for some

14  ulterior gain he may have, and he certainly got the

15  attention he needed at that time when he was making

16  these statements and presenting himself as being

17  somebody else and having these personalities.

18          Along those same lines --

19          THE COURT: Doctor Saleh, let me -- I'm going

20  to interrupt you, and I want to make a comment to you as

21  well as Mr. Gray. When he asks you a question, I would

22  request that you answer the question that is asked. If

23  it's a yes, no question, you may respond. I would

24  appreciate it if you respond yes or no, and then you may

25  explain.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
                                                            (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 133 of 234

1          Unless he calls for specific examples and

2     recitation of excerpts from the record, I'd prefer you

3     not do that, just because if we continue at this pace,

4     we're going to be here until the evening. If he wants to

5     elicit that information from you, he can ask you that.

6          If Mr. Bell thinks that something important

7     has been left out, he's going to have a chance to come

8     back to you and elicit that. So you'll have a full

9     opportunity to express your views, to the extent you

10    already haven't had it.

11          I think some of these questions we're just --

12    we're retreading ground that's already been covered. We

13    don't have a jury here. I think Doctor Saleh has been

14    very eloquent and thorough in his responses, so I don't

15    think there's a need to retread ground that's already

16    been covered, Mr. Gray. So if you could limit yourself

17    to new material, I would appreciate it.

18          MR. GRAY: Yes, Your Honor -- certainly my

19    intention.

20          BY MR. GRAY:

21    Q      And, Doctor Saleh, in fact, after that

22    revelation of Ken and Kirsten, isn't it true that Mr.

23    King was then sent to Butner for further evaluation, and

24    then your report at page nine, you note in that report

25    that they found out and said he wasn't believable?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208            www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 134 of 234

1   Isn't that true?

2   A       Yes.

3   Q       Now, with regard to Mr. King's conduct involving

4   drug use, you on your report on page -- if you would,

5   please turn there with me to page 16 at the bottom where

6   it says speech and thought.

7   A       Yes.

8   Q       It states that in that first blotted -- it says

9   Mr. King's speech was regular in rate, normal in tone

10  and value, and then it says he denied obsessions. So you

11  asked him that question?

12  A       I asked about intrusive thoughts he may have

13  had, yes.

14  Q       And he denied those?

15  A       He denied them to me when I asked him that

16  question.

17  Q       And you asked him about compulsions, and he

18  denied those as well?

19  A       When I asked him the question at that time, yes.

20  Q       And asked him about phobias, and he denied that

21  as well?

22  A       Yeah, sure.

23  Q       And you also asked him about paraphilic disorder

24  related symptoms such as deviant sexual thoughts,

25  fantasies or behaviors, and he denied all of those to

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208      www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 135 of 234

1    you as well?

2    A        That's correct.

3    Q        And when he denied all those things, you relied

4    upon those statements, isn't that true?

5    A        No, that's not true.

6    Q        And further on in that paragraph, it says you

7    did -- Mr. King told you that he did multiple

8    personality disorder thing, that he attempted to do the

9    massive depressive thing -- manic depressive thing and

10   being suicidal and he did it to better living conditions

11   and to get attention, isn't that right?

12   A        That is what he told me, yes.

13   Q        And he also told you that he had BS-ed these

14   people so many times, I thought I was doing the right

15   thing trying to let them take care of me, isn't that

16   right?

17   A        That is what he said, yes.

18   Q        And on page 17 in the diagnostic opinion, at the

19   very bottom of the second paragraph in that line, you

20   write the data with regard to paraphilic disorder

21   diagnoses are inexistent?

22   A        Yep.

23   Q        So you didn't find anything that would support a

24   paraphilic disorder within the records that you reviewed

25   for Mr. King?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 136 of 234

1    A        Let me just see. Actually, what I said is -- you

2    omitted one piece of what I said. I said in fact, with

3    the exception of Mr. King's behaviors in the mid '70s,

4    1970s, the data with regard to possible paraphilic

5    disorder diagnoses are inexistent.

6    Q        So there's nothing in the record after the '70s

7    that would indicate that he's got a paraphilic disorder?

8    A        There is nothing in the records since the mid

9    1970s that would suggest or support the notion that he

10   suffers presently from a paraphilic disorder, however

11   you were to define it.

12   Q        Doctor Saleh, you're familiar with the DSM-IV

13   casebook, aren't you?

14   A        Yes.

15   Q        That's a document or that's a book that's relied

16   upon by those within your field, isn't that right?

17   A        It depends. I mean, as you know, some people

18   rely on certain things. Other people don't.

19   Q        And it's also known as being a learning

20   companion to the Diagnostic and Statistical Manual for

21   mental disorders?

22   A        Yeah.

23   Q        And within that casebook, there are scenarios

24   that are used to help make diagnoses, isn't that right?

25   A        I haven't looked at it for a while, but if

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 137 of 234

1  that's what you say, it probably is accurate.

2  Q      And in the diagnostic casebook,

3  if I could read you this hypothetical --

4  A      Yep.

5  Q      Growing up, often feeling alone and unloved, he

6  began fantasizing about the perfect relationship with an

7  ideal woman who -- could sweep her off her feet. As time

8  passed, such fantasies and urges began to assume an

9  eroticized obsessional quality. Initially he would

10 imagine himself coercing an unwilling woman into sexual

11 activities that she would then come to enjoy. He would

12 then fantasize of a -- caring relationship. Often he

13 would masturbate while having these fantasies. Though

14 Jim understood that the scenario in these fantasies was

15 unlikely, he nevertheless began to be preoccupied with

16 sexually exciting urges to act upon these fantasies.

17       When he was 16, he committed his first rape, and

18 after each rape, he would promise himself never again,

19 but in time as his preoccupations and urges were

20 rekindled, he would repeat the cycle. Although he would

21 often threaten women with a knife to obtain their

22 compliance, he never physically hurt them and used

23 minimal amount of force necessary. Any obvious signs of

24 suffering and anguish would diminish rather than enhance

25 his erotic arousal. During the course of each rape, he

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208**     **(704) 333-9889**
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 138 of 234

1    would invariably throw away his weapon and assure the

2    women that he did not intend to injure them or cause

3    them harm.

4         When reading magazines or watching movies

5    depicting scenes of females in positions of subjugation

6    or bondage, he would become erotically aroused,

7    fantasizing that they were enjoying the experience, but

8    he would not become thus aroused if the women seemed to

9    be suffering or in genuine distress.               Apart

10   from his conviction for rape, Jim has never been

11   convicted or accused of any other type of criminal

12   activity. He has no history of outpatient or inpatient

13   psychiatric treatment. He was stable at work. He has a

14   stable work history. He has never abused alcohol and

15   other drugs.

16        Now, with regard to that hypothetical, the

17   DSM-IV casebook says however, this rape behavior can

18   best be understood as a manifestation of a specific

19   paraphilia because the erotic arousal depended on having

20   a nonconsenting partner. During the development of the

21   DSM-III-R, the term paraphilic coercive disorder was

22   suggested for this particular type of paraphilia, but

23   this category has never been officially recognized.

24   Therefore, Jim's disorder would be coded as paraphilia

25   not otherwise specified, DSM-IV. Would that be

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 139 of 234

1  consistent with your training and understanding as to

2  how a person with that sort of past background should be

3  characterized?

4  A       I'm not sure if I fully understand that question

5  in terms of characterize. I mean --

6  Q       Is paraphilia NOS a proper diagnosis for that

7  hypothetical?

8  A       NOS for that hypothetical? It depends. I mean,

9  again, you just read me a one page document and you're

10 asking me if I would consider paraphilia NOS as a proper

11 diagnosis for this hypothetical. I would have to say it

12 depends, and one has to look at the differential

13 diagnosis.

14      Would I consider it and would I consider sexual

15 behaviors of a violent nature? Would I consider a

16 paraphilic disorder diagnosis? Yes. I mean, in terms of

17 the differential diagnosis, but would that be --

18 appropriate diagnosis I would give to this hypothetical,

19 what you just read, I don't know without knowing more

20 about the case.

21 Q       If you were to learn -- and if Mr. King were not

22 diagnosed as being a chronic liar or pathological liar,

23 would Mr. King have the diagnosis of paraphilia NOS?

24 A       Actually, I was told -- I mean, what pieces of

25 his records would you want me to rely on? The things he

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 140 of 234

1    acknowledged at one -- at one point in time or things he

2    dismissed at another time? Do you want me to acknowledge

3    when he said all these -- things about him or Marlene

4    King was responsible for his behaviors? If you could be

5    more specific -- what element of the record do you want

6    me to consider?  That heroin did help him to avoid

7    acting out or amphetamines drove the behavior? I mean, I

8    have to tell you, that question I don't think I can even

9    answer. You have to give me a more specific -- I mean,

10   you have to provide me with a better question.

11   Q       Fair enough. At the bottom of page 16 of your

12   report, Doctor Saleh, in the line where he was

13   recounting to you I BS-ed these people so many times, I

14   thought it was doing the right thing trying to let them

15   take care of me, right after that line, he states I can

16   do it on my own, I'm fine. My question to you, Doctor

17   Saleh, is can Mr. King do his treatment on his own?  Is

18   he fine?

19   A       Actually, I don't think he was referring to

20   treatment, so -- he was not referring to treatment.

21   Q       And is he fine?

22   A       Depends how you define fine. I mean, what do you

23   mean with fine?  I mean, is he fine in what regards?

24           MR. GRAY: No further questions.

25           THE COURT: Mr. Bell?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 141 of 234

1          MR. BELL: Thank you, Your Honor.

2          EXAMINATION

3          BY MR. BELL:

4    Q       Doctor Saleh, earlier in your testimony there

5    was discussion about the APA's stance with regard to

6    sexually violent person or sexually dangerous person

7    statutes. I think the Government attorney read some

8    documentation related to their resistance or their --

9    actually, I believe you indicated they filed amicus

10   briefs in Supreme Court cases related to that, isn't

11   that correct?

12   A       That's my understanding.

13   Q       I just want to clarify. I believe you testified,

14   and correct me if I'm wrong, that you do not personally

15   as a psychiatrist necessarily have any sort of bias

16   against sexually dangerous person or sexually violent

17   person statutes per se, do you?

18   A       No, I don't.

19   Q       I believe your testimony was that as long as the

20   evaluators adhere to the proper principles in conducting

21   their evaluations and arriving at their diagnoses, it

22   was fine and proper if someone was determined to be a

23   sexually dangerous person or a sexually violent person,

24   isn't that correct?

25   A       Yes. I mean, the bottom line is the foundation

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
                                                              (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 142 of 234

1  that would allow me to then apply empirical information

2  or the database on the statute. So if my foundation is

3  flawed and I make things up while I go along, try to

4  find something to make my case and then apply that

5  elicited clinical information on a legal statute, that's

6  where the problem is, and then that's -- misleading the

7  trier of fact. It's like the not guilty by reason of

8  insanity defense -- I do -- you have clinical data, look

9  at the clinical data and then apply it to the statute

10  and address a legal question where the court allows you

11  to do it, but the, I think, at least expertise of the

12  forensic psychiatrist is -- we need to provide the court

13  with the clinical data unbiased as they present

14  themselves and then apply it, but ultimately that's a

15  legal process one has to go through.

16  Q       And you've had any number of cases where you've

17  evaluated an individual, an inmate or an offender where

18  you have determined that, in fact, they did fall under

19  the statute, the sexually violent person statute in

20  Massachusetts or where have you, haven't you?

21  A       Yes, absolutely. The cases I have done, I

22  have -- both for the prosecution. I mean, I have done

23  cases where I wrote a report stating that in my opinion

24  to a reasonable degree of medical certainty that the

25  respondent meets a sexually dangerous person definition

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 143 of 234

1   as defined by the Massachusetts statute. I have wrote

2   it, reported back to the attorney or the office who

3   retained me on the case. I have reported back to

4   attorneys, defense attorneys stating that I read the

5   records, that in my opinion the person meets that

6   definition and that I couldn't assist them, and I have

7   done the contrary.

8           I reported to the prosecution that a

9   person doesn't meet the definition, and the same is true

10  for defense attorneys, the person doesn't meet the

11  definition under SVP --

12  Q       Now, there was a lot of testimony earlier about

13  this diagnosis of paraphilia NOS, nonconsent or label,

14  whatever you want to call it, the fact that it does

15  not -- is not contained in the DSM-IV-T-R, and you

16  indicated that there was no empirical evidence to

17  support the diagnosis and so forth.

18          The diagnoses that do end up in the DSM-IV-T-R,

19  if you would briefly -- I don't want to get into a long

20  diatribe about it, but just briefly explain to The Court

21  the sort of vigorous debate and research and so forth

22  that goes into how something ends up in the DSM-IV-T-R

23  or DSM -- manual briefly.

24  A       Yep. I'll do it as briefly as possible. So the

25  way -- goes about it, there is a database on a given

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 144 of 234

1  proposed condition in terms of articles, studies,

2  research, and then it's presented to the taskforce, for

3  example, and that is looked at, and then over the time

4  it's -- decision that is not made over a week or so, but

5  over a certain time period. There's further information

6  pertaining to a given diagnosis that is looked at, as

7  you pointed out, debate -- debated, discussed, and only

8  if it meets a standard of it being a valid scientific

9  entity, it will make it into the diagnosis.

10          Having it in a back page of the DSM, I think

11  that is what that would be or would -- considered to be.

12  That's not the way the diagnosis works. In order to make

13  it into the DSM, there needs to be a robust foundation

14  behind it. Otherwise, it's not going to be introduced.

15  And the fact that the DSM for 30 years now has rejected

16  the paraphilia NOS, nonconsent, it actually notes that

17  the NOS non -- so the paraphilia NOS category shouldn't

18  be used as a proxy for the nonconsent diagnosis. There

19  is a reason behind it, and the reason is because there's

20  no scientific evidence supporting these conditions and,

21  therefore, it doesn't make it into the DSM.

22  Q       There was some testimony earlier in the week,

23  Doctor Saleh, related to self-reporting by Daniel King,

24  and it's in the record, about the heroin use to dampen

25  his drive for sexual acting out and so forth. Was it

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 145 of 234

1   important in your assessment of Mr. King that he had, in

2   fact, not tested positive for opiates or heroin since he

3   had been at Butner? And I believe he went there in May

4   of 2009 and yet there had been no incidents at least in

5   the record of sexual misconduct. Was that important to

6   your decision?

7   A          Yes, absolutely. I mean, that's, again, one of

8   those points where you have somebody who is -- if the

9   urine toxicology screens are accurate has used heroin.

