UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-HC-02009-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | GOVERNMENT'S POST-HEARING |
| Petitioner, | ) | PROPOSED FINDINGS OF FACT |
| | ) | AND CONCLUSIONS OF LAW |
| v. | ) | |
| | ) | |
| DANIEL H. KING, | ) | |
| | ) | |
| Respondent. | ) | |

## I.   INTRODUCTION[1]

The United States seeks to civilly commit Respondent, Daniel

H. King, as a "sexually dangerous person" under Section 302(4) of

the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh

Act"), Pub. L. No. 109-248, Title 111, § 302(4), 120 Stat. 587, 620-22

(2006), codified at 18 U.S.C. §§ 4247-4248.

In order to commit Respondent, the government must prove by

clear and convincing evidence that he is "sexually dangerous."

Under the Adam Walsh Act, a person is sexually dangerous if he "has

engaged or attempted to engage in sexually violent conduct or child

molestation and . . . is sexually dangerous to others."  18 U.S.C.

§ 4247(a)(5).  In order to determine that a person is sexually

---

1 This document includes information contained in the United
States "pre-hearing" proposed findings of fact and conclusions of
law filed on October 12, 2011, <u>see</u> Docket Exh. 65, as well as
supplemental information. For clarity, the supplemental information
is presented in bold font.

dangerous to others, a court must find that the person "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. § 4247(a)(6).

The government must therefore prove by clear and convincing evidence that (1) Respondent has engaged or attempted to engage in sexually violent conduct or child molestation; (2) Respondent suffers from a serious mental illness, abnormality, or disorder; and (3) that as a result of such serious mental illness, abnormality or disorder, Respondent would have serious difficulty refraining from sexually violent conduct or child molestation if released.

**The evidentiary hearing in this case occurred over the four-day period of October 17-19 and November 16, 2011. At the hearing, the Court heard testimony from the government's expert witnesses, Dr. Gary Zinik and Dr. Dawn Graney, both licensed psychologists; Respondent's expert witness, Dr. Fabian Saleh, a licensed psychiatrist; Respondent, and; Ms. Jakonia Walton, a lay witness. In addition to the testimonial evidence considered by the Court, the Court considered various documentary exhibits, including the forensic evaluation reports of the parties' experts, as well as law enforcement, treatment, medical, and Bureau of Prisons' documents.**

## II. FINDINGS OF FACT

### A. Procedural History

1.      This litigation commenced on January 19, 2010, when the government certified Respondent as a sexually dangerous person pursuant to 18 U.S.C. § 4248. [D.E. 1].  No action was taken by the Court until June 1, 2010, when the Federal Public Defender was directed to provide representation. [D.E. 2].

2.      On June 25, 2010, Respondent requested a hearing to determine whether he met criteria for civil commitment as a sexually dangerous person.  [D.E. 4]. Respondent's case was transferred to this Court on August 6, 2010. [D.E. 7].

3.      On August 25, 2010, the Federal Public Defender requested to withdraw as Respondent's counsel; on September 14, 2010, the Court granted the request and ordered substitute counsel. [D.E. 9; 12]. On September 16, 2010, Attorney Joseph L. Bell entered an appearance as Respondent's counsel. [D.E. 13].

4.      On December 2, 2010, March 30, 2011, and June 24, 2011, Respondent requested, and subsequently was granted, extensions of time to complete discovery. [D.E. 23; 31-34; 39].  On July 5, 2011, the Court ordered that any remaining discovery conclude by September 15, 2011. [D.E. 39].

5.      On September 1, 2011, the Court ordered the case referred to Magistrate Judge James E. Gates for hearing and memorandum and recommendation. The Court set the hearing for October 17, 2011. [D.E. 49].

6.    On September 16, 2011, Respondent requested the Court reconsider its referral of this case for hearing before a magistrate judge. On October 11, 2011, the Court denied the motion. [D.E. 53; 62].

**B.    Personal and Family Data**

1.    Respondent was born in June 1958 in Wilmington, Delaware. [p.1; Ex. 39, 838].[2] While an infant, he was separated from his natural parents and adopted by Mr. and Mrs. King. Respondent's natural brother, who is approximately 18 months older than Respondent, was also adopted by the Kings. [p.5].

2.    At approximately age 12, Respondent began exposing his penis to children. Respondent's parents sought professional help for this problem, but were told Respondent would outgrow the problem. However, Respondent continued to engage in such conduct. [p.5].

3.    Respondent did not get along well with women, including his adoptive mother ("mother"). He often threatened his mother, who, out of fear for her safety, would lock him out of the house or wait

---

[2]Much of the information contained in Sections B-E herein is taken from Exhibit 23, the Presentence Report (PSR) prepared by probation officials for the Superior Court of the District of Columbia in United States v. King, Case No. F-2818-88B. Page number citations (denoted by "p.") refer to the page number(s) of the PSR. Citations to exhibits (denoted by "Ex.") are to Petitioner's Exhibits, and, as necessary for clarity, include the page number referenced as the Bates stamp number within the Exhibit. For example, this citation is to Petitioner's Exhibit 39, Bates number 838.

4

at a neighbor's house until her husband returned home. [p.6].

4. Respondent has reported that he dropped out of high school due to drug use, legal problems, and an inability to concentrate. He later obtained his GED while incarcerated in Virginia. Id.

5. Respondent married his first wife, "D.J.", on or about 1982. They did not have any children. They divorced on or about 1986, following Respondent's 1985 conviction and sentence for Carrying a Dangerous Weapon in District of Columbia Case No. F-6785-83FG. [pp. 4-6].

6. Subsequent to the divorce, Respondent met another woman, "M", with whom he developed a relationship. They married in February 1987, while Respondent was incarcerated in Virginia. [p.7]. They had one child together in 1988. [Id.]. They divorced in 1988. [Ex. 2].

