UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:10-HC-2009-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | RESPONDENT'S REVISED |
| v. | ) | PROPOSED FINDS OF FACT |
| | ) | AND |
| DANIEL H. KING, | ) | CONCLUSIONS OF LAW |
| | ) | |
| Respondent. | ) | |

COMES NOW respondent, Daniel H. King, by and through his undersigned counsel, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. INTRODUCTION

Petitioner, the United States of America ("government") instituted this civil action on January 19, 2010, seeking to commit Daniel H. King as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("Act"). 18 U.S.C. § 4248. (Docket Entry ("D.E.") 1). The government's petition states that mental health personnel for the Federal Bureau of Prisons ("BOP") examined respondent and issued a preliminary determination that respondent is sexually dangerous within the meaning of the Act. The petition stayed respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person. The government's petition was filed one day prior to respondent's scheduled date of release from BOP custody on January 20, 2010. *See id.*

Magistrate Judge James E. Gates conducted a bench trial in this case over a four (4) day period from October 17, 2011 through October 19, 2011 and on November 16, 2011. At the hearing, the Court heard testimony from the government's expert witnesses, Gary A. Zinik, Ph.D., Dawn J. Graney, Psy.D., licensed psychologists; respondent's expert witness, Fabian M. Saleh, M.D., a licensed psychiatrist; respondent, and; Jakonia Walton, a lay witness. In addition

1

to the testimonial evidence considered by the Court, the Court considered various documentary exhibits, including the forensic evaluation reports of the parties' experts, as well as law enforcement, treatment, medical, and Bureau of Prisons' documents. At the conclusion of the trial, the Court directed the parties to file revised proposed findings of fact and conclusions of law no later than seven (7) days after the filing of the last transcript from the bench trial. (D.E. 86). The last transcript was filed on December 14, 2011. (D.E. 89). On December 20, 2011, Respondent filed a Motion for Extension of Time to File his Revised Findings of Fact and Conclusions of Law. (D.E. 90). The Court granted the motion and ordered that respondent's Revised Findings of Fact and Conclusions of Law be filed on December 28, 2011. (D.E. 91.). Respondent's Revised Findings of Fact and Conclusions of Law are being filed this date pursuant to the Court's Order.

After considering the testimony at the bench trial, the evidentiary record, and the parties' submissions, this Court concludes that the government has failed to establish by clear and convincing evidence that respondent is sexually dangerous to others as required by the Act.

## II. FINDINGS OF FACTS

1. Daniel H. King ("King" or "respondent") is a fifty-three (53) year old divorced male. Resp. Ex. 1 at 1. On or about July 8, 1988, King pled guilty in the Superior Court of the District of Columbia to Armed Kidnapping and a Parole Violation and the Court sentenced King to a twelve (12) to thirty-six (36) year District of Columbia prison sentence and recommended that King be designated to a federal facility. Pet. Ex. 26.

2. At the time of the beginning of his hearing, King has been incarcerated for 634 days or approximately one (1) year and nine (9) months beyond his scheduled release date of January 20, 2010. (D.E. 1).

### A. **Personal History**:

3. King was born on June 26, 1958 in Wilmington, Delaware. Resp. Ex. 1 at 2. King's biological father was of English heritage (Hispanic or presumably French descent), whereas

King's biological mother was of Blackfoot Indian and Spanish-Mexican heritage.  *Id.*  King's

parents lived together in a common-law relationship, but separated when King was about six (6)

months old.  *Id.* at 3.  Following his biological parents' permanent separation, King's mother

"felt unable to cope without any family support and believed that adoption would be best for Dan

and Steve [King's older brother]."  *Id.*  King was placed in the care of the Children's Bureau at

seven and one-half (7½) months old and was adopted by Robert and Ruth Howard King at

fourteen (14) months of age (King's older brother, Steven, was also adopted by Robert and Ruth

King).  *Id.*  King has at least one additional sibling who was not adopted along with him and his

brother, Robert.  *Id.*

4.  King denied a history of physical or emotional abuse.  Resp. Ex. 1 at 3.  Although

denying a history of maladaptive behaviors, such as fire-setting behaviors or cruelty to animals,

King reportedly had a tumultuous upbringing.  *Id.*  King reportedly was threatening towards his

adoptive mother and was said to be a "chronic liar" and at times was "unable to tell the truth."

