IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:10-HC-2009-FL

UNITED STATES OF AMERICA          )
                                  )
        Petitioner,               )
                                  )
        v.                        )        **MEMORANDUM AND**
                                  )        **RECOMMENDATION**
DANIEL H. KING,                   )
                                  )
        Respondent.               )


**Table of Contents**

I.    ADAM WALSH CHILD PROTECTION AND SAFETY ACT OF 2006 ........................... 3

II.   PROCEDURAL HISTORY ................................................................................. 4

III.  FINDINGS OF FACT ...................................................................................... 6

  A. Personal History ...................................................................................... 6

  B. Medical History ....................................................................................... 7

  C. Mental Health History ............................................................................. 8

  D. Substance Abuse History ......................................................................... 10

  E. Criminal and Sexual Offense History ....................................................... 11

    1. Early Exhibitionism ............................................................................. 11

    2. 1974–Indecent Exposure ("1974 Offense") ......................................... 11

    3. 1975–Seize, Transport, and Detain with Intent to Defile ("1975 Offense") ................... 11

    4. 1978–Attempted Abduction ("1978 Offense") ..................................... 12

    5. 1983–Carrying a Dangerous Weapon–Felony and Simple Assault ("1988 Offense").... 13

    6. 1988–Armed Kidnapping ("1988 Offense") ......................................... 14

    7. 1993–Incident with BOP Therapist ...................................................... 14

    8. 2011–Wake County Jail Incident .......................................................... 15

    9. Dismissed Offenses ............................................................................. 15

  F. Incarceration History and Prison Disciplinary Record ............................... 16

IV.     RESPONDENT'S PAST STATEMENTS AND TESTIMONY ...................................... 16

  A. Respondent's Past Statements ................................................................................ 16

  B. Respondent's Hearing Testimony ........................................................................... 22

V.      EXPERT OPINIONS ................................................................................................. 24

  A. Qualifications of the Experts .................................................................................. 24

  B. § 4248 Evaluations of Respondent ......................................................................... 24

  C. Mental Health Diagnoses ........................................................................................ 26

    1. Antisocial Personality Disorder .......................................................................... 26

    2. Exhibitionism ....................................................................................................... 28

    3. Paraphilia NOS, Nonconsent ............................................................................... 31

    4. Substance Abuse and Substance Dependence ..................................................... 36

  D. Potential for Future Offending ............................................................................... 38

    1. Actuarial Risk Assessments ................................................................................. 38

    2. Dynamic and other Clinical Factors .................................................................... 40

    3. Psychopathy Checklist ......................................................................................... 42

VI.     ANALYSIS ................................................................................................................. 43

  A. Respondent's Credibility ........................................................................................ 43

    1. Legal Standards for Determining Credibility ...................................................... 44

    2. Analysis of Respondent's Credibility .................................................................. 44

  B. Elements for Civil Commitment ............................................................................. 54

    1. Prior Sexually Violent Conduct or Child Molestation ........................................ 54

    2. Current Serious Mental Illness, Abnormality, or Disorder ................................. 55

    3. Serious Difficulty Refraining .............................................................................. 56

  C. First Element: Prior Sexually Violent Conduct or Child Molestation ................. 57

  D. Second Element: Current Serious Mental Illness, Abnormality, or Disorder ..................... 59

  E. Third Element: Serious Difficulty Refraining ....................................................... 62

VII.    CONCLUSION ........................................................................................................... 65

This case comes before the court for a determination of whether respondent Daniel H.

King ("respondent") is a sexually dangerous person and thereby subject to commitment under 18

U.S.C. § 4248 ("4248"). The case was referred to the undersigned for an evidentiary hearing and memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* first Docket Entry of 1 September 2011). For the reasons stated below, it will be recommended that respondent be found to be a sexually dangerous person and that he be committed pursuant to 18 U.S.C. § 4248.

## I.     ADAM WALSH CHILD PROTECTION AND SAFETY ACT OF 2006

The Adam Walsh Child Protection and Safety Act of 2006 ("the Act"), Pub. L. No. 109-248, § 302, 120 Stat. 587, 619-22 (codified in 18 U.S.C. §§ 4241, 4247, and 4248), established a program for the civil commitment of individuals in the custody of the Federal Bureau of Prisons ("BOP"), and others, who are determined to be "sexually dangerous person[s]." 18 U.S.C. § 4248(d). The commitment process is initiated when either the Attorney General, the Director of BOP, or their designee files a certification that an individual is sexually dangerous pursuant to the Act. *Id.* (a); *United States v. Timms*, 664 F.3d 436, 439 (4th Cir. 2012). Following such certification, the district court must conduct a hearing to determine if the person is sexually dangerous. 18 U.S.C. § 4248(d). "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General." *Id.* (d).

A "sexually dangerous person" is defined by statute as one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). The phrase "sexually dangerous to others" means that "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Thus, to satisfy the criteria for civil

commitment under § 4248, the government must show by clear and convincing evidence that an individual: (1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (2) currently "suffers from a serious mental illness, abnormality, or disorder"; and (3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(5), (6); *see United States v. Comstock*, __ U.S. __, 130 S. Ct. 1949, 1954 (2010).

## II.    PROCEDURAL HISTORY

On or about 8 July 1988, respondent pled guilty in the Superior Court of the District of Columbia to armed kidnapping and a parole violation. (Gov't Ex. 26 at 22[1]; Final Pretrial Order (D.E. 67) at 2, Stip. 9.b.). The court sentenced respondent to 12 to 36 years of imprisonment and recommended that he be designated to a federal facility. (Gov't Ex. 26 at 22; Final Pretrial Order at 2, Stip. 9.b.). Respondent was committed to the custody of BOP and, with the exception of being housed once in a District of Columbia facility, served his sentence in several federal prisons. (Tr. II 75:22 to 76:5).

On 19 January 2010, one day prior to respondent's release from custody due to completion of his term of imprisonment, the government commenced this proceeding by filing a certification of respondent as a sexually dangerous person pursuant to 18 U.S.C. § 4248(a), which was signed by Ivonne E. Bazerman, Psy.D., Acting Chairperson of the BOP Certification Review Panel. (D.E. 1; Final Pretrial Order at 2, Stip. 9.a.). On 1 June 2010, the Federal Public Defender was directed to provide representation for respondent. (D.E. 2; Final Pretrial Order at 2, Stip. 9.c.). On 25 June 2010, respondent filed a motion requesting a commitment hearing.

---

[1] Page number references in citations to the parties' exhibits will be to the Bates number, when available, and then to the document's original page number.

(D.E. 4). The discovery period ended on 15 September 2011 (D.E. 39), and the case was set for a hearing on 17 October 2011 before the undersigned. (D.E. 49).

On 16 September 2011, respondent filed a motion (D.E. 53) to reconsider the court's referral of the case for hearing before a magistrate judge, which was denied on 11 October 2011 (D.E. 62). On 11 and 12 October 2011, the government and respondent filed their proposed findings of fact and conclusions of law. (D.E. 64, 65).

The commitment hearing was conducted on four days: 17-19 October and 16 November 2011 (*see* D.E. 68, 70, 71, 84).[2] At the hearing, the court heard testimony from the government's expert witnesses, Gary Zinik, Ph.D. and Dawn Graney, Psy.D., both licensed psychologists; respondent; and respondent's expert witness, Fabian Saleh, M.D., a licensed psychiatrist. In addition to the testimonial evidence, the court admitted into evidence various documentary exhibits submitted by both parties, including the forensic evaluation reports of the parties' experts, medical records, court records, police reports, and BOP records.[3]

On the third day of the hearing, 19 October 2011, the government informed the court of an incident on the morning of 18 October 2011 in which respondent allegedly exposed his genitals at the Wake County Jail, where he was being housed during the hearing. (Tr. III 121:21 to 122:6). The government argued that this incident was relevant to the court's commitment determination under § 4248 and requested that the record be kept open for possible introduction of evidence until more information about the incident could be obtained. (*Id*.). In an effort to avoid having to recall expert witnesses, Dr. Zinik and Dr. Saleh were each presented with an

---

[2] Separate transcripts were generated for each day of the hearing. Specifically, Transcript of Hearing, Vol. I ("Tr. I") (D.E. 74) is of the proceedings on 17 October 2011; Vol. II ("Tr. II") (D.E. 75) is of the proceedings on 18 October 2011; Vol. III ("Tr. III") (D.E. 85) is of the proceedings on 19 October 2011; and Vol. IV is of the continued proceedings on 16 November 2011 ("Tr. IV") (D.E. 89).

[3] The parties stipulated to the authenticity of all copies of official documents, documents kept in the ordinary course of business, and all production exchanged during discovery. (*See* Final Pretrial Order (D.E. 67) 1-2 ¶ 7).

agreed hypothetical reflecting the facts as the government then understood them, in response to which each testified.  (*Id*. 181:4-23).[4]  Following the hearing, and at the court's direction, the government filed the incident report prepared by the Wake County Sheriff's Office.  (D.E. 73).

The court conducted a continuation hearing on 16 November 2011 (D.E. 77) to hear evidence on the alleged incident at the Wake County Jail, which consisted of the testimony of Jakonia Walton, one of the female prisoners who witnessed the incident.  (Tr. IV 5:7 to 6:15).  At the request of respondent, as well as the government, the court granted the parties leave to file supplemental proposed findings of fact and conclusions of law following completion of the hearing.  (*See* 18 November 2011 Order (D.E. 86)).  The government and respondent filed their supplemental proposed findings of fact and conclusions of law on 21 December 2011 (D.E. 92) and 28 December 2011 (D.E. 93), respectively.

## III.    FINDINGS OF FACT

### A.  Personal History

Respondent was born on 26 June 1958 in Wilmington, Delaware.  (Gov't Ex. 23 at 1; Resp. Ex. 1 (Saleh) at 2).  He was separated from his biological parents at the age of seven and a half months and placed in the care of the Children's Bureau.  (Resp. Ex. 1 (Saleh) at 3).  At the age of 14 months, respondent was adopted by Robert and Ruth Howard King.  (*Id*.).  Respondent's natural brother, Robert, who is approximately 18 months older than respondent, was also adopted by the Kings.  (Gov't Ex. 23 at 5; Resp. Ex. 1 (Saleh) at 3).  Respondent had at least one additional sibling who was not adopted by the Kings.  (Resp. Ex. 1 (Saleh) at 3).

---

[4]  The hypothetical presented to Drs. Zinik and Saleh was as follows:  Respondent, while housed in a local confinement facility during the hearing in this matter, exposed his genitals to a female within that facility.  (Tr. III 189:17-24 (presented to Dr. Saleh); 198:2-7 (presented to Dr. Zinik)).  These facts differ somewhat from the incident as described by one of the female inmates at the continued hearing held on 16 November 2011.  The evidence presented at that hearing indicated that respondent not only exposed himself but also masturbated in front of the female inmates.  Further details regarding this incident are discussed below.

Respondent dropped out of high school in the 11th grade due to drug use, law violations, and the inability to concentrate. (Gov't Ex. 23 at 6; Resp. Ex. 1 (Saleh) at 3). He later obtained his General Equivalency Diploma while incarcerated in Virginia. (Gov't Ex. 23 at 6; Resp. Ex. 1 (Saleh) at 3). Respondent also earned college credits in business administration from Blue Ridge Community College and is reportedly a "qualified tree surgeon," having worked as a tree climber and landscape foreman. (Resp. Ex. 1 (Saleh) at 3).

Respondent has been married and divorced twice. (Resp. Ex. 1 (Saleh) at 6). He met his first wife, D.J., in 1981. (*Id.*). After a courtship of about one year, they married on 16 July 1982. (*Id.*). Respondent has not seen or heard from D.J. since his arrest in 1983. (Tr. II 59:12-17). This marriage produced no children and ended in divorce in 1986. (Resp. Ex. 1 (Saleh) at 6).

Respondent met his second wife, M.K., a budget analyst at the Department of Interior, in 1982. (*Id.*). Respondent and M.K. were married on 14 February 1987 and were expecting their first child when respondent was arrested for his most recent offense in 1988.[5] (Resp. Ex. 1 (Saleh) at 7). They divorced in 1988. (Gov't Ex. 2 (Graney) at 2652).

### B.  Medical History

Respondent was born with club feet that impaired his physical abilities, and, at age 11, he had the first of 5 corrective surgeries, which resulted in pins being placed in his feet and chronic pain as an adult. (Gov't Ex. 5 (Zinik) at 2620). Respondent also suffered from severe hearing loss and attended a school for the deaf until the age of eight. (*Id.*). At age 17, respondent had supernumerary nipples surgically removed from his left thorax and right abdomen. (Resp. Ex. 1 (Saleh) at 4; Gov't Ex. 9 at 1504; Gov't Ex. 5 (Zinik) at 2620).

---

[5] Respondent's criminal offense history is discussed in detail below.

Respondent has reported[6] to several examining mental health professionals that at age 15 or 16 he suffered head trauma when a group of teenage boys hit him on the head with a 2x4 board after they caught him exposing himself. (*See* Gov't Ex. 1 (Graney) at 2398; Gov't Ex. 5 (Zinik) at 2622; Resp. Ex. 1 (Saleh) at 4). He reported that he was knocked unconscious and spent seven weeks in a coma. (*Id*.). He also reported that he experienced a period of headaches and seizures in the months following his recovery, but that he has had no residual symptoms in adulthood. (*See* Gov't Ex. 1 (Graney) at 2398; Gov't Ex. 5 (Zinik) at 2622; Resp. Ex. 1 (Saleh) at 4).

## C.  Mental Health History

Respondent was a disruptive factor in the home beginning at age 12, and his parents reported that he was powerless to control his own behavior. (Tr. I 214:21-23; 216:1-5). Respondent was described as being a "chronic liar" and being "unable to tell the truth." (Gov't Ex. 23 at 6; Resp. Ex. 1 (Saleh) at 3; Tr. I 215:23-25). Respondent did not get along well with women, including his adoptive mother ("mother"). (Gov't Ex. 23 at 5; Tr. I 215:312). He often threatened his mother, who, out of fear for her safety, would lock him out of the house or wait at a neighbor's house until her husband returned home. (Gov't Ex. 23 at 5-6). Respondent began exposing himself to other children at age 12. (Gov't Ex. 23 at 5).