10  There is testimony or at least I understand somebody

11  suggested that the heroin or -- was used to dampen the

12  sexual drive so that that helped him not to act out

13  sexually. And say so far we take this as being fact, and

14  what we do know is that Mr. King has not acted out

15  sexually with the exception of the 1993 incident when he

16  approached a person and this alleged -- whatever was

17  alleged earlier that may have happened yesterday, last

18  night.

19          The question boils down to so if I say heroin

20  helped him not to act out sexually, that was a treatment

21  that helped him to stay away -- of -- stay out --

22  control, the question that I would have -- would ask

23  myself as the expert is what's the half-life of heroin,

24  how long does it stay in your system and what does it do

25  to you, because that's a relevant question, because my

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 146 of 234

1  understanding is that Mr. King has not used heroin every

2  single day, three times a day because -- only this way

3  one could be assured that it's indeed in his system,

4  that he builds up a steady -- level and operating under

5  the assumption that that would allow him not to act out

6  sexually.

7         Heroin doesn't stay in your system for more than

8  a few hours. My understanding reading the records is

9  that he has not used heroin every single day, several

10 times a day, and urine tox screens over the last years

11 at least the tox screens I saw -- we have only a handful

12 of toxicology screens that show that he had used heroin

13 and he has not used heroin -- last two years, since

14 2009. I would have then to go back and explain how it is

15 possible if the theory of heroin being the damper of

16 sexually out acting out behavior -- that he has not

17 acted out sexually during the time periods in between

18 the heroin -- you had positive urine toxicology screens

19 -- the last two years.

20        So that hypothesis of heroin being the solution

21 to his behavior, sexual behaviors and impulsivity

22 becomes nullified because it doesn't -- I mean, I

23 can't -- yeah. I mean, I wouldn't be able to conclude

24 that that helped him to -- behavior, appropriate -- not

25 to act out sexually, because what about all the other

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 147 of 234

1   days and times while he is in the prison system where he

2   has not acted out sexually and it was not related to --

3   heroin?  So it doesn't make sense, that analogy.

4   Q       Now, just a few moments ago, Mr. Gray related or

5   pointed to a statement or a -- I guess a statement of

6   Mr. King in quotes and asked you whether or not you

7   relied on that statement from his interview in arriving

8   at your determination or evaluation, your ultimate

9   opinion about Mr. King. Explain again briefly to The

10  Court exactly how you used his statements that -- that

11  you didn't totally disregard them, but you used them in

12  terms of the context of the overall record. Just briefly

13  explain that to The Court again, how these statements

14  were useful to you in your evaluation.

15  A       His statements to me?

16  Q       Yes.

17  A       Well, I wanted to hear his side of the story at

18  that time, and that was, I think, the extent of what I

19  was able to get is his side of the story, and, again,

20  I'm not sure if I totally understand your question in

21  terms of --

22  Q       Well, I think that the impression from the

23  question from Mr. Gray was that you totally disregarded

24  what he told you in the interview. I may be misstating,

25  and if I am, I'm sure I'll be corrected. I don't think

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 148 of 234

1   your testimony was that you totally disregarded his

2   statements or didn't take 'em into account but that you

3   took 'em into account in the context of the overall

4   record, and I'll just ask you to sort of explain to The

5   Court again briefly sort of how you did that.

6   A        So the one thing I can say is -- take the

7   example I think that was brought out earlier about the

8   obsessions. So if I ask somebody if they have an

9   obsession, I don't just ask do you have an obsession and

10  then go with the answer. What I try to do is elicit --

11  is the description of what they describe as being an

12  obsession consistent with what I understand the

13  obsession to be. Is this a way an obsession would

14  present itself in a person presenting with, say, a

15  sexual disorder or obsessive-compulsive disorder? I to

16  get a description of the phenomena he at one point in

17  time is reported to have experienced.

18          Same thing with hallucination. So he may say I

19  have heard voices in the past. If I ask him tell me

20  about that, how does it present itself, what was it

21  like, and if he gives me the description as I heard

22  earlier that it's a voice in my head and that's -- and

23  then if I were to conclude that's a hallucination, that

24  would be incorrect, because a hallucination doesn't work

25  like that. So I try to get a description from him to

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 149 of 234

1   suggest -- well, to support one or dismiss the condition

2   of, say, psychosis that he was given at one point in

3   time.

4           His descriptions of psychosis or hallucinations

5   were inconsistent with what I know and understand how

6   hallucinations present themselves in patients truly

7   afflicted with a psychotic illness. And so, I mean, in

8   this way -- and that's -- much of the time we spent was

9   going through these phenomena trying to see if they're

10  actually consistent with the pathology, the

11  phenomenology of these conditions, and they were not,

12  and, therefore, I would agree with the fact that

13  presently the fact that he doesn't have a clinical

14  diagnosis by -- or doesn't carry a diagnosis by his

15  current providers makes sense, that there is no

16  diagnosis of schizophrenia or bipolar disorder because

17  he did not report anything that would be remotely close

18  to that condition the way at least these conditions

19  would have to be diagnosed.

20          MR. BELL: Nothing further, Your Honor.

21          THE COURT: Mr. Gray?

22          MR. GRAY: No, Your Honor.

23          THE COURT: Let me ask you, sir, if I could,

24  just a couple of questions. Is my understanding correct

25  that in evaluating a person who has been in prison,

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 150 of 234

1  particularly one for an extended period, that that fact

2  that they have been in a prison environment would be

3  considered in an evaluating a conduct?

4          THE WITNESS: Yes.

5          THE COURT: Say you're trying to evaluate

6  whether a person has a paraphilia. How would the prison

7  environment affect the analysis? And what I'm

8  specifically wondering about is if you are in a

9  controlled -- if the patient is in a controlled

10  environment like that where there may be fewer

11  opportunities to act out, so to speak, how does that

12  figure into the analysis of whether the person would

13  have paraphilia?

14          THE WITNESS: I mean, in terms of -- let me

15  see how to explain it. If you are in a controlled

16  environment, he has not the same amount of opportunities

17  he would have if he were in the community.

18          THE COURT: That's exactly what I was getting

19  at, yes.

20          THE WITNESS: And so the question then is how

21  do we know that it's the environment that is prohibiting

22  him to engage in paraphilic behaviors he presents with

23  but they're not manifest because of environment.

24          THE COURT: Right.

25          THE WITNESS: Okay. So the answer to that

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 151 of 234

1   is -- if I may break it down --

2            THE COURT: Certainly.

3            THE WITNESS: -- so I can explain, the first

4   thing I would do is with Mr. King, we have not just a

5   one year prison term we're looking at, but years of

6   prison time, so he has been -- he has gotten used to the

7   environment he is in, has adjusted, and in that context

8   has engaged in behaviors that are considered against the

9   rules of the prison environment -- and procuring all the

10  drugs he has procured over the course of these years.

11  So he has -- despite the fact that he is in this

12  controlled environment, he ended up having urine

13  toxicology screens positive for heroin, so it didn't

14  deter him from engaging in ultimately -- I don't know if

15  it's criminal behavior, but at least behaviors that are

16  not sanctioned within that setting. That's one.

17           The other thing I can point out, that despite the

18  fact that he is in a prison environment, controlled

19  environment, his sexual drive has remained and he has

20  been sexually active as he has been previously prior to

21  Coming to the prison environment. He has had

22  relationships with, for example, the inmate, Smith,

23  where they were considered a couple. He had strong urges

24  for him, and so he has established relationships,

25  homosexual relationships with at least this one inmate I

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 152 of 234

1    know of offhand.

2           And his sexual interest is geared towards men,

3    and if you say -- even disregard the issue of sexual

4    orientation but say that he is an opportunist and is

5    going to be sexually involved with men because these are

6    the only people he can have sex with, and if he truly

7    had a paraphilic disorder where he would again have to

8    establish that he has these intense urges -- I mean, we

9    talk about the intense urges that -- people, if they

10   truly suffer from it to act out, I would expect to see

11   something in the last 30 years within the environment he

12   has been in where you would say that this man has

13   indeed -- because ultimately untreated, he has not been

14   on -- no medications -- you treat a paraphilic

15   disorder.

16          So you have somebody with an untreated

17   paraphilic disorder in this environment where there are

18   stimuli because there are female staff, male staff,

19   inmates he has sex with, yet there is no sexual acting

20   out behavior other than the 1993 incident where he

21   proposed somebody to touch his penis and nothing else

22   happened, and that's where I think that doesn't go hand

23   in hand with -- paraphilia diagnosis, however one were

24   to define it, because if I truly suffer from this

25   condition, I can't just turn it off and say because I'm

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 153 of 234

1  in this setting, I'm not going to have this drive or

2  interest.

3          And the way to think about this is appetite for

4  food. I mean, it's -- sexual drive is a physiological

5  drive that requires excitation and -- and people within

6  this human response cycle, sexual response cycle, they

7  get excited, they engage in sexual behavior. Then

8  there's a resolution phase and they start all over the

9  cycle of sexual activity. And with a person with a

10 paraphilic disorder, the difference is that their target

11 of their sexual interest is paraphilic. For example, the

12 person with pedophilia that -- they're interested, for

13 example, in children.

14         Now, with Mr. King, his target has not been

15 children. If one were to say that his interest is having

16 coercive sexual acts or being aroused by the coercive

17 nature of the sexual activity, he would have

18 opportunities within the system to engage in that

19 behavior, and specifically if these symptoms were as

20 intense, because you can't just turn it off and say

21 well, I'm not going to act on these impulses because I'm

22 in a prison system in the absence of any treatment or

23 medications.

24         And so I think it's really this negative here

25 that we have, lack of data supporting a paraphilic

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 154 of 234

1  disorder diagnosis that wouldn't allow me to draw the
2  conclusions within this setting or even outside this
3  setting in the community to say that his behaviors are
4  that of a patient or individual with a paraphilic
5  disorder.
6           If I could just make one last point maybe to
7  be even clearer is if I tried to diet and I say I'm on a
8  diet and I have to lose weight, I may have the best
9  intentions to lose weight. Come six p.m., I'm going to
10  be hungry and I will succumb to the urge and will open
11  the door of the fridge and will sneak into the kitchen
12  and eat something and will be upset later on,  but I
13  give into this physiological drive which is appetite for
14  food and ultimately end up not adhering to the diet.
15          Sexual drive, if it's as intense as required
16  by the DSM and it's paraphilic in nature, you would
17  expect something somewhere, but in the absence of any
18  data supporting that, again, from my viewpoint, there is
19  no evidence to support this paraphilic diagnosis at this
20  time.
21          THE COURT: Very good. Thank you. Mr. Bell,
22  any follow-up?
23          MR. BELL: No, sir, Your Honor.
24          THE COURT: Mr. Gray?
25          MR. GRAY: No, Your Honor.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 155 of 234

1             THE COURT: Very good. You may step down, sir.

2    Mr. Bell, is there any other evidence from the

3    Respondent?

4             MR. BELL: There is not, Your Honor. We would

5    like to hold Doctor Saleh in reserve in case we need to

6    bring him back on -- rebuttal. I assume that they are

7    going to have a rebuttal witness, but other than that,

8    we have no evidence at this time.

9             THE COURT: Okay. Very good. Mr. Lockridge,

10   sir, is there any rebuttal evidence?

11            MR. LOCKRIDGE: Just briefly, we'd like to

12   reoffer Doctor Zinik on rebuttal.

13            THE COURT: That would be fine. You all

14   settled, Doctor Zinik?

15            THE WITNESS: Yes. Thank you, Your Honor.

16            THE COURT: Okay. Very good. Let me remind

17   you, sir, that you do remain under oath.

18            THE WITNESS: Yes, Your Honor.

19            THE COURT: Very good. Mr. Lockridge?

20            MR. LOCKRIDGE: Thank you, Your Honor.

21         EXAMINATION

22         BY MR. LOCKRIDGE:

23   Q     Doctor Zinik, I hope to keep it brief.

24   You heard Doctor Saleh's testimony here today?

25   A     I did, yes.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 156 of 234

1   Q        And his -- also with regard to his testimony

2   with regard to the use of actuarials?

3   A        I did, yes.

4   Q        And is it your opinion -- or what is your

5   opinion with regard to the -- your use of the actuarial

6   instruments that you used as to their -- whether they

7   have been reviewed and accepted among your peers?

8   A        Well, it's my opinion that the actuarial

9   scales I use, the -- the Static-99, the MNSOS -- and the

10  Static-2002R are accepted within the professional

11  community. I think I mentioned that this is the

12  direction that the field of civil commitment is moving

13  toward. This is becoming the standard of professional

14  practice, using actuarial scales as a component of risk

15  assessment.

16          In fact, there are some states -- I understand

17  that the State of Texas actually requires the use of the

18  Static-99R. I know that California is using the

19  Static-99R at several points prior to parole of sex

20  offenders, and I don't know if it's required by SVP

21  evaluators, but it is highly recommended that the SVP

22  evaluators on the Department of Mental Health use

23  actuarial instruments.

24          I have a five page bibliography here of dozens

25  of studies. These are cross-validation studies or what

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 157 of 234

1   we call replication studies. The majority of them apply

2   to the Static-99R. There is no question that these

3   instruments have been validated and cross-validated

4   across many samples of sex offenders, but particularly

5   the Static-99, it is used all over the Country. It is --

6   there are cross-validation studies from Germany and

7   foreign countries, so I think there's plenty of evidence

8   that these scales are valid.

9          The way -- now, what that means is that the --

10  the sorting value of them, that they're useful and they

11  are valid and the results are replicated across

12  different samples and different countries for sorting

13  sex offenders into low, medium and high risk categories.

14  They show, you know, continuous at least moderately high

15  levels of validity for that purpose.

16         Where you run into difficulty with the

17  actuarials -- and I do agree with Doctor -- if it's

18  Saleh or Saleh, forgive me, I'm not sure what the

19  correct pronunciation is. I've heard both, but there is

20  a lot of controversy over them. There is a base rate

21  problem, which means that the actual reoffense rates of

22  the offenders varied from sample to sample. Those do not

23  remain constant, so it is important to try to match your

24  case as accurately as you can to the sample of offenders

25  that you feel they're the most closely compared to.

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 158 of 234

1    Otherwise, you may have -- you may be off in terms of

2    these predictions of rates of recidivism.