C. **Respondent's Criminal and Sexual History**

1. Police records reveal that on May 21, 1974, Respondent, then age 15, approached two girls (ages 7 and 8) while they were fishing in a creek. Respondent exposed his penis to the girls and asked if they wanted to feel it. Juvenile petitions were taken out against Respondent for indecent exposure. [Ex. 7].

2. Respondent's presentence report reveals that on September 10, 1974, Respondent was adjudicated responsible for two counts of Indecent Exposure in Fairfax County, Virginia, for offense conduct that occurred on or prior to April 18, 1974. No details as to the

5

offense conduct were noted. [p. 3].

3.    Records reveal that on the evening of October 9, 1975, Respondent, then age 17, approached a female stranger, age 19, walking on a path adjacent to a street. After some initial conversation, Respondent grabbed the female with one hand and placed a knife at her neck with the other hand. Respondent forced the female into the rear seat of a car being driven by another male and they drove away. The driver advised Respondent to release the female, but Respondent told him to shut up and keep driving. While in the car, Respondent unsuccessfully attempted to remove the female's blouse. He held the female around the throat and placed his hand under her blouse and fondled her breasts. The female reported that Respondent also forced her to touch his penis. [Ex. 8]. The driver continued to tell Respondent to release the female, which he eventually did. Upon questioning by the police, Respondent admitted to forcing the female into the car and fondling her breasts. [Id.]. On October 27, 1975, Respondent was adjudicated responsible for Seize, Transport & Detain with Intent to Defile and sentenced as a juvenile to indeterminate probation, not to exceed his 21st birthday. [p.3].

4.    Records reveal that on or about April 7, 1978, Respondent, then age 19, was charged with two counts of attempted abduction. [p.3]. Respondent was subsequently convicted of one count of Felony Abduction. On November 8, 1978, the Circuit Court of Fairfax County,

6

Commonwealth of Virginia (Case No. 27419), sentenced Respondent to a 10-year term of imprisonment, 5 years of said term suspended on good behavior, and 5 years of probation to be served upon his release from imprisonment, as a result of his conviction for felony Abduction. [Ex. 10]. On February 3, 1984, the above period of probation was revoked due to Respondent's commission of another crime in late 1983, and Respondent received a 5-year active term of imprisonment. [p.3; Ex. 17]. He was paroled from that sentence on November 14, 1985, to serve another sentence he received on February 13, 1985. [Ex. 17].

5.    On November 23, 1983, while still on parole for felony abduction, Respondent approached a female stranger and asked her to walk him to his car so that he would not be arrested for being drunk. Upon arriving at the female's car, Respondent again asked the female to go to his car. She declined, and Respondent told her not to scream or he would kill her. He then attempted to push her into her vehicle. The female kicked Respondent and screamed, and Respondent fled to a black vehicle and left the scene. The female then informed her boyfriend and another person what happened, and the police were called. In describing Respondent to the police, the female reported, in part, that he had a red knit hat and a green jacket. Respondent was subsequently arrested wearing a red hat and green jacket.  During the arrest, Police recovered a pair of handcuffs from Respondent's

jacket. Recovered from Respondent's vehicle was an air pistol, located on the front passenger seat, an axe handle with nails on one end under the driver's seat, and lengths of rope on the floorboard with one rope hooked through a seat belt anchor. [Ex. 13]. Respondent was charged with Assault with Intent to Kidnap While Armed, Carrying a Dangerous Weapon, and Simple Assault. [pp. 3-4]. He subsequently pled guilty to Carrying a Dangerous Weapon and Simple Assault. On February 13, 1985, the Superior Court of the District of Columbia (Case No. F-6785-83FG) sentenced Respondent to a 2 to 8 year term of imprisonment for Carrying a Dangerous Weapon and a consecutive 1 year term for the assault. [Ex. 14]. Respondent paroled from the above sentence in September 1987. [p.4; Ex. 18]

6.    On February 19, 1988, Respondent, while on parole from the 1985 sentence, approached and grabbed a female around the neck, threatened her with a knife not to scream, led her down the street, asked her if she had any money, and attempted to force her into his auto. His attempt was thwarted due to a pedestrian diverting his attention from the female, who was able to break free and flee the scene. Police records indicate the female did not know Respondent. [Ex. 20, 21]. As part of the presentence investigation in this case, Respondent gave, in part, the following reason for his offense conduct: "I know what my intentions were . . . for a sex assault. I wasn't able to control what I was doing . . . The impulses are so

8

strong. I attempted to get help for them. It's been happening since 1975." [p.3]. On June 7, 1988, Respondent wrote a letter to the criminal court in which he admitted the violent nature of all his prior criminal offenses and requested the court get him psychological help for his problem. [Ex. 22]. On July 8, 1988, the Superior Court of the District of Columbia (Criminal Docket No. F2818-88B) found Respondent guilty of Armed Kidnapping and sentenced him to a 12 to 36 year term of imprisonment. Respondent was released from confinement to mandatory parole on January 20, 2010. [Ex. 26].

7.    On April 9, 1993, **while in custody of the BOP** during a **one on one** therapy session, Respondent stated to a female psychologist, "I want you to touch my penis." The BOP sanctioned Respondent for this conduct. [Ex. 33; Ex. 55].

**8.**    On the morning of October 18, 2011, Respondent was detained in a jail holding cell pending transportation to this Court for his § 4248 evidentiary hearing later that morning. In another jail cell across the hall from Respondent was Ms. Jakoniah Walton, a 23 year old female and three other female detainees. [Walton, Nov 16, 2011 Tr. 6-10]. According to Ms. Walton, while in her holding cell looking through her cell window that morning, she saw Respondent stand on a bench in his cell, pull his pants down and purposefully expose his penis toward her and the other female detainees in her cell. Respondent's elevated stance on the bench resulted in Ms.