*Id.*

5.  King entered the school system at six (6) years of age.  *Id.*  King attended a special

school for "hearing-impaired" people.  *Id.*  King reportedly got along with his peers and did not

pose a disciplinary problem, noting, "I didn't have a lot of fights with kids."  *Id.*  King reportedly

did "poorly in grade school (C's)," and dropped out of school mid-way through the 11th grade

"because I was in trouble with the law."  *Id.*

6.  King obtained his General Equivalency Diploma ("GED") in 1979 while incarcerated

at Staunton Correctional Center in Virginia.  King also earned college credits in business

administration from Blue Ridge Community College.  *Id.*

7.  King is a "qualified tree surgeon," having worked as a tree climber and landscape

foreman. *Id.*

8.  King has not served in the military.  *Id.*

3

9. King was born with "club" feet that impaired his physical abilities and at age eleven (11), King began having the first of five (5) corrective surgeries which resulted in pins being placed in his feet and chronic pain as an adult. Pet. Ex. 5 at 2620. King also suffered from severe hearing loss and attended a school for the deaf up to age eight (8). *Id.*

10. King also suffered a closed head injury at age fifteen (15), "getting into a fight with some fellows and they hit me with a piece of wood." *Id.* at 4. King reportedly was in an induced coma, but did not suffer persistent neurological problems. *Id.*

11. King has been married and divorced twice. Resp. Ex. 1 at 6. King met his first wife, Dorothy Jordan, sometime in 1981 at a night-club in Fairfax, Virginia. *Id.* After a courtship of about one (1) year, they got married on July 16, 1982. *Id.* King has not seen or heard from Ms. Jordan since his arrest in 1983. (R. Vol. II at 59). This marriage produced no children and eventually ended in divorce in 1986. *Id.*

12. King met his second wife, Marlene Crossland King, a budget analyst at the Department of Interior, in 1982. *Id.* With regard to this relationship, a document titled "Intake Format" dated September 29, 1987 states, "He is enthused about the marriage and admires his wife because she will stand up to him. He also likes the fact that she pushes him." Pet. Ex. 19 at 906. King and Marlene Crossland were married on February 14, 1987 and were expecting their first child, Matthew, when King was arrested for the governing offenses. Resp. Ex. 1 at 7.

13. With regards to this relationship, King indicates that he does not want to renew a romantic relationship with his ex-wife, respondent is willing to rent a room from Ms. King upon his release so that he has a place to stay until he can get established in the community. (R. Vol. II at 55-6, 96).

14. King has a long-standing history of alcohol and substance abuse, dating back to his early adolescence. Resp. Ex. 1 at 4. King reportedly began drinking alcohol at age thirteen (13). *Id.* King's alcohol consumption (beer and liquor) rapidly escalated to daily use and was associated with frequent periods of intoxication. *Id.* Although presenting with a history of

4

alcohol-induced blackouts (periods of memory loss associated with significant drinking), King does not have a documented history of delirium tremens (a syndrome of severe alcohol withdrawal) or withdrawal seizures. *Id.*

15.  King also has a history of marijuana, cocaine, and methamphetamine abuse. *Id.* In addition, King reportedly began abusing intravenous heroin in 1978. *Id.* King continued to abuse drugs and alcohol in the prison system, having last used heroin in May 2009. *Id.*

**B.  Criminal and Sexual Offense History:**

16.  According to the Presentence Report ("PSR") compiled by the Probation Office for the District of Columbia, at the time of the sentencing which led to the respondent's instant incarceration in BOP custody, respondent had six (6) prior criminal convictions. Pet. Ex. 23 at 855-56.

17.  On April 18, 1974, when King was fifteen (15) years old, he was charged in Fairfax County, Virginia as a juvenile with two (2) counts of indecent exposure. On September 10, 1974, King pled guilty to both counts and was given one year of unofficial probation. *Id.* at 855. The case concerned one incident of exposure which involved two (2) victims. Pet. Ex. 2 at 2654. Respondent testified that he was walking in the park and saw two (2) young girls fishing across the creek from him and he exposed himself to them. (R. Vol. II at 209). When respondent was asked why he exposed himself to the girls, he responded that he did it because he was "mean" and a "bully" and wanted to get a reaction out of the girls. *Id.*

18.  On October 10, 1975, when King was seventeen (17) years old, he was charged in Fairfax County, Virginia as a juvenile with Seize, Transport and Detained with Intent to Defile Her Person. Pet. Ex. 23 at 855. On October 27, 1975, King pled guilty and was given indeterminate probation not to exceed his twenty-first (21st) birthday. *Id.*

19.  On April 7, 1978, when King was nineteen (19) years old, he was charged as an adult with two (2) counts of attempted abduction. On November 8, 1978, Count One was Nolle Prossed and King plead guilty to Count Two. King was sentenced to ten (10) years with all but

five (5) years suspended and King was placed on ESS probation upon his release from prison. *Id.* Respondent testified that these offenses were not sexually motivated, but were motivated by his need to obtain money. (R. Vol. II at 31).