Because of respondent's behavioral problems, his parents sought professional help. (*Id*.). He was seen by Dr. William A. Morgan in 1967, when he would have been approximately nine years old, and was diagnosed as "negative, resistive, unhappy and developing anxiety." (Gov't Ex. 23 at 7; Gov't Ex. 1 (Graney) at 2397). During the period of 1971 to 1974, respondent, then

---

[6] This incident is based solely on respondent's self-reports and there is no medical evidence in the record from which the court can confirm the accuracy of respondent's claim. At the hearing, Dr. Saleh testified that the reference to this incident in his expert report was based on respondent's report and not upon review of medical records. (Tr. III 90:9-24).

13 to 16 years old, received mental health counseling "in relation to exposures and obscene phone calls." (Gov't Ex. 23 at 7; Gov't Ex. 1 (Graney) at 2397). During 1974 to 1975, he received mental health therapy related to his indecent exposure behavior. (Gov't Ex. 9 at 1501).

Following respondent's October 1975 arrest and conviction for the offense of seize, transport, and detain with intent to defile a female, he received court-ordered inpatient psychiatric treatment at West Brook Hospital in Virginia. (Gov't Ex. 9 at 1502). He was expelled from that facility in late 1975 for allegedly engaging in inappropriate sexual contact with a female patient. (Gov't Ex. 9 at 1502, 1505).

Pursuant to court order, on 29 December 1975, respondent, then age 17, was admitted to the Henry Phipps Psychiatric Clinic at John Hopkins Hospital ("Phipps Clinic") for mental health treatment. (Gov't Ex. 9 at 1506). He was given a diagnosis of exhibitionism and group delinquent reaction of adolescence. (Gov't Ex. 23 at 8; Gov't Ex. 9 at 1507).

In 1977, respondent attended a few therapy sessions with a psychiatrist at Fairfax County Hospital, but the treatment was discontinued because the doctor concluded that it was not effective because respondent was attending the sessions only because they had been ordered by the court. (Tr. II 69:14-24; Gov't Ex. 23 at 8).

While incarcerated in March 1986 in the District of Columbia prison system, at age 27, respondent underwent a brief psychological evaluation in the District of Columbia, Department of Corrections system, in part, to determine his eligibility for a work-release program. (Gov't Ex. 2 (Graney) at 2660-61). In June 1987, after participating in therapy that was recommended as a result of this evaluation, respondent was recommended for the work-release program and was paroled in September 1987. (Gov't Ex. 2 (Graney) at 2661). At the time of his parole, at around age 29, respondent received an outpatient mental health evaluation at the Alexandria

Mental Health Center. (Gov't Ex. 1 (Graney) at 2398; Gov't Ex. 19 at 903-08). He was diagnosed with intermittent explosive disorder and alcohol dependence, in remission. (Gov't Ex. 19 at 908).

Since respondent's incarceration in 1988 for his latest offense, he has sought and received psychological and psychiatric treatment for such issues as anxiety, family conflict, anger, and sexual issues. (Gov't Ex. 2 (Graney) at 2666). While he has also sought treatment for suicidality, hallucinations, and multiple personality disorder, he has an extensive history of feigning psychiatric illnesses for personal gain. (Resp. Ex. 1 (Saleh) at 8-9).

### D. Substance Abuse History

Respondent has a longstanding history of alcohol and substance abuse, dating back to his early adolescence. (Resp. Ex. 1 (Saleh) at 4). He reports that he began drinking alcohol at age 13. (*Id.*). His alcohol consumption rapidly escalated to daily use and was associated with frequent periods of intoxication. (*Id.*). Although presenting with a history of alcohol-induced blackouts, respondent does not have a documented history of delirium tremens (a syndrome of severe alcohol withdrawal) or withdrawal seizures. (*Id.*).

Respondent also has a history of marijuana, cocaine, heroin, and methamphetamine abuse. (*Id.*). He used marijuana regularly from 1973 until 1983, when he began using cocaine, heroin, and amphetamines. (Gov't Ex. 23 at 9). Respondent continued to abuse drugs and alcohol in the prison system, having last used heroin in May 2009. (Resp. Ex. 1 (Saleh) at 4). As discussed in more detail below, respondent has been sanctioned numerous times for wrongful use or possession of alcohol and drugs while in BOP custody. (Gov't Ex. 55).

### E. Criminal and Sexual Offense History

#### 1. Early Exhibitionism

In about 1971, at approximately age 12, respondent began exposing his penis to children. (Gov't Ex. 23 at 5). Respondent's parents sought professional help for this problem, but were told respondent would outgrow the problem. (*Id.*). However, respondent continued to engage in such conduct. (*Id.*).

#### 2. 1974–Indecent Exposure ("1974 Offense")

On 18 April 1974, when respondent was 15 years old, he was charged in Fairfax County, Virginia as a juvenile with two counts of indecent exposure. (Gov't Ex. 23 at 3). The incident involved respondent approaching two girls (ages seven and eight) while they were fishing in a creek. (Gov't Ex. 7 at 1; Gov't Ex. 2 (Graney) at 2654). Respondent exposed his penis to the girls and asked if they wanted to feel it. (Gov't Ex. 7 at 1; Gov't Ex. 2 (Graney) at 2654). Respondent pled guilty to both counts and, on 10 September 1974, he was given one year of probation as a juvenile. (Tr. I 210:2-6; Final Pretrial Order at 2-3, Stip. 9.h).

#### 3. 1975–Seize, Transport, and Detain with Intent to Defile ("1975 Offense")

On 10 October 1975, when respondent was 17 years old, he was charged in Fairfax County, Virginia as a juvenile with the offense of seize, transport, and detain with intent to defile the victim's person. (Gov't Ex. 23 at 3). In this incident, respondent approached a female stranger, age 19, walking on a path adjacent to a street following a high school football game. (Gov't Ex. 8 at 2015). After some initial conversation, respondent grabbed the female with one hand and placed a knife at her neck with the other hand. (Gov't Ex. 8 at 2020). Respondent forced the female into the rear seat of a car being driven by another male and they drove away. (Gov't Ex. 8 at 2020-21). The driver advised respondent to release the female, but respondent

told him to shut up and keep driving. (Gov't Ex. 8 at 2021). Respondent held the female around the throat and placed his hand under her blouse and fondled her breasts. (*Id*.). He also forced the female to touch his penis. (*Id*.). At the driver's insistence, respondent finally released the victim. (Gov't Ex. 8 at 2021-22). Upon questioning by the police, respondent admitted to forcing the female into the car and fondling her breasts. (Gov't Ex. 8 at 2023). On 27 October 1975, respondent pled guilty to this offense and was given indeterminate probation not to last past his 21st birthday. (Gov't Ex. 23 at 3; Final Pretrial Order at 2-3, Stip. 9.g).

### 4. 1978–Attempted Abduction ("1978 Offense")

On 7 April 1978, when respondent was 19 years old, he was charged in Fairfax County, Virginia as an adult with two counts of attempted abduction. (Gov't Ex. 23 at 3; Gov't Ex. 10; Gov't Ex. 11 at 2008). Though records providing details of these offenses were not offered into evidence, respondent has reported that on this occasion he attempted to abduct two women on separate occasions on the same day. (Tr. I 48:23 to 49:16). On 8 November 1978, the first count of attempted abduction was *nolle prossed*, and respondent pled guilty to the second count. (*Id*.). He was sentenced to 10 years with all but 5 years suspended, plus 5 years probation after completing his incarceration. (*Id*.; Final Pretrial Order at 3, Stip. 9.f.). Respondent was released from prison in December 1980. (Tr. I 52:3-7; Tr. II 31:24 to 32:8; 64:19).

On 3 February 1984, respondent's probation was revoked due to his commission of another crime in late 1983 in the District of Columbia, the 1983 offense described below, and he received a 5-year active term of imprisonment. (Gov't Ex. 23 at 3; Gov't Ex. 17 at 844; Final Pretrial Order at 2-3, Stip. 9.f.). He was paroled from that imprisonment on 14 November 1985, and began serving the sentence he received for the 1983 offense. (Gov't Ex. 17 at 844).

### 5.  1983–Carrying a Dangerous Weapon–Felony and Simple Assault ("1988 Offense")

On 23 November 1983, when respondent was 25 years old and still on probation for his 1978 offense, he was charged in the District of Columbia with simple assault, two counts of carrying a dangerous weapon–felony, and assault with intent to kidnap while armed.  (Gov't Ex. 23 at 3-4).  He was in his first marriage at the time.  (Resp. Ex. 1 (Saleh) at 6).  In this incident, respondent approached a female stranger and asked her to walk him to his car so that he would not be arrested for being drunk.  (Gov't Ex. 13 at 1970).  Upon arriving at the female's car, respondent again asked the female to go to his car.  (*Id.*).  She declined, and respondent told her not to scream or he would kill her.  (*Id.*).  He then attempted to push her into her vehicle.  (*Id.*). The female kicked respondent and screamed, and respondent fled to a black vehicle and left the scene.  (*Id.*).  The female then informed her boyfriend and another person about what had happened, and the police were called.  (*Id.*).  In describing respondent to the police, the female reported, in part, that he had a red knit hat and a green jacket.  (*Id.*).  Respondent was subsequently arrested wearing a red hat and green jacket.  (*Id.*).  Police recovered a pair of handcuffs from respondent's jacket.  (*Id.*).  Recovered from respondent's vehicle were an air pistol on the front passenger seat; an axe handle with nails on one end under the driver's seat; and lengths of rope on the floorboard with one rope hooked through a seat belt anchor.  (*Id.*).

On 23 November 1983, the simple assault case was "no papered."  (Gov't Ex. 23 at 3-4). On 13 February 1985, one count of carrying a dangerous weapon–felony was dismissed, and respondent pled guilty to the other count of carrying a dangerous weapon–felony, and to simple assault.  (Gov't Ex. 14; Gov't Ex. 23 at 4; Final Pretrial Order at 2-3, Stip. 9.e.).  Respondent was sentenced to two to eight years on the carrying a dangerous weapon–felony count and a

consecutive one-year term on the simple assault count. (Gov't Ex. 14; Gov't Ex. 23 at 4; Final Pretrial Order at 2-3, Stip. 9.e.). He was paroled on 3 September 1987. (Gov't Ex. 23 at 4).

### 6. 1988–Armed Kidnapping ("1988 Offense")

On 19 February 1988, at age 29, and while on parole for the 1983 offense, respondent was charged in the District of Columbia with assault with intent to rob while armed and armed kidnapping. (Gov't Ex. 23 at 4). The incident occurred after defendant had dinner at a restaurant with his second wife, who was pregnant. (Gov't Ex. 2 (Graney) at 2656; Gov't Ex. 5 (Zinik) at 2619). Respondent had approached and grabbed a female around the neck, threatened her with a knife and instructed her not to scream, led her down the street, asked her if she had any money, and attempted to force her into his vehicle. (Gov't Ex. 21). His attempt was thwarted when a pedestrian diverted his attention from the female, who was able to break free and flee the scene. (*Id*.). Police records indicate that the female did not know respondent. (*Id*.). On 8 July 1988, the charge of assault with intent to rob while armed was dismissed, and respondent pled guilty to armed kidnapping. (Gov't Ex. 23 at 4). Respondent was sentenced to 12 to 36 years for this offense. (Gov't Ex. 26 at 22).

### 7. 1993–Incident with BOP Therapist

On 9 April 1993, while in custody of BOP, respondent was in a one-on-one therapy session with a female BOP psychologist. (Gov't Ex. 33 at 93; Final Pretrial Order at 2, Stip. 9.d.). While discussing his exhibitionism, he asked the psychologist to turn off the audio recorder and then stated, "I want you to touch my penis." (Gov't Ex. 33 at 93; Final Pretrial Order at 2, Stip. 9.d.). The BOP sanctioned respondent for this conduct. (Gov't Ex. 33 at 93; Gov't Ex. 55 at 3321-22; Final Pretrial Order at 2, Stip. 9.d.).

### 8. 2011–Wake County Jail Incident

On the morning of 18 October 2011, respondent was detained in a jail holding cell pending transportation to this court for continuation of his § 4248 hearing later that morning. (Tr. II 121:21 to 122:6; Tr. IV 6:4-25). In another jail cell across the hall from respondent were Ms. Jakoniah Walton, a 23-year old female, and three other female detainees. (Tr. IV 5:9 to 6:22). While in her holding cell looking through her cell window, Ms. Walton saw respondent stand on a bench in his cell, pull his pants down, and purposefully expose his penis to her and the other female detainees in her cell. (Tr. IV 7:17 to 13:16). Respondent's elevated stance on the bench resulted in Ms. Walton being able to clearly see respondent's penis and his related conduct. (Tr. IV 13:9-16). While standing on the bench, respondent purposefully masturbated in a manner so that the female detainees could see his actions and made unwanted sexual gestures toward them while attempting to keep their attention focused on himself. (Tr. IV 13:3-8).

After banging on their cell door for several minutes, the female inmates were able to summon a correctional employee and report respondent's conduct. (Tr. IV 13:17-24). The correctional employee confronted respondent about his conduct and instructed him to stop. (Tr. IV 14:1-12). Ms. Walton testified that based on a conversation she overheard between two inmate trustees cleaning respondent's cell after he was removed, she concluded that respondent had ejaculated as a result of his conduct. (Tr. IV 14:22 to 15:8).

### 9. Dismissed Offenses

Defendant was arrested for possession of marijuana on 7 April 1978 and for trespassing on an unspecified date. (Gov't Ex. 5 (Zinik) at 10; Gov't Ex. 46 (Bazerman) at 2384). Both charges were dismissed. (Gov't Ex. 5 (Zinik) at 10; Gov't Ex. 46 (Bazerman) at 2384).

**F. Incarceration History and Prison Disciplinary Record**

While in BOP custody, respondent has been sanctioned for the following violations:

1.      9 April 1993.  Making a sexual proposal to a BOP staff member, as detailed above.

2.      28 November 1995.  Threatening bodily harm to a female staff psychologist. (Gov't Ex. 37 at 1; Gov't Ex. 55 at 3321).

3.      16 July 1998.  Possessing a dangerous weapon.  (Gov't Ex. 55 at 3320).

4.      1 September 1999.  Disruptive conduct–high.  (*Id.*).

5.      6 July 2000.  Attempted escape.  (Gov't Ex. 55 at 3319).

6.      13 September 2000.  Threatening bodily harm.  (*Id.*).

7.      22 October 2010.  Refusing an order; being insolent to staff member.  (Gov't Ex. 55 at 3316).

8.      1998 to 2009.  Numerous sanctions for wrongful use/possession of drugs and alcohol:  possessing intoxicants (1998, 2000, 2004), possessing drugs, use of drugs, and possessing a dangerous weapon (1998), possessing intoxicants (homemade alcohol) (1999, 2006), refusing to take alcohol test (1999), use of drugs/drug items (2000), use of drugs (2003, 2005, 2009), possessing intoxicants and use of drugs (2007).  (Gov't Ex. 2 (Graney) at 2654; Gov't Ex. 5 (Zinik) at 2624-25).