3           So, you know, I think you do tread into more

4    controversial waters when you try to make statements

5    such as, you know, Mr. King would reoffend at a 50

6    percent rate within ten years. You know, these are

7    statements that -- you know, I would not make a

8    statement like that. I mean, we don't know. Again, we're

9    applying group data to an individual, and all we can say

10   is that, you know, based on the offenders in the

11   original developmental sample of this instrument who

12   scored similar to Mr. King, that that group reoffends at

13   a, you know, 25 percent rate in five years or whatever

14   it might be, okay?

15          But I think that -- I mean, actuarials are here

16   to stay and they are becoming more widely used. The

17   Association for the Treatment of Sexual Abusers, the

18   ATSA organization that Doctor Saleh referred to, his --

19   they have a policy paper on their website where they

20   recommend the use of actuarial instruments for the civil

21   commitment evaluation risk assessments, so, you know, I

22   just think that -- and the purpose of this is to try to

23   make our efforts more scientific.

24          You know, this is -- I think the caveats are

25   important. You know, this is not rocket scientists --

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 159 of 234

1  this is not rocket science. These are not infallible

2  instruments. There are margins of error, but I think

3  they are good enough. They have been proved good enough

4  over the last ten years or 15 years that they are worthy

5  of using and they are being used more and more, so, I

6  mean, I would certainly support the use of them in a

7  case like this.

8  Q      Doctor Zinik, did you hear the questions and

9  answer regarding the use of the DSM-IV-T-R casebook?

10 A      I did, yes.

11 Q      Are you familiar with the scenario that was --

12 A      I am, yes.

13 Q      -- testified to?

14 A      Yes.

15 Q      Could you just briefly, I guess, restate the

16 scenario as you understand it that -- the scenario

17 that's in the DSM-IV-T-R casebook?

18 A      Okay. Well, this is a casebook that is published

19 by the American Psychiatric Press which publishes the

20 DSM manual and it is designed to be used in conjunction

21 with the DSM manual as case examples of how to diagnose

22 these different disorders, and this is a book in which

23 there is a case and it's referred to -- it's called the

24 Perfect Relationship. I think that's the title of it,

25 and that's how it's known among the professionals in the

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 85  Filed 11/18/11  Page 160 of 234

1    filed.

2            Anyway, we call it the perfect relationship, and

3    it was a fellow, Jim. I think Mr. Gray read the story.

4    This is a real person, a real living person who -- as a

5    matter of fact, he is a patient of Doctor Fred Berlin,

6    and Doctor Berlin wrote up the case example, and this

7    is -- actually, the same case example word for word

8    verbatim was also reprinted in another paper by Doctor

9    Berlin in the Journal of Sexual Addiction and Sexual

10   Compulsivity in 1997, so it's been reprinted in a couple

11   different places.

12           In fact, I was at the ATSA conference last

13   October in Phoenix and went to a training provided by

14   Doctor Fred Berlin, and he showed a videotape of this

15   patient. His name is Jim, and he talked about how he

16   would masturbate thinking -- you know, he had sexual

17   fantasies about raping women, and he started raping

18   women when he was 16. He actually observed his father

19   raping women, and that was one of the first exposures to

20   that experience he had, and it was sexually exciting to

21   him when he -- and he tells the whole story.

22           I mean, this is a living, breathing example of a

23   rape paraphilia. This guy is in prison now and has been

24   for I think about 25 years. It was one of the early

25   cases of Doctor Berlin's. In the videotape, you see both

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 161 of 234

1   of them as young men, and now they're, you know, 25

2   years older, but, you know, my point that I do agree

3   with some things that Doctor Saleh said, but there's one

4   thing I disagree with, which is if I think -- if he

5   said -- if I heard correctly that he said that the -- I

6   mean, yes, he's right that the language is messy. There

7   is no standard terminology to diagnose this condition.

8   That's a problem.

9             You know, I use the term forced sex with

10  nonconsenting females. That term does not appear in the

11  DSM, that is true. Those are the qualifiers I used after

12  the paraphilia NOS diagnosis, which does appear in the

13  DSM. Paraphilia NOS is the beginning of the appropriate

14  diagnostic term, but there's no standard qualifying

15  terms or specifiers that are in use. Unfortunately,

16  that's a problem, but if you were to say that the

17  condition does not exist, if you were to say that

18  there's not a single sex offender out there in the whole

19  world who is not -- who is sexually aroused by forcing

20  women to have sex with him, that statement is not true.

21  I mean, those people exist.

22            I have -- I mean, I can think of half a dozen of

23  them off the top of my head that I sat across the table

24  and talked to them, and they will tell you sometimes

25  they have to be in treatment for a period of time before

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 162 of 234

1    they're willing to fess up and talk about their private

2    sexual fantasies and masturbation habits and those kind

3    of dirty, private secrets, if you will, but there are --

4    sometimes, you know, you get an honest guy who will say

5    this is what turns me on, this is -- you know, I

6    masturbate at night to fantasizing about raping women

7    and I've been doing this since I was 14 and I have

8    raped, you know, 20, 30 victims and I -- you know, one

9    of my most exciting sexual turn-ons is to break into a

10   woman's home at night and sexually assault her. And, I

11   mean, these kind of serial sex offenders do exist. We

12   have some good case examples, and there's also some

13   empirical evidence to support their existence.

14          Now, this is -- see, one of the problems is it's

15   so hard to do research with -- on this condition because

16   it's -- you know, you don't get many sex offenders who

17   are willing to talk about their private masturbation

18   fantasies, for one thing. You don't get many sex

19   offenders, many rapists who are willing to participate

20   in the plethysmograph evaluations that I was talking

21   about earlier.

22          Now, remember, this is one area of inquiry into

23   the -- where there's some good new empirical research

24   that's coming out about the -- you know, the existence

25   of forced paraphilia for -- forced sex. It's not very

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 163 of 234

1  clear-cut, because the samples are small. You know,

2  we've only got small groups of incarcerated rapists who

3  are willing to submit to these plethysmograph

4  evaluations, but there's certainly been some spirited

5  debate in the academic press.

6           There are a couple experts. There's Doctor

7  Raymond Knight.  There's Doctor David Thorton. There's

8  Doctor Martin Lumiere. (phonetic)

9  Q      Doctor Zinik, I'm sorry. Not to interrupt --

10  A      Okay.

11  Q      Unless you had something else to say that's

12  pertinent, I think that you've answered the question.

13  A      Okay.

14  Q      I appreciate that.

15  A      Sure.

16  Q      Getting back to that casebook, the DSM-IV-T-R

17  casebook, under that scenario, what did the authors of

18  the casebook indicate the proper diagnosis for that case

19  was?

20  A      Paraphilia NOS.

21  Q      Is that what you diagnosed Mr. King with?

22  A      Yes, but I added some specifiers, yes.

23           MR. LOCKRIDGE: No further questions, Your

24  Honor.

25           THE COURT: Thank you, sir. Mr. Bell?

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 164 of 234

1            MR. BELL: Briefly, Your Honor.

2       EXAMINATION

3       BY MR. BELL:

4  Q      Doctor Zinik, your testimony on Monday, you

5  indicated that you do quite a bit of work for the

6  California Department of Mental Health, is that correct?

7  A      Yes.

8  Q      I'm going to read to you from an article that we

9  pulled from the Psychiatric Times related to -- well,

10 the title of the article is Another Step Toward Ending

11 the Paraphilia NOS Fad, the California DMH -- which

12 stands for the Department of Mental Health -- Takes a

13 Stand. Are you familiar with this article?

14 A      Yes, I am.

15 Q      So you would know that in the article it

16 basically states that paraphilia NOS, nonconsent has

17 received two devastating setbacks -- two of the three

18 strikes that be will necessary to finally knock it

19 permanently out of the box. Are you familiar with that

20 statement?

21 A      Yes.

22 Q      The first strike came with the DSM-V decision to

23 reject the ill-conceived proposal for a new diagnosis of

24 coercive paraphilia. Are you familiar with that?

25 A      Yes.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 165 of 234

1    Q       The next step discussed below, which we'll get

2    to, has come from the California Department of Mental

3    Hygiene, which is the department you do some work for,

4    correct?

5    A       Yes. Well, no, no.

6    Q       I mean mental health.

7    A       Yeah. That's the wrong term.

8    Q       -- which has instructed state SVP/SDP

9    evaluators, which you're one of, correct?

10   A       Yes.

11   Q       -- to end their careless misuse of the

12   paraphilia diagnosis. The third and final strike will

13   hopefully come soon when paraphilia NOS, nonconsent is

14   finally ruled inadmissible as expert testimony, a move

15   that surely makes great sense, given that this diagnosis

16   does not meet the expectable standards of competent,

17   much less expert psychiatric diagnosis. Are you familiar

18   with that statement in this article?

19   A       Yes.

20   Q       Further, the California DMH took the latest and

21   giant step forward in ending the paraphilia NOS fad

22   recently. State evaluators were recently summoned to an

23   SVP training workshop where they were explicitly

24   instructed to adhere closely to the intent of the DSM-IV

25   and to desist from making idiosyncratic paraphilia

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 166 of 234

1   diagnoses. Are you familiar with that?

2   A       I've read the article, yes.

3   Q       Did you actually go to one of these training

4   workshops?

5   A       No, I did not go. I was not there.

6   Q       Now, you talked about the risk assessment tools

7   and the actuarials, and I believe you agreed in your

8   testimony on Monday and you reiterated it today.

9   I don't want to belabor the point, but they are limited

10  in their use, there is some subjectivity involved with

11  taking a offender and placing them in a particular

12  comparison group. You agree to that, correct?

13  A       Yes.

14  Q       And you have to take that individual's

15  characteristics as they're presented to you in the

16  record, use that information in putting them in a

17  comparison group, correct?

18  A       Yes.

19  Q       And that is a subjective determination made

20  strictly by the evaluator, correct?

21  A       Well, this new SRAFV is an instrument that is

22  designed to try standardize that method, that is

23  correct, but there is some even within that -- scoring

24  that, there's some subjectivity. You have to use the

25  records and, you know, decide what you consider

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 167 of 234

1   important and so on.

2   Q       And you would acknowledge that in this

3   particular case with Mr. King, that's what you did, you

4   looked at the record, his criminal history, his records

5   of mental health treatment, his self-reporting and all

6   of those things, and that's what you used in determining

7   that he was in the high risk, high needs comparison

8   group, correct?

9   A       Yes.

10  Q       And would you acknowledge that again -- and I

11  think you stated it earlier that these tools are not

12  designed nor are they accurate in saying that a

13  particular offender is going to have a particular

14  likelihood of offending at a particular rate in a given

15  period of time. Is that a true statement?

16  A       Yes.

17  Q       Now, this DSM-IV-T-R casebook, the case that you

18  talked about Jim, there was quite a bit of -- as I could

19  read or follow along with the hypothetical, which

20  apparently wasn't a hypothetical, there was quite a bit

21  of self-reporting involved in that hypothetical,

22  correct?

23  A       Yes.

24  Q       And the assumption would be that the person who

25  made this PNOS diagnosis for the purposes of the

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 168 of 234

1  casebook believed or had reason to believe the

2  self-reports of that particular individual, Jim,

3  correct?

4  A      Well, he had been arrested multiple times for

5  sexual assault.

6  Q      Well, but he also self-reported about fantasies,

7  urges, desires. The assumption would be that in the

8  casebook those self-reports were believable and usable

9  to the evaluator in coming to that diagnosis, correct?

10 A      Yes.

11 Q      And, again, you made a diagnosis of PNOS,

12 nonconsent as to female persons -- something to that

13 effect or paraphilic coercive disorder. You also added

14 that identifier on the end of it, correct?

15 A      Yes, because I think the terminology is

16 synonymous, yes.

17 Q      So PCD -- as I'm going to call it, PCD is

18 synonymous with this PNOS, nonconsent diagnosis,

19 correct?

20 A      I think that's correct, yes.

21 Q      And the PCD was specifically rejected by the

22 DSM-III Board back in the '80s, correct?

23 A      Well, it was sexual assault disorder in the

24 DSM-III in 1980.

25 Q      I'm sorry. '86 I believe PCD was rejected,

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 169 of 234

1    correct?

2    A        Yes, that's correct.

3    Q        And then apparently according to the article I

4    just read from, PNOS, nonconsent or coercive paraphilic

5    diagnosis was once again rejected by the DSM-V Board,

6    correct?

7    A        Yes.

8            MR. BELL: I don't have anything further, Your

9    Honor.

10           THE COURT: Thank you, sir. Mr. Lockridge?

11           MR. LOCKRIDGE: Just briefly, Your Honor.

12           EXAMINATION

13           BY MR. LOCKRIDGE:

14   Q        Not to beat a dead horse, Doctor Zinik -- has

15   paraphilia not otherwise specified, nonconsent been

16   ruled inadmissible in California or Washington or any

17   other court, to your knowledge?

18   A        Not that I know of, and this paper, this was

19   written by Doctor Allen Frances. He's not on the -- you

20   know, he's not on the -- not in the California

21   Department of Mental Health. He's one of the editors of

22   the DSM and he is a very outspoken opponent to

23   paraphilic coercive disorder and the use and, you know,

24   misuse of paraphilia NOS, nonconsent, very politically

25   active in terms of promoting -- I mean, I think it would

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
                                                              (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 170 of 234

1   be fair to say that he has mounted a campaign to keep

2   that diagnosis out of the DSM.

3           All of his articles have this kind of tone to

4   them. They're very politically motivated, and I'm not --

5   I don't -- you know, I wasn't at this meeting where this

6   statement was made. I have seem some e-mails. We're

7   trying to get some clarification. The California

8   evaluators are trying to get some clarification on, you

9   know, if there is -- I think this was kind of an

10  offhanded comment that was made during a training by the

11  new director, and whether it's some kind of official

12  policy, we don't know.

13          I mean, I certainly would not stop

14  diagnose -- if I found a sex offender, if you sent -- if

15  I had to evaluate a case of a serial rapist with, you

16  now, multiple cycles of persistence of sexual offending

17  like I described before who commits a sexual assault,

18  goes to jail, gets out and does it again and repeats

19  that cycle over and over, and, you know, many of the

20  other kind of signs and symptoms of what I believe

21  characterize this disorder, hour you supposed to

22  diagnose a guy like that? If he looks like he's really

23  erotically aroused by sexually assaulting women and he

24  even chooses to rape women when he has a consenting

25  sexual partner available to him, what diagnostic term do

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 171 of 234

1  we use?

2          THE COURT: Is it possible that a person

3  fitting that description could be diagnosed as

4  paraphilia sadism?