9

Walton being able to clearly see Respondent's penis and his related conduct. While standing on the bench, Respondent purposefully masturbated in a manner so that the female detainees could see his actions and made unwanted sexual gestures toward them while attempting to keep their attention focused on him. Respondent continued this unwanted, unsolicited conduct for several minutes until the females were able to summon a correctional employee, who confronted Respondent about his conduct. [Walton, Nov 16, 2011 Tr. 10-14]. Ms. Walton testified that it appeared that he had ejaculated as a result of his conduct.

**D.   Respondent's Mental and Emotional Health**

1.   During the period of 1971-1974, Respondent, then approximately 13-16 years old, received mental health counseling "in relation to exposures and obscene phone calls." [p. 7]. During 1974-1975, Respondent received mental health therapy related to his indecent exposure behavior. [Ex. 9, 1501-1502].

2.   Following Respondent's October 1975 arrest and adjudication for Seize, Transport & Detain with Intent to Defile a female, he was court-ordered to received inpatient psychiatric treatment at Westbrook Hospital in Virginia. He was expelled from that facility in late 1975 for allegedly engaging in inappropriate sexual contact with a female patient. [Ex. 9, 1502, 1505].

3.   On December 29, 1975, Respondent, then age 18, was admitted

10

pursuant to court order to the Henry Phipps Psychiatric Clinic at John Hopkins Hospital for mental health treatment.[3] [Ex. 9, 1505-1506]. On admission, he complained, in part, of difficulty controlling his impulses to expose himself to women. [Id., 1497]. He reported that he experienced sexual fantasies about exposing himself to others since age 13 and stated that whenever he has sexual intercourse, he fantasizes about exposing himself to women or tying them up and raping them. [Id., 1500]. During that admission, Respondent stated that previously received psychological therapy related to his exposing himself did not help him to discover the reason for his actions. He also admitted to frequent alcohol and drug use. He was given a diagnosis of Exhibitionism and Group Delinquent Reaction of Adolescence [p. 8; Ex. 9, 1507].

4. In 1977, Respondent attended a few therapy sessions with a psychiatrist at Fairfax County Hospital, but such treatment was discontinued by the doctor because Respondent did not attend on his own. [p.8].

5. In September 1987, Respondent received **an outpatient mental health evaluation** at the Alexandria Mental Health Center. Respondent's treatment provider noted that Respondent had a history

---

**3** A medical record entry from John Hopkins records indicates, apparently incorrectly, that Respondent's admission occurred on December 29, 1976 rather than 1975. [Ex. 9, 1497]. Other entries from the same record show he was actually admitted on December 29, 1975. [Ex. 9, 1504-1506].

of violence largely directed at women which needed careful exploration. Respondent was diagnosed with Intermittent Explosive Disorder and Alcohol Dependence, in remission. [Ex. 19, 903-908].

6.    In 1988, Respondent informed probation officials that he has been unable to control his behavior and knows that he is still in need of treatment. [Ex. 23, 8].

7.    In a letter from Respondent dated April 29, 1993, he requested that the BOP provide him assistance for his "problems". [Ex. 32].

8.    In 1997, Respondent received a psychological evaluation while incarcerated in Leavenworth, Kansas. [Ex. 39, 838]. The evaluation was conducted at the request of the United States Parole Commission for the purpose of assessing whether Respondent may pose a threat to the community if released. [Id.]. During the evaluation, Respondent admitted that he has not always been able to control his indecent exposure behavior and that he engaged in such behavior as a way of humiliating and controlling others through dominance. Respondent complained that the BOP had not provided him the mental health assistance he needed to address his behaviors. [Id., 839-40]. He was diagnosed with a history of polysubstance dependence, a history of exhibitionism, and antisocial personality disorder. The evaluator also opined that, given Respondent's long assaultive history in the community and the psychological test data, that he

12

remains a potential threat to the community. [Id., 840-42].

9.    In July 2009, Respondent was evaluated by Dr. Bazerman, a BOP psychologist, at the request of the BOP's Certification Review Panel, to determine whether he meets criteria for certification for civil commitment under 18 U.S.C. § 4248. During that evaluation, Respondent informed Dr. Bazerman that the sex offender treatment he received to that point has not been effective due to his lack of ownership of his issues, that he feels he has not received adequate tools to control himself, [Ex. 46, 2383], and that it would be a matter of time until he sexually reoffended. [Id., 2386, 2389]. During the evaluation, Respondent informed Dr. Bazerman that the crimes for which he has been convicted were committed with the intent to sexually assault the victims and that he had committed other sexual offenses for which he had not been caught. [Id., 2385-86]. Dr. Bazerman noted Respondent's history of feigning mental illness for secondary gains. Dr. Bazerman diagnosed Respondent with Paraphilia Not Otherwise Specified ("NOS"), Non-Consent; Exhibitionism, by history; Polysubstance Abuse, and; Antisocial Personality Disorder. [Id., 2387].

    E.    Respondent's Substance Abuse History

1.    Respondent's presentence report indicates that he used marijuana regularly from 1973 until 1983, when he began using cocaine, heroin, and amphetamines. He described himself to Probation

13

as an alcoholic. [p.9].

2.    While in BOP custody, Respondent has been sanctioned numerous times for wrongful use/possession of alcohol/drugs. [Ex. 55].