20.  On November 23, 1983, when King was twenty-five (25) years old, he was charged with simple assault, two (2) Counts of Carrying a Dangerous Weapon – Felony, Assault With Intent to Kidnap While Armed. *Id.* at 855-56. On November 23, 1983, the simple assault case was "no papered." *Id.* On February 13, 1985, one count of Carrying a Dangerous Weapon – Felony was dismissed and King pled guilty to the other count of Carrying a Dangerous Weapon – Felony, and to Simple Assault. *Id.* at 856. King was sentenced to two (2) to eight (8) years on the Carrying a Dangerous Weapon – Felony count and one year on the simple assault count. *Id.* King was paroled on September 3, 1987. *Id.* Respondent testified that this assault took place when he tried to rob a woman outside of a bar in Washington, D.C. and that his motivation for the assault was pecuniary. (R. Vol. II at 32).

21.  On February 19, 1988, when King was twenty-nine (29) years old, he was charged as an adult with Assault With Intent to Rob While Armed and Armed Kidnapping. *Id.* On July 8, 1988, the Assault With Intent to Rob While Armed case was dismissed and King pled guilty to Armed Kidnapping. *Id.* King was sentenced to twelve (12) to thirty-two (32) years on the Armed Kidnapping case. *Id.* In this case, the police report reflects that respondent demanded money from the victim. Pet. Ex. 21 at 1966.

**C. Bureau of Prisons Disciplinary History:**

22.  According to the BOP Forensic Evaluation Report dated August 1, 2011, respondent has been sanctioned for the following violations while in BOP custody:  Refusing to Obey an Order (to clean up) (1992), Making a Sexual Proposal or Threat (1993), Threatening Bodily Harm (1995), Possessing Intoxicants (1998), Possessing Drugs, Use of Drugs, and Possessing a Dangerous Weapon (1998), Possessing Intoxicants (homemade alcohol) (1999), Refusing to Take Alcohol Test (1999), Disruptive Conduct-High (1999), Refusing to Obey an Order (l999),

Possessing Intoxicants (2000), Attempted Escape (2000), Threatening Bodily Harm (2000), Use of Drugs/Drug Items (2000), Use of Drugs (2003), Possessing Intoxicants (2004), Use of Drugs (2005), Possessing Intoxicants (homemade alcohol) (2006), Possessing Intoxicants and Use of Drugs (2007), Use of Drugs (2009), Refusing Work or Program Assignment (2009), and Phone Abuse (2009), and Being Insolent to a Staff Member and Refusing to Obey an Order (2010). Pet. Ex. 2 at 2654, Pet. Ex. 5 at 2624-25.

23.  While respondent has been charged with many violations of BOP regulations since his incarceration began on his latest offense in February 1988, other than the one violation in 1993 for making a sexual proposal or threat to a staff member, respondent has not been charged or sanctioned for any sexual violation of BOP regulations.  (R. Vol. I at 195; Vol. II at 83-4, 145; Vol. III at 47-8, 51).

**D. Current Status:**

24.  On January 19, 2010, the government filed the instant proceeding seeking to commit King as a sexually dangerous person pursuant to the Act.  (D.E. 1).  The government's petition was filed one day prior to respondent's scheduled date of release from BOP custody on January 20, 2010.  *See id.*

25.  As of the date of the beginning of his hearing, King has been incarcerated for 634 days or approximately one (1) year and nine (9) months beyond his scheduled release date of January 20, 2010. (D.E. 1).

### III.  EXPERTS WITNESS QUALIFICATIONS

26.  On January 11, 2011, the government filed the *curriculum vitae* ("CV") of Gary A. Zinik, Ph.D., as a retained government expert.  (D.E. 27).  Dr. Zinik originally reviewed respondent's records and produced an evaluation of King dated October 1, 2010.  Dr. Zinik subsequently interviewed King on July 26, 2011 and submitted an updated evaluation of respondent on September 1, 2011.  Dr. Zinik testified that respondent's forensic evaluation was the first he had done pursuant to the Act.  (R. Vol. I  134-5).

7

27.  On January 11, 2011, the government filed the CV of Dawn Jenee′ Graney, Psy.D., as a government expert.  (D.E. 27).  Dr. Graney is an employee of the Psychology Services Department of Federal Correctional Complex - Butner ("FCC-Butner"), where respondent (and all those currently undergoing § 4248 proceedings) is currently housed.  Dr. Graney interviewed respondent on three (3) separate occasions prior to preparing her Pre-Certification Forensic Evaluation which was completed on November 13, 2009.  Dr. Graney also prepared a Forensic Evaluation which was submitted on August 1, 2011.  Dr. Graney testified that at the time of her testimony, she had completed sixteen (16) forensic evaluations, including respondent's.  (R. Vol. II at 134).  Of the sixteen (16) evaluations completed by Dr. Graney, she determined that fourteen (14) of the inmates should be certified under the Act.  *Id.* 135-36.

28.  On July 12, 2011, respondent filed the CV of Fabian M. Saleh, M.D., as respondent's retained expert.  (D.E. 43).  Dr. Saleh reviewed respondent's records and conducted an interview of respondent and submitted an evaluation on April 13, 2011.

29.  The Parties did not challenge the qualifications of any of the above experts.  The Court, having reviewed the CV's of the experts and their reports, and having heard their testimony, finds that each individual is qualified by education, skill and experience to offer expert testimony in this matter.