In addition, in February and May 2011, BOP staff confiscated from respondent's room some magazines containing photographs of scantily clad women in sexually suggestive poses. (Gov't Ex. 53).

**IV.      RESPONDENT'S PAST STATEMENTS AND TESTIMONY**

**A.  Respondent's Past Statements**

A significant portion of the relevant evidence in this case comes from respondent's own statements about the sexual nature of his behaviors and offenses, his sexual urges, and his level of control over these urges.  He has made such statements to mental health professionals, law

enforcement, and court personnel. Because of the importance of this evidence to issues before the court, the court provides a detailed description of these statements below.

In May 1976, while being treated at the Phipps Clinic, respondent reported that he had "difficulty controlling his impulses to expose himself to women." (Gov't Ex. 9 at 1497). He also reported that "[s]ince age 13 his sexual fantasies have mainly concerned his exposing himself." (Gov't Ex. 9 at 1500). During sexual intercourse, respondent stated that "he fantasizes about exposing himself or about tying women up and raping them." (*Id.*).

In May or June 1988, respondent informed probation officials preparing his presentence report for the 1988 offense that his intent behind that offense was to sexually assault the victim. (Gov't Ex. 23 at 3). He elaborated as follows:

> I wasn't able to control what I was doing. I don't use drugs. Every crime I committed I don't recall why I was there at that particular point. I don't blame them. I don't think about them before I do it. The impulses are so strong. I attempted to get help for them. It's been happening since 1975.

(Gov't Ex. 23 at 3; *see also id.* 8, 9, 10).

On 7 June 1988, respondent sent a letter to the sentencing judge in which he asks for treatment and states that his mental problem "takes over [his] whole being and won't let [him] live [his] own life" and that his "whole life has been destroyed and controlled by [his] mental problems." (Gov't Ex. 22 at 819, 821; *see also id.* 820).

On 5 November 1991, respondent a told BOP psychotherapist that his frustrations with his wife "would accumulate and finally be released as impulsive abductions with rape intent." (Gov't Ex. 34 at 1916).

In 1992, respondent stated, apparently to a prison psychotherapist, that he experienced "'mounting tension before acting out sexually.'" (Gov't Ex. 2 (Graney) at 2661). He also stated

that he "'would like to get better control of his exhibitionism desires . . . [and] did not want to get release *(sic)* until he has better control of himself.'" (*Id*.).

In September 1997, a psychologist interviewed respondent, apparently on three occasions, for a report to the Parole Commission, dated 22 September 1997, on whether respondent would pose a threat to the community if released. (Gov't Ex. 39 at 838). Respondent stated that he began exposing himself to females due to his anger at being rejected by girls because of his hearing problem. (Gov't Ex. 39 at 839). He further explained how his feelings of rejection encouraged his exhibitionism:

> I like you, you don't like me, take this [gesturing to his penis]! I finally got a response from them that did not make me cry. . . . I was in control and I liked it. For the first time in my life I elicited responses from people not from my hearing, but the way I wanted to do it.

(Gov't Ex. 39 at 839).

During this evaluation, respondent also complained that he had not received the mental health treatment he needed to address his "repetitive pattern of behavior that has been unacceptable in society that is inappropriate, that I have not always been able to control." (*Id*.). He further elaborated that the behavior to which he was referring was "Indecent Exposure and my need to control completely and humiliate other individuals through dominance." (Gov't Ex. 39 at 839-40). Nevertheless, he stated that he believed he was then able to control himself. (*Id*. at 840).

On 22 September 2000, respondent sought resumption of treatment with medication due to "anxiety and anger and premeditated acts." (Gov't Ex. 34 at 1790). According to the person who interviewed him, he indicated that "when these thoughts enter his mind he becomes anxious" and that he has had this problem since his teen years "when he was charged with abduction, attempted murder, etc." (*Id*.). He further stated, "'I have no remorse.'" (*Id*.).

On 30 June 2009, respondent wrote a letter to an official in the BOP's Sex Offender Certification Review Branch (which reviews inmates to determine whether they meet the criteria for civil commitment under the Act) as part of his effort at the time to obtain commitment under § 4248. (Gov't Ex. 44). In this letter, he acknowledges the "repetitive pattern of behavior [which] is obvious, even to the untrained eye." (*Id.* at 1953). He goes on to express his strong concerns that he will be unable to control his behavior upon his release:

> Having been incarcerated for the amount [of] years that I have been, I can only compare this to a hibernating bear who awakened with the desire to eat, and eat he will. . . . I do not like the actions that have caused me to become incarcerated for these many years. Yet, how do I stop the hungry bear from eating upon his awakening from hibernation? I alone cannot do it and I am very well aware of that. . . . With all my heart I say, "I have no desire to harm anybody," but I realize that my desires and abilities are separate worlds in which I have not developed the ability to control myself.

(Gov't Ex. 44 at 1953).

On 31 July 2009, respondent was evaluated by Dr. Bazerman at the request of the BOP's Certification Review Panel to determine whether he met the criteria for certification for commitment under § 4248. (Gov't Ex. 46 (Bazerman) at 2381). During that evaluation, respondent informed Dr. Bazerman that the sex offender treatment he received to that point had not been effective, that he had not received adequate tools to control himself, and that it would be a matter of time until he sexually reoffended. (Gov't Ex. 46 (Bazerman) at 2383, 2386, 2389). He also reported to Dr. Bazerman that the crimes for which he has been convicted were committed with the intent to sexually assault the victims and that he had committed other sexual offenses for which he had not been caught. (Gov't Ex. 46 (Bazerman) at 2384, 2385-86). He also stated that he uses alcohol and opiates to reduce his sex drive "insuring that he does not harm any of the female staff members." (Gov't Ex. 46 (Bazerman) at 2384).

In September and October 2009, Dr. Graney conducted several interviews of respondent, totaling about two and a half hours, for her 13 November 2009 precertification forensic evaluation of respondent. (Gov't Ex. 1 (Graney) at 2390). Respondent admitted to Dr. Graney, as he had to Dr. Bazerman, that his offenses in 1978, 1983, and 1988 were sexually motivated. (Gov't Ex. 1 (Graney) at 2393).

Respondent also reiterated to Dr. Graney that he had committed more sexual offenses, similar to his attempted abductions, than those reflected in his criminal record. (Gov't Ex. 1 (Graney) at 2395). While he did not provide specific details to her about any of these individual offenses, he did provide extensive detail as to his modus operandi:

> Mr. King asserted that all of his victims were strangers. He did not preselect his victims, but would rather choose a time and location that was most conducive to his plans (*i.e.*, to abduct a female). The inmate indicated that he chose victims based on their perceived "vulnerability," for example, women walking alone at night. He remarked that he never chose Black or "foreign" women because they are "too aggressive . . . have to hurt them." Rather it was his perception that Caucasian women "tend to focus more on just surviving." Mr. King stated that he targeted women who were less likely to resist and had "something to live for." The inmate asserted that a knife was his weapon of choice during the abductions because he felt women feared knives more than firearms. He noted the weapon instilled fear and made them cooperate. Mr. King said he wore a mask to cover his face during his offenses because his features are "too distinct" and he felt he would be easily identified. He also stated he tried to speak very little as he knew his voice would be easily identifiable given his history of hearing loss. He asserted that instead he used index cards he had prepared ahead of time on which he wrote instructions to his victims. For example, he said a card may read something like, "If you don't do what I want you to do, I will rape you."

> Mr. King reported he placed his victims in his car. He said he used bindings, such as luggage strapping, and blindfolds, but only for purposes of physically controlling his victims and keeping them from seeing their location. He noted it was also another way of demonstrating his control as well. Mr. King remarked that he chose items for binding that would not cut into the victim's skin in part because he did not want blood in his car and also because he did not want to cause "anymore physical pain than necessary." He claimed he only kept items for binding his victims in his car when he knew he needed them. He said he did not leave them in the car all the time because they could be considered a "rape kit." Mr. King was asked about the items found on his person and in his car at the time

of his November 1983 arrest, specifically the handcuffs, rope, air pistol, and axe handle with nails in it. The inmate admitted the handcuffs and rope were to obtain control of the victim of the attempted abduction, however, he said the air pistol belonged to his stepson and the axe handle was a tool he used for tree work.

After gaining physical control of a victim, the inmate would drive a short distance away, after which time he would remove the blindfold. He noted he would then show the victim another index card saying something to the effect that he would use the knife if they did not cooperate. As noted previously, Mr. King reported he did not engage in sexual intercourse with the victims, but would rather spend hours exposing himself to them and making them masturbate him. Again, he used the index cards to instruct them what to do. He noted he initially only kept victims for an hour or so, but he eventually was keeping victims for up to as long as eight hours. Mr. King noted the length of time he kept a victim often depended on the time at which he abducted the victim. He remarked that the earlier he got out looking for victims, the more time he had to "hunt." The inmate noted he only physically assaulted a victim on one or two occasions, but informed that it was to regain control of when a victim began resisting. He asserted that on those occasions, he had hit the victims in the solar plexus to stun them and regain control. Mr. King said he rarely touched or fondled a victim, but when he did so it was to show them he "could and would" if they did not cooperate.

(Gov't Ex. 1 (Graney) at 2395-96).

Respondent also told Dr. Graney that he engaged in this type of offense approximately three times per month. (Gov't Ex. 1 (Graney) at 2396). He also said that "once an offense occurred, he knew another would follow because the 'euphoric high is so good, better than any drug.'" (*Id.*).

Respondent further told Dr. Graney that he has fantasies about exposing himself to females almost daily and that these fantasies have continued in prison. (*Id.*). He reported that he does not usually engage in his exposure behavior because he cannot get away with it as easily, but that he does sometimes expose himself to female staff in a manner that makes it appear accidental. (*Id.*). Respondent reported that he often used heroin in prison to help reduce his sexual urges, including his urge to masturbate in front of female staff. (Gov't Ex. 1 (Graney) at 2393, 2396).

Respondent explained to Dr. Graney that "his potential for violence was increasing prior to his most recent arrest, in part because he was keeping his victims for longer periods of time." (Gov't Ex. 1 (Graney) at 2397). He further asserted that "if released to the community he knows it is 'only a matter of time' before he would commit another sexual offense." (*Id.*). He stated that for any such future offenses he "'won't leave any witnesses behind'" because "all of his previous victims readily identified him in court." (*Id.*). He admitted that "his violence could escalate to killing victims to avoid detection." (*Id.*).

Despite these statements, in a letter dated 25 April 2010 to a BOP case manager, respondent recanted all statements he made in his interview with Dr. Graney. (Gov't Ex. 51). Further, during a 26 July 2011 clinical interview of respondent by Dr. Zinik, respondent again recanted many of his prior statements and asserted that, except for the 1974 indecent exposure offense, he had never committed a sexual offense. (Gov't Ex. 57 (Zinik) at 2682). More specifically, he again recanted the detailed confessions he made to Dr. Graney in the precertification forensic evaluation. (*Id.* at 2683). Respondent asserted that he fabricated these statements so that he could be civilly committed because he was afraid his lengthy incarceration would prevent him from functioning in society. (*Id.*).

## B. Respondent's Hearing Testimony

In the presentation of its case at the commitment hearing, the government called respondent as a witness. During direct examination, the government questioned respondent in detail about his criminal and sexual offense history, including the circumstances of and respondent's motivations for the offenses of which he was convicted and those solely reported by respondent. (Tr. I 206:6 to 210:16; Tr. II 20:5 to 51:7). While he confirmed many of the facts of these offenses as reflected in the record, he also denied or contradicted many of the facts. For

example, although the victim of the 1975 offense stated that respondent forced her to touch his penis, respondent denied that this occurred. (Tr. II 23:21 to 24:2).

The government also reviewed with respondent his psychological history, including both treatment and evaluations conducted for the purposes of the proceedings under § 4248. (Tr. I 202:21 to 205:9; Tr. II 24:10 to 27:1; 51:8-18). During this line of questioning, respondent testified about why he had recanted many of the statements he made to mental health professionals regarding his sexual offense history. (Tr. II 5:14-18; 8:1 to 17:22). He testified that he had initially wanted to be civilly committed under § 4248 and, in support of that goal, he lied during examinations about his sexual proclivities and uncharged sexual offense conduct and fabricated new details for some of his past offenses to make them appear more sexually motivated. (Tr. II 5:14-18). He further testified that upon learning that the § 4248 commitment program at the Federal Correctional Institution in Butner, North Carolina ("FCI-Butner") was not what he expected, he decided to recant many of these alleged fabricated statements. (Tr. II 54:1-22; 56:3-20).

On cross-examination, respondent testified further about his psychological treatment history as well as about his family, work, and medical history. (Tr. II 57:25 to 70:19). In particular, he testified about his hearing impairment and the multiple surgeries required to correct a birth defect that affected his interior ankle bones. (Tr. II 59:18 to 61:6; 63:6 to 64:9). Respondent also testified that his fabrication regarding details of his prior offenses for the purpose of increasing his chances of obtaining § 4248 commitment is part of a life-long pattern of manipulating BOP to obtain desired placements in BOP facilities. (Tr. II 70:8 to 82:25). Specifically, he testified at length about how he had feigned multiple mental illnesses and even an escape attempt to obtain his transfer to other prison facilities. (*Id.*). He said that his desire to

be transferred often came when he was unable to pay for the drugs that he was using.  (Tr. II 71:4-11).

## V.   EXPERT OPINIONS

### A.  Qualifications of the Experts

At the commitment hearing, the government tendered Dr. Zinik and Dr. Graney as experts.  Dr. Zinik is a clinical forensic psychologist specializing in risk assessment of sexual offenders.  (Tr. I 16:6-13; Zinik Curriculum Vitae ("CV") (D.E. 27)).  Dr. Graney is currently employed by the BOP Psychology Services Department of the Federal Correctional Complex–Butner as a sex offender forensic psychologist.  (Tr. II 111:14-20; Graney CV (D.E. 15)).  With no objection from respondent, the court recognized Drs. Zinik and Graney as experts in the field of forensic psychology.  (Tr. I 26:11-18; Tr. II 113:15-19).