5          THE WITNESS: There's a difference, Your

6  Honor, and it's a good question, and in some ways it's

7  kind of a question of degree, and there may a continuum

8  actually of what -- you know, paraphilic coercive

9  disorder or paraphilia NOS nonconsent at one end or one

10  pole and, you know, lust, murder and extreme sexual

11  sadism at the other end and, you know, serial rapist

12  falls somewhere in between, but sexual sadism involves

13  the -- what is the erotic turn-on is the suffering and

14  the pain and the humiliation of the victim, and while it

15  is -- now I'm going back to the description in Doctor

16  Graney's report that Mr. King provided of, you know,

17  that whole elaborate story of the -- the scripted form

18  of his paraphilia.

19          He does -- remember he said that his biggest

20  turn-on is to totally dominate, humiliate and subjugate

21  women sexually, so he does -- he is aroused by the

22  humiliation to some degree, but he made a point to

23  describe how he -- even when he would tie them up and

24  use bindings and the handcuffs and things like that, he

25  didn't want it to be too tight because he didn't want to

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 172 of 234

1    hurt them and he didn't want blood on his car. Remember
2    that statement?
3               And so he made a point of not injuring them,
4    and so I would say and, in fact, I would rule out sadism
5    for his diagnosis, and a couple of -- I think Doctor
6    Bazerman also ruled out sadism or -- again, I'm
7    forgetting exactly, but it was at least one of the other
8    evaluators in his file considered sexual sadism and
9    ruled it out.
10              And so I really -- you know, if it's true,
11   you know, what is unique about Mr. King's case is he has
12   made two mutually logically incompatible, you know,
13   mutually exclusive statements. He's -- on one hand, he
14   said, you know, I am a -- my most exciting sexual
15   experience is kidnapping women at knifepoint, tying them
16   up, you know, completely dominating and humiliating them
17   sexually, making them -- exposing myself and watching
18   them make me masturbate for hours, and I'm like a
19   hibernating bear, and if you let me out, I'm going to
20   wake up and I'm going to do it again. It's only a matter
21   of time, and this time I may kill my victims, okay?
22              On the other hand, he said none of that's
23   true, I made it all up, that's just a story that I
24   concocted in order to stay in prison because I was
25   afraid to get out and I didn't have any support, and I'm

Huseby, Inc.                                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 173 of 234

1   not a sex offender, I don't have any sexual problems,

2   I'm not going to register as a sex offender because I've

3   never been convicted of a sexual crime.

4          Now, both of those statements cannot be true.

5   And, you know, as an evaluator, I am forced to pick and

6   choose which ones I believe, and I think clinically and

7   I think in terms of the actuarial assessment, it is

8   really important to err on the safe side in this case. I

9   mean, I just find -- again, with all respect to Doctor

10  Saleh, you know, I look at the data very differently

11  than he does.

12         I think there is enough data to conclude -- to

13  support a diagnosis, whatever terminology you want to

14  use, that Mr. King is sexually aroused by forced sex

15  with nonconsenting women.

16             THE COURT: Okay. Thank you.

17             MR. LOCKRIDGE: I have no further questions,

18  Your Honor.

19             THE COURT: Mr. Bell?

20         EXAMINATION

21         BY MR. BELL:

22  Q      Just briefly, Doctor Zinik. So you agree as you

23  sit here today that you did have to pick and choose and

24  make value judgments with regard to which statements of

25  Mr. King you believed and which ones you didn't believe,

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                        www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 174 of 234

1    correct?

2    A        I wouldn't say value judgments. I mean, I think

3    when you have got two mutually incompatible -- logically

4    incompatible statements, yes, you do have -- I would say

5    I made some professional and clinical judgments and I

6    did pick and choose, yes.

7    Q        Okay. And would you also agree that since 1988

8    to the present time, there's absolutely no evidence in

9    the record while he's been in custody of any sexual

10   misconduct of any kind except for one incident in 1993

11   where he supposedly asked a female staffer to touch his

12   penis? Would you agree with that statement?

13   A        Yes.

14               MR. BELL: Nothing further, Your Honor.

15               THE COURT: Anything else?

16               MR. LOCKRIDGE: Nothing further, Your Honor.

17               THE COURT: Let me tell you what I'm thinking

18   about. I'm thinking about the evidence -- the report

19   that you had mentioned, Mr. Gray. I don't know whether

20   the Government is seeking an opinion of Doctor Zinik

21   regarding that. I'm wondering -- I assume we don't have

22   that report at this time.

23               MR. GRAY: No, Your Honor, we don't have that

24   at this time.

25               THE COURT: What I was thinking about, since

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 175 of 234

1    we have both Doctor Zinik and Doctor Saleh -- am

2    I pronouncing your name correctly, Doctor Saleh?

3                 DOCTOR SALEH: You did, actually.

4                 THE COURT: Okay. We have both these gentlemen

5    here now. I'm wondering whether it would be possible --

6    and, of course, each of these gentlemen could say

7    whether they were being provided sufficient information

8    to offer an opinion or whether this report, the data in

9    that would affect their opinions in any way, but --

10   whether it would be possible to frame some type of a

11   proffer, a description of what we're talking about here

12   that can be presented since we have them here for them

13   to hear and offer their thoughts on.

14                MR. GRAY: Your Honor, this was one of the --

15   we had considered at least from the Government's

16   standpoint whether or not -- while Doctor Saleh was on

17   the stand whether or not we should ask him to give an

18   opinion based upon the hypothetical. However, we're

19   still -- as you know, we're here in trial. We're still

20   trying to get a full -- ascertain -- a full grasp on all

21   of the facts. Any proffer I give right now I feel would

22   probably be lacking the overall facts and circumstances

23   of what took place.

24                THE COURT: That's fine. I'm not aware,

25   obviously, of the extent of the information obviously

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 176 of 234

1  that the Government's in possession of at this time.

2          MR. BELL: I mean, obviously we would be

3  concerned if we don't have a full view of what did or

4  didn't happen. They may give an opinion that might

5  change on one fact or two facts that we don't know

6  about, so we would object to that.

7          THE COURT: Okay. Very good. Thank you, Doctor

8  Zinik. You may step down, sir. Any further evidence, Mr.

9  Lockridge?  Mr. Gray?

10          MR. GRAY: Your Honor, we don't have any

11  further evidence at this time, but we would renew our

12  motion to have this hearing open until we get an

13  opportunity to fully vet out this information. Once

14  again, we're not asking this in the sense of trying to

15  be tricky or to unnecessarily delay the schedule of any

16  of the participants in this trial. However, we have --

17  information that has been related to us would have

18  bearing upon the issues at stake in this case as to

19  whether or not Mr. King is, in fact, a sexually

20  dangerous person or has engaged in any sort of act

21  within the last -- as Mr. Bell mentioned, since 1988,

22  any acts of sexual deviancy or sexual acting out.

23          THE COURT: That's fine. We can address that

24  again after we get done with the other proceeding that

25  we may have. Other -- Mr. Bell, is there any other

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208     www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 85  Filed 11/18/11  Page 177 of 234

1   evidence?

2          MR. BELL: Your Honor, if I can have just a

3   moment, I'd like to talk to Doctor Saleh and make that

4   decision as to whether or not we need to call him back.

5          THE COURT: We can just take our afternoon

6   break. Why don't we err on the side of being sure you

7   have enough time -- why don't we reconvene at 2:45?

8      (Whereupon off the record.)

9          THE COURT: Mr. Bell, we did come back a bit

10  earlier than I had anticipated. Have you had sufficient

11  time to speak with Doctor Saleh?

12         MR. BELL: I have talked to Doctor Saleh.

13  However, Mr. King has just requested that he have a

14  couple of minutes with me, and I have not spoken with

15  him, so if The Court would indulge us in that --

16         THE COURT: Mr. Gray, you were standing. Do

17  you have --

18         MR. GRAY: Yes, Your Honor. I just wanted to

19  advise The Court that I've had a chance to get

20  additional consult with my supervisor, Mr. Renfer, and

21  he advised me of sufficient facts that would assist in a

22  proffer. I understand that there will be some discussion

23  on that point. I know that Respondent's Counsel would

24  object to it, but we're prepared to provide a proffer if

25  The Court should desire us to do so.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 178 of 234

1            THE COURT: Have you cleared those facts with

2    Mr. Bell?

3            MR. BELL: I haven't had an opportunity to

4    share them with Mr. Bell as of yet. I can do that with

5    him as soon as I can at the first opportunity.

6            THE COURT: Yes. I would like you to do that.

7    We can always -- I mean, one solution may be to present

8    the facts on a hypothetical basis.

9            MR. BELL: Your Honor, I talked to Doctor

10   Saleh briefly about what little he did know about the

11   situation, what potentially it could mean, and, frankly,

12   he's very reluctant to give any sort of opinion about

13   what may or may not have happened without having the

14   opportunity to talk to Mr. King about it, ask his

15   thoughts about it and that sort of thing. And Doctor

16   Zinik may want to do the same thing.

17            This is not something that I think we can do

18   in a proffer type, hypothetical type situation, because

19   we're not talking about a hypothetical individual. We're

20   talking about Mr. King, and we're talking about a

21   situation -- that they allege apparently he did

22   something, which I'm not exactly sure what it was, so

23   it's not a hypothetical. It's an actual, apparently,

24   situation, so I don't think a hypothetical works in that

25   situation.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 179 of 234

1          At least my expert is saying he would not be

2   comfortable rendering an opinion with regard to that

3   conduct without, you know, having the opportunity at

4   least to talk to the client about it.

5          THE COURT: Well, let's take this one step

6   at a time. Why don't, Mr. Gray, we take a break here to

7   enable you to convey that information? Mr. Bell, you

8   need some time to speak with your client. How much time

9   do you anticipate that you need, Mr. Bell?

10         MR. BELL: He just said four or five minutes.

11  I don't know how long it's going to take for us to

12  talk --

13         MR. GRAY: -- I'm not adding any additional

14  facts to what you already know. I'm just going to

15  basically tell him what we would offer as being the

16  hypothetical.

17         THE COURT: Okay. Well, let's reconvene at

18  2:55 p.m.

19     (Whereupon off the record.)

20         THE COURT: Mr. Bell?

21         MR. BELL: Your Honor, I'm going to call

22  Doctor Saleh back to the stand briefly, but I do want to

23  just apprise The Court of what we've talked about and

24  just update you, and Mr. Gray can jump in if I get

25  anything wrong.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                    www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 180 of 234

1           With regard to this issue that something may

2    or may not have happened yesterday, --

3           THE COURT: Yes, sir.

4           MR. BELL: -- what we believe is appropriate

5    is if the Government chooses to pose a hypothetical

6    situation to the experts and it's a hypothetical

7    situation -- to opine as to whether or not this would

8    affect their opinion one way or the other as to their

9    diagnosis and so forth -- however, if The Court intends

10   to consider that as substantive evidence, in other

11   words, whether it actually did or did not happen, then

12   our position would be that we would have to have a

13   hearing to assess the credibility of the information and

14   so on and so forth, but the good news about that is it

15   appears we can finish with the experts on the basis of a

16   hypothetical and then perhaps deal with the evidentiary

17   part.

18          Of course, if The Court wants to hear or

19   consider this on merits, then -- what I mean by the

20   merits is as to whether something actually did or didn't

21   happen, then we may have to -- I don't know if reconvene

22   is the proper term or what have you, but have some sort

23   of hearing on that very limited situation.

24          THE COURT: Okay.

25          MR. BELL: I'm just throwing that out.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 181 of 234

1  Obviously it's up to The Court as to what we do.

2          THE COURT: Oh, no. That's fine. That was the

3  reason I mentioned hypothetical. I thought with the

4  experts here, it might be a way of not having to trouble

5  them further with it.

6          MR. BELL: But at this time, I would call

7  Doctor Saleh back to the stand.

8          THE COURT: Okay. Very good. Doctor Saleh,

9  sir, let me just remind you that do remain under oath.

10          THE WITNESS: Yes, sir.

11          BY MR. BELL:

12  Q      Doctor Saleh, there was some discussion in your

13  original testimony, and I think Doctor Zinik talked

14  about this hypothetical in the casebook related to this

15  Jim individual. If you would, point out to The Court

16  some of the issues that you think exist with regard to a

17  diagnosis from a casebook based upon either a

18  hypothetical or real individual and a diagnosis in this

19  case as we sit here today with Mr. King.

20  A      Yes. So the issue of the casebook that -- may

21  use it for training purposes to train students,

22  residents and so forth to help them understand

23  sexuality -- and so that's one that the -- something

24  completely different in a clinical setting and we see

25  this many times. Patients may be treated without --

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 182 of 234

1  diagnosis, whether they may not be given a diagnosis

2  and months may go by until they get a diagnosis, even if

3  the sex offender therapy setting -- we have in a

4  clinical community. So diagnosis is many times

5  irrelevant. People are referred to sex offender therapy

6  without a diagnosis whatsoever and they are treated,

7  talked to about sexual issues, sexual behavior, so

8  that's, I think -- fundamental difference.

9        The second thing is in -- particular case is

10  that given what I heard earlier, the individual that's

11  Jim has been considered or is considered to be a

12  reliable reporter, and, again, in the clinical setting

13  we don't go and second-guess the patient's intent,

14  thoughts when they come to see you, volunteer. The

15  assumption is that they're there to get help. We're not

16  going to do a forensic assessment or anything remotely

17  close to what we're doing here to determine if they're

18  accurate or inaccurate with regard to what they report

19  to us.

20        So here you have somebody who reports these

21  fantasies, these thoughts, and the assumption there is

22  and -- threshold is very low is that what is reported is

23  indeed accurate.  So that would be, I would say, the

24  fundamental difference that we talk about in clinical

25  setting, was it reliable -- supposedly reliable patient

Huseby, Inc.            www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 183 of 234

1   and here you talk about forensic setting -- is court of

2   law not with a patient with whom you have a therapeutic

3   relationship, but with a respondent who is not in any

4   therapeutic relationship with you, and so that's --

5   Q      Again, just, again, to reiterate it, this DSM

6   casebook is in no way a part of or included -- overall

7   two set volume of the DSM-IV-T-R, it is a separate book

8   that has case histories and I guess examples of things

9   not part of DSM-IV-T-R, correct?

10  A      Right. And, again -- equate it as a proxy of

11  introducing a diagnosis or giving it validity. It's --

12  in my opinion, again, it would be misleading because it

13  wasn't existent when we had discussions in the DSM-IV

14  about this diagnosis -- this casebook was there.