**F.    Respondent's Institutional Conduct**

1.    Disciplinary records reveal that Respondent has incurred several rule violations during his confinement in BOP custody. [Ex. 55]. In addition to Respondent's numerous violations for wrongful use/possession of drugs and alcohol and other violations, he has been sanctioned for the following:

a. April 9, 1993 - Making a Sexual Proposal to a BOP staff member. Respondent asked a female BOP psychologist to touch his penis. [Ex. 33; Ex. 55, 3321].

b. November 28, 1995 - Threatening Bodily Harm to a female staff psychologist. (Exh. 37; Ex. 55, 3321].

c. July 16, 1998 – Possessing a Dangerous Weapon. [Ex. 55, 3320].

d. September 1, 1999 – Disruptive Conduct – High. [Id.].

e. July 6, 2000 – Attempted Escape. [Id., 3319].

f. September 13, 2000 – Threatening Bodily Harm. [Id.].

g. October 22, 2010 – Refusing an Order; Being Insolent to Staff Member. [Id., 3316].

2.    In February and May 2011, BOP staff confiscated from

14

Respondent's room some magazines containing photographs of scantily clad women in sexually suggestive poses. [Ex. 53].

3.     In some emails between Respondent and his ex-wife, "M", dated June 2011, M indicates her belief that Respondent intends to purchase a pay as you go phone upon his release so that he cannot be tracked by authorities. She also informed Respondent of her distrust of him and that he could not come to her house unless he has a computer chip implanted in his body. [Ex. 54].

4.     On the morning of October 18, 2011, while detained in a jail holding cell during the pendency of the § 4248 evidentiary hearing in this case, Respondent intentionally exposed his penis to, and masturbated in the presence of, female detainees housed in a holding cell across the hall. [Walton, Nov 16, 2011 Tr. 6-10]. Respondent engaged in this conduct despite the serious nature of the proceedings facing him and the possibility that he could be civilly committed under § 4248 as a sexually dangerous person.

**G.     Evaluations and Testimony of Dr. Gary Zinik**

1.     Dr. Gary Zinik is a clinical forensic psychologist, who has evaluated hundreds of sex offenders to determine whether they meet criteria for civil commitment as sexually dangerous/violent persons. His curriculum vita is Exhibit 6.

2.     Dr. Zinik's initial forensic evaluation of Respondent, dated October 1, 2010, is Exhibit 5. On July 26, 2011, Dr. Zinik

15

interviewed Respondent for evaluation purposes, with the consent of Respondent and his counsel. Dr. Zinik completed an updated forensic evaluation of Respondent on August 1, 2011. That report is Exhibit 57.

3.    Dr. Zinik opined in both of his evaluation reports and during testimony in this case that Respondent meets criteria for civil commitment as a sexually dangerous person under the Adam Walsh Act. [Ex. 5, 2640; Ex 57, 2688]. In forming his opinion, Dr. Zinik considered the voluminous documents referenced in his reports. Such documents included information related to Respondent's criminal history, medical history, social history, substance abuse history, institutional adjustment, and other records related to Respondent. In the second report, Dr. Zinik also relied on his July 2011 clinical interview of Respondent, and considered the forensic evaluation of Dr. Fabian Saleh, dated April 13, 2011. [Ex. 5; Ex. 57].

4.    Dr. Zinik determined that Respondent had previously engaged in or attempted to engage in sexually violent conduct or child molestation. Dr. Zinik referenced Respondent's convictions and investigatory records from 1974, 1975, 1978, 1983, and 1988, other official records, Respondent's juvenile conduct, his self-reported admissions and denials, and his institutional behavior, in support of this conclusion. [Id.]

5.    Dr. Zinik opined that Respondent suffers from the

16

following serious mental disorders: Paraphilia Not Otherwise
Specified, forced sex with nonconsenting females; Exhibitionism;
Polysubstance Abuse, and; Antisocial Personality Disorder. [Ex. 5,
2628; Ex. 57, 2686].

6. As stated by Dr. Zinik and Dr. Graney, the Diagnostic and
Statistical Manual of Mental Disorders, Fourth Edition, Text
Revision ("DSM-IV-TR") defines the essential features of a
paraphilia as "recurrent, intense sexually arousing fantasies, urges
or behaviors generally involving 1) nonhuman objects, 2) the
suffering or humiliation of oneself or one's partner, or 3) children
or other nonconsenting persons that occur over a period of at least
6 months." DSM-IV-TR, 566; [Ex. 5, 2628; Ex. 2, 2668]. As stated by
Dr. Zinik, Paraphilia Not Otherwise Specified ("NOS") is listed in
the DSM-IV-TR as a mental disorder. It refers to a group of paraphilic
disorders that do not meet the criteria for the specific categories
of paraphilias listed in the DSM. DSM-IV-TR, 576; [Zinik, Oct. 19,
2011, Tr. 77]. Dr. Zinik explained that there are numerous
paraphilias not listed in the DSM, and that the proper way to diagnose
such paraphilias is to render a diagnosis of Paraphilia NOS, followed
by a descriptor of the paraphilia. In Respondent's case, Dr. Zinik
diagnosed Paraphilia NOS, with the descriptor "forced sex with
nonconsenting females", sometimes described by other evaluators as
Paraphilia NOS, "nonconsent" or Paraphilic NOS, "paraphilic coercive

17

disorder". Dr. Zinik stated these descriptors are synonomous. [Zinik, Oct. 19, 2011, Tr. 76-77]. Dr. Zinik provided a sufficient basis for his opinion that Respondent suffers from this paraphilia. In addition to the conduct that led to Respondent's convictions, the relative rapidity of Respondent's reoffending upon release from confinement, the sexual motivation for his crimes despite the presence of apparent consenting partners (i.e. his wives), evidence of a rape kit, evidence of advanced planning and premeditation, other records reviewed by Dr. Zinik, the admissions made by Respondent regarding his continued sexual urges, and Respondent's conduct while detained, formed the basis of Dr. Zinik's opinion. Dr. Zinik further opined that Paraphilia NOS is a serious mental illness, abnormality or disorder in this case. [Ex. 5; 57].