## IV.  LEGAL PRINCIPLES

### A.  Standard of Proof and Elements Required to be Established:

30.  The government has the burden of proving each element by clear and convincing evidence.  18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "'Clear and convincing' has been defined as evidence of such weight that it produces in

8

the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001)(internal quotations and citations omitted). It has alternatively been described "as meaning 'highly probable.'" *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (*quoting* 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)).

31. To commit respondent, the government must prove by clear and convincing evidence that respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

32. This phrase has not been defined by the statute. The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002). *See,* H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion § 511. In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 534 U.S. at 413.

33. A finding of dangerousness is also constitutionally required. *Crane*, 534 U.S. at 407-409, 410 (stating "we have consistently upheld involuntary commitment statutes . . . [when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness'

9

or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-358; quotations omitted)). *See also Foucha v. Louisana*, 504 U.S. 71, 82-83 (1992).

34. The Court finds that in this regard, the statute and due process considerations require that, in addition to a volitional impairment, the government must prove by clear and convincing evidence that Respondent poses a risk of re-offense that is significant enough to justify a finding that Respondent is sexually dangerous and therefore can be preventively detained.

35. In this case, the government has proven neither by clear and convincing evidence. The evidence in this case does not demonstrate that respondent currently suffers from a serious mental illness, abnormality, or disorder that would result in volitional impairment.

**A. Prior Bad Acts:**

36. On April 18, 1974, when King was fifteen (15) years old, he was charged in Fairfax County, Virginia as a juvenile with two (2) counts of indecent exposure. On September 10, 1974, King pled guilty to both counts and was given one year of unofficial probation. *Id.* at 855. The case concerned one incident of exposure which involved two (2) victims. Pet. Ex. 2 at 2654.

37. On October 10, 1975, when King was seventeen (17) years old, he was charged in Fairfax County, Virginia as a juvenile with Seize, Transport and Detained with Intent to Defile Her Person. Pet. Ex. 23 at 855. On October 27, 1975, King pled guilty and was given indeterminate probation not to exceed his twenty-first (21st) birthday. *Id.*

38. The Court finds by clear and convincing evidence that these acts, committed by King as a juvenile some thirty-seven (37) years and thirty-six (36) years ago respectively, were "violent sexual offenses" under the Act.

**B. Respondent Does Not Suffer from a Serious Mental Illness, Abnormality or Disorder:**

**1. Introduction:**

39. Respondent's expert, Fabian M. Saleh, M.D., stated to a reasonable degree of medical certainty that King did not suffer from a genuine or co-concurring mental illness at this

10

time.  Resp. Ex. 1 at 17.  Dr. Saleh indicates that King suffers from a personality disorder best characterized as Antisocial Personality Disorder.  *Id.*  Dr. Saleh also found that King presented with a long history of heroin, Marijuana (cannabis), cocaine, methamphetamine, and alcohol abuse.  *Id.*

40.  The government's retained expert, Gary A. Zinik, Ph.D., diagnosed respondent as suffering from Paraphilia NOS, Non-Consent, Exhibitionism, and Alcohol Abuse, and Opiate abuse, Antisocial Personality Disorder.  Pet. Ex. 5 at 2686, Resp. Ex. 57 at 2686.

41.  The government's second expert, Dawn J. Graney, Psy.D., diagnosed respondent as suffering from Paraphilia NOS (Non-Consent), Alcohol Dependence in a Controlled Environment, Depressive Disorder NOS, and Antisocial Personality Disorder.  Pet. Ex. 2 at 2668.

### 2.  Expert Opinions:

#### a.  Gary A. Zinik, Ph.D.:

42.  Dr. Zinik is a clinical forensic psychologist who produced an initial forensic evaluation of King, dated October 1, 2010, based strictly upon a review of respondent's records.  Pet. Ex. 5.  Dr. Zinik subsequently interviewed King on July 26, 2011 and submitted an updated evaluation of respondent on September 1, 2011 incorporating his findings from the interview into the latter report.  Pet. Ex. 57.  Dr. Zinik did not request nor was he provided any materials or records by respondent or respondent's counsel for use in forming his opinions.

43.  Dr. Zinik opined in both of his evaluation reports that respondent met the criteria for civil commitment under the Act.

44.  Dr. Zinik determined that respondent had previously engaged in or attempted to engage in sexually violent conduct or child molestation.  Pet. Ex. 5 at 2617-20, Pet. Ex. 57 at 2681.  In so doing, Dr. Zinik referenced respondent's convictions and investigatory records from 1974, 1975, 1978, 1983, and 1988, other official records, respondent's juvenile conduct, his self-reported admissions and denials, and his institutional behavior.  *Id.*

11

45.  Dr. Zinik opined in both reports that respondent suffers from the following mental disorders:  Paraphilia Not Otherwise Specified, forced sex with nonconsenting females, also known as Paraphilic Coercive Disorder; Exhibitionism; Polysubstance Abuse, and; Antisocial Personality Disorder.