Respondent tendered as an expert Dr. Saleh, a forensic psychiatrist and a child and adolescent psychiatrist.  (Tr. III 6:19-22; Saleh CV (D.E. 41)).  The court appointed Dr. Saleh as an examiner selected by respondent pursuant to 18 U.S.C. §§ 4247(b) and 4248(b).  (*See* Order (D.E. 38)).  He is board certified in general psychiatry and forensic psychiatry.  (Tr. III 14:12-13).  With no objection from the government, the court recognized Dr. Saleh as an expert in the field of forensic psychiatry.  (Tr. III 22:23 to 23:2).

### B.  § 4248 Evaluations of Respondent

Respondent was first evaluated for the purposes of possible certification under § 4248 on 31 July 2009 by Dr. Bazerman of the BOP Certification Review Panel.  Dr. Bazerman conducted a clinical interview of respondent via videoconference.  In her report dated 13 August 2009 (Gov't Ex. 46 (Bazerman)), Dr. Bazerman does not provide an opinion of respondent's eligibility for commitment under § 4248, but only the results of a diagnostic evaluation, an actuarial

assessment of risk, and a summary of other relevant risk factors. (Gov't Ex. 46 (Bazerman) at 2387-89).

In September and October 2009, Dr. Graney conducted a precertification forensic evaluation of respondent and issued a report on her findings on 13 November 2009. (Gov't Ex. 1 (Graney)). For the purposes of this evaluation, as indicated, Dr. Graney conducted several clinical interviews of respondent totaling approximately two and a half hours. (Gov't Ex. 1 (Graney) at 2390). In her report, Dr. Graney concluded that respondent met the criteria for commitment under § 4248. (Gov't Ex. 1 (Graney) at 2404).

During 1 June 2011 to 1 August 2011, Dr. Graney conducted a forensic evaluation of respondent and issued a report on her findings on 1 August 2011,[7] in which she again concluded that respondent met the criteria for commitment. (Gov't Ex. 2 (Graney) at 2679; Gov't Ex. 3 (Graney) at 3410). Respondent did not participate in an interview for this evaluation. (Gov't Ex. 2 (Graney) at 2649). On 16 September 2011, Dr. Graney issued a supplement to the forensic evaluation report to make certain corrections. (Gov't Ex. 3 (Graney)).

Dr. Zinik conducted a forensic evaluation of respondent based solely on a review of respondent's records and issued a report of his findings on 1 October 2010. (Gov't Ex. 5 (Zinik)). In his report, Dr. Zinik concluded that respondent met the criteria for commitment under § 4248. (Gov't Ex. 5 (Zinik) at 2640). On 1 August 2011, Dr. Zinik completed an updated forensic evaluation of respondent. (Gov't Ex. 57 (Zinik)). For the purposes of this second evaluation, Dr. Zinik interviewed respondent on 26 July 2011 for approximately three and three quarter hours. (Tr. I 29:1-6). Dr. Zinik again concluded that respondent met the criteria for commitment. (Gov't Ex. 57 (Zinik) at 2688).

---

[7] The report was signed by Dr. Graney on 3 August 2011.

Dr. Saleh conducted a forensic evaluation in April 2011 and issued a written report on 13 April 2011. (Resp. Ex. 1 (Saleh)). As part of the evaluation, Dr. Saleh conducted an interview of respondent for approximately four and a half hours. (Resp. Ex. 1 (Saleh) at 2). Dr. Saleh concluded that respondent did not meet the criteria for commitment. (Resp. Ex. 1 (Saleh) at 18).

## C. Mental Health Diagnoses

All three testifying experts applied the criteria set forth in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"), the current version of which is the Fourth Edition, Text Revision (2000) ("DSM-IV-TR") in diagnosing respondent. The DSM is the catalog of mental disorders published by the American Psychiatric Association and used by psychological professionals to diagnose mental illness. (Tr. I 75:21-25).

Each of the three testifying experts diagnosed respondent with antisocial personality disorder. (Gov't Ex. 2 (Graney) at 2668; Gov't Ex. 5 (Zinik) at 2628; Resp. Ex. 1 (Saleh) at 17). In addition, both Drs. Zinik and Graney diagnosed respondent with exhibitionism; paraphilia, not otherwise specified ("paraphilia NOS"), nonconsent[8]; and substance abuse or substance dependence.[9] (Gov't Ex. 1 (Graney) at 2399-2400; Gov't Ex. 2 (Graney) at 2668-72; Gov't Ex. 5 (Zinik) at 2628). Each diagnosis is examined in turn below.

### 1. Antisocial Personality Disorder

The DSM-IV diagnostic criteria for the antisocial personality disorder are as follows:

---

[8] While Dr. Graney used the descriptor of "non-consent," Dr. Zinik noted that there are alternative terms used for this diagnosis, including "forced sex with non-consenting females," "paraphilic coercive disorder" ("PCD"), and "rape paraphilia." Each of these various descriptors is used for the same diagnosis. (Tr. I 25:2-12). For consistency, the court will refer to this diagnosis as "paraphilia NOS, nonconsent."

[9] More specifically, Dr. Graney diagnosed respondent with "Alcohol Abuse" and "Opiate Abuse," (Gov't Ex. 2 (Graney) at 2668), and Dr. Zinik diagnosed respondent with "Polysubstance Dependence (alcohol, marijuana, opiates, methamphetamine, cocaine)," (Gov't Ex. 5 (Zinik) at 2628).

A.  There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three or more of the following:

    (1)  failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest

    (2)  deception, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure

    (3)  impulsiveness or failure to plan ahead

    (4)  irritability and aggressiveness, as indicated by repeated physical fights or assaults;

    (5)  reckless disregard for safety of self or others

    (6)  consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations

    (7)  lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another

B.  The individual is at least age 18 years.

C.  There is evidence of Conduct Disorder . . . with onset before age 15 years.

D.  The occurrence of antisocial behavior is not exclusively during the course of Schizophrenia or a Manic Episode.

DSM-IV-TR at 706.  (*See also* Tr. I 102:13 to 104:10; Tr. III 53:24 to 54:7; Gov't Ex. 5 (Zinik) at 2632).

In support of their diagnosis of antisocial personality disorder, each of the experts cited to the substantial evidence in the record demonstrating respondent's lengthy criminal history, which includes violent offenses; his pervasive pattern of lying and deceitfulness; and his manipulation and conning of others for his personal gain, such as his attempts to manipulate prison mental health professionals by feigning different mental illnesses to secure transfer to other prison facilities.  (Tr. I 104:13 to 107:25; Tr. II 127:7-14; Tr. III 53:18 to 54:23).  Drs. Graney and

Zinik also cited to evidence that respondent has admitted to a lack of remorse for his actions, experienced problems with anger, and exhibited threatening behavior, including threats directed at prison staff for which he was disciplined. (Tr. I 104:13 to 107:25; Tr. II 127:7-14; Tr. III 54:8-23). All three experts also concluded that respondent met the criteria for conduct disorder before the age of 15, as required for the diagnosis. (Gov't Ex. 2 (Graney) at 2671; Gov't Ex. 5 (Zinik) at 2632; Tr. III 53:18 to 54:7). While Dr. Graney concluded that respondent's antisocial personality disorder constituted a serious mental illness for the purposes of § 4248 commitment (Tr. II 127:7-14), Dr. Saleh concluded that it did not (Tr. III 64:12-24). The record does not establish whether Dr. Zinik viewed respondent's antisocial personality disorder as serious, and the court will therefore assume that he did not.

### 2. Exhibitionism

The DSM diagnostic definition of exhibitionism is recurrent, intense sexually arousing fantasies, sexual urges, and behaviors involving the exposure of one's genitals to strangers which occur for a period of greater than six months. (Tr. I 99:19-25). A diagnosis of exhibitionism also requires that the symptoms cause significant distress or impairment in functioning. (Tr. I 100:16-18).

Dr. Zinik further described this mental disorder as follows:

Often there's a desire to shock or surprise the observer, and sometimes these men will report that they have sexually—while exposing themselves, they have fantasies that the observer or the victim will also be sexually aroused and want to have sex with them. That's part of the intrapsychic motivation and the fantasy that propels them to do it.

(Tr. I 100:4-10). Dr. Zinik also explained in his 1 October 2010 report that an individual with exhibitionism may masturbate while exposing himself or while fantasizing about exposing

himself. (Gov't Ex. 5 (Zinik) at 2631). He further noted that "[e]xhibitionism is very compulsive and has the highest recidivism rate of all sex offenses." (*Id*.).

Applying the above diagnostic criteria, Dr. Zinik concluded that respondent suffered from exhibitionism. (Tr. I 98-15-17). In support of this diagnosis, Dr. Zinik notes respondent's history of recurrently exposing himself to strangers, which began at age 12, caused his parents to seek treatment for respondent, and resulted in his arrest when was 14 or 15. (Tr. I 100:22 to 101:2; Gov't Ex. 5 (Zinik) at 2631). Dr. Zinik also referenced the following: respondent's report during treatment at the Phipps Clinic in 1976 that he had fantasies of exposing himself; his report to Dr. Graney in 2009 that he continues to have daily urges and fantasies to expose himself to women; his report that he used heroin while incarcerated as a way of reducing his urges to masturbate in front of female staff; and the incident in 1993 in which respondent asked a female therapist to touch his penis while they were discussing his exhibitionism. (Tr. I 101:3-17; Gov't Ex. 2 (Graney) at 2392-93; Gov't Ex. 5 (Zinik) at 2631; Gov't Ex. 46 (Bazerman) at 2384; Gov't Ex. 57 (Zinik) at 2685).

In response to the hypothetical about the Wake County Jail self-exposure incident, Dr. Zinik testified that such behavior further supports his diagnosis of exhibitionism. (Tr. III 198:2-9). Dr. Zinik also stated that the incident would constitute "compelling evidence for a total breakdown in sexual impulse control." (Tr. III 198:9-13). He concluded that respondent's exhibitionism constituted a serious mental illness on the grounds that it resulted in illegal activity and criminal sanctions and because respondent's exhibitionism, which is typically a non-violent paraphilia, includes aspects of having victims masturbate him. (Tr. I 101:18 to 102:4).

Dr. Graney based her diagnosis of exhibitionism on evidence similar to that cited by Dr. Zinik, including respondent's report that he has fantasized about exposing himself to women on

a daily basis since adolescence. (Gov't Ex. 1 (Graney) at 2400; Gov't Ex. 2 (Graney) at 2671). In her 1 August 2011 report, she notes that "[w]hile [respondent] has no incident reports for exposing himself to females in prison, he admitted to still engaging in the behavior when able to make it appear accidental." (Gov't Ex. 1 (Graney) at 2400). Dr. Graney also concluded that respondent's exhibitionism constituted a serious mental illness because he has suffered repeated legal consequences from the disorder and has reported distress in being unable to control his urges. (Tr. II 126:14 to 127:6).

Dr. Saleh did not diagnose respondent with exhibitionism. In his testimony, Dr. Saleh explained that if respondent suffered from exhibitionism, which requires "recurrent and intense sexual thought of wanting to expose yourself to an unsuspecting person," there would be more evidence of him having engaged in this behavior while incarcerated. (Tr. III 40:3 to 13). He also stated that because respondent is bisexual, he would have had unlimited opportunity to expose himself to male victims during his 30 years of incarceration. (Tr. III 41:7 to 19). He opined that a person with true exhibitionism would be unable to control his urge to expose himself for a period of 30 years of incarceration and, therefore, one would expect to see some evidence of this behavior. (Tr. III 41:20 to 42:17).

Further, while agreeing that the diagnosis of exhibitionism would have been reasonable when respondent was 17 years old, Dr. Saleh stated that he could not conclude that it would remain a valid diagnosis 40 years later absent documentation of the behavior. (Tr. III 106:8 to 108:17). Dr. Saleh further explained that a diagnosis of exhibitionism based on the record before him would be inappropriate given that respondent has been found to be a chronic liar and a malingerer and that his records contain multiple diagnoses, such as multiple personality disorder

and psychosis, which are supported by no evidence beyond respondent's own reports. (Tr. III 131:21 to 133:17).

When asked whether he would change his opinions with regard to whether respondent is sexually dangerous based on the hypothetical regarding the Wake County Jail, Dr. Saleh stated that such facts would not change his opinion. (Tr. III 189:17 to 190:5). He said that it would be inappropriate to diagnose respondent with exhibitionism with only a single incident since those reported when he was a juvenile (Tr. III 194:13 to 195:20) and that even if this was evidence of exhibitionism recurring after many years, exhibitionism is not sexually violent conduct for the purpose of § 4248. (Tr. III 196:5-19).

### 3. Paraphilia NOS, Nonconsent

Dr. Zinik and Dr. Graney diagnosed respondent with paraphilia NOS, nonconsent. The DSM-IV-TR defines a paraphilia as "recurrent, intense sexually arousing fantasies, urges or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months." DSM-IV-TR at 566; (*see also* Gov't Ex. 5 (Zinik) at 2628; Gov't Ex. 2 (Graney) at 2668). These urges or fantasies must result in some type of impairment for the individual to qualify for a paraphilia diagnosis. (Tr. III 27:10-13). Paraphilia NOS is listed in the DSM-IV-TR as a mental disorder and refers to disorders that do not meet the criteria for the specific categories of paraphilias listed in the DSM-IV-TR, such as pedophilia, voyeurism, and exhibitionism. (Tr. I 76:9-14; 77:11-14). Dr. Zinik testified that there are numerous paraphilias not listed in the DSM-IV-TR and that the proper way to diagnose such paraphilias is to render a diagnosis of paraphilia NOS–a type of "residual category"–followed by a descriptor of the paraphilia. (Tr. I 76:14-20). Because the specific diagnosis of a nonconsent paraphilia is not

found in the DSM-IV-TR, Drs. Zinik and Graney use the NOS category in combination with the "nonconsent" descriptor when assigning this diagnosis, as they did with respect to respondent. (Tr. I 76:25 to 77:10). As indicated, Dr. Saleh did not diagnose respondent as having any paraphilia.

Dr. Graney testified that the paraphilia NOS, nonconsent diagnosis would be used for an individual who is sexually aroused to the coercive nature of sexual acts and that "the diagnosis is typically used when you're talking about rapists." (Tr. II 123:10-12, 20-21). Dr. Zinik describes this disorder as follows:

> [Paraphilia NOS, nonconsent] reflects an underlying deviant sexual arousal to forced sex and is conceived as the sexualizing of power, control, and dominance over non-consenting persons. The eroticizing of coercive sex is thought to develop psychologically so that physical force and the non-consent of the sexual situation become established "turn ons" that are pursued in either fantasy or reality for repeated sexual gratification. PCD [or paraphilic coercive disorder] is believed to characterize the sexual arousal system of some serial sex offenders, particularly those who demonstrate persistent, repetitive acts of coercive sex over time with multiple victims.