15         I actually worked with Director Fred Berlin and

16  so -- know Fred Berlin, and now after I heard Doctor

17  Zinik -- that case, I know this patient, know about the

18  case. And so that's something that was known to people

19  for years, yet despite that understanding, that

20  knowledge, the DSM-IV-T-R has -- refuted and various

21  organizations have refuted this diagnosis, so to come

22  now backward and say that because it's in a casebook

23  that it gives it validity, it's, in my opinion, again,

24  incorrect and it's a misrepresentation of what this --

25  are meant to be.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 184 of 234

1 Q  Thank you, Doctor Saleh. Now, you heard Doctor

2 Zinik's testimony related to the fact that he -- I don't

3 want to put words in his mouth, but he essentially had

4 no choice but to pick and choose factual self-reports

5 from Mr. King -- he stated that, you know, what else am

6 I going to diagnose him with. What problems do you see

7 with that sort of approach to -- when you're doing a

8 forensic evaluation?

9 A  With all due respect to Doctor Zinik, I have to

10 say I was very surprised by -- demeanor and that

11 question that he apparently addressed The Court. The

12 scope of a forensic psychiatrist, psychologist or

13 scientist is not to make up diagnoses or draw

14 conclusions in terms of diagnosis of psychopathology.

15 Criminal behavior is criminal behavior, and there are

16 many types that -- people engage in criminal behavior --

17 which could be serial rapists going out and killing,

18 murdering, assaulting, heroin addict who may go and rob

19 to get drugs.

20   If I go and pathologize everybody who comes in

21 because they engaged in some bad criminal behavior, if

22 it's sexual, the heroin addict, the murderer, the

23 intruder, then what I do is I pathologize criminal

24 behavior, and that's not the scope and role of the

25 scientist or the psychologist or psychiatrist. So if you

Huseby, Inc. www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208 (704) 333-9889
Case 5:10-hc-02009-FL-JG Document 85 Filed 11/18/11 Page 185 of 234

1    can't diagnose, if there's no basis behind the

2    diagnosis, you don't diagnosis, there's no need to

3    diagnose.

4          The other question that we were asked -- I

5    believe even Doctor Zinik did not come up with a

6    diagnosis -- it was look at the data and draw

7    conclusions if you can apply them to the statutes.

8    That's the issue in front of us, not to -- necessarily

9    to make up a diagnosis, so why would I go and

10   pathologize criminal behavior? That is what -- I think

11   what I understood Doctor Zinik's testimony -- he was

12   compelled to do and therefore choose among those

13   statements and ended up choosing this statement Mr. King

14   made that would allow him -- diagnosis on what basis,

15   what scientific philosophy behind it I -- don't

16   understand it, was --

17   Q     Just to be clear, when you say pathologize

18   criminal behavior, what do you mean by the term

19   pathologize?

20   A     Meaning that I'm trying essentially to translate

21   criminal behavior he engaged in and call the behavior

22   symptoms or sign of that disorder.

23          Again, take the example of a bank robber. He may

24   go and rob a bank and in the context of robbing the bank

25   he may go and kill the bank teller. I could certainly --

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 186 of 234

1    and there are people who do it -- come back and say

2    well, let's understand him, understand where he's coming

3    from, that we have to forgive him -- a certain sense

4    because the robbing of the bank occurred in the context

5    of a syndrome that is called bank robber syndrome in the

6    context of being poor, so I understand it and treat him

7    and look and approach his case differently than I would

8    with anybody else who would engage in this behavior

9    which is just walking to the bank robbing and killing

10   somebody and I would just look at the behavior which is

11   criminal. It's not a sign or symptom of a disorder and

12   that's -- and people reach for a number of reasons and

13   many times they reach for reasons that have nothing to

14   do with sexual disorder or psychiatric disorder.

15          That's why -- I think it's where you erroneously

16   pathologize behavior and call it sexual behavior or rape

17   disorder, and that's where the problem is.

18   Q      And finally, Doctor Saleh, you indicated earlier

19   in your testimony that you acted as "gatekeeper" at

20   times for the prosecuting attorney. Explain to The Court

21   exactly what you meant by that term.

22   A      Yeah. I actually asked to clarify because,

23   again, my role is not to police -- my work and what I

24   did, so thanks for asking, yeah. So the issue is that I

25   am retained by the district attorney's office, this one,

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 187 of 234

1    actually, by the attorney's office in Worcester in

2    getting a set of records, which can be voluminous or it

3    can be just 50, 60 pages, and my role is to review these

4    records and then provide the district attorney's office

5    with an opinion to a reasonable degree of medical

6    certainty whether or not the respondent meets sexually

7    dangerous person definition as defined by MGL 123A.

8          If I say yes, the person meets the definition of

9    a sexually dangerous person, my recommendation is that I

10   would recommend that that person be further assessed. If

11   I say that he does not meet the definition of a sexually

12   dangerous person, I say that no further assessment is

13   needed or I just conclude that in my opinion he does not

14   meet the definition of SDP.

15         So I think the term gatekeeper -- I don't want

16   that to be misinterpreted or, I mean, misconstrued as

17   something that I'm not. I mean, I just report back to

18   the DA's office and then the DA may follow through with

19   my recommendation or may choose not to follow through

20   with it.

21         MR. BELL: Nothing further, Your Honor.

22         THE COURT: Doctor Saleh, the reference you

23   gave, this MG or something to that effect --

24         THE WITNESS: That's the Massachusetts -- MGL

25   123A.

Huseby, Inc.                                                   www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 188 of 234

1          THE COURT: Very good. Thank you, sir.

2    Mr. Gray, any questions?

3          MR. GRAY: Thank you, Your Honor.

4     EXAMINATION

5     BY MR. GRAY:

6    Q     Doctor Saleh, you mentioned rape paraphilia.

7    Mr. King hasn't been charged with rape, has he?

8    A     No.

9          MR. GRAY: Your Honor, we have no further

10   questions on rebuttal at this time. However, we would --

11   for the sake of expediency, if we might be able to pose

12   a hypothetical to Doctor Saleh at this time, we indulge

13   The Court's favor to do so.

14         MR. BELL: No objection, Your Honor.

15         THE COURT: That's fine.

16   BY MR. GRAY:

17   Q     Doctor Saleh, I'd like to pose a hypothetical to

18   you. If hypothetically you were -- if you were to learn

19   that Mr. King were to have had while in custody of the

20   US Marshals within a confinement facility exposed his

21   genitals to a female within that facility, would that

22   cause you to change your opinion as to whether or not

23   he's sexually dangerous or has engaged in paraphilic

24   behavior?

25   A     It would not change my opinion.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 189 of 234

1    Q        And would it change your opinion to learn that

2    he did that -- if he did that behavior during the course

3    of this trial?

4    A        I wouldn't be surprised. It wouldn't change my

5    opinion, no.

6              MR. GRAY: No further questions. Thank you.

7              THE COURT: Mr. Bell?

8              MR. BELL: Nothing, Your Honor.

9              THE COURT: Doctor Saleh, I wanted to ask you

10   a question just to make sure that I've got these

11   concepts straight in my mind. I know you testified on

12   this. I just want to be clear that my understanding is

13   correct. In your opinion, is it possible for there to be

14   a person somewhere out there in the world who would find

15   sexual arousal from a sexual encounter by the

16   nonconsensual aspect of that encounter?

17             THE WITNESS: If you don't mind, may I just

18   ask that -- I clearly understand, so that they would be

19   aroused by the nonconsenting aspect of the sexual

20   encounter?

21             THE COURT: Yes, sir.

22             THE WITNESS: If there's a person out there --

23   certainly possible, yes --

24             THE COURT: And that, as I understand it, is a

25   separate question from whether or not that condition

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208                    www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 190 of 234

1  should be included in the DSM --

2          THE WITNESS: The issue -- I'm not 100 percent

3  sure if I understand the question, but I think I do. So

4  hypothetically let's say that -- let's give the example

5  we have here and say that that is a person who

6  self-reported -- reliable and who was reporting to get

7  aroused by the nonconsenting aspect of the sexual

8  encounter and he's a live person and say that's, indeed,

9  the case, so that's his sexual experience.

10         And, now, does this mean that if there is

11  somebody with this condition that would equate to a

12  diagnosis that would warrant inclusion in the DSM?  The

13  answer would be no, because I can give you an example

14  that -- I have a patient of mine who gets sexually

15  arroused when he drives a car and he -- now, does it

16  mean that this experience of this one particular man I

17  consider to be a reliable reporter -- would that warrant

18  now inclusion in the DSM of a diagnosis? I wouldn't know

19  even how to term it. The answer would be no, because in

20  order to diagnose somebody or provide that diagnosis,

21  you need to have more than just one case report. And,

22  again, this one case report, I don't know the details of

23  this case.

24         And I also have to say it depends how you

25  elicit that information from the individual. So if I

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 191 of 234

1   phrase the question in a certain way, the patient may

2   respond in a certain manner to me, yet if I ask the

3   question in a different way, the answer to that same

4   type of question would be different. So how much of this

5   is suggestive to them to respond to you affirmative

6   because I'm trying to make and support a diagnosis,

7   That's also something that has to be determined in

8   general.

9            And that's, again, where I look

10  at differentiation between -- sexual disorder. It's many

11  times very difficult, if not impossible to draw the

12  conclusion that somebody is aroused to the very specific

13  and narrow aspect of the sexual encounter which is

14  nonconsenting aspect because there's much more going on

15  into a sexual encounter than just nonconsenting aspect.

16  So just to be able to say that and say there is actually

17  something like that that I can clearly make the

18  distinction and say that the interest is not dominating

19  or controlling the victim but it's a nonconsenting

20  aspect, I think it's difficult to make, and that's why

21  in part that diagnosis has been refuted, because it's

22  difficult, if not impossible, to differentiate between

23  other behaviors people engage in that we would call

24  criminal and rape and their -- pathology and disorder.

25            THE COURT: But even if you could isolate the

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 192 of 234

1 person who is aroused just to that one nonconsenting

2 feature, my understanding is that alone -- you have one

3 person in front of you who -- for whom that's true, that

4 doesn't provide a sufficient basis to recognize that as

5 a -- a condition that would apply to other people

6 because you'd have to have evidence showing that this

7 isn't just a one time phenomenon for this one person.

8 You've got to -- you'd have to show that there are other

9 human beings would have this condition, is that --

10          THE WITNESS: And that's, indeed, the point,

11 to be able to determine that that experience is a valid

12 experience that would warrant and justify diagnosis

13 consideration in a book like the DSM. So you may have --

14 idiosyncratic experience like a patient that I was

15 referring to who gets excited driving a car, but this on

16 its own doesn't justify diagnosis because that -- goes

17 much more into a diagnosis than one case report, and

18 even if you looked at the research we do, you typically

19 don't rely on case reports. They are not considered to

20 be scientific and valid -- treatment or diagnostic

21 decisions. It's what they are. It's case reports with

22 all the limitations that go hand in hand with case

23 reports.

24          THE COURT: I see. Let me shift back now to

25 the hypothetical. You testified that it would not change

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 193 of 234

1    the opinions. Let me ask you, sir, why would that not

2    change?

3              THE WITNESS: Because, again, the question

4    before me is if Mr. King is suffering from this

5    serious -- and agreeing that he meets the first prong,

6    but the second prong being does he suffer from this

7    serious mental illness, disorder or condition, and then

8    I have establish the nexus as a result of it he's -- and

9    he would have difficulty in refraining from violent --

10   sexually violent conduct or child molestation. I think

11   the language of the statute --

12             THE COURT: Yes.

13             THE WITNESS: So if that's the language of the

14   statute and we have this alleged incident of him having

15   exposed himself in the middle of a trial -- and,

16   actually, I don't know if there were other inmates or

17   staff or whatever that may have been -- but he exposed

18   himself to women. And let's look at it from the worst

19   case scenario. Let's say you have him now exposing

20   himself to other women, and we do know that he was

21   diagnosed in the past with exhibitionism. The data

22   available to Park Dietz and Doctor Alessi in 1976

23   allowed then to justify that diagnosis.

24             And then since 1976 or '77 -- I might be

25   wrong by one year or two -- there was no incident of

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 194 of 234

1  exposing behaviors, and then you have this one single
2  incident of exposing. Would that now change my opinion
3  with regard to the current diagnosis of exhibitionism?
4  Because that's really the question I think one would
5  have to ask is does this now mean that because of this
6  one incident in a person who has antisocial personality
7  disorder, does that now mean that he suffers from
8  exhibitionism, everything that I was saying and
9  describing earlier is mistaken and erroneous? And I
10 would certainly acknowledge yes, it could be the case,
11 but one single episode in 35 years or 34 years of time
12 having passed in a very circumscribed -- I mean, very --
13 I wouldn't want -- call it unusual -- very particular
14 period in Mr. King's life -- which is awaiting
15 commitment or not, that one episode would not make it
16 the diagnosis of exhibitionism, because I would have to
17 explain why he didn't engage in any such behavior for 35
18 years -- doesn't suddenly reoccur. This disorder he may
19 have had when he was 15, 16 or 17 years of age, it
20 doesn't suddenly return. That's one.
21          The second issue is hypothetically let's say
22 if it did occur in the context of exhibitionism, was
23 this volitional impairment that drove this behavior or
24 was this deliberate behavior, because that's, again,
25 important because if it would be -- I would expect

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 195 of 234

1    something over the last 35 years, but because of the

2    very particular circumstance -- I mean, he's in the

3    custody of the marshal -- exposing himself, I do know

4    that's quite manipulative.

5              In terms of the behavior, he has engaged in

6    various behaviors that ultimately were discounted and

7    disregarded as being -- function of disorder. At least I

8    would conclude that this is probably deliberate behavior

9    not occurring in the context of exhibitionism, but even

10   if I take now one further stage -- and say let me

11   operate under the assumption that that was the first

12   sign of exhibitionism that was dormant for 35 years,

13   does this now mean that this exhibitionism satisfies the

14   statutory definition of a sexually dangerous person?

15   Based on what I know, it wouldn't, because one leg of

16   data in all these years -- and I don't -- at least in

17   Massachusetts, we would not consider exhibitionism as

18   being sexually violent conduct, and so I don't think

19   that I could make that argument.

20             And even when I earlier said that I agreed with

21   the first prong, my agreement with the first prong is

22   not because of what he did as a 15 year old exposing

23   himself, but what he did two years or 18 or 15 months

24   later when he fondled a victim's breast. That was the

25   basis of me saying yes, that's why he meets that first

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 196 of 234

1   prong.

2              So given, again, the totality of all

3   information in front of me -- and I would say even if

4   this happened, I don't think -- at least I wouldn't be

5   able to say that that is now a person who is a sexually

6   dangerous person as defined by this statute.