7. Despite Respondent's confinement since the late 1980's, there is substantial evidence that he continues to have an intense, paraphilic interest in abducting and performing forced sexual acts on non-consenting females. For example, in 1993, during a therapy session, he asked a BOP psychologist to touch his penis. [Ex. 33, 93; Ex. 55, 3321]. In 1997, during a psychological evaluation conducted on behalf of the Parole Commission, Respondent complained that he had not received the mental health treatment he needed. When asked what problems he wanted to address, Respondent answered "my repetitive pattern of behavior that has been unacceptable in society

18

that is inappropriate, that I have not always been able to control." [Ex. 39, 839-40]. In 2009, Respondent wrote a letter to BOP mental health staff, in which he stated that he has not developed the ability to control himself. [Ex. 44]. He also stated verbally to BOP psychology staff that he has committed other undetected sexual offenses in the past, that the crimes for which he has been convicted were sexual in nature, that the sex offender treatment he has received has not been effective, that he has not received adequate tools to control himself, and that he would sexually reoffend if released. [Exs. 2; 5; 46; 57]. Moreover, on October 18, 2011, just hours prior to Respondent's return to Court for continuation of his § 4248 hearing, he purposefully masturbated toward and in the presence of four non-consenting female detainees who were housed in a holding cell across from him. [Walton, Nov 16, 2011 Tr. 6-14]. Dr. Zinik testified that such behavior is "very compelling evidence for a total breakdown in sexual impulse control" and that such evidence supports his opinion in this case. [Zinik, October 19, 2011, Tr. 198].

8. Dr. Zinik defined Exhibitionism and provided a sufficient basis for his diagnosis of Exhibitionism. [Ex. 5; Ex. 57]. There is substantial evidence in the record that Respondent has a history of recurrently exposing himself to strangers as well as a history of recurrent, intense fantasies and urges to expose himself. Moreover, Respondent has admitted to BOP staff as recently as 2009 that he

19

continues to have urges and fantasies to expose himself to women, and that he has used heroin while incarcerated as a way of reducing his urges. [Exs. 2; 5; 46; 57]. Dr. Zinik also testified that Respondent's exposure of his genitals and masturbation toward some female detainees in October 2011 during the pendency of this litigation supports his diagnosis of Exhibitionism. [Zinik, October 19, 2011, Tr. 198].

9.   Dr. Zinik defined Antisocial Personality Disorder and provided a sufficient basis in his report for that serious mental illness. [Exs. 5; 57]. There is substantial evidence in the record that Respondent meets the criteria for this diagnosis.

10.   Dr. Zinik defined Polysubstance Dependence and provided a sufficient basis for that diagnosis. [Exs. 5; 57]. There is substantial evidence in the record that Respondent has frequently abused alcohol and various controlled substances, including heroin and marijuana, throughout much of his teenage and adult years. Despite his confinement in BOP custody, he has continued to abuse alcohol and illegal drugs, as demonstrated by his numerous rule violations for alcohol/drug use and possession. [Ex. 55].

11.   In determining whether Respondent would have serious difficulty refraining from sexually violent conduct or child molestation, Dr. Zinik did both a clinical analysis and an analysis of several risk tools that have at least a moderate degree of

20

accuracy. The risk tools used by Dr. Zinik place Respondent in the comparison group of offenders with a high risk of reoffending. [Exs. 5, 2632-2645; 57, 2686-90].

12.   Dr. Zinik used three actuarial risk assessment tools, the STATIC-99 Revised (STATIC-99R), the STATIC-2002R, and the MnSOST-R, to assist him in assessing Respondents' risk to sexually reoffend in the future. All three of the above tools are supported by empirical research to have moderate accuracy in predicting the risk of future sexual re-offense by sex offenders and are widely used by professionals in conducting risk assessments of sex offenders. [Id.].

13.   Dr. Zinik scored Respondent with an 8 on the STATIC-99R, a 9 on the STATIC 2002-R and a 16 on the MnSOST-R. Each of those scores places Respondent in the highest risk levels for being charged with or convicted of a sexual offense. Respondent's score ranks on the STATIC 99R, STATIC 2002-R, and MnSOST-R, fall, respectively, into the 99th, 98th, and 96th percentiles. With respect to the STATIC 99R, for example, this means that 99 percent of sex offenders in the comparison sample group, scored at or below Respondent's score of 8. [Id.].

14.   Individuals in the high risk/high needs sample group of sexual offenders, to which Respondent was compared, that scored an 8 on the STATIC 99R are estimated to sexually reoffend at a rate of

21

approximately 45 percent in 5 years of release and 55.3 percent within 10 years. Individuals in the sample group to which Respondent was compared that scored a 9 on the STATIC 2002-R, are estimated to sexually reoffend at a rate of 41.6 percent within 5 years of release and 52.3 percent within 10 years. Individuals in the sample group to which Respondent was compared that scored a 16 on the MnSOST-R are estimated to reoffend at a rate of 40 percent within 6 years. [Id.].

15. In addition to the static risk factors set forth above, Dr. Zinik reviewed relevant dynamic risk factors in assessing Respondent's risk for sexual reoffense, [Ex. 5, 2637-2639]. A dynamic risk factor refers to something that has the capacity to change over time, for example with treatment, [Id., 2637]. Dr. Zinik used the STABLE-2007, a dynamic risk assessment instrument. [Id.]. The presence of dynamic risk factors increases an offender's risk. [Id.].