46.  Dr. Zinik defined a paraphilia as involving:

> recurrent, intense sexually arousing fantasies, urges, or behaviors generally involving 1) nonhuman objects, 2) suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons.  The sexual preoccupation must occur over a period of at least 6 months and cause significant distress or impairment in social, occupational, or other important areas of functioning.

Pet. Ex. 57 at 2628.

47.  The basis for Dr. Zinik's diagnosis of King as suffering from Paraphilia Not Otherwise Specified, forced sex with nonconsenting females, was the conduct that led to respondent's prior criminal convictions, the relative rapidity of respondent's reoffending upon release from confinement, the sexual motivation (as self-reported by respondent) for his crimes despite the presence of apparent consenting partners, evidence of a rape kit, evidence of advanced planning and premeditation, other evaluations reviewed by Dr. Zinik, the self-reports made by respondent in 2009 regarding his past sexual conduct and continued sexual urges, and respondent's conduct while detained.  *See* Pet. Ex. 5, Pet. Ex. 57 and (R. Vol. I at 14-201).

48.  Dr. Zinik stated that King's self-reports to having committed numerous sexual crimes for which King has never been caught was critical to King's paraphilia diagnosis and his risk assessment to commit future sexual crimes.  Pet. Ex. 5 at 2625.

49.  Dr. Zinik defined respondent as a "pathological liar."  Pet. Ex. 57 at 2685.  (R. Vol. I at 161-2).

12

50. Dr. Zinik testified that he was "picking and choosing" the self-reports that he believes were credible in arriving at King's Paraphilia NOS, non-consent diagnosis. (R. Vol. I at p. 165).

51. Dr. Zinik further found that:

> Paraphilia NOS includes all paraphilias that do not meet the criteria for a specific category, including a paraphilia for rape and nonconsenting sex, also known as Paraphilic Coercive Disorder (PCD).

Pet. Ex. 5 at 2628.

52. Dr. Zinik admitted that while a general diagnosis of Paraphilia Not Otherwise Specified is found in the DSM-IV-TR, but that the specific diagnosis of forced sex with nonconsenting females, described by Dr. Zinik as Paraphilic Coercive Disorder, is not found in the DSM-IV-TR. Resp. Ex. 6 at 125; (R. Vol. I at 168-9).

53. Dr. Zinik testified that there is significant disagreement among experts in the field of forensic psychology as to the validity of a diagnosis for Paraphilia NOS on the basis of non-consenting victims. (R. Vol. I at 90).

54. Dr. Zinik testified that without a diagnosis of Paraphilia NOS, non-consent in this case, respondent would not be a "sexually dangerous person" under the Act. (R. Vol. I at 194-5).

55. During respondent's latest confinement which began in 1988 (a period of twenty-three (23) years), respondent has been involved in one documented incidence of inappropriate sexual conduct related to a female. In 1993, during a therapy session, it is alleged that King asked a BOP psychologist to touch his penis. Pet. Ex. 33 at 93; Pet. Ex. 55 at 3321. An alleged incident of respondent exposing himself at the Wake County Jail was reported during respondent's trial. (R. Vol. IV at 3-24).

56 Dr. Zinik stated that Exhibitionism "involves the exposure of one's genitals to a stranger." Pet. Ex. 5 at 2631.

13

57. Other than incidents self-reported by respondent, the only documented case of respondent's exhibitionism occurred on May 21, 1974 when respondent was a fifteen (15) year old juvenile. Pet. Ex. 7 at 2477-78.

58. Dr. Zinik testified that the alleged incident of exposure at the Wake County Jail would strengthen his diagnosis of exhibitionism, but that a diagnosis of exhibitionism by itself would not be enough for respondent to qualify as a "sexually dangerous person" under the Act. (R. Vol. I at 196-7); (R. Vol. III at 201-2).

59. Dr. Zinik diagnosed respondent as suffering from Antisocial Personality Disorder and provided a sufficient basis in his report for that diagnosis. *See* Pet. Ex. 5 and Pet. Ex. 57.

60. Dr. Zinik testified that a diagnosis of Antisocial Personality Disorder standing alone is insufficient in itself to support civil commitment for sexual dangerousness.

61. Dr. Zinik defined Polysubstance Dependence and stated that respondent suffered from this malady. *See* Pet. Ex 5 and Pet. Ex. 57.

**b. Dawn J. Graney, Psy.D.:**

62. Dr. Graney is a forensic psychologist currently employed by the BOP. Dr. Graney first produced a Pre-Certification Forensic evaluation of King, dated November 13, 2009, based upon a review of respondent's records and interviews with respondent. Resp. Ex. 7 at 24. Dr. Graney subsequently submitted an updated Forensic Evaluation of respondent on August 1, 2011. Pet. Ex. 2. Dr. Graney also submitted a supplement to her Forensic Evaluation of August 1, 2011. Pet. Ex. 3. Dr. Graney did not request nor was he provided any materials or records by respondent or respondent's counsel for use in forming her opinions.