(Gov't Ex. 5 (Zinik) at 2629).

Each of the experts testified about the controversy surrounding the use of a diagnosis of paraphilia NOS, nonconsent. Dr. Graney explained that this diagnosis has been excluded from the DSM-IV-TR and from earlier versions of the DSM because of the lack of scientific evidence that there are a significant number of people who are sexually aroused to the coercive nature of sexual acts. (Tr. II 150:10-12, 20-21). She further testified that one of the concerns about using this diagnosis is that someone with a history of rape may be given the diagnosis solely on the basis of having engaged in rape behavior. (Tr. II 123:22 to 124:3). She further added:

> Not all rapists who rape even repeatedly are considered to have a paraphilia—has to be evidence that these—had these ongoing and intense urges and fantasies about the coercive nature of the act. There are rapists who rape simply because they're just very criminally minded. They might in the course of a robbery come

across a female victim and just opt to rape her just as part of his criminal thinking, but he doesn't necessarily have urges or fantasies that are driving that behavior.

(Tr. II 124:4-13). While acknowledging the potential for misuse of the paraphilia NOS, nonconsent diagnosis, she held the opinion that this diagnosis can be used if there is "clear evidence of the urges and fantasies that support the arousal to the coercive nature of the acts." (Tr. II 125:24 to 126:5).

Dr. Zinik testified that the diagnosis of paraphilia NOS, nonconsent is "controversial, and for good reason." (Tr. I 173:17-18). He explained that "[i]t's hard to diagnose because there are very few rapists that will admit to these urges and feelings like [respondent] has." (Tr. I 173:9-11).

Dr. Saleh further explained the basis of the controversy surrounding the use of the paraphilia NOS, nonconsent diagnosis. He testified that "paraphilia NOS, nonconsent" does not exist as a diagnosis and, for more than three decades, has been refuted by the field, including the American Psychiatric Association and the American Academy of Psychiatry and the Law. (Tr. III 28:10 to 29:2). He asserted that there has been no empirical evidence to show that this condition exists. (Tr. III 29:3-8).

Dr. Graney testified that the specific evidence in this case that respondent has an arousal response to the nonconsent aspect of a sexual encounter is his own statements to her to the effect that "the forceful act of exposing himself to another person is . . . stimulating, euphoric, it's better than any drug." (Tr. II 153:8-14). In her forensic evaluation report, Dr. Graney set out the specific grounds for her diagnosis:

> [Respondent's] repeated sexual offending, which began in adolescence, despite negative consequences; his rapid reoffending after receiving negative consequences; his description of frequent fantasies of exposing himself; his expressed desire to control and humiliate his victims; his description of feeling a "euphoric high" associated with his sexual offending; his report that his sexual

urges were driven by the "unwillingness" of his victims; his very ritualized pattern of offending; his level of offense planning and premeditation; his recognition of a "rape kit;" his description of "mounting tension" before he sexually offended; his offending when having concomitant, consenting sexual partners; his reported dislike of intercourse because he did not feel a sense of control; and his repeated claims that he has felt unable to control his sexual offense urges . . . .

(Gov't Ex. 2 (Graney) at 2670).

She further elaborated:

[A]lthough the respondent's sexual offending, as best is known, has not included vaginal or anal intercourse, the use of objects to vaginally or anally penetrate a victim, or oral copulation, the acts are no less sexually violent. His use of weapons, force, and threats, and pushing victims into waiting vehicles, in order to force them to look at and/or touch his exposed penis is both violent and clearly sexually motivated.

(Gov't Ex. 2 (Graney) at 2670).

At the hearing, Dr. Graney further opined that respondent's "urges to expose himself are intertwined with—arousal to the aspect of offensive behavior" and that "he has these urges and fantasies about forcefully exposing himself to someone, to restrain them or essentially holding them captive while he engages in this behavior and then having them masturbate him." (Tr. II 122:12-20). Dr. Graney testified that she considered respondent's paraphilia NOS, nonconsent a serious mental illness. The reasons she cited are that "[h]e has suffered repeated legal consequences as a result of his actions" and "has on more than one occasion talked about the problems that these sexual urges have caused in his life and has even reported some distress about being unable to control these urges." (Tr. II 126:15 to 127:6).

Similar to the factors cited by Dr. Graney, Dr. Zinik's diagnosis of paraphilia NOS, nonconsent was based on: respondent's persistent sexual offending; the relative rapidity of respondent's reoffending upon release from confinement; the sexual motivation for his crimes despite the presence of apparently consenting partners (*i.e.*, his wives); evidence of a rape kit;

evidence of advanced planning, premeditation, and ritualization of his offenses; and the admissions made by respondent regarding his continued sexual urges. (Gov't Ex. 5 (Zinik) at 2629-31; Tr. I 83:24 to 85:7; 94:15 to 98:14). Like Dr. Graney, Dr. Zinik diagnosed respondent as having a disorder combining elements of the nonconsent paraphilia and exhibitionism, explaining "[i]t's almost as if his paraphilia for forced sex and his exhibitionism have merged together into one type of paraphilia that causes him to expose himself and have the victims masturbate him." (Tr. I 102:1-4; *see also* Tr. I 197:14-7 ("I think that [respondent's] – his paraphilia NOS and his exhibitionism are sort of merged, as I said before, kind of synthesized into one disorder.")).

Dr. Zinik further concluded that paraphilia NOS, nonconsent is a serious mental illness, abnormality, or disorder in respondent's case given the violent crimes and victim trauma that result from his conduct. (Tr. I 87:20 to 88:2).

Both Dr. Zinik and Dr. Graney testified that without a diagnosis of paraphilia NOS, nonconsent, they would be unable to conclude that respondent met the criteria for commitment under § 4248. (Tr. I 194:25 to 195:4; Tr. II 146:23 to 147:6).

Irrespective of his position that paraphilia NOS, nonconsent is not a valid diagnosis, Dr. Saleh opined that respondent does not suffer from any paraphilic disorder because the only evidence of sexually motivated offenses was limited to two instances, when respondent was a juvenile and the Wake County Jail incident, and that the remainder of the evidence of sexually motivated behavior consists of the inconsistent and unreliable self-reports by respondent. (Tr. III 34:6 to 22; 36:18 to 38:21; 194:13 to 195:20). He also relied on the opinions of prior professionals, as well as other evidence, including a personality assessment, that respondent is a "manipulative liar" and a "bad faker of psychopathology." (Tr. III 44:17 to 45:5).

Dr. Saleh further testified that the failure to see the expression of any paraphilic behavior, such as exhibitionism, over his 30 years of incarceration prior to the commitment hearing is inconsistent with the recurrent and intense sexual urges that are characteristic of a paraphilia. (Tr. III 40:3-20). He stated that if respondent had a paraphilic urge, such as exhibitionism, he would be unable to control it for such a lengthy period of time. (Tr. III 41:20 to 42:1). As indicated, the Wake County Jail incident did not change his views because of its rarity. (Tr. III 189:17 to 190:5; 194:13 to 195:20). He also opined that the lack of paraphilic behavior is even more striking in light of the evidence that respondent has a healthy sexual drive and is engaging in sexual relationships with other inmates. (Tr. III 42:8-17). Finally, Dr. Saleh opined that for a theoretical diagnosis of paraphilia NOS, nonconsent, there would have to be evidence during respondent's incarceration demonstrating specifically the existence of an arousal to the nonconsenting aspect of a sexual encounter. (Tr. III 43:5-12). He concluded that the record lacked any such evidence. (Tr. III 43:19-24).

### 4. Substance Abuse and Substance Dependence

Based on respondent's documented substance abuse history as discussed above, both Dr. Graney and Dr. Zinik diagnosed respondent with a mental disorder related to his use of controlled substances. Under the DSM, "[s]ubstance abuse is characterized by a maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by such issues as recurrent substance-related legal problems or continued use of the substance despite persistent social or interpersonal problems." (Gov't Ex. 2 (Graney) at 2671). Dr. Graney determined that respondent warranted the diagnoses of alcohol and opiate abuse, "based on his continued use of these substances in prison." (Gov't Ex. 2 (Graney) at 2671). She further stated that with more data regarding the frequency of respondent's substance use, "it may be possible to

determine whether [respondent] qualifies for a diagnosis of Substance Dependence." (Gov't Ex. 2 (Graney) at 2671).

Dr. Zinik diagnosed respondent with polysubstance dependence, a more severe form of drug and alcohol abuse. (Gov't Ex. 5 (Zinik) at 2631; Tr. I 77:20-25; 166:9-11). Dr. Zinik described the diagnostic criteria of this conditions as follows:

> Substance Dependence is a cluster of symptoms characterized by the continued use of the substance (alcohol or drugs) despite significant problems it causes. There is a pattern of repeated use of the substance for at least 12 months that leads to compulsive drug-taking behavior and may result in physical tolerance and withdrawal of the substance. Polysubstance Dependency is the dependence on at least three substances for a minimum of one year.

(Gov't Ex. 5 (Zinik) at 2631; *see also* Tr. I 166:11-19). Dr. Zinik's diagnosis was based on respondent's "well established history of polysubstance dependence involving alcohol, marijuana, amphetamines, heroin, opiates, and cocaine." (Gov't Ex. 5 (Zinik) at 2631). Dr. Zinik cited to respondent's arrest for possession of marijuana in 1978, numerous positive drug screens, and multiple prison disciplinary violations related to alcohol and drugs. (Gov't Ex. 5 (Zinik) at 2631). Dr. Zinik also noted a connection between respondent's use of drugs and his sexual offending: "He reports using amphetamines regularly during his sexual crimes to enhance arousal and alertness and admits that he used heroin in prison in part to reduce his sexual urges." (Gov't Ex. 5 (Zinik) at 2631).

Although recognizing that respondent has a history of drug and alcohol abuse, Dr. Saleh did not diagnose respondent with substance abuse or substance dependence. (Resp. Ex. 1 (Saleh) at 17; Tr. III 50:2-10). He testified that he was not able to determine whether a diagnosis of substance dependence was appropriate for respondent because the records he reviewed did not provide any evidence of signs and symptoms of withdrawal or tolerance, which is required for such a diagnosis. (Tr. III 50:11-18).

### D. Potential for Future Offending

In determining whether respondent would have serious difficulty refraining from sexually violent conduct, Dr. Zinik and Dr. Graney conducted both a clinical analysis and an analysis of several actuarial risk assessment tools. Based on these analyses, described more fully below, both Dr. Zinik and Dr. Graney concluded that respondent is at high risk for sexual re-offense, and, consequently, that he would have serious difficulty refraining from sexually violent conduct if released.

Because Dr. Saleh did not conclude that respondent had a serious mental illness for the purpose of § 4248, he did conduct any risk assessments or otherwise offer an opinion as to whether respondent would have serious difficulty refraining from sexually violent conduct or child molestation if released. (Tr. III 54:24 to 56:5).

### 1. Actuarial Risk Assessments

Actuarial risk assessments are tools that are used to calculate a statistical risk that someone will be re-convicted for a new sexual offense within a specified time frame based on the scores that an individual obtains on certain static measures. (Gov't Ex. 2 (Graney) at 2672). The measures are static in that they are based on historical facts and are therefore invariable, except for age, and, depending on the specific tool used, include such factors as the number of prior sex offenses, whether any victims were related to the offender, and whether the offender was single or had cohabited for less than two years. (*See* Static-99R Scoring Summary (Gov't Ex. at 2641). The risk of reoffense is determined by comparing the individual to a sample group of sex offenders with similar scores for which the reoffense rate has been determined. (Tr. 112:9 to 114:13).

Dr. Zinik used three actuarial risk assessment tools, the Static-99R, the Static-2002R, and the Minnesota Sexual Offender Screening Tool-Revised ("MnSOST-R"), to assist him in assessing respondent's risk to sexually reoffend in the future. Dr. Zinik scored respondent with an 8 on the Static-99R, a 9 on the Static-2002R, and a 16 on the MnSOST-R. (Gov't Ex. 5 (Zinik) at 2632-37; Gov't Ex. 57 (Zinik) at 2687). Each of those scores places respondent in the highest risk levels for being charged with or convicted of a sexual offense within 5 to 10 years of release.[10] (Gov't Ex. 5 (Zinik) at 2636; Gov't Ex. 57 (Zinik) at 2687). Respondent's score ranks on the Static-99R, Static-2002R, and MnSOST-R fall, respectively, into the 99th, 98th, and 96th percentiles. (Gov't Ex. 5 (Zinik) at 2636; Gov't Ex. 57 (Zinik) at 2687). With respect to the Static-99R, for example, this means that 99 percent of sex offenders in the comparison sample group scored at or below respondent's score of 8. (Gov't Ex. 5 (Zinik) at 2636).

Individuals in the high risk/high needs sample group of sexual offenders, to which respondent was compared, who scored an 8 on the Static-99R are estimated to sexually reoffend at a rate of approximately 45 percent within 5 years of release and 55.3 percent within 10 years. (Gov't Ex. 5 (Zinik) at 2636; Gov't Ex. 57 (Zinik) at 2687). Individuals in the sample group to which respondent was compared who scored a 9 on the Static-2002R are estimated to sexually reoffend at a rate of 41.6 percent within 5 years of release and 52.3 percent within 10 years. (Gov't Ex. 5 (Zinik) at 2636; Gov't Ex. 57 (Zinik) at 2687). Individuals in the sample group to which respondent was compared who scored a 16 on the MnSOST-R are estimated to reoffend at a rate of 40 percent within 6 years. (Gov't Ex. 5 (Zinik) at 2636; Gov't Ex. 57 (Zinik) at 2687).

In the 2009 precertification forensic evaluation, Dr. Graney utilized the Rapid Risk Assessment for Sex Offender Recidivism ("RRASOR") and the Static-99R. (Gov't Ex. 1

---

[10] The three risk assessments calculate risk of reoffense for the following time frames: Static-99R, 5 and 10 years; Static-2002R, 5 and 10 years; MnSOST-R, 6 years. (Gov't Ex. 5 (Zinik) at 2636).

(Graney) at 2402). Respondent scored a 4 on the RRASOR. (Gov't Ex. 1 (Graney) at 2403). Based on the normative sample of the RRASOR, a score of 4 is associated with a 33 percent likelihood of being convicted of a sexual offense within 5 years post incarceration, and an approximately 49 percent likelihood within 10 years post-incarceration. (Gov't Ex. 1 (Graney) at 2402-03). Respondent scored a 7 on the Static-99R, which corresponds with an approximately 38 percent likelihood of being re-convicted of a new sexual offense within 5 years post-incarceration, and a 49 percent likelihood of being re-convicted of a new sexual offense in 10 years. (*Id.*).