7              THE COURT: Okay. Very good, sir. Thank you.

8   Mr. Bell?

9              MR. BELL: Nothing further, Your Honor.

10             THE COURT: Mr. Gray?

11             MR. GRAY: Nothing further, Your Honor.

12             THE COURT: Very good. Doctor Saleh, you may

13  step down. Thank you. I assume that concludes the

14  evidence for the Respondent?

15             MR. BELL: That's correct, Your Honor.

16             THE COURT: Mr. Lockridge?

17             MR. LOCKRIDGE: Your Honor, we'd just like to

18  briefly pose the same hypothetical to Doctor Zinik.

19             THE COURT: That will be fine. Let me remind

20  you that you remain under oath.

21             THE WITNESS: Yes, Your Honor.

22         EXAMINATION

23         BY MR. LOCKRIDGE:

24  Q      Doctor Zinik, do you recall the hypothetical

25  that was posed to Doctor Saleh?

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 197 of 234

1    A        Would you repeat it again, please?

2    Q        Hypothetically speaking, Doctor Zinik, if you

3    were to learn that Mr. King were to have while in the

4    custody of the US Marshals in a confinement facility --

5    have exposed his genitals to a female within that

6    facility, would that change or affect your opinion with

7    regard to your diagnosis in this case?

8    A        Well, my answer would be that it would support

9    my opinion. If it were true that Mr. King sexually

10   exposed himself to a female, say, hypothetically

11   yesterday in the county jail during his civil commitment

12   trial, I would find this very compelling evidence for a

13   total breakdown in sexual impulse control.

14            Now of all times to be doing that kind of

15   behavior would signal to me that something has triggered

16   him, that he -- you know, something is stimulating him.

17   Perhaps it's all the discussion here at the trial about

18   his history. You know, if it happened yesterday after he

19   left court -- I know Doctor Graney was a female

20   psychologist -- a female expert was on the stand.

21            I am reminded of the fact that the other

22   incident that occurred in 1993 happened within the

23   context -- as we've said before, he was discussing this

24   sexual disorder with a female therapist and he was

25   talking about -- you know, if you read the infraction

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 198 of 234

1    report, the female therapist -- this was being recorded

2    and they were discussing his history of exposing himself

3    and asking women to touch his penis. He got emotional.

4    He broke down and started crying. He asked for the tape

5    to be turned off, and that's when he asked the therapist

6    if he could expose himself and if she would touch his

7    penis. So there was something about the context of the

8    discussion it appears if -- if you just look at the

9    sequence of events that contributed to him acting out in

10   that sexual way. I consider this very compelling

11   evidence. I think it's -- it is also what we -- it's a

12   form of what we call sexual preoccupation. I mean,

13   obviously he must have been preoccupied with sexual

14   impulses and thoughts.

15            I was surprised to hear Doctor Saleh say that he

16   could look at this as -- I think he said deliberate

17   behavior rather than an act of exhibitionism. I mean, I

18   don't see any other way to interpret it other than an

19   act of sexual exposure. I think that this is a dynamic

20   risk factor that is -- there's empirical evidence that

21   sexual preoccupation, which this would be a form of, you

22   know, acting in an inappropriate sexual manner in a

23   legal context is associated with increased risk of

24   sexually reoffending, and I would be concerned that if

25   he's doing this now, now of all times within the

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 199 of 234

1  structured setting of the jail, what might he do when he

2  gets out?

3          And the fact that he -- the fact that -- as

4  we've already said, at least as I've tried to

5  communicate and I think Doctor Graney agreed with me

6  that -- I think this is evidence of his exhibitionism. I

7  think it does support the diagnosis of exhibitionism,

8  and we -- I've said how -- and Doctor Graney said as

9  well that there is in a sense a merging or an

10 intertwining of his exhibitionism and his coercive

11 sexual paraphilia or whatever terminology you want to

12 use to describe it. These things are combined in a sense

13 for him, and so I'm very concerned that if he's starting

14 to expose himself again and he were released to the

15 community, he would be at high risk to expose himself

16 and to commit these same kind of sexual assaults that he

17 has in the past that he has described that involves

18 sexual exposure and that, you know, he has been

19 reporting since the mid 1970s.

20         THE WITNESS: So I look at this very

21 differently, Your Honor.

22         MR. LOCKRIDGE: Nothing further, Your Honor.

23         THE COURT: Mr. Bell?

24     EXAMINATION

25     BY MR. BELL:

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 200 of 234

1  Q      Doctor Zinik, if hypothetically this incident

2  occurred, would you agree that it would be the first

3  incident of exposure that's documented anywhere other

4  than through Mr. King's own words since the 1970s or --

5  well, maybe 1978 was the last incident where there's

6  evidence outside of his own statements where he exposed

7  himself. Would you agree with that statement if it

8  occurred?

9  A      Well, you know, we've got the '93 incident. He

10  didn't expose himself, but he talked about it. He asked

11  if he could do it. And then prior to that was the second

12  sexual offense that he was arrested for at age 17 where

13  he exposed himself to the female victim in the car and

14  forced 'em to touch his penis.

15  Q      Right. So you're talking about '78 to now?

16  A      I think that one was actually '75.

17  Q      '75 to now, this would be the only -- if it

18  occurred, this would be the only incident other than

19  that one back in '75 and then the one incident in '93

20  where he asked the staffer to touch his penis?

21  A      That we know of, yes.

22  Q      Okay. And you still agree as you testified on

23  Monday and actually Doctor Graney testified yesterday

24  that without a diagnosis of PNOS, nonconsent, you would

25  opine that Mr. King is not a sexually dangerous person

Huseby, Inc.                                                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208              (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 201 of 234

1   under the act?

2   A       Yes.

3                MR. BELL: Nothing further, Your Honor.

4                THE COURT: Redirect, Mr. Lockridge?

5                MR. LOCKRIDGE: Nothing further, Your Honor.

6                THE COURT: Very good. Thank you, Doctor

7   Zinik.

8                THE WITNESS: Thank you, Your Honor.

9                MR. BELL: -- nothing further from the

10  Respondent by way of evidence.

11               MR. BELL: Nothing further at this time, Your

12  Honor.

13               THE COURT: Very good. Thank you. Do Counsel

14  wish an opportunity to make closing arguments?

15               MR. GRAY: Yes, Your Honor, briefly. At this

16  time, we'd like to ask if we may excuse Doctor Zinik

17  from the courtroom so that he can get his travel back --

18                THE COURT: I assume there's no objections.

19                MR. BELL: No, Your Honor. In fact, I'm

20  scheduled to take Doctor Saleh back, but that's assuming

21  I get finished here in time to do that. But, no, that's

22  fine.

23               THE COURT: Okay.

24               MR. GRAY: Thank you, Your Honor.

25               THE COURT: What's your time frame, Mr. Bell?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 202 of 234

1          MR. BELL: -- quarter 'til five, so I don't --
2     I think we should be okay.
3          THE COURT: I don't anticipate arguments
4     taking that long.
5          MR. GRAY: No, Your Honor, certainly not from
6     the Government.
7          Your Honor, the issue before us is whether or
8     not Mr. King meets the criteria under 4248, and in doing
9     that, there's been a lot of discussion about whether or
10    not Mr. King's a liar, but ultimately that's not the
11    issue. The issue really comes down to whether or not
12    he's engaged or attempted to engage in sexually violent
13    conduct or child molestation. And, once again, the
14    statute doesn't require that that's a conviction -- just
15    means that he's engaged in or attempted to engage in
16    that sexually violent conduct, that the Respondent
17    suffers from a serious mental illness, abnormality or
18    disability and as a result of that abnormality or
19    disorder, he's going to have serious difficulty
20    refraining from sexual violence or child molestation if
21    he's released.
22         But, Your Honor, we would like to just --
23    once again just remind The Court that what's really at
24    stake here when we take a look at the statute is whether
25    or not Mr. King can be subjected to court ordered

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 203 of 234

1   treatment. It's very much like 4246, and the

2   determination as to whether or not The Court can order

3   Mr. King to undergo this treatment, we have to make a

4   determination as to whether or not there's a -- he's

5   going to have serious difficulties from refraining from

6   acts of sexual violence as a result of a serious mental

7   illness, abnormality or disorder.

8           Now, there's been a lot of evidence that's

9   been presented to The Court with regard to his past

10  conduct, and a little bit of that evidence when it comes

11  to his past conduct is relevant in one of the issues

12  that's been postured within this -- over the course of

13  this hearing of whether or not you can believe the

14  self-reports of Mr. King.

15          I anticipate that the Respondent will say

16  that if you take Mr. King's self-reports out of the

17  picture, you have a person who hasn't acted on any

18  behavior since 1993 where he solicited an intern in

19  Federal prison to touch his penis, and prior to that,

20  1978. However, if you take a look and do as both Doctor

21  Saleh and Doctor Zinik suggest you do, look at the

22  entire record in context, it's very clear that what we

23  have here is a person who has a serious mental disorder

24  in the sense that this is a person who becomes sexually

25  aroused when he is placing women into a point of

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 204 of 234

1  subjugation, fear and binding. That is his sexual

2  disorder, and he finds great gratification in that.

3          Now, we get that from a lot of his

4  statements, but his statements are not only corroborated

5  by past history -- because if we take a look at the

6  diagnosis of those in the Phipps Clinic in 1976, they

7  said yes, he is a person who isn't honest, and they

8  recognize that. And if you take a look at Government

9  Exhibit Number Nine, it will tell you that they

10  recognize that he is not an honest person. They did, as

11  Doctor Saleh and Doctor Zinik did -- took a step back

12  and fairly evaluated the information and made a

13  determination based on the entire record as to whether

14  or not his statements under these conditions could

15  actually be believed.

16          And they took a statement seriously enough to

17  include as a part of his record to say that this is a

18  person who has thoughts of rape, thoughts of binding

19  women and thoughts of subjugating women, and that's as

20  early as 1976. As we start to take a look at his conduct

21  in 1983 and in 1988 when he's engaging in the abduction

22  crimes, the most -- 1983 abduction crime, we see a

23  pattern that emerged.

24          He talked about while he was serving time in

25  prison -- his desire to engage in binding of women, how

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 205 of 234

```
 1   he liked to be able to force women into this sort of
 2   position. He gets out of jail, and what do we see in
 3   1983? In 1983, he's engaging in that sort of conduct by
 4   taking a woman who is walking out of a bar who is
 5   vulnerable, pushing her into a car, and then when he's
 6   later arrested -- and as you heard the details from Mr.
 7   King, Mr. King detailed in great detail how he was
 8   arrested driving northbound on Wisconsin Avenue and got
 9   pulled over in Brandywine when the cops found these
10   items in his car, the rope that was secured to a seat
11   belt holster, the knife which wasn't located in the car,
12   but Mr. King admitted that there was a knife and so did
13   the victim in her statement -- said that there was a
14   knife involved in that offense -- the handcuffs which
15   were found on his person, the air pistol which was the
16   crime that he pled guilty to in terms of carrying a
17   deadly weapon, but most importantly are the things that
18   he had with that entire, as he termed it, rape kit which
19   was there to help further his overall goals.
20           This is something that we need to place in
21   context of the entire history of Mr. King. What was his
22   intent? Well, we know what his intent was based on his
23   statements to psychiatrists outside of the Bureau of
24   Prisons and within the Bureau of Prisons. He enjoys
25   placing women -- to a position of subjugation. This is
```

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 206 of 234

1   what sexually stimulates him.

2          Now, one of the things that we do when we

3   look at that, we look at that to determine whether or

4   not he suffers from a serious mental illness,

5   abnormality or disorder. Doctor Zinik, Doctor Graney,

6   Doctor Bazerman all took a look at this context of

7   behavior and determined that even though he's a liar,

8   you've got to take a look at his lies and actually

9   compare them to evidence within the records, determine

10  whether or not there's some things you can believe.

11         In fact, not only did Doctor Zinik do it,

12  Doctor Bazerman do it, Doctor Graney do it, but by the

13  testimony of Doctor Saleh is that he did it as well, and

14  that by doing that, what we have is Doctor Zinik, Doctor

15  Graney, Doctor Bazerman all coming in with the diagnosis

16  that he was suffering from paraphilia NOS. The fact that

17  his mental disorder is one that leads him to find sexual

18  gratification, euphoria, joy from binding women and

19  engaging in that sort of conduct, that is his illness.

20         How do we know he will have serious difficulty

21  from refraining from doing that in the future? Let's

22  take a look at the period of time that elapsed between

23  his confinement based on the 1983 offense and the 1988

24  offense, six month gap took place that -- where he

25  engaged in, once again, the same type of behavior,

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG  Document 85  Filed 11/18/11  Page 207 of 234

1    abduction of a woman, forcing her into a car. His

2    history is replete with this sort of behavior.

3              Why hasn't he engaged in this sort of

4    behavior while he's been in the Bureau of Prisons?

5    Well, one thing is going to be that his conduct involves

6    women that he specifically identified he specifically

7    targets as being weak, those who are going to be more

8    vulnerable and ones that he can basically take advantage

9    of. He's not going to find that in the Bureau of Prisons

10   except for the one person he did find, the green new

11   intern that happened to be treating him when he went

12   over to her, said let's stop the tape and said you want

13   to touch my penis. He hasn't had a whole lot of

14   opportunity within the Bureau of Prisons to demonstrate

15   his overall proclivities.

16             However, he has told Doctor Graney and Doctor

17   Bazerman that he enjoyed engaging in that sort of

18   behavior and detailed to them his overall desire for

19   this sort of thing. He told them he was like a

20   hibernating bear. He told them these are fantasies that

21   he had. He detailed how he likes to find -- the types of

22   women, not Black, not foreign, because, you know, they

23   are the easiest ones to try to take advantage of, how he

24   would identify and track his victims like -- he even

25   told you how he would do that. All these things put

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 208 of 234

 1   together in the context of what we can believe from Mr.
 2   King is that we can believe that his paraphilia -- his
 3   actions over the course of his lifetime indicate that
 4   it's real.
 5          The real question and I think the issue
 6   really coming down before all of us, the question that
 7   we all have in the back of our mind is why in the world
 8   would somebody say, you know what, I really want to be
 9   civilly committed, because ultimately that is what Mr.
10   King said he did. He wrote a letter, a series of
11   letters -- 30 days he was writing letters asking why
12   haven't I been committed, I want to be committed. I
13   talked to Bazerman, how long is it going to be before
14   you guys make a decision? He was asking these questions.
15          Doctor Saleh's going to tell you that he's
16   asking these questions for ulterior motives. You know
17   what? Doctor Zinik may tell you that it was for ulterior
18   motive, he's lying in order to gain something, but one
19   thing that's consistent where all these lies -- that
20   he'll lie until he's pushed into a corner, and when he's
21   pushed into a corner, that's when he admits the truth.
22   That's one consistent thing that we have about Mr. King.
23   And what corner was Mr. King pushed into?  Into the
24   corner of civil commitment.
25          If you take a look at Doctor Saleh's report

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 209 of 234

1   at page 14, he talks about an interview in 2009 where

2   Mr. King talked to Dianna Repiska, (phonetic) and Doctor

3   Repiska was told about this hibernating bear thing. This

4   is what Doctor Saleh put in his report. After the

5   interview, this writer, Doctor Repiska spent some time

6   processing what had transpired, and his reaction -- Mr.