16. Dr. Zinik considered the following dynamic risk factors: (1) significant social influences, (2) intimacy deficits, (3) sexual self-regulation, (4) cooperation with supervision, and (5) general self-regulation, [Ex. 5, 2638-2639]. Although Dr. Zinik did not opine as to Respondent's significant social influences, he noted that, based on Respondent's procurement of drugs in prison, he associates with substance abusing inmates while confined. [Id.]. Dr. Zinik determined that Respondent suffers from serious intimacy deficits,

22

as demonstrated, in part, by his relatively brief marriages that ended due to his sexual offending, his reported hatred and hostility toward women and girls, and a lack of evidence of remorse for his victims. [Id., 2639]. Dr. Zinik indicated that Respondent has not cooperated with supervision while confined or while on probation/parole supervision, as demonstrated by his long list of rule violations while confined and his history of reoffending while on supervision in the community. [Id.] Dr. Zinik also determined that Respondent has exhibited poor general self-regulation. [Id.]. Dr. Zinik also considered Respondent's October 2011 exposure incident, which he considered as "very compelling evidence" of a lack of sexual impulse control on Respondent's part. He considered such conduct as evidence of sexual preoccupation, which is a dynamic risk factor that increases the risk of sexual re-offense in this case. [Zinik, October 19, 2011, Tr. 198].

17. Dr. Zinik also considered the following three factors that are considered protective because they decrease the risk of further sexual reoffending: (1) having been in the community without sexually reoffending; (2) having less than 15 years left in the offender's time at risk due to illness or physical conditions that significantly decrease the motivation and/or ability to sexually reoffend, and (3) very advanced age, [Id.]. Dr. Zinik concluded that none of these factors are present for Respondent. [Id.].

23

18.   Based on the overall risk scales applicable to Respondent and other factors, including the October 2011 exposure incident, which Dr. Zinikin Dr. Zinik opined that Respondent is at high risk for sexual re-offense. [Id.].

**H.    Evaluations of Dr. Dawn Graney**

1.   Dr. Dawn Graney is currently employed by the Bureau of Prisons as a forensic psychologist. She has been assigned to the Federal Correctional Institution in Butner, North Carolina since August, 2002. Her curriculum vita is Exhibit 4. Dr. Graney's Precertification Forensic Evaluation report of Respondent, dated November 13, 2009, is Exhibit 1. Her Forensic Evaluation report of Respondent, dated August 1, 2011, is Exhibit 2, and her supplement to the 2011 report is Exhibit 3.

2.   Dr. Graney's reports address Respondent's developmental history, relationship history, education history, military/work history, substance abuse history, non-sexual criminal history, sexual criminal history, psychosexual history, mental health history, medical history, her diagnostic impressions, her use of actuarial instruments and her opinion regarding Respondent's sexual dangerousness. [Exs. 1; 2; 3].

3.   Dr. Graney opines that Respondent meets the criteria for civil commitment under the Adam Walsh Act, [Id.].

4.   Dr. Graney reviewed the same materials as Dr. Malinek, and

24

had the opportunity to interview Respondent. [Id.].

5.    Dr. Graney made the following diagnoses: (1) Paraphilia Not Otherwise Specified, non-consent; (2) Exhibitionism; (3) Alcohol Abuse; (4) Opiate Abuse, and; (5) Antisocial Personality Disorder. [Exs. 1, 2399-2400; 2, 2668-72].

6.    In the 2009 precertification forensic evaluation, Dr. Graney utilized the Rapid Risk Assessment for Sex Offender Recidivism ("RRASOR") and the STATIC-99R, [Ex. 1]. Respondent scored a 4 on the RRASOR. Based on the normative sample of the RRASOR, a score of 4 is associated with a 33% likelihood of being convicted of a sexual offense within five years post-incarceration, and approximately 49% likelihood within ten years post-incarceration. [Ex. 1, 2402-03].

Respondent scored a 7 on the STATIC-99R, which corresponds with approximately a 38% likelihood for being re-convicted of a new sexual offense within five years post-incarceration, and a 49% likelihood for being re-convicted of a new sexual offense in 10 years. [Id.].

7.    In the August 2011 forensic evaluation, Dr. Graney utilized the STATIC-99R to assess Respondent's risk of sexual reoffense. Dr. Graney initially scored Respondent as a 7 on the STATIC-99R, but after correcting a scoring error in a supplement to her report, she scored him as an 8. [Exs. 2, 2672-74; 3].    Individuals with the same score from the High Risk/High Need group sample have been found to sexually reoffend at a rate of approximately 45% within

25

five years and 55.3% in 10 years. [Ex. 3].

8.    Based on the above, Dr. Graney opined that Respondent would have serious difficulty in refraining from sexually violent conduct if released. [Exs. 1, 2404; 2, 2679].

**I.    Evaluation of Dr. Fabian Saleh**

1.    Dr. Fabian Saleh is a psychiatrist. His qualifications are set forth in his curriculum vita.

2.    Dr. Saleh conducted a forensic evaluation on Respondent in April 2011 to determine whether he meets criteria for civil commitment as a sexually dangerous person under the Adam Walsh Act. As part of that evaluation, Dr. Saleh conducted an interview of Respondent.

3.    During Dr. Saleh's interview of Respondent, Respondent retracted his prior admissions that he would kill or sexually assault anyone if released from confinement. He informed Dr. Saleh that he made those admissions in order to remain confined so that he could continue to be cared for. Respondent stated to Dr. Saleh that he currently masturbates to sexual fantasies four to five times per week. [Resp. Ex. 1, at 5].

4.    Dr. Saleh diagnosed Respondent as suffering from Antisocial Personality Disorder.

5.    Dr. Saleh opined that Respondent does not suffer from a paraphilic disorder and, that, with the exception of Respondent's

26

behaviors in the mid-1970's, the evidence of a possible paraphilic disorder is "inexistent." [Respondent's Ex. 1, at 17]. He further stated that none of the data he reviewed described sexually violent conduct. [Id.].

6.  At trial, Dr. Saleh testified that "Paraphilia NOS, nonconsent" does not exist as a diagnosis. [Saleh, Oct. 19, 2011, Tr. 114-115].