63. Dr. Graney opined in both of her evaluation reports that respondent meets the criteria for civil commitment under the Act.

64. Dr. Graney determined that respondent had previously engaged in or attempted to engage in sexually violent conduct or child molestation. Pet. Ex. 1 at 2393-95 and Pet. Ex. 2 at 2654-57.

14

65. Dr. Graney opined in both reports that respondent suffers from the following mental disorders: (1) Paraphilia Not Otherwise Specified, non-consent; (2) Exhibitionism; (3) Alcohol Abuse; (4) Opiate Abuse, and; (5) Antisocial Personality Disorder. Pet. Ex. 1 at 2399-2400 and Pet. Ex. 2 at 2668-72.

66. Dr. Graney also admitted that while a general diagnosis of Paraphilia Not Otherwise Specified is found in the DSM-IV-TR, the specific diagnosis of Paraphilia Not Otherwise Specified, Non-Consent, is not found in the DSM-IV-TR. Resp. Ex. 7 at 62.

67. The primary basis for Dr. Graney's diagnosis of King as suffering from Paraphilia Not Otherwise Specified, Non-Consent, were respondent's prior criminal convictions for non-sexual offenses and respondent's self-reporting of his actions and thoughts. Pet. Ex. 2400-02 and Pet. Ex. 2668-70.

68. Dr. Graney stated that she relied on a 2008 article in the Journal of American Academy of Psychiatry and the Law by Dr. Allen Frances to support her diagnosis of Paraphilia NOS, non-consent in this case. (R. Vol. II at 124-6). The 2008 article was written by the same Dr. Allen Frances that later wrote an October 2011 article that Dr. Zinik stated he was familiar with entitled, "Another Step Toward Ending the Paraphilia NOS Fad: California DMH Takes a Stand" wherein Dr. Frances lauded the DSM-V Board's decision to reject the ill-conceived proposal for a coercive Paraphilia diagnosis in the DSM-V, lauded the California Department of Mental Health's instruction to its SVP evaluators to end the careless misuse of the Paraphilia NOS, non-consent diagnosis, and advocated for the day when the diagnosis of Paraphilia NOS, non-consent is no longer accepted as expert testimony because the diagnosis does not meet the standard of competent, much less, expert testimony psychiatric testimony. (R. Vol. IV at pp. 165-7).

69. Dr. Graney testified that she agreed with Dr. Zinik's statement that without a diagnosis of Paraphilia NOS, non-consent, respondent could not be classified as a "sexually dangerous person" under the Act. (R. Vol. II at 146-7).

70. While Dr. Graney determined that King was a "reliable historian," Dr. Zinik defined respondent as a "pathological liar." Pet. Ex. Ex. 1 at 2391 and Pet. Ex. 57 at 2685.

### c. Fabian M. Saleh, M.D.:

71. Dr. Saleh is a clinical forensic psychologist who produced a forensic evaluation of King, dated April 13, 2011, based upon a review of respondent's records provided to respondent by the government, two (2) letters dated April 25, 2010 and signed by respondent, and an interview with respondent which occurred on March 9, 2011. Resp. Ex. 1 at 2.

72. Dr. Saleh opined in his evaluation that respondent did not meet the criteria for civil commitment under the Act. (R. Vol. III at 26).

73. Dr. Saleh further determined that King has been described as being "provocative and manipulative," having an extensive history of "acting out and feigning psychiatric symptoms for secondary gain," and of "faking and malingering." Resp. Ex. 1 at 9. In his report, Dr. Saleh cites the following examples from the records he reviewed:

> A note titled "Brief Counseling Session," dated 07/09/1996 (bates-stamped page 1848. See also bates-stamped page 1850), reads:
>
> > [...] His MMPI-II results were invalid and suggest he was attempting to "fake bad" by exaggerating symptoms of mental jl1ness [sic]. This is consistent with his presentation in sessions in which he often claims to have three personalities yet appears to be malingering and trying to avoid taking responsibility for his actions.
>
> Similarly, a note titled "Suicide Watch," dated 10/19/1999 (bates-stamped page 1798), reads:
>
> > He has been quite hostile in the past few months with Psych Svcs since his manipulative tactics have not been successful. SHU Officers stated that he has not been a behavior management problem nor has he exhibited any suicidal gestures or made suicidal statements. No psychological sx were noticed by SHU Officers. Mr. King's latest suicide attempt was

16

thought to be more manipulative in nature in order to ensure he would be off the compound for his own safety and also to avoid an incident report. He has no Axis I dx but has a hx of malingering. His six month SW flup has been completed and he will no longer be followed monthly by psych svcs for that purpose.  […]

Mr. King has also a history of suicidal "gestures" (e.g., bates-stamped pages 836 and 1247) and self-injurious behavior (bates-stamped page 1737). For example, a document titled, "Suicide Risk Assessment," from 04/23/1999 (bates-stamped pages 2451-2453), says:

Inmate King indicated that he was attempting to overdose on synthetic heroin. He stated that his intent was to take enough heroin to die and walk to medical and die in front of everyone so that he would be taken seriously. […] he seems to have a low frustration tolerance and has a history of using violence against himself and others to meet objectives.