In the August 2011 forensic evaluation, Dr. Graney utilized the Static-99R to assess respondent's risk of sexual reoffense. (Gov't Ex. 2 (Graney) at 2672). Dr. Graney initially scored respondent as a 7 on the Static-99R, but after correcting a scoring error in a supplement to her report, she scored him as an 8. (Gov't Ex. 2 (Graney) at 2672; Gov't Ex. 3 (Graney) at 3409-11). Individuals with the same score from the High Risk/High Need group sample have been found to sexually reoffend at a rate of approximately 45 percent within five years and 55.3 percent in 10 years. (Gov't Ex. 3 (Graney) at 3410).

### 2. Dynamic and other Clinical Factors

In addition to the actuarial risk assessments based on static risk factors set forth above, Drs. Zinik and Graney reviewed relevant dynamic risk factors in assessing respondent's risk for sexual reoffense. (Gov't Ex. 5 (Zinik) at 2637-2639; Gov't Ex. 2 (Graney) at 2674-76). A dynamic risk factor refers to something that has the capacity to change over time, for example, with treatment. (Gov't Ex. 5 (Zinik) at 2637). The presence of dynamic risk factors increases an offender's risk of reoffense. (*Id.*). Dr. Zinik and Dr. Graney both used the STABLE-2007

dynamic risk assessment instrument. (Gov't Ex. 5 (Zinik) at 2637; Gov't Ex. 2 (Graney) at 2674).

They also found respondent to have the following dynamic risk factors: (1) intimacy deficits, (2) poor sexual self-regulation, (3) problems in cooperating with supervision, and (4) poor general self-regulation. (Gov't Ex. 5 (Zinik) at 2638; Gov't Ex. 2 (Graney) at 2674-76). Dr. Zinik determined that respondent suffers from serious intimacy deficits based on several other considerations: his relatively brief marriages that ended due to his sexual offending, his reported hatred and hostility toward women and girls, and a lack of evidence of remorse for his victims. (Gov't Ex. 5 (Zinik) at 2639). With respect to sexual impulse control, Dr. Zinik further found respondent's Wake County Jail exposure incident "very compelling evidence" of a lack of sexual impulse control. (Tr. III 198:2-13). He considered such conduct as evidence of sexual preoccupation, which is a dynamic risk factor that increases the risk of sexual re-offense. (Tr. III 199:17-24). Dr. Zinik's finding of problems cooperating with supervision is based on respondent's long list of rule violations while incarcerated and his history of reoffending while on supervision in the community. (Gov't Ex. 5 (Zinik) at 2639).

Dr. Graney considered the following factors in determining respondent's level of volitional impairment:

> repeated involvement in sexually-motivated offense behaviors, disregard for personal consequences, impaired ability to learn from experience, offending while under supervision, seeking out offense opportunities, behavior suggestive of a driven quality (*e.g.*, talking about "mounting tension," frustration that led to offending), engaging in offenses when likely to get caught (*e.g.*, abducting females by force from the street and into a vehicle), repeated admissions of inability to control the behavior, and statements of intent to reoffend.

(Gov't Ex. 2 (Graney) at 2674).

Dr. Graney and Dr. Zinik also considered certain factors that may indicate a reduced risk of reoffense. Dr. Zinik considered the following three mitigating or "protective" factors: (1) having been in the community without sexually reoffending; (2) having less than 15 years left in the offender's time at risk due to illness or physical conditions that significantly decrease the motivation and/or ability to sexually reoffend, and (3) very advanced age. (Gov't Ex. 5 (Zinik) at 2639). Dr. Zinik concluded that none of these factors are present with respect to respondent. (Gov't Ex. 5 (Zinik) at 2639).

Dr. Graney considered the risk mitigating factors of successful completion of sex offender treatment, having been in the community without sexually reoffending for 10 years, advanced age, and chronic medical conditions that would specifically minimize the risk of sexual reoffending. (Gov't Ex. 2 (Graney) at 2676). Dr. Graney concluded that the evidence did not support the applicability of any of these mitigating factors to respondent. (Gov't Ex. 2 (Graney) at 2676).

Dr. Zinik also scored respondent on the Structured Risk Assessment-Forensic Version (SRA-VF), a new measure of dynamic and psychological risk factors. (Gov't Ex. 5 (Zinik) at 2687). The factors on the SRA-FV fall into three broad psychological domains: sexual interests, relationship style, and self-management. (Gov't Ex. 5 (Zinik) at 2687). Respondent's score of 3.58 on the SRA-FV placed him at the very high level of need/risk, which strongly indicates that exceptional levels of risk management are appropriate. (Gov't Ex. 5 (Zinik) at 2687).

### 3. Psychopathy Checklist

Dr. Zinik evaluated respondent with the Hare Psychopathy Checklist, revised, 2nd edition ("PCL-R") to determine the presence and degree of psychopathy. (Gov't Ex. 5 (Zinik) at 2686). Dr. Zinik defined "psychopathy" as "similar to antisocial personality disorder; however, it

represents a more extreme form of potential dangerousness." (Gov't Ex. 5 (Zinik) at 2686). The

PCL-R manual describes a psychopath as follows:

> Interpersonally, psychopaths are grandiose, egocentric, manipulative, dominant, forceful and cold-hearted. Affectively, they display shallow and labile emotions, are unable to form long-lasting bonds to people, principles, or goals, and are lacking in empathy, anxiety, and genuine guilt and remorse. Behaviorally, psychopaths are impulsive and sensation seeking, and they readily violate social norms. The most obvious expressions of these predispositions involve criminality, substance abuse, and failure to fulfill social obligations and responsibilities.

(Gov't Ex. 5 (Zinik) at 2686). Respondent's score on the PCL-R was 33, which places him in

the very high range–the 94.2 percentile–for psychopathy. (Gov't Ex. 57 (Zinik) at 2686).

## VI. ANALYSIS

### A. Respondent's Credibility

The court begins its analysis of whether the government has satisfied each of the three

elements for commitment of respondent with an assessment of the credibility of respondent's

self-reports to the effect that he has an impulse to engage in nonconsensual sexual encounters

and his recent recantations of such statements. The credibility of these statements bears directly

on whether each of the elements is satisfied. They are particularly important with respect to the

second and third elements, relating, respectively, to whether respondent has a serious mental

illness, abnormality, or defect, and whether he would have serious difficulty refraining from

sexually violent conduct or child molestation if released. If respondent's statements are deemed

credible, they strongly support the government's case. On the other hand, if these statements are

not credited, the government's case is substantially weaker, especially under the clear and

convincing standard.

### 1. Legal Standards for Determining Credibility

In assessing the credibility of witnesses, trial courts consider "variations in demeanor and tone of voice." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). But there are other factors as well. "Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id.*; *see also United States v. Marcavage*, 609 F.3d 264, 281 (3rd Cir. 2010) (applying factors in *Anderson* in holding that trial court's crediting of the government's evidence was error on the grounds that "[t]here are simply too many inconsistencies and gaps in the testimony of the government's witnesses, not to mention substantial contradictions between that testimony and other evidence in the record").

Recantation of prior statements may appropriately be viewed with skepticism. *See, e.g., United States v. Wilson*, 624 F.3d 640, 664 (4th Cir. 2010); *Jackson v. United States*, 638 F. Supp. 2d 514, 617 (W.D.N.C. 2009). Courts look to the factors previously referenced and like considerations to determine the credibility of recantations, including the motive for recanting; the consistency, detail, and corroboration of the statements being recanted; and the timing of recantation. *See, e.g., Wilson*, 624 F.3d at 665 (degree of corroboration of prior statement, witness's motive to lie by recanting); *United States v. Baumgardner*, No. 1:08CR00024, 2009 WL 2424334, at *9-12 (W.D. Va. 6 Aug. 2009) (consistency of prior statements, level of detail of prior statements, corroboration of prior statements, consistency of explanations for recantation, timing of recantation, motive to lie by recanting).

### 2. Analysis of Respondent's Credibility

The court finds respondent's self-reports of an impulse to engage in nonconsensual sexual encounters to be credible. One reason is their multiplicity. Respondent reported on at

least 10 separate occasions an impulse to engage in nonconsensual sexual encounters. These occasions are as follows: (1) his statements in May 1976 at the Phipps Clinic (Gov't Ex. 9 at 1497, 1500); (2) his statements in May or June 1988 for the presentence report for his 1988 offense (Gov't Ex. 23 at 3, 8, 9, 10); (3) his 7 June 1988 letter to the sentencing judge for the 1988 offense (Gov't Ex. 22 at 819, 820, 821); (4) his 5 November 1991 statements to a BOP psychotherapist (Gov't Ex. 34 at 1916); (5) his 1992 statement to a prison psychotherapist (Gov't Ex. 2 (Graney) at 2661); (6) his September 1997 statements to a psychologist for the Parole Commission (Gov't Ex. 39 at 839-40); (7) his 22 September 2000 statements to a BOP psychologist (Gov't Ex. 34 at 1790); (8) his 30 June 2009 letter to the BOP Sex Offender Certification Review Branch (Gov't Ex. 44 at 1953); (9) his 31 July 2009 interview with Dr. Bazerman (Gov't Ex. 46 (Bazerman) at 2383, 2384, 2385, 2386, 2389); and (10) his interview in the September to October 2009 period with Dr. Graney (Gov't Ex. 1 (Graney) at 2395-96; 2397).

Moreover, as can be seen, respondent made such statements continually over the course of more than three decades, from 1976 to 2009, spanning most of his life. His last such statement was within about two years of his commitment hearing.

The statements in question are fundamentally consistent. They all concern, in one way or another, an impulse on respondent's part to engage in nonconsensual sexual encounters with young women.

Further, respondent's statements provide a detailed and comprehensive description of this impulse. His statements address the strength of his impulse to engage in nonconsensual sexual contact; his motivation behind the impulse to control the victim; the longevity of his having the impulse problem; his recognition that his mental problems are destroying his life; his attempts not to succumb to the impulse through drugs and self-discipline; his techniques and strategies

when acting on the impulse; and the great psychological gratification he receives from acting on the impulse. The level of detail and comprehensiveness of respondent's statements is strongly suggestive of a person who has actually experienced the matters described, as opposed to one simply fabricating them.[11]

Respondent's self-reports of a strong impulse to engage in nonconsensual sexual encounters find substantial corroboration in his behavior. Such behavior includes the offenses for which he was found guilty. His 1974 offense, of course, entailed his exposing himself to two young girls. His 1975 offense involved an abduction in which he fondled the victim and exposed himself.

His 1978, 1983, and 1988 offenses all involved abduction or attempted abduction of young women, and movement of the victim to a waiting car. While, as respondent points out, these three offenses did not involve overtly sexual conduct, they are consistent with his statements that they were sexually motivated. The method used also matches the overtly sexual 1975 offense. Further, in the 1983 offense, respondent was found with handcuffs, rope, and other articles which he himself termed a rape kit.

In addition, he committed the 1983 offense while on probation and the 1988 offense while on parole, and therefore when he faced an enhanced risk of being caught. Moreover, the 1988 offense came only six months after he was placed on parole. These facts substantiate his

---

[11]The court recognizes that respondent's statement that he has engaged in sexually motivated abductions three times per month since he was 15 may well reflect exaggeration designed to promote his then goal of civil commitment, although the court does finds credible the notion that he has committed some such offenses without the knowledge of the authorities. Similarly, respondent's statement that he instructs his victims with note cards to avoid being identified by voice may be an embellishment. Even if it were assumed that these statements are not grounded in historical fact, they definitely show, at a minimum, respondent's preoccupation with these types of sexual encounters. It is conceivable that, at worst, they reflect respondent's intentions if he is released.

compulsion to engage in such conduct. (Tr. I 60:16-25 (testimony by Zinik); Tr. II 129:6-10 (testimony by Graney); Gov't Ex. 5 (Zinik) at 2630[12]; Gov't Ex. 2 (Graney) at 2670).

Moreover, all of the post-1974 offenses appear to have been interrupted. In the 1975 incident, the driver of the vehicle talked respondent into letting the victim go, seemingly before respondent wanted to. In the other offenses, the victim managed to escape before respondent was able to secure her in a vehicle, which he was clearly trying to do. The fact that respondent was unable to complete these offenses, including seemingly the overtly sexual component of them, does not deprive them of corroborative force.

Additional corroborative conduct by respondent includes the incident in 1993 in which he asked a therapist to touch his penis. His undoubted awareness that he would face punishment for this conduct tends to substantiate that he suffers with an impulse to engage in such conduct and, as a result, has difficulty refraining from such conduct. (*See* Tr. I 66:6 to 67:4; Tr. III 198:2 to 200:2) (testimony by Zinik). Of like import is his exposure of himself at the Wake County Jail on the morning of the second day of his commitment hearing. He had to know that he would likely be caught and that evidence of such conduct would likely be introduced at the hearing, but he engaged in it anyway. (*See* Tr. III 198:1-13; 199: 24 to 200:2) (testimony by Zinik).

In addition, as indicated, respondent has reported that he was able to expose himself to female staff tacitly while in prison by displaying himself seemingly inadvertently. He also, as discussed, reported using drugs and alcohol to suppress his impulse to engage in nonconsensual sexual encounters and satisfied the impulse by fantasizing about such encounters. (*See* Tr. II 158:18-22 (testimony by Graney that "[y]ou can diagnose a paraphilia based on urges and

---

[12] Although Dr. Zinik also cites the 1983 offense as an instance of rapid reoffending, he incorrectly believed respondent was released from his 1978 offense in late 1982 or early 1983, rather than 1980. (Tr. I 52:3-7; Tr. II 31:24 to 32:8; 64:19).

fantasies without the presence—the behaviors if the individual is telling you that those urges and fantasies are causing significant stress or impairment in their life").

Respondent alleges that he committed the post-1974 offenses for the purpose of robbery, not sexual reasons. The court does not find this contention credible. Among other reasons, robbery does not require abduction. To the contrary, abduction would appear to expose the perpetrator to substantially more risk than simply taking the victim's valuables. Moreover, he demanded money in only one of the incidents, the 1978 offense.

Respondent contends that his record regarding sexual conduct while in prison–the incident in 1993 is his only sexual violation–not only fails to corroborate his possession of the requisite mental health deficiency, but shows to the contrary. The court finds respondent's contention unconvincing. By his own account, he engaged in tacit self-exposure in prison and used narcotics to suppress his impulse. He also reported that he used fantasies of nonconsensual sexual encounters for sexual gratification. (Gov't Ex. 2 (Graney) at 2658). And, of course, there was the incident during his commitment hearing.