7   King's reaction to the possibility he may be referred

8   for certification, she had to ponder on this.  She was

9   confused by this. She knew he was a liar. She had to

10  reflect on why in the world is somebody doing this,

11  because this just doesn't meet the pattern.

12          And then she comes to the conclusion he did

13  not present any acute stress and denied any major

14  concerns at this time. And I'm reading from the indented

15  paragraph on page 14 of Doctor Saleh's report. It's

16  Respondent's Exhibit Number One. Inmate King felt fairly

17  sure that he would, in all caps, be certified and was

18  willing to accept his part -- accept this as part of his

19  fate. On multiple occasions, he stated he would do

20  whatever is necessary in order to not hurt anyone in the

21  future.

22          What we have here is a person that decided

23  that they were going to try to get ahead of the curve.

24  What was his gain in asking to be committed earlier?  He

25  recognized this. He recognized his past. He knew what he

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 210 of 234

1   had said to the psychologists. He knew that the chance

2   of him being certified were very high, so what does he

3   decide to do? He does what he always does, which is when

4   he's in a corner, he decides to do what he can to help

5   himself out, so he decides he's going to ask for

6   commitment in order to get a head start on -- to show

7   that he can be a productive member. Now, how do we know

8   that that was his motivation as opposed to --

9           THE COURT: Mr. Gray, let me just ask. I think

10  his testimony was not when he's pushed into a corner

11  that he tells the truth. I mean, in several instances he

12  spoke at length about how he would get behind in drug

13  payments or work off bills for elicit drugs at prison,

14  so by his own statement -- fabricate a story, escape

15  story was one, I think multiple personality story may

16  have been one, and in one instance, he felt threatened

17  by the -- I think he described it as a Hispanic gang at

18  one prison, or he was worried. I took that to mean he

19  was worried for his personal safety. His response to

20  that wasn't to tell the truth. It was -- by his

21  statement, it was to tell a lie.

22          MR. GRAY: I completely agree, Your Honor.

23  What I'm talking about, his -- his propensity of lying

24  until he gets put into a corner, that's the statement

25  that was made about him in Exhibit Number Nine when he

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 211 of 234

1  was at Phipps Hospital, and that's the statement that

2  was made not only by him, but by his mother, he's going

3  to lie until he gets put into a corner. But how do we

4  know that -- and I hear what you're saying, Your Honor,

5  and in order to determine whether or not he's telling

6  the truth or a lie as to his overall motivation, I want

7  to get into civil commitment because I've heard about

8  Coalinga State Hospital and I heard that it's great

9  conditions and I had heard it's really nice and I did

10 all the research on it. All we have to do is do what all

11 the doctors and everybody in this case should do, look

12 at the actual tangible evidence to determine whether or

13 not what he's saying is true.

14          Mr. King testified that Exhibit Number 21 was

15 the document that he looked at and he researched prior

16 to him being -- prior to him sending off the letter

17 saying I want to get out of here, I'm revoking

18 everything I've said, but if we take a look at the

19 bottom of Exhibit 21, it tells us when that document was

20 printed out. It was October, 2010.

21          Now, how else do we know that Mr. King was

22 just lying about revoking his status for some other

23 reason?  Well, let's take a good look at what he told us

24 on the stand. He said I knew within 30 days of being in

25 the Maryland house that I didn't want to be here because

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 212 of 234

1    I knew it was a prison, yet it was 90 days after that

2    that he wrote his first letter recounting -- April is

3    when he sent the letter off recounting what he said to

4    Doctor Graney. However, he said he had been there for 30

5    days and knew that it wasn't where he wanted to be.

6            It's not as if he didn't know he couldn't

7    write letters. When he was trying to get certified, he

8    wrote letters almost every 30 days to the warden, to the

9    CRP, to his unit manager, but when he finds out that

10   he's going to be in Maryland House and he's going to be

11   under, his words, prison conditions, he doesn't write a

12   letter immediately. He doesn't recant immediately. It

13   isn't for months that he decides he's going to recant.

14   It's when we look at all of his actions in context, that

15   is what gives us the indication as to whether or not we

16   can believe certain things about him.

17           Now, when it comes down to the real issue of

18   whether or not he's engaging in -- whether or not he's

19   suffering from a serious mental disorder or illness or

20   abnormality, we've seen the testimony and we've heard

21   the testimony and we've seen the report that he exhibits

22   the characteristics of a person suffering from

23   paraphilia NOS. Do we know 100 percent for sure that

24   he's going to engage in acts of misconduct or acts of

25   sexual violence if he's released? We don't know that for

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 213 of 234

1   sure. Nobody will be able to tell you that. Doctor Zinik

2   told you very clearly that actuarials don't tell you

3   that sort of stuff. It's not appropriate to even use 'em

4   in that way.

5           The question we have to ask ourselves is is

6   he going to have serious difficulty refraining from

7   engaging in that conduct if he's released. His past

8   history indicates to us that he will have serious

9   difficulty refraining. The fact that he has not engaged

10  in any treatment or therapy while he's been in the

11  Bureau of Prisons indicates that he will have serious

12  difficulty if released.

13          But most importantly, I think, are his own

14  words where he said that he is not a sexual offender,

15  and more importantly, what he told Doctor Saleh which

16  was he's fine. All of this in context gives us a clear

17  indication to let us know whether or not we can weigh

18  and determine whether by clear and convincing evidence

19  we feel he's going to have serious difficulty refraining

20  from engaging in acts of sexual violence or child

21  molestation.

22          Your Honor, with all this evidence that we

23  put before you, this question -- and we feel that all of

24  this evidence viewed in context appropriately shows that

25  Mr. King has engaged in acts of sexual violence or child

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 214 of 234

1    molestation in the past, he has a serious mental

2    abnormality, illness and disorder, either an antisocial

3    personality disorder as diagnosed by Doctor Saleh,

4    but -- paraphilia NOS as diagnosed by Doctor Bazerman,

5    Doctor Graney and Doctor Zinik and that he will have

6    serious difficulty refraining from engaging in acts of

7    sexual violence as a result of his paraphilia NOS and/or

8    his antisocial personality disorder.

9              Thank you, Your Honor.

10             THE COURT: Thank you, sir. Mr. Bell?

11             MR. BELL: Thank you, Your Honor. Your Honor,

12   first I just want to talk briefly about the facts

13   related to the offenses that Mr. King has been charged

14   and the circumstances surrounding those facts and the

15   information about those circumstances and where it comes

16   from.

17             It's clear that he was found guilty of

18   exposing himself at the age of 15, convicted of indecent

19   exposure, placed on probation. There is objective

20   evidence of that in the record, police reports,

21   conviction records and so forth. October, 1975, again

22   he's convicted of abducting a 19 year old female, placed

23   on probation, clear evidence in the record of fondling,

24   clear evidence in the record -- well, there's evidence

25   in the record -- it goes both ways, but there may have

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 215 of 234

1  been an exposure situation. It may have been a touching

2  of his penis. That's 1975, age 17. So we would concede

3  as Doctor Saleh conceded on the stand or testified that

4  yes, at some time in the past Mr. King has been involved

5  in serious sexual conduct.

6        Prong one of the test is met, but you have to

7  draw a line of demarcation in this case in 1975 and

8  thereafter, because in every instance thereafter when

9  he's charged with a crime, there's no clear objective

10 evidence that it was sexually motivated and certainly

11 more specifically motivated by the nonconsent coercive

12 aspect of sexual arousal.

13        At age 19, he was charged and found guilty or

14 pled guilty to attempted abduction -- no evidence in the

15 record really of any kind about that offense other than

16 his self-reporting that it was sexually motivated.

17 November 23, 1983, simple assault, CDW, carrying a

18 deadly weapon, age 25. If you listen to the Government's

19 part of the spin on the evidence, there may be some

20 evidence that there were tools for rape in the vehicle

21 or on his person. Well, he also was a tree climber, so

22 there was also tools for tree climbing in the vehicle,

23 but there's no statements other than Mr. King that

24 indicate in any way that that offense was sexually

25 motivated. Even if it was sexually motivated, it

Huseby, Inc.                                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 216 of 234

1   occurred when he was 19 years of age, and he's now 53.

2   And, again, further, there's no evidence even if it was

3   sexually motivated that it was motivated by this

4   coercive intense arousal by the coercive aspect of the

5   offense other than Mr. King's word certainly.

6            And, finally, the offense that he's been

7   serving time on since February of 1988, armed

8   kidnapping, age 29, frankly, Your Honor, the objective

9   evidence would indicate that this is not a sexually

10  motivated offense. You heard Doctor Zinik himself

11  testify that one of the reasons he found the offense to

12  be sexually motivated is there was no mention of money,

13  no talk of cash, no you have money, that sort of thing.

14  Well, in this particular case, clearly the record, the

15  objective record that nobody can argue with is that he

16  did ask her if she had money, did she have a lot of

17  money, and his only testimony was that it was --

18  motivation for the crime was to rob her.

19            All of the other reports of sexual offenses

20  come solely from Daniel King, a man who's been diagnosed

21  time and again as a chronic liar, manipulator, and even

22  Doctor Zinik, the Government's witness in his report

23  stated he is a pathological liar, he was unreliable.

24  And, quite frankly, Your Honor, as he sat on the stand

25  on Tuesday and testified, I can't tell you whether he

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 217 of 234

1  was telling the truth or not. I don't know. I know he

2  testified. I don't know if he was telling the truth or

3  not. No one can tell that about this individual. I hate

4  to say that about my client, but I think it's the truth.

5          The objective facts related to Mr. King's

6  sexual conduct, however, since he's been incarcerated

7  can be documented and it is objective. Probably his

8  daily life was more monitored for the years that he was

9  in prison from 1988 to now than certainly it ever was

10 before that and more monitored than any individual who

11 lives out in the world. These guys, they get up at a

12 certain time. They eat at a certain time. They go to bed

13 at a certain time. They have a job at a certain time.

14 You know, there is no room for things to happen that

15 would not be reported in the record.

16          When you look at that, from 1988 to the

17 present time, there are absolutely no sex offenses,

18 infractions, write-ups of any kind related to male or

19 female staffers, related to male or female inmates other

20 than the one incident in 1993 where it's alleged that he

21 asked a female staffer to touch his penis. He denies

22 that. I don't know if he's telling the truth or not, but

23 that's the only incident objective in the record in

24 24 -- almost 24 years period of time.

25          He's an admitted bisexual who has said that

**Huseby, Inc.**                                    www.huseby.com
**1230 West Morehead Street, #408, Charlotte, NC 28208**      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 218 of 234

1   he's had numerous homosexual partners while in the

2   Bureau of Prisons, and, again, even though his access to

3   females was very limited in the Bureau of Prisons, his

4   access to other male inmates was not. And you heard

5   Doctor Saleh testify that it wouldn't necessarily be --

6   sexual orientation wouldn't necessarily play into the

7   paraphilia if it exists, and there are no sex offenses,

8   infractions, write-ups related to any males -- staffers

9   or inmates again for a period of 23 years.

10          The Government doctors would say and did say

11  that he's in a penal setting. He's in the Bureau

12  of Prisons, he is controlled, his conduct is

13  controlled. However, his conduct may have been

14  controlled, but it certainly did not keep him from

15  getting in trouble. He got in trouble a lot. Dirty urine

16  tests, talking back, insubordination to staff members,

17  all of these things that are in the record clearly show

18  that he didn't have a problem going to the SHU, he

19  didn't have a problem getting in trouble, and of all of

20  the infractions and incidents that he had, again, the

21  only one of a sexual nature occurred in 1993, and, again,

22  that involved no touching of any kind. It was simply a

23  proposition. He has manipulated the mental health system

24  to -- in whatever maybe skewed way, he thinks it's

25  helping him since he was a child essentially.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 219 of 234

1        You know, you heard him testify that he

2   learned early on that if he was sick, things would go

3   easier for him. That may not be true, probably isn't

4   true, but in his mind, it was. He feigned, malingered at

5   least 12 different diagnoses, at least 12. There are

6   probably more -- that none of the doctors that you heard

7   from in this case, in this trial found. He faked an

8   escape attempt and then turned himself in so he would

9   get caught, so he would get shipped to another facility.

10  He's been in nine facilities in his time with the Bureau

11  of Prisons. He's used the system, the mental health

12  system to help him do his time. You heard him say it.

13       The precertification process, his testimony that

14  he wanted -- he had nowhere to go, I think you can tell

15  from his testimony he's not a dumb person. He's

16  relatively intelligent. He's been institutionalized for

17  a long time. He knows how the system works, and in the

18  past he's been successful in manipulating the system,

19  and I believe in this case he felt like he was going to

20  be successful in manipulating again, and, unfortunately,

21  his idea of what he was going to manipulate into was

22  wrong. And he did an excellent job of laying a

23  foundation through his own words to get him precertified

24  as a sexually dangerous person.

25             The bottom line is -- well, and I think it's

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 220 of 234

1   important to note to The Court Doctor Graney's testimony

2   that only -- I think she had done 14 or 16 evaluations,

3   precertification evaluations, and he was only one of

4   three inmates that were willing to talk to her. I think

5   that's important why was he was willing to talk to her.

6   He didn't have to. He wanted to, and he told her what he

7   thought would help him get in because he thought it was

8   going to be a place he wanted to be, and then he

9   realized it wasn't where he wanted to be.

10          When you take it in sum, you have an incident

11  exposure case in 1974, objective evidence. You have a

12  fondling and a possible exposure in 1975. You have an

13  incident with a -- there were tools found, ropes and so

14  forth, air pistol, handcuffs found in his vehicle in

15  1983, and you have one sexual proposal in 1993 that did

16  not involve any contact or touching of any kind. And

17  other than that, you have got his word over and over and

18  over again, but they're not consistent. He says he has

19  this problem and he's got blackouts and multiple

20  personalities, and now, by the way, I have sexual

21  problems, and there's just no consistency what with he

22  has said over the years.