7.  Dr. Saleh concluded that Respondent did not meet criteria for civil commitment as a sexually dangerous person.

8.  At the § 4248 evidentiary hearing, Dr. Saleh was asked whether he would change his opinions with regard to whether Respondent is sexually dangerous or has engaged in paraphilic activity if he were to learn that Respondent had exposed his genitals to a female while in the custody of the U.S. Marshals during the course of his § 4248 trial. [Saleh, Oct. 19, 2011, Tr. 19, 189-90]. Dr. Saleh stated such facts would not change his opinion. Dr. Saleh stated that he would conclude that such conduct by Respondent was probably deliberate behavior rather than a sign of exhibitionism or volitional impairment. [Id., 195-96].

9.  Dr. Saleh did not offer an opinion as to whether Respondent would have serious difficulty refraining from sexually violent conduct or child molestation if released. Nor did he use any sexual offender risk assessment tools as part of his evaluation.

## III. CONCLUSIONS OF LAW

**A.** **Respondent has engaged in or attempted to engage in sexually violent conduct or child molestation.**

1.     The government has established by clear and convincing evidence that Respondent has engaged in or attempted to engage in sexually violent conduct or child molestation. Respondent attempted to engage in child molestation during the commission of his exhibitionism offenses as a juvenile. Moreover, he engaged in sexually violent conduct during the commission of the 1975 offense, for which he was convicted of Seize, Transport & Detain with Intent to Defile the victim. The evidence reveals he fondled the victim's breast and forced her to touch his penis. Moreover, Respondent's own admissions indicate that the criminal acts for which he was convicted in 1978, 1985, and 1988, were committed in an attempt to engage in sexual acts with non-consenting females. Accordingly, the government has met its burden on the first element.

2.     During and prior to the evidentiary hearing, Respondent recanted most of his previous admissions that his criminal offenses were committed for sexual purposes. The Court finds Respondent's admissions credible and supported by the weight of the evidence. Accordingly, the Court discounts Respondent's recantations and gives heavy weight to his admissions regarding the sexual purposes for his offense conduct.

**B. Respondent is "sexually dangerous" to others.**

1. Given the record, which includes the forensic evaluation reports of Dr. Zinik, Dr. Graney, Dr. Saleh, and statements and admissions of Respondent, as well as the documentary evidence in this case, the government has established by clear and convincing evidence that Respondent suffers from a serious mental illness, abnormality or disorder in the form of Paraphilia NOS, nonconsent, Exhibitionism, and Antisocial Personality Disorder.

2. The Court discredits Dr. Saleh's opinion to the extent that he opines that Paraphilia NOS, nonconsent, is not a valid diagnosis. Paraphilia NOS is specifically listed as a disorder in the DSM-IV-TR as a residual category for coding paraphilias that do not meet the criteria for any of the specific categories listed in the DSM-IV-TR, such as Exhibitionism. Id. at 576. As reflected in the record, the term "nonconsent", as used by Dr. Graney and Dr. Zinik (and various other experts and courts in in these types of cases) is merely a descriptor that gives clarity to the diagnosis.[4] Based on the

---

[4] The court notes that several courts, including the Commonwealth of Massachusetts, where Dr. Saleh practices, have allowed a diagnosis of Paraphilia NOS, with a descriptor of "nonconsent" or "rape", as evidence to support the civil commitment of sexually dangerous/violent persons. See, e.g., Brown v. Watters, 599 F.3d 602, 616 (7th Cir. 2010); In Re Anderson, 79 Mass. App. Ct. 1102 (2011); In Re Interest of D.H., 797 N.W. 2d 263, 272-75 (2011); 160 Wash. App 1038, 2011 WL1048611, *2 (2011); In Re A.M., 787 N.W.2d 752, 758 (2010); In re Detention of Moore, 167 Wash.2d 113, 216 P.3d 1015, 1019 (2009); In re Care and Treatment of Colt, 289 Kan. 234,

evidence in this case, Respondent meets the criteria for that disorder. The government has established that Respondent presents with the essential features of a paraphilia, namely that he has "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors" toward "nonconsenting" females which has "occur[red] over a period of at least 6 months" and "cause[d] clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-IV-TR, at 566. The evidence presented in this case, including Dr. Zinik's and Dr. Graney's reports, shows that Respondent has a long history of engaging in or attempting to engage in sexually violent conduct against nonconsenting females. Although some of Respondent's criminal offenses are not sexual crimes on their face, much of the underlying conduct was committed for the purpose of forcing nonconsenting females to submit to Respondent's sexual acts.

    3.    Despite Respondent's recent denials and statements to the

---

211 P.3d 797, 804 (2009).
    Notably, in <u>United States v. Carta</u>, 592 F.3d 34 (2010), the First Circuit considered the validity of a diagnosis of Paraphilia NOS, Hebephilia, given that Paraphila NOS, Hebephilia is not specifically listed in the DSM-IV-TR. The First Circuit held that "a mental disorder or defect need not necessarily be one so identified in the DSM in order to meet the statutory requirement" of the Adam Walsh Act. <u>Id</u>. at 39-40. In analyzing whether Carta met criteria for that diagnosis, the First Circuit analyzed whether he exhibited the three "essential features" of a paraphilia, ultimately determining that he did.

contrary, the evidence reveals that Respondent still suffers from paraphilic urges, fantasies or behaviors to engage in sexually violent conduct against non-consenting persons and to expose himself to others. This is supported by his written and verbal admissions which are consistent with, and supported, by the record. His urges and arousal to expose himself to nonconsenting females and to assault females for his own sexual gratification is sexually deviant and meets the criteria for Paraphilia NOS and Exhibitionism, as defined by the DSM-IV-TR.