His behaviors have been described as "attention-seeking behavior because he reportedly had no desire to actually kill himself at the time [1995]" (bates-stamped page 1740). As illustrated in the next note, Mr. King has "not taken responsibility for any of his actions and likes to blame others for his problems.  The corresponding document titled "Post-Suicide Watch Report," dated 04/26/1999 (bates-stamped page 1810. See also bates-stamped page 1826), reads:

[…] Inmate King has a long history of being manipulative in order to force a transfer. Inmate stated several times that he just wanted to be transferred to Marion where he could have his own room and a television  in his room and be left alone. Inmate King has not taken responsibility for any of his actions and likes to blame others for his problems.

Likewise, a document titled "Brief Counseling Session," dated 04/30/1999 (bates-stamped page 1809), reads:

> […] Inmate has not been on any medications for a
> long time and it appears that he was on medication
> for anger management and sedation reasons. Inmate
> has a very manipulative back ground which
> includes claiming to have multiple personality
> disorder as well as hearing voices, etc. Inmate has
> also tried to convince everyone that he is deaf or at
> least hard of hearing but according to some of his
> previous institutions, he was neither deaf not hard
> of hearing.

Resp. Ex. 1 at 9-10.

74. As further evidence of King's skill in manipulation and malingering, Dr. Saleh cited

the following examples of various diagnoses that King has received since he has become

involved with the mental health system:

- Psychotic Disorder Not Otherwise Specified (bates-stamped page 1068);
- Schizophrenia (provisional) (bates-stamped page 1197);
- "Hallucinosis, NOS" and "No [personality disorder] diagnosis" (bates-stamped page 1336);
- Polysubstance Dependence (Alcohol, Amphetamines, Marijuana) (bates-stamped page 840);
- Alcohol Dependence, in Remission (bates-stamped page 908);
- "Cannabis Abuse to (to relieve auditory hall)" (bates-stamped page 2466);
- Anxiety Disorder Not Otherwise Specified (bates-stamped page 1306);
- "Adjustment Disorder with Mixed Anxiety" (bates-stamped page 2150);
- Dissociative Disorder (bates-stamped page 1846. See also bates-stamped page 2452);
- Personality Disorder (bates-stamped page 1290);
- Schizoid Personality Disorder (bates-stamped pages 1916 and 2470);
- Borderline Personality Disorder (bates-stamped page 1034);
- Antisocial Personality Disorder (bates-stamped page 840);
- Sexual Sadism (bates-stamped page 1754);
- "Paraphilia, Not Otherwise Specified, Non-Consent" (bates-stamped page 1723);
- Intermittent Explosive Disorder (bates-stamped page 908);
- "Group delinquent reaction of adolescence" (bates-stamped page 860);
- Exhibitionism (bates-stamped page 860)
- Multiple Personality Disorder (bates-stamped pages 888 and 1039).

Resp. Ex. 7-8.

75. When Dr. Saleh asked King about his mental health history, he responded:

> I did the multiple personality disorder thing . . . . I attempted to do
> the manic-depressive thing and being suicidal . . . I did it to gain
> better living conditions and to get attention. I BS'd these people so
> many times. I thought I was doing the right thing, trying to let
> them take care of me. I can do it on my own. I'm fine.

Resp. Ex. 1 at 16.

76 Ultimately, Dr. Saleh determined that because of King's history of malingered symptoms, lying, and manipulation dating back to his adolescence, the self-reports of respondent must be completely discounted as inherently unreliable for the purposes of forming a diagnosis in respondent's case. (R. Vol. III at 36-41). Dr. Saleh states that one cannot, on the one hand, diagnose King as a "pathological liar" as was done by Dr. Zinik in his report, then on the other hand, use King's self-reports as the primary basis for a diagnosis of paraphilia in his case. *See* Pet. Ex. 57 at 2685; (R. Vol. III at 43-4).