The court believes respondent had a strong motive to be truthful when he made the self-reports of his impulse to engage in nonconsensual sexual acts—namely, the desire to obtain effective treatment for the problem. He himself stated at the time of many of the self-reports this was the reason he made them. (Gov't Ex. 57 (Zinik) at 2684; Gov't Ex. 46 (Bazerman) at 2383). As he acknowledged, acquisition of effective treatment would enable him to minimize the risk of re-offense and other disruption to his life caused by the impulse to engage in nonconsensual sexual conduct. Subsequent to his 1988 offense, his reasoning was that another conviction would keep him in prison for the rest of his life. (Gov't Ex. 46 (Bazerman) at 6-7; Tr. II 92:10-25).

Moreover, when respondent made his self-reports to Drs. Bazerman and Graney in 2009, they were against his short-term liberty interest. Specifically, he acknowledged that by his statements regarding his mental condition he subjected himself to commitment under § 4248. (Tr. II 5:14-24). The fact that he made the statements despite this awareness tends to substantiate their credibility.

Respondent contends that he fabricated the self-reports regarding the impulse to engage in nonconsensual sexual encounters for ulterior motives. The court does not find respondent's contention credible. For example, he now states that he fabricated the self-reports he made at the time of sentencing for the 1988 offense to obtain transfer from the District of Columbia corrections system into the federal system and a more lenient sentence, both of which he believed were more likely if an offender had a mental problem. (Tr. II 44:19 to 46:25). But this purported motive does not adequately account for why respondent selected this particular mental problem over the myriad of other possibilities. Respondent's explanation that the impulse to engage in nonconsensual sexual encounters "fit[s] the pattern of [his] life" is not a convincing one. (Tr. II 47:1-7). For example, he did not claim an irresistible impulse to rob people, even though he now argues that his post-1974 offenses were for the purpose of robbery. (*See* Tr. I 57:4-19; Tr. II 27:2-11, 32:6-22). Indeed, he claims now he committed only one sex offense, the 1974 offense involving self-exposure as a minor. (Tr. I 202:13-20).

Respondent says that he fabricated the statements to Drs. Bazerman and Graney for the ulterior motive of obtaining custodial care for the rest of his life in a relatively comfortable setting that he believed commitment under § 4248 would offer. (Tr. II 5:14 to 7:5).[13] The court does not find this proffered motivation credible. Among other reasons, being in his 50's, he was

_____

[13] In testifying about why he changed his mind about wanting to be civilly committed, respondent compared the environment at FCI-Butner to that of being imprisoned for a criminal sentence and stated, "If I want to be in prison, I'll commit another crime." (Tr. II 56:3-20).

too young to likely be willing to acquiesce in spending the rest of his life—probably 20 years or more—in prison. Although he had said he found the prospect of being outside prison unduly intimidating, he boasts about being able to obtain what he wants through manipulation of others. (Tr. II 70:8 to 82:25). Moreover, he has a history of employment in the tree service industry, although admittedly his skills may have deteriorated through the passage of time.

Nor does the court find credible respondent's contention that he was fully motivated to come clean and renounce his prior claims of a sexual mental condition because his second ex-wife had contacted him and offered to lease a room to him, thereby relieving his trepidation at living outside of prison. (Tr. I 71:12 to 72:14; Gov't Ex. 57 (Zinik) at 2683). The tie he has with her has not been shown to be sufficiently strong to effect such a sea change in his life's plan. Their marriage ended over 20 years ago, and it appears that they have had little contact in the intervening years.

Moreover, the record shows that they presently have a very distrustful and seemingly unstable relationship. (*See* Gov't Ex. 2 (Graney) at 2678-79; Gov't Ex. 54 (collection of emails between respondent and ex-wife)). She insisted in a 9 June 2011 email that he have a GPS device implanted in him so that he can be tracked "[b]ecause I will not be used again as your trump card to help your [*sic*] get out of prison." (Gov't Ex. 54 at 3207). In a 15 June 2011 email, Ms. King wrote to respondent: "I don't trust you and I don't know if I ever will. I don't even trust your lying mouth. . . . Do you think we should go our separate way[s] since I don't trust your words and actions? Really, this is not a good thing." (Gov't Ex. 54 at 3210). In an email to his counsel on 26 July 2011, respondent stated: "'I do want [Ms. King] involved but minimally. She is way to (*sic*) controlling but a truly wonderful person.'" (Gov't Ex. 2 (Graney) at 2679).

Rather than based on the motivations respondent cites, his recantations of his pleas for treatment appear grounded in buyer's remorse. He regretted having disclosed his actual mental problem when the time came to face the consequences of having done so.

Notably, respondent has not obtained sex-offender treatment since his teen years. The absence of such treatment tends to substantiate his self-reports that his impulse problem has persisted over decades into the present time.

Two of the three mental health experts who testified in this proceeding—Drs. Graney and Zinik—deemed credible respondent's self-reports of an impulse to engage in nonconsensual sexual encounters. Dr. Graney relied largely on respondent's extended history of self-reports regarding the impulse. (Tr. II 128:4-10; 151:23-153:2). In particular, she cites to such self-reports after his 1988 offense but before the enactment of the Act in 2006 when she perceived him as having little motivation to lie. (*Id.* 152:10-19). Dr. Zinik also pointed to respondent's history of self-reports of his impulse to engage in nonconsensual encounters with women, going back to his teen years. (Gov't Ex. 57 (Zinik) at 3-6; Tr. III 173:10-174:15).[14]

The court gives substantial weight to these credibility assessments, finding they are for the most part well reasoned and soundly based in the evidence. Both Drs. Graney and Zinik took into account respondent's penchant for manipulation of others through lies. (*E.g.*, Gov't Ex. 57 (Zinik) at 2685; Tr. II 151:23-152:3; 152:20-153:2). Moreover, Dr. Graney's assessment that respondent had no motivation to lie with respect to his self-reports in the period between the 1988 offense and adoption of the Act in 2006 finds support in his own testimony. While he

---

[14] The court does not accept Dr. Zinik's additional rationale that "it is really important to err on the safe side in this case." (Tr. III 174:6-9). The court deems this statement an expression by Dr. Zinik of the intensity of his belief that respondent will reoffend. Nevertheless, it is the government that has the burden of proof in this case and if the proper result were unclear (which the court does not believe it is), the doubt would be resolved in respondent's favor.

identified a specific ulterior motive for one of the self-reports of his impulse problem, he did not for the others. [15]

Dr. Saleh is, of course, the lone mental health examiner who did not accept respondent's self-reports as credible.  Notably, he did not find them non-credible.  Rather, he found that he could not determine whether or not they were true.  (Tr. III 77:13 to 83:25)  Thus, none of the three testifying experts accepted as truthful respondent's recantations of his prior self-reports.

Dr. Saleh found the credibility of respondent's self-reports indeterminable on the grounds that respondent had given multiple other explanations for his offense conduct, he is a habitual liar, and there was no way to determine which versions were true.  The court finds Dr. Saleh's analysis unpersuasive.

There is no question that respondent is a habitual liar.  The fact, though, that a person lies frequently does not mean that everything he says is a lie.  Thus, the credibility of each statement must be evaluated in light of the attendant circumstances.  As the court's own analysis indicates, an evaluation of respondent's statements does permit their credibility to be determined.  The other two mental health experts shared this view, as their reports and testimony indicate.  For the court not to undertake a credibility analysis as it did would enable a party or other witness to insulate himself from his truthful, potentially incriminating statements by simply lying extensively about the same matters at a later time.

In support of his determination that respondent's self-reports cannot be trusted, Dr. Saleh cites respondent's statement to a psychologist at the prison in Atlanta on 17 February 1994 that even though he did not drink or use drugs, he had blackouts during which he offended.  (*See*

---

[15] He testified that he lied in making his 22 September 2000 statement (Gov't Ex. 34 at 1790) to obtain something out of it, although he was not able to be more specific.  (Tr. II 107:7-109:1).  He offered no specific ulterior motive for his 5 November 1991 statement (Gov't Ex. 34 at 1916), 1992 statement (Gov't Ex. 2 (Graney) at 2661), or September 1997 statements (Gov't Ex. 39 at 839-40).

Resp. Ex. 1 (Saleh) at 17-18 (citing Resp. Ex. 11 at 2466[16])). Dr. Saleh also points to a 3 June 1995 report of a psychologist at FCI-Butner discussing further statements by respondent regarding his alleged multiple personalities. (*See* Resp. Ex. 1 (Saleh) at 17 (citing Resp. Ex. 11 at 2464)). Respondent testified that he made up the claim of blackouts and multiple personalities to obtain transfer from the Atlanta facility to FCI-Butner to avoid drug debts he had accumulated. (Tr. II 71:7-72:4).

In contrast to respondent's self-reports regarding his impulse to engage in nonconsensual sexual encounters with women, though, the record in this case readily discredits respondent's claims of blackout and multiple personality. For example, the copious evidence in the record of substance abuse by respondent discredits his claim that he did not use alcohol or drugs. Similarly, as he himself acknowledges, FCI-Butner quickly determined that his allegations of blackouts and multiple personalities were false. (Tr. II 72:1-16). The record is bereft of any evidence to support them.

Respondent's recantation at the commitment hearing was part of a broader pattern by him at the hearing and in his interview with Dr. Zinik to falsely minimize his offense conduct. For example, he grotesquely characterized his abduction of the victim in the 1975 offense, at knifepoint, as "escorting" her to the waiting car. (Tr. II 20:15-23; 24:3-6). He insisted that he is not a sex offender, although he pled guilty to two offenses with sexual elements—the 1974 and 1975 offenses. (Tr. I 202:13-20; 209:25 to 210:6; Tr. II 20:5 to 24:9). He claimed that the handcuffs in the 1983 offense were toys and that he was not wearing the jacket containing them even though the police reports and the presentence report to which he did not object show unequivocally to the contrary. (Tr. II 39:9 to 40:3; 40:13-20). He also testified on the second day of the hearing that, "I've been locked up almost 30 years. I'm really not too interested in

---

[16] A copy of the psychologist's report reciting this statement also appears in Gov't Ex. 34 at 1899.

sex, to be quite honest with you." (Tr. II 11:1-3). Of course, within a matter of hours before giving this sworn testimony, he had exposed himself and masturbated in front of four female inmates at the Wake County Jail.[17]

For the foregoing reasons, the court concludes that respondent's self-reports regarding his sexual impulse to engage in nonconsensual sexual encounters are credible.

**B. Elements for Civil Commitment**

As indicated, there are three essential elements the government must establish by clear and convincing evidence to obtain an individual's civil commitment under § 4248. They are that the person: (1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (2) currently "suffers from a serious mental illness, abnormality, or disorder"; and (3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(5), (6). Each of these elements will be reviewed in further detail below.

**1. Prior Sexually Violent Conduct or Child Molestation**

Although the statute does not specifically define "sexually violent conduct," BOP regulations that set forth the standards for certification of persons to federal district courts as sexually dangerous persons define "sexually violent conduct" to include:

[A]ny unlawful conduct of a sexual nature with another person ("the victim") that involves:

(a)     The use or threatened use of force against the victim;

---

[17] At the hearing, respondent did admit to asking the therapist to touch his penis during the 9 April 1993 incident. (Tr. II 57:10-13). Respondent had previously denied doing so, explaining that he and the psychotherapist fabricated the story to help cover up a romance they were having. (Gov't Ex. 57 (Zinik) at 2685). Abandonment of that farcical tale does not detract significantly from the efforts respondent otherwise made at the hearing to minimize his offense conduct.

(b)     Threatening or placing the victim in fear that the victim, or any other person, will be harmed;

(c)     Rendering the victim unconscious and thereby engaging in conduct of a sexual nature with the victim;

(d)     Administering to the victim, by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance, and thereby substantially impairing the ability of the victim to appraise or control conduct; or

(e)     Engaging in such conduct with a victim who is incapable of appraising the nature of the conduct, or physically or mentally incapable of declining participation in, or communicating unwillingness to engage in, that conduct.

28 C.F.R. § 549.92.  Sexually violent conduct under § 4248 need not be criminal behavior. *United States v. Comstock*, 627 F.3d 513, 520 (4th Cir. 2010).

"Child molestation" is also not defined by statute.  However, BOP regulations define it as "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years."  28 C.F.R. § 549.93.

## 2.  Current Serious Mental Illness, Abnormality, or Disorder

The Act requires explicitly that the mental illness, abnormality, or disorder of the person sought to be committed be "serious."  18 U.S.C. § 4247(a)(6).  Although the statute does not provide a definition for "serious," the testifying experts in this case all interpret it to mean that the person's mental illness, abnormality, or disorder significantly disrupts the person's life, such as by resulting in the person's recurrent participation in criminal conduct.

### 3. Serious Difficulty Refraining

The "serious difficulty" element "refers to the degree of the person's 'volitional impairment,' which impacts the person's ability to refrain from acting upon his deviant sexual interests." *United States v. Hall*, __ F.3d __, No. 11-7102, 2012 WL 34481 (4th Cir. 9 Jan. 2012) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)). "[T]he 'serious difficulty' language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior." *United States v. Abregana*, 574 F. Supp. 2d 1145, 1159 (D. Haw. 2008). As the Supreme Court has put it, to meet substantive due process requirements, "this [difficulty], when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Kansas v. Crane*, 534 U.S. 407, 413 (2002) (internal citations omitted). Proof of statistical probability of reoffense is not required. *United States v. Hunt*, 643 F. Supp. 2d 161, 180 (D. Mass. 2009) ("[T]his court does not construe the 'serious difficulty' criterion for commitment to require proof of any statistical probability of reoffense."); *see also Crane*, 534 U.S. at 413 (recognizing that inability to control behavior will not be demonstrable "with mathematical precision").

Under BOP regulations, the "serious difficulty refraining" element may include consideration of evidence:

    (a)    Of the person's repeated contact, or attempted contact, with one or more victims of sexually violent conduct or child molestation;

(b)     Of the person's denial of or inability to appreciate the wrongfulness, harmfulness, or likely consequences of engaging or attempting to engage in sexually violent conduct or child molestation;

(c)     Established through interviewing and testing of the person or through other risk assessment tools that are relied upon by mental health professionals;

(d)     Established by forensic indicators of inability to control conduct, such as:

    (1)     Offending while under supervision;
    (2)     Engaging in offense(s) when likely to get caught;
    (3)     Statement(s) of intent to re-offend; or
    (4)     Admission of inability to control behavior; or

(e)     Indicating successful completion of, or failure to successfully complete, a sex offender treatment program.