23          And I think Doctor Saleh's testimony was very

24  profound in that you have to look at all of these

25  statements in context. You can't pick and choose. What

Huseby, Inc.
www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 221 of 234

1  helps you -- helps you get to the goal line -- the goal

2  line being civil commitment or a diagnosis that gets you

3  to civil commitment. You've got to look at it all and

4  take it and weigh it looking at it in the context of

5  making a diagnosis, not the diagnosis.

6          Both Government experts agreed when they

7  testified on Monday and Tuesday, and then Doctor Zinik

8  agreed today again without a diagnosis of paraphilia

9  NOS, nonconsent, Mr. King is not a sexually dangerous

10  person under the act in their opinion. Doctor Saleh did

11  not diagnose him with PNOS, nonconsent, so if The Court

12  finds that he did not suffer from this paraphilic

13  disorder, we contend that he cannot be a sexually

14  dangerous person under the evidence before The Court

15  today or in this trial.

16          Paraphilia NOS, nonconsent -- paraphilia, the

17  individual must present with recurrent, intense sexually

18  arousing fantasies, urges or behaviors generally

19  involving nonhuman objects, suffering or humiliation of

20  one's self or one's partner, children or other

21  nonconsenting persons over a period of more than six

22  months, and there must be impairment.

23          The specific -- I'm not going to call it

24  diagnosis, but the specific condition or label of

25  paraphilia NOS, nonconsent, the individual must

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 222 of 234

1   present -- and it must be shown that his arousal in the

2   nonconsent aspect of the interaction with the victim,

3   the coercion, it must be recurrent and intense.

4           Any rape is not a paraphilia. Any sexual

5   offense is not a paraphilia. Any attempted sexual

6   offense is not a paraphilia. It's a very specific

7   finding that a doctor must find to make that diagnosis.

8   And with regard to that diagnosis, you heard Doctor

9   Saleh testify it is a fictitious diagnosis, ad hoc, it's

10  not in the DSM-III, it's not in the DSM-IV, it's not in

11  the DSM-IV-T-R, it has been specifically rejected in

12  some form or another, whether it be the PCD or

13  paraphilia nonconsent -- I mean paraphilia not otherwise

14  specified, nonconsent over and over and over again by

15  the APA Boards that approves the diagnoses that go in

16  this manual that control or should control the

17  psychologists who make diagnoses when they're treating

18  people.

19          You heard Doctor Saleh, Doctor Zinik and

20  Doctor Graney all agree that there's a difference

21  between a clinical setting and a setting in a court of

22  law, that the standard is higher and it must be, because

23  we're looking at taking away this man's liberties. If

24  The Court finds that he's a sexually dangerous person,

25  he doesn't get out.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 223 of 234

1          And when the Government says that it is only

2     court ordered treatment, well, let me tell you about

3     that, Your Honor. What it means -- that once he becomes

4     a sexually dangerous person, the burden now shifts and

5     from now on into perpetuity, he's got to prove that he

6     should get out and the burden shifts to him, and that's

7     a big difference. So it's a lot more than just court

8     ordered treatment.

9          THE COURT: It's much more, I agree, because

10    court ordered treatment can be imposed through a

11    condition of supervised release, and we're talking about

12    commitment here, and I think they are different issues

13    entirely.

14          MR. BELL: I agree, Your Honor, and I think

15    you saw from the testimony today through Doctor Zinik

16    that this diagnosis of paraphilia NOS, nonconsent is

17    being called into question. In California, the state

18    where he's from, by a group that he does work for, I

19    mean, it is a debate. He admitted it. Doctor Graney

20    admitted it and Doctor Saleh said it. It is a debate and

21    it's been debated and debated and debated for years, and

22    it's not included in the DSM-IV-T-R and it's been

23    rejected by the DSM-V.

24          Doctor Saleh found that there's no diagnosis

25    of PNOS, nonconsent. Doctor Zinik stated twice that Mr.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 224 of 234

1 King cannot be a sexually dangerous person without a

2 diagnosis of PNOS, nonconsent. Doctor Graney also stated

3 that she agreed with Doctor Zinik, that without a

4 diagnosis of paraphilia not otherwise specified,

5 nonconsent, he cannot be a sexually dangerous person

6 under the act. There's no such diagnosis, but even if

7 there was or is or is a condition, there may be one

8 person in 100,000 people -- suffer from.

9          In this particular case, the Government has

10 not proven by clear and convincing evidence -- and I do

11 want to just briefly talk about the standard of proof.

12 As The Court's aware, it is an intermediate standard of

13 proof like somewhere between the preponderance of the

14 evidence, more likely than not and proof beyond a

15 reasonable doubt.

16          The Fourth Circuit case, which is the seminal

17 case and, frankly, about the only one I can find dealing

18 with clear and convincing evidence, states as follows.

19 In other words, The Court must be convinced by evidence

20 of such weight that it produces in the mind of the trier

21 of fact a firm belief or conviction without hesitancy as

22 to the truth of the allegations sought to be

23 established.

24          In the incident case, Your Honor, when you

25 look at the -- of inconsistencies and the evidence of

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 225 of 234

1  the spurious nature of this paraphilia not otherwise

2  specified, nonconsent diagnosis and the high burden

3  placed on the Government under the clear and convincing

4  standard, we contend that The Court must find that the

5  Government has failed to carry its burden of proof in

6  this case in establishing that Daniel King is a sexually

7  dangerous person under the act.

8          Thank you.

9          THE COURT: Thank you, sir. Why don't we talk

10  just a minute about the matter that was the subject of

11  the hypothetical? It seems to me one course would be to

12  have the report on that incident filed in the court,

13  then have -- then we'd all see what the specifics of

14  what the allegations are, at least as reported by the

15  deputy, provide Counsel an opportunity to confer and

16  possibly even to come up with a proposal for any further

17  proceedings.

18          As I sit here now, I don't know, frankly,

19  whether that report is relevant. I don't know that yet

20  without seeing it, and I don't know that Counsel is able

21  at this point without seeing it to know the significance

22  it has, whether or not we need to take further evidence

23  beyond it, whether the report itself should even be

24  admitted into the record.

25          I'm not suggesting that it be filed. I'm not

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 226 of 234

1  stating it should be a direct part of the record of this

2  commitment. I'm not suggesting that. Whatever we do

3  though, I think we need to do it expeditiously to keep

4  this matter moving along. So I don't envision elaborate

5  proceedings with respect to this development.

6          Mr. Gray, would a week be sufficient time for

7  the Government to obtain and file this report?

8          MR. GRAY: Your Honor, it's our understanding

9  that the deputy who filed the report, she is visiting

10  her -- she's off duty today. She's working with her

11  mother who apparently is ill, so we've made efforts to

12  see what we can do about getting that as quickly as we

13  can. A week should -- looks like that should work for

14  us, Your Honor.

15          THE COURT: I'll direct that that report be

16  filed within one week from today.

17          MR. GRAY: Your Honor, should we file a notice

18  of receipt and then provide it to the other side as

19  opposed to filing the actual report, or I guess --

20          THE COURT: Well, it may contain --

21          MR. BELL: Yeah. I would request that it not

22  be -- at least the document itself at this point in time

23  not be public record, but it -- file a notice and then

24  we -- The Court can see it, we can see it and then maybe

25  we can decide how we want to handle it or with The

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 227 of 234

1  Court's help how we want to handle it. I would prefer

2  that it not be filed, the report itself not be filed.

3            MR. GRAY: Your Honor, I'm sorry. It looked

4  like you were about to say something. I apologize.

5            THE COURT: No.

6            MR. GRAY: But if we were to file a notice and

7  then within four days after that propose a course of

8  conclusion with regard to that, within four days after

9  receipt --

10           THE COURT: Well, that works. We can do that,

11  have you all get some kind of status report, or we could

12  have some kind of telephone conference, or we could do

13  both, frankly.

14           MR. BELL: That would be fine.

15           THE COURT: Is four days sufficient? That

16  would be -- we get specific about dates, today's the

17  19th. A week from today would be the 26th. Of course, it

18  may not take a week.

19           MR. GRAY: Your Honor, the reason I proposed

20  four days is I was just trying to make sure, because it

21  is Wednesday -- making sure it doesn't fall on a

22  Saturday.

23           THE COURT: That's fine. We can revert to the

24  old -- format, and it's now been removed from the

25  Federal rules. We could say three business days after

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 228 of 234

1  the Government --

2          MR. BELL: And, Your Honor, if we get it today

3  or tomorrow, as soon as they get it and they can send it

4  to me, we can cut this shorter if we can, obviously.

5          THE COURT: That's fine. You can always do

6  things earlier, but these would be outside limits, and I

7  direct that it be served either by e-mail or telephone

8  fax so that we don't have to worry that it's not going

9  to trigger an additional three days for mailing or

10 circulation would -- otherwise allowed under Rule Six.

11          So within three days, business days after

12 service, I guess I'll look for the parties to file a

13 proposed resolution, assuming you can reach it. If you

14 have a different position than that statement of

15 resolution or proposal, I'll address that as well and

16 then we'll take it from there. I would like to receive a

17 copy of this report to look at.

18          MR. BELL: No. That's -- that's -- I didn't

19 mean to object --

20          THE COURT: No, no, not at all --

21          MR. BELL: I didn't want to file, you know,

22 where -- need to look it up.

23          THE COURT: I understand. I'm wondering

24 whether the document, the report itself could be filed

25 under seal, but the notice of filing would be filed

Huseby, Inc.                                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 229 of 234

1  publicly so the public would be on notice of that. There

2  was a police report that had been filed.

3           MR. GRAY: We should be able to do it under

4  seal, Your Honor.

5           THE COURT: Okay. You can always work with the

6  clerk's office on the nuances of --

7           MR. GRAY: Your Honor, it would help us

8  greatly if you were to submit an order to us -- in an

9  order saying that it be filed under seal. That would --

10          THE COURT: Very good.

11          MR. GRAY: -- all that --

12          THE COURT: Very good. We'll take care of

13  that. Mr. Bell, did you have any desire to submit

14  supplemental proposed findings? I'm not necessarily

15  asking for them. I just wanted to inquire of you. You've

16  submitted very extensive ones. Both sides have.

17          MR. BELL: Based on the evidence, Your Honor,

18  I would at least like to have the time to have the

19  opportunity to submit -- without having 'em -- my other

20  ones in front of me here and reviewing 'em, I think I

21  would like to have that opportunity. Now, I may decide

22  not to, but --

23          THE COURT: That's fine. Well, why don't you

24  wrap that issue into the status report proposal document

25  that we have been talking about? And obviously --

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 230 of 234

1   provide both sides that opportunity to express their

2   interest in it, and I would allow the parties to at

3   least propose a deadline for submission of them, keeping

4   in mind that we do need to keep this case progressing.

5           MR. BELL: Your Honor, the only possible

6   problem with that, if we get that document from him

7   tomorrow when we get three business days --

8           THE COURT: Oh. Don't misunderstand me.

9   I wasn't saying that supplemental proposed findings and

10  conclusions would be due by then, simply an indication

11  of --

12          MR. BELL: Sort of a time frame?

13          THE COURT: Yeah. Whether the parties wish to

14  do that, and, if so, what was their proposed time frame.

15          MR. LOCKRIDGE: I can tell you we definitely

16  want to do that, Your Honor.

17          THE COURT: Okay.

18          MR. BELL: And I would -- probably would, too,

19  but I just don't want to say definitively without

20  looking at it.

21          THE COURT: No. That's fine. Now, if you want

22  to include transcript citations, which you may well if

23  you're going to do supplemental findings, I would take

24  that into account with your -- your proposal. You may

25  want to also speak with the court reporter about the

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 231 of 234

1  acquisition of the transcript. The Court obviously is

2  going to require a transcript of this proceeding.

3          Very good. Is there anything else we can

4  accomplish today, Mr. Gray?

5          MR. GRAY: Your Honor, one more matter of

6  housekeeping, I've just been informed by the Marshals

7  office that R&D is closed, so they would like to house

8  Mr. King overnight at Wake County and --  before

9  transporting him back, and we request that there be an

10  order from The Court doing that.

11          THE COURT: What is closed now?

12          MR. GRAY: R&D, the prison, Your Honor.

13          THE COURT: Oh, I see -- inmates. Well, I

14  think that the transport of Mr. King is in the good

15  hands of the United States Marshals Service.

16          MR. BELL: Well, Your Honor, I would just

17  like to make The Court aware Mr. King has real

18  reservations about going back to Wake County simply

19  because of the allegations that have been made about

20  what may or may not have happened yesterday. He

21  indicated to me that he does not want to go back there.

22          Now, I don't know about whether they can send

23  him back to Butner, but I don't know if the marshals

24  could accommodate him in another facility or -- I don't

25  know, but he has expressed a real desire not to be sent

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 232 of 234

1    back to Wake County.

2              MR. KING: Excuse me, Your Honor.

3              THE COURT: I don't need to hear from Mr.

4    King. You may sit down, sir. I think issues like this

5    are probably in the -- the United States Marshals

6    Service, I'll defer to their judgment with respect to

7    the transport of Mr. King.

8              MR. GRAY: Thank you, Your Honor.

9              THE COURT: Anything further?

10             MR. LOCKRIDGE: No, Your Honor. Thank you.

11             THE COURT: Mr. Bell?

12             MR. BELL: No, Your Honor.

13             THE COURT: Very good. Gentlemen, I do want to

14   compliment counsel for both sides on their level of

15   preparation for this hearing. The Court did appreciate

16   it. Very good. We'll be in recess.

17

18

19        WHEREUPON, the hearing was concluded at 4:37 p.m.

20

21

22

23

24

25

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 233 of 234

1                          CERTIFICATE

2

3          I, Glynde M. Jones, Notary Public in and for the

4     State of North Carolina, do hereby certify that the

5     foregoing transcript of proceedings taken in the United

6     States District Court is a true and accurate

7     transcription of the shorthand notes of the proceedings

8     taken by me in machine shorthand and transcribed by

9     computer under my supervision.

10

11         Dated this 14th day of November, 2011.

12

13

14

15     _____

16     GLYNDE M. JONES, NOTARY PUBLIC

17     Notary Public Number: 20022120063

18

19

20

21

22

23

24

25

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208**          **(704) 333-9889**
Case 5:10-hc-02009-FL-JG   Document 85   Filed 11/18/11   Page 234 of 234