4. Given the record, including the forensic evaluations of Dr. Zinik, Dr. Graney, and Dr. Saleh, Respondent also meets the criteria for Antisocial Personality Disorder. Respondent's Antisocial Personality Disorder is an acceptable diagnosis for the purpose of this element. The record, particularly Dr. Zinik's and Dr. Graney's discussion of Respondent's antisocial personality traits and behaviors, supports the conclusion that Respondent's Antisocial Personality Disorder is also "serious" such that it meets the second element under 4248. Regardless, as described by Dr. Graney, the combination of Respondent's Paraphilia Not Otherwise Specified, Exhibitionism, and Antisocial Personality Disorder diagnoses acting together, are a serious mental illness, abnormality or disorder that meets the second element of 4248.

5. The government has established by clear and convincing

evidence that as a result of his serious mental illness, abnormality or disorder, Respondent would have "serious difficulty in refraining from sexually violent conduct . . . if released."

6.    The government must show that Respondent's difficulty will be "serious."  Merely the presence of an urge to engage in sexually violent conduct is insufficient to meet this prong of the test for civil commitment if the person the government seeks to commit has developed skills necessary to overcome such urge without difficulty. See United States v. Carta, 2011 WL 2680734, slip op., at *22 (D. Mass. July 7, 2011).

7.    The government, however, need not establish that the person it seeks to commit will, or is likely to, reoffend.  See United States v. Hunt, 643 F.Supp.2d 161, 179-81 (D. Mass. 2009).  Instead, the analysis focuses on Respondent's volitional control understood in relation to his mental illness.  Carta, at *22.  This determination requires more than relying on recidivism rates of past offenders, but requires analysis of a range of different factors, including Respondent's history before incarceration, his time in prison, and the opinions of experts.  Id.

8.    The determination of this prong of the analysis is informed by the constitutional constraints on the civil commitment scheme. Carta, at *23.  In Kansas v. Crane, 534 U.S. 411 (2002), the Supreme Court held that in order to civilly commit someone for sexual

dangerousness "there must be proof of serious difficulty in controlling behavior." Id. at 413. This standard allowed courts wide discretion in relying on a number of different factors relevant to sexual dangerousness. Carta, *23. The standard did not have "any kind of narrow or technical meaning;" nor was it demonstrable with "mathematical precision." Crane, at 413.

9.   The final analysis must not be just whether Respondent exhibits traits shared by recidivists. Carta, at *23. Rather, Respondent's volitional control must be "viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself. . . [in such a way that] distinguish[es] [him] from the dangerous but typical recidivist convicted in an ordinary criminal case." Id.

10. The evidence in this case, including Respondent's historical and recent unsolicited admissions of his difficulty in controlling his behavior and in refraining from committing sexual offenses if released, his October 2011 exposure behavior, as well as his documented history of sexual offending since his early teenage years, supports the conclusion that Respondent would have "serious difficulty in refraining from sexually violent conduct or child molestation if released." Indeed, Respondent clearly has not developed the skills necessary to overcome, without serious difficulty, his urges to engage in sexually violent conduct with

33

females.

11.    First, Respondent has been convicted, on multiple occasions, of offense behaviors involving the abduction and attempted abduction of female strangers by force. The record evidence reveals Respondent's offense conduct was motivated by his intent to engage in sexually violent conduct against the victims.

12.    Second, despite multiple incarcerations and periods of mental health treatment, when released to society, Respondent has continued to reoffend by engaging in sexually violent conduct and unlawful conduct with the intent to engage in sexually violent and unwanted sexual conduct against nonconsenting females.

13.    While detained at Butner, post-Certification, Respondent has admitted to his ongoing urges and fantasies to engage in sexual offenses against females. On the morning of Respondent's evidentiary hearing in this case, Respondent purposefully exposed his genitals to, and masturbated in the presence of, some female detainees.

14.    Greater weight should be given to the opinions of Drs. Zinik and Graney than to the opinion of Dr. Saleh.  Their analysis of Respondent's sexual dangerous is more thorough, better reasoned, supported by the record, and therefore more convincing than Dr. Saleh's analysis.

15.    The way in which Respondent's Paraphilia Not Otherwise Specified, Exhibitionism, and Antisocial Personality Disorder

34

interact have made him, and continue to make him, a sexually dangerous person. Respondent's lack of self-control is exacerbated by his antisocial attributes and substance abuse addictions. Many of his past behaviors appear to have arisen from a combination of his personality traits and serious mental illnesses. Moreover, Respondent appears to have little to no ability to manage his mental illness.

16. Respondent should be committed to the custody of the Attorney General until he is no longer a sexually dangerous person under the Adam Walsh Act.

Respectfully submitted, this 21st day of December, 2011.

```
                         THOMAS G. WALKER
                         United States Attorney

                         By: /s/ Michael Lockridge
                             Michael Lockridge
                         Special Assistant U.S. Attorney
                         Attorney for Petitioner
                         U.S. Attorney's Office, Civil Division
                         310 New Bern Avenue
                         Suite 800, Federal Building
                         Raleigh, NC  27601-1461
                         (919) 575-3900 x 5093
                         (919) 856-4309
                         Fax: (919) 856-4821
                         E-mail: michael.lockridge@usdoj.gov
                         N.C. Bar # 28644
```

35

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served upon Joseph R. Bell, counsel for Respondent, by electronically filing the foregoing with the Clerk of Court this date, December 21, 2011, using the CM/ECF system which will send notification of such filing to the above.

/s/ Michael Lockridge
Michael Lockridge
Special Assistant U.S. Attorney
Attorney for Petitioner
U.S. Attorney's Office Civil Division
310 New Bern Avenue
Suite 800, Federal Building
Raleigh, NC  27601-1461
(919) 575-3900 x 5093
(919) 856-4309
Fax: (919) 856-4821
E-mail: michael.lockridge@usdoj.gov
N.C. Bar # 28644