77. Dr. Saleh states that in his opinion, to a reasonable degree of medical certainty, that King suffers from a personality disorder best characterized as Antisocial Personality Disorder. Resp. Ex. 1 at 17. The basis for the diagnosis is King's long-standing and maladaptive pattern of anti-social and criminal behavior. *Id.* In King's case, the personality features have manifested themselves in his pattern of deceitfulness, consistent irresponsibility, and manipulative and criminal behavior. Id. In addition to a personality disorder, King presents with a history of heroin, marijuana (cannabis), cocaine, methamphetamine, and alcohol abuse. *Id.*

78. Dr. Saleh further determined that, although respondent presents with a history of malingered (faked) symptoms of psychopathology, the data available does not suggest that King suffers from a genuine or co-occurring mental illness at this time. *Id.* Dr. Saleh further opined that there is no evidence in support of a diagnosis of a paraphilic disorder at this time. *Id.*

79. Dr. Saleh cites ample records with data describing antisocial and manipulative behavior, but a dearth of data describing actual sexually violent conduct. (R. Vil. III at 34-40). Further, notwithstanding King's homosexual proclivities and evidence of his remaining sexual

19

drive while he has been in prison, there is no data describing paraphilic or otherwise sexually deviant behavior in the penal setting. (R. Vol. III at 151-5).

80. Dr. Saleh testified that Paraphilia NOS, nonconsent is nothing more than a label, because there is no such a diagnosis of paraphilia NOS, nonconsent. It is fictitious and ultimately made up, refuted by the field and not just by a handful of doctors who say well, we disagree with you in terms of the diagnosis, but the American Psychiatric Association, the American Academy of Psychiatry and the Law, even the criminal justice system refuted that diagnosis, not just in one meeting or two meetings, but over decades, and that there is no foundation behind the diagnosis whatsoever. (R. Vol. III at 28-32).

81. When presented with a hypothetical related to an alleged incident of exposure by respondent at the Wake County Jail during the trial, Dr. Saleh indicated that if such an action took place, it would not change his opinion regarding any diagnosis or opinion he rendered related to respondent because, at worst, this may indicate some weak evidence that he suffers from exhibitionism (which Dr. Saleh does not believe) which diagnosis would not qualify respondent as a sexually dangerous person under the Act. (R. Vol. III at 189-97).

82. Based upon the foregoing, this Court finds that the government has not established by clear and convincing evidence that respondent suffers from a serious mental illness, abnormality or disorder that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

**C. Serious Difficulty Refraining from Sexually Violent Conduct or Child Molestation:**

83. In order to commit King, the government must prove that the serious mental illness, abnormality or disorder that respondent suffers from results in "serious difficulty refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). As discussed previously, this term implies a volitional impairment.

84. This Court finds that the government has not established by clear and convincing

evidence that respondent currently suffers from a serious mental illness, abnormality or disorder that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

## VII.  CONCLUSIONS OF LAW

95.  The Court finds that Respondent has committed acts of sexual violence in the past.

96.  The Court finds that respondent meets the diagnostic criteria for Antisocial Personality Disorder and polysubstance dependence.

97.  The Court has considered the evidence for and against the validity of the diagnosis of Paraphilia-NOS-Nonconsent.  Given the lack of agreement among experts in the field as to the validity of this diagnosis and the lack of credible evidence related to a diagnosis of this condition as it relates specifically to respondent, the Court finds that the government has failed to show, by clear and convincing evidence, that respondent suffers from this mental illness, condition or disorder.

98.  Having determined that the government has failed to prove that respondent suffers from a serious mental illness, abnormality, or disorder, this court need not address the third criterion for commitment under the Act, that is, whether Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released.  *See USA v. Graham*, 683 F.Supp.2d 129 (D. Mass. 2010).

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in this matter that Daniel H. King is not a "sexually dangerous person" and order his release from the custody of the federal Bureau of Prisons.

RESPECTFULLY SUBMITTED, this the 28th day of December 2011.

_____/s/ Joseph L. Bell, Jr._____
Joseph L. Bell, Jr.
N.C. State Bar No. 18082
BATTS, BATTS & BELL, LLP
Post Office Drawer 8228
Rocky Mount, North Carolina  27804-1228
Voice: (252) 977-6450
FAX:   (252) 972-7500
Email:  jbelljr@battslaw.com
Counsel for Daniel H. King

## CERTIFICATE REGARDING SERVICE

I hereby certify that on December 28, 2011, I electronically filed the foregoing RESPONDENT'S REVISED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW with the Clerk of Court, United States District Court, Eastern District of North Carolina, using the CM/ECF system which will send notification of such filing to the following: Edward D. Gray, Assistant United States Attorney, Eastern District of North Carolina, G. Norman Acker, III, Assistant United States Attorney, Eastern District of North Carolina, Michael D. Bredenberg, Federal Medical Center, and Michael E. Lockridge, Federal Bureau of Prisons, Legal Center.

This the 28th day of December 2011.

/s/ Joseph L. Bell, Jr.

Joseph L. Bell, Jr.
N.C. State Bar No. 18082
BATTS, BATTS & BELL, LLP
Post Office Drawer 8228
Rocky Mount, North Carolina 27804-1228
Voice: (252) 977-6450
FAX: (252) 972-7500
Email: jbelljr@battslaw.com
Counsel for Daniel H. King