28 C.F.R. § 549.95.

## C. First Element:  Prior Sexually Violent Conduct or Child Molestation

The parties agree that the 1974 offense satisfies the first element for commitment, although based on different legal theories.  The government contends that the offense constitutes child molestation (Gov't Rev. Prop. Findings of Fact (D.E. 92) 28 ¶1), while respondent argues that it constitutes an instance of sexually violent conduct (Resp. Rev. Prop. Findings of Fact (D.E. 93) ¶¶ 36, 38).  It is not altogether clear that this conduct meets the definition of either child molestation or sexually violent conduct.  With respect to child molestation, there was no contact with the victims, as the BOP definition seems to require.  *See United States v. Revland*, 5:06-HC-2212, 2011 WL 6749814, at *2 (E.D.N.C. 23 Dec. 2011) (finding that indecent exposure to minors does not constitute child molestation on the grounds that exposure of one's genitalia in the presence of children is not equivalent to conduct of a sexual nature *with* children as contemplated by the BOP definition); *but see United States v. Abregana*, 574 F. Supp. 2d

1145, 1158-59 (D. Haw. 2008) (holding that child molestation "does not require a showing of physical acts of violence, but that the term was intended to encompass a broad variety of sexually exploitative acts directed at minors"). As to whether the incident was sexually violent conduct, the only provision of the BOP definition for such conduct that would appear applicable is that the conduct placed the victim in fear of harm, but there is no evidence that the two girls who witnessed respondent's self-exposure were placed in fear of harm, although that would certainly seem to have been likely. *See* 28 C.F.R. § 549.92(b).

The court need not resolve the issue of whether the 1974 incident constituted child molestation or sexually violent conduct within the meaning of 18 U.S.C. § 4247(a)(5), because another offense, the 1975 offense, clearly did constitute sexually violent conduct under 18 U.S.C. § 4247(a)(5). By the express terms of the statute defining that crime at the time respondent committed it, it is a sexual offense. The statute read:

> Abduction with the intent to extort money, or pecuniary benefit, abduction of any person *with intent to defile* such person, and abduction of any female under sixteen years of age for the purpose of concubinage or prostitution shall be punished with death, or by confinement in the penitentiary for life or any term not less than three years . . . .

Va. Code Ann. § 18.1-38 (as quoted in *McKinley v. Com.*, 217 Va. 1, 2-3, 225 S.E.2d 352, 353 (1976)) (emphasis added). The offense of "abduction with intent to defile requires an intent to sexually molest a victim of any sex." *Simms v. Com.*, 2 Va. App. 614, 617, 346 S.E.2d 734, 735 (1986).

The facts of the 1975 offense also show it to be an act of sexually violent conduct. As discussed, it involved respondent abducting a woman at knife point, fondling her breasts, and forcing her to touch his exposed penis. In sum, the court finds by clear and convincing evidence

that respondent has previously engaged in sexually violent conduct in satisfaction of the first element for civil commitment under § 4248.

Although the 1975 offense alone satisfies this element, respondent has, as indicated, admitted that the 1978, 1983, and 1988 offenses were all sexually motivated, and the court has found these admissions to be credible. The court therefore finds by clear and convincing evidence that these incidents constitute attempted acts of sexually violent conduct that also satisfy the first element required for commitment. They are, of course, attempted in the sense that respondent did not complete the sexual component of the offenses.[18]

### D. Second Element: Current Serious Mental Illness, Abnormality, or Disorder

The court finds by clear and convincing evidence that respondent has several serious mental illnesses, abnormalities, or defects within the meaning of the Act. The second element for civil commitment under § 4248 is therefore satisfied.

One such disorder is opiate and alcohol abuse. The court finds that respondent has this disorder based on the reasons advanced by Dr. Graney, who gave him this diagnosis. The court deems it a serious mental illness, abnormality, or defect within the meaning of the Act, 18 U.S.C. § 4247(a)(6), given the substantial negative impact it has had on respondent's life. The court does not agree with Dr. Zinik's diagnosis of polysubstance dependence, because, as concluded by Dr. Saleh and Dr. Graney, the record does not appear to contain evidence of tolerance or withdrawal as required to render this more serious diagnosis.

A second mental illness, abnormality, or defect from which respondent suffers is antisocial personality disorder. The court finds that respondent has this disorder based on the reasons cited by the testifying experts, all of whom diagnosed respondent with it. Although only

---

[18] These findings and the underlying evidence thoroughly discredit respondent's testimony that he had been convicted of only one sexual offense. (Tr. I 202:13-20).

Dr. Graney found it to be a serious disorder, the court believes respondent's manifest penchant for manipulation of others and disregard of their rights establishes it as a serious mental illness, abnormality, or defect within the meaning of the Act.

Respondent also suffers from a third mental illness, abnormality, or defect— exhibitionism—which the court considers serious within the meaning of the Act because of the substantial disruptive effect it has had on respondent's life and that of others. The court adopts the reasoning of Drs. Graney and Zinik in support of their diagnosis of exhibitionism for respondent.

Lastly, the court finds that respondent has a mental illness, abnormality, or defect, specifically a paraphilic disorder characterized by his impulse to engage in nonconsensual sexual encounters with women ("respondent's paraphilic disorder"). Subject to the qualifications stated below, this disorder is the paraphilia diagnosed by Drs. Graney and Zinik as paraphilia NOS, nonconsent, and the court agrees with the reasoning advanced by Drs. Graney and Zinik for their diagnosis. This disorder is obviously a serious one because of the substantial disruption it has caused in respondent's life and the lives of the victims of his offenses.

Although Drs. Graney and Zinik employed the formal diagnosis of paraphilia NOS, nonconsent for this disorder, the court declines to do so. The implication of such a diagnosis is that respondent's disorder is one afflicting some portion of the human population, rather than a disorder unique to respondent. As noted, there is a controversy in the psycyhological and psychiatric professional community over whether paraphilia NOS, nonconsent is, in fact, a disorder found among the general population. The court does not believe that in this case the government has shown that it is.

Notably, even though Drs. Graney and Zinik assigned the paraphilia NOS, nonconsent diagnosis to respondent's paraphilic disorder, they both recognized the unique nature of the paraphilia as presented in respondent. Referring to the merging of elements of exhibitionism and the nonconsent disorder presented by respondent, Dr. Graney testified that this was "unusual" and "unique" and "not something I personally have seen before." (Tr. II 122:12-21). Likewise, Dr. Zinik testified that respondent was "unusual" in this respect. (Tr. I 101:24 to 102:1).

The fact that in this case respondent's paraphilic disorder has not been shown to be present in the general population does not, of course, preclude the determination that respondent has it. As Dr. Saleh aptly explained at the hearing, it is possible to have only one individual in the world who exhibits a particular deviant sexual arousal, which would not qualify for inclusion in the DSM, but is no less a real condition experienced by that individual. (*See* Tr. III 190:9 to 193:23). To illustrate this point, Dr. Saleh testified that he has one patient who becomes sexually aroused when driving an automobile. (Tr. III 191:10-23). Dr. Saleh acknowledged that this could be a true sexual experience for the patient even if this one case would not provide sufficient data to warrant inclusion in the DSM as a diagnosis. (*Id.*)

In addition, the Act does not require that to come within its scope a mental illness, abnormality, or defect be included in the DSM. As the First Circuit has held, the serious mental illness requirement in the Act is not "delimited by the consensus of the medical community" and "a mental disorder or defect need not necessarily be one so identified in the DSM in order to meet the statutory requirement." *United States v. Carta*, 592 F.3d 34, 39-40 (1st Cir. 2010). The *Carta* court cited the United States Supreme Court holding in *Kansas v. Crane*, 534 U.S. 407, 413 (2002) that "the science of psychiatry, which informs but does not control ultimate legal

determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." *Carta*, 592 F.3d at 40 n.2.

Key evidence supporting the determination that respondent has this disorder is his statements throughout his adult life about his impulse to engage in nonconsensual sexual encounters with young women, as reviewed above. His statements help distinguish him from a nonparaphilic offender who offends as part of his criminal thinking without being driven to do so by urges or fantasies, as respondent is. (*See* Tr. II 124:7-13) (testimony by Graney distinguishing paraphilic rapist from nonparaphilic rapist).

Indeed, as discussed, much of the controversy regarding the paraphilia NOS, nonconsent diagnosis centers on the difficulty of determining which feature, if any, of the offense conduct is driving the offender. This difficulty is avoided in this case by respondent's statements.

Respondent's statements are corroborated by his conduct, as previously detailed. Particularly salient aspects of his conduct include: the persistence of his offending; the relative rapidity of his reoffense after release for the 1983 offense; his commission of offenses when he had willing sexual partners, his wives, available; and his commission of offenses—the 1983 offense, 1988 offense, and the Wake County Jail incident—when facing an enhanced risk of being caught. (*See, e.g.*, Gov't Ex. 5 (Zinik) at 2629-31; Tr. I 83:24 to 85:7; 94:15 to 98:14).

### E.  Third Element:  Serious Difficulty Refraining

The court finds by clear and convincing evidence that, as a result of the serious mental illnesses, abnormalities, or defects the court has determined respondent to have, he would have serious difficulty refraining from sexually violent conduct if released. The third element for civil commitment under the Act is therefore satisfied.

The mental illness, abnormality, or defect that would most directly result in respondent's having serious difficulty refraining from sexually dangerous conduct is, of course, his paraphilic disorder characterized by the impulse to engage in nonconsensual sexual encounters with young women. His other mental illnesses, abnormalities, or defects enhance the difficulty he would have. (*See* Tr. II at 197:4-25). Conversely, without his paraphilic disorder, the court does not believe respondent would have the requisite difficulty refraining from sexually dangerous conduct. (*See* Tr. I 194:25 to 195:4; Tr. II 146:23 to 147:6).

The evidence establishing that respondent would have difficulty refraining includes, most significantly, this own repeated statements regarding the intensity of the impulse, his inability to resist it, and the resulting sense of loss of control over his life. Not only has he described his difficulty refraining in the past, but has stated expressly that he will reoffend if released.

His conduct, of course, substantiates that he would have difficulty refraining. The following specific aspects of respondent's conduct, as identified by Dr. Graney, are probative of the difficulty he would have:

> respondent's repeated involvement in sexually-motivated offense behaviors, disregard for personal consequences, impaired ability to learn from experience, offending while under supervision, seeking out offense opportunities, behavior suggestive of a driven quality (*e.g.*, talking about "mounting tension," frustration that led to offending), engaging in offenses when likely to get caught (*e.g.*, abducting females by force from the street and into a vehicle).

(Gov't Ex. 2 (Graney) at 2677).

Additional salient factors, which Dr. Zinik identified, are: (1) respondent's commission of sexual offenses as both a minor and an adult, which "signals the emergence of a deviant sexual preference that becomes entrenched as a life pattern in adulthood" (Gov't Ex. 5 (Zinik) at 2629); (2) his commission of the 1988 offense so shortly after his release from imprisonment for the the 1983 offense  (Gov't Ex. 5 (Zinik) at 2630); (3) his need to use drugs to gain control of

his sexual urges (Gov't Ex. 5 (Zinik) at 2639); (4) his commission of the 1983 and 1988 offenses even when he had consenting sexual partners, his respective wives, available to him (Gov't Ex. 5 (Zinik) at 2630); and (5) his self-exposure at the Wake County Jail (Tr. III at 198:2 to 200:19).

Since respondent's exhibitionism and paraphilic disorder are intertwined, it is also relevant that, as Dr. Zinik noted, "[e]xhibitionism is very compulsive and has the highest recidivism rate of all sex offenses." (Gov't Ex. 5 (Zinik) at 2631). Indeed, he views the Wake County Jail incident as presaging resumption by respondent of his offense conduct of abducting women for the purpose of exposing himself to them. (Tr. III 200:3-19).

Further evidence showing that respondent would have difficulty refraining is his failure to receive sex offender treatment since his teen years. In addition, there is his present denial that he is a sex offender, which indicates his present refusal to recognize that he has a sexual problem which will require effort by him to keep in check. The fact that respondent's only criminal convictions are for sexual offenses highlights his impaired volitional impairment in that particular area. The relative paucity of overt paraphilic conduct by respondent while incarcerated does not show that he would not have serious difficulty refraining from sexually violent conduct for the same reasons, previously discussed, that it does not negate the presence of his paraphilic disorder.

Many of these factors are recognized in the BOP regulations addressing the serious difficulty refraining element. *See, e.g.,* 28 C.F.R. § 549.95(d) (offending while under supervision, engaging in offenses when likely to be caught, statements of intent to reoffend, admission of inability to control behavior) and (e) (failure to complete a sex-offender treatment program).

Finally, with respect to the actuarial risk assessments performed by Drs. Graney and Zinik, the court acknowledges that the results of these assessments are consistent with the other evidence that respondent is likely to reoffend. However, the court has not given these assessments great weight. While the court concludes that these tools may be useful in identifying, from a large population, individuals who may warrant further, more detailed evaluations, it does not find them to be helpful in determining whether any one individual with a unique history and set of characteristics may be likely to reoffend. As one court has stated, while the recidivism rates generated by these risk assessments "are circumstantially relevant to the serious difficulty inquiry because offenders who continually expose themselves to punishment may be presumed to have the most difficulty refraining from sexual reoffending, . . . the ultimate question called for by [§ 4248] concerns the self-control of an individual, not the statistical rearrest patterns of a given population." *United States v. Hunt*, 643 F. Supp. 2d 161, 180 (D. Mass. 2009). The *Hunt* court further stated that while it had considered the respondent's actuarial scores, it had "afford[ed] them less weight than Respondent's past conduct, the severity of his pedophilia, and the testimony of the experts." *Id.; see also* Order (D.E. 110)*, United States v. Red Star*, No. 5:06-HC-2222-BR, 6-7 (E.D.N.C. 3 Jan. 2012) (noting that court considered respondent's actuarial scores, but "afford[ed] them less weight than [respondent's] past and current conduct, and the testimony of the experts as a whole"). The court's approach in this case is comparable. Given the strength of the other evidence of the difficulty refraining respondent would have, the actuarial assessments are not essential to that determination.

## VII.    CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that the court enter an order finding by clear and convincing evidence that respondent is a sexually dangerous person within the

meaning of the Adam Walsh Child Protection and Safety Act of 2006, 18 U.S.C. § 4247(a)(5), and civilly committing him pursuant to 18 U.S.C. § 4248(d).

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 29th day of February 2012.

James E. Gates
United States Magistrate